TO:

**The McGraw-Hill Companies, Inc.**
**c/o The Prentice-Hall Corporation System**
**125 Lincoln Ave Ste 223**
**Santa Fe, NM 87501**

Received by: _____
*(signature)*

Printed name: _____

Dated: _____

EXHIBIT A

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT COURT**

| | |
|---|---|
| GENESEE COUNTY EMPLOYEES' RETIREMENT SYSTEM, On Behalf of Itself and All Others Similarly Situated,<br><br>     Plaintiff,<br><br> v.<br><br>THORNBURG MORTGAGE, INC., THORNBURG MORTGAGE HOME LOANS, INC., CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., GREENWICH CAPITAL ACCEPTANCE, INC., STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC., ANDREW A. KIMURA, JEFFREY A. ALTABEF, EVELYN ECHEVARRIA, MICHAEL A. MARRIOTT, THOMAS ZINGALLI, ROBERT J. MCGINNIS, CAROL P. MATHIS, JOSEPH N. WALSH III, JOHN C. ANDERSON, JAMES M. ESPOSITO, JEFFREY L. VERSCHLEISER, MICHAEL B. NIERENBERG, JEFFREY MAYER, THOMAS F. MARANO, THORNBURG MORTGAGE SECURITIES TRUST 2006-2, THORNBURG MORTGAGE SECURITIES TRUST 2006-3, THORNBURG MORTGAGE SECURITIES TRUST 2006-4, THORNBURG MORTGAGE SECURITIES TRUST 2006-5, THORNBURG MORTGAGE SECURITIES TRUST 2006-6, THORNBURG MORTGAGE SECURITIES TRUST 2007-1, THORNBURG MORTGAGE SECURITIES TRUST 2007-2, THORNBURG MORTGAGE SECURITIES TRUST 2007-3, THORNBURG MORTGAGE SECURITIES TRUST 2007-4, THORNBURG MORTGAGE SECURITIES TRUST 2007-5, BANC OF AMERICA SECURITIES LLC, CREDIT SUISSE SECURITIES LLC, GREENWICH CAPITAL MARKETS, MOODY'S CORP., MCGRAW-HILL COMPANIES, INC., and FITCH RATINGS,<br><br>     Defendants. | No. D-101-CV-2009-00656<br><br><br><br>**SUMMONS** |

**SUMMONS**
**THE STATE OF NEW MEXICO**

TO: The McGraw-Hill Companies, Inc , Defendant

ADDRESS: c/o The Prentice-Hall Corporation System, 125 Lincoln Ave Ste 223,
       Santa Fe, NM 87501

You are required to serve upon Labaton Sucharow LLP an answer or motion in response

to the complaint which is attached to this summons within thirty (30) days after service of this

summons upon you, exclusive of the day of service, and file your answer or motion with the

court as provided in Rule 1-005 NMRA.

If you fail to file a timely answer or motion, default judgment may be entered against you

for the relief demanded in the complaint.

Attorneys for Plaintiff Genesee County Employees' Retirement System

LABATON SUCHAROW LLP           CARPENTER, STOUT & RANSOM, Ltd.
THOMAS A. DUBBS, ESQ.          WILLIAM H. CARPENTER, ESQ.
DAVID J. GOLDSMITH, ESQ.       1600 University Blvd NE, Ste A
PAUL SCARLATO, ESQ.            Albuquerque NM 87102
LAURA KILLIAN MUMMERT, ESQ.    Telephone: (505) 243-1336
STEFANIE J. SUNDEL, ESQ.
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700

WITNESS the Honorable ___DANIEL A. SANCHEZ___District Judge of the First

Judicial District Court of the State of New Mexico, and the seal of the District Court of Santa Fe

County, this 27th day of February, 2009.

STEPHEN T. PACHECO

_____
STEPHEN T. PACHECO
Court Administrator/Clerk of court

By _Michelle Garcia_____
       Deputy

# RETURN[1]

STATE OF NEW MEXICO      ) .
                                   ) ss
COUNTY OF _____   )

       I, being duly sworn, on oath, state that I am over the age of eighteen (18) years and not a party to this lawsuit, that I served this summons in _____ County on the _____ day of _____ , 2009, by delivering a copy of the summons, with complaint attached, in the following manner:

**(check one box and fill in appropriate blanks)**

[ ]   to the defendant _____ (*used when defendant accepts a copy of summons and complaint or refuses to accept the summons and complaint*)

[ ]   to the defendant by [mail] [courier service] as provided by Rule 1-004 NMRA (*used when service is by mail or commercial courier service*).

       After attempting to serve the summons and complaint on the defendant by personal service or by mail or commercial courier service, by delivering a copy of this summons, with a copy of complaint attached, in the following manner:

[ ]   to _____ , a person over fifteen (15) years of age and residing at the usual place of abode of defendant _____ , (*used when the defendant is not presently at place of abode*) and by mailing by first class mail to the defendant at _____
(*insert defendant's last known mailing address*) a copy of the summons and complaint.

[ ]   to _____ , the person apparently in charge at the actual place of business or employment of the defendant and by mailing by first class mail to the defendant at
_____ (*insert defendant's business address*) and by mailing the summons and complaint by first class mail to the defendant at
_____ (*insert defendant's last known mailing address*).

[ ]   to _____ , an agent authorized to receive service of process for defendant
_____ .

[ ]   to _____ , [parent] [guardian] [custodian] [conservator] [guardian ad litem] of defendant _____ (*used when defendant is a minor or an incompetent person*)

[ ]   to _____ (*name of person*), _____ , (*title of person authorized to receive service Use this alternative when the defendant is a corporation or an association subject to a suit under a common name, a land grant board of trustees, the State of New Mexico or any political subdivision*)

Fees:   _____

_____
Signature of person making service

_____
Title (*if any*)

Subscribed and sworn to before me this _____ day of _____ , _____[2]

_____
Judge, notary or other officer authorized to administer oaths

_____
Official title



STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

ENDORSED
First Judicial District Court

FEB 2 7 2009

Santa Fe, Rio Arriba
Los Alamos Counties
PO Box 2268
Santa Fe, NM 87504-2268

----------------------------------------------------- x

GENESEE COUNTY EMPLOYEES'
RETIREMENT SYSTEM, on behalf of itself
and all others similarly situated,

                            Plaintiff,

    v.

THORNBURG MORTGAGE, INC.,
THORNBURG MORTGAGE HOME LOANS,
INC., CREDIT SUISSE FIRST BOSTON
MORTGAGE SECURITIES CORP.,
GREENWICH CAPITAL ACCEPTANCE, INC.,
STRUCTURED ASSET MORTGAGE
INVESTMENTS II, INC., ANDREW A. KIMURA,
JEFFREY A. ALTABEF, EVELYN
ECHEVARRIA, MICHAEL A. MARRIOTT,
THOMAS ZINGALLI, ROBERT J. McGINNIS,
CAROL P. MATHIS, JOSEPH N. WALSH III,
JOHN C. ANDERSON, JAMES M. ESPOSITO,
JEFFREY L. VERSCHLEISER, MICHAEL B.
NIERENBERG, JEFFREY MAYER, THOMAS F.
MARANO, THORNBURG MORTGAGE
SECURITIES TRUST 2006-2, THORNBURG
MORTGAGE SECURITIES TRUST 2006-3,
THORNBURG MORTGAGE SECURITIES
TRUST 2006-4, THORNBURG MORTGAGE
SECURITIES TRUST 2006-5, THORNBURG
MORTGAGE SECURITIES TRUST 2006-6,
THORNBURG MORTGAGE SECURITIES
TRUST 2007-1, THORNBURG MORTGAGE
SECURITIES TRUST 2007-2, THORNBURG
MORTGAGE SECURITIES TRUST 2007-3,
THORNBURG MORTGAGE SECURITIES
TRUST 2007-4, THORNBURG MORTGAGE
SECURITIES TRUST 2007-5, BANC OF
AMERICA SECURITIES LLC, CREDIT SUISSE
SECURITIES LLC, GREENWICH CAPITAL
MARKETS, MOODY'S CORP., MCGRAW-HILL
COMPANIES, INC., and FITCH RATINGS,

                          Defendants.

----------------------------------------------------- x

Case No. D-101-CV-2009-00656

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
SECURITIES ACT OF 1933**

~~DEMAND FOR JURY TRIAL~~

## NATURE OF THE ACTION

1.    This class action is brought pursuant to the Securities Act of 1933 (the "Securities Act") by the Genesee County Employees' Retirement System ("Plaintiff"), individually and on behalf of all persons and entities that purchased or otherwise acquired Mortgage Loan Pass-Through Certificates of Defendant Thornburg Mortgage Home Loans, Inc. ("Thornburg Mortgage"), the securitization subsidiary of Defendant Thornburg Mortgage, Inc. ("TMI" and, together with Thornburg Mortgage, "Thornburg"), pursuant to Registration Statements and related Prospectuses and Prospectus Supplements (collectively, the "Offering Documents") filed with the U.S. Securities and Exchange Commission ("the SEC") by Structured Asset Securities Corp. ("Structured Asset Securities") and Defendants Credit Suisse First Boston Mortgage Securities Corp. ("Credit Suisse First Boston"), Greenwich Capital Acceptance, Inc. ("GCA"), and Structured Asset Mortgage Investments II, Inc. ("SAMI II") (collectively, the "Depositor Defendants"). The Securities Act imposes liability upon issuers, directors, signing officers, underwriters and others for material misrepresentations and omissions in registration statements and prospectuses. This action solely asserts strict liability and negligence claims under the Securities Act.

2.    Thornburg is a residential mortgage lender that originates, acquires and retains investments in adjustable rate mortgages ("ARMs"), with specialization in jumbo ARMs for primary residences, vacation homes and investment properties.

3.    Thornburg represented that it concentrated on only prime, high quality mortgage loans. It repeatedly represented in the Offering Documents that "[Thornburg's] securitization program generally concentrates on *prime*, jumbo adjustable rate and hybrid residential mortgage loans, *with features geared towards more sophisticated, affluent borrowers*, such as large loan balances, interest-only periods and modification options." (emphases added). Additionally, Larry A. Goldstone, the President and Chief Operating Officer of TMI, emphasized during a

- 2 -

May 16, 2007 A.G. Edwards & Sons, Inc. Investment Conference that Thornburg's "focus is on prime origination, *not subprime or Alt-A.*" (emphasis added).

      4.     Thornburg financed the purchase and origination of its purportedly prime ARMs with equity, capital, unsecured debt, Collateralized Mortgage Debt and short-term borrowings, such as Reverse Repurchase Agreements ("RPAs"). RPAs involve a simultaneous sale of pledged securities to a lender at an agreed upon price in return for Thornburg's agreement to repurchase the same securities at a future date (the maturity of the borrowing) at a higher price. The price difference is the cost of borrowing under these agreements. Thornburg borrowed money under RPAs based on the fair value of its ARMs. Therefore, if the value of Thornburg's ARMs declined, lenders could initiate margin calls or change margin requirements.

      5.     The Depositor Defendants, in cooperation with various investment banks ("Underwriters") and assisted by certain National Statistical Rating Organizations ("NSRO" or "Rating Agencies"), selected loans originated or acquired by Thornburg, pooled them together and securitized then into mortgage-backed securities ("MBS") that were sold to qualifying special purpose entities referred to as the "Issuing Trusts."

      6.     The Issuing Trusts, in turn, sold Thornburg Mortgage Loan Pass-Through Certificates (the "Certificates") to Plaintiff and other members of the Class, purportedly providing monthly distributions of interest and principal on future cash flows from the loans underlying the Issuing Trusts. The Certificates included several classes or "tranches" which had various priorities of payment, exposure to default, interest payment provisions and/or levels of seniority. As borrowers made their loan payments, distributions were to be made to Plaintiff and members of the Class.

      7.     The Offering Documents, which the respective Depositor Defendants filed with the SEC in connection with issuing the Certificates, falsely represented to investors that the Certificates were supported by a pool of *high-quality* adjustable rate and hybrid first lien residential mortgage loans.

- 3 -

8.    Nowhere in the Offering Documents did the Defendants disclose that the Certificates were not supported by high-quality prime loans, but instead were supported by risky, Alternative-A ("Alt-A") mortgage loans. Alt-A loans are issued to borrowers who do not qualify for Grade A, or "prime," mortgage loans.[1] Although the borrowers behind these mortgages will typically have clean credit histories, the mortgage itself will generally have some issues that increase its risk profile, such as higher loan-to-value ("LTV") and debt-to-income ratios or inadequate documentation of the borrower's income. Therefore Alt-A loans are considered riskier than prime loans.

9.    According to several confidential witnesses with direct knowledge of Thornburg's loan origination practices, Thornburg frequently originated large amounts of Alt-A loans. By disregarding its underwriting standards for high-quality prime loans, Thornburg was able to close more loans and earn more fees by issuing Alt-A mortgages. Then, by pooling and selling those mortgages to the Issuing Trusts, the Depositor Defendants shifted the undisclosed and increased risk of loss from mortgage defaults to Plaintiff and other unwitting members of the Class.

10.    The scheme was ultimately revealed as the U.S. residential mortgage crisis hit and the decline in the value of Alt-A assets held by Thornburg triggered margin calls on its RPAs.

11.    On February 28, 2008, Thornburg revealed for the first time that its MBS were backed by risky Alt-A loans and that the declining value of these Alt-A assets specifically were to blame for the margin calls.

12.    Following Thornburg's confession that its assets included MBS backed by Alt-A loans, the Rating Agencies began to downgrade a majority of the classes of the Certificates.

13.    Contrary to the material assurances of the Offering Documents, the mortgage loans underlying the Certificates were not originated in accordance with the stated underwriting

---

[1] There is a strong presumption in the lending industry that a FICO score of 660 divides prime and subprime borrowers. The principal definition of "subprime" is found in the Expanded Guidance for Subprime Lending Programs, issued jointly on January 31, 2001 by the U.S. Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision

standards and thus were not the high-quality prime loans that Defendants represented to investors. Instead, Defendants concealed the fact that the securities purchased by Plaintiff and members of the Class were backed by low-quality Alt-A loans.

14.     Because of this misconduct, the Offering Documents that the Depositor Defendants filed with the SEC in connection with the Issuing Trusts contained materially false and misleading statements concerning the Certificates' value, investment risks and quality of the underlying mortgage loans.

15.     Furthermore, Defendants' misconduct materially and adversely impacted the value of the Certificates, and Plaintiff and members of the Class were damaged thereby.

## JURISDICTION AND VENUE

16      The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l*(a)(2) and 77*o*.

17.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, which provides that "[t]he district courts of the United States . . . shall have jurisdiction of offenses and violations under this title and under the rules and regulations promulgated by the Commission in respect thereto . . . and, concurrent with State and Territorial courts, except as provided in section 77p of this title with respect to covered class actions, of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter." Section 22 further provides that, "[e]xcept as provided in section 77p(c) of this title [Section 16 of the Securities Act], no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States." Section 16(c) of the Securities Act refers to "covered class actions." This action asserts claims under the Securities Act and is not a covered class action within the meaning of Section 16(c). Therefore, pursuant to Section 22 of the Securities Act, this action is not removable. *See Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008).

- 5 -

18. Venue is proper in this Court because many of the acts and transgressions leading to the violations of law complained of herein occurred in Santa Fe County, including the preparation and dissemination of materially false and misleading statements in the Registration Statements, as well as the Prospectuses and Prospectus Supplements, as further detailed below. Furthermore, all of the Defendants conduct business within this County, and certain of them, including Thornburg, are headquartered in this County.

## THE PARTIES

**A.    Plaintiff**

19. Plaintiff Genesee County Employees' Retirement System is an institutional investor that provides retirement benefits for approximately 3,000 working and retired public employees of Genesee County, Michigan and manage approximately $509 million in assets as of December 31, 2007. Plaintiff purchased Class 2A-1 Certificates of Thornburg Mortgage Securities Trust 2007-4 pursuant to and/or traceable to the Registration Statement, as amended, and Prospectus Supplement, filed by GCA with the SEC on January 29, 2007 and August 31, 2007, respectively.

20. As a direct and proximate cause of the false and misleading statements alleged herein, Plaintiff suffered damages when the truth became known and the value of the Certificates dropped.

**B.    Thornburg Corporate Defendants**

21. TMI is a single-family (one-to-four unit) residential mortgage lender that originates, acquires and retains investments in ARM Assets. It is incorporated in the State of Maryland with executive offices located at 150 Washington Avenue, Suite 302, Santa Fe, New Mexico.

22. Thornburg Mortgage was formed in 1999 and is a wholly-owned subsidiary of TMI with principal offices located at 150 Washington Avenue, Suite 302, Sante Fe, New Mexico. Thornburg Mortgage purchases and originates first lien residential mortgage loans

primarily for securitization. Thornburg Mortgage served as "Sponsor" of the transaction and "Seller" of the mortgage loans in the securitization of the Issuing Trusts; and worked with the Underwriter Defendants (as defined below) and the Rating Agency Defendants (as defined below) in structuring the securitization transactions related to the Certificates.

## C.    Depositor Defendants

23.    Credit Suisse First Boston was organized for the purposes of establishing trusts, selling beneficial interests in those trusts and acquiring and selling mortgage assets to those trusts. It is a wholly owned subsidiary of Credit Suisse Management LLC and an indirect wholly owned subsidiary of Credit Suisse Holdings (USA) Inc. with principal offices located at 11 Madison Avenue, New York, New York. Credit Suisse First Boston served as "Depositor" in the securitization of Thornburg Mortgage Securities Trust Series 2006-2, Series 2006-6, and Series 2007-5 and was an "Issuer" of the Certificates within the meaning of Section 2 of the Securities Act, 15 U.S.C. § 77b(a)(4).

24.    GCA is a finance subsidiary of Greenwich Capital Holdings, Inc. and an affiliate of Greenwich Capital Markets, Inc. organized for the limited purpose of acquiring, owning and transferring mortgage assets and selling interests in those assets or bonds secured by those assets. GCA maintains its principal office at 600 Steamboat Road, Greenwich, Connecticut. GCA served as "Depositor" in the securitization of Thornburg Mortgage Securities Trust Series 2006-3 and Series 2007-4 and was an "Issuer" of the Certificates within the meaning of Section 2 of the Securities Act, 15 U.S.C. § 77b(a)(4).

25.    SAMI II is a wholly owned subsidiary of The Bear Stearns Companies Inc. and was organized for the sole purpose of serving as a private secondary mortgage market conduit. SAMI II maintains its principal office at 383 Madison Avenue, New York, New York. SAMI II served as "Depositor" in the securitization of Thornburg Mortgage Securities Trust Series 2006-5 and Series 2007-3 and was an "Issuer" of the Certificates within the meaning of Section 2 of the Securities Act, 15 U.S.C. § 77b(a)(4).

26.    Credit Suisse First Boston, GCA, and SAMI II are collectively referred to as the "Depositor Defendants."

**D.    The Individual Defendants**

### 1.    Credit Suisse First Boston

27.    Defendant Andrew A. Kimura ("Kimura") was, at all relevant times, a Director and President of Credit Suisse First Boston. Defendant Kimura signed the Registration Statements filed by Credit Suisse First Boston on August 26, 2005 (No. 333-127872), June 30, 2006 (No. 333-135481), and February 28, 2007 (No. 333-140945), as amended.

28.    Defendant Jeffrey A. Altabef ("Altabef") was, at all relevant times, a Director and Vice President of Credit Suisse First Boston. Defendant Altabef signed the Registration Statements filed by Credit Suisse First Boston on August 26, 2005 (No. 333-127872), June 30, 2006 (No. 333-135481), and February 28, 2007 (No. 333-140945), as amended.

29.    Defendant Evelyn Echevarria ("Echevarria") was, at all relevant times, a Director of Credit Suisse First Boston. Defendant Echevarria signed the Registration Statements filed by Credit Suisse First Boston on August 26, 2005 (No. 333-127872), June 30, 2006 (No. 333-135481), and February 28, 2007 (No. 333-140945), as amended.

30.    Defendant Michael A. Marriott ("Marriott") was, at all relevant times, a Director of Credit Suisse First Boston. Defendant Marriott signed the Registration Statements filed by Credit Suisse First Boston on August 26, 2005 (No. 333-127872), June 30, 2006 (No. 333-135481), and February 28, 2007 (No. 333-140945), as amended.

31.    Defendant Thomas Zingalli ("Zingalli") was, at all relevant times, the Principal Accounting Officer and Controller of Credit Suisse First Boston. Defendant Zingalli signed the Registration Statements filed by Credit Suisse First Boston on August 26, 2005 (No. 333-127872), June 30, 2006 (No. 333-135481), and February 28, 2007 (No. 333-140945), as amended.

### 2.    GCA

32.    Defendant Robert J. McGinnis ("McGinnis") was, at all relevant times, a Director and Principal Executive Officer of GCA. Defendant McGinnis signed the Registration Statements filed by GCA on January 11, 2006 (No. 333-130961) and January 29, 2007 (No. 333-140279), as amended.

33.    Defendant Carol P. Mathis ("Mathis") was, at all relevant times, the Principal Financial Officer and Principal Accounting Officer of GCA. Defendant Mathis signed the Registration Statements filed by GCA on January 11, 2006 (No 333-130961) and January 29, 2007 (No. 333-140279), as amended.

34.    Defendant Joseph N. Walsh III ("Walsh") was, at all relevant times, a Director and Managing Director of GCA. Defendant Walsh signed the Registration Statements filed by GCA on January 11, 2006 (No. 333-130961) and January 29, 2007 (No. 333-140279), as amended

35.    Defendant John C. Anderson ("Anderson") was, at all relevant times, a Director and Managing Director of GCA. Defendant Anderson signed the Registration Statements filed by GCA on January 11, 2006 (No. 333-130961) and January 29, 2007 (No. 333-140279), as amended.

36.    Defendant James M. Esposito ("Esposito") was, at all relevant times, a Director, Managing Director, General Counsel, and Secretary of GCA. Defendant Esposito signed the Registration Statements filed by GCA on January 11, 2006 (No. 333-130961) and January 29, 2007 (No. 333-140279), as amended.

### 3.    SAMI II

37.    Defendant Jeffrey L. Verschleiser, ("Verschleiser") was, at all relevant times, the Principal Executive Officer of SAMI II. Defendant Verschleiser signed the Registration Statements filed by SAMI II on March 6, 2006 (No. 333-132232) and January 26, 2007 (No. 333-140247), as amended.

- 9 -

38.    Defendant Michael B. Nierenberg ("Nierenberg") was, at all relevant times, the Principal Financial Officer and Principal Accounting Officer of SAMI II. Defendant Nierenberg signed the Registration Statements filed by SAMI II on March 6, 2006 (No. 333-132232) and January 26, 2007 (No. 333-140247), as amended.

39.    Defendant Jeffrey Mayer ("Mayer") was, at all relevant times, a Director of SAMI II. Defendant Mayer signed the Registration Statements filed by SAMI II on March 6, 2006 (No 333-132232) and January 26, 2007 (No. 333-140247), as amended.

40.    Defendant Thomas F. Marano ("Marano") was, at all relevant times, a Director of SAMI II. Defendant Marano signed the Registration Statements filed by SAMI II on March 6, 2006 (No. 333-132232) and January 26, 2007 (No. 333-140247), as amended.

E.    The Issuing Trusts

41.    Each of the Issuing Trusts, named as a defendant herein, are statutory trusts formed under Delaware law. Collectively, the Issuing Trusts are:

| Trust | Amount of Offering | Depositor | Underwriters | Rating Agencies |
|---|---|---|---|---|
| Thornburg Mortgage Securities Trust 2006-2 | $938,996,100 | Credit Suisse First Boston | GCM; Credit Suisse; Bear Stearns; Lehman | Moody's S&P |
| Thornburg Mortgage Securities Trust 2006-3 | $1,541,159,100 | GCA | GCM; Credit Suisse; Bear Stearns; Lehman | Moody's Fitch |
| Thornburg Mortgage Securities Trust 2006-4 | $1,649,002,100 | Structured Asset Securities | GCM; Credit Suisse; Bear Stearns; Lehman | Moody's S&P |
| Thornburg Mortgage Securities Trust 2006-5 | $2,674,412,100 | SAMI II | GCM; Credit Suisse; BAS; Bear Stearns; Lehman | Moody's S&P |
| Thornburg Mortgage Securities Trust 2006-6 | $1,282,270,100 | Credit Suisse First Boston | GCM; Credit Suisse; Bear Stearns; Lehman | Moody's S&P |
| Thornburg Mortgage Securities Trust 2007-1 | $1,401,841,000 | Structured Asset Securities | GCM; Credit Suisse; Bear Stearns; Lehman | Moody's S&P |
| Thornburg Mortgage Securities Trust 2007-2 | $1,266,617,000 | Structured Asset Securities | GCM; Credit Suisse; Bear Stearns; Lehman | Moody's S&P |
| Thornburg Mortgage Securities Trust 2007-3 | $1,423,789,000 | SAMI II | GCM; Credit Suisse; Bear Stearns; Lehman | Moody's S&P |
| Thornburg Mortgage Securities Trust 2007-4 | $1,288,554,100 | GCA | GCM | Moody's S&P |

| Trust | Amount of Offering | Depositor | Underwriters | Rating Agencies |
|---|---|---|---|---|
| Thornburg Mortgage Securities Trust 2007-5 | $730,358,100 | Credit Suisse First Boston | Credit Suisse | S&P Fitch |

**F.    The Underwriter Defendants**

42.    Defendant Banc of America Securities LLC ("BAS") is an investment banking subsidiary of Bank of America Corp. with principal offices located at 100 North Tryon Street, Charlotte, North Carolina. BAS acted as an Underwriter for Thornburg Mortgage Securities Trust Series 2006-6, within the meaning of Section 2 of the Securities Act, 15 U.S.C. § 77b(a)(11). As an underwriter, BAS participated in the drafting and dissemination of the Offering Documents for the Certificates and issued false and misleading Prospectus Supplements in connection therewith as set forth below.

43.    Defendant Credit Suisse Securities LLC, d/b/a Credit Suisse Securities (USA) LLC ("Credit Suisse"), is a subsidiary of Credit Suisse Group with principal offices located at 11 Madison Avenue, New York, New York. Credit Suisse acted as an Underwriter for Thornburg Mortgage Securities Trust Series 2006-2, 2006-3, 2006-4, 2006-5, 2006-6, 2007-1, 2007-2, 2007-3, and 2007-5, within the meaning of Section 2 of the Securities Act, 15 U.S.C. § 77b(a)(11). As an underwriter, Credit Suisse participated in the drafting and dissemination of the Offering Documents for the Certificates and issued false and misleading Prospectus Supplements in connection therewith as set forth below.

44.    Defendant Greenwich Capital Markets, a/k/a RBS Greenwich Capital ("GCM"), is a subsidiary of Greenwich Capital Holdings, Inc. with principal offices located at 600 Steamboat Road, Greenwich, Connecticut. GCM acted as an Underwriter for Thornburg Mortgage Securities Trust Series 2006-2, 2006-3, 2006-4, 2006-5, 2006-6, 2007-1, 2007-2, 2007-3, and 2007-4, within the meaning of Section 2 of the Securities Act, 15 U.S.C. § 77b(a)(11). As an underwriter, GCM participated in the drafting and dissemination of the Offering Documents for the Certificates and issued false and misleading Prospectus Supplements in connection therewith as set forth below.

45.     Defendants BAS, Credit Suisse, and GCM are collectively referred to as the "Underwriter Defendants."

## G.    The Rating Agency Defendants

46.     Defendant Moody's Corp. is a Delaware corporation with its principal place of business located at 250 Greenwich Street, New York, New York. Moody's Investor Services, Inc. ("Moody's"), a division of Moody's Corp., is a credit rating agency that performs credit analysis for commercial and government entities and has a 40% market share of the world-wide credit ratings market. As a condition of issuance, Moody's, among other rating agencies, was retained by the Depositor Defendants to issue certain ratings, not below investment grade, with respect to the Certificates. Moreover, Moody's was a substantial participant in creating each of the Trusts and in drafting and disseminating the Offering Documents for the Certificates.

47.     Defendant McGraw-Hill Cos., Inc. ("McGraw-Hill") is a New York Corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York. Standard & Poor's Ratings Services ("S&P"), a division of McGraw-Hill, is a credit rating agency that performs credit analysis for commercial and government entities and also has a 40% market share of the world-wide credit ratings market. As a condition of issuance, S&P, among other rating agencies, was retained by the Depositor Defendants to issue certain ratings, not below investment grade, with respect to the Certificates. S&P was a substantial participant in creating nearly all of the Trusts and in drafting and disseminating the Offering Documents for the Certificates.

48.     Defendant Fitch Ratings ("Fitch") is a credit rating agency headquartered in New York, New York and London, England. According to Fitch, it is a leading global credit rating agency. Fitch is a majority-owned subsidiary of Fimalac, S A., an international business support services group headquartered in Paris, France. As a condition of issuance, Fitch, among other rating agencies, was retained by the Depositor Defendants to issue certain ratings, not below investment grade, with respect to the Certificates. Moreover, Fitch was a substantial participant

- 12 -

in creating nearly all of the Trusts and in drafting and disseminating the Offering Documents for the Certificates.

49.    Defendants Moody's, S&P, and Fitch are collectively referred to as the "Rating Agency Defendants."

## SUBSTANTIVE ALLEGATIONS

A.    **The Mortgage Industry and Mortgage Securitization**

50.    The mortgage industry has been traditionally characterized by a lending institution (*i.e.*, the loan originator) holding a direct interest in the property as collateral for a mortgage in the event the borrower defaulted on the loan. Under the traditional model, the loan originator held the note until it matured and was exposed to the concomitant risk that the borrower would fail to repay the loan. As such, under the traditional model, the loan originator had a financial incentive to obtain an accurate property appraisal before issuing a mortgage to ensure that the mortgage was adequately collateralized in the event the borrower defaulted and the property was foreclosed.

51.    Beginning in the 1990s, the traditional model of loan origination changed. Under the new model, after a loan originator issues a mortgage to a borrower, the loan originator typically sells the mortgage into the financial markets to third-party financial institutions. By selling the mortgage, the loan originator obtains fees in connection with the issuance of the mortgage, receives upfront proceeds when it sells the mortgage into the financial markets, and thereby has new capital to issue more mortgages. The mortgages sold into the financial markets are typically pooled together and securitized into what are commonly referred to as MBS. In addition to receiving proceeds from the sale of the mortgage, the loan originator no longer holds the risk that the borrower may default; that risk is transferred with the mortgages to investors who purchase the MBS.

- 13 -

52. As illustrated below, mortgage securitization is a structured finance process in which mortgage loans are acquired, pooled together, and then sold to investors who acquire rights in the income flowing from the mortgage pools.



(Source: *The Wall Street Journal*)

53. The MBS pool together the cash flow received when mortgage borrowers make interest and principal payments as required by the underlying mortgage terms. That cash is then distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by an MBS investor. The highest tranche (also referred to as the "senior tranche") is first to receive its share of the mortgage proceeds. Since the senior tranche is first to receive payments, it is also the last tranche to absorb any losses should mortgage borrowers become delinquent or default on their mortgage. As a result, the senior tranches of most MBS were rated AAA by the Rating Agencies. After the senior tranche, the middle tranches (referred to as "mezzanine tranches") next receive their share of the proceeds. In accordance with their order of priority, the mezzanine tranches were generally rated from AA to BB by the Rating Agencies. The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches (referred to as "equity tranches"). This process is repeated each month and all investors receive the payments owed to them so long as the mortgage borrowers are current on their mortgages. The following diagram illustrates the concept of tranches within a MBS comprised of residential mortgages (often referred to as "residential mortgage backed securities" or "RMBS"):

- 14 -



(Source: *The Wall Street Journal*)

54.     As illustrated below, in the typical securitization transaction, participants in the transaction are the sponsor (who is often also the loan servicer), the depositor, the underwriter, the issuing trust and investors. On the closing date of a trust series, the mortgage loans supporting the trust are first sold by the sponsor of the securitization transaction to the depositor in return for cash. This has the effect of removing the loans from the sponsor's financial statements. The depositor then sells those mortgage loans and related assets to the trust, in exchange for the trust issuing certificates to the depositor. The depositor then works with the underwriter of the trust to price and sell the certificates to investors.

55.     Thereafter, the mortgage loans supporting the trusts are serviced by the servicer, which earns monthly servicing fees by collecting principal and interest from borrowers. After subtracting a servicing fee, the servicer sends the remainder of the payments to a trustee for administration and distribution to the trust, and ultimately, to investors.

**B.    The Role of the Rating Agency Defendants**

56.     As a condition to issuance, the Certificates were required to be rated not lower than investment-grade, that is, in one of the four highest rating categories, by at least one NSRO, *i.e.* Moody's, S&P and/or Fitch.

57.     The credit rating for each class of Certificates purportedly indicated the Rating Agency Defendants' view as to the creditworthiness of the Certificates in terms of the likelihood

- 15 -

of the receipt of all distributions on the mortgage loans by Plaintiff and members of the Class who purchased the Certificates.

58. The ratings took into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the Certificates, and the extent to which the payment stream on that mortgage pool is adequate to make payments required by the Certificates.

59. Obtaining a top rating for the Certificates was important, because the main buyers of MBS are institutional investors, such as pension funds and mutual funds, who generally require, or are required by law, to invest in only investment-grade securities. Failure to get a top rating would have severely limited the market for the Certificates.

60. To insure a top rating, issuers of MBS have developed methods to enhance the credit of their security by working and consulting with the rating agencies that rate them.

61. Enhancing the credit of an MBS is designed to absorb all or a portion of credit losses, thereby increasing the likelihood that investors receive contractual cash flows and raising the securities' credit ratings. Credit enhancement may be provided in various forms, including subordination of one or more classes of the securities of that series, the establishment of one or more reserve accounts, the use of a cross-collateralization feature, use of a mortgage pool insurance policy, a letter of credit, overcollateralization, interest rate swap agreement, or interest rate cap agreement.

62. To determine how much credit enhancement was required for an investment-grade rating, the Rating Agency Defendants assessed the potential future performance of the loan using credit characteristics such as the amount of documentation provided by borrowers to verify their income levels and/or assets and other various loan information (i.e. principal amount, geographic location of the property, credit history and FICO (credit) score of the borrower, the loan-to-value ("LTV") ratio, and type of loan, the amount of equity in the property used as collateral, and whether the borrowers intend to rent or occupy their homes).

- 16 -

63.    The Rating Agency Defendants then reviewed the capital structure of the MBS and determined if it was sufficient to meet the desired credit rating. If it did not, the Rating Agency Defendants insisted on additional credit enhancement under the transaction, after which the Depositor Defendants then adjusted the capital structure of the MBS to provide the requisite credit enhancement for the desired rating.

64.    The Rating Agency Defendants received a fee for their services only when the desired credit rating was issued. Moreover, each of the Rating Agency Defendants generated fees for their services in connection with the MBS transactions based on an "issuer pays" fee model, wherein the Depositor Defendants, the entities that issued the securities, were also the entities that sought the desired ratings and paid the Rating Agency Defendants for those ratings.

**C.    Thornburg Mortgage Loan Pass-Through Certificates**

65.    The Certificates at issue here were sold to Plaintiff and other class members pursuant to Registration Statements, Prospectuses, and Prospectus Supplements filed with the SEC in accordance with Rule 424(b)(5), as identified below:

Offering Documents Filed by Defendant Credit Suisse First Boston

a.  Registration Statement No. 333-127872 filed on August 26, 2005, as amended.
    i.  Prospectus dated December 22, 2005;
        1.  Prospectus Supplement filed March 31, 2006 for the issuance of Series 2006-2 Certificates.

b.  Registration Statement No. 333-135481 filed on June 30, 2006, as amended.
    i.  Prospectus dated October 27, 2006.
        1.  Prospectus Supplement filed November 30, 2006 for the issuance of Series 2006-6 Certificates.

c.  Registration Statement No. 333-140945 filed on February 28, 2007, as amended.
    i.  Prospectus dated April 20, 2007.
        1.  Prospectus Supplement filed October 31, 2007 for the issuance of Series 2007-5 Certificates.

Offering Documents Filed by Structured Asset Securities[2]

---

[2] On February 9, 2009, Structured Asset Securities filed a petition for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of New York.

d. Registration Statement No. 333-129480 filed on November 4, 2005, as amended.

    i. Prospectus dated June 2, 2006.

        1. Prospectus Supplement filed August 11, 2006 for the issuance of Series 2006-4 Certificates.

e. Registration Statement No. 333-133985 filed on July 19, 2006, as amended.

    i. Prospectus dated February 20, 2007;

        1. Prospectus Supplement filed February 27, 2007 for the issuance of Series 2007-1 Certificates.

    ii. Prospectus dated March 26, 2007;

        1. Prospectus Supplement filed April 30, 2007 for the issuance of Series 2007-2 Certificates.

Offering Documents Filed by Defendant SAMI II

f. Registration Statement No. 333-132232 filed on March 6, 2006, as amended.

    i. Prospectus dated March 28, 2006.

        1. Prospectus Supplement filed August 28, 2006 for the issuance of Series 2006-5 Certificates.

g. Registration Statement No. 333-140247 filed on January 26, 2007, as amended

    i. Prospectus dated June 28, 2007.

        1. Prospectus Supplement filed August 1, 2007 for the issuance of Series 2007-3 Certificates.

Offering Documents Filed by Defendant GCA

h. Registration Statement No. 333-130961 filed on January 11, 2006.

    i. Prospectus dated April 26, 2006.

        1. Prospectus Supplement filed June 29, 2006 for the issuance of Series 2006-3 Certificates.

i. Registration Statement No. 333-140279 filed on January 29, 2007.

    i. Prospectus dated July 30, 2007.

        1. Prospectus Supplement filed August 31, 2007 for the issuance of Series 2007-4 Certificates.

66.    Thornburg acquired or originated the mortgage loans underlying the offered Certificates through one of four channels: (1) unaffiliated correspondent originators that originate loans according to its underwriting guidelines or principally, in the case of First Republic Bank, that correspondent's underwriting guidelines, (2) through bulk purchases in the secondary market, (3) through its retail operations and (4) through its wholesale loan channel

- 18 -

67.    With the exception of Series 2006-4 and Series 2006-5, the Prospectus Supplements for each Series of Certificates represented that the majority of the loans were originated pursuant to Thornburg's underwriting standards, or as the case may have been, First Republic Bank's underwriting standards, through Thornburg's retail channels or its correspondent lenders.[3] The Prospectus Supplements further represented that the mortgage files for loans acquired from correspondent lenders were reviewed by Thornburg to insure that they met the applicable underwriting standards.

68.    For certain of the Trusts, a small percentage of the underlying mortgage loans were acquired through Thornburg's wholesale loan channel and bulk purchase program. Wholesale loan originations were sourced from mortgage brokers and mortgage lenders approved by Thornburg and underwritten by Thornburg. The Prospectus Supplements represented that for those loans acquired through bulk purchases, Thornburg conducted a loan documentation review of a portion of the mortgage loans to confirm adherence to the terms of the purchase agreement with the loan seller.

69.    The Offering Documents described the underwriting standards used to originate the mortgage loans underlying the Certificates, including the amount of documentation necessary to verify various credit characteristics of the borrower, such as employment and income. For example, a "full documentation" program requires information regarding the borrowers' assets and income, i.e. bank statements, W-2 forms, tax returns and/or pay stubs. Under a "stated income" program, the borrower simply states his or her income and assets on the loan application, but no verification of either the borrowers' income or assets is undertaken. Loans issued pursuant to a stated income program are considered riskier than full documentation loans.

70.    The Offering Documents were false and misleading because they failed to disclose that Thornburg, its correspondent lenders, and its wholesale originators were not adhering to its stated underwriting guidelines and were originating a significant amount of risky

---

[3] The majority of the mortgage loans underlying the Certificates for Series 2006-4 and Series 2006-5 were acquired through Thornburg's bulk purchase program.

Alt-A loans pursuant to a stated income documentation program. The Offering Documents also failed to disclose that Thornburg did not conduct an adequate quality control review of the mortgage files for loans acquired through correspondent lenders and bulk purchases to insure that the loans complied with stated underwriting standards and were only of the highest quality, as represented to investors.

71. According to several individuals who underwrote mortgages for Thornburg, identified as confidential witnesses in the Consolidated Class Action Complaint in *In re Thornburg Mortgage, Inc Securities Litigation*, No. 07-815 JB/WDS (D.N.M. May 27, 2008), Thornburg did not strictly originate high quality loans, but relaxed their underwriting standards to originate Alt-A loans as a means to increase loan volume and turn higher profits in selling those loans for securitization.

72. The confidential witnesses reported that Thornburg frequently originated "stated income loans" where the borrower's income was not verified if the borrower demonstrated "six to twelve months of assets" in reserve. The witnesses stated that such loans really were synonymous with risky Alt-A loans.

73. A Wholesale Operations Manager for AmFirst Wholesale Lending, a division of AmTrust Mortgage Corp. ("Amtrust"), from May 2004 through December 2006, who underwrote loans for Thornburg, stated that Thornburg originated a material amount of Alt-A loans. The confidential witness stated that Amtrust handled Alt-A loans for Thornburg where documentation standards were either "waived or reduced." S/he also stated that Thornburg's "stated income" loans usually required "six to twelve months of debt service," but nevertheless were clearly Alt-A loans.

74. A Team Manager employed by Adfitech, a company acquired by Thornburg in August 2006, was in charge of the Non-Performing Loan Department and stated that "anything goes for Thornburg loans." The witness stated that loans which would not be approved "under normal circumstances" because of low FICO scores, a high LTV ratio, lack of income

- 20 -

verification or problems with collateral often were approved if the borrower had enough money or stock to put up as collateral.

75.    The Adfitech Team Manager also stated that during a meeting of department managers, attendees were ordered "to get more loans out of here," that they were "spending too much time on details," and that they would "have to sacrifice something," *i.e.* standards so that Thornburg could earn more revenue.

76.    An underwriter for United Pacific Mortgage who originated mortgages purchased by Thornburg recalled that approximately 25% of the loans she underwrote were "stated income" or "Alt-A" loans that were "more flexible with guidelines." She recalled that during her four-year tenure with United Pacific Mortgage from September 2003 through July 2007, Thornburg purchased stated income loans.

**D.    The Truth Is Disclosed**

77.    As a result of the deteriorating conditions in the mortgage market, the value of Thornburg securities backed by risky Alt-A loans declined, triggering billions of dollars in margin calls from Thornburg's RPA counter-parties beginning in the second half of 2007.

78...    On February 28, 2008, Thornburg revealed for the first time in its Annual Report on Form 10-K for year ended December 31, 2007 that the margin calls were on $2.9 billion in MBS backed by risky Alt-A loans. Specifically, the section titled, "Recent Developments" stated:

> Beginning on February 14, 2008, there was once again a sudden adverse change in mortgage market conditions in general and more specifically in the valuations of mortgage securities backed by Alt-A mortgage loan collateral. As of February 15, 2008, our Purchased ARM Assets included approximately $2.9 billion of super senior, credit-enhanced mortgage securities, all of which are AAA-rated and *backed by Alt-A mortgage collateral*. Our current credit assessment of these mortgage securities in our portfolio suggests a low possibility of future downgrades and even less risk of actual losses. We have not realized any losses on these mortgage securities to date. However, we have observed deterioration in the liquidity for these securities and increased difficulty in obtaining market prices. *Accordingly, market valuations of these securities have decreased between 10 and 15 percent since January 31, 2008, and as a result, we have been subject to margin calls on this collateral. Since February 14, 2008, we have met margin calls in excess of*

- 21 -

*$300 million on our Reverse Repurchase Agreements, the substantial majority of*
*which is related to the decline in valuations placed on these securities.*

(Emphases added.)

79.    On March 9, 2008, Thornburg filed an Amended Annual Report on Form 10-K/A
with the SEC to restate its consolidated financial statements for the year ended December 31,
2007 to reflect a $676 million loss for 2007 on ARM Assets and other related charges.
Thornburg additionally reported that since December 31, 2007 and through March 6, 2008, it had
received $1.8 billion in margin calls, only $1.2 billion of which it could meet at that time.

80.    In an article published by *The New York Times* on March 16, 2008 entitled, "Wait,
Weren't These the Safer Bets?," Thornburg's President, Larry A. Goldstone was quoted as
saying, "Alt-A has been the precipitating event; it's just been feeding on itself."

81.    On April 4, 2008, the SEC issued a letter of investigation to Thornburg, indicating
that it was initiating an investigation into the margin calls received by Thornburg during March
2008 that pushed it to the brink of bankruptcy.

82.    Following these negative disclosures, the Rating Agency Defendants downgraded
a majority of the classes of Certificates issued pursuant to the Offering Documents and
purchased by Plaintiff and members of the Class.

83.    With respect to Series 2006-2, on September 25, 2008, S&P downgraded Class B-
3 from BBB to BB. On October 28, 2008, S&P further downgraded Class B-3 from BB to B and
also downgraded Class B-2 from A to BBB. Subsequently, on November 21, 2008, Moody's
downgraded 4 classes of Certificates: Classes A-2-A and A-2-C from Aaa to A2; and Classes A-
1-A and A-1-C from Aaa to A3.

84.    With respect to Series 2006-3, on August 13, 2008, Fitch downgraded Class B-3
from A to A-. Subsequently on November 21, 2008, Moody's downgraded 7 classes of
certificates: Classes A-1 and A-2 from Aaa to A1; Classes A-3 and A-X from Aaa to Aa3; Class
B-1 from Aa2 to Baa1; Class B-2 from A2 to Ba3; and Class B-3 from Baa2 to Caa1.

85.    With respect to Series 2006-4, on October 28, 2008, S&P downgraded Class B-2 from A to BBB and Class B-3 from BBB to BB. On November 21, 2008, Moody's downgraded Classes A-1, A-2-A, and A2C from Aaa to A1.

86.    With respect to Series 2006-5, on October 6, 2008, Moody's downgraded Class B-2 from A2 to A2- and Class B-3 from Baa2 to Baa2-. On November 21, 2008, Moody's further downgraded Classes B-2 and B-3 and downgraded 2 additional classes: Class A-2 from Aaa to Aa2; Class B-1 from Aa2 to Baa1, Class B-2 from A2- to Ba3; and Class B-3 from Baa2- to Caa1.

87.    With respect to Series 2006-6, on September 22, 2008, S&P downgraded Class B-2 from A to BBB and Class B-3 from BBB to BB. On November 21, 2008, Moody's downgraded Class A-2 from Aaa to Aa1.

88.    With respect to Series 2007-1, on November 21, 2008, Moody's downgraded 5 classes of the offered Certificates: Classes A-1 and A-3-B from Aaa to A3; and Classes A-2-A and A-2-C from Aaa to Baa1.

89.    With respect to Series 2007-2, on November 21, 2008, Moody's downgraded Classes A-1, A-2-B, and A-3-B from Aaa to Aa2.

90.    With respect to Series 2007-3, on November 21, 2008, Moody's downgraded 8 classes of the offered Certificates: Class 1-A-1 from Aaa to Aa2; Class 1-A-2 from Aaa to B3; Classes 2-A-1 and 3-A-1 from Aaa to A1; Class 2-A-2 from Aaa to B1; Class 3-A-2 from Aaa to B2; and Classes 4-A-2 and 4-A-4 from Aaa to Ba3.

91.    With respect to Series 2007-4, on November 21, 2008, Moody's downgraded Classes 2-A-1 and 3-A-2 from Aaa to Aa2.

92.    With respect to Series 2007-5, on August 7, 2008, Fitch downgraded Class 2-A-1 from AAA to AAA-.

93.    As a result of Rating Agency downgrades, the market value of the Certificates purchased by Plaintiff and members of the Class significantly declined.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

94.    The Offering Documents pursuant to which Defendants issued the Certificates contained material false and misleading statements with respect to: (a) compliance with stated underwriting guidelines; (b) the quantity of mortgage loans originated pursuant to various documentation programs, including fully documented loans and stated income loans; (c) the borrowers' debt-to-income ratio; (d) the level of credit enhancement calculated to afford a certain pre-determined level of protections to investors; (e) the ratings issued by the Rating Agency Defendants to each class of Certificates; and (f) the conflict of interest between the Rating Agency Defendants and the issuers of the Certificates.

### A.    Compliance with Stated Underwriting Guidelines

95.    The Prospectus Supplements represented that the large majority of the mortgage loans underlying the Trusts were originated by Thornburg or its correspondent lenders pursuant to Thornburg's underwriting standards, or in the case of correspondent lender First Republic Bank, First Republic Bank's underwriting standards.[4]  For example, the Prospectus Supplement for Series 2006-2 stated:

> Approximately 84.51% of the mortgage loans were originated by [Thornburg] directly or through its correspondent channel (other than the mortgage loans originated by First Republic Bank), in each case, *generally in accordance with [Thornburg's] underwriting guidelines* for its correspondent and retail channels as described herein under "The Seller – Underwriting Standards—The Seller's Underwriting Process" herein.  Approximately 15.49% of the mortgage loans were originated by First Republic Bank *in accordance with First Republic Bank's underwriting guidelines*.
>
> \*   \*   \*
>
> Approximately 5.39% of the mortgage loans in this securitization were originated through [Thornburg's] retail channel . . . *Such mortgage loans are underwritten directly by [Thornburg]* through its two retail fulfillment vendors *according to*

---

[4]  *See* Prospectus Supplements for Series 2006-2 at S-29 (84.51%); Series 2006-3 at S-31 (100%); Series 2006-6 at S-25 (90.26%); Series 2007-1 at S-4 and S-45 (95.41%); Series 2007-2 at S-45 (78.50%); Series 2007-3 (73.44%); Series 2007-4 at S-24 (98.3%); and Series 2007-5 at S-1 and S-28 (98.12%).  With respect to Series 2006-4, 31.74% of the underlying mortgage loans were originated by Thornburg and 56.60% were originated by Wells Fargo Bank in accordance with Wells Fargo Bank's underwriting standards.  With respect to Series 2006-5, 72.19% of the mortgage loans were originated by Wells Fargo Bank in accordance with the Wells Fargo Bank underwriting guidelines, and 25.70% of the mortgage loans were originated by Thornburg.

> *[Thornburg's] underwriting standards* (subject to any exceptions approved by [Thornburg's] underwriters on a case by case basis).

(Emphases added.)

96. For loans that were originated by correspondent lenders, the Prospectus Supplements assured investors that Thornburg reviewed the lenders' mortgage files prior to acquiring the loans to insure that they complied with the stated underwriting guidelines.[5] Using the same, or substantially similar language, each Prospectus Supplement made the following representation:

> Prior to acquiring any mortgage loan from a correspondent, *[Thornburg] conducts a review of the mortgage file to determine whether the mortgage loan meets [Thornburg's] underwriting standards or, in the case of First Republic Bank, that correspondent's underwriting guidelines,* or whether an exception is warranted on a case by case basis. For a limited number of loans, the review process is conducted under [Thornburg's] supervision by one of its retail fulfillment vendors.

(Emphasis added.)

97. For loans acquired through Thornburg's wholesale channel, the Prospectus Supplement for Series 2007-1, among others, stated that the loans were underwritten by Thornburg: "Wholesale loan originations are mortgage loans that are sourced from mortgage brokers and mortgage lenders approved by the Sponsor and that are underwritten by the Sponsor and closed with the Sponsor's funds in the name of the Sponsor."

98. For loans acquired through Thornburg's bulk purchase program, the Prospectus Supplements represented that Thornburg reviewed a portion of those mortgage loans to assure compliance with the terms of the purchase agreement with the loan seller. For example, the Prospectus Supplement for Series 2007-1 represented the following:

> In connection with its bulk purchase program, *[Thornburg] conducts a loan documentation review of a portion of the mortgage loans to confirm adherence to the terms of the purchase agreement with the loan seller.* Each loan seller represents in the related purchase agreement that the loans were underwritten in

---

[5] *See* Prospectus Supplements for Series 2006-2 at S-40; Series 2006-4 at S-47; Series 2006-5 at S-29 to S-30; Series 2006-6 at S-34; Series 2007-1 at S-53; Series 2007-2 at S-54; Series 2007-3; Series 2007-4 at S-32; and Series 2007-5 at S-36.

accordance with the underwriting standards and guidelines of the respective loan
seller or other specified underwriting standards and guidelines.

(Emphasis added.)

99. With respect to the underwriting standards used to originate the mortgage loans,

the August 26, 2005 Registration Statement filed by Credit Suisse First Boston represented the

following:

### UNDERWRITING STANDARDS FOR MORTGAGE LOANS

\*    \*    \*

SINGLE AND MULTI-FAMILY MORTGAGE LOANS. The mortgage credit
approval process for one- to four-family residential loans follows a standard
procedure that generally complies with FHLMC and FNMA regulations and
guidelines, except that certain mortgage loans may have higher loan amount and
qualifying ratios, and applicable federal and state laws and regulations The credit
approval process for Cooperative Loans follows a procedure that generally complies
with applicable FNMA regulations and guidelines, except for the loan amounts and
qualifying ratios, and applicable federal and state laws and regulations. The
originator of a mortgage loan generally will review a detailed credit application by
the prospective mortgagor designed to provide pertinent credit information,
including a current balance sheet describing assets and liabilities and a statement of
income and expenses, as well as an authorization to apply for a credit report that
summarizes the prospective mortgagor's credit history with local merchants and
lenders and any record of bankruptcy. In addition, *an employment verification is
obtained from the prospective mortgagor's employer wherein the employer reports
the length of employment with that organization, the current salary, and gives an
indication as to whether it is expected that the prospective mortgagor will continue
such employment in the future.* If the prospective mortgagor is self-employed, he or
she is required to submit copies of signed tax returns. The prospective mortgagor
may also be required to authorize verification of deposits at financial institutions. In
certain circumstances, other credit considerations may cause the originator or
depositor not to require some of the above documents, statements or proofs in
connection with the origination or purchase of certain mortgage loans.

\*    \*    \*

Based on the data provided, certain verifications and the appraisal, *a determination
is made by the originator as to whether the prospective mortgagor has sufficient
monthly income available to meet the prospective mortgagor's monthly obligations
on the proposed loan and other expenses related to the residence,* such as property
taxes, hazard and primary mortgage insurance and, if applicable, maintenance, and
other financial obligations and monthly living expenses. Each originator's lending
guidelines for conventional mortgage loans generally will specify that mortgage

- 26 -

payments plus taxes and insurance and all monthly payments extending beyond one year, including those mentioned above and other fixed obligations, such as car payments, would equal no more than specified percentages of the prospective mortgagor's gross income. These guidelines will be applied only to the payments to be made during the first year of the loan. Other credit considerations may cause an originator to depart from these guidelines. For example, when two individuals co-sign the loan documents, the incomes and expenses of both individuals may be included in the computation.

\* \* \*

To the extent specified in the related prospectus supplement, the depositor may purchase mortgage loans for inclusion in a trust fund that are underwritten under standards and procedures which vary from and are less stringent than those described in this prospectus. For instance, mortgage loans may be underwritten under a "limited documentation" program if stated in the related prospectus supplement. With respect to these mortgage loans, minimal investigation into the borrowers' credit history and income profile is undertaken by the originator and such mortgage loans may be underwritten primarily on the basis of an appraisal of the mortgaged property or Cooperative Dwelling and the loan-to-value ratio at origination. Thus, if the loan-to-value ratio is less than a percentage specified in the related prospectus supplement, the originator may forego certain aspects of the review relating to monthly income, and traditional ratios of monthly or total expenses to gross income may not be considered

Other examples of underwriting standards that may be less stringent than traditional underwriting standards include investment properties, loans with high loan-to-value ratios and no primary mortgage insurance, and loans made to borrowers with imperfect credit histories.

(Emphases added.)

100.   The June 30, 2006 and February 28, 2007 Registration Statements filed by Credit Suisse represented the following:

Underwriting Standards for Mortgage Loans

\* \* \*

Single and Multi-Family Mortgage Loans

\* \* \*

Generally, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, *the mortgagor will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and*

- 27 -

***personal information,*** and furnished an authorization to apply for a credit report which summarizes the mortgagor's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts. . . . In the case of certain borrowers with acceptable payment histories, no income will be required to be stated (or verified) in connection with the loan application.

Based on the data provided in the application and certain verification (if required), ***a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property*** such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the LTV ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the mortgagor after origination.

The mortgage loans have been originated under "full" or "alternative," "reduced documentation," "stated income/stated assets" or "no income/no asset" programs. The "alternative," "reduced," "stated income/stated asset" and "no income/no asset" programs generally require either alternative or less documentation and verification than do full documentation programs which generally require standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories. Generally, an "alternative" documentation program requires information regarding the mortgagor's income (i.e., W 2 forms, tax returns and/or pay stubs) and assets (i e., bank statements) as does a "full doc" loan, however, alternative forms of standard verifications are used. Generally, under both "full" and "alternative" documentation programs at least one year of income documentation is provided. Generally, under a "reduced documentation" program, either no verification of a mortgagor's stated income is undertaken by the originator or no verification of a mortgagor's assets is undertaken by the originator. Under a "stated income/stated assets" program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied. Generally, under a "no income/no asset" program, the mortgagor is not required to state his or her income or assets and therefore, no verification of such mortgagor's income or assets is undertaken by the originator. The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.

(Emphases added.)