101.    The November 4, 2005 and May 10, 2006 Registration Statements filed by Structured Asset Securities made the following representations with respect to underwriting procedures:

Underwriting Standards

\*    \*    \*

Except as otherwise set forth in the prospectus supplement, the originator of a Loan will have applied underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and the value and adequacy of the related property as collateral. FHA Loans and VA Loans will have been originated in compliance with the underwriting policies of the FHA and the VA, respectively.

The depositor may purchase Loans for inclusion in a trust fund that are underwritten under less strict standards and procedures that require limited (or no) supporting documentation, typically referred to as "limited documentation" or "no documentation" programs. In addition, Mortgage Loans may have been originated in connection with a governmental program under which underwriting standards were significantly less stringent and designed to promote home ownership or the availability of affordable residential rental property notwithstanding higher risks of default and losses. The prospectus supplement will specify the underwriting standards applicable to the Mortgage Loans.

In addition, the depositor may purchase Loans for inclusion in a trust fund which vary from, or do not comply with, the applicable originator's underwriting guidelines. In some cases, the divergence from a strict application of the applicable underwriting guidelines was the result of a permitted exception under such underwriting guidelines (i.e., a case by case permitted exception based upon other compensating factors such as relatively low debt to income ratio, good credit history, stable employment or financial reserves of the borrower). In other instances, the divergence from the applicable underwriting guidelines was the result of an unintentional underwriting error by the applicable originator. In such cases, the prospectus supplement will specify the nature of these exceptions to the underwriting guidelines.

102.    The January 11, 2006 and January 29, 2007 Registration Statements filed by GCA made the following representations:

UNDERWRITING STANDARDS

Each seller will represent and warrant that all the loans that it originated and/or sold to the depositor or one of the depositor's affiliates will have been underwritten in accordance with standards consistent with those utilized by institutional lenders generally during the period of origination for similar types of loans. As to any loan insured by the FHA or partially guaranteed by the VA, the related seller will

represent that it has complied with the underwriting policies of the FHA or the VA, as the case may be.

Underwriting standards are applied by or on behalf of a lender to evaluate a prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information, including the principal balance and payment history of any senior lien loan on the related mortgaged property. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. *Generally, an employment verification is obtained from an independent source, which is typically the borrower's employer. The verification reports the borrower's length of employment with its employer, current salary, and expectations of continued employment.* If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts. Underwriting standards which pertain to the creditworthiness of borrowers seeking Multifamily Loans will be described in the related prospectus supplement.

\*    \*    \*

Once all applicable employment, credit and property information is received, *a determination generally is made as to whether the prospective borrower has sufficient monthly income available,*

    o   to meet the borrower's monthly obligations on the proposed loan, generally determined on the basis of the monthly payments due in the year of origination, and other expenses related to the mortgaged property such as property taxes and hazard insurance, and

    o   to meet monthly housing expenses and other financial obligations and monthly living expenses.

The underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the borrower's income and credit history, may be varied in appropriate cases where factors such as low loan-to-value ratios or other favorable credit exist.

(Emphases added.)

103.    The March 6, 2006 and January 26, 2007 Registration Statements filed by SAMI II represented:

- 30 -

UNDERWRITING STANDARDS

Mortgage loans to be included in a mortgage pool will be purchased on the closing date by the depositor either directly or indirectly from Affiliated Sellers or Unaffiliated Sellers. The depositor will acquire mortgage loans utilizing re-underwriting criteria which it believes are appropriate, depending to some extent on the depositor's or its affiliates' prior experience with the Seller and the servicer, as well as the depositor's prior experience with a particular type of mortgage loan or with mortgage loans relating to mortgaged properties in a particular geographical region. A standard approach to re-underwriting is to compare loan file information and information that is represented to the depositor on a tape with respect to a percentage of the mortgage loans the depositor deems appropriate in the circumstances. The depositor will not undertake any independent investigations of the creditworthiness of particular obligors.

The mortgage loans, as well as mortgage loans underlying mortgage securities will have been originated in accordance with underwriting standards described below.

The underwriting standards to be used in originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan.

The mortgage loans will be originated under "full/alternative", "stated income/verified assets", "stated income/stated assets", "no documentation" or "no ratio" programs. The "full/alternative" documentation programs generally verify income and assets in accordance with Fannie Mae/Freddie Mac automated underwriting requirements. The stated income/verified assets, stated income/stated assets, no documentation or no ratio programs generally require less documentation and verification than do full documentation programs which generally require standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories. Generally, under both "full/alternative" documentation programs, at least one month of income documentation is provided. This documentation is also required to include year-to-date income or prior year income in case the former is not sufficient to establish consistent income. Generally under a "stated income verified assets" program no verification of a mortgagor's income is undertaken by the origination however, verification of the mortgagor's assets is obtained. Under a "stated income/stated assets" program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied. Generally, under a "no documentation" program, the mortgagor is not required to state his or her income or assets and therefore, no verification of such mortgagor's income or assets is undertaken by the originator. The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.

Generally, under a "no ratio" program, the mortgagor is not required to disclose their income although the nature of employment is disclosed. Additionally, on a "no ratio" program assets are verified.

*The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available* (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses. However, the Loan-to-Value Ratio of the mortgage loan is another critical factor. In addition, a mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations.

High LTV Loans are underwritten with an emphasis on the creditworthiness of the related mortgagor. High LTV Loans are underwritten with a limited expectation of recovering any amounts from the foreclosure of the related mortgaged property.

\*    \*    \*

Each prospective mortgagor will generally complete a mortgage loan application that includes information on the applicant's liabilities, income, credit history, employment history and personal information. One or more credit reports on each applicant from national credit reporting companies generally will be required. The report typically contains information relating to credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions, or judgments.

(Emphasis added.)

104.    The Prospectus Supplements provided a more detailed description of the underwriting standards used to originate the mortgage loans. Using the same, or substantially similar language, each Prospectus Supplement made the following representations:

THE SELLER'S UNDERWRITING STANDARDS

General.

Underwriting standards are applied by or on behalf of the seller to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide the underwriting officer with pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expense, as well as

an authorization to apply for a credit report which summarizes the borrower's credit history with merchants and lenders and any record of bankruptcy.

\*   \*   \*

The Seller's Underwriting Process.

General. The seller's underwriting guidelines are intended to evaluate the value of the mortgaged property as collateral and to consider the borrower's credit standing and repayment ability. Generally, the borrowers have FICO scores of 650 or above. With respect to adjustable rate, interest only loans with loan-to-value ratios above 80%, the borrowers are qualified at a note rate 2% in excess of the otherwise applicable rate. With respect to all other interest only loans, the borrowers are qualified based on the seller's regular underwriting guidelines and the interest only payment called for by the note. On a case-by-case basis, the seller may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratios, low debt-to-income ratios, good credit history, stable employment, financial reserves, and time in residence at the applicant's current address. A portion of the mortgage loans represent underwriting exceptions.

Correspondent and Retail. Approximately [   %] and [   %] of the group 1 and group 2 mortgage loans, respectively, were generally originated or acquired in accordance with the seller's underwriting guidelines with respect to its correspondent channel, except in the case of two correspondents, First Republic Bank and Countrywide Home Loans Inc., which originate in accordance with their own underwriting criteria and guidelines which have been approved by the seller, and approximately [   %] and [   %] of the group 1 and group 2 mortgage loans, respectively, were originated in accordance with the seller's guidelines for its retail channel. The seller's underwriting guidelines for its correspondent and retail channels are applied in accordance with a procedure that generally requires (1) one full appraisal report of the mortgaged property valued up to $650,000, one full appraisal report and one field review for mortgaged property valued between $650,000 and $1,000,000, and two full appraisal reports for mortgaged property valued at $1,000,000 or more, that satisfy the requirements of Fannie Mae and Freddie Mac and (2) a review by the seller of all appraisal reports. The seller's underwriting guidelines generally permit single-family mortgage loans with loan-to-value ratios at origination of up to 95% (or, with respect to additional collateral mortgage loans, up to 100%) for the highest credit grading category, depending on the creditworthiness of the borrower, the type and use of the property, the loan size, the purpose of the loan application and the documentation type. Generally, loans with loan-to-value ratios greater than 80% must either have mortgage insurance or additional collateral securing the loan. See "The Mortgage Loan Groups--Mortgage Loan Statistics--Additional Collateral Mortgage Loans" above.

Each prospective borrower completes an application that includes information with respect to the applicant's liabilities, assets, income and employment history, as

well as certain other personal information. A credit report is required on each applicant from at least one credit reporting company. The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments.

The mortgage loans were originated or acquired consistent with and generally conform to "full/alternate documentation," "stated income documentation," or "no ratio documentation" residential loan programs.

For "full/alternate documentation" program loans, current employment is verified, a two-year history of previous employment (or for self-employed borrowers, two years of income tax returns), verification through deposit verifications of sufficient liquid assets for down payments, closing costs and reserves, and depository account statements or settlement statements documenting the funds received from the sale of the previous home are required.

For "stated income documentation" program loans, current employment is verified, a two-year history of previous employment is verified, qualifying income is based on the stated amount provided by the prospective borrower, and deposit verifications are made to ensure sufficient liquid assets.

For "no ratio documentation" program loans, current employment is verified and a minimum of two years' history of previous employment and verification of sufficient liquid assets are required.

Verification of the source of funds (if any) required to be deposited by the applicant as a down payment in the case of a purchase money loan is generally required under all program guidelines.

105.    The Prospectus Supplements for Series 2006-4 and 2006-5 stated that 56.60% and 72.19%, respectively, of the mortgage loans were originated by Wells Fargo Bank pursuant to its own underwriting standards and acquired by Thornburg through its bulk purchase program. The Prospectus Supplements for those Series of Certificates stated the underwriting standards of Wells Fargo Bank as follows:

Mortgage Loan Underwriting.

The Mortgage Loans have been underwritten in accordance with one or more of the following: (i) Wells Fargo Bank's "general" underwriting standards, (ii) Wells Fargo Bank's "retention program," and (iii) the underwriting standards of participants in Wells Fargo Bank's non-agency conduit program.

General Standards. Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (i.e., the lower of the appraised value of the Mortgaged Property and the purchase price), the borrower's means of support and the borrower's credit history. Wells Fargo Bank's guidelines for underwriting may vary according to the nature of the borrower or the type of loan, since differing characteristics may be perceived as presenting different levels of risk. With respect to certain Mortgage Loans, the originators of such loans may have contracted with unaffiliated third parties to perform the underwriting process. Except as described below, the Mortgage Loans will be underwritten by or on behalf of Wells Fargo Bank generally in accordance with the standards and procedures described herein.

*    *    *

A prospective borrower applying for a mortgage loan is required to complete a detailed application. The loan application elicits pertinent information about the applicant, with particular emphasis on the applicant's financial health (assets, liabilities, income and expenses), the property being financed and the type of loan desired. A self-employed applicant may be required to submit his or her most recent signed federal income tax returns. With respect to every applicant, credit reports are obtained from commercial reporting services, summarizing the applicant's credit history with merchants and lenders.

Generally, significant unfavorable credit information reported by the applicant or a credit reporting agency must be explained by the applicant. The credit review process generally is streamlined for borrowers with a qualifying Mortgage Score.

Verifications of employment, income, assets or mortgages may be used to supplement the loan application and the credit report in reaching a determination as to the applicant's ability to meet his or her monthly obligations on the proposed mortgage loan, as well as his or her other mortgage payments (if any), living expenses and financial obligations. . . . Verifications of income, assets or mortgages may be waived under certain programs offered by Wells Fargo Bank, but Wells Fargo Bank's underwriting guidelines require, in most instances, a verbal or written verification of employment to be obtained. In some cases, employment histories may be obtained through one of various employment verification sources, including the borrower's employer, employer-sponsored web sites, or third-party services specializing in employment verifications. In addition, the loan applicant may be eligible for a loan approval process permitting reduced documentation. The above referenced reduced documentation options and waivers limit the amount of documentation required for an underwriting decision and have the effect of increasing the relative importance of the credit report and the appraisal. Documentation requirements vary based upon a number of factors, including the

purpose of the loan, the amount of the loan, the ratio of the loan amount to the property value and the mortgage loan production source. Wells Fargo Bank accepts alternative methods of verification, in those instances where verifications are part of the underwriting decision; for example, salaried income may be substantiated either by means of a form independently prepared and signed by the applicant's employer or by means of the applicant's most recent paystub and/or W-2. Loans underwritten using alternative verification methods are considered by Wells Fargo Bank to have been underwritten with "full documentation." In cases where two or more persons have jointly applied for a mortgage loan, the gross incomes and expenses of all of the applicants, including nonoccupant co-Mortgagors, are combined and considered as a unit.

In general, borrowers applying for loans must demonstrate that the ratio of their total monthly debt to their monthly gross income does not exceed a certain maximum level. Such maximum level varies depending on a number of factors including Loan-to-Value Ratio, a borrower's credit history, a borrower's liquid net worth, the potential of a borrower for continued employment advancement or income growth, the ability of the borrower to accumulate assets or to devote a greater portion of income to basic needs such as housing expense, a borrower's Mortgage Score and the type of loan for which the borrower is applying.... Wells Fargo Bank permits debt-to-income ratios to exceed guidelines when the applicant has documented compensating factors for exceeding ratio guidelines such as documented excess funds in reserves after closing, a history of making a similar sized monthly debt payment on a timely basis, substantial residual income after monthly obligations are met, evidence that ratios will be reduced shortly after closing when a financed property under contract for sale is sold, or additional income has been verified for one or more applicants that is ineligible for consideration as qualifying income.

\*    \*    \*

Underwriter Discretion. During the second calendar quarter of 2005, Wells Fargo Bank initiated a program designed to encourage its mortgage loan underwriting staff to prudently, but more aggressively, utilize the underwriting discretion already granted to them under Wells Fargo Bank's underwriting guidelines and policies. This initiative was viewed by management as necessary and desirable to make prudent loans available to customers where such loans may have been denied in the past because of underwriter hesitancy to maximize the use of their ability to consider compensating factors as permitted by the underwriting guidelines. There can be no assurance that the successful implementation of this initiative will not result in an increase in the incidence of delinquencies and foreclosures, or the severity of losses, among mortgage loans underwritten in accordance with the updated philosophy, as compared to mortgage loans underwritten prior to the commencement of the initiative.

106.    The Prospectus Supplement for Series 2007-2 additionally provided the underwriting process for First Republic Bank, as follows:

- 36 -

First Republic's Underwriting Process

\*     \*     \*

The underwriting process is intended to assess both the prospective borrower's credit standing and the ability to repay, and the value and adequacy of the mortgaged property as collateral. However, First Republic relies primarily on the borrower's ability to repay the loan. This includes analyzing the borrower's cash flow, verified liquidity, credit-standing, employment history, and overall financial condition. The value of the mortgaged property is considered as a measure of the extent of its recovery in the event of default. To determine the adequacy of the property as collateral for a loan, appraisals are obtained from qualified outside appraisers approved by First Republic. These appraisers are chosen from a small group of appraisers and their qualifications are reviewed at least annually.

\*     \*     \*

Each prospective borrower submits an application package that includes the applicant's federal income tax returns for at least the last two years (self-employed individuals are required to submit their personal and business tax returns for the past three years, as are individuals seeking larger loan amounts) and information with respect to the applicant's bank and brokerage accounts, assets, liabilities, income, and employment history. In addition, First Republic, with the applicant's permission, obtains credit reports from three credit bureaus, including the applicant's respective credit scores. First Republic verifies the income, employment and liquid assets of the applicant to determine the borrower's ability to make timely payment. In all cases, First Republic obtains the applicant's permission to obtain copies of tax returns directly from the Internal Revenue Service to verify income information. First Republic will generally obtain a verification of mortgage and current mortgage statement for mortgage loans not reported on the credit report. Information relative to significant adverse credit and legal actions must be explained in writing by the applicant and must be acceptable to First Republic. The origination process also requires that adequate title insurance, standard fire and hazard insurance and, where necessary, flood insurance be obtained and maintained.

Once all applicable employment, credit and property information is received, a determination is made as to whether the prospective borrower has (1) sufficient income available to meet both housing and total debt obligations and (2) sufficient post-loan liquidity to carry the debt in the event of any personal setback or regional economic downturn. The borrower's credit history and track record for accumulation of assets is another important factor in deciding the amount of credit to be extended. The amount of the loan may be limited by these factors, in addition to the established value of the mortgaged property. In some cases, First Republic may exceed its standard maximum loan-to-value guidelines and extend additional credit to a qualified borrower if compensating factors exist. In such cases, First Republic may require the borrower to pledge additional collateral to secure the mortgage loan, including marketable securities or certificates of deposit acceptable to First Republic. In other cases, First Republic may require a borrower to secure the mortgage loan

- 37 -

with additional real estate collateral. The value of the additional collateral must be such that it brings the total collateral value within First Republic's standard loan-to-value guidelines. Securities and certificates of deposit, as additional collateral, are pledged specifically to secure the borrower's loan, are marked to market daily, and cannot be removed from the pledge agreement until the loan amount is within First Republic's conservative, standard loan to value requirements, and only upon First Republic's executive loan committee's express approval. If the market value of the additional collateral declines below specified levels, the related borrower is required to pledge sufficient additional collateral to secure the mortgage loan or to pay down the mortgage loan balance to an acceptable level.

107.    The Prospectus Supplements for Series 2007-3 stated that 23.03% of the mortgage loans underlying the Certificates were originated by Countrywide Home Loans, Inc. ("Countrywide") pursuant to its own underwriting guidelines and acquired by Thornburg through its bulk purchase program. The Prospectus Supplement stated the underwriting standards of Countrywide as follows:

Countrywide's Underwriting Standards

General

Countrywide Home Loans has been originating mortgage loans since 1969. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.

As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

\*    \*    \*

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly

portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. . . . Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

\*   \*   \*

The nature of the information that a borrower is required to disclose and whether the information is verified depends, in part, on the documentation program used in the origination process. In general under the Full Documentation Loan Program (the "Full Documentation Program"), each prospective borrower is required to complete an application which includes information with respect to the applicant's assets, liabilities, income, credit history, employment history and other personal information. Self-employed individuals are generally required to submit their two most recent federal income tax returns. Under the Full Documentation Program, the underwriter verifies the information contained in the application relating to employment, income, assets and mortgages.

A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both. Countrywide Home Loans offers the following documentation programs as alternatives to its Full Documentation Program: an Alternative Documentation Loan Program (the "Alternative Documentation Program"), a Reduced Documentation Loan Program (the "Reduced Documentation Program"), a CLUES Plus Documentation Loan Program (the "CLUES Plus Documentation Program"), a No Income/No Asset Documentation Loan Program (the "No Income/No Asset Documentation Program"), a Stated Income/Stated Asset Documentation Loan Program (the "Stated Income/Stated Asset Documentation Program") and a Streamlined Documentation Loan Program (the "Streamlined Documentation Program").

\*   \*   \*

Standard Underwriting Guidelines.

\*   \*   \*

Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.

In connection with the Standard Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Program, the CLUES Plus Documentation Program or the Streamlined Documentation Program.

The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.

Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio ranges up to 95%.

The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.

The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

Expanded Underwriting Guidelines.

Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also

permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

*    *    *

Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.

In connection with the Expanded Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Loan Program, the No Income/No Asset Documentation Program and the Stated Income/Stated Asset Documentation Program. Neither the No Income/No Asset Documentation Program nor the Stated Income/Stated Asset Documentation Program is available under the Standard Underwriting Guidelines.

The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines.

Similarly, the same documentation and verification requirements apply to mortgage loans documented under the Reduced Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Reduced Documentation Program, higher loan balances and Loan-to-Value Ratios are permitted for mortgage loans underwritten pursuant to the Expanded Underwriting Guidelines than those permitted under the Standard Underwriting Guidelines. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 90%. The borrower is not required to disclose any income information for some mortgage loans originated under the Reduced Documentation Program, and accordingly debt-to-income ratios are not calculated or included in the underwriting analysis. The maximum Loan-to-Value Ratio, including secondary financing, for those mortgage loans ranges up to 85%.

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. This

- 41 -

program is limited to borrowers with excellent credit histories. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income. The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%. Mortgage loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

Under the Expanded Underwriting Guidelines, Countrywide Home Loans may also provide mortgage loans to borrowers who are not U.S. citizens, including permanent and non-permanent residents. The borrower is required to have a valid U.S. social security number or a certificate of foreign status (IRS form W 8). The borrower's income and assets must be verified under the Full Documentation Program or the Alternative Documentation Program. The maximum Loan-to-Value Ratio, including secondary financing, is 80%.

108. The above statements regarding the underwriting standards used to originate or acquire the mortgage loans underlying the Certificates for each Issuing Trust were untrue statements of material fact, because they failed to disclose that:

a. Thornburg, its correspondent lenders, and its wholesale mortgage brokers and lenders were blatantly disregarding Thornburg's stated underwriting standards, or in the case of First Republic Bank, First Republic Bank's underwriting standards;

b. Thornburg, its correspondent lenders, and its wholesale mortgage brokers and lenders were abusing underwriter discretion to take exception to and diverge from the applicable underwriting standards, including the overuse of stated income and Alt-A loans in lieu of full documentation prime loans;

c. Thornburg was not conducting adequate quality control reviews of the mortgage loans acquired from its correspondent lenders, wholesale mortgage brokers and lenders, and sellers through its bulk purchase program to insure that they complied with the stated underwriting standards; and

- 42 -

       d.    the mortgage loans underlying the Certificates were not supported by adequate documentation concerning, *inter alia,* the borrowers' income and employment.

## B.    Loan Documentation Program

109.    Each of the Prospectus Supplements specifically represented that the vast majority of the mortgage loans underlying the Certificates were originated using the full documentation program as set forth in the following table, such that the borrowers' current employment and income were documented and verified:

| Trust | Loan Group 1 | Loan Group 2 | Loan Group 3 | Loan Group 4 |
|-------|-------------|-------------|-------------|-------------|
| Series 2006-2 | 85.59% | 89.80% | n/a | n/a |
| Series 2006-3 | 85.37% | 83.97% | 89.95% | n/a |
| Series 2006-4 | 83.14% | 55.91% | n/a | n/a |
| Series 2006-5 | 62.09% | n/a | n/a | n/a |
| Series 2006-6 | 77.96% | n/a | n/a | n/a |
| Series 2007-1 | 77.12% | 76.97% | 84.70% | n/a |
| Series 2007-2 | 87.26% | 80.66% | 88.05% | n/a |
| Series 2007-3 | 15.95% | 81.51% | 81.91% | 85.68% |
| Series 2007-4 | 80.57% | 78.16% | 88.82% | n/a |
| Series 2007-5 | 79.87% | 77.25% | 84.87% | n/a |

110.    The Prospectus Supplements also included a table demonstrating the number of mortgage loans originated under each loan documentation program.[6] For example, the Prospectus Supplement for Series 2006-2 included the following table:

---

[6] *See* Prospectus Supplements for Series 2006-2 at Annex II-3, Annex II-13, and Annex II-22; Series 2006-3 at S-38, S-53, S-69, and S-84; Series 2006-4 at S-A-6, S-A-20, and S-A-32; Series 2006-5 at A-5; Series 2006-6 at Annex II-5; Series 2007-1 at S-B-7, S-B-21, S-B-35, and S-B-49; Series 2007-2 at S-B-7, S-B-21, S-B-35, and S-B-48; Series 2007-3; Series 2007-4 at S-B-4, S-B-19, S-B-34, and S-B-48; and Series 2007-5 at S-B-6, S-B-17, S-B-29, and S-B-41

| DOCUMENTATION | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE AS OF THE CUT-OFF DATE |
|---|---|---|---|
| Full Documentation .... ... ... ... | 1,207 | $838,344,740.10 | 88.48% |
| Stated Income Documentation ... | 106 | 100,783,293.57 | 10.64 |
| No Ratio Documentation ... ... | 10 | 8,394,717.54 | 0.89 |
| Total ... ... ... ... ......... | 1,323 | $947,522,751.21 | 100.00% |

111.    The Prospectus Supplements further represented that Thornburg specialized in prime mortgages: "The seller's securitization program generally *concentrates on prime*, jumbo adjustable rate and hybrid residential mortgage loans, with features geared towards more sophisticated, affluent borrowers, such as large loan balances, interest-only periods and modification options." (emphasis added).[7]

112    The above statements were untrue statements of material fact because they failed to disclose that:

a    Thornburg, its correspondent lenders, and its wholesale mortgage brokers and lenders were blatantly disregarding Thornburg's underwriting standards for its full documentation program, and in the case of First Republic Bank, First Republic Bank's underwriting standards for its full documentation program;

b.    A significant amount of the full documentation loans underlying the Trusts actually were stated income, or Alt-A loans, because they were not supported by sufficient documentation concerning, *inter alia*, the borrowers' income and employment;

c.    Thornburg, its correspondent lenders, and its wholesale mortgage brokers and lenders were abusing underwriter discretion to take exception to and diverge from the applicable underwriting standards for the full documentation program, including the overuse of stated income and Alt-A loans; and

---

[7] *See* Prospectus Supplements for Series 2006-2 at S-39; Series 2006-3 at S-96; Series 2006-4 at S-46; Series 2006-5 at S-30; Series 2006-6 at S-34; Series 2007-1 at S-53; Series 2007-2 at S-53; Series 2007-3; Series 2007-4 at S-31; and Series 2007-5 at S-35.

d.    Thornburg was not conducting adequate quality control reviews of the mortgage loans acquired from its correspondent lenders and from originators through its bulk purchase program to insure compliance with stated underwriting standards for full documentation loans.

### C.    Debt-to-Income Ratios of the Borrowers

113.    Certain of the Prospectus Supplements made specific representations about the borrowers' debt-to-income ratios.[8] For example, the Prospectus Supplement for Series 2006-4 stated that the non-zero weighted average debt-to-income ratio of the mortgage loans was approximately 34.237% as of the Cut-off Date, and included the following table:

DEBT-TO-INCOME RATIO OF THE MORTGAGE LOANS

| DEBT-TO-INCOME RATIO (%) | NUMBER OF MORTGAGE LOANS | SCHEDULED PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF AGGREGATE SCHEDULED PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | WEIGHTED AVERAGE GROSS COUPON | WEIGHTED AVERAGE STATED REMAINING TERM | WEIGHTED AVERAGE ORIGINAL LOAN-TO-VALUE | WEIGHTED AVERAGE CREDIT SCORE |
|---|---|---|---|---|---|---|---|
| N/A | 34 | $21,255,840.47 | 1.28% | 6.303% | 354 | 59.08% | 762 |
| 0.001 - 10.000 | 28 | 46,852,597.00 | 2.82 | 6.231 | 357 | 60.78 | 739 |
| 10.001 - 20.000 | 157 | 136,297,523.00 | 8.19 | 6.280 | 354 | 64.81 | 747 |
| 20.001 - 30.000 | 395 | 299,435,164.49 | 18.00 | 6.267 | 354 | 66.89 | 737 |
| 30.001 - 40.000 | 873 | 670,113,886.05 | 40.27 | 6.261 | 355 | 67.59 | 737 |
| 40.001 - 50.000 | 586 | 428,954,160.95 | 25.78 | 6.230 | 355 | 68.64 | 733 |
| 50.001 - 60.000 | 50 | 42,279,183.79 | 2.54 | 6.243 | 356 | 62.71 | 732 |
| 60.001 - 70.000 | 33 | 18,033,556.94 | 1.08 | 6.179 | 355 | 68.09 | 763 |
| 70.001 - 80.000 | 1 | 760,000.00 | 0.05 | 6.250 | 357 | 80.00 | 724 |
| TOTAL | 2,157 | $1,663,981,912.69 | 100% | 6.254% | 355 | 67.09% | 737 |

114.    The above statements were untrue statements of material fact because they failed to disclose that the borrowers' income was not verified and adequately supported by proper documentation pursuant to stated underwriting standards such that the data used to calculate the debt-to-income ratios was based on inaccurate or falsified income figures.

---

[8] See Prospectus Supplements for Series 2006-4 at S-A-4, S-A-18, and S-A-31; Series 2006-5 at A-3; Series 2006-6 at Annex II-3; Series 2007-1 at S-B-5, S-B-19, S-B-33, and S-B-47; Series 2007-2 at S-B-5, S-B-19, S-B-33, and S-B-47; Series 2007-3; and Series 2007-5 at S-B-4, S-B-15, S-B-27, and S-B-39.

- 45 -

**D.    Credit Enhancement**

115.    Each Prospectus Supplement described the amount and type of credit enhancement provided for each Series of Certificates.[9]  For example, the Prospectus Supplement for Series 2006-2 stated:

> Credit enhancement for the offered certificates includes subordination, loss allocation and limited cross-collateralization features.
>
> \*       \*       \*
>
> CREDIT ENHANCEMENT
>
> Payments of principal and interest on the group 1 certificates and group 2 certificates will be paid on a pro rata basis; provided, however, that the Class A- 1-B Certificates will have a prior right of payment of principal over the Class A-1-C Certificates. The senior certificates will have a prior right of payment over the subordinate certificates. Among the classes of subordinate certificates, the Class B-1 Certificates will have the highest payment priority and the Class B-6 Certificates will have the lowest payment priority.
>
> Subordination is designed to provide the holders of certificates with a higher payment priority with protection against most losses realized when the remaining unpaid principal balance on a mortgage loan exceeds the amount of proceeds recovered upon the liquidation of that mortgage loan. In general, this loss protection is accomplished by allocating the realized losses first, among the subordinate certificates, beginning with the subordinate certificates with the lowest payment priority, and second, to the related class or classes of senior certificates (other than the Class A-X-1 and Class A-X-2 Certificates) on a pro rata basis; provided that the pro rata portion of any realized losses attributable to the group 2 mortgage loans otherwise allocable to the Class A-2-B Certificates will be allocated entirely to the Class A-2-C Certificates until their certificate principal balance is reduced to zero before any such realized losses are allocated to the Class A-2-B Certificates.
>
> In addition, the manner of allocating payments of principal to the certificates will differ, as described in this prospectus supplement, depending upon the occurrence of several different events or triggers.
>
> Up to and including the distribution date in March 2013, the subordinate certificates will not receive any unscheduled principal unless the senior certificates (other than the interest-only certificates) are paid down to zero or the credit enhancement provided by the subordinate certificates has doubled prior to that certain loss and delinquency tests have been satisfied. After the distribution date in March 2013,

---

[9] *See* Prospectus Supplements for Series 2006-2 at S-15; Series 2006-3 at S-17; Series 2006-4 at S-8; Series 2006-5 at S-10; Series 2006-6 at S-11; Series 2007-1 at S-8; Series 2007-2 at S-8; Series 2007-3; Series 2007-4 at S-12; and Series 2007-5 at S-15.

subject to certain loss and delinquency triggers being satisfied, the subordinate
certificates will receive increasing portions of principal prepayments over time.

See "Description of the Certificates--Principal," "--Allocation of Losses" and "--
Subordination of the Subordinate Certificates" in this prospectus supplement.

116. The statements regarding credit enhancement for the Certificates were untrue
statements of material fact because they failed to disclose that the Certificates were not protected
with the level of credit enhancement represented to investors in the Prospectus Supplements
because:

        a.    Thornburg, its correspondent lenders, and its wholesale mortgage brokers
and lenders were blatantly disregarding Thornburg's stated underwriting standards, or in the case
of First Republic Bank, First Republic Bank's underwriting standards;

        b    Thornburg, its correspondent lenders, and its wholesale mortgage brokers
and lenders were abusing underwriter discretion to take exception to and diverge from the
applicable underwriting standards, including the overuse of stated income and Alt-A loans in lieu
of full documentation prime loans;

        c.    Thornburg was not conducting adequate quality control reviews of the
mortgage loans acquired from its correspondent lenders, wholesale mortgage brokers and
lenders, and sellers through its bulk purchase program to insure that they complied with the
stated underwriting standards; and

        d.    the mortgage loans underlying the Certificates were not supported by
adequate documentation concerning, *inter alia*, the borrowers' income and employment.

**E.    Credit Ratings Assigned by the Rating Agency Defendants and Conflicts of Interest**

117. With respect to the ratings assigned to each class of the Certificates, the
Prospectus Supplements used the same, or substantially similar language, and stated:

It is a condition to the issuance of the offered certificates that the
certificates initially have the ratings from Moody's Investors Service, Inc. and
Standard & Poor's Rating Services, a division of The McGraw-Hill Companies,
Inc. set forth in the table on page S-5. The ratings on the offered certificates
address the likelihood that the holders of the offered certificates will receive all
distributions on the mortgage loans to which they are entitled.

A rating is not a recommendation to buy, sell or hold securities and it may be lowered or withdrawn at any time by the assigning rating agency.

*    *    *

It is a condition to the issuance of the offered certificates that the senior certificates be rated "AAA" by Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc ("S&P") and "Aaa" by Moody's Investors Service, Inc. ("Moody's," and together with S&P, the "rating agencies"). It is a condition to the issuance of the Class B-2 Certificates that they be rated at least "A" by S&P. It is a condition to the issuance of the Class B-3 Certificates that they be rated at least "BBB" by S&P.

The ratings assigned by the above rating agencies address the likelihood of the receipt of all distributions on the mortgage loans by the related certificate holders under the agreement pursuant to which the certificates are issued. The ratings of each rating agency take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on that mortgage pool is adequate to make payments required by the certificates. However, ratings of the certificates do not constitute a statement regarding frequency of prepayments on the related mortgage loans. . . .

The ratings do not address the possibility that, as a result of principal prepayments, holders of the offered certificates may receive a lower than anticipated yield, and such ratings do not address the ability of the seller to repurchase certain mortgage loans for which the interest rate or terms have converted.

The ratings assigned to the offered certificates should be evaluated independently from similar ratings on other types of securities. A rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the rating agency.

The depositor has not engaged any rating agency other than S&P and Moody's to provide ratings on the offered certificates. However, there can be no assurance as to whether any other rating agency will rate the offered certificates or, if it does, what ratings would be assigned by that rating agency. Any rating on the offered certificates by another rating agency, if assigned at all, may be lower than the ratings assigned to the offered certificates by S&P and Moody's.

118.    The Prospectus Supplements included a table that set forth the required initial rating for each class of Certificates. The Prospectus Supplement for Series 2006-2, for example, included the following table:

- 48 -

| CLASS | CLASS PRINCIPAL BALANCE (1) | EXPECTED FINAL DISTRIBUTION DATE (5) | CUSIP NUMBER | INITIAL CERTIFICATE RATINGS S&P | MOODY'S |
|-------|---------------------------|--------------------------------------|--------------|------|---------|
| A-1-A | $50,715,000 | March 2009 | 885220 KS 1 | AAA | Aaa |
| A-1-B | $92,204,000 | May 2008 | 885220 KI 9 | AAA | Aaa |
| A-1-C | $144,397,000 | March 2009 | 885220 KU 6 | AAA | Aaa |
| A-2-A | $460,343,000 | March 2009 | 885220 KV 4 | AAA | Aaa |
| A-2-B | $150,000,000 | March 2009 | 885220 KW 2 | AAA | Aaa |
| A-2-C | $16,700,000 | March 2009 | 885220 KX 0 | AAA | Aaa |
| A-X-1 | Notional Amount(8) | March 2009 | 885220 KY 8 | AAA | Aaa |
| A-X-2 | Notional Amount(8) | March 2009 | 885220 KZ 5 | AAA | Aaa |
| A-R | $100 | April 2006 | 885220 LA 9 | AAA | Aaa |
| B-1 | $13,266,000 | June 2013 | 885220 LB 7 | AA | N/R (11) |
| B-2 | $6,633,000 | June 2013 | 885220 LC 5 | A | N/R (11) |
| B-3 | $4,738,000 | June 2013 | 885220 LD 3 | BBB | N/R (11) |

119.    The above statements were untrue statements of material fact because they: (a) failed to disclose that the ratings assigned to the Certificates did not reflect the true likelihood of the receipt of all payments on the loans; (b) misrepresented that the ratings considered the actual credit quality of the loans; (c) misrepresented that the ratings considered the extent to which the payment stream on the loans was adequate to make the payments required by the Certificates; and (d) misrepresented that certain Certificates were "investment-grade" when they should have been classified as below investment-grade, in accordance with the Rating Agency Defendants' pre-established rating guidelines.

120.    Additionally, the above statements were misleading in that they failed to disclose that the Rating Agency Defendants employed an "issuer pays" fee model and entered into compensation agreements with the issuers of the Certificates whereby they would be compensated only if they provided the desired rating. Such a fee model naturally created a conflict of interest which undermined the credibility of the ratings at the time they were issued.

121.    As a result of the Defendants' misrepresentations, the original ratings provided by the Rating Agency Defendants did not represent the true risk of the Certificates, as they were based on insufficient information and faulty assumptions concerning how many underlying mortgages were likely to default. The President's Working Group on Financial Markets, Policy Statement Financial Market Developments confirmed that there were flaws in credit rating

agencies' assessments of subprime MBS and other complex structured financial products, such as mortgage pass-through certificates.

122.    Internal Rating Agency emails recently made public by U.S. Congressional investigators reveal that some Rating Agency Defendant employees suspected before the credit markets deteriorated that the Rating Agency Defendants used lax standards for rating MBS. For example, one email between colleagues at S&P stated, "Rating agencies continue to create and [sic] even bigger monster – the CDO market. Let's hope we are all wealthy and retired by the time this house of cards falters." As J.P. Morgan CEO Jamie Dimon observed, "There was a large failure of common sense. Very complex securities should not have been rated as if they were easy to value bonds."

123.    Consequently, on June 11, 2008, the SEC proposed new rules that would, *inter alia*: (1) prohibit rating agencies from issuing ratings on a structured product, including mortgage pass-through certificates, unless information on the assets underlying the product was made available; (2) prohibit credit rating agencies from structuring the same products they rate; and (3) require the public disclosure of the information used by credit rating agencies in determining a rating on a structured product, including information on the underlying assets.

124.    On July 8, 2008, the SEC released findings from an extensive 10-month examination of the ratings practices of Fitch, Moody's, and S&P. As announced by the SEC:

> Under new statutory authority from Congress that enabled the SEC to register and examine credit rating agencies, the agency's staff conducted examinations of Fitch Ratings, Ltd., Moody's Investor Services Inc., and Standard & Poor's Ratings Services to evaluate whether they are adhering to their published methodologies for determining ratings and managing conflicts of interest. With the recent subprime market turmoil, the SEC has been particularly interested in the rating agencies' policies and practices in rating mortgage-backed securities and the impartiality of their ratings.
>
> The SEC staff's examinations found that rating agencies struggled significantly with the increase in the number and complexity of subprime residential mortgage-backed securities (RMBS) and collateralized debt obligations (CDO) deals since 2002. The examinations uncovered that none of the rating agencies examined had specific written comprehensive procedures for rating RMBS and CDOs. Furthermore, significant aspects of the rating process were not always disclosed or even

documented by the firms, and conflicts of interest were not always managed appropriately.

"We've uncovered serious shortcomings at these firms, including a lack of disclosure to investors and the public, a lack of policies and procedures to manage the rating process, and insufficient attention to conflicts of interest," said SEC Chairman Christopher Cox.

125.    Specifically, the examinations found:

- There was a substantial increase in the number and in the complexity of RMBS and CDO deals since 2002, and some of the rating agencies appear to have struggled with the growth.

- Significant aspects of the ratings process were not always disclosed.

- Policies and procedures for rating RMBS and CDOs can be better documented.

- The rating agencies are implementing new practices with respect to the information provided to them.

- The rating agencies did not always document significant steps in the ratings process – including the rationale for deviations from their models and for rating committee actions and decisions – and they did not always document significant participants in the ratings process.

- The surveillance processes used by the rating agencies appear to have been less-robust than the processes used for initial ratings.

- Issues were identified in the management of conflicts of interest and improvements can be made.

- The rating agencies' internal audit processes varied significantly.

126.    On December 3, 2008, the SEC approved a series of measures to increase transparency and accountability at credit rating agencies, and ensure that firms provide more meaningful ratings and greater disclosures to investors.

## CLASS ACTION ALLEGATIONS

127.    Plaintiff brings this action on its own behalf and as a class action pursuant to Civil Rule 23 on behalf of all persons and entities who purchased or otherwise acquired the Certificates of the Issuing Trusts pursuant or traceable to the false and misleading

Registration Statements, Prospectuses and Prospectus Supplements, and who were damaged thereby (the "Class").

128.    Excluded from the Class are the Defendants, their officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

129.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.

130.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class action and securities litigation. Plaintiff has no interests that are contrary or in conflict with those of the Class members that Plaintiff seeks to represent.

131.    Plaintiff's claims are typical of the claims of the Class members. Plaintiff and all members of the Class purchased the Certificates pursuant to Registration Statements, Prospectuses and Prospectus Supplements and have sustained damages as a result of the wrongful conduct complained of herein.

132.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members individually to redress for the wrongful conduct alleged herein.

133.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (i)    Whether the federal securities laws were violated by the Defendants' acts and omissions as alleged herein;

        (ii)    Whether documents, including the Registration Statements, Prospectuses and Prospectus Supplements, that the Depositor

- 52 -

Defendants filed with the SEC contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(iii)    Whether the market prices of the Certificates were artificially inflated due to the material misrepresentations and omissions complained of herein; and

(iv)    Whether the Class members have sustained damages and, if so, the appropriate measure thereof.

134.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

135.    The names and addresses of the record owners of the Certificates purchased are available from the Depositor Defendants and/or their transfer agent(s). Notice can be provided to persons who purchased or otherwise acquired the Certificates by a combination of published notice and first class mail, using techniques and forms of notice similar to those customarily used in other class actions arising under in state and federal securities class actions

## CAUSES OF ACTION

## COUNT I

### Violations of Section 11 of the Securities Act

### Asserted Against Thornburg, the Issuing Trusts, the Individual Defendants, and the Underwriter Defendants

136.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Plaintiff and all Class members who purchased the Certificates pursuant or traceable to the Registration Statements filed with the SEC and the corresponding Prospectuses and Prospectus Supplements.

137.    This Count is not based on and does not sound in fraud. All preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. This Count is predicated upon Defendants' strict liability for making false and materially misleading statements in the Offering Documents.

138.    This Count is asserted against: (a) Thornburg, (b) the Issuing Trusts, which issued the Certificates offered to the investing public, (c) the Individual Defendants, all of whom signed the Registration Statements and were officers and/or directors of the respective Depositor Defendants at the time, and (d) the Underwriter Defendants who served as underwriters for the offerings of the Certificates

139.    The Offering Documents were materially false and misleading and contained untrue statements of material fact and omitted to state material facts necessary to make the statements made therein, under the circumstances in which they were made, not misleading, as set forth above.

140.    None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects  Had they exercised reasonable care, the Defendants named in this Count could have known of the material misstatements and omissions alleged herein.

141.    At the time they purchased the Certificates, Plaintiff and members of the Class did not know, or by the reasonable exercise of care could have known, of the material misstatements and omissions alleged herein.

142.    In connection with the Registration Statements and offering of the Certificates, the Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

143.    This Count is brought within one year after discovery of the untrue statements and omissions in the Offering Documents, and within three years after the Certificates were sold to Plaintiff and members of the Class.

144.    Plaintiff and the Class members acquired the Certificates pursuant or traceable to the Registration Statements before the Depositor Defendants made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the Registration Statements.

145. By reason of the misconduct alleged herein, the Defendants named in this Count violated Section 11 of the Securities Act and are liable to the Plaintiff and the Class members who purchased or acquired the Certificates pursuant or traceable to the Registration Statements, each of whom has been damaged as a result of such violations.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act

### Asserted Against the Depositor Defendants, the Underwriter Defendants, and the Rating Agency Defendants

146 Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Plaintiff and all members of the Class who purchased or otherwise acquired the Certificates pursuant to the Offering Documents.

147. This Count is not based on and does not sound in fraud. All preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

148. This Count is brought against the Depositor Defendants, the Underwriter Defendants, and the Rating Agency Defendants, each of whom offered and sold Certificates to Class members by the use of communication in interstate commerce and/or the United States mails, by means of the Offering Documents.

149. Specifically, in connection with the Issuing Trusts, the Depositor Defendants selected the Underwriter Defendants to underwrite and promote the Certificates. Pursuant to an underwriting agreement, the Depositor Defendants issued and the Underwriter Defendants underwrote and promoted the sale of the Certificates to the investing public.

150. The Rating Agency Defendants were "substantial participants" in the Offering of certain of the Certificates identified in paragraph 65 above, and are therefore liable as "sellers" under Section 12(a)(2) of the Securities Act.

- 55 -

151.   The Depositor Defendants, the Underwriter Defendants and the Rating Agency
Defendants participated in the preparation and dissemination of the false and misleading
Offering Documents for their own financial benefit. But for their participation in the sale of the
Certificates to the investing public, including their solicitation as set forth herein, the sale of the
Certificates could not and would not have been accomplished. Specifically, the Depositor
Defendants, the Underwriter Defendants, and the Rating Agency Defendants:

> (i)     Made the decision to offer the Certificates for sale to the investing
> public. The Depositor Defendants and the Underwriter Defendants
> drafted, revised and/or approved the Offering Documents. These
> written materials were calculated to create interest in the
> Certificates and were widely distributed by or on behalf of the
> Defendants named in this Count for that purpose;

> (ii)    Finalized the Offering Documents, and caused them to become
> effective; and

> (iii)   Conceived and planned the sale of the Certificates and orchestrated
> all activities necessary to affect the sale of the Certificates to the
> investing public, by issuing the Certificates, promoting the
> Certificates and supervising their distribution and ultimate sale to
> the investing public.

152.   As set forth more specifically above, the Offering Documents contained untrue
statements of material fact and omitted material facts necessary in order to make the statements,
in light of circumstances in which they were made, not misleading.

153.   Plaintiff and the members of the Class did not know, nor could they have known,
of the untruths or omissions contained in the Offering Documents.

154.   The Depositor Defendants, the Underwriter Defendants and the Rating Agency
Defendants were obligated to make a reasonable and diligent investigation of the statements
contained in the Offering Documents to ensure that such statements were true and that there was
no omission of material fact required to be stated in order to make the statements contained
therein not misleading. The Depositor Defendants, the Underwriter Defendants, and the
Rating Agency Defendants did not make a reasonable investigation and did not possess
reasonable grounds for the belief that the statements contained in the Offering Documents were

accurate and complete in all material respects. Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein.

155.    This Count is brought within one year after discovery of the untrue statements and omissions in the Offering Documents and within three years after the Certificates were sold to Plaintiff and Class members in connection with the Issuing Trusts.

156.    By reason of the misconduct alleged herein, the Defendants named in this Count violated Section 12(a)(2) of the Securities Act and are liable to Plaintiff and members of the Class who purchased or acquired the Certificates pursuant or traceable to the Offering Documents, each of whom has been damaged as a result of such violation.

157.    Plaintiff and the members of the Class who purchased the Certificates pursuant to the Offering Documents hereby seek rescission of their purchases and tender to the Defendants named in this Count any Certificates that Plaintiff and other members of the Class continue to own, in return for the consideration paid for those Certificates, together with interest thereon.

### COUNT III

### Violations of Section 15 of the Securities Act

### Asserted Against TMI and the Individual Defendants

158.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Plaintiff and all members of the Class who purchased or otherwise acquired the Certificates pursuant or traceable to the Offering Documents.

159.    This Count is not based on and does not sound in fraud. All preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

160.    For all the reasons set forth above in Counts I and II, TMI is a controlling entity of Thornburg Mortgage and the Individual Defendants are controlling entities or persons of the respective Depositor Defendants and are liable to Plaintiff and the members of the Class who

- 57 -

purchased the Certificates pursuant or traceable to the materially false and misleading statements and omissions contained in the Offering Documents, pursuant to Sections 11 and 12(a)(2) of the Securities Act, and were damaged thereby.

161.    This Count is asserted against TMI, who was a control person of Thornburg Mortgage, and against the Individual Defendants, each of whom was a control person of the respective Depositor Defendants, within the meaning of Section 15 of the Securities Act, by virtue of their control, ownership, offices, directorship, and specific acts. As control persons, TMI and the Individual Defendants had the power and influence, and exercised the same, to cause Thornburg Mortgage and the Depositor Defendants to engage in the acts described herein.

162.    TMI and the Individual Defendants' control, ownership and positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and members of the Class.

163.    By virtue of the conduct alleged herein, for which Thornburg Mortgage and the Depositor Defendants are primarily liable, as set forth above, TMI and the Individual Defendants are jointly and severally liable with and to the same extent as Thornburg Mortgage and the Depositor Defendants, pursuant to Section 15 of the Securities Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action pursuant to Civil Rule 23;

(b)    Awarding compensatory and rescissory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.


Dated:    February 27, 2009                    Respectfully submitted,

                                                CARPENTER STOUT & RANSOM LTD.


                                                WILLIAM H. CARPENTER, ESQ.
                                                1600 University NE, Suite A
                                                Albuquerque, New Mexico 87102
                                                Telephone: (505) 243-1336
                                                Facsimile: (505) 243-1339

                                                LABATON SUCHAROW LLP
                                                THOMAS A. DUBSS, ESQ.
                                                DAVID J. GOLDSMITH, ESQ.
                                                PAUL SCARLATO, ESQ.
                                                LAURA KILLIAN MUMMERT, ESQ.
                                                STEFANIE J. SUNDEL, ESQ.
                                                140 Broadway
                                                New York, New York 10005
                                                Telephone: (212) 907-0700
                                                Facsimile: (212) 818-0477

                                                *Attorneys for Plaintiff*