UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

| | |
|---|---|
| GENESEE COUNTY EMPLOYEES' RETIREMENT SYSTEM; MARYLAND-NATIONAL CAPITAL PARK & PLANNING COMMISSION EMPLOYEES' RETIREMENT SYSTEM; MIDWEST OPERATING ENGINEERS PENSION TRUST FUND, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> THORNBURG MORTGAGE SECURITIES TRUST 2006-3; THORNBURG MORTGAGE SECURITIES TRUST 2006-5; THORNBURG MORTGAGE SECURITIES TRUST 2007-4; GREENWICH CAPITAL ACCEPTANCE, INC.; STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC.; CREDIT SUISSE SECURITIES LLC, d/b/a CREDIT SUISSE SECURITIES (USA) LLC; RBS SECURITIES, INC.; BANC OF AMERICA SECURITIES LLC; ROBERT J. MCGINNIS; CAROL P. MATHIS; JOSEPH N. WALSH III; JOHN C. ANDERSON; JAMES M. ESPOSITO; JEFFREY L. VERSCHLEISER; MICHAEL B. NIERENBERG; JEFFREY MAYER; | No. 1:09-cv-00300-JOB/RLP <br><br> CLASS ACTION <br><br> AMENDED COMPLAINT FOR VIOLATIONS OF §§11, 12(a)(2) AND 15 OF THE SECURITIES ACT OF 1933 AND §§58-13B-30.B AND 58-13B-40.A OF THE NEW MEXICO SECURITIES ACT OF 1986 <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

[Caption continued on following page.]

THOMAS F. MARANO; MOODY'S CORP.;   )
MOODY'S INVESTORS SERVICE, INC.;   )
MCGRAW-HILL COMPANIES, INC.;   )
STANDARD & POOR'S RATINGS   )
SERVICES; FITCH, INC.; and FITCH   )
RATINGS,   )
                                         )
                       Defendants.   )
                                         )

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

BACKGROUND OF THE ACTION ....................................................................2

JURISDICTION AND VENUE ...........................................................................7

NON-PARTIES ....................................................................................................7

THE PARTIES......................................................................................................8

    Lead Plaintiffs ..............................................................................................8

    Thornburg Defendants .................................................................................8

    Depositor Defendants...................................................................................9

    The Underwriter Defendants........................................................................9

    The Individual Defendants.........................................................................10

    The Rating Agency Defendants .................................................................12

FACTUAL ALLEGATIONS .............................................................................13

THE FALSE AND MISLEADING OFFERING DOCUMENTS.................................15

    The Offering Documents in Connection with the Issuance of the Loans Placed in
        the Trusts Misrepresented the Loan Origination and Underwriting
        Standards Utilized ...............................................................................15

    Loans Originated by Wells Fargo ..............................................................15

    Loans Originated by Thornburg Mortgage Home Loans, Inc. ....................17

    The Offering Documents Misrepresented the Documentation Purportedly
        Required in Connection with the Issuance of the Loans Placed in the
        Trusts...................................................................................................19

    The Offering Documents Misrepresented the Validity of the Appraisals
        Conducted in Connection with the  Issuance of the Loans Placed in the
        Trusts...................................................................................................20

    The Offering Documents Falsely Stated that the Loan Documents in Connection
        with the Issuance of the Loans Placed in the Trusts Were Accurate and
        Free of Fraud.......................................................................................24

**Page**

The Offering Documents Misrepresented the LTV Ratios of the Mortgages
Placed in the Trusts ..........................................................................................25

The Credit Ratings Prominently Displayed in the Offering Documents Were False
and Misleading ...................................................................................................28

The Rating Agencies Issued False and Misleading Ratings on the Thornburg
Certificates ........................................................................................................31

The Defendants Used the Rating Agencies' Defective Models and Methodologies
to Create the Certificates ...................................................................................33

The Models Used to Assign Ratings Were Outdated and Defective ................................34

The Rating Agencies Failed to Conduct Reasonable Due Diligence into the
Underwriters'/Servicers' Representations ...........................................................36

The Rating Agencies Lacked the Resources to Adequately and Properly Rate the
MBSs...................................................................................................................37

The Rating Agencies Were Not Independent ....................................................................37

CLASS ACTION ALLEGATIONS ........................................................................................38

CLAIMS FOR RELIEF ...........................................................................................................40

COUNT I .................................................................................................................................40

Violations of §11 of the Securities Act Asserted Against the Thornburg
Defendants, the Depositor Defendants, the Individual Defendants, and the
Underwriter Defendants ......................................................................................40

COUNT II ................................................................................................................................42

Violations of §12(a)(2) of the Securities Act Asserted Against the Thornburg
Defendants, the Depositor Defendants, the Individual Defendants and the
Underwriter Defendants ......................................................................................42

COUNT III ...............................................................................................................................44

Violations of §15 of the Securities Act Asserted Against Underwriter Defendant
RBS and the Individual Defendants ....................................................................44

583126_1

**Page**

COUNT IV.................................................................................................................46

    Violations of the New Mexico Securities Act of 1986 Against All Defendants ..............46

PRAYER FOR RELIEF ..........................................................................................47

JURY DEMAND.....................................................................................................48

583126_1

## INTRODUCTION

1.      This is a securities class action brought on behalf of Lead Plaintiffs the Maryland-National Capital Park & Planning Commission Employees' Retirement System and the Midwest Operating Engineers Pension Trust Fund and all other investors which collectively purchased more than $5 billion of Series 2006-3, 2006-5 and 2007-4 Thornburg Mortgage Securities Trust mortgage pass-through certificates (the "Certificates") issued pursuant to and/or traceable to three registration statements filed with and declared effective by the Securities and Exchange Commission (the "SEC") between January 2006 and January 2007 (the "Class").[1]

2.      The claims herein for violations of §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") and the New Mexico Securities Act of 1986 ("N.M. Securities Act")[2] are asserted against: (i) the trusts which were used to issue the Certificates (the "Issuing Trusts"); (ii) the entities which served as depositors and issuers of the Certificates; (iii) senior insiders of those depositors; (iv) the underwriters of the Certificates; and (v) the rating agencies which issued investment-grade ratings in connection with the sale of the Certificates.  Plaintiffs are not alleging that defendants committed fraud or acted with deceitful intent.  Rather, plaintiffs allege negligence and strict liability claims.

---

[1]      The registration statements and prospectuses are collectively referred to herein as the "Offering Documents."

[2]      The N.M. Securities Act of 1986 was repealed in 2009, and the repeal was effective on January 1, 2010.  *See* §58-13B-1 *et seq*.  The successor act, the New Mexico Uniform Securities Act, §58-13C-101 *et seq*., contains a "transition" provision that expressly provides that the N.M. Securities Act of 1986 "exclusively governs all actions or proceedings that are pending on the effective date of the New Mexico Uniform Securities Act or may be instituted on the basis of conduct occurring before the effective date of the New Mexico Uniform Securities Act."  §58-13C-701.A.  This action was pending on the effective date of the New Mexico Uniform Securities Act. As such, the N.M. Securities Act of 1986 governs this action.

## BACKGROUND OF THE ACTION

3.      A mortgage pass-through certificate or mortgage-backed security ("MBS") represents a securitized interest in an underlying pool of mortgages, paying certificate holders the cash flows derived from the pools of securitized mortgages.  Thus, in theory, the principal and interest payments from the underlying pool of mortgages are passed directly to investors each month.  A certificate's value and the interest rate at which it can be sold are tied directly to the objective ability of the borrowers associated with the underlying mortgages to repay the principal and interest on the underlying mortgages as well as the adequacy of the collateral in the event of default.  The certificates at issue here were supported by pools of mortgage loans originated, acquired and/or serviced by Thornburg Mortgage Home Loans, Inc. ("TMHL" or "Thornburg") and its business affiliates.[3]

4.      Credit rating agencies Moody's Corp. and Moody's Investors Services, Inc. ("Moody's"); McGraw-Hill Companies, Inc. (through its Standard & Poor's Ratings Services ("S&P") division); and Fitch Ratings and Fitch, Inc. ("Fitch") (collectively, the "Rating Agencies" or the "Rating Agency Defendants") played an essential role in the pricing and sale of the Certificates,[4] provided ratings in connection with the issuance of each of the Certificates, which

---

[3]      Thornburg affiliates included several well-known financial institutions, including for example, Wells Fargo Bank, N.A. ("Wells Fargo") from which Thornburg acquired 72% of the loans contained in the 2006-5 Trust.

[4]      In April 2010, hearings before the U.S. Senate Permanent Subcommittee on Investigations revealed that the "credit rating agencies allowed Wall Street to impact their analysis, their independence and their reputation for reliability."  The Senate hearings uncovered a host of troubling practices relating to the manner in which credit ratings are assigned to MBS, including testimony by a former managing director at Moody's that Moody's was "more concerned about losing a few points of market share than about violating the law," and that there was a "see no evil, hear no evil

ratings were fundamental to the sale of the Certificates.  In connection with issuing a rating, the Rating Agencies were charged by law with acting independently in evaluating and reporting on the risk associated with a particular investment.  The ratings on the Certificates issued by the Rating Agency Defendants were prominently displayed in the Offering Documents, as each of the defendants was aware that most institutional investors were prohibited from purchasing investments with any rating other than investment grade.  The Certificates at issue here received the highest possible rating which exists – AAA/Aaa – in connection with the issuance of the Certificates.

5.      In addition to the false and misleading AAA/Aaa ratings prominently displayed in the Offering Documents, the Offering Documents also contained numerous other misrepresentations and omitted material facts necessary to make the Offering Documents not false and/or misleading.  For example, the Series 2006-5 Offering Documents falsely described the underwriting standards purportedly used to originate the loans placed in the Trust, stating that with regard to the Wells Fargo loans purchased by Thornburg (which comprised 72% of the loans in the 2006-5 Trust):

- "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral";

- prior to "acquiring any mortgage loan from a correspondent, [Thornburg] conducts a review of the mortgage file to determine whether the mortgage loan meets [Thornburg's] underwriting standards";

- "[i]n connection with its bulk purchase program, [Thornburg] conducts a loan documentation review of a portion of the mortgage loans to confirm adherence to the terms of the purchase agreement with the loan seller"; and

- the sellers of loans to Thornburg were required to confirm "that the loans were underwritten in accordance with the underwriting standards and guidelines of the respective loan seller or other specified underwriting standards and guidelines."

sort of attitude."  *See* Wall Street and the Financial Crisis: The Role of Credit Rating Agencies, Permanent Subcommittee on Investigation, April 23, 2010.

583126_1

6.      These statements were false and misleading.  Indeed, Wells Fargo's underwriting standards were not adhered to in connection with the origination of many, if not most, of the mortgage loans placed into the Trusts, nor did Thornburg review and confirm that Wells Fargo had in fact underwritten loans in compliance with its own underwriting standards.  Moreover, the loans placed into the Trusts had been made without regard to the borrowers' ability to repay the loans. The loan originators, including Wells Fargo, made as many loans as possible without regard to borrowers' actual ability to repay, as the loan originators were not carrying the loans on their own balance sheets or subjecting themselves to the risk of non-payment or default.  Rather, the loan originators were rapidly generating the mortgages, packaging the mortgage loans into pools and selling the loans to defendants.

7.      The Offering Documents also assured investors that the property appraisals utilized in connection with the underwriting of the underlying mortgages were based on "comparable homes sold" and (presumably to confirm the legitimacy and objectiveness of the appraisals) further represented that appraisers' compensation had "***not [been] affected by the approval or disapproval of the mortgage loan***."  Specifically, the Offering Documents stated that:

- ●      appraisals had been conducted "***by a qualified appraiser, duly appointed by the originator of the mortgage loan, who had no interest, direct or indirect in the mortgaged property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the mortgage loan or, in accordance with certain specified programs of the originator of the mortgage loan an approved AVM in lieu of the appraisal***"; and

- ●      "***appraisal of any mortgaged property reflects the individual appraiser's judgment as to value, based on the market values of comparable homes sold within the recent past in comparable nearby locations and on the estimated replacement cost***."

8.      These representations were false and misleading.  In fact, the compensation paid to appraisers who were utilized in connection with the mortgage loans placed in the Trusts was contingent upon providing the loan originators with predetermined, inflated property appraisals

- 4 -

which were designed to allow borrowers to qualify for loans without regard to the actual value of the appraised property.  In addition, the property appraisals used in connection with the underwriting of the loans placed in the Trusts were not based on recent sales of comparable properties, but rather utilized prior sales that were cherry-picked to support an inflated sales price.

9.     The Offering Documents also falsely represented that the documents submitted in connection with the loan underwriting process were accurate and free of fraud.  Specifically, the Offering Documents represented that "**no fraud was committed by the originator of the mortgage loan[s] and the seller is not aware of any fact that would reasonably lead the seller to believe that any mortgagor had committed fraud in connection with the origination of such mortgage loan[s].**" The Offering Documents further stated that each "**mortgage loan schedule is complete, true and correct in all material respects and . . . the mortgage note or an affidavit of lost note with respect to each mortgage loan has been delivered to the trustee or its designee.**"  Finally, the Offering Documents emphasized that the "**origination practices used by the seller or the related originator of the mortgage loan**" were "**in all respects legal, proper, prudent and customary in the mortgage origination and servicing business.**"  They were not.

10.     These representations were false and misleading as fraud and manipulation pervaded the underwriting process.  Appraisers routinely submitted artificial property appraisals.  And, the documents submitted in connection with the loans were riddled with inaccuracies, as borrowers and loan originators inflated borrowers' incomes to allow the borrowers to appear to qualify for loans which they could not actually qualify for.

11.     In addition, the Offering Documents represented that the loan-to-value ("LTV") ratios of the loans underlying the Certificates possessed certain, specific LTV ratios. These ratios, in fact, were materially understated.  For example, the Prospectus Supplement for the Series 2006-5 Trust

- 5 -

represented that the weighted average original loan-to-value ratio of the mortgage loans in the 2006-5 Trust was approximately 67.59%.  The Prospectus Supplement further represented that ***less than 1%*** of the mortgage loans had original LTV ratios in excess of 80%.  Likewise, the Prospectus Supplement for the Series 2007-4 Trust represented that the weighted average original loan to value ratio of the mortgage loans was 70.74% and that only approximately 3.43%, 2.54% and 2.54% of the group 1, group 2, and group 3 mortgage loans, respectively, had original LTV ratios in excess of 80%.  The LTV ratios contained in the Offering Documents were based on inaccurate and inflated property appraisals, rendering the LTV ratios specified in the Offering Documents understated and false.

12.    The Offering Documents also stated that the Certificates had been legitimately awarded "investment-grade" credit ratings.  Notwithstanding the fact that (according to the Rating Agencies' own models) the Certificates warranted lower credit ratings, the Rating Agency Defendants opined that the Certificates at issue here each warranted the highest credit rating available.  These AAA (S&P and Fitch) and Aaa (Moody's) ratings were included in the Offering Documents.  The Rating Agency Defendants either were aware or should have known that the credit ratings of the Certificates were inaccurate and understated the investment risk associated with the Certificates because the ratings were generated using outdated assumptions, relaxed rating criteria and/or inaccurate information.

13.    Lead Plaintiffs and the Class purchased the Certificates pursuant and traceable to the false and misleading Offering Documents and, in doing so, suffered substantial economic loss as they acquired securities at inflated prices that were far riskier than represented, were not equivalent to other investments with the same credit ratings, and were anything but the "best quality."  Subsequent to the purchase of the Certificates by the Lead Plaintiffs and the Class, the Rating

- 6 -

Agency Defendants downgraded nearly all of the Certificates to below investment-grade, rendering the Certificates unmarketable at the prices paid by Lead Plaintiffs and the Class.  Lead Plaintiffs and the Class have suffered substantial economic harm in connection with their purchases of the Certificates.

## JURISDICTION AND VENUE

14.     The claims alleged herein arise under §§11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o, and §58-13B-30.B and §58-13B-40.A of the N.M. Securities Act.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 (*see* 15 U.S.C. §77v) and 28 U.S.C. §1367(a).

16.     Venue is proper pursuant to §22 of the Securities Act, 15 U.S.C. §77v and 28 U.S.C. §1391(b).  Many of the acts and conduct complained of herein occurred in substantial part in this District.  TMST, formerly known as Thornburg Mortgage, Inc., and TMHL were headquartered in New Mexico.  In addition, defendants conduct business in this District.

17.     In connection with the acts and conduct alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

## NON-PARTIES

18.     On May 1, 2009, TMST, formerly known as Thornburg Mortgage, Inc., declared bankruptcy.  TMHL purchased and originated first lien residential mortgage loans primarily for securitization.  TMHL served as "Sponsor" of the transactions, "Seller" of the mortgage loans in the securitization of the Issuing Trusts, and "Servicer" of the loans comprising the Trusts.  TMHL declared bankruptcy on May 1, 2009.  Neither Thornburg Mortgage, Inc., nor TMHL are named as a defendant in this action.

## THE PARTIES

### Lead Plaintiffs

19.     Lead Plaintiff the Maryland-National Capital Park & Planning Commission Employees' Retirement System (the "Retirement System") is a single employer defined benefit pension plan established in 1972 that is administered by a Board of Trustees.  The Retirement System covers employees of the Park & Planning Commission, which is the bi-county agency empowered to acquire, develop and administer a regional system of parks.  As of 2009, the Retirement System had more than 3,400 members, including more than 2,200 active employees and 980 retirees and beneficiaries.  The Retirement System purchased Certificates in the 2006-3 and 2007-4 Trusts pursuant and/or traceable to the Offering Documents as reflected in its Certification previously filed with the Court and suffered substantial economic loss in connection therewith.

20.     Lead Plaintiff the Midwest Operating Engineers Pension Trust Fund (the "Pension Trust Fund") provides benefits to members of Local 150 of the International Union of Operating Engineers.  Local 150 represents employees principally in Indiana, Illinois and Iowa and serves approximately 23,000 members.  The Pension Trust Fund purchased Certificates in the 2006-3, 2006-5 and 2007-4 Trusts pursuant and/or traceable to the Offering Documents as reflected in its Certification previously filed with the Court and suffered substantial economic loss in connection therewith.

### Thornburg Defendants

21.     Defendants Thornburg Mortgage Securities Trust 2006-3, Thornburg Mortgage Securities Trust 2006-5 and Thornburg Mortgage Securities Trust 2007-4 are statutory trusts formed under Delaware law and were each an "Issuer" of the Certificates within the meaning of §2(a)(4) of the Securities Act, 15 U.S.C. §77b(a)(4).

- 8 -

**Depositor Defendants**

22.     Defendant Greenwich Capital Acceptance, Inc. ("GCA") is a finance subsidiary of Greenwich Capital Holdings, Inc. and an affiliate of RBS Securities, Inc. ("RBS"), formerly known as Greenwich Capital Markets, Inc., organized for the limited purpose of acquiring, owning and transferring mortgage assets and selling interests in those assets or bonds secured by those assets. RBS served as a "Depositor" for the Series 2006-3 and Series 2007-4 Certificates and was the "Issuer" of the Certificates within the meaning of §2(a)(4) of the Securities Act, 15 U.S.C. §77b(a)(4).

23.     Defendant Structured Asset Mortgage Investments II, Inc. ("SAMI II") is a wholly owned subsidiary of The Bear Stearns Companies Inc. ("Bear Stearns"), which was acquired by JP Morgan Chase & Co., and was organized for the sole purpose of serving as a private secondary mortgage market conduit.  SAMI II served as a "Depositor" for the Series 2006-5 Certificates and was the "Issuer" of the Certificates within the meaning of §2(a)(4) of the Securities Act, 15 U.S.C. §77b(a)(4).

24.     GCA and SAMI II are collectively referred to as the "Depositor Defendants."

**The Underwriter Defendants**

25.     Defendant Credit Suisse Securities LLC, d/b/a Credit Suisse Securities (USA) LLC ("Credit Suisse"), is a subsidiary of Credit Suisse Group.  Credit Suisse acted as an "Underwriter" for the Series 2006-3 and 2006-5 Certificates within the meaning of §2(a)(11) of the Securities Act, 15 U.S.C. §77b(a)(11).   As an underwriter, Credit Suisse participated in the drafting and dissemination of the Offering Documents pursuant to which the Certificates were sold to Lead Plaintiffs and other Class members.

26.     Defendant RBS Securities, Inc. ("RBS"), formerly known as Greenwich Capital Markets, d/b/a RBS Greenwich Capital, is a subsidiary of Greenwich Capital Holdings, Inc.  RBS acted as an "Underwriter" for the Series 2006-3, 2006-5 and 2007-4 Certificates within the meaning of §2(a)(11) of the Securities Act, 15 U.S.C. §77b(a)(11).  As an underwriter, RBS participated in the drafting and dissemination of the Offering Documents pursuant to which the Certificates were sold to Lead Plaintiffs and other Class members.

27.     Defendant Banc of America Securities LLC ("BAS") is an investment banking subsidiary of Bank of America Corp.  BAS acted as "Underwriter" for the Series 2006-5 Certificates within the meaning of §2(a)(11) of the Securities Act, 15 U.S.C. §77b(a)(11).  As an underwriter, BAS participated in the drafting and dissemination of the Offering Documents pursuant to which the Certificates were sold to Lead Plaintiffs and other Class members.

28.     Defendants Credit Suisse, RBS and BAS are collectively referred to as the "Underwriter Defendants."

**The Individual Defendants**

29.     Defendant Robert J. McGinnis ("McGinnis") was, at all relevant times, a Director and Principal Executive Officer of RBS.  Defendant McGinnis signed the Registration Statements filed by RBS on January 11, 2006 (No. 333-130961) and January 29, 2007 (No. 333-140279), as amended.

30.     Defendant Carol P. Mathis ("Mathis") was, at all relevant times, the Principal Financial Officer and Principal Accounting Officer of GCA.  Defendant Mathis signed the Registration Statements filed by RBS on January 11, 2006 (No 333-130961) and January 29, 2007 (No. 333-140279), as amended.

- 10 -

31.     Defendant Joseph N. Walsh III ("Walsh") was, at all relevant times, a Director and Managing Director of RBS.  Defendant Walsh signed the Registration Statements filed by RBS on January 11, 2006 (No. 333-130961) and January 29, 2007 (No. 333-140279), as amended.

32.     Defendant John C. Anderson ("Anderson") was, at all relevant times, a Director and Managing Director of RBS.  Defendant Anderson signed the Registration Statements filed by RBS on January 11, 2006 (No. 333-130961) and January 29, 2007 (No. 333-140279), as amended.

33.     Defendant James M. Esposito ("Esposito") was, at all relevant times, a Director, Managing Director, General Counsel, and Secretary of RBS. Defendant Esposito signed the Registration Statements filed by RBS on January 11, 2006 (No. 333-130961) and January 29, 2007 (No. 333-140279), as amended.

34.     Defendant Jeffrey L. Verschleiser, ("Verschleiser") was, at all relevant times, the Principal Executive Officer of SAMI II.  Defendant Verschleiser signed the Registration Statement filed by SAMI II on March 6, 2006 (No. 333-132232), as amended.

35.     Defendant Michael B. Nierenberg ("Nierenberg") was, at all relevant times, the Principal Financial Officer and Principal Accounting Officer of SAMI II.  Defendant Nierenberg signed the Registration Statement filed by SAMI II on March 6, 2006 (No. 333-132232), as amended.

36.     Defendant Jeffrey Mayer ("Mayer") was, at all relevant times, a Director of SAMI II. Defendant Mayer signed the Registration Statement filed by SAMI II on March 6, 2006 (No. 333-132232), as amended.

37.     Defendant Thomas F. Marano ("Marano") was, at all relevant times, a Director of SAMI II.  Defendant Marano signed the Registration Statement filed by SAMI II on March 6, 2006 (No. 333-132232), as amended.

38.     Defendants McGinnis, Mathis, Walsh, Anderson, Esposito, Verschleiser, Nierenberg, Mayer, and Marano are collectively referred to as the "Individual Defendants."

**The Rating Agency Defendants**

39.     Defendant Moody's Corp. is a Delaware corporation which together with defendant Moody's Investors Service, Inc. (collectively, "Moody's"), is a credit rating agency that performs credit analysis for commercial and government entities and has a 40% market share of the world-wide credit ratings market.  As a condition of issuance, Moody's, among other rating agencies, was retained by the Depositor Defendants to issue certain ratings, not below investment-grade, with respect to the Certificates.  Moreover, Moody's was a substantial participant in creating each of the Trusts and in drafting and disseminating the Offering Documents for the Certificates issued pursuant thereto.

40.     Defendant McGraw-Hill Companies, Inc. ("McGraw-Hill") is a New York corporation.  Defendant Standard & Poor's Ratings Services ("S&P"), a division of McGraw-Hill, is a credit rating agency that performs credit analysis for commercial and government entities and also has a 40% market share of the world-wide credit ratings market.  As a condition of issuance, S&P, among other rating agencies, was retained by the Depositor Defendants to issue certain ratings, not below investment-grade, with respect to the Certificates.  S&P was a substantial participant in creating each of the Trusts and in drafting and disseminating the Offering Documents for the Certificates.

41.     Defendants Fitch, Inc. and Fitch Ratings (collectively, "Fitch") is a credit rating agency headquartered in New York, New York and London, England.  According to Fitch, it is a leading global credit rating agency.  Fitch is a majority-owned subsidiary of Fimalac, SA, an international business support services group headquartered in Paris, France.  As a condition of

- 12 -

issuance, Fitch, among other rating agencies, was retained by the Depositor Defendants to issue certain ratings, not below investment-grade, with respect to the Certificates.  Moreover, Fitch was a substantial participant in creating the 2006-3 Trust and in drafting and disseminating the Offering Documents for the Certificates issued pursuant thereto.

42.     Defendants Moody's, S&P and Fitch are collectively referred to as the "Rating Agency Defendants."  The Thornburg Defendants, Depositor Defendants, Underwriter Defendants and Individual Defendants caused the Rating Agency Defendants to be paid substantial amounts during 2006 and 2007 for their participation in the issuance and sale of the Certificates.

## FACTUAL ALLEGATIONS

43.     MBSs are created via the aggregation of large numbers of home mortgage loans into a single pool held by a trust.  The cash flow (*i.e.*, principal and interest payments from the underlying mortgage loans) of a MBS is derived from the payment by homeowners on the underlying mortgages contained in the pool.  Interests in the MBS are then sold to investors in the form of certificates using a cash-flow schedule (referred to as a "waterfall") that is structured to allocate incoming cash flows to various "tranches" of the trust.  Those tranches within a MBS which have the highest priority of payment represent the "safest" investments in the pool and are structured by issuers, depositors and rating agencies to receive AAA ratings.  Tranches lower down the entitlement line obtain payment only after the more senior tranches are paid, and therefore receive lower credit ratings.

44.     The Thornburg Defendants, Depositor Defendants, Individual Defendants, Underwriter Defendants, and Rating Agency Defendants designed the Certificates to ensure they received the highest ratings.  The defendants could not have sold the Certificates without the AAA/Aaa ratings assigned to the Certificates by the Rating Agency Defendants.

- 13 -

45.     The 2006-3 Trust, the 2006-5 Trust and the 2007-04 Trust were riddled with poor-quality loans, which contained fraudulent borrower information, or were made to borrowers who lacked the ability to repay the loans or refinance those loans before higher loan payments kicked in. The underlying loans had not been underwritten in compliance with the originators' or Thornburg's underwriting standards.   Moreover, prior to the issuance of the Certificates at issue in this case, housing prices had stopped appreciating, and borrowers were unable to refinance their loans resulting in rapidly escalating delinquencies and foreclosures.

46.     The defendants represented in the Offering Documents that Thornburg acquired the loans contained in the Trusts by (i) originating the loans itself; (ii) acquiring loans originated through Thornburg correspondents; and/or (iii) via bulk purchases of loans from originators such as Wells Fargo.   The Offering Documents described the underwriting guidelines purportedly used in connection with the origination of those loans, identified the specific loan originators which sold the loans to Thornburg and detailed the originators' specific underwriting guidelines associated therewith.   The Offering Documents provided detailed information about the underlying loans contained in each trust, including the number of loans purportedly originated using a "full documentation program."   The Offering Documents also described the appraisal practices purportedly used in connection with loan origination with respect to the loans within the Trusts. Moreover, the Offering Documents affirmatively represented that: (i) the loans within the Trusts complied with specific LTV ratios; (ii) the Certificates had "investment-grade" credit ratings issued by well-known (and, at the time, well-respected) rating agencies; and (iii) none of the documents submitted in connection with the loan underwriting process contained untrue or false information.

47.     The representations in the Offering Documents about the loan underwriting standards, appraisal practices, loan origination documents, LTV ratios, and credit ratings were each false and misleading when made.

## THE FALSE AND MISLEADING OFFERING DOCUMENTS

**The Offering Documents in Connection with the
Issuance of the Loans Placed in the Trusts
Misrepresented the Loan Origination and
Underwriting Standards Utilized**

### Loans Originated by Wells Fargo

48.     In connection with the registration and sale of the Series 2006-5 Certificates, the defendants prepared and filed with the SEC a prospectus supplement (the "2006-5 Prospectus Supplement") which disclosed that 72% of the loans involved in the mortgage pool underlying the Series 2006-5 Trust were originated by Wells Fargo, or through Wells Fargo's conduit program and purchased by TMHL pursuant to its Bulk Purchase program.

49.     The 2006-5 Prospectus Supplement expressly represented that the loans in the Series 2006-5 Trust were "underwritten in accordance with one or more of the following: (i) Wells Fargo Bank's 'general' underwriting standards, (ii) Wells Fargo Bank's 'retention program,' and (iii) the underwriting standards of participants in Wells Fargo Bank's non-agency conduit program."  The Prospectus Supplement further assured investors that "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral."

50.     The 2006-5 Prospectus Supplement also represented, with respect to all loans acquired via Thornburg's Bulk Purchase program, including the Wells Fargo loans, that Thornburg conducted adequate loan documentation reviews which "confirm adherence to the terms of the purchase agreement with the loan seller," and obtained assurances that those loans "were

- 15 -

underwritten in accordance with the underwriting standards and guidelines of the respective loan

seller or other specified underwriting standards and guidelines."

51.     The statements made in ¶¶49-50 were materially false and misleading when made.

The true facts which were not disclosed were that:

(a)     Wells Fargo had systemically failed to follow its stated underwriting standards in order to meet origination goals.

(b)     Wells Fargo required the underwriters who had underwritten loans placed in the 2006-5 Trust to generate a specified number of loans regardless of the repayment ability of the borrower by continually making exceptions for loan amounts, LTV, income, and other factors in order to ensure that loans which otherwise did not meet Wells Fargo's underwriting criteria would still be completed.

(c)     Wells Fargo was aware that information being submitted to it by borrowers to qualify for loans in connection with the loans it then sold to Thornburg and others was false, including borrowers' use of falsified bank statements.

(d)     During the time period when the loans in the Trusts were originated and Wells Fargo was systematically ignoring its own loan underwriting standards, lending to persons who Wells Fargo was aware could not afford to repay the loans, Wells Fargo employees objecting to this practice were fired.

(e)     Wells Fargo had implemented a program in late 2006 called "***courageous underwriting***" which formalized the practice of ignoring underwriting guidelines where doing so was necessary to ensure that a loan was approved.

(f)     As a matter of practice, Wells Fargo extended stated income loans to persons with questionable credit and incomes who lacked the demonstrable ability to comply with the terms of the loan.

(g)     As a result of (a)-(f) above, contrary to the representations in the Offering Documents, neither defendants nor Wells Fargo employed the standards which allowed them to determine whether borrowers' income or ability to repay their loans was sufficient to meet the loan payments.

- 16 -

**Loans Originated by Thornburg Mortgage Home Loans, Inc.**

52.     As depicted below, Thornburg or its "correspondent lenders" originated a large

percentage of the mortgages within the Series 2006-3 Trust (82.6%), Series 2007-4 Trust (100%),

and Series 2006-5 Trust (26.3%).[5] The Prospectus Supplements for the Series 2006-3, 2006-5 and

2007-4 Certificates each represented that the mortgage loans originated by Thornburg or its

correspondent lenders were originated and/or acquired in a manner which complied with

Thornburg's underwriting standards, stating:

The Seller's Underwriting Process.

General.  The seller's underwriting guidelines are intended to evaluate the
value of the mortgaged property as collateral and to consider the borrower's credit
standing and repayment ability.  Generally, the borrowers have FICO scores of 650
or above.  With respect to adjustable rate, interest only loans with loan-to-value
ratios above 80%, the borrowers are qualified at a note rate 2% in excess of the
otherwise applicable rate.  With respect to all other interest only loans, the borrowers
are qualified based on the seller's regular underwriting guidelines and the interest
only payment called for by the note.  On a case-by-case basis, the seller may
determine that, based upon compensating factors, a prospective borrower not strictly
qualifying under the applicable underwriting guidelines warrants an underwriting
exception.  Compensating factors may include, but are not limited to, low loan-to-
value ratios, low debt-to-income ratios, good credit history, stable employment,
financial reserves, and time in residence at the applicant's current address.  A portion
of the mortgage loans represent underwriting exceptions.

Correspondent and Retail. . . .  The seller's underwriting guidelines for its
correspondent and retail channels are applied in accordance with a procedure that
generally requires (1) one full appraisal report of the mortgaged property valued up
to $650,000, one full appraisal report and one field review for mortgaged property
valued between $650,000 and $1,000,000, and two full appraisal reports for
mortgaged property valued at $1,000,000 or more, that satisfy the requirements of
Fannie Mae and Freddie Mac and (2) a review by the seller of all appraisal reports.
The seller's underwriting guidelines generally permit single-family mortgage loans
with loan-to-value ratios at origination of up to 95% (or, with respect to additional
collateral mortgage loans, up to 100%) for the highest credit grading category,

---

[5]     As set forth above, Wells Fargo originated 72% of the loans in the Series 2006-5 Trust.

depending on the creditworthiness of the borrower, the type and use of the property, the loan size, the purpose of the loan application and the documentation type.

Each prospective borrower completes an application that includes information with respect to the applicant's liabilities, assets, income and employment history, as well as certain other personal information. A credit report is required on each applicant from at least one credit reporting company. The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments.

53.     For loans originated by correspondent lenders, the Offering Documents assured investors that Thornburg had reviewed the lenders' mortgage files prior to acquiring the loans contained in the Trusts to ensure that the lenders complied with the stated underwriting guidelines, representing that "[p]rior to acquiring any mortgage loan from a correspondent, [Thornburg] conducts a review of the mortgage file to determine whether the mortgage loan meets [Thornburg's] underwriting standards . . . or whether an exception is warranted on a case by case basis. For a limited number of loans, the review process is conducted under [Thornburg's] supervision by one of its retail fulfillment vendors."

54.     The statements in ¶¶49-50 and 52-53 were materially false and/or misleading when made. The true facts which were not disclosed in the Offering Documents were that:

(a)     Thornburg's correspondent lenders and wholesale mortgage brokers and lenders had been generating the loans without regard to Thornburg's stated underwriting standards;

(b)     Thornburg's correspondent lenders and wholesale mortgage brokers and lenders were abusing underwriter discretion as a matter of course by invoking exceptions to and/or diverging from applicable underwriting standards;

(c)     Thornburg had not conducted adequate quality control reviews of the mortgage loans acquired from its correspondent lenders, wholesale mortgage brokers and lenders,

- 18 -

and sellers through its Bulk Purchase program, including Wells Fargo, to ensure that they complied

with the stated underwriting standards; and

(d)    the mortgage loans underlying the Certificates were not supported by adequate

documentation, *inter alia*, accurate data concerning the borrowers' income and employment or

accurate appraisals.

**The Offering Documents Misrepresented
the Documentation Purportedly Required in
Connection with the Issuance of the Loans
Placed in the Trusts**

55.    Each of the Offering Documents specifically represented that the vast majority of the

mortgage loans underlying the Certificates were originated using a full documentation program,

which documented and verified the borrowers' current employment and income, stating:

| Trust | Loan Group 1 | Loan Group 2 | Loan Group 3 |
|-------|--------------|--------------|--------------|
| Series 2006-3 | 85.37% | 83.97% | 89.95% |
| Series 2006-5 | 62.09% | n/a | n/a |
| Series 2007-4 | 80.57% | 78.16% | 88.82% |

Specifically, the Offering Documents for Series 2006-3, 2006-5 and 2007-4 Trusts represented that

"[f]or 'full/alternate documentation' program loans [or 'Loan Group' loans], current employment is

verified, a two-year history of previous employment (or for self-employed borrowers, two years of

income tax returns), verification through deposit verifications of sufficient liquid assets for down

payments, closing costs and reserves, and depository account statements or settlement statements

documenting the funds received from the sale of the previous home are required."

56.    The statements made in ¶¶49-50, 52-53 and 55 were false and/or misleading when

made.  The true facts were that:

(a)    Thornburg, its correspondent lenders, and its wholesale mortgage brokers and

lenders were generating loans in violation of Thornburg's underwriting standards;

- 19 -

(b)      Full documentation loans underlying the Trusts were not supported by sufficient documentation concerning, *inter alia*, the borrowers' income and employment; and

(c)      Thornburg was not in fact conducting adequate quality control reviews of the mortgage loans acquired from its correspondent lenders or from originators through its Bulk Purchase program to ensure compliance with stated underwriting standards for full documentation loans.

**The Offering Documents Misrepresented the Validity
of the Appraisals Conducted in Connection with the
Issuance of the Loans Placed in the Trusts**

57.      The Offering Documents for the Series 2006-3, 2006-5 and 2007-4 Trusts represented that the "appraisal of any mortgaged property reflects the individual appraiser's judgment as to value, based on the market values of comparable homes sold within the recent past in comparable nearby locations and on the estimated replacement cost" and that each mortgage file contained an "appraisal of the related mortgaged property by a qualified appraiser, duly appointed by the originator of the mortgage loan, who had no interest, direct or indirect in the mortgaged property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the mortgage loan or, in accordance with certain specified programs of the originator of the mortgage loan an approved AVM in lieu of the appraisal."

58.      The statements in ¶57 were materially false and/or misleading when made.  The true facts were that Thornburg and Wells Fargo – from which Thornburg purchased approximately 72% of the loans comprising the Series 2006-5 Trust – used inflated appraisals which represented that the home securing the underlying loan was worth more than the actual market value of the property.  For example:

- 20 -

(a)     To support the huge number of loans it was generating, Wells Fargo insisted that appraisals of properties be done by Rels Valuation ("Rels") – a joint venture between First American Real Estate Solutions (a subsidiary of First American Corporation) and Wells Fargo Foothill (a subsidiary of Wells Fargo & Co.).  Rels contracted with appraisers to perform the appraisals, demanding that if the appraisers wanted to perform appraisals for Wells Fargo, they had to agree to a reduced appraisal fee as low as 50% below the market rate.  Rels told the independent appraisers that if they did not agree to the reduced rate, Wells Fargo would place them on a "do-not use" list preventing them from being hired by Wells Fargo again.

(b)     Wells Fargo's practice of using inflated appraisals in order to ensure that loans would be approved was systemic and commonplace:

(i)     Wells Fargo used an Illinois residential real estate appraisal firm that was frequently threatened by Wells Fargo that it would lose future business if it failed to provide appraisals with a specific designated value without regard to the homes' actual value.

(ii)     A real estate appraiser in Las Vegas (where numerous Series 2006-3, 2006-5 and 2007-4 loans were originated), who conducted over 300 inflated appraisals for originators, including Wells Fargo, confirmed that Wells Fargo required appraisers to come up with appraisals which were typically 15% to 25% higher than the actual market values, or risk being blackballed from additional business.

(iii)     Wells Fargo mortgage brokers demanded inflated appraisals as a matter of course in Southern California,[6] where a large number of the loans underlying the

---

[6]     Twenty-four percent of the loans underlying the 2006-3 Certificates and 36% of the mortgage loans placed in the 2006-5 Trust were California loans.

Certificates were originated.  For example, Wells Fargo lenders directed appraisers to either give them the appraisal numbers Wells Fargo demanded or be precluded from doing business in California, not just with Wells Fargo but with any lender.  In some cases, the underlying appraised houses have been described as "crack houses" which should have been bulldozed, but were appraised with values exceeding $100,000.

59.     Defendants' representations that the appraisals underlying the loans were based on "the market values of comparable homes sold within the recent past in comparable nearby locations" was also false and misleading.  To the extent Rels utilized comparable home sales, such data was manipulated to inflate home values.  Between 2005 to 2007 (the timeframe of the appraisals for the loans in the Trusts at issue in this case) Rels used untrained employees pulling "comparable home sales" for Wells Fargo loans by doing nothing more than looking for sales on the internet and/or a "drive by" of the purported comparable properties.  No legitimate valuation analysis of the individual properties was done other than to find data supporting higher prices while disregarding any data inconsistent therewith.  Rels also applied consistent pressure on its employees to utilize home sales that were high enough to support the inflated appraisals and allow the loans in question to be completed.  If the initial comparable home values were not high enough, Rels demanded that higher priced homes be found and used, even when those homes were not, in fact, comparable to the homes that were the subject of the appraisals and loans in question.

60.     Rels' improper appraisal practices for Wells Fargo were subject to regulatory action by the State of Nevada Real Estate Division, Department of Business and Industry.  In fact, charges were brought in connection with its Wells Fargo appraisal practices arising out of Rels' appraisal of the subject property at a value 33% higher than ***the highest model in the subject area***, and to justify the inflated appraisal, failed to include numerous comparable model matches available at the time of

- 22 -

the report with actual values that ranged from 55% to 75% of the appraised value of the subject home.  Sanctions were imposed for the practice of relying solely on comparable sales for homes, which were substantially larger and not comparable in fact to the subject property, which manipulative conduct violated numerous professional and ethical standards for appraisers as well as applicable law.[7]

61.     Similarly, independent appraisers in Florida (where a significant number of the mortgage loans placed in the Trusts were made) have confirmed that many relevant appraisals were not based on "comparable properties."  Rather, in order to stay in business, inflated appraisals were made even if it required driving 20 miles away for "comparable" sales that were, in fact, anything but comparable.  Appraisers routinely manipulated the appraisal process by intentionally using more expensive properties with larger lots or square footages, or which had amenities which the appraised property did not have, in order to inflate the value of the appraised property.

---

[7]     These included the following violations of the "standards published in the Uniform Standards of Professional Appraisal Practice adopted by the Appraisals Standard Board of the Appraisal Foundation as authorized by Congress and adopted in Nevada" by NRS 645C.460(1)(a) and NAC 645C.405(i):

(a)     failing to protect the public by issuing an appraisal with significant errors;

(b)     failing to correctly employ recognized methods and techniques that are necessary to produce a credible appraisal;

(c)     rendering appraisal services in a careless or negligent manner; and

(d)     preparing a misleading report by failing to use the model match sales in the subject neighborhood and/or making a report with numerous errors.

- 23 -

**The Offering Documents Falsely Stated that the
Loan Documents in Connection with the Issuance
of the Loans Placed in the Trusts Were Accurate
and Free of Fraud**

62.     The Series 2006-3, 2006-5 and 2007-4 Offering Documents assured Lead Plaintiffs

and the Class that the underlying documentation was "true and correct" and that the loan origination

practices were free from fraud.  The Offering Documents utilized in connection with the issuance of

the Series 2006-3, 2006-5 and 2007-4 Certificates, emphasized that:

(a)     "To the seller's best knowledge, no fraud was committed by the originator of

the mortgage loan and the seller is not aware of any fact that would reasonably lead the seller to

believe that any mortgagor had committed fraud in connection with the origination of such mortgage

loan."

(b)     "The information set forth in the final mortgage loan schedule is complete,

true and correct in all material respects."

(c)     "The origination practices used by the seller or the related originator of the

mortgage loan . . . with respect to each mortgage note and mortgage have been in all respects legal,

proper, prudent and customary in the mortgage origination and servicing business."

63.     The statements in ¶62 were each false and/or misleading when made.  Defendants

either knew or should have known of the misrepresentations and fraud in the loan documents prior to

offering the Certificates for sale, as defendants purportedly performed due diligence on the loans

before purchasing them from originators.  The true facts about the loan portfolios in the 2006-3,

2006-5 and 2007-4 Trusts were that:

(a)     borrowers and loan originators, including Wells Fargo, were systematically

and routinely falsifying the incomes of the borrowers in order to qualify borrowers for loans they

could not otherwise qualify for or afford to pay;

- 24 -

(b)      the property appraisals utilized in connection with the loans in the Trusts were systematically inflated by appraisers who were being pressured and/or threatened by loan originators; and

(c)      the loan documentation contained misrepresentations overstating borrowers' assets, understating borrowers' debts, and/or misrepresenting borrowers' employment status and the occupancy of the purchased properties.

**The Offering Documents Misrepresented the
LTV Ratios of the Mortgages Placed in the Trusts**

64.      The Prospectus Supplements used in connection with the sale of the Certificates detailed the LTV ratios associated with the loans in each Trust.  Such information is material to investors, as lower LTV ratios indicate less risk with respect to the Certificates, while a higher LTV ratio indicates greater risk.

(a)      The Prospectus Supplement for the Series 2006-3 Certificates represented that the weighted average original LTV ratio of the mortgage loan was 67% and that approximately 2.33%, 2% and 1.19% of the group 1, group 2 and group 3 mortgage loans had original LTV ratios in excess of 80%.

(b)      The Prospectus Supplement for Series 2006-5 represented that the weighted average original LTV ratio of the mortgage loans was approximately 67.59% and that less than 1% of the loans had original LTV ratios in excess of 80%.

(c)      Likewise, the Prospectus Supplement for Series 2007-4 represented that the weighted average original LTV ratio of the mortgage loans was 70.74% and that approximately 3.43%, 2.54% and 2.54% of the group 1, group 2 and group 3 mortgage loans respectively had original LTV ratios in excess of 80%.

- 25 -

65.     An example of the extensive LTV ratio information contained within the Offering

Documents is set forth below in an excerpt from the Prospectus Supplement for Series 2006-3:

| STATED PRINCIPAL BALANCE ($) | NUMBER OF MORTGAGE LOANS | STATED PRINCIPAL BALANCE AS OF THE CUT-OFF DATE ($) | STATED PRINCIPAL BALANCE AS OF THE CUT-OFF DATE (%) | WEIGHTED AVERAGE GROSS COUPON (%) | % OF AGGREGATE WEIGHTED AVERAGE STATED REMAINING TERM | WEIGHTED AVERAGE ORIGINAL LOAN-TO-VALUE (%) | WEIGHTED AVERAGE CREDIT SCORE |
|---|---|---|---|---|---|---|---|
| 0-100,000.00 | 31 | 2,662,759.63 | 0.17 | 6.419 | 358 | 67.45 | 771 |
| 100,000.01-200,000.00 | 279 | 44,043,245.52 | 2.83 | 6.338 | 354 | 74.10 | 753 |
| 200,000.01-300,000.00 | 287 | 72,246,814.85 | 4.65 | 6.312 | 354 | 72.46 | 758 |
| 300,000.01-400,000.00 | 206 | 73,187,474.68 | 4.71 | 6.261 | 351 | 72.13 | 745 |
| 400,000.01-500,000.00 | 197 | 90,447,070.25 | 5.82 | 6.249 | 356 | 69.89 | 748 |
| 500,000.01-600,000.00 | 177 | 98,182,508.27 | 6.32 | 6.213 | 356 | 70.70 | 747 |
| 600,000.01-700,000.00 | 144 | 93,966,995.61 | 6.05 | 6.264 | 356 | 69.75 | 749 |
| 700,000.01-800,000.00 | 121 | 91,283,468.14 | 5.87 | 6.221 | 355 | 69.98 | 747 |
| 800,000.01-900,000.00 | 71 | 60,995,843.69 | 3.92 | 6.168 | 354 | 66.46 | 740 |
| 900,000.01-1,000,000.00 | 121 | 118,161,621.56 | 7.60 | 6.230 | 355 | 64.97 | 749 |
| 1,000,000.01-2,000,000.00 | 377 | 541,673,464.75 | 34.85 | 6.234 | 358 | 66.70 | 747 |
| 2,000,000.01-3,000,000.00 | 46 | 116,714,556.17 | 7.51 | 6.357 | 357 | 64.22 | 735 |
| 3,000,000.01-4,000,000.00 | 21 | 75,265,019.99 | 4.84 | 6.380 | 357 | 62.35 | 722 |
| 4,000,000.01-5,000,000.00 | 8 | 37,124,784.59 | 2.39 | 6.574 | 358 | 53.10 | 724 |
| 5,000,000.01 and Greater | 6 | 38,414,924.00 | 2.47 | 6.846 | 358 | 51.16 | 715 |
| TOTAL | 2,092 | 1,554,370,551.70 | 100.00% | 6.279% | 356 | 67.00% | 744 |

66.     The Prospectus Supplements for Series 2006-5 and 2007-4 provided similar

information on the LTV ratios of the loans.

## Series 2006-5
## Scheduled Principal Balance of the Mortgage Loans

| STATED PRINCIPAL BALANCE ($) | NUMBER OF MORTGAGE LOANS | SCHEDULED PRINCIPAL BALANCE AS OF THE CUT-OFF DATE ($) | % OF AGGREGATE SCHEDULED PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | WEIGHTED AVERAGE GROSS COUPON (%) | WEIGHTED AVERAGE STATED REMAINING TERM | WEIGHTED AVERAGE ORIGINAL LOAN-TO-VALUE (%) | NON-ZERO WEIGHTED AVERAGE CREDIT SCORE |
|---|---|---|---|---|---|---|---|
| 0.01-100,000.00 | 24 | 1,863,526.05 | 0.07 | 6.514 | 335 | 68.56 | 771 |
| 100,000.01-200,000.00 | 134 | 20,833,945.00 | 0.77 | 6.668 | 348 | 72.81 | 756 |
| 200,000.01-300,000.00 | 139 | 34,968,277.79 | 1.30 | 6.569 | 350 | 72.26 | 749 |
| 300,000.01-400,000.00 | 121 | 42,877,581.11 | 1.59 | 6.444 | 351 | 69.05 | 758 |
| 400,000.01-500,000.00 | 584 | 271,473,004.41 | 10.08 | 6.393 | 356 | 68.94 | 755 |
| 500,000.01-600,000.00 | 637 | 354,168,630.94 | 13.16 | 6.368 | 357 | 69.59 | 754 |
| 600,000.01-700,000.00 | 495 | 322,667,170.34 | 11.99 | 6.366 | 357 | 69.31 | 756 |

- 26 -

| STATED PRINCIPAL BALANCE ($) | NUMBER OF MORTGAGE LOANS | SCHEDULED PRINCIPAL BALANCE AS OF THE CUT-OFF DATE ($) | % OF AGGREGATE SCHEDULED PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | WEIGHTED AVERAGE GROSS COUPON (%) | WEIGHTED AVERAGE STATED REMAINING TERM | WEIGHTED AVERAGE ORIGINAL LOAN-TO-VALUE (%) | NON-ZERO WEIGHTED AVERAGE CREDIT SCORE |
|---|---|---|---|---|---|---|---|
| 700,000.01-800,000.00 | 308 | 232,489,941.18 | 8.64 | 6.356 | 357 | 68.93 | 758 |
| 800,000.01-900,000.00 | 203 | 173,678,884.50 | 6.45 | 6.358 | 358 | 69.86 | 756 |
| 900,000.01-1,000,000.00 | 356 | 349,507,980.24 | 12.98 | 6.309 | 358 | 64.28 | 754 |
| 1,000,000.01-2,000,000.00 | 504 | 723,971,662.12 | 26.89 | 6.440 | 358 | 66.66 | 749 |
| 2,000,000.01-3,000,000.00 | 36 | 90,308,660.46 | 3.35 | 6.585 | 358 | 66.27 | 753 |
| 3,000,000.01-4,000,000.00 | 13 | 47,458,347.21 | 1.76 | 6.834 | 359 | 59.21 | 739 |
| 4,000,000.01-5,000,000.00 | 3 | 13,525,000.00 | 0.50 | 6.914 | 359 | 56.17 | 760 |
| 5,000,000.01-6,000,000.00 | 1 | 5,117,523.10 | 0.19 | 7.500 | 348 | 60.00 | 704 |
| 6,000,000.01-7,000,000.00 | 1 | 7,000,000.00 | 0.26 | 6.375 | 360 | 47.46 | 756 |
| TOTAL | 3,559 | 2,691,910,134.45 | 100.00% | 6407% | 357 | 67.59% | 753 |

## Series 2007-4
## Stated Principal Balances of the Mortgage Loans

| STATED PRINCIPAL BALANCE ($) | NUMBER OF MORTGAGE LOANS | STATED PRINCIPAL BALANCE AS OF THE CUT-OFF DATE ($) | AGGREGATE STATED PRINCIPAL BALANCE AS OF THE CUT-OFF DATE (%) | WEIGHTED AVERAGE GROSS COUPON (%) | WEIGHTED AVERAGE STATED REMAINING TERM | WEIGHTED AVERAGE ORIGINAL LOAN-TO-VALUE (%) | NON-ZERO WEIGHTED AVERAGE CREDIT SCORE |
|---|---|---|---|---|---|---|---|
| 0.01-100,000.00 | 23 | 1,998,688.56 | 0.14 | 6.471 | 349 | **67.38** | 765 |
| 100,000.01-200,000.00 | 131 | 20,703,801.78 | 1.43 | 6.523 | 349 | **71.60** | 757 |
| 200,000.01-300,000.00 | 157 | 39,276,312.30 | 2.71 | 6.510 | 350 | **74.09** | 758 |
| 300,000.01-400,000.00 | 110 | 38,140,053.22 | 2.63 | 6.516 | 354 | **70.52** | 747 |
| 400,000.01-500,000.00 | 126 | 57,839,100.02 | 3.99 | 6.462 | 355 | **72.13** | 758 |
| 500,000.01-600,000.00 | 126 | 69,947,161.59 | 4.82 | 6.469 | 355 | **73.86** | 754 |
| 600,000.01-700,000.00 | 122 | 79,376,639.51 | 5.47 | 6.442 | 355 | **73.35** | 753 |
| 700,000.01-800,000.00 | 102 | 77,086,446.93 | 5.32 | 6.450 | 357 | **72.38** | 748 |
| 800,000.01-900,000.00 | 46 | 39,602,151.26 | 2.73 | 6.510 | 357 | **72.08** | 750 |
| 900,000.01-1,000,000.00 | 81 | 78,787,662.83 | 5.43 | 6.496 | 355 | **70.29** | 754 |
| 1,000,000.01-2,000,000.00 | 382 | 558,110,738.37 | 38.48 | 6.467 | 358 | **72.66** | 749 |
| 2,000,000.01-3,000,000.00 | 89 | 219,343,896.63 | 15.12 | 6.470 | 358 | **70.72** | 742 |
| 3,000,000.01-4,000,000.00 | 20 | 69,695,384.00 | 4.81 | 6.595 | 359 | **67.98** | 754 |
| 4,000,000.01-5,000,000.00 | 17 | 75,018,500.00 | 5.17 | 6.409 | 357 | **65.01** | 760 |
| 5,000,000.01 and Greater | 4 | 25,375,000.00 | 1.75 | 6.682 | 356 | **50.68** | 715 |
| TOTAL | 1,536 | $450,301,537.00 | 100.00% | 6.478% | 357 | **71.24%** | 750 |

67.     The LTV ratios contained in the Offering Documents detailed in ¶¶64-66 above were false and misleading.   The true facts were that the LTV ratios were calculated using the false appraisals that inflated property values as alleged herein.   Incorporating inflated appraisals into the LTV calculation resulted in lower LTV ratios than actually existed in the loan pool.   For example, if a borrower seeks to borrow $90,000 in connection with the purchase of a house legitimately appraised at $100,000, the LTV ratio is $90,000/$100,000 or 90%.   If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to 75% ($90,000/$120,000).  Because the LTV ratio is calculated by using the appraised value of the property (and because the property values in the appraisals were inflated as detailed herein), this resulted in false, artificially understated LTV ratios.   Thus, the LTV ratios as represented in the Offering Documents were artificially understated, making it appear to investors that the Certificates were much safer/less risky than they actually were.   The artificial LTV ratios reported in the Offering Documents signaled that borrowers would not likely default on the loans.   However, the equity position of the borrowers in the properties was, in fact, overstated, subjecting the Trusts to greater risk of default and with a lower equity "cushion" than actually existed to protect the Trusts in the event of default or foreclosure on the underlying mortgage loan.

**The Credit Ratings Prominently Displayed in the
Offering Documents Were False and Misleading**

68.     Each of the Offering Documents acknowledged the importance of the ratings to be issued by the Rating Agencies, using the same, or substantially similar language, that it was a condition to the issuance of the offered Certificates that the senior certificates be rated "AAA" by Standard &Poor's and "Aaa" by Moody's.   The Offering Documents went on to state that: "[t]he ratings assigned by the above rating agencies address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreement pursuant to which the

- 28 -

certificates are issued." The Offering Documents also stated that: "[t]he ratings of each rating agency take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on that mortgage pool is adequate to make payments required by the certificates."

69.     Each of the Prospectus Supplements provided the ratings for each class of loans within each Trust. The Prospectus Supplement for Series 2006-3 provided:

| | INITIAL CERTIFICATE RATINGS | |
|---|---|---|
| CLASS | MOODY'S | FITCH |
| A-1 | Aaa | AAA |
| A-2 | Aaa | AAA |
| A-3 | Aaa | AAA |
| A-X | Aaa | AAA |
| A-R | Aaa | AAA |

The Prospectus Supplement for Series 2006-5 represented:

| | INITIAL CERTIFICATE RATINGS | |
|---|---|---|
| CLASS | MOODY'S | S&P |
| A-1 | Aaa | AAA |
| A-2 | Aaa | AAA |
| A-X | Aaa | AAA |
| A-R | Aaa | AAA |

The Prospectus Supplement for Series 2007-4 stated:

| | INITIAL CERTIFICATE RATINGS | |
|---|---|---|
| CLASS | MOODY'S | S&P |
| 1A-1 | Aaa | AAA |
| 2A-1 | Aaa | AAA |
| 3A-1 | Aaa | AAA |

- 29 -

| | | |
|---|---|---|
| 3A-2 | Aaa | AAA |
| A-R | Aaa | AAA |

70.     The statements in ¶¶68-69 were false and misleading.  The true facts which were then available to the defendants were that the ratings assigned to the Certificates:

(a) did not reflect the true likelihood of the receipt of all payments on the underlying loans;

(b) misrepresented that the ratings were based on the actual credit quality of the loans;

(c) misrepresented that certain Certificates were "investment-grade" when they should have been classified as below investment-grade, in accordance with the Rating Agency Defendants' pre-established rating guidelines; and

(d) as a result of (a)-(c) above, the original ratings provided by the Rating Agency Defendants did not represent the true risk of the Certificates, but were in fact based on insufficient information and faulty assumptions concerning how many underlying mortgages were likely to default.[8]

---

[8]     In March 2008, the President's Working Group on Financial Markets, which includes the Secretary of the Treasury and Chairs of the Federal Reserve Board, SEC and Commodity Futures Trading Commission, confirmed that there were flaws in credit rating agencies' assessments of subprime MBS and other complex structured financial products, such as mortgage pass-through certificates.

Consequently, on June 11, 2008, the SEC proposed new rules that would, *inter alia*: (a) prohibit rating agencies from issuing ratings on a structured product, including mortgage pass-through certificates, unless information on the assets underlying the product was made available; (b) prohibit credit rating agencies from structuring the same products they rate; and (c) require the public disclosure of the information used by credit rating agencies in determining a rating on a structured product, including information on the underlying assets.

On July 8, 2008, the SEC released findings from an extensive 10-month examination of the ratings practices of Fitch, Moody's, and S&P:

Under new statutory authority from Congress that enabled the SEC to register and examine credit rating agencies, the agency's staff conducted examinations of Fitch Ratings, Ltd., Moody's Investor Services Inc., and Standard & Poor's Ratings Services to evaluate whether they are adhering to their published methodologies for determining ratings and managing conflicts of interest. With the recent subprime market turmoil, the SEC has been particularly interested in the rating agencies'

- 30 -

71.     Additionally, the statements in ¶¶68-69 were false and misleading because they failed to disclose that the Rating Agency Defendants employed an "issuer pays" fee model and entered into compensation agreements with the issuers of the Certificates whereby the Rating Agency Defendants would be compensated, if, and only *if* the Rating Agency Defendants provided the rating demanded by the Thornburg Defendants, Depositor Defendants, Underwriter Defendants and Individual Defendants.  Neither this conflict of interest nor the amount of the current payments or schedule of future profits to the Rating Agency Defendants was disclosed.  These facts were material to investors.

**The Rating Agencies Issued False and Misleading
Ratings on the Thornburg Certificates**

72.     Moody's, S&P and Fitch have enjoyed for decades a unique position in the financial markets as a legislatively imposed and protected oligopoly.

73.     Credit ratings purport to assess the creditworthiness of a particular financial instrument by predicting the likelihood that the debt will be repaid.  Triple-A ratings are the top ratings and are supposed to designate the safest investments.  Investments with triple-A ratings have

---

policies and practices in rating mortgage-backed securities and the impartiality of their ratings.

The SEC staff's examinations found that rating agencies struggled significantly with the increase in the number and complexity of subprime residential mortgage-backed securities (RMBS) and collateralized debt obligations (CDO) deals since 2002. The examinations uncovered that none of the rating agencies examined had specific written comprehensive procedures for rating RMBS and CDOs. Furthermore, significant aspects of the rating process were not always disclosed or even documented by the firms, and conflicts of interest were not always managed appropriately.

"*We've uncovered serious shortcomings at these firms, including a lack of disclosure to investors and the public, a lack of policies and procedures to manage the rating process, and insufficient attention to conflicts of interest* . . . ."

- 31 -

historic yield default rates of less than 1/20 of 1%, while default rates for triple-B investments are more than 20 times greater at just under 1%.  Thus, instruments with Aaa-Baa (Moody's), AAA-BBB (S&P), and AAA-BBB (Fitch) ratings are deemed "investment-grade," while those with ratings of triple-B- or Baa3 or below are deemed below investment-grade.  As a condition of issuance, the Certificates were required to be rated not lower than investment-grade, that is, in one of the four highest rating categories, by at least one Nationally Recognized Statistical Rating Organization, *i.e.*, Moody's, S&P and/or Fitch.

74.     Defendants were aware that credit ratings are very important to institutional investors, like those in the Class here, as they are barred from holding below investment-grade assets. Moreover, the Rating Agency Defendants received a fee for their services only if they issued the desired investment grade credit rating, meaning that each of the Rating Agency Defendants were paid fees for their services in connection with the 2006-3, 2006-5 and 2007-4 Trusts when – and only when – the Certificates received the desired ratings.

75.     To determine whether or not a particular Certificate was awarded an investment-grade rating, the Rating Agency Defendants were required to assess the potential future performance of the underlying loan pool by using credit characteristics, including the nature of the documentation provided by borrowers to verify their income levels and/or assets as well as other loan information such as principal amount, geographic location of the property, credit history and FICO (credit) score of the borrower, the LTV ratio, and type of loan, the amount of equity in the property used as collateral, and whether the borrowers intended to rent or occupy their homes.

76.     The Rating Agency Defendants were required to then review the capital structure of the Trusts and determine if they were sufficient to meet the desired credit rating for the Certificates,

or, whether as part of the transaction, the Depositor Defendants would be required to adjust the capital structure of the Trusts to provide the requisite credit enhancement for the desired rating.

77.     As set forth in ¶¶70-71, the original investment-grade ratings assigned by the Credit Rating Agency Defendants to the Certificates issued by the 2006-3 Trust, 2006-5 Trust, and 2007-4 Trust did not represent the true risk of the Certificates, but were in fact based on insufficient information and false assumptions about the underlying mortgages.

78.     Ultimately, subsequent to the Offerings, the Rating Agency Defendants were forced to disclose that the Trusts' ratings were not as they had been represented to be.  As MBS across the country began to fail in unprecedented numbers, and the Rating Agency Defendants were forced to adjust ratings downward to the level the Certificates should have originally received if the Rating Agency Defendants had completed reasonable diligence and/or not ignored facts concerning the credit quality of the loans included in the Trusts.

79.     In connection with the Rating Agencies' downgrades, the Certificates purchased by Lead Plaintiffs and members of the Class declined significantly in price.  In addition to the price declines, investors in the MBS were harmed by receiving a rate of return which did not reflect the true riskiness of the MBS securities.  In fact, the downgrades were dramatic, the Certificates were not reduced by just one or two grade levels, but by as many as 18 grade levels downward.

**The Defendants Used the Rating Agencies' Defective Models and Methodologies to Create the Certificates**

80.     The underwriters used the Rating Agencies' models to create the Certificates as the Rating Agencies shared their RMBS methodologies and models with the underwriters so that the underwriters together with the Thornburg Defendants, Underwriter Defendants, Depositor Defendants and Individual Defendants could structure the Trusts to achieve the desired ratings.

- 33 -

81.     The defendants created the Certificates based upon the Rating Agencies' models and compensated the Rating Agencies handsomely to obtain ratings for the Certificates.  Because the Underwriter Defendants and the other defendants used the Rating Agencies' own methods and models to create the Certificates, the Certificates received triple-A ratings.

**The Models Used to Assign Ratings Were
Outdated and Defective**

82.     The Rating Agencies purported to employ complex mathematical models to predict foreclosure rates for mortgages.  However, in April 2010, subsequent to the Offerings of the Series 2006-3 Certificates, 2006-5 Certificates and 2007-4 Certificates, internal emails and testimony from high ranking executives employed by the Rating Agency Defendants were disclosed publicly and confirmed that the Rating Agency Defendants had been aware that their modeling assumptions had been wrong, yet failed to timely adjust their models or cease issuing defective credit ratings on MBS.  For example:

*S&P*

- In August 2006, a S&P employee internally confirmed that S&P was failing to adjust its ratings to take into account then-known credit risks from the fraud and lax underwriting standards associated with the trust certificates it rated: "*[T]here has been rampant appraisal and underwriting fraud in the industry for quite some time as pressure has to feed the origination machine*."

- In September 2006, S&P internally admitted: "*I think it's telling us that underwriting fraud; appraisal fraud and the general appetite for new product among originators is resulting in loans being made that shouldn't be made*."  A colleague responded that the head of the S&P surveillance group "*told me that broken down to loan level what she is seeing in losses is as bad as high 40's - low 50%.  I'd love to be able to publish a commentary with this data but [it] maybe [sic] too much of a powder keg*."

- Frank Raiter, former managing director and head of residential mortgage ratings at S&P from 1995-2005, testified on April 23, 2010 before the U.S. Senate that in late 2002, a new version of S&P's ratings model was developed using approximately 2.5 million loans with significant performance information, but was not implemented due to budgetary constraints.  Then "[i]n late 2002 or early 2003, another version of

the model was introduced based on approximately 650,000 loans. At the same time, a data set of approximately 2.8 million loans was collected for use in developing the next version of the model. By early 2004, preliminary analysis of this more inclusive data set and the resulting econometric equation was completed. *That analysis suggested that the model in use was underestimating the risk of some Alt-A and subprime products. In spite of this research, the development of this model was postponed due to a lack of staff and IT resources*. Adjustments to the model used in 2004, with the identified problems, were not made until March, 2005. To my knowledge a version of the model based on the 2.8 million loan data set was never implemented." Mr. Raiter also explained that "it's clear from a lot of these e-mails, people were making very poor calls in terms of the analytics."

- Mr. Raiter further explained that "*if you've developed a model in-house that shows that it's much better than anything you're running, and it shows that you have been too optimistic with the ratings you've assigned, and you do not immediately start to use it and go back and re-rate the old deals so you can warn the investors that we've been wrong, then that's not doing the right thing*." Mr. Raiter further noted that one "thing that was heard constantly" was that "if we change, everybody will think that we've been wrong. And that just put a real anchor on any new ideas quickly going through the process, because they were afraid somebody would suggest that they hadn't been right before and they'd have liability or they'd lose some market share."

- Mr. Raiter also explained that with respect to a new model S&P developed to rate RMBS, S&P "ran out of financing and funding and our budgets in 2003 to put this version 6-0 model in place, but the preliminary analysis, as Dr. Parisi suggested, was that *we were not adequately rating the transactions*."

### *Moody's*

- As Richard Michalek, VP/Senior Credit Officer in the Structured Derivatives Products Group at Moody's admitted during his April 23, 2010 testimony before the U.S. Senate that even as late as December 2007: "*[i]nstalling improvements [continued to be] left for the someday pile*."

- A Moody's managing director commented that the rating agency's "*errors make us look either incompetent at credit analysis or like we sold our soul to the devil for revenue or a little bit of both*."

83.    In May 2006, S&P announced its plans to change the model used to rate subprime

mortgage bonds. Subprime bonds issued before July 1, 2006, would continue to be rated by the old,

less rigorous model. *The Prospectus Supplements for the Thornburg 2006-3 and 2006-5 Trusts*

- 35 -

*were issued under the model which the defendants knew or should have known was outdated and*

*inaccurate*.

84.     Not until July 2007, did S&P make a major change to its RMBS rating model.  The

revised RMBS model projected much higher default rates for many mortgages, including mortgages

similar to those at issue here.  Yet, despite this major change, S&P decided ***not*** to retest existing

RMBS securities because re-evaluating existing RMBS securities with the revised model would have

led to mass downgrades.  Such downgrades occurred subsequently, causing massive losses to MBS

investors.

**The Rating Agencies Failed to Conduct Reasonable
Due Diligence into the Underwriters'/Servicers'
Representations**

85.     The Rating Agency Defendants were either aware or should have known that the

originators of the mortgage loans in the Trusts had loosened – or worse, abandoned – their

underwriting standards and were relying on falsified mortgage loan documentation, yet rated the

Certificates investment-grade while disclaiming any responsibility for verifying the accuracy of the

underlying loans.  In fact, Senate Subcommittee hearings in 2010 revealed that during the prior

decade at S&P, the managing directors and analysts were internally told (rather, scolded) that "***[a]ny***

***request for loan level tapes [from the banks] is TOTALLY UNREASONABLE!!!***"  At the same

time, the directors/analysts were told they "MUST produce a credit estimate" and it was their

"responsibility to devise some method for doing do."

86.     The true facts were that the Rating Agency Defendants' failure to conduct even

cursory due diligence of loan quality in connection with the issuance of the Certificates was a prime

factor in the issuance of the false and misleading ratings assigned to the Certificates.  For example,

Fitch President and CEO Stephen Joynt admitted to the Senate Panel on April 22, 2008, that Fitch

- 36 -

"*did not do the due diligence function of trying to recognize whether there was fraud involved in the origination of loans*" and that this failure was "*one of the biggest accelerants for why there's been problems across the board in the mortgage market itself*."

**The Rating Agencies Lacked the Resources to
Adequately and Properly Rate the MBSs**

87.    At the time the Rating Agency Defendants issued the ratings for the Certificates, the Rating Agency Defendants were grossly understaffed and overwhelmed.[9]  The underwriters of certificates reluctantly argued with the credit-rating analysts, substituted lower value assets at the last minute, and pressured analysts to waive their procedures and standards.

**The Rating Agencies Were Not Independent**

88.    Despite holding themselves out as independent arbiters of the MBSs they rated, the Rating Agency Defendants were anything but independent.  The true facts were:

- That in a drive for market share and the revenue from increased volume of rating MBS deals like the Certificates here, the Rating Agency Defendants provided unsupported favorable credit ratings by utilizing outdated models.

- That Moody's "underwent a revision in the compensation structure" in 2006 so that a larger percentage of its employees' compensation was deferred  making it more important to its analysts that they reach revenue numbers on a quarterly and annual basis, so they could max-out bonuses, meaning that the ratings the analysts gave – or didn't give – would drastically affect their bonuses and current income.

- That Moody's was under extreme pressure from Wall Street to refrain from downgrading the RMBSs and succumbed to that pressure.  For example, when

---

[9]    Internal S&P communications confirm this fact.  For example on June 1, 2006, one S&P analyst noted: "In addition to the project above that involves some 863 deals, I have a back log of deals that are out of date with regard to ratings. . . .  We recognize that I am still understaffed with these two additional bodies."  Likewise on January 5, 2007, another S&P staffer stated: "Now that we are into 2007, I want to take a moment to reiterate my concerns regarding the significant deficit in terms of the # of analysts currently assigned to work on US ABS and RMBS data needs. Additionally, the caliber of the few resources currently assigned to work on these deals, which by the way number more than 8,000, is not at all sufficient."

Moody's downgraded debt ratings in July 2007, Wall Street's reaction was swift: Moody's market share dropped by 2/3 from a 75% market share in residential real estate-backed CDOs to 25%.

89.     The Rating Agency Defendants played a crucial role in the sale of the Series 2006-3, 2006-5 and 2007-4 Trusts.  The Certificates issued by these Trusts could not have been issued without the Rating Agency Defendants assigning the Certificates investment grade ratings.  Indeed, many of the Certificates could never have been issued absent Triple-A ratings.  Despite the flawed and/or non-existent underwriting standards employed by originators such as Wells Fargo, the Rating Agency Defendants continued to give the Certificates the highest Triple-A ratings – the same ratings given to U.S. Treasury debt.

## CLASS ACTION ALLEGATIONS

90.     Plaintiffs bring this action on their own behalf and as a class action pursuant to Civil Rule 23 on behalf of all persons and entities who purchased or otherwise acquired the Certificates, pursuant or traceable to the false and misleading Registration Statements, Prospectuses and Prospectus Supplements, and were damaged thereby (the "Class").

91.     Excluded from the Class are the defendants, their officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any defendant has or had a controlling interest.

92.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds of members in the proposed Class.

93.     Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs

- 38 -

have no interests that are contrary or in conflict with those of the Class members that plaintiffs seek to represent.

94.     Plaintiffs' claims are typical of the claims of the Class members.  Plaintiffs and all members of the Class purchased the Certificates pursuant to the Offering Documents and have sustained damages as a result of the wrongful conduct complained of herein.

95.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members individually to seek redress for the wrongful conduct alleged herein.

96.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by the defendants' acts and omissions as alleged herein;

(b)     Whether the N.M. Securities Act was violated by defendants and/or defendants' acts and/or omissions as alleged herein.

(c)     Whether the Offering Documents, including the Registration Statements, Prospectuses and Prospectus Supplements that the Depositor Defendants and Individual Defendants filed with the SEC contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d)     Whether the Class members have sustained damages and, if so, the appropriate measure.

- 39 -

97.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

98.     The names and addresses of the record owners of the Certificates purchased are available from the Depositor Defendants and from their transfer agent(s).  Notice can be provided to persons who purchased or otherwise acquired the Certificates by a combination of published notice and first class mail, using techniques and forms of notice similar to those customarily used in other state and federal securities class actions.

## CLAIMS FOR RELIEF

## COUNT I

### Violations of §11 of the Securities Act Asserted Against the Thornburg Defendants, the Depositor Defendants, the Individual Defendants, and the Underwriter Defendants

99.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.  This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the plaintiffs and all Class members who purchased the Certificates pursuant or traceable to the Registration Statements filed with the SEC and the corresponding Prospectuses and Prospectus Supplements.

100.    This Count does not allege that any defendant committed fraud or acted with deceitful intent.  Plaintiffs allege that defendants' violations of the Securities Act are strict liability violations and that neither the Underwriter Defendants or Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were not false and misleading or did not omit material facts that rendered statements made therein not false and misleading.

- 40 -

101.    This Count is asserted against: (a) the Thornburg Defendants and the Depositor Defendants who issued the Certificates; (b) the Individual Defendants, each of whom signed the Registration Statements and were officers and/or directors of the respective Depositor Defendants at the time; and (c) the Underwriter Defendants who served as underwriters of the Certificates.

102.    The Offering Documents were materially false and misleading, and contained untrue statements of material fact and omitted to state material facts necessary to make the statements made therein, under the circumstances in which they were made, not misleading, as set forth above.

103.    At the time they purchased the Certificates, plaintiffs and members of the Class did not know, or by the reasonable exercise of care could not have known, of the material misstatements and omissions alleged herein.

104.    In connection with the Registration Statements and offering of the Certificates, the defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

105.    This Count was brought within one year after discovery of the untrue statements and omissions in the Offering Documents, and within three years after the Certificates were sold to plaintiffs and the members of the Class.

106.    Plaintiffs and the Class members acquired the Certificates pursuant or traceable to the Registration Statements before it was made generally available an earnings statement covering a period of at least 12 months beginning after the effective date of the Registration Statements.

107.    By reason of the misconduct alleged herein, the defendants named in this Count violated §11 of the Securities Act and are liable to the plaintiffs and the Class members who purchased or acquired the Certificates pursuant or traceable to the Registration Statements, each of whom has been damaged as a result of such violations.

## COUNT II

### Violations of §12(a)(2) of the Securities Act Asserted
### Against the Thornburg Defendants, the Depositor Defendants, the
### Individual Defendants and the Underwriter Defendants

108.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.   This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §771(a)(2), on behalf of the plaintiffs and all members of the Class who purchased or otherwise acquired the Certificates pursuant to the Offering Documents.

109.    This Count does not allege that defendants committed fraud or acted with deceitful intent.

110.    This Count is brought against the Thornburg Defendants, the Depositor Defendants, the Individual Defendants and the Underwriter Defendants, each of whom offered and sold Certificates to Class members by the use of communication in interstate commerce and/or the United States mails, by means of the Offering Documents.

111.    Specifically, in connection with the Issuing Trusts, the Thornburg Defendants and the Depositor Defendants selected the Underwriter Defendants to underwrite and promote the Certificates.   Pursuant to an underwriting agreement, the Depositor Defendants issued and the Underwriter Defendants underwrote and promoted the sale of the Certificates to plaintiffs and the Class.

112.    The Thornburg Defendants, the Depositor Defendants, the Individual Defendants and the Underwriter Defendants participated in the preparation and dissemination of the false and misleading Offering Documents for their own financial benefit.   These written materials were calculated to create interest in the Certificates and were widely distributed by or on behalf of the defendants named in this Count for that purpose.   But for their participation in the sale of the

- 42 -

Certificates to plaintiffs and the Class, including their solicitation as set forth herein, the sale of the Certificates could not and would not have been accomplished.   Specifically, the Thornburg Defendants, the Depositor Defendants, the Individual Defendants and the Underwriter Defendants:

       (a)     Made the decision to offer the Certificates for sale to investors.

       (b)     Drafted, revised and/or approved the Offering Documents;

       (c)     Finalized the Offering Documents, and caused them to become effective; and

       (d)     Conceived and planned the sale of the Certificates and orchestrated all activities necessary to effect the sale of the Certificates to the investing public, by issuing the Certificates, promoting the Certificates and supervising their distribution and ultimate sale to investors.

113.    As set forth more specifically above, the Offering Documents contained untrue statements of material fact and omitted material facts necessary in order to make the statements, in light of the circumstances in which they were made, not misleading.

114.    Plaintiffs and the members of the Class did not know, nor could they have known, of the untruths or omissions contained in the Offering Documents.

115.    The Thornburg Defendants, the Depositor Defendants, the Individual Defendants and the Underwriter Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.   The Thornburg Defendants, the Depositor Defendants, the Individual Defendants and the Underwriter Defendants did not make a reasonable investigation and did not possess reasonable grounds for the belief that the statements contained in the Offering

- 43 -

Documents were not false and misleading and did not omit material facts that rendered statements made therein not false and misleading.

116. This Count was brought within one year after discovery of the untrue statements and omissions in the Offering Documents and within three years after the Certificates were sold to plaintiffs and Class members.

117. By reason of the misconduct alleged herein, the defendants named in this Count violated §12(a)(2) of the Securities Act and are liable to plaintiffs and members of the Class who purchased or acquired the Certificates pursuant or traceable to the Offering Documents, each of whom has been damaged as a result of such violation.

118. Plaintiffs and the members of the Class who purchased the Certificates pursuant to the Offering Documents hereby seek rescissions of their purchases and tender to the defendants named in this Count any Certificates that plaintiffs and other members of the Class continue to own, in return for the consideration paid for those Certificates, together with interest thereon.

## COUNT III

### Violations of §15 of the Securities Act
### Asserted Against Underwriter Defendant RBS
### and the Individual Defendants

119. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein. This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the plaintiffs and all members of the Class who purchased or otherwise acquired the Certificates pursuant or traceable to the Offering Documents.

120. This Count does not allege that defendants committed fraud or acted with deceitful intent.

- 44 -

583126_1

121.    For all the reasons set forth above in Counts I and II, Underwriter Defendant RBS and the Individual Defendants are controlling entities or persons of the respective Depositor Defendants and are liable to plaintiffs and the members of the Class who purchased the Certificates pursuant or traceable to the materially false and misleading statements and omissions contained in the Offering Documents, pursuant to §§11 and 12(a)(2) of the Securities Act, and were damaged thereby.

122.    Defendant RBS, formerly known as Greenwich Capital Markets, controlled all aspects of the management and policies of Depositor Defendant RBS.  RBS controlled the Depositor Defendant GCA by virtue of the following: (i) RBS created Depositor Defendant GCA as its Special Purpose Entity ("SPE") for the Certificates; (ii) revenue from the Depositor Defendant GCA's securitizations inured exclusively to RBS's benefit; (iii) statements in RBS's SEC filings show control through comprehensive involvement with the Depositor Defendant GCA's operations; (iv) RBS directly participated in Depositor Defendant GCA's issuance of the Certificates, including prominently featuring "Greenwich Capital Markets" on the front page of the Prospectus and Prospectus Supplement for Series 2006-3; and (v) Individual Defendants from Depositor Defendant GCA at the same time served as high level executives at GCM, including Chief Financial Officer and Managing Director Mathis, Manager, Director and Head of Consumer Finance McGinnis, and Managing Director Walsh.

123.    This Count is also asserted against the Individual Defendants, each of whom was a control person of the Depositor Defendants, within the meaning of §15 of the Securities Act, by virtue of their control, ownership, offices, directorship, and specific acts.  As control persons, the Individual Defendants had the power and authority to cause, and did in fact cause, the Depositor Defendants to engage in the wrongful conduct complained of herein.

- 45 -

124.    The Individual Defendants' control, ownership and positions made them privy to and provided them with actual knowledge of the material facts concealed from plaintiffs and members of the Class.

125.    By virtue of the conduct alleged herein, for which the Depositor Defendants are primarily liable, as set forth above, the Underwriter Defendant RBS and the Individual Defendants are jointly and severally liable with and to the same extent as the Depositor Defendants, pursuant to §15 of the Securities Act.

## COUNT IV

### Violations of the New Mexico Securities Act of 1986
### Against All Defendants

126.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

127.    The Court has jurisdiction over this claim pursuant to 28 U.S.C. §1367(a).

128.    Pursuant to N.M. Stat. Ann. §58-13B-30.B, it is unlawful for any person, directly or indirectly, to make an untrue statement of a material fact or fail to state a necessary material fact where such an omission would be misleading in connection with an offer to sell a security.

129.    A person who, in connection with the offer or sale of a security, violates N.M. Stat. Ann. §58-13B-30.B, is liable pursuant to N.M. Stat. Ann. §58-13B-40.A.

130.    As described herein, each of the defendants named herein made untrue statements of material fact or failed to state material facts necessary to make their statements not misleading in connection with the offer and sale of the Certificates, in violation of N.M. Stat. Ann. §58-13B-30.B resulting in harm to plaintiffs and members of the Class.  The Rating Agency Defendants, for instance, issued investment grade (including Triple-A) ratings on Certificates, which ratings were untrue and misleading in that the Certificates were not nearly as safe as represented by such ratings.

- 46 -

The Rating Agency Defendants continued to use models which resulted in inflated ratings through they possessed data which confirmed that such models were defective.  Such ratings were important in the successful sale of the Certificates.

131.    As a result of their violations of N.M. Stat. Ann. §58-13B-30.B, in connection with the offer and sale of the Certificates, all defendants are liable in an amount to be determined at trial to plaintiffs and the Class who purchased the Certificates and suffered substantial harm as a result thereof.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives;

B.    Awarding compensatory and/or rescissory damages in favor of Lead Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Such other and further relief as the Court may deem just and proper; and

E.    Awarding all necessary injunctive and/or declaratory relief.

583126_1

**JURY DEMAND**

Lead Plaintiffs hereby demand a trial by jury.

DATED:  December 10, 2010          ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                   DARREN J. ROBBINS
                                   JONAH H. GOLDSTEIN
                                   DANIELLE S. MYERS


                                   s/ DARREN J. ROBBINS
                                   DARREN J. ROBBINS

                                   655 West Broadway, Suite 1900
                                   San Diego, CA  92101
                                   Telephone:  619/231-1058
                                   619/231-7423 (fax)

                                   Lead Counsel for Plaintiffs

                                   LAW OFFICES OF NICHOLAS
                                     KOLUNCICH III, LLC
                                   NICHOLAS KOLUNCICH III
                                   6501 Americas Parkway NE
                                   One Park Square – Suite 620
                                   Albuquerque, NM  87107-5375
                                   Telephone:  505/881-2228
                                   505/881-4288 (fax)

                                   Liaison Counsel

- 48 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 10, 2010, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 10, 2010.

s/ DARREN J. ROBBINS
DARREN J. ROBBINS

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  DarrenR@rgrdlaw.com

583126_1

# Mailing Information for a Case 1:09-cv-00300-JB-RLP

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Floyd Abrams**
  fabrams@cahill.com

- **Eric R. Burris**
  eburris@bhfs.com,ecordero@bhfs.com,ywhitson@bhfs.com,bdouglas@bhfs.com

- **Bradley J Butwin**
  bbutwin@omm.com

- **Candace Camarata**
  camaratac@gtlaw.com

- **William H. Carpenter**
  bill@carpenter-law.com,djstout@carpenter-law.com,RGonzales@carpenter-law.com,lsromero@carpenter-law.com

- **Michael R Comeau**
  mcomeau@cmtisantafe.com,receptionist@cmtisantafe.com

- **James J Coster**
  jcoster@ssbb.com

- **Jonathan C. Dickey**
  jdickey@gibsondunn.com

- **Thomas A. Dubbs**
  tdubbs@labaton.com

- **Richard Edlin**
  edlinr@gtlaw.com

- **Andrew J Ehrlich**
  aehrlich@paulweiss.com

- **Martin Flumenbaum**
  mflumenbaum@paulweiss.com

- **Frederic S. Fox**
  ffox@kaplanfox.com

- **David J. Goldsmith**
  dgoldsmith@labaton.com

- **Jonah H. Goldstein**
  jonahg@csgrr.com

- **Christopher A Gorman**
  cgorman@cahill.com

- **Joel Haims**
  jhaims@mofo.com

- **Donald R. Hall**
  dhall@kaplanfox.com

- **Grey W. Handy**
  ghandy@cmtisantafe.com,sdevargas@cmtisantafe.com,receptionist@cmtisantafe.com

- **Robert N Kaplan**
  rkaplan@kaplanfox.com

- **Jaime Rae Kennedy**
  jkennedy@montand.com,dherrera@montand.com

- **Dean J. Kitchens**
  DKitchens@GibsonDunn.com

- **Ronald Lefton**
  leftonr@gtlaw.com

- **Kristina Martinez**
  kemartinez@hollandhart.com,rsougstad@hollandhart.com,intaketeam@hollandhart.com

- **Laura Killian Mummert**
  lkillianmummert@labaton.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com

- **Victor R. Ortega**
  vortega@montand.com,dherrera@montand.com,cvaldez@montand.com

- **Aviah Cohen Pierson**
  acohenpierson@kaplanfox.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com,jillk@rgrdlaw.com,kathryns@rgrdlaw.com

- **Jonathan Rosenberg**
  jrosenberg@omm.com

- **Tammy Lynn Roy**
  troy@cahill.com

- **Josh M Rubins**
  jrubins@ssbb.com

- **Paul Scarlato**
  pscarlato@labaton.com

- **Allison Schnieders**
  aschnieders@mofo.com

- **Robert F Serio**
  rserio@gibsondunn.com

- **Mark F. Sheridan**
  msheridan@hollandhart.com,rsougstad@hollandhart.com,intaketeam@hollandhart.com

- **Luis G. Stelzner**
  lgs@stelznerlaw.com,twerner@stelznerlaw.com,dlujan@stelznerlaw.com,aw@stelznerlaw.com

- **Stefanie J. Sundel**
  ssundel@labaton.com

- **William J Sushon**
  wsushon@omm.com

- **Robert P. Warburton**
  rpw@stelznerlaw.com,gbyrne@stelznerlaw.com

- **Jason D Williamson**
  jwilliamson@paulweiss.com

- **Aric H Wu**
  awu@gibsondunn.com,jmyatt@gibsondunn.com

- **Adam Zurofsky**
  azurofsky@cahill.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Jason W Myatt
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193

Wilmer Cutler Pickering
Hale & Dorr
350 South Grand Ave.
Suite 2100
Los Angeles, CA 90071
```

**Jason W Wyatt**
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193