IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GENESEE COUNTY EMPLOYEES' RETIREMENT
SYSTEM; MARYLAND-NATIONAL CAPITAL PARK
& PLANNING COMMISSION EMPLOYEES'
RETIREMENT SYSTEM; MIDWEST OPERATING
ENGINEERS PENSION TRUST FUND, Individually and
On Behalf of All Others Similarly Situated,

                Plaintiffs,

      v.

THORNBURG MORTGAGE SECURITIES TRUST
2006-3; THORNBURG MORTGAGE SECURITIES
TRUST 2006-5; THORNBURG MORTGAGE
SECURITIES TRUST 2007-4; GREENWICH CAPITAL
ACCEPTANCE, INC.; STRUCTURED ASSET
MORTGAGE INVESTMENTS II, INC.; CREDIT
SUISSE SECURITIES LLC, d/b/a CREDIT SUISSE
SECURITIES (USA) LLC; RBS SECURITIES INC.;
BANC OF AMERICA SECURITIES LLC; ROBERT J.
MCGINNIS; CAROL P. MATHIS; JOSEPH N. WALSH
III; JOHN C. ANDERSON; JAMES M. ESPOSITO;
JEFFREY L. VERSCHLEISER; MICHAEL B.
NIERENBERG; JEFFREY MAYER; THOMAS F.
MARANO; MOODY'S CORP.; MOODY'S INVESTORS
SERVICES, INC.; MCGRAW-HILL COMPANIES, INC.;
STANDARD & POOR'S RATINGS SERVICES; FITCH,
INC.; and FITCH RATINGS,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 1:09-cv-00300-JOB/RLP

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS
OF DEFENDANTS GREENWICH CAPITAL ACCEPTANCE, INC.
(N/K/A RBS ACCEPTANCE INC.), STRUCTURED ASSET MORTGAGE
INVESTMENTS II, INC., CREDIT SUISSE SECURITIES (USA) LLC,
RBS SECURITIES INC. (F/K/A GREENWICH CAPITAL MARKETS, INC.),
ROBERT J. McGINNIS, CAROL P. MATHIS, JOSEPH N. WALSH III,
JOHN C. ANDERSON, JAMES M. ESPOSITO, JEFFREY VERSCHLEISER,
MICHAEL B. NIERENBERG, JEFFREY MAYER, AND THOMAS F. MARANO**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ......................................................... 4

    I.    THE PARTIES ....................................................................................................... 4

    II.    THE CERTIFICATES ........................................................................................... 5

        A.    The 2006-3 Offering ................................................................................ 6

        B.    The 2006-5 Offering ................................................................................ 6

        C.    The 2007-4 Offering ................................................................................ 7

    III.    THE OFFERING DOCUMENTS ......................................................................... 7

    IV.    PLAINTIFFS' CLAIMS ..................................................................................... 11

STANDARDS ON THIS MOTION .................................................................................. 12

ARGUMENT .................................................................................................................... 13

    I.    PLAINTIFFS PLEAD NO ACTIONABLE
        MISREPRESENTATION OR OMISSION ....................................................... 13

        A.    The Allegations Regarding The Underwriting Standards And
            Documentation For The Mortgage Loans Are Not Actionable .............. 14

            1.    Loans Originated By Thornburg ................................................. 14

            2.    Loans Originated By Wells Fargo ............................................... 17

        B.    The Appraisal Allegations Are Not Actionable .................................... 20

            1.    Appraisals Used By Thornburg ................................................... 21

            2.    Appraisals Used By Wells Fargo ................................................ 22

        C.    The LTV Ratio Allegations Are Not Actionable .................................. 25

        D.    Plaintiffs Do Not Allege A Material
            Number Of Non-Complying Loans ...................................................... 26

## TABLE OF CONTENTS
### (Continued)

Page

E. Plaintiffs Plead No Actionable Misrepresentation Relating To The Mortgage Loans Because They Do Not Allege A Failure To Cure Non-Complying Loans ..................... 27

F. Plaintiffs Plead No Actionable Misrepresentation Or Omission Relating To The Ratings Assigned To Plaintiffs' Certificates ............... 29

II. PLAINTIFFS DO NOT PLEAD A COGNIZABLE ECONOMIC LOSS ............................................................ 31

A. Plaintiffs Do Not Allege That They Have Failed To Receive Any "Pass-Through" Distributions....................................... 32

B. Plaintiffs Recouped Their Investment In 2006-5 Certificates Long Before This Lawsuit Was Filed ................................. 34

III. PLAINTIFFS HAVE FAILED TO ALLEGE FACTS TO ESTABLISH THEIR STANDING TO PURSUE A SECTION 12(A)(2) CLAIM ..................................... 35

IV. PLAINTIFFS DO NOT PLEAD RELIANCE ON ANY ALLEGED MISREPRESENTATION IN THE 2006-5 OFFERING DOCUMENTS ..................................... 38

V. PLAINTIFFS' FEDERAL SECURITIES CLAIMS ARE TIME-BARRED ......................................................... 39

A. Plaintiffs Fail To Plead Facts To Establish Their Compliance With The One-Year Statute Of Limitations............................. 41

B. Plaintiffs' Claims Are Barred Because A Reasonable Investor Would Have Discovered The Facts Underlying Plaintiffs' Claims More Than One Year Prior To February 27, 2009 ..................... 43

C. Plaintiffs' Claims Relating To The 2006-3 And 2006-5 Offerings Are Barred Because A Reasonable Investor Would Have Discovered The Facts Underlying Plaintiffs' Claims More Than One Year Prior To December 10, 2010 ................... 47

D. Plaintiffs' Claims Relating To The 2006-3 And 2006-5 Offerings Are Barred by The Three-Year Statute Of Repose................. 49

# TABLE OF CONTENTS
## (Continued)

Page

VI.     PLAINTIFFS FAIL TO STATE A CONTROL PERSON CLAIM.................... 50

    A.     In The Absence Of A Primary Violation By The Depositor
        Defendants, Plaintiffs Have No Claim For Control Person Liability ...... 50

    B.     Plaintiffs Fail To Plead Facts Demonstrating
        That The Individual Defendants Or RBS Were
        "Control Persons" Of The Depositor Defendants.................................. 50

        1.     Individual Defendants.................................................. 51

        2.     RBS ................................................................................ 52

VII.    PLAINTIFFS' CLAIM UNDER THE NEW MEXICO
    SECURITIES ACT SHOULD BE DISMISSED ................................. 52

    A.     Plaintiffs Do Not Allege That They Purchased Certificates,
        Or Were Offered The Certificates, In New Mexico ............................... 53

    B.     Plaintiffs Fail To State A Claim Under
        The New Mexico Securities Act ........................................................... 54

    C.     Plaintiffs' Claims Relating To The 2006-3
        And 2006-5 Offerings Are Time-Barred ................................. 54

CONCLUSION.................................................................................................... 55

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Allen v. Oakbrook Sec. Corp.*,
  763 So. 2d 1099 (Fla. Dist. Ct. App. 1999) ............................................................. 53

*Ames v. Uranus, Inc.*,
  1993 WL 106896 (D. Kan. Mar. 17, 1993) .................................................... 39, 41

*Anixter v. Home-Stake Prod. Co.*,
  939 F.2d 1420 (10th Cir. 1991) ................................................................................ 40

*APA Excelsior III L.P. v. Premiere Techs., Inc.*,
  476 F.3d 1261 (11th Cir. 2007) ................................................................................ 39

*Arena Land & Inv. Co., Inc. v. Petty*,
  906 F. Supp. 1470 (D. Utah 1994) .......................................................................... 51

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) ................................................................................... 13, 15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................ 12, 13, 14, 15

*Blackmoss Invs., Inc. v. ACA Capital Holdings, Inc.*,
  2010 U.S. Dist. LEXIS 2899 (S.D.N.Y. Jan. 14, 2010) ........................................ 35

*Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates*,
  __ F. Supp. 2d. __, 2010 WL 3815796 (W.D. Wash. Sept. 28, 2010) ............................ *passim*

*Cal. Public Emps.' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) .................................................................................... 23

*Calnin v. Hilliard*,
  2008 WL 336892 (E.D. Wis. Feb. 5, 2008) ............................................................ 53

*Caprin v. Simon Transp. Servs. Inc.*,
  99 F. App'x 150 (10th Cir. 2004) .............................................................. 40, 41, 48

*City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*,
  2010 U.S. Dist. LEXIS 137290 (E.D.N.Y. Dec. 23, 2010) .................................... 19

*Finkel v. Stratton Corp.*,
  962 F.2d 169, 174 (2d Cir. 1992) ............................................................................ 49

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994) ................................................................. 34

*Flinn Found. v. Petro-Lewis Corp.*,
    1985 WL 358 (D. Colo. Nov. 8, 1985) ................................................ 41

*Freedman v. Value Health, Inc.*,
    2000 WL 630916 (D. Conn. Mar. 24, 2000) ....................................... 54

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) .......................................................................... 36

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008) ................................................ 27

*Grubka v. WebAccess Int'l, Inc.*,
    445 F. Supp. 2d 1259 (D. Colo. 2006) ............................................... 47

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
    665 F. Supp. 2d 404 (S.D.N.Y. 2009) ........................................... 26, 27

*In re Broderbund/Learning Co. Sec. Litig.*,
    294 F.3d 1201 (9th Cir. 2002) ....................................................... 31, 34

*In re Chaus Sec. Litig.*,
    801 F. Supp. 1257 (S.D.N.Y. 1992) ................................................... 41

*In re Downey Sec. Litig.*,
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) .................................... 17

*In re IndyMac Mortgage-Backed Sec. Litig.*,
    718 F. Supp. 2d 495 (S.D.N.Y. 2010) ........................................ *passim*

*In re Lehman Bros. Sec. and ERISA Litig.*,
    684 F. Supp. 2d 485 (S.D.N.Y. 2010) ..................................... 29, 31, 47

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................ 34

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 429 (S.D.N.Y. 2003) ................................................ 35

*In re Metro. Sec. Litig.*,
    532 F. Supp. 2d 1260 (E.D. Wash. 2007) .......................................... 43

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010) ............................................................ 35, 40, 43

*In re Thornburg Mortg., Inc. Sec. Litig.*,
683 F. Supp. 2d 1236 (D.N.M. 2010) ............................................................... *passim*

*In re Thornburg Mortg., Inc. Sec. Litig.*,
695 F. Supp. 2d 1165 (D.N.M. 2010) ............................................................... 36, 37

*In re VeriFone Sec. Litig.*,
11 F.3d 865 (9th Cir. 1993) ............................................................... 26

*In re Wells Fargo Mortgage-Backed Certificates Litig.*,
2010 WL 4117477 (N.D. Cal. Oct. 19, 2010) ............................................................... 48

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*,
32 F.3d 697 (2d Cir. 1994) ............................................................... 41

*Johnston v. Norton*,
1993 WL 465333 (S.D.N.Y. Nov. 10, 1993) ............................................................... 53

*Joseph v. Wiles*,
223 F.3d 1155 (10th Cir. 2000) ............................................................... 36

*Klein v. Gen. Nutrition Cos., Inc.*,
186 F.3d 338 (3d Cir. 1999) ............................................................... 22

*Lane v. Page*,
649 F. Supp. 2d 1256 (D.N.M. 2009) ............................................................... 40

*Lewis v. Casey*,
518 U.S. 343 (1996) ............................................................... 35

*Lone Star Fund V (U.S.), LP v. Barclays Bank PLC*,
594 F.3d 383 (5th Cir. 2010) ............................................................... 28

*Maher v. Durango Metals, Inc.*,
144 F.3d 1302 (10th Cir. 1998) ............................................................... 36, 50

*Mass. Bricklayers and Masons Fund v. Deutsche Alt-A Secs.*,
2010 WL 1370962 (E.D.N.Y. Apr. 6, 2010) ............................................................... 6

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
722 F. Supp. 2d 1157 (C.D. Cal. 2010) ............................................................... 6, 48

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Murken v. Solv.-Ex Corp.*,
    1997 WL 34605217 (D.N.M. Aug. 19, 1997) ....................................... 53

*N.J. Carpenters Health Fund v. DLJ Mortg. Cap., Inc.*,
    2010 U.S. Dist. LEXIS 136142 (S.D.N.Y. Dec. 15, 2010) ..................................... 48

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    __ F. Supp. 2d __, 2011 WL 147735 (S.D.N.Y. Jan. 18, 2011) ............................................ 33

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ................................... 29, 30, 51, 52

*N. J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
    2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) .................................... *passim*

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*,
    __ F. Supp. 2d __, 2010 WL 4054149 (S.D.N.Y. Oct. 14, 2010) ..................................... 33, 34

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996) ..................................................... 20

*Pinter v. Dahl*,
    486 U.S. 622 (1988)................................................................. 36

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    __ F.3d __, 2011 WL 183971 (1st Cir. Jan. 20, 2011) ..................................... *passim*

*Public Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
    714 F. Supp. 2d 475 (S.D.N.Y. 2010) ................................... 29, 35, 37, 38

*Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*,
    638 F. Supp. 2d 120 (D. Mass. 2009) ............................... 23

*Republic Bank & Trust Co. v. Bear, Stearns & Co., Inc.*,
    707 F. Supp. 2d 702 (W.D. Ky. 2010)................................. 19, 20, 22, 25

*Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*,
    941 F. Supp. 1369 (S.D.N.Y. 1996) ............................................ 52

*Sterlin v. Biomune Sys.*,
    154 F.3d 1191 (10th Cir. 1998) ..................................... 40

*The Wilderness Soc'y v. Kane Cnty.*,
    __ F.3d __, 2011 WL 79487 (10th Cir. Jan. 11, 2011)........................... 13

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*TSC Indus., Inc. v. Northway*,
   426 U.S. 438 (1976)...................................................................................... 26

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
   692 F. Supp. 2d 387 (S.D.N.Y. 2010) ................................................... *passim*

*Yuan v. Bayard Drilling Techs., Inc.*,
   96 F. Supp. 2d 1259 (D. Okla. 1999)............................................................ 52

**Rules and Statutes**

15 U.S.C. § 77k.................................................................................... 31, 38, 39

15 U.S.C. § 77l.............................................................................................. 31

15 U.S.C. § 77m....................................................................................... 40, 49

NMSA 1978, § 58-13B-30 (1986)................................................................. 53

NMSA 1978, § 58-13B-41 (1986)................................................................. 54

NMSA 1978, § 58-13B-54 (1986)................................................................. 53

**Other Authorities**

*Asset-Backed Securities*, Securities Act Release No. 33-8518,
   70 Fed. Reg. 1506 (Jan. 7, 2005).......................................................... 32, 38

*Disclosure of Security Ratings*, Securities Act Release No. 33-7086,
   1994 WL 469347 (Aug. 31, 1994)............................................................... 31

Hazen, Thomas Lee, The Law of Securities Regulation § 7.3[4] (6th ed. 2009) ........................ 39

Defendants Greenwich Capital Acceptance, Inc. (n/k/a RBS Acceptance Inc.) and Structured Asset Mortgage Investments II, Inc. (collectively, the "Depositor Defendants"), Defendants Credit Suisse Securities (USA) LLC and RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.),[1] and Defendants Robert J. McGinnis, Carol P. Mathis, Joseph N. Walsh III, John C. Anderson, James M. Esposito, Jeffrey L. Verschleiser, Michael B. Nierenberg, Jeffrey Mayer, and Thomas F. Marano (collectively, the "Individual Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs' Amended Complaint.

## INTRODUCTION

This case is yet another opportunistic attempt to use the securities laws as an insurance policy against any potential *future* loss from investments in mortgage-backed securities ("MBS"). Plaintiffs, two sophisticated pension funds, purchased mortgage pass-through certificates backed by residential mortgage loans. Now that the residential real estate market has collapsed, Plaintiffs have brought suit for "rescissions of their purchases" and "return for the consideration paid for those Certificates." (¶ 118).[2] But Plaintiffs do not allege that they have failed to receive any of the "pass through" payments on their certificates – which is all they are entitled to receive – and have failed to identify a single loan underlying their certificates that was inaccurately described in the Offering Documents. Nonetheless, Plaintiffs purport to assert

---

[1] Defendants Credit Suisse Securities (USA) LLC, RBS Securities Inc. and Banc of America Securities LLC are collectively referred to as the "Underwriter Defendants."

[2] All paragraph references in the form (¶___) are to Plaintiffs' Amended Complaint, dated December 10, 2010 (Dkt. 103). All references in the form (Ex.___) are to the exhibits to this motion to dismiss.

claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, as well as under the New Mexico Securities Act of 1986. The Amended Complaint should be dismissed for multiple independent reasons.

*First*, Plaintiffs fail to plead any actionable misrepresentation or omission. The Offering Documents provided extensive and detailed disclosures about the loans underlying the certificates, including that most of the loans were "interest-only" loans with high principal balances years after origination and that certain loans were originated pursuant to "stated income" programs under which "no verification of monthly income is required" or pursuant to "underwriting exceptions." No reasonable investor could have been mistaken about the risks associated with the loans backing their investments. Moreover, though the mortgage pools for the 2006-3, 2006-5, and 2007-4 offerings were collectively composed of 7187 mortgage loans, Plaintiffs fail to identify even a single loan in which an underwriting standard was not followed, the loan documentation was inaccurate, an inflated appraisal was used, or a loan-to-value ("LTV") ratio was misstated. Not one. Moreover, as courts in MBS cases repeatedly have held, credit ratings assigned to securities do not give rise to liability under the securities laws.

*Second*, Plaintiffs do not plead a cognizable loss, an essential element of their Securities Act claims. The sole economic benefit that Plaintiffs bargained for in purchasing their certificates was the "pass-through" payments of principal and interest from the mortgage loans backing the certificates. Plaintiffs neither bargained for, nor were promised, any particular value of their securities in the secondary trading markets. Indeed, the Offering Documents specifically warned investors that a secondary market for the certificates might never exist. Because the Amended Complaint is devoid of any allegation that Plaintiffs have not received the "pass-

through" payments due on their certificates, Plaintiffs have not pled a cognizable loss.  Plaintiffs' claims relating to the 2006-5 offering also must be dismissed for the independent reason that Plaintiffs sold their 2006-5 certificates just three month after they purchased them and recouped their entire investment in the certificates long *before* this lawsuit was filed.

*Third*, Plaintiffs have failed to allege facts to establish their standing to pursue a Section 12(a)(2) claim.  Plaintiffs do not allege facts establishing that they purchased their certificates in an initial public offering directly from, or at the "direct and active" solicitation of, any of the named defendants on the Section 12(a)(2) claim.

*Fourth*, Plaintiffs' Section 11 claim relating to the 2006-5 offering fails because Plaintiffs do not plead reliance on any alleged misrepresentation in the 2006-5 Offering Documents. Plaintiffs are not entitled to a presumption of reliance because they purchased their 2006-5 certificates more than one year after the 2006-5 offering.  In the absence of a presumption of reliance, Plaintiffs must plead their reliance on the alleged misrepresentations.  Plaintiffs have failed to do so.

*Fifth*, Plaintiffs' federal securities claims are time-barred.  Indeed, Plaintiffs have pled *no* facts to establish that their claims were filed within the applicable one-year statute of limitations. Nor could they.  There were myriad allegations in the public record that should have caused a reasonable investor to discover the facts underlying Plaintiffs' claims more than one year before any investors in the certificates pursued their claims.  Moreover, Plaintiffs' claims relating to the 2006-3 offering are barred by the applicable three-year statute of repose.

*Sixth*, Plaintiffs' Section 15 claim for control person liability should be dismissed because they have neither alleged an underlying primary violation of Section 11 or 12(a)(2) nor alleged

facts demonstrating that the Individual Defendants or Defendant RBS Securities Inc. were "control persons" of the Depositor Defendants.

*Seventh*, Plaintiffs' state securities law claim should be dismissed because Plaintiffs have not alleged conduct within the scope of the New Mexico Securities Act, an actionable misrepresentation or omission, or a cognizable injury, and Plaintiffs' claims with respect to two of the offerings at issue are time-barred.

For all the reasons set forth herein, Plaintiffs' Amended Complaint should be dismissed with prejudice.[3]

## FACTUAL AND PROCEDURAL BACKGROUND

## I.   THE PARTIES

Lead Plaintiffs Maryland-National Capital Park & Planning Commission Employees' Retirement System ("Maryland National") and Midwest Operating Engineers Pension Trust Fund ("Midwest Operating") purport to bring claims on behalf of a putative class of investors that purchased mortgage-backed securities issued by three separate trusts in three different offerings sponsored by Thornburg Mortgage Home Loans, Inc., a wholly-owned subsidiary of Thornburg Mortgage, Inc.  (¶¶ 1, 3, 19-20).  There were multiple tranches of mortgage pass-through certificates issued in each offering, and the certificates in each offering were backed by different pools of mortgage loans originated or acquired by Thornburg.  (¶ 3).

The named defendants are the three statutory trusts that were the issuers of the certificates (the "Thornburg Defendants"); the three ratings agencies that issued credit ratings for the

---

[3]   The moving defendants herein also adopt, to the extent applicable, the arguments set forth in the motions to dismiss filed by other defendants.

certificates (the "Ratings Agency Defendants"); the three financial services firms that acted as underwriters in one or more of the offerings (the "Underwriter Defendants"); the two entities that served as depositors for the certificates (the "Depositor Defendants"); and nine former directors and/or officers of the Depositor Defendants (the "Individual Defendants").  (¶¶ 21-42).

## II.   <u>THE CERTIFICATES</u>

The certificates are a type of asset-backed security whose value (unlike the value of corporate stock) does not depend on the profitability of their issuer.  Instead, their value is tied to the streams of principal and interest payments made on the underlying assets – *i.e.*, pools of mortgage loans.  (¶ 3).  Thornburg originated, or acquired from other loan originators, home mortgage loans that were contributed to separate pools underlying each of the certificates.  (*Id.*).  The loan pools were deposited into trusts, which issued the mortgage pass-through certificates.  (¶ 43).  The statutory trusts named as defendants here are Thornburg Mortgage Securities Trust 2006-3, Thornburg Mortgage Securities Trust 2006-5, and Thornburg Mortgage Securities Trust 2007-4.  (¶ 21).  As borrowers make monthly mortgage payments, the trusts "pass through" the payments to certificate holders in an order of priority that is based on their class.  (¶ 43).

Each of the challenged offerings consisted of multiple classes of mortgage pass-through certificates.  Each class (often referred to as a "tranche") was a separately traded security, and each had its own unique CUSIP identifier, original principal note balance, interest rate, credit rating, payment rights, and priority for receiving "pass-through" distributions.[4]  Plaintiffs allege

---

[4]  *See* 2006-3 Prospectus Supplement ("Pro Supp.") at S-5 (Ex. A); 2006-5 Pro Supp. at S-1 (Ex. B); 2007-4 Pro Supp. at S-1 (Ex. C).

purchases of 6 of the 20 securities that were publicly offered in the 2006-3, 2006-5, and 2007-4 offerings.  (Dkt. 56, Ex. B).[5]

### A.    The 2006-3 Offering

Lead plaintiffs purchased 3 tranches of certificates from the 2006-3 offering on June 19, 2006, and sold certain of their certificates on July 18, 2006.  (Dkt. 56, Ex. B).  The three separate loan groups comprising the underlying mortgage pool for the 2006-3 offering consisted in aggregate of 2092 loans.  2006-3 Pro Supp. at S-9 (Ex. A).  The depositor for the offering was Greenwich Capital Acceptance, Inc. ("GCA"), and the underwriters were Credit Suisse Securities (USA) LLC ("Credit Suisse") and Greenwich Capital Markets, Inc. (now known as RBS Securities Inc. ("RBS")).  (¶¶ 22, 25-26).

### B.    The 2006-5 Offering

Lead plaintiff Midwest Operating purchased 1 tranche of certificates from the 2006-5 offering on October 17, 2007.  Midwest Operating received 3 months of "pass-through" distributions and sold its certificates on January 16, 2008.  As a result, Midwest Operating recouped its investment in 2006-5 certificates.  (Dkt. 56, Ex. B).  Lead plaintiff Maryland

---

[5]  Because each tranche of a MBS offering is a separate security, a number of district courts in MBS cases have recently expressed skepticism about the constitutional standing of a plaintiff to assert claims relating to tranches in which it did not invest.  *See* Transcript of Oral Argument at 8, *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, No. 08 Civ. 10783 (S.D.N.Y.) (Ex. D) ("you can only represent the class of persons or entities that purchased the particular – the certificate from the particular tranche from the particular trust that you purchased"); *Mass. Bricklayers and Masons Fund v. Deutsche Alt-A Secs.*, 2010 WL 1370962, at *1 (E.D.N.Y. Apr. 6, 2010) (directing plaintiffs to "plead only the causes of action with respect to securities actually purchased by Plaintiffs" and to "specify in the pleading the tranches in which they invested"); *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1164 (C.D. Cal. 2010) ("*Countrywide MBS*") ("Plaintiffs must replead their causes of action with respect to securities actually purchased by Plaintiffs.").

National did not purchase any 2006-5 certificates.  The underlying mortgage pool for the 2006-5 offering consisted of 3559 loans.  2006-5 Pro Supp. at S-5 (Ex. B).  Wells Fargo allegedly originated 72% of the loans in the 2006-5 loan pool.  (¶ 48).  The depositor for the offering was Structured Asset Mortgage Investments II, Inc. ("SAMI II"), and the underwriters were Credit Suisse, RBS, and Banc of America Securities LLC ("BAS").  (¶¶ 23, 25-27).

### C.    The 2007-4 Offering

Lead plaintiffs purchased 2 tranches of certificates from the 2007-4 offering on August 30, 2007.  Midwest Operating sold certificates on January 23, 2009.  Maryland National has not sold its 2007-4 certificates.  (Dkt. 56, Ex. B).  The three separate loan groups comprising the underlying mortgage pool for the 2007-4 offering consisted in aggregate of 1536 loans.  2007-4 Pro Supp. at S-5 (Ex. C).  The depositor for the offering was GCA, and the underwriter was RBS.  (¶¶ 22, 26).

### III.    THE OFFERING DOCUMENTS

Each offering was registered with the SEC under (i) a shelf registration statement; (ii) a base prospectus; and (iii) a prospectus supplement.  (Exs. A-C and E-J).  The shelf registration statement contained no specific information regarding the mortgage pools for any offering.  Rather, the prospectus and prospectus supplement for each offering (the "Offering Documents") contained all of the relevant information regarding the pool of mortgage loans that supported the offering.

Each set of Offering Documents described in great detail the nature and quality of each corresponding pool of mortgage loans held by a trust, including the ranges of loan principal balances, the interest rates for the loans, the geographical distribution of the mortgaged

properties (by state), the purpose of the loans (*e.g.*, purchase or refinance), the property type (*e.g.*, single family residence), the occupancy type (*e.g.*, primary residence), the ranges of LTV ratios, and the ranges of the borrowers' credit scores.[6]

The Offering Documents disclosed that the underlying mortgage loans were acquired or originated "through four separate channels: (1) from unaffiliated correspondent originators that originate loans according to its underwriting guidelines or principally in the case of First Republic Bank that correspondent's underwriting guidelines, (2) through bulk purchases in the secondary market, (3) through [Thornburg's] retail operations and (4) through [Thornburg's] wholesale loan channel."[7]   The bulk of the underlying mortgage loans were *not* originated by Thornburg.  For example, of the mortgage loans in the 2006-5 pool, "approximately 1.14% were originated by [Thornburg] through its retail operations and approximately 0.39% were originated by [Thornburg] through its wholesale operations."[8]   The "unaffiliated correspondent originators" for the mortgage loans included Luxury Mortgage Corporation, Manhattan Mortgage Company, Inc., First Republic Bank, Countrywide, and IndyMac Bank, F.S.B.[9]

---

[6]   *See*, *e.g.*, 2006-3 Pro Supp. at S-33 to S-49 (Ex. A); 2006-5 Pro Supp. at Schedule A (Ex. B); 2007-4 Pro Supp. at S-B-1 to S-B-16 (Ex. C).

[7]   2006-5 Pro Supp. at S-30 (Ex. B).  *See also* 2006-3 Pro Supp. at S-96 (Ex. A); 2007-4 Pro Supp. at S-31 (Ex. C).

[8]   2006-5 Pro Supp. at S-30 (Ex. B).  *See also* 2006-3 Pro Supp. at S-96 (Ex. A) (4.18% of loans originated by Thornburg); 2007-4 Pro Supp. at S-31 (Ex. C) (26.09% originated by Thornburg).

[9]   *See* 2006-3 Pro Supp. at S-45 (Ex. A); 2006-5 Pro Supp. at A-7 (Ex. B); 2007-4 Pro Supp. at S-B-11 (Ex. C).

The Offering Documents disclosed that the underlying mortgage loans "were originated or acquired consistent with and generally conform to" a variety of loan origination programs, including the "full documentation," "streamline documentation," "stated income documentation," "no ratio documentation," and "alternative documentation" programs.[10]  The Offering Documents described each loan program and that, under some of them, "no or limited information was obtained regarding borrowers' income or employment."[11]  The Offering Documents further disclosed that a number of mortgage loans did not conform to the stated underwriting guidelines for the programs:

> On a case-by-case basis, the seller may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratios, low debt-to-income ratios, good credit history, stable employment, financial reserves, and time in residence at the applicant's current address.[12]

These disclosures in the Offering Documents "placed investors on notice" that the assets Thornburg was securitizing included "Alt-A" loans.  *In re Thornburg Mortg., Inc. Sec. Litig.*, 683 F. Supp. 2d 1236, 1258-59 (D.N.M. 2010).

The Offering Documents for the 2006-5 offering, which had a loan pool composed mostly of loans originated by Wells Fargo, further warned that "[v]erifications of income, assets

---

[10]  *See* 2006-3 Pro Supp. at S-99 (Ex. A); 2006-5 Pro Supp. at S-33 (Ex. B); 2007-4 Pro Supp. at S-39 (Ex. C).

[11]  *See* 2006-3 Pro Supp. at S-31 (Ex. A); 2006-5 Pro Supp. at S-24 (Ex. B); 2007-4 Pro Supp. at S-24 (Ex. C).

[12]  *See* 2006-3 Pro Supp. at 98 (Ex. A); 2006-5 Pro Supp. at S-33 (Ex. B); 2007-4 Pro Supp. at S-38 (Ex. C).

or mortgages may be waived under certain programs offered by Wells Fargo Bank."[13]  In

addition,  the Offering Documents cautioned investors that Wells Fargo had "initiated a program

designed to encourage its mortgage loan underwriting staff to prudently, but more aggressively,

utilize the underwriting discretion already granted to them under Wells Fargo Bank's

underwriting guidelines and policies" and that "[t]here can be no assurance that the successful

implementation of this initiative will not result in an increase in the incidence of delinquencies

and foreclosures, or the severity of losses, among mortgage loans underwritten."[14]

The mortgage pools were composed largely of interest-only loans with high principal

balances.  For example, the Offering Documents for the 2007-4 offering disclosed that over 90%

of the loans in the mortgage pool "require[d] the borrowers to make monthly payments of

accrued interest, but not principal, for a fixed period following origination" and cautioned that

those interest-only loans posed default risks:  "After the interest-only period, the borrower's

monthly payment will be recalculated to cover both interest and principal . . . When the monthly

payment increases, the borrower may not be able to pay the increased amount and may

default."[15]  In addition, because over 60% of the loans had principal balances of over

$1,000,000, the Offering Documents warned investors to "consider the risk that the loss and

---

[13]  *See* 2006-5 Pro Supp. at S-37 (Ex. B).

[14]  *See id.* at S-40.

[15]  2007-4 Pro Supp. at S-16 (Ex. C).  *See also* 2006-3 Pro Supp. at S-22 (Ex. A) (over 95% of
      loans are interest-only loans); 2006-5 Pro Supp. at S-15 (Ex. B) (over 88% of loans are
      interest-only loans).

delinquency experience on these high balance mortgage loans may have."[16]  Given the profile of

the underlying loans, the Offering Documents warned that the mortgage pools would be

negatively impacted by a downturn in the housing market:  "If the residential real estate market

should experience an overall decline in property values[,] . . . foreclosures and losses could be

higher than those now generally experienced in the mortgage lending industry."[17]

The Offering Documents also made clear that the certificates were potentially illiquid

investments for which there might never be any secondary market in which to sell them:

> There is currently no secondary market for the offered certificates and there can
> be no assurance that a secondary market for the offered certificates will develop.
> Consequently, you may not be able to sell your securities readily or at prices that
> will enable you to realize your desired yield. . . .
>
> The secondary markets for asset-backed securities have experienced periods of
> illiquidity and can be expected to do so in the future.  Illiquidity can have a
> severely adverse effect on the price of securities . . . .

2006-3 Pro Supp. at S-28 (Ex. A).  *See also* 2006-5 Pro Supp. at S-21 (Ex. B); 2007-4 Pro Supp.

at S-21 (Ex. C).

## IV.   PLAINTIFFS' CLAIMS

On February 27, 2009, Genesee County Employees' Retirement System filed the first

complaint in this lawsuit in state court.  The case was subsequently removed to this Court.

Genesee County purchased certificates from the 2007-4 offering, but did not purchase

certificates from the 2006-3 or 2006-5 offerings.  On June 26, 2009, three competing motions for

---

[16]  2007-4 Pro Supp. at S-19 (Ex. C).  *See also* 2006-3 Pro Supp. at S-24 (Ex. A) (approximately
50% of loans have principal balances of over $1,000,000); 2006-5 Pro Supp. at S-17 (Ex. B)
(approximately 33% of loans have principal balances of over $1,000,000).

[17]  2006-5 Prospectus at 7-8 (Ex. I).

lead plaintiff were filed.  (Dkt. 48, 52, 55).  On February 26, 2010, Maryland National and

Midwest Operating were appointed lead plaintiffs.  (Dkt. 83).  On December 10, 2010, or nearly

10 months after they were appointed lead plaintiffs, Maryland National and Midwest Operating

filed an Amended Complaint.  (Dkt. 103).  No investor that purchased 2006-3 or 2006-5

certificates filed a claim relating to the 2006-3 or 2006-5 offerings until Maryland National and

Midwest Operating filed the Amended Complaint.

In the Amended Complaint, Plaintiffs do not allege that they have failed to receive any of

the promised "pass-through" payments on their certificates.  Plaintiffs nevertheless seek recovery

for unspecified "damages" (i) under Section 11 of the Securities Act against the Thornburg

Defendants, Underwriter Defendants, Depositor Defendants, and Individual Defendants (¶¶ 99-

107); (ii) under Section 12(a)(2) of the Securities Act against the Thornburg Defendants,

Underwriter Defendants, Depositor Defendants, and Individual Defendants (¶¶ 108-118); (iii)

under Section 15 of the Securities Act against Greenwich Capital Markets (now known as RBS

Securities Inc.) and the Individual Defendants (¶¶ 119-125); and (iv) under the New Mexico

Securities Act of 1986 against all defendants (¶¶ 126-131).  Plaintiffs allege that the Offering

Documents failed to provide adequate information about the underwriting standards and loan

documentation for the loans in the mortgage pools (¶¶ 48-56, 62-63), the appraisals for the loans

(¶¶ 57-61), the loan-to-value ratios for the loans (¶¶ 64-67), and the credit ratings assigned to the

certificates (¶¶ 68-89).

## STANDARDS ON THIS MOTION

Dismissal is appropriate here under Fed. R. Civ. P. 12(b)(6) because Plaintiffs fail to

allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 545 (2007).  A plaintiff may not rely on conclusory allegations.  Instead, a plaintiff must establish each element of its claims through factual allegations sufficient "to raise a right to relief above the speculative level."  *Id*.  Where "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint must be dismissed.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

Dismissal is also appropriate here under Fed. R. Civ. P. 12(b)(1) because Plaintiffs have failed to allege facts establishing their standing to bring a Section 12(a)(2) claim.  A defect in standing deprives the Court of jurisdiction over a claim.  *See The Wilderness Soc'y v. Kane Cnty.*, __ F.3d __, 2011 WL 79487, at *4 (10th Cir. Jan. 11, 2011).

## ARGUMENT

## I.   PLAINTIFFS PLEAD NO ACTIONABLE MISREPRESENTATION OR OMISSION

Plaintiffs' claims must be dismissed because the Amended Complaint pleads no actionable misrepresentation or omission.  In assessing the allegations in MBS complaints, courts have looked at whether there are facts alleged to "create a sufficient nexus between the alleged underwriting standard abandonment and the loans underlying the Certificates" (*In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 510 (S.D.N.Y. 2010) ("*IndyMac MBS*")), and "whether enough has been said in the complaint – beyond conclusory assertions – to link such practices with specific lending banks that supplied the mortgages that underpinned the trusts." *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, __ F.3d __, 2011 WL 183971, at *8 (1st Cir. Jan. 20, 2011) ("*Nomura MBS*").  Only those allegations that "have cited to more substantial sources, including statements from confidential witnesses, former employees and internal e-mails" regarding "*specific* allegations as to [the loan originator]" have

survived motions to dismiss.  *Id.* (emphasis in original).  Allegations that are "too conclusory" or are based on a source that "offers no nexus to the Certificates at issue" have been dismissed. *Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates, Series AR1*, __ F. Supp. 2d. __, 2010 WL 3815796, at *7 (W.D. Wash. Sept. 28, 2010) ("*WaMu MBS*").

Here, though the mortgage pools for the 2006-3, 2006-5, and 2007-4 offerings were collectively composed of 7187 mortgage loans, Plaintiffs fail to identify even a single loan in which an underwriting standard was not followed, the loan documentation was inaccurate, an inflated appraisal was used, or a LTV ratio was misstated.  Moreover, many of the loans in the mortgage pools were originated by "unaffiliated correspondent originators," such as Luxury Mortgage Corporation, Manhattan Mortgage Company, Inc., First Republic Bank, Countrywide, and IndyMac Bank, F.S.B., as to whom Plaintiffs make no allegations at all.  Instead, Plaintiffs rely on conclusory and generalized allegations that fall well short of the *Twombly* requirement that a plaintiff plead factual allegations sufficient "to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

### A.    The Allegations Regarding The Underwriting Standards And Documentation For The Mortgage Loans Are Not Actionable

Plaintiffs' conclusory allegations regarding the underwriting standards and documentation for the mortgage loans underlying the Certificates (¶¶ 48-56, 62-63) are patently insufficient.

### 1.    Loans Originated By Thornburg

Though Plaintiffs entitle a section of the Amended Complaint "Loans Originated by Thornburg Mortgage Home Loans, Inc." (Dkt. 103 at 17), the vast bulk of the underlying loans in the mortgage pools for the 2006-3, 2006-5, and 2007-4 offerings were *not* originated by

Thornburg.[18]  There is no factual allegation in the Amended Complaint regarding how any loan originated by Thornburg, much less any loan in the loan pools, was originated "without regard to Thornburg's stated underwriting standards" or based on loan documentation that "contained misrepresentations" or was not "sufficient" under loan program through which it was originated. (¶¶ 54(a), 56(b), 63(c)).  Nor is there any factual allegation in the Amended Complaint regarding any loan, much less any loan in the loan pools, that Thornburg acquired from a correspondent lender or mortgage broker but for which it did not conduct "adequate quality control reviews." (¶¶ 54(c), 56(c)).

Rather than plead any factual allegations to support their claim, Plaintiffs block quote statements from the Offering Documents and conclusorily assert that they were false because the opposite was true.  (¶¶ 52-56, 62-63).  That is insufficient.  "[A] plaintiff's burden to set forth the grounds of his or her entitlement to relief 'requires more than labels and conclusions.'"  *In re Thornburg*, 683 F. Supp. 2d at 1247 (quoting *Twombly*, 550 U.S. at 546).  Indeed, "the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context."  *Iqbal*, 129 S. Ct. at 1954.

Plaintiffs have literally pled *no* factual allegations to support their conclusory statements:

- The Offering Documents disclosed that "[o]n a case-by-case basis, the seller may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the applicable underwriting guidelines warrants

---

[18]  *See* 2006-3 Pro Supp. at S-96 (Ex. A) (4.18% of loans originated by Thornburg); 2006-5 Pro Supp. at S-30 (Ex. B) (1.53% of loans originated by Thornburg); 2007-4 Pro Supp. at S-31 (Ex. C) (26.09% of loans originated by Thornburg).

an underwriting exception."[19]  There is no factual allegation regarding any of the loans for which Thornburg granted an underwriting exception, much less any factual allegations to support Plaintiffs' conclusory assertion that "lenders were abusing underwriter discretion as a matter of course by invoking exceptions."  (¶ 54(b)).

- The bulk of the underlying loans in the mortgage pools for the 2006-3, 2006-5, and 2007-4 offerings were originated by "unaffiliated correspondent originators."[20]  There is no allegation in the Amended Complaint regarding loans originated by correspondent originators such as Luxury Mortgage Corporation, Manhattan Mortgage Company, Inc., First Republic Bank, Countrywide, and IndyMac Bank, F.S.B. much less any factual allegations to support Plaintiffs' bald statement that "Thornburg had not conducted adequate quality control reviews of the mortgage loans acquired from its correspondent lenders."  (¶ 54(c)).

- The Offering Documents disclosed: "There has recently been an increasing number of mortgage loans originated under 'stated income' programs . . . Typically no verification of monthly income is required under stated income programs, which increases the risk that these borrowers have overstated their income and may not have sufficient income to make their monthly mortgage loan payments."[21]  The Offering Documents further disclosed that "no or limited information was obtained regarding borrowers' income or employment" for loans originated under loan programs other than the full documentation program and set forth the number and percentage of loans that were originated under the more permissive loan programs.[22]  There is no allegation that the disclosure of the number of loans originated with "no or limited information . . . regarding borrowers' income or employment" was inaccurate, much less any factual allegation regarding even a single instance in which a mortgage loan was "not supported by adequate documentation . . . concerning the borrowers' income and employment."  (¶ 54(d)).

---

[19] *See* 2006-3 Pro Supp. at 98 (Ex. A); 2006-5 Pro Supp. at S-33 (Ex. B); 2007-4 Pro Supp. at S-38 (Ex. C).

[20] *See* 2006-3 Pro Supp. at S-45 (Ex. A); 2006-5 Pro Supp. at A-7 (Ex. B); 2007-4 Pro Supp. at S-B-11 (Ex. C).

[21] 2006-3 Prospectus at 13-14 (Ex. H).

[22] *See* 2006-3 Pro Supp. at S-31, S-38 (Ex. A); 2006-5 Pro Supp. at S-24, A-5 (Ex. B); 2007-4 Pro Supp. at S-24, S-B-4 (Ex. C).

Moreover, Plaintiffs do not reference *any* sources for their allegations, much less "substantial sources, including statements from confidential witnesses, former employees and internal e-mails" regarding "*specific* allegations as to [the loan originator]."  *Nomura MBS*, 2011 WL 183971, at *8 (emphasis in original).  *See also In re Downey Sec. Litig.*, 2009 WL 2767670, at *6 (C.D. Cal. Aug. 21, 2009) (dismissing securities claims where plaintiff failed "to provide any particularized factual allegations evidencing such a systemic disregard for proper underwriting").

### 2.     Loans Originated By Wells Fargo

Plaintiffs' conclusory claims relating to the loans originated by Wells Fargo in the 2006-5 mortgage pool (¶¶ 48-51, 62-63) are equally deficient:

- There were 2506 loans in the 2006-5 mortgage pool originated by Wells Fargo.[23]  Wells Fargo originated approximately $366 billion of loans in 2005 and $398 billion of loans in 2006.[24]  The aggregate amount of the 2506 loans was *less than 1%* of Wells Fargo's loans in either of those years.  There is no factual allegation regarding how Wells Fargo "failed to follow its stated underwriting standards" with regard to even a single loan that it originated in 2005 or 2006, much less any loan in the 2006-5 mortgage pool.  (¶ 51(a)).

- The Offering Documents disclosed that "[v]erifications of income, assets or mortgages may be waived under certain programs offered by Wells Fargo Bank" and that Wells Fargo had implemented an initiative to encourage its mortgage loan underwriting staff to "aggressively . . . utilize the underwriting discretion already granted to them under Wells Fargo Bank's underwriting guidelines and policies" to make underwriting exceptions.[25]  Under the initiative, loans were made available "where such loans may have been denied

---

[23]  *See* 2006-5 Pro Supp. at A-7 (Ex. B).

[24]  *See* Wells Fargo & Co., Current Report (Form 8-K) (Jan. 17, 2006) (Ex. K); Wells Fargo & Co., Current Report (Form 8-K) (Jan. 16, 2007) (Ex. L).

[25]  *See* 2006-5 Pro Supp. at S-37, S-40 (Ex. B).

in the past because of underwriter hesitancy to maximize the use of their ability to consider compensating factors as permitted by the underwriting guidelines."[26]  Thus, the Offering Documents fully disclosed that Wells Fargo had "formalized the practice" of aggressive underwriting exceptions.  (¶ 51(e)).  There is no factual allegation regarding any of the loans for which Wells Fargo granted an underwriting exception, much less any factual allegations to support Plaintiffs' conclusory assertion that Wells Fargo "required" its underwriters to "generate a specified number of loans regardless of the repayment ability of the borrower" or to "falsify[] the incomes of the borrowers in order to qualify borrowers for loans that could not otherwise qualify for."  (¶¶ 51(b), 63(a)).

● There is no factual allegation regarding any loan for which Wells Fargo failed to "determine whether borrowers' income or ability to repay their loans was sufficient" or extended loans to borrowers who "could not afford to repay the loans" or "lacked the demonstrable ability to comply with the terms of the loans," much less any factual allegations to support Plaintiffs' bald assertion that "the loans placed into the [2006-5 loan pool] had been made without regard to the borrowers' ability to repay the loans."  (¶¶ 6, 51(d), (f)-(g)).  Moreover, the Offering Documents disclosed that under its "retention program" (i) borrowers "may not need to demonstrate that their current total monthly debt obligation in relation to their monthly income level"; (ii) "Wells Fargo Bank may not obtain a current credit report for the borrower"; and (iii) "the borrower may not be required to provide any verifications of current employment, income level or extent of assets."[27]  Thus, the Offering Documents fully disclosed the risk that loans might be made without "any limitation on the ratio of a borrower's current total debt obligation in relation to current monthly income."[28]

● There is no factual allegation regarding any loan in the 2006-5 mortgage pool originated under the Wells Fargo full documentation program that was "not supported by sufficient documentation." (¶ 56(b)).  Furthermore, the Offering Documents disclosed that "Wells Fargo Bank accepts alternative methods of verification" and that "[l]oans underwritten using alternative verification methods are considered by Wells Fargo Bank to have been underwritten with 'full documentation.'"[29]  The Offering Documents thus disclosed that loans

---

[26] *Id.* at S-40.

[27] *Id.*

[28] *Id.*

[29] *Id.* at S-38.

originated under the Wells Fargo "full documentation" program might be
supported by "alternative methods of verification."

Moreover, Plaintiffs again fail to reference *any* sources for their allegations, much less
"substantial sources, including statements from confidential witnesses, former employees and
internal e-mails" regarding "*specific* allegations as to [the loan originator]."  *Nomura MBS*, 2011
WL 183971, at *8 (emphasis in original).

Plaintiffs also make no factual allegations that would "create a sufficient nexus between
the alleged underwriting standard abandonment and the loans underlying the Certificates."
*IndyMac MBS*, 718 F. Supp. 2d at 510.  In *Tsereteli v. Residential Asset Securitization Trust
2006-A8*, 692 F. Supp. 2d 387 (S.D.N.Y. 2010) ("*Tsereteli MBS*"), the court found the plaintiffs
had alleged a sufficient nexus because "the percentage of defaulting loans [in the mortgage pool]
rose dramatically shortly after the Certificates were issued."  *Id.* (quotation marks omitted).
There is no allegation here that the percentage of defaulting loans in the 2006-5 mortgage pool
"rose dramatically" in late 2006 "shortly after" after the 2006-5 certificates were issued in
August 2006.  In *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*, 2010
U.S. Dist. LEXIS 137290, at *16 (E.D.N.Y. Dec. 23, 2010), the court found the plaintiffs had
"complied with the court's directive to tie the allegedly misleading statements to their particular
investments" because the plaintiffs "conducted a review of the documentation underlying 64
loans backing the AR5 Trust, and 72 loans backing the WFHE2 Trust."  *Id.* at *8.  Here, there
are no factual allegations at all regarding the actual loans in the 2006-5 loan pool.  *See Republic
Bank & Trust Co. v. Bear, Stearns & Co., Inc.*, 707 F. Supp. 2d 702, 712 (W.D. Ky. 2010)
(dismissing underwriting standard allegations because "the complaint contains no allegations on
this subject that are in any way specific to the loans and securities involved in this case").

* * *

In sum, the Amended Complaint is devoid of any factual allegations to support Plaintiffs' conclusory assertions.  Moreover, as demonstrated above, the robust disclosures in the Offering Documents demonstrate, on their face, that the Plaintiffs were provided with all the material facts regarding the underwriting and loan documentation for the mortgage loans.  *See, e.g.*, 2006-5 Pro Supp. at S-37, S-40 (Ex. B) (describing Wells Fargo initiative encouraging underwriters to "aggressively utilize" underwriting discretion to make underwriting exceptions).  Accordingly, Plaintiffs' claims should be dismissed.  *See In re Thornburg*, 683 F. Supp. 2d at 1261 ("As the Court has found no false or misleading statement upon which to premise Section 11 or Section 12(a)(2) liability, the Court will grant Defendants' motion to dismiss those claims."); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (dismissing Securities Act claims based on alleged failure to disclose risk of investment in MBS because "[t]he prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed").

## B.    The Appraisal Allegations Are Not Actionable

Plaintiffs' appraisal allegations (¶¶ 57-61, 63(b)) also fail to state a claim.  Indeed, courts in MBS cases have repeatedly rejected the same type of appraisal allegations that Plaintiffs advance here.  *See Nomura MBS*, 2011 WL 183971, at *9; *WaMu MBS*, 2010 WL 3815796, at *7; *Tsereteli MBS*, 692 F. Supp. 2d at 393-94; *Republic Bank*, 707 F. Supp. 2d at 712-13; *IndyMac MBS*, 718 F. Supp. 2d at 510-11; *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 WL 1473288, at *8 (S.D.N.Y. Mar. 29, 2010) ("*DLJ MBS*").

20

1.     **Appraisals Used By Thornburg**

The Amended Complaint is devoid of any factual allegations supporting Plaintiffs' claim that Thornburg "used inflated appraisals." (¶ 58).  Indeed, Plaintiffs do not provide a single example of where Thornburg "used inflated appraisals," much less any example of a loan in the 2006-3, 2006-5, or 2007-4 mortgage pools where Thornburg "used inflated appraisals" or a source for their conclusory assertion that "the property appraisals utilized in connection with the loans in the Trusts were systematically inflated by appraisers."  (¶ 63(b)).

Moreover, "neither an appraisal nor a judgment that a property's value supports a particular loan amount is a statement of fact.  Each is instead a subjective opinion based on the particular methods and assumptions the appraiser uses." *Tsereteli MBS*, 692 F. Supp. 2d at 393. Thus, statements about appraisals "are actionable under the Securities Act only if the complaint alleges that the appraiser did not truly believe the appraisal at the time it was issued." *IndyMac MBS*, 718 F. Supp. 2d at 511.  The Amended Complaint here is devoid of any such factual allegations regarding the appraisers who issued the appraisals used by Thornburg.  *See DLJ MBS*, 2010 WL 1473288, at *7-8 (dismissing appraisal allegations because "[t]hey are not actionable where, as here, the Complaint fails to allege that the speaker did not truly believe the statements at the time it was made public").

Furthermore, the Offering Documents cautioned that the quality of appraisals could "vary widely," that appraisers "may feel pressure" to provide an appraisal that enables an originator to make the loan, and that assessed values of the mortgaged properties were subject to change:

> The quality of these appraisals may vary widely in accuracy and consistency.  Because in most cases the appraiser is selected by the mortgage loan broker or lender, the appraiser may feel pressure from that broker or lender to provide an appraisal in the amount necessary to enable the originator to make the loan, whether or not the value of

the property justifies such an appraised value.  Inaccurate or inflated appraisals may result in an increase in the number and severity of losses on the mortgage loans.[30]

Plaintiffs were thus specifically warned about the risks of lender "pressure" on appraisers and "inaccurate or inflated appraisals."  *See Klein v. Gen. Nutrition Cos., Inc.*, 186 F.3d 338, 344 (3d Cir. 1999) (dismissing securities claims where prospectus warned investors of risks).

Here, there are no factual allegations regarding any pressure on appraisers by Thornburg, much less pressure that resulted in inflated appraisals.  Plaintiffs' conclusory assertion that Thornburg "used inflated appraisals" is patently insufficient.  *See Nomura MBS*, 2011 WL 183971, at *8 (affirming dismissal of appraisal allegations based on "a single general statement that the appraisals underlying the loans at issue here failed to comply with USPAP requirements").

### 2.     Appraisals Used By Wells Fargo

Plaintiffs' allegations regarding the appraisals used by Wells Fargo for the loans that it originated in the 2006-5 mortgage pool are likewise insufficient.

*First,* although there were 2506 loans in the 2006-5 mortgage pool originated by Wells Fargo, Plaintiffs do not identify a single loan in the 2006-5 mortgage pool where Wells Fargo used inflated appraisals.  *See Republic Bank*, 707 F. Supp. 2d at 712 (dismissing appraisal allegations because "there is nothing in the complaint alleging anything wrong with the appraisals of the specific properties involved in this litigation").  Instead, Plaintiffs purport to rely on alleged instances of Wells Fargo pressure on appraisers in Illinois, Las Vegas, Southern

---

[30]  2006-3 Prospectus at 13, 47 (Ex. H); 2006-5 Prospectus at 18 (Ex. I); 2007-4 Prospectus at 9, 47 (Ex. J).

California and Florida from unspecified sources in an unspecified time period and alleged

regulatory action by the Nevada Real Estate Division regarding appraisals from an unspecified

time period (¶¶ 58-61) that are untethered to the loans in the 2006-5 mortgage pool.[31]  That is

insufficient.  In *Tsereteli MBS*, for example, the court rejected appraisal allegations even though

a report by the Treasury Department's Office of Inspector General had identified loans in which

IndyMac Bank had accepted appraisals that did not conform with the Uniform Standards of

Professional Appraisal Practice because the report "does [not] contain any suggestion that the

loans the OIG examined were in the pools underlying the Certificates."  692 F. Supp. 2d at 393-

94.  Similarly, in *WaMu MBS*, the court rejected as "too conclusory" allegations adopted from a

New York Attorney General complaint regarding *WaMu* pressure on appraisers because they

"offer[ed] no nexus to the Certificates at issue here."  2010 WL 3815796, at *7.

     Here, too, there are no factual allegations tying Plaintiffs' appraisal allegations to the

loans in the 2006-5 mortgage pool.  The absence of such factual allegations is particularly

glaring here because, as discussed in Section I.A.2. above, the 2506 loans in the 2006-5

mortgage pool originated by Wells Fargo constituted less than 1% of the aggregate amount of the

loans that Wells Fargo originated in either of 2005 or 2006.  *See IndyMac MBS*, 718 F. Supp. 2d

---

[31] *See Cal. Public Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 148 (3d Cir. 2004) (affirming dismissal because plaintiffs failed to allege "when any of [the confidential sources] were employed by [defendant,] . . . the dates that these sources acquired the information they purportedly possess, or how any of these former employees had access to such information"); *Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*, 638 F. Supp. 2d 120, 127-28 (D. Mass. 2009) ("None of the information provided [by confidential witnesses] gives sufficient context for its true meaning or impact to be discernible . . . .  Lead Plaintiff must provide more than 'tales from the trenches'").

at 510 (rejecting "bald allegations" that "sales personnel and account executives 'would pressure' appraisers to appraise properties at artificially high levels" because they contained "insufficient factual amplification to support a plausible inference that the appraisers of the properties underlying the Certificates were subjected to pressure or that they succumbed to it.").

*Second*, Plaintiffs' allegation that Rels Valuation, the joint venture between First American Real Estate Solutions and a Wells Fargo subsidiary, demanded appraisers "to agree to a reduced appraisal fee as low as 50% below the market rate" (¶ 58(a)), says nothing about whether appraisals were inflated.  *See Nomura MBS*, 2011 WL 183971, at *8 (affirming dismissal of appraisal allegations because there were no factual allegations that the lender pressure actually resulted in inflated appraisals).

*Third*, Plaintiffs ignore that "real estate appraisals are not statements of fact but rather statements of opinion or belief."  *IndyMac MBS*, 718 F. Supp. 2d at 511.  There are no factual allegations that an appraiser for a Wells Fargo loans underlying the 2006-5 mortgage pool did not truly believe the appraisal that it issued.  *See Tsereteli MBS*, 692 F. Supp. 2d at 393 (dismissing appraisal allegations because complaint did not contain allegations that appraisers "did not truly have the opinion" reflected in the appraisals when they were issued).

*Fourth*, the Offering Documents specifically warned that the assessed values of the mortgaged properties could be "inaccurate" and were subject to change:  "No assurance can be given that values of the mortgaged properties have remained or will at their levels on the dates of

origination of the related loans."[32]  *See Republic Bank*, 707 F. Supp. 2d at 712-13 (dismissing appraisal allegations where offering documents warned that there were "no assurances that property values would remain where they were when the mortgages were originated").

Consistent with the holdings of the courts in *Tsereteli MBS*, *WaMu MBS*, *IndyMac MBS*, *Nomura MBS*, *DLJ MBS*, and *Republic Bank*, this Court should dismiss Plaintiffs' allegations relating to the appraisals used by Wells Fargo.

### C.  The LTV Ratio Allegations Are Not Actionable

Plaintiffs' claim relating to LTV ratios should be dismissed because it is "completely derivative of the improper appraisal practices claim."  *Tsereteli MBS*, 692 F. Supp. 2d at 394 (dismissing claims relating to appraisal and LTV ratios).  *See also WaMu MBS*, 2010 WL 3815796, at *7 (same); *IndyMac MBS*, 718 F. Supp. 2d at 511 (same); *DLJ MBS*, 2010 WL 1473288, at *8 (same).  Indeed, the Amended Complaint makes clear that the LTV ratio allegations are duplicative of, and derived entirely from Plaintiffs' flawed appraisal allegations: "Because the LTV ratio is calculated by using the appraised value of the property (and because the property values in the appraisals were inflated as detailed herein), this resulted in false, artificially understated LTV ratios."  (¶ 67).

In addition, Plaintiffs' claim relating to LTV ratios is based on the erroneous premise that an inflated appraisal must cause a misstated LTV ratio that overstates borrower equity.  (*Id.*)  The Offering Documents plainly defined LTV ratios with respect to purchase mortgage loans as the ratio between the principal balance of the mortgage loan and the *lesser* of the selling price of the

---

[32]  2006-3 Prospectus at 13, 47 (Ex. H); 2006-5 Prospectus at 7 (Ex. I); 2007-4 Prospectus at 9, 47 (Ex. J).

property *or* its appraised value.  2006-3 Pro Supp. at S-32 (Ex. A).  Because the denominator is

the lesser of the sale price or appraisal value, the LTV ratio for a purchase mortgage in each case

reflects the market value of the property and, thus, would not overstate borrower equity.

Accordingly, Plaintiffs' boot-strapped and hopelessly contrived claim relating to LTV

ratios should be dismissed.

### D.      Plaintiffs Do Not Allege A Material Number Of Non-Complying Loans

Even if Plaintiffs had pled factual allegations to support their conclusory claims of

misrepresentations and omissions (and they have not), Plaintiffs' allegations relating to the

thousands of underlying loans in each of the 2006-3, 2006-5, and 2007-4 mortgage pools still

must be dismissed because Plaintiffs have failed to adequately allege materiality.  *See In re*

*VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993) (affirming dismissal of Securities Act

claims for failure to adequately allege materiality).  The materiality standard requires "a showing

of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed

actual significance in the deliberations of the reasonable [investor]."  *TSC Indus., Inc. v.*

*Northway*, 426 U.S. 438, 459 (1976).

The decision in *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404

(S.D.N.Y. 2009) is instructive.  There, the plaintiff alleged that the offering documents for the

common stock of Brittania, a shipping company, were misleading because "Brittania misstated

or failed to disclose . . . that Brittania used FFAs [forward freight agreements] to hedge against

increases, and not merely decreases, in charter rates."  *Id.* at 406.  The court dismissed plaintiffs'

Section 11 and 12(a)(2) claims because "the Complaint specifies only one FFA [out of 37 FFAs]

as being inconsistent with its characterization of Brittania's disclosures." *Id.* at 416.  The court

rejected the plaintiff's attempt to "blunt the impact of th[e] deficiency" by asserting that it had identified "simply one example" of Brittania's allegedly misleading use of FFAs because "[i]t is the Complaint's allegations and not vague assertions . . . that must be able to withstand a motion to dismiss." *Id.* at 416 n.8.

Here, Plaintiffs do not identify, even roughly, the number or volume of loans in any of the 2006-3, 2006-5, or 2007-4 mortgage pools that did not comply with the characteristics of the loans disclosed in the Offering Documents. Even assuming that some "non-complying" loans were included in some loan pool for some offering, Plaintiffs do not allege that the purported deviations reached material levels, either relative to the huge number of loans held in the mortgage pools or to the performance of similarly situated loans during the housing meltdown. Without such allegations to establish materiality, Plaintiffs cannot state a claim. *See Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (dismissing Securities Act claims based on alleged failure to disclose increase in integration-related expenses because plaintiff failed to "describe in any way the magnitude of the increase, the initial projections, or by how much the actual costs exceeded the internal budget").

### E. Plaintiffs Plead No Actionable Misrepresentation Relating To The Mortgage Loans Because They Do Not Allege A Failure To Cure Non-Complying Loans

Plaintiffs' claims relating to the underlying loans in the mortgage pools also must be dismissed for the independent reason that the sole remedy for a breach of any representation or warranty relating to a loan is for the seller to repurchase or replace the loan, and Plaintiffs do not allege any failure to cure any purportedly non-complying loans. As set forth in the Offering Documents:

27

> Upon discovery of a breach of any representation or warranty that materially and adversely affects the interests of the certificateholders in a mortgage loan and the related documents, the seller will have a period of 90 days after discovery or notice of the breach to effect a cure.  A determination of whether a breach of those representations numbered (3), (14), (17), (18), (29), (34), (35) and (36) above has occurred will be made without regard to the seller's knowledge of the factual conditions underlying the breach.  With respect to the seller, if the breach cannot be cured within the 90-day period, the seller will be obligated to either:
>
> - cause the removal of the affected loan from the trust and, if within two years of the closing date, substitute for it one or more eligible substitute mortgage loans, or
>
> - purchase the affected loan from the trust.
>
> The purchase price will be deposited in the distribution account on or prior to the next determination date after the seller's obligation to purchase the defective loan arises.  ***The obligation of the seller to repurchase or substitute for a defective mortgage loan is the sole remedy available to the trustee or the holders of certificates regarding any defect in that mortgage loan and the related documents.***

2006-3 Pro Supp. at S-121-22 (Ex. A) (emphasis supplied); 2006-5 Pro Supp. at S-65-66 (Ex. B);

2007-4 Pro Supp. at S-59-60 (Ex. C).

In *Lone Star Fund V (U.S.), LP v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010), the

Fifth Circuit explained that "repurchase or substitute" provisions do not waive a defendant's

obligations under the Securities Act, but instead "change the nature of [a defendant's]

representation" concerning the underlying mortgage loans – namely, that the loans either

conform, or will be made to conform, with the characteristics set forth in the offering materials.

*Id.* at 390.  The Fifth Circuit held that "Barclays made no actionable misrepresentations" because

"[e]ven though the mortgage pools contained [non-conforming] mortgages, Appellants have not

alleged that Barclays failed to substitute or repurchase the [non-conforming] mortgages."  *Id*. at

389.

Plaintiffs here have not alleged that this "sole remedy" provided for in the Offering Documents was ever sought or requested, much less that there was failure to repurchase or substitute non-complying loans. *Lone Star* plainly holds that no misrepresentation claim lies in such circumstances. Accordingly, Plaintiffs' Section 11 and 12(a)(2) claims should be dismissed for the independent reason that Plaintiffs do not allege any failure to cure non-complying loans.

## F. Plaintiffs Plead No Actionable Misrepresentation Or Omission Relating To The Ratings Assigned To Plaintiffs' Certificates

Courts in MBS cases have repeatedly dismissed Securities Act claims based on alleged misrepresentations or omissions regarding ratings and ratings methodologies. *See Nomura MBS*, 2011 WL 183971, at *9-10; *WaMu MBS*, 2010 WL 3815796, at *7; *In re IndyMac*, 718 F. Supp. 2d at 511-12; *In re Lehman Bros. Sec. and ERISA Litig.*, 684 F. Supp. 2d 485, 492-93 (S.D.N.Y. 2010) ("*Lehman MBS*"); *Tsereteli MBS*, 692 F. Supp. 2d at 394; *DLJ MBS*, 2010 WL 1473288, at *7-8; *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 1257528, at *6-7 (S.D.N.Y. Mar. 31, 2010) ("*RALI MBS*"). Plaintiffs' claims here relating to ratings and ratings methodologies should likewise be dismissed.

*First*, the ratings assigned to Plaintiffs' certificates cannot give rise to liability under the Securities Act because they are not considered part of the registration statement for the certificates.

> SEC Rule 436(g)(1) states that "the security rating assigned . . . by a nationally recognized statistical rating organization . . . shall not be considered a part of the registration statement prepared or certified by a person within the meaning of Sections 7 and 11 of the Act."

*Public Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 714 F. Supp. 2d 475, 481 (S.D.N.Y. 2010) ("*Merrill Lynch MBS*") (citing 17 C.F.R. § 230.436(g)(1)).

*Second*, there is no allegation that the Offering Documents inaccurately disclosed the ratings assigned to the certificates.  Rather, Plaintiffs complain that the rating agencies used "outdated and defective" models and later changed their initial ratings.  That is insufficient to state a claim:

> The ratings are *opinions* purportedly expressing the agencies' professional judgment about the value and prospects of the certificates. . . . [T]he ratings were not false or misleading because rating agencies should have been using better methods and data.  Defendants are not liable under the securities laws when their opinions, or those they reported, were honestly held when formed but simply turn out later to be inaccurate; nor are they liable only because the could have formed "better" opinions. . . . That a high rating may be mistaken, a rater negligent in the model employed or the rating company interested in securing more business may be true, but it does not make the report of the rating false or misleading.

*Nomura MBS*, 2011 WL 183971, at *9-10 (emphasis in original).  *See also WaMu MBS*, 2010 WL 3815796, at *7 ("The mere fact that the ratings would have been different under a different methodology is insufficient to state a claim."); *RALI MBS*, 2010 WL 1257528, at *6 ("credit ratings . . . are clearly opinion statements because they predict future value and reliability, and are not actionable unless it is alleged that the opinions were not truly held"); *IndyMac MBS*, 718 F. Supp. 2d at 512 ("Ratings are opinions and therefore actionable under the Securities Act only if not truly held by the ratings agencies when issued.").

*Third*, the Offering Documents expressly warned investors that "[a] rating is not a recommendation to buy, sell or hold securities and it may be lowered or withdrawn at any time by the assigning rating agency."  2006-3 Pro Supp. at S-18 (Ex. A); 2006-5 Pro Supp. at S-10 (Ex. B); 2007-4 Pro Supp. at S-12 (Ex. C).  Because Plaintiffs were provided with all material facts, they cannot claim to have been misled.

30

*Fourth*, it was publicly known for many years that rating agencies are paid by issuers to rate securities.  That the Offering Documents do not repeat what was common knowledge is immaterial and fails to state a claim.  *See WaMu MBS*, 2010 WL 3815796, at *7 ("[T]he risk that the rating agencies operated under a conflict of interest because they were paid by the issuers had been known publicly for years.  Thus, because reasonable investors knew that the rating agencies were paid by the issuers, the alleged misstatement is immaterial."); *Lehman MBS*, 684 F. Supp. 2d at 492 ("The Securities Act does not require disclosure of that which is publicly known, and the risk that the ratings agencies operated under a conflict of interest because they were paid by the issuers had been known publicly for years."); *IndyMac MBS*, 718 F. Supp. 2d at 512  ("there was no duty to disclose the rating agencies' conflicts of interest, as the information was known widely").[33]

## II.      PLAINTIFFS DO NOT PLEAD A COGNIZABLE ECONOMIC LOSS

The Amended Complaint should be dismissed for the independent reason that Plaintiffs do not plead a legally cognizable economic loss, an essential element of their claims for damages under both Sections 11 and 12(a)(2) of the Securities Act.  *See* 15 U.S.C. §§ 77k(e), 77l(a); *In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1203-05 (9th Cir. 2002) (dismissing Section 11 and 12(a)(2) claims for failure to plead a cognizable loss).

---

[33] Moreover, the SEC has previously considered, and declined to adopt, any requirement that offering documents disclose (i) "the method of compensating the rating organization"; (ii) "the extent of the rating organization involvement in the structuring of the security"; or (iii) "activities that could be viewed as 'rating shopping.'"  *Disclosure of Security Ratings*, Securities Act Release No. 33-7086, 1994 WL 469347, at *9-10 (Aug. 31, 1994).  *See also IndyMac MBS*, 718 F. Supp. 2d at 512 ("the rating agencies' role in structuring the Certificates is immaterial as a matter of law").

### A.   Plaintiffs Do Not Allege That They Have Failed To Receive Any "Pass-Through" Distributions

Plaintiffs concede that a mortgage pass-through certificate is a "securitized interest" in a "cash flow (*i.e.*, the principal and interest payments from the underlying mortgage loans)" and that "the principal and interest payments from the underlying pool of mortgages are passed directly to investors each month." (¶¶ 3, 43). "Asset-backed securities and ABS issuers differ from corporate securities." *Asset-Backed Securities*, Securities Act Release No. 33-8518, 70 Fed. Reg. 1506, 1508 (Jan. 7, 2005). Whereas corporate securities are purchased for the purpose of investment and the price at which they may later be sold, asset-backed securities are purchased for "the timing and receipt of cash flows from th[e] [underlying] assets." *Id.* at 1511.

 Plaintiffs do not allege that they failed to receive any of their monthly "pass-though" payments.[34]  Instead, Plaintiffs claim to have been injured because their certificates are "unmarketable" in the secondary market "at the prices paid by Lead Plaintiffs." (¶ 13).  The Offering Documents, however, specifically warned Plaintiffs and other investors that a secondary market for the certificates might never develop and that the certificates might not be resalable at all, much less "at the prices paid by Lead Plaintiffs":

> There is currently no secondary market for the offered certificates and there can be no assurance that a secondary market for the offered certificates will develop. Consequently, you may not be able to sell your certificates readily or at prices that will enable you to realize your desired yield.

---

[34]  Nor could they.  The monthly distribution reports for Thornburg MBS indicate that all "pass-through" distributions have been made on the certificate tranches that Plaintiffs purchased. The monthly distribution reports are publicly available at http://www.ctslink.com/Search Series.do?searchphrase=thornburg.

2006-3 Pro Supp. at S-28 (Ex. A).  *See also* 2006-5 Pro Supp. at S-21 (Ex. B); 2007-4 at S-21 (Ex. C).  Because Plaintiffs were expressly warned that the certificates were not liquid and that "there can be no assurance that a secondary market . . . will develop," they cannot allege an injury based on an allegation that the certificates are "unmarketable" in a secondary market.

The decision in *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, __ F. Supp. 2d __, 2010 WL 4054149 (S.D.N.Y. Oct. 14, 2010) is directly on point.  There, as here, the offering documents expressly warned that the certificates might not be resalable.  There, as here, plaintiffs nonetheless purported to allege an injury based on an alleged diminution in value of their certificates in the secondary market.  The court rejected plaintiffs' theory of injury:

> NECA contends that it has alleged an injury and damages cognizable under the statute by claiming that "the value of the Certificates has diminished greatly since their original offering, as has the price at which members of the Class can dispose of them in the secondary market for these Certificates." . . .
>
> [H]owever, the Certificates were issued with the express warning that they might not be resalable.  This is unsurprising given the structure of asset-backed securities, which are "primarily serviced by the cash flows of a discrete pool of receivables or other financial assets, either fixed or revolving, that by their terms convert into cash within a finite time period."  17 C.F.R.  229.10(c).  Because NECA made an investment that it knew might not be liquid, it may not allege an injury based upon the hypothetical price of the Certificates on a secondary market at the time of suit.

*Id.* at *3.  *See also N.J. Carpenters Health Fund v. Residential Capital, LLC*, __ F. Supp. 2d __, 2011 WL 147735, at *6 (S.D.N.Y. Jan. 18, 2011) ("In some situations, section 12(a)(2) damages can be sufficiently alleged based on market value decline.  That is not so where the injured party was warned in advance [that there might be no secondary market for the security].").

Absent an allegation that they have failed to receive a "pass-though" payment on the asset-backed securities that the purchased, Plaintiffs' bald allegation that their investment is now "far riskier" (¶ 13) adds nothing:  "Section 11 does not permit recovery for increased risk.

Instead, to allege an injury cognizable under Section 11, [a plaintiff] must allege the actual

failure to receive payments due under the Certificates." *NECA-IBEW*, 2010 WL 4054149, at *4.

*See also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) ("[The

plaintiff] does not allege actual injury by simply claiming that it incurred additional risk of loss

as a consequence of the fraud.  Thus, we reject [the plaintiff's] novel theory that it was damaged

simply by being undersecured when, with respect to those loans not yet foreclosed, the actual

damages it will suffer, if any, are yet to be determined.").

Because Plaintiffs have not alleged a cognizable economic loss, their Section 11 and

12(a)(2) claims must be dismissed.  *See In re Merrill Lynch & Co., Inc. Research Reports Sec.

Litig.*, 272 F. Supp. 2d 243, 253 (S.D.N.Y. 2003) (dismissing Securities Act claims because

"[w]here it is apparent from the face of the complaint that the plaintiff cannot recover her alleged

losses, dismissal of the complaint pursuant to Fed. R. Civ. P. 12(b)(6) is proper").

### B.    Plaintiffs Recouped Their Investment In 2006-5 Certificates Long Before This Lawsuit Was Filed

Plaintiffs' claim relating to the 2006-5 certificates must be dismissed for the additional

reason that they have recouped their entire investment in the 2006-5 certificates.  Lead plaintiff

Midwest Operating purchased $159,803 face amount of 2006-5 certificates on October 17, 2007,

and sold for $156,494 in proceeds on January 16, 2008.  (Dkt. 56, Ex. B).  During the three

months in which it held the certificates, Midwest Operating received "pass-through" distributions

totaling $3,308.  (*Id.*).  It thus recouped its investment in 2006-5 certificates *before* this lawsuit

was filed and has no cognizable damages.  *See Broderbund*, 294 F.3d at 1203-05 (dismissing

Section 11 and 12(a)(2) claims where the plaintiff had already received equal consideration for what he paid prior to the filing of the lawsuit).[35]   Because Maryland National did not purchase any 2006-5 certificates and Midwest Operating has no cognizable damages on its 2006-5 certificates, there is no named plaintiff with standing to pursue a claim relating to the 2006-5 offering.  *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) (to establish standing to sue, "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent") (quotation marks and citation omitted).

## III.   PLAINTIFFS HAVE FAILED TO ALLEGE FACTS TO ESTABLISH THEIR STANDING TO PURSUE A SECTION 12(a)(2) CLAIM

"Standing under Section 12(a)(2) is more restrictive than under Section 11," and courts have repeatedly dismissed Section 12(a)(2) claims asserted by plaintiffs in MBS cases for lack of standing.  *WaMu MBS*, 2010 WL 3815796, at *4; *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2010 WL 3239430, at *5 (S.D.N.Y. Aug. 17, 2010) ("*Morgan Stanley MBS*"); *Merrill Lynch MBS*, 714 F. Supp. 2d at 484; *DLJ MBS*, 2010 WL 1473288, at *4.

---

[35]  The Amended Complaint not only fails to allege a cognizable loss by Midwest Operating on the 2006-5 certificates, but affirmatively demonstrates that there is no causal link between an alleged misrepresentation and a purported loss.  "Under Sections 11 and 12, if the amount the Plaintiff seeks is not the depreciation in value of a subject security resulting from the offending portion of the prospectus, oral communication, or registration statement, then such amount shall not be recoverable."  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003).  Here, Plaintiffs allege that the value of their certificates "declined" following ratings downgrades (¶ 79), but Midwest Operating bought and sold its 2006-5 certificates long *before* any rating downgrade.  Thus, "the absence of loss causation is apparent on the face of the complaint."  *Blackmoss Invs., Inc. v. ACA Capital Holdings, Inc.*, 2010 U.S. Dist. LEXIS 2899, at *29 (S.D.N.Y. Jan. 14, 2010) (dismissing Section 11 and 12(a)(2) claims).

Here, Plaintiffs' Section 12(a)(2) claim must be dismissed because Plaintiffs have failed to allege facts to establish their standing to pursue a Section 12(a)(2) claim. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 222 (1990) ("[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke the judicial resolution of the dispute.") (quotation marks and citation omitted).

To state a Section 12(a)(2) claim, a plaintiff must allege that it purchased its certificates in an initial public offering directly from, or at the "direct and active" solicitation of, a defendant. *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1220 (D.N.M. 2010) ("*In re Thornburg II*") (citing *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir. 1998)). The Supreme Court established this "purchaser-seller" rule in *Pinter v. Dahl*, 486 U.S. 622 (1988), explaining that Section 12 "contemplates a buyer-seller relationship not unlike traditional contractual privity." *Id.* at 642. *See also Joseph v. Wiles*, 223 F.3d 1155, 1161 (10th Cir. 2000) (noting that Section 12(a)(2) contains "an express privity requirement, giving a cause of action only to individuals who purchase securities directly from a person who sells the securities by means of a prospectus").

Here, Plaintiffs do not even allege from whom they purchased their certificates. Instead, Plaintiffs allege that they purchased certificates "pursuant and/or traceable to the Offering Documents." (¶¶ 19-20, 117). That is insufficient:

> Here, the Complaint does not expressly allege [Section 12(a)(2)] standing. Instead, rather coyly, the Complaint makes such allegations as that "plaintiffs and other Class members purchased or otherwise acquired Certificates pursuant and/or traceable to the defective Prospectus Supplements." Even under the modest requirements of Rule 8(a) of the Federal Rules of Civil Procedure, this is insufficient to allege standing for purposes of a Section 12(a)(2) claim.

*Merrill Lynch MBS*, 714 F. Supp. 2d at 484 (internal citations omitted).  *See also WaMu MBS*,

2010 WL 3815796, at *5 (dismissing Section 12(a)(2) claim because "if plaintiffs did in fact

purchase the Certificates directly from the defendants, they should have said so"); *DLJ MBS*,

2010 WL 1473288, at *4 ("The Complaint alleges only that Plaintiff purchased Certificates

'pursuant and traceable to' the Offering Documents.  This, however, is insufficient to assert

standing for Section 12 claims.") (internal citation omitted).

 Plaintiffs also have failed to allege facts establishing any of the defendants' "direct and

active" solicitation in connection with the "immediate sale" of certificates to Plaintiffs.  *In re*

*Thornburg II*, 695 F. Supp. 2d at 1220.  Indeed, rather than allege facts establishing that a

particular defendant engaged in the "direct and active" solicitation of Plaintiffs' purchase,

Plaintiffs lump 18 defendants together and conclusorily assert that "[t]he Thornburg Defendants,

the Depositor Defendants, the Individual Defendants and the Underwriter Defendants" are all

liable under Section 12(a)(2) because they "[m]ade the decision to offer the Certificates,"

"[d]rafted, revised and/or approved the Offering Documents," and "orchestrated all activities

necessary to effect the sale of the Certificates." (¶ 112).  That is not the law.  *See In re*

*Thornburg II*, 695 F. Supp. 2d at 1220 ("The fact that the individual Defendants created the

offering documents . . . does not constitute 'direct and active' solicitation of the 'immediate sale'

that Section 12(a)(2) liability requires.").

 In addition, Plaintiffs have not pled that they purchased all their certificates in the initial

public offerings.  Plaintiffs' own filings indicate to the contrary.  Midwest Operating, for

example, did not purchase its 2006-5 certificates until October 2007 (Dkt. 56, Ex. B), or well

over a year after the public offering of the 2006-5 certificates in August 2006.  *See Merrill Lynch*

*MBS*, 714 F. Supp. 2d at 484 (dismissing Section 12(a)(2) claim because standing for Section 12(a)(2) claims is limited to "persons who have directly purchased the securities . . . in the subject public offering(s), and not in the secondary market.").

Because Plaintiffs have failed to allege from whom they purchased their certificates, much less any facts establishing a defendant's "direct and active" solicitation of their purchases, Plaintiffs' Section 12(a)(2) claim against all the Defendants must be dismissed.

## IV.    PLAINTIFFS DO NOT PLEAD RELIANCE ON ANY ALLEGED MISREPRESENTATION IN THE 2006-5 OFFERING DOCUMENTS

Plaintiffs' Section 11 claim relating to the 2006-5 offering also must be dismissed for failure to plead facts establishing their reliance on any alleged misrepresentation in the 2006-5 Offering Documents.  The presumption of reliance otherwise applicable to Section 11 claims does not apply where an investor "acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least 12 months beginning after the effective date of the registration statement."  15 U.S.C. § 77k(a).  For asset-backed securities, monthly distribution reports that are publicly available for Thornburg MBS are the equivalent of earnings statements typically filed by corporate entities.  *See Asset-Backed Securities*, 70 Fed. Reg. at 1509.

The 2006-5 certificates were publicly offered on August 29, 2006.  *See* 2006-5 Pro Supp. at i (Ex. B).  Lead plaintiff Midwest Operating, however, did not purchase its 2006-5 certificates

until October 17, 2007 (Dkt. 56, Ex. B), or after more than 12 months of distribution reports for the 2006-5 certificates.[36]  Thus, no presumption of reliance applies.  *See* 15 U.S.C. § 77k(a).

In the absence of a presumption of reliance, Plaintiffs' claim relating to the 2006-5 certificates must be dismissed because the Amended Complaint is devoid of any allegation that Midwest Operating relied on the alleged misrepresentations in the Prospectus Supplement in acquiring its certificates.  *See APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476 F.3d 1261, 1271 (11th Cir. 2007) (The presumption of reliance under Section 11 "ends after an earnings statement which covers a period of at least twelve months after the effective date of the registration statement has become available."); Thomas Lee Hazen, The Law of Securities Regulation § 7.3[4] (6th ed. 2009) ("When a section 11(a) plaintiff has acquired the securities more than twelve months after the effective date of the registration statement, and if the issuer has distributed an 'earnings statement' for that period, the plaintiff must prove reliance on the material misstatement or omission.").

## V.   **PLAINTIFFS' FEDERAL SECURITIES CLAIMS ARE TIME-BARRED**

Plaintiffs' Securities Act claims also must be dismissed as time-barred.  A plaintiff asserting a Section 11 or Section 12(a)(2) claim must affirmatively establish that the claim was filed within the one-year statute of limitations and the three-year statute of repose set forth in Section 13 of the Securities Act.  *See Ames v. Uranus, Inc.*, 1993 WL 106896, at *4 (D. Kan.

---

[36]  Excerpts from the first distribution report issued after the August 29, 2006 offering and the last distribution report issued prior to Plaintiffs' alleged purchase on October 17, 2007 are attached as Exhibits M-N and are publicly available at http://www.ctslink.com/Full Document.do?Selector=SeriesDocument%2CPERIODICRPT%2CMBS%2CTMHL%2C200 65%2CTMHL_20065_RMT%2CPDF.  *See also* 2006-5 Pro Supp. at S-28 (Ex. B) (providing website address for access to distribution reports).

Mar. 17, 1993) (citing *Anixter v. Home-Stake Prod. Co.*, 939 F.2d 1420, 1434 (10th Cir. 1991)).

Section 13 provides:

> No action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . In no event shall any such action be brought to enforce a liability created under section 77k . . . of this title more than three years after the security was bona fide offered to the public, or under section 77l(a)(2) of this title more than three years after the sale.

15 U.S.C. § 77m.

The one-year statute of limitations begins when a plaintiff has either actual notice of an alleged misstatement or, "in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *Caprin v. Simon Transp. Servs. Inc.*, 99 F. App'x 150, 155-56 (10th Cir. 2004) (unpublished) (citation omitted). *See also Lane v. Page*, 649 F. Supp. 2d 1256, 1301 (D.N.M. 2009) (the one-year limitations period begins to run when a "reasonable investor should have discovered the facts underlying the alleged fraudulent activity") (citation omitted). Inquiry notice arises when there are sufficient "storm warnings" to put a reasonable investor on notice of the possibility of fraudulent activity. *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1196 (10th Cir. 1998).[37] It is not necessary that the available information "discuss each and every aspect of the alleged fraudulent activity to put [an investor] on notice of the need to inquire." *Id.* at 1204 (holding that a single magazine article generally critical of a company's

---

[37] "[C]ourts may take judicial notice of financial data, news coverage, and prior lawsuits without converting a motion to dismiss into a motion for summary judgment. . . . Even a single news article may give rise to inquiry notice." *Morgan Stanley MBS*, 2010 WL 3239430, at *7 (internal citation omitted). *See also Lane*, 649 F. Supp. 2d at 130 ("it is appropriate for the Court to consider, on a motion to dismiss, materials such as newspaper articles not referenced in a complaint").

claim was sufficient to put a reasonable investor on notice of the possibility of fraudulent activity).  "[E]ven rumors or vague charges would suffice to put a reasonable investor on notice of possible fraud."  *Caprin*, 99 F. App'x at 156.  Once on inquiry notice, a plaintiff must bring its claims within one year of when a "reasonable investor . . . exercising reasonable diligence" would have "discover[ed] the facts underlying the alleged fraud."  *Id.* at 156.

The three-year statute of repose is "an absolute limitation that applies whether or not the investor could have discovered the violation."  *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 704 (2d Cir. 1994).

A.      **Plaintiffs Fail To Plead Facts To Establish Their Compliance With The One-Year Statute Of Limitations**

Compliance with the one-year limitations period in Section 13 is "an essential, substantive element of a claim under Sections 11 and 12(2)."  *In re Chaus Sec. Litig.*, 801 F. Supp. 1257, 1265 (S.D.N.Y. 1992).  Thus, to satisfy Section 13, a plaintiff must plead facts concerning the "(1) the time and circumstances of the discovery of the [alleged false] statement; (2) the reasons why it was not discovered earlier (if more than one year has lapsed); and (3) the diligent efforts which plaintiff undertook in making or seeking such discovery."  *Id*.  *See also Ames*, 1993 WL 106896, at *4 (dismissing Securities Act claims because plaintiffs failed to "allege[] the time when they actually discovered the alleged misrepresentations and omissions" or "a time when they could have reasonably discovered the misrepresentations or omissions"); *Flinn Found. v. Petro-Lewis Corp.*, 1985 WL 358, at *3 (D. Colo. Nov. 8, 1985) (Section 13 requires a plaintiff to "state affirmatively the time and circumstances of discovery of the allegedly untrue statements or omissions" and, when the action is commenced more than one

41

year from a sale, "the reason why they could not have discovered the untruths or omissions" earlier).

Here, Plaintiffs have pled *no* facts to establish that their claims were filed within the one-year limitations period.  Indeed, the Amended Complaint is devoid of any factual allegations regarding the time or circumstances of Plaintiffs' alleged "discovery" of misstatements or omissions, let alone any factual allegations regarding the efforts that Plaintiffs undertook in making or seeking such discovery.  Instead, Plaintiffs conclusorily assert that "[a]t the time they purchased the Certificates, plaintiffs . . . did not know, or by the reasonable exercise of care could not have known, of the material misstatements and omissions alleged" (¶¶ 103, 114) and that their claims were "brought within one year after discovery of the untrue statements and omissions in the Offering Documents." (¶¶ 105, 116).  That is insufficient.

The decision in *Morgan Stanley MBS* is instructive.  Like Plaintiffs here, one of the plaintiffs in *Morgan Stanley* conclusorily asserted that that it had brought suit "less than one year" after discovery of the alleged misrepresentations and omissions, but failed to allege any facts regarding the time or circumstances of its discovery.  The court rejected the plaintiff's conclusory allegations as "insufficient":

> A plaintiff is required to plead, among other things, the time and circumstances of its discovery of the fraudulent statement upon which its claim is based.  Here, WVIMB merely alleges that "[a]t the time of their purchases of the Certificates, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to mid-2008.  Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which this action is based until the time that the first complaint was filed."  Lead Plaintiff does not allege the precise timing or the means by which it gained knowledge of the relevant facts.

42

> The timeliness allegation of the CAC is plainly insufficient to address the requisite issues of time and circumstances.

2010 WL 3239430 at *6-7.

Because Plaintiffs have failed to plead any facts demonstrating their compliance with the one-year statute of limitations period, Plaintiffs' Securities Act claims must be dismissed. *See In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1286 (E.D. Wash. 2007) (holding that plaintiff's allegations that no class member "'knew or in the exercise of reasonable care could have known of the facts concerning the inaccurate and misleading statements and omissions herein' at the time they received the various Registration Statements" failed to satisfy Section 13 because such an allegation "contains no facts, [and] it refers only to the time at which the securities were acquired").

### B.   Plaintiffs' Claims Are Barred Because A Reasonable Investor Would Have Discovered The Facts Underlying Plaintiffs' Claims More Than One Year Prior To February 27, 2009

Plaintiffs' Securities Act claims also must be dismissed because a reasonable investor would have discovered the facts underlying Plaintiffs' claims more than one year prior to the filing of the original complaint in this action on February 27, 2009.

Indeed, the allegations on which Plaintiffs rely for their claims were widespread within the public domain well before February 27, 2008:

- In 2005 and 2006, it was alleged that there was "growing fraud in home loan applications, where sticker-shocked buyers lie about their incomes and assets."[38]

---

[38] Kenneth R. Harney, *Lies are Growing in Loan Process*, WASH. POST, July 30, 2005 (Ex. O). *See also* Bob Tedeschi, *Mortgages*: *The Growing Problem of Fraud*, N.Y. TIMES, July 9, 2006 (Ex. P) (describing the growing problem of mortgage fraud and "fraud for profit,"

[Footnote continued on next page]

In 2007, it was alleged that "misstatements about employment and income are being made every day" in loan applications.[39]

● The Offering Documents for the 2006-3, 2006-5 and 2007-4 offerings, as well as the Form-10K that Thornburg publicly filed with the SEC in March 2007, "placed investors on notice" that Thornburg underwrote and acquired "Alt-A" loans. *In re Thornburg*, 683 F. Supp. 2d at 1258. It was likewise widely reported in 2007 that Wells Fargo underwrote "Alt-A" loans.[40]

● In 2006, it was alleged that relaxed underwriting standards had "blurred the line between the alt-A and subprime asset classes," as "permissible loan-to-value . . . and debt-to-income ratios [have] risen" and borrowers can "easily avail themselves of features such as interest-only payments."[41] It was further alleged that "interest-only mortgages accounted for more than 40 percent of alt[-]A securitizations in 2005," and that "there is growing concern that investors and originators may now be overexposed to credit risk."[42]

● By 2007, it was alleged that Alt-A loans "ignore[d] traditional standards for documentation,"[43] and there was "considerable risk associated with the lax underwriting standards and exotic mortgage products utilized in this segment of the market."[44]

---

[Footnote continued from previous page]
   which involves the falsification of mortgage application documents by applicants or predatory lenders).

[39] Bob Ivry, *Subprime "Liar Loans" Fuel Bust With $1 Billion Fraud*, BLOOMBERG.COM, Apr. 25, 2007 (Ex. Q).

[40] *See, e.g.*, Jonathan Stempel, *Fremont plummets, other mortgage lenders hold firm*, REUTERS, Feb. 28, 2007 (Ex. R) (reporting that Wells Fargo is among publicly traded companies that make Alt-A loans); *Top Alt-A Lenders in First Half of 2007*, NAT'L MORTGAGE NEWS, Sept. 17, 2007 (Ex. S) (listing Wells Fargo as one of the top 20 Alt-A lenders).

[41] Brenda B. White, *The Emergence of Alt-A*, MORTGAGE BANKING, Apr. 1, 2006 (Ex. T).

[42] *Id.*

[43] Jody Shenn, *'Prime,' 'Subprime,' 'Nonprime' – Does it Matter?*, AM. BANKER, Oct. 21, 2005 (Ex. U).

[44] Credit Suisse, *Mortgage Liquidity Du Jour: Underestimated No More*, Mar. 12, 2007 (Ex. V). *See also* Chris Isidore, *"Liar Loans": Mortgage Woes Beyond Subprime*, CNNMONEY.COM, Mar. 19, 2007 (Ex. W) (reporting statements of industry experts

[Footnote continued on next page]

- In July 2007, it was alleged that the ratings agencies were examining whether to cut credit ratings on securities related to Alt-A mortgages "after failing to predict how far delinquencies would rise."[45]

- In July 2007, it was reported that S&P made "a major change to its RBMS rating model" that "projected much higher default rates" for "mortgages similar to those at issue here."  (¶ 84)[46]

- In the summer of 2007, there was significant press regarding the devaluation of Thornburg's mortgage portfolio.[47]  These press reports raised significant questions about Thornburg's mortgage-backed securities and noted that "the value of Thornburg's highly-rated mortgage securities used as collateral for its loans has fallen significantly."[48]  At the same time, it was reported that Wells Fargo had "stopped issuing Alt-A loans this month as demand for mortgage-backed securities has dried up."[49]

---

[Footnote continued from previous page]
  describing Alt-A loans as "liar loans" that are based on "little or no verification of income"); Ben Steverman, *Mortgage Crisis Roughs Up IndyMac: The Mortgage Lender, Which Provides "Alt-A" Loans, Suffers as the Mortgage Crisis Spreads*, BUSINESSWEEK ONLINE, July 18, 2007 (Ex. X) (reporting that "[b]uyers who take out Alt-A loans . . . submit little documentation").

[45] Jody Shenn, *Moody's Says Some "Alt-A" Mortgages Are like Subprime*, BLOOMBERG NEWS, July 31, 2007 (Ex. Y).

[46] *See also S&P Cuts $3.7 bln RMBS ratings, may cut more*, REUTERS.COM, Nov. 16, 2007 (Ex. Z) (noting that S&P "cut 215 RMBS backed first-lien Alt-A mortgage loans totaling $4.7 billion").

[47] *See* Floyd Norris, *With Markets Moving Wildly, Insight Suffers*, N.Y. TIMES, Aug. 17, 2007 (Ex. AA) (reporting on Thornburg's recent credit crunch and stating that questions have been raised "about the value of mortgage securities and the credibility of the ratings that enabled the securities to be sold").

[48] David Landis, *Thornburg: Another Subprime Victim?*, KIPLINGER.COM, Aug. 15, 2007 (Ex. BB).

[49] Jeff St. John, *There Goes the Neighborhood: As More Subprime Loans Topple, Even Buyers With Good Credit See Trouble Ahead*, FRESNO BEE, Aug. 19, 2007 (Ex. CC).

- Thornburg suffered a precipitous stock price drop in the summer of 2007.[50] The situation was so unstable that, on August 15, 2007, trading in Thornburg stock was halted after it plunged 47% and Moody's cut the company's credit rating by two levels to B2, leaving the ratings on review for another downgrade.[51]

- Plaintiffs complain about pressure that loan originators applied to appraisers. (¶¶ 57-61).  In February 2007, "[a] new survey of the national appraisal industry found that 90 percent of appraisers reported that mortgage brokers, real estate agents, lenders and even consumers have put pressure on them to raise property valuations to enable deals to go through."[52]

- Plaintiffs complain about appraisals performed by Rels Valuation, a joint venture between First American Corporation and Wells Fargo.  (¶¶ 58-60).  In November, 2007, there were highly publicized allegations of appraisal fraud by First American Corporation.[53]

- Plaintiffs complain about "outdated" ratings models.  (¶¶ 82-84).  In 2007, the press already had reported that "[r]atings agencies' models for creditworthiness may be outdated given new developments in financial markets."[54]

- Plaintiffs complain that the rating agencies were "not independent."  (¶¶ 88-89).  In fact, "the risk that the ratings agencies operated under a conflict of

---

[50] *See* Andrew Farrell, *Thornburg Retreats*, FORBES.COM, Aug. 20, 2007 (Ex. DD) (reporting that "[d]eclining mortgage values . . . sunk Thornburg's book value to $12.40 per share on Friday from $19.38 per share at the end of June").

[51] *Trading Is Halted In Shares Of Mortgage Lender*, N.Y. TIMES, Aug. 15, 2007 (Ex. EE).

[52] Kenneth R. Harney, *Appraisers Under Pressure to Inflate Values*, WASH. POST, Feb. 3, 2007 (Ex. FF).  *See also* Sarah Max, *Appraisal Fraud: Your Home At Risk*, CNNMONEY.COM, June 2, 2005 (Ex. GG) ("appraisers are under increasing pressure from lenders, mortgage bankers and real estate agents to 'hit their number' when appraising property," by "being told to base their estimate on a predetermined value").

[53] *See* Press Release, Attorney General Andrew M. Cuomo, *NY Attorney General Sues First American and Its Subsidiary For Conspiring With Washington Mutual to Inflate Real Estate Appraisals* (Nov. 1, 2007) (Ex. HH) (announcing that the New York Attorney General was suing First American Corporation for colluding "to inflate the appraisal values of homes").

[54] James Kanter, *Europeans Plan to Investigate Ratings Agencies and Their Warnings*, N.Y. TIMES, Aug. 17, 2007 (Ex. II).

interest because they were paid by the issuers *had been known publicly for years.*"  *Lehman MBS*, 684 F. Supp. 2d at 489 (emphasis supplied).[55]

These myriad disclosures from 2007 and before on the very matters about which Plaintiffs now complain make clear that a reasonable investor would have discovered the facts underlying Plaintiffs' claims more than one year prior to February 27, 2009.  Accordingly, Plaintiffs' Securities Act claims must be dismissed as time-barred.  *See Grubka v. WebAccess Int'l, Inc.*, 445 F. Supp. 2d 1259, 1266-67 (D. Colo. 2006) (dismissing Securities Act claims as time-barred where available information would "alert a reasonable investor to the possibility of fraud" even though it "did not 'discuss each and every aspect' of the conduct" complained about in the lawsuit).

C.     **Plaintiffs' Claims Relating To The 2006-3 And 2006-5 Offerings Are Barred Because A Reasonable Investor Would Have Discovered The Facts Underlying Plaintiffs' Claims More Than One Year Prior To December 10, 2010**

Plaintiffs' claims relating to the 2006-3 and 2006-5 offerings also must be dismissed because Plaintiffs' own pleadings confirm that a reasonable investor would have discovered the facts underlying Plaintiffs' claims more than one year prior to December 10, 2010.  Though the first complaint in this action was filed on February 27, 2009, the original named plaintiff, Genesee County Employees' Retirement System, did not invest in any certificates from the 2006-3 or 2006-5 offerings.  Rather, Genesee County only alleged purchases of certificates from

---

[55]  *See also* Richard Beales, et al., *Failing Grades?*, FIN. TIMES, May 16, 2007 (Ex. JJ) (recognizing "the potential for conflicts of interest, given that investment banks rather than investors pay for ratings" and that "the scale of their dependence on investment banks for structured finance business gives [ratings agencies] a significant incentive to look kindly on the products they are rating").

the 2007-4 offering.  (Dkt. 1 Ex. A ¶ 19).  The Genesee County complaint thus did not toll

claims relating to either the 2006-3 or 2006-5 offerings.  Indeed, courts in MBS cases repeatedly

have held that neither principles of tolling nor the relation back doctrine apply where the plaintiff

in a prior complaint did not allege purchases of, and therefore lacked standing to assert claims

relating to, the MBS at issue.  *See N.J. Carpenters Health Fund v. DLJ Mortg. Cap., Inc.*, 2010

U.S. Dist. LEXIS 136142, at *6-7 (S.D.N.Y. Dec. 15, 2010); *In re Wells Fargo Mortgage-

Backed Certificates Litig.*, 2010 WL 4117477, at *3-7 (N.D. Cal. Oct. 19, 2010); *WaMu MBS*,

2010 WL 3815796, at *10; *Countrywide MBS*, 722 F. Supp. 2d at 1166-67.

Here, no investor that actually purchased 2006-3 or 2006-5 certificates filed a claim

relating to the 2006-3 or 2006-5 offerings until December 10, 2010, when Plaintiffs filed the

Amended Complaint.  (Dkt. 103.)  Thus, Plaintiffs' claims relating to the 2006-3 and 2006-5

offerings are time-barred if they discovered or should have discovered through reasonable

diligence the alleged misstatements or omissions at issue by more than one year prior to

December 10, 2010.  *See Caprin*, 99 F. App'x at 155-56.[56]

In addition to the publicly available facts discussed in Section V.B. above, the original

complaint in this action confirms that a reasonable investor would have discovered the facts

---

[56]  It was not until June 26, 2009, when Maryland National and Midwest Operating filed their
motion for lead plaintiff (Dkt. 55), that any investor in 2006-3 or 2006-5 certificates even
expressed an interest in litigation.  Following their appointment as lead plaintiffs, Maryland
National and Midwest Operating waited over 10 months until December 10, 2010 to file their
claims, although there was no reason Plaintiffs could not have filed them sooner.  As
explained herein, the pleadings in this case confirm that a reasonable investor would have
discovered the facts underlying Plaintiffs' claims well before either June 26, 2008 or
December 10, 2009.

underlying Plaintiffs' claims well before December 10, 2009.  As alleged in the original

complaint, the "truth" about Thornburg's mortgage-backed securities was disclosed no later than

February 2008.  *See* Dkt. 1, Ex. A ¶ 11 ("On February 28, 2008, Thornburg revealed for the first

time that its MBS were backed by risky Alt-A loans and that the declining value of these Alt-A

assets specifically were to blame for the margin calls."); *id.* ¶¶ 77-79 (stating that the "truth" was

disclosed in Thornburg's February 28, 2008 and March 9, 2008 SEC filings, which revealed that

"margin calls were on $2.9 billion in MBS backed by risky Alt-A loans"); *id.* ¶ 80 (citing news

article from March 2008 reporting that "Alt-A has been the precipitating event; it's just been

feeding on itself").

The pleadings in this case thus demonstrate that Plaintiffs' claims relating to the 2006-3

and 2006-5 offerings must be dismissed as barred by the one-year statute of limitations.

> **D.     Plaintiffs' Claims Relating To The 2006-3 And 2006-5 Offerings**
> **Are Barred by The Three-Year Statute Of Repose**

Plaintiffs' Securities Act claims relating to the 2006-3 and 2006-5 offerings are also

barred by the three-year statute of repose.  *See* 15 U.S.C. § 77m.  Plaintiffs purchased certificates

from the 2006-3 offering on June 19, 2006 and from the 2006-5 offering on October 17, 2007

(Dkt. 56, Ex. B), but did not file claims relating to the 2006-3 and 2006-5 offerings until well

over three years later, when they filed the Amended Complaint on December 10, 2010.  (Dkt.

103).  Accordingly, Plaintiffs' claims relating to the 2006-3 and 2006-5 offerings must be

dismissed.  *See Finkel v. Stratton Corp.*, 962 F.2d 169, 172-73, 174 (2d Cir. 1992) (dismissing

Section 11 and 12(a) claims as barred by the three-year statute of repose).

## VI.    PLAINTIFFS FAIL TO STATE A CONTROL PERSON CLAIM

Plaintiffs' Section 15 claim against the Individual Defendants and RBS must be dismissed because (i) Plaintiffs have failed to allege an underlying primary violation of the Securities Act; and (ii) Plaintiffs have failed to allege facts demonstrating that Individual Defendants and RBS were "control persons" of the Depositor Defendants.  *See Maher v. Durango Metals*, *Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998) ("[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person.").

### A.    In The Absence Of A Primary Violation By The Depositor Defendants, Plaintiffs Have No Claim For Control Person Liability

As explained above, Plaintiffs have failed to state a claim against the Depositor Defendants.  In the absence of a primary violation of Section 11 or 12(a)(2) by the Depositor Defendants, Plaintiffs have no claim for control person liability under Section 15.  *In re Thornburg*, 683 F. Supp. 2d at 1261 ("because the Section 15 claim is derivative in nature, failure to state a claim under Sections 11 or 12(a)(2) results in a failure to state a claim under Section 15").

### B.    Plaintiffs Fail To Plead Facts Demonstrating That The Individual Defendants Or RBS Were "Control Persons" Of The Depositor Defendants

Plaintiffs have also failed to plead facts demonstrating "control" by the Individual Defendants or RBS over the Depositor Defendants.  *See Maher*, 144 F.3d at 1305 (affirming dismissal of Section 15 claim because plaintiff "failed to plead sufficient facts establishing COM's control of Durango").  "Control in this context is not the mere ability to persuade, but

almost always means the practical ability to *direct* the actions of people." *RALI MBS*, 2010 WL

1257528, at *7 (quotation marks and citation omitted).

### 1.   **Individual Defendants**

Plaintiffs conclusorily assert that the Individual Defendants were "control persons" of the

Depositor Defendants "by virtue of their control, ownership, offices, directorship, and specific

acts," but do not plead facts establishing that each of the Individual Defendants "had the power

and authority to cause, and did in fact cause, the Depositor Defendants to engage in the wrongful

conduct complained of herein." (¶¶ 123-24). Instead, Plaintiffs allege only that the Individual

Defendants were directors or officers of one of the Depositor Defendants, and that each of the

Individual Defendants signed one or more registration statements. (¶¶ 29-37). That is

insufficient:

> Plaintiffs simply allege the Individual Defendants were either officers or directors
> of WMAAC and that they signed the Registration Statements. Based on nothing
> more, Plaintiffs claim each of the Individual Defendants are control persons "by
> virtue of his or her control, ownership, offices, or directorship." Such allegations,
> alone, are insufficient to state a claim. First, making blanket allegations about the
> Individual Defendants makes no sense when the Defendants apparently held
> different positions. In other words, Plaintiffs should have substantiated their
> allegations about the Individual Defendants with individualized facts. Second, the
> allegations are entirely circular and couched as conclusions of law. Plaintiffs
> allege the Individual Defendants are control persons "by virtue of his or her
> control." This offers no factual content that would establish a plausible claim .
> . . . The Section 15 claims must be dismissed.

*WaMu MBS*, 2010 WL 3815796, at *9. *See also Arena Land & Inv. Co., Inc. v. Petty*, 906 F.

Supp. 1470, 1482 (D. Utah 1994) (dismissing Section 15 claim because plaintiffs "fail to allege

. . . the power of the Pettys to direct the management and policies of Strand or Global regarding

the specific transactions upon which the primary violations are predicated").

### 2.   <u>RBS</u>

Plaintiffs conclusorily assert RBS was the control person of Depositor Defendant GCA, but do not plead facts establishing that RBS "controlled all aspects of the management and policies of Depositor Defendant [GCA]." (¶ 122).  Instead, Plaintiffs allege that RBS was an "affiliate" of GCA, participated as an underwriter for certificates issued by GCA, and had "involvement with the Depositor Defendant GCA's operations" because three RBS employees served as GCA directors or officers.  (¶¶ 22, 122).  The alleged corporate "affiliation" of RBS, without the "practical ability to direct the actions" of GCA, is insufficient to state a Section 15 claim.  *RALI MBS*, 2010 WL 1257528, at *7 (dismissing Section 15 claim based on allegations that underwriter defendants were control person of depositor defendants because "[a]lthough Plaintiffs make a number of assertions about the influence and participation of these separate companies, they do not sufficient allege that they had control over the RALI issuing enterprises").  *See also Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*, 941 F. Supp. 1369, 1379 (S.D.N.Y. 1996) (dismissing control person claim against defendant corporation that allegedly was a founder, creditor, and shareholder of the alleged primary violator, had a Vice President on the primary violator's board of directors, and was the underwriter for the relevant offering); *Yuan v. Bayard Drilling Techs., Inc.*, 96 F. Supp. 2d 1259, 1271 (D. Okla. 1999) (dismissing Section 15 claim against corporation that had ownership stake in, and whose president served on the board of, the alleged primary violator).

## VII.   PLAINTIFFS' CLAIM UNDER THE NEW MEXICO <u>SECURITIES ACT SHOULD BE DISMISSED</u>

Plaintiffs' claim under the New Mexico Securities Act (the "N.M. Securities Act") should be dismissed for multiple independent reasons.

### A.    Plaintiffs Do Not Allege That They Purchased Certificates, Or Were Offered The Certificates, In New Mexico

*First*, Plaintiffs do not allege that they purchased their certificates, or were offered the certificates, in New Mexico.  Section 58-13B-30(B) of the N.M. Securities Act applies only if (1) "an offer to sell is made in this state; or (2) an offer to purchase is made and accepted in this state."  NMSA 1978, § 58-13B-54 (1986).  The Amended Complaint is devoid of any allegations to establish the required nexus to New Mexico.  Plaintiffs' claim must therefore be dismissed.  *See Murken v. Solv.-Ex Corp.*, 1997 WL 34605217 (D.N.M. Aug. 19, 1997) (dismissing claim under N.M. Securities Act where plaintiffs failed to allege that offer to sell or purchase securities of New Mexico corporation was made in state).[57]

_____

[57] In interpreting the scope of state blue sky laws like the N.M. Securities Act, courts have repeatedly held that there must be some nexus between the sale or purchase and the state and not merely the security and the state.  *See Calnin v. Hilliard*, 2008 WL 336892, at *10 (E.D. Wis. Feb. 5, 2008) (dismissing claims under Wisconsin blue sky law where plaintiffs "failed to present any evidence sufficient to establish that there was any relevant contact between the State of Wisconsin and [plaintiffs'] transactions, an element essential to" the state securities claims); *Johnston v. Norton*, 1993 WL 465333, at *23 (S.D.N.Y. Nov. 10, 1993) (finding that plaintiffs failed to satisfy New Jersey's scope of act provision where plaintiffs' did not allege that offer to purchase interest in New Jersey limited partnership was made or received in New Jersey); *Allen v. Oakbrook Sec. Corp.*, 763 So. 2d 1099, 1101 (Fla. Dist. Ct. App. 1999) (holding that securities fraud claim based on sales of securities of Florida corporation should have been dismissed where sales took place out of state).

Here, Plaintiffs do not allege the requisite nexus between their purchases of certificates and New Mexico.  Though Thornburg was based in New Mexico, it was neither the issuer nor the seller of the certificates.  Instead, Thornburg originated and acquired loans that it sold to GCA and SAMI II, the Depositor Defendants, based in Connecticut and New York, respectively.  (¶¶ 22-23).  The Depositor Defendants pooled the mortgage loans and transferred the mortgage pools to three trusts, the Thornburg Defendants that are the issuers of the certificates.  The Thornburg Defendants are all Delaware entities.  (¶ 21).  The Underwriter Defendants likewise were not based in New Mexico, but instead in Connecticut,

[Footnote continued on next page]

### B.    Plaintiffs Fail To State A Claim Under The New Mexico Securities Act

*Second*, even if Plaintiffs had alleged a sufficient nexus to New Mexico to pursue a claim under the N.M. Securities Act (and they have not), Plaintiffs have failed to state a claim under the N.M. Securities Act.  As discussed in Section I above, Plaintiffs have failed to plead an actionable misrepresentation or omission.  Moreover, as discussed in Section II above, Plaintiffs have failed to plead a cognizable economic loss.  Because an untrue statement or omission of material fact and injury are both requisite elements of a claim under the N.M. Securities Act, Plaintiffs have failed to state a claim.  *See Freedman v. Value Health, Inc.*, 2000 WL 630916, at *7 (D. Conn. Mar. 24, 2000) ("as the court has dismissed the [federal securities] claims on the basis that the statements at issue were not misleading, the causes of action under N.M.S.A. §§ 58-13B-31 and 58-13B-30 are similarly dismissed").

### C.    Plaintiffs' Claims Relating To The 2006-3 And 2006-5 Offerings Are Time-Barred

*Third*, Plaintiffs' N.M. Securities Act claims relating to the 2006-3 and 2006-5 offerings are time-barred.  Under Section 58-13B-41(A) of the N.M. Securities Act, a plaintiff must file a claim "within two years after the discovery of the violation or after discovery should have been made by the exercise of reasonable diligence."  As discussed in Section V.C. above, no investor that actually purchased certificates from the 2006-3 or 2006-5 offerings filed claims relating to those offerings until December 10, 2010, when Plaintiffs filed the Amended Complaint.  (Dkt.

---

[Footnote continued from previous page]
    New York, and North Carolina. (Dkt. 1, Ex. A, ¶¶ 42-44).  There are similarly no allegations that any of the Individual Defendants reside in New Mexico.

103).  Thus, Plaintiffs' claims relating to the 2006-3 and 2006-5 offerings are time-barred if they

discovered or should have discovered through reasonable diligence the alleged misstatements or

omissions at issue before December 10, 2008.  As discussed in Section V.B. above, a reasonable

investor would have discovered the facts underlying Plaintiffs' claims well before December 10,

2008.  Accordingly, Plaintiffs' claims should be dismissed as barred by the two-year limitations

period.

## <u>CONCLUSION</u>

For all these reasons, Defendants Greenwich Capital Acceptance, Inc. (n/k/a RBS

Acceptance Inc.), Structured Asset Mortgage Investments II, Inc., Credit Suisse Securities (USA)

LLC, RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.), Robert J. McGinnis, Carol P.

Mathis, Joseph N. Walsh III, John C. Anderson, James M. Esposito, Jeffrey L. Verschleiser,

Michael B. Nierenberg, Jeffrey Mayer, and Thomas F. Marano respectfully request that this

Court dismiss Plaintiffs' claims against them and award such other and further relief as the Court

deems appropriate.

Respectfully submitted,

MONTGOMERY & ANDREWS, PA

By:____/s/ Victor R. Ortega_____
    Victor R. Ortega
    325 Paseo de Peralta
    Santa Fe, NM 87501
    (505) 982-3873

*Attorneys for Defendants Greenwich Capital*
*Acceptance, Inc. (n/k/a RBS Acceptance*
*Inc.), Structured Asset Mortgage Investments*
*II, Inc., Credit Suisse Securities (USA) LLC,*
*RBS Securities Inc. (f/k/a Greenwich Capital*
*Markets, Inc.), Robert J. McGinnis,*
*Carol P. Mathis, Joseph N. Walsh III, John C.*
*Anderson, James M. Esposito, Michael B.*
*Nierenberg, and Thomas F. Marano*

GIBSON DUNN & CRUTCHER LLP
Robert F. Serio
Aric H. Wu
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

*Attorneys for Defendants Greenwich Capital*
*Acceptance, Inc. (n/k/a RBS Acceptance*
*Inc.), Structured Asset Mortgage Investments*
*II, Inc., Credit Suisse Securities (USA) LLC,*
*RBS Securities Inc., Robert J. McGinnis,*
*Carol P. Mathis, Joseph N. Walsh III, John C.*
*Anderson and James M. Esposito*

MORRISON & FOERSTER LLP
Joel C. Haims
Ruti Smithline
1290 Avenue of the Americas
New York, NY 10104-0050
212-468-8000

*Attorneys for Defendants*
*Michael B. Nierenberg and Thomas F. Marano*

Respectfully submitted,

BROWNSTEIN HYATT FARBER
SCHRECK, LLP

By:____/s/ Eric R. Burris_____
    Eric R. Burris
    201 Third NW, Suite 1700
    Albuquerque, NM 87102
    (505) 244-0770

*Attorneys for Defendants*
*Jeffrey Mayer and Jeffrey L. Verschleiser*

GREENBERG TRAURIG LLP
Richard A. Edlin
Ronald D. Lefton
Candace Camarata
200 Park Avenue
New York, NY 10166
(212) 801-9200

*Attorneys for Defendant Jeffrey Mayer*

KRAMER LEVIN NAFTALIS
& FRANKEL LLP
Dani R. James
Jade A. Burns
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

*Attorneys for Defendant*
*Jeffrey L. Verschleiser*

## CERTIFICATE OF SERVICE

I hereby certify that, on February 11, 2011, a true and correct copy of the foregoing pleading was filed electronically pursuant to CM/ECF procedures for the District of New Mexico, which caused counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.


                              /s/ Victor R. Ortega
                              Victor R. Ortega