UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

| | |
|---|---|
| GENESEE COUNTY EMPLOYEES' RETIREMENT SYSTEM, et al., On Behalf of Themselves and All Others Similarly Situated,<br><br>                                        Plaintiffs,<br><br>         vs.<br><br>THORNBURG MORTGAGE, INC., et al.,<br><br>                                        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:09-cv-00300-JB-KBM<br><br><u>CLASS ACTION</u><br><br>LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS OF DEFENDANTS GREENWICH CAPITAL ACCEPTANCE, INC. (N/K/A RBS ACCEPTANCE INC.), STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC., CREDIT SUISSE SECURITIES (USA) LLC, RBS SECURITIES INC. (F/K/A GREENWICH CAPITAL MARKETS, INC.), ROBERT J. McGINNIS, CAROL P. MATHIS, JOSEPH N. WALSH III, JOHN C. ANDERSON, JAMES M. ESPOSITO, JEFFREY VERSCHLEISER, MICHAEL B. NIERENBERG, JEFFREY MAYER AND THOMAS F. MARANO AND BANC OF AMERICA SECURITIES LLC'S JOINDER IN THE MOTION TO DISMISS OF THE DEPOSITOR DEFENDANTS, THE INDIVIDUAL DEFENDANTS, CREDIT SUISSE SECURITIES (USA) LLC, AND RBS SECURITIES, INC. |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    STATEMENT OF FACTS ....................................................................................3

III.   PLAINTIFFS STATE A CLAIM UNDER §§11 AND 12(a)(2) OF THE
SECURITIES ACT ...............................................................................................4

      A.     Strict Liability Under §§11 and 12(a)(2) of the Securities Act ...............5

      B.     Rule 8(a) Applies to Plaintiffs' Claims....................................................6

      C.     The Complaint Alleges that Defendants Made Materially False and
Misleading Statements Pursuant to the Strict Liability Provisions of §§11
and 12(a)(2)...............................................................................................7

      D.     The Offering Documents Did *Not* Disclose the Allegedly Omitted
Information .............................................................................................13

            1.     The Offering Documents Did *Not* Disclose the Originators' *Actual*
Lending Practices.......................................................................14

            2.     The Offering Documents Misrepresented the Property Appraisals
of the Trusts' Underlying Loans .................................................16

            3.     The Offering Documents Misrepresented the LTV Ratios
Associated with the Loans in the Trusts ....................................18

            4.     The Offering Documents Did *Not* Disclose that the Underlying
Loan Documents Were *Actually* Falsified and Full of Untrue
Statements ..................................................................................19

            5.     The Offering Documents Did *Not* Disclose that the Credit Ratings
Assigned to the Certificates Were *Actually* False and Inherently
Unreliable...................................................................................19

      E.     The Defendants Cannot Escape Liability Under the Securities Act by
Pointing to Purported "Cure" Provisions in the Offering Documents.................22

IV.   THE COMPLAINT ALLEGES COGNIZABLE DAMAGES AND EQUITABLE
RELIEF UNDER §§11 AND 12(a)(2) ................................................................25

      A.     The Complaint States a Cognizable Claim for Damages Under §11 by
Alleging a Decline in the Value of the Certificates ................................26

- i -

Page

B.      The Continued Receipt of Payments Does Not Negate Plaintiffs'
        Allegations Regarding the Certificates' Decline in Value ....................................29

C.      Defendants' Purported "Warnings" Regarding the Potential Lack of a
        Secondary Market for the Certificates Are Irrelevant to Plaintiffs'
        Allegations Regarding the Certificates' Actual Decline in Value ........................31

D.      Lead Plaintiff Midwest OE Suffered a Loss from Its Purchase and Sale of
        the 2006-5 Certificates ..........................................................................................32

V.      PLAINTIFFS HAVE SUFFICIENTLY ALLEGED THAT THEY HAVE
        STANDING TO PURSUE CLAIMS UNDER SECTION 12(a)(2)..................................34

A.      The Complaint Adequately States a §12(a)(2) Claim Against the
        Depositor, Individual and Underwriter Defendants ................................................34

B.      The Complaint Adequately States a §12(a)(2) Claim Against Defendant
        BAS........................................................................................................................38

VI.     LEAD PLAINTIFF MIDWEST OE IS ENTITLED TO THE PRESUMPTION
        OF RELIANCE FOR ITS PURCHASE OF THE 2006-5 CERTIFICATES ....................41

VII.    PLAINTIFFS' CLAIMS ARE TIMELY .........................................................................46

A.      As an Affirmative Defense, the Statute of Limitations Is *Defendants'*
        Burden to Prove, Not *Plaintiffs'* Burden to Plead...................................................47

B.      Defendants' Articles Do Not Establish, as a Matter of Law, that Plaintiffs
        Were on Inquiry Notice Before the Original Complaint Was Filed ......................49

        1.      The Court Should Decline to Take Judicial Notice of Articles that
                Are Not Referenced in the Complaint .........................................................50

        2.      Even If the Court Takes Judicial Notice of the Existence of
                Defendants' Articles, They Still Do Not Establish that the
                Complaint Was Untimely as a Matter of Law ...........................................51

C.      The Claims Relating to the 2006-3 and 2006-5 Trusts Are Also Timely..............56

VIII.   PLAINTIFFS' COMPLAINT ADEQUATELY STATES A CONTROL PERSON
        CLAIM............................................................................................................................60

IX.     THE COMPLAINT ADEQUATELY STATES A CLAIM UNDER THE N.M.
        SECURITIES ACT ..........................................................................................................63

- ii -

**Page**

X.      CONCLUSION.....................................................................................................................66

614852_1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
   651 F. Supp. 2d 155 (S.D.N.Y. 2009)..........................................................................22

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) ...................................................................60, 61, 62

*Aldrich v. McCulloch Props.*,
   627 F.2d 1036 (10th Cir. 1980) ..................................................................................47

*Allen v. Oakbrook Sec. Corp.*,
   763 So. 2d 1099 (Fla. Dist. Ct. App. 1999) ...............................................................66

*Alpern v. UtiliCorp United*,
   84 F.3d 1525 (8th Cir. 1996) ......................................................................................27

*Am. Pipe and Constr. Co. v. Utah*,
   414 U.S. 538 (1974)......................................................................56, 57, 58, 60

*Ashcroft v. Iqbal*,
   __ U.S. __, 129 S. Ct. 1937 (2009)..........................................................5, 6, 10

*Bauer v. Prudential Fin., Inc.*,
   2010 U.S. Dist. LEXIS 64384 (D.N.J. June 29, 2010) ..........................................62

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................................5, 6, 12

*Blessing v. Sirius XM Radio Inc.*,
   2010 U.S. Dist. LEXIS 122076 (S.D.N.Y. Nov. 17, 2010)....................................59

*Bowman v. Cnty. of Okla.*,
   1993 U.S. App. LEXIS 25028 (10th Cir. Sept. 27, 1993) ......................................51

*Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*,
   2002 U.S. Dist. LEXIS 27189 (D.N.J. June 26, 2002),
   *aff'd*, 394 F.3d 126 (3d Cir. 2004) ...........................................................................59

*Calnin v. Hilliard*,
   2008 WL 336892 (E.D. Wis. Feb. 5, 2008)....................................................65, 66

*CalPERS v. Moody's Corp.*,
   No. CGC-09-490241, Order (San Francisco Cnty. Super. Ct. June 1, 2010).........22

**Page**

*Commercial Fin. Servs. v. Arthur Andersen LLP,*
    94 P.3d 106 (Okla. Ct. App. 2004) ....................................................................22

*Crown, Cork & Seal Co. v. Parker,*
    462 U.S. 345 (1983)..........................................................................................58

*Doody v. E.F. Hutton & Co.,*
    587 F. Supp. 829 (D. Minn. 1984)...................................................................23

*Feiner v. SS&C Techs., Inc.,*
    47 F. Supp. 2d 250 (D. Conn. 1999)..........................................................38, 39

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000).............................................................................8

*Greene v. Horizon/CMS Healthcare Corp.,*
    1998 U.S. Dist. LEXIS 12254 (D.N.M. July 13, 1998)...............................65, 66

*Grossman v. Novell, Inc.,*
    120 F.3d 1112 (10th Cir. 1997) ..........................................................4, 8, 13, 18

*Gustafson v. Alloyd Co.,*
    513 U.S. 561 (1995)..........................................................................................38

*Herman & MacLean v. Huddleston,*
    459 U.S. 375 (1983)....................................................................................6, 21

*Hevesi v. Citigroup, Inc.,*
    366 F.3d 70 (2d Cir. 2004)....................................................................... *passim*

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.,*
    159 F.3d 723 (2d Cir. 1998)...........................................................................13

*In re AFC Enters. Sec. Litig.,*
    348 F. Supp. 2d 1363 (N.D. Ga. 2004) ...........................................................27

*In re Am. Int'l Grp.,*
    2010 U.S. Dist. LEXIS 101263 (S.D.N.Y. Sept. 27, 2010)............................62

*In re Ambac Fin. Grp., Inc.,*
    693 F. Supp. 2d 241 (S.D.N.Y. 2010).......................................................57, 62

*In re Charles Schwab Corp. Sec. Litig.,*
    257 F.R.D. 534 (N.D. Cal. 2009)....................................................................62

- v -

**Page**

*In re Citigroup Bond Litig.*,
723 F. Supp. 2d 568 (S.D.N.Y. 2010)....................................................................62

*In re Countrywide Fin. Corp. Sec. Litig.*,
2009 WL 7322254 (C.D. Cal. Dec. 9, 2009) ........................................................45

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..........................................................31, 60

*In re Donald Trump Casino Sec. Litig.*,
7 F.3d 357 (3d Cir. 1993)....................................................................................13

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
2000 U.S. Dist. LEXIS 13469 (S.D.N.Y. Sept. 20, 2000)......................................40

*In re Dynegy, Inc.*,
339 F. Supp. 2d 804 (S.D. Tex. 2004) ............................................................48, 49

*In re Elec. Data Sys. Corp. "ERISA" Litig.*,
305 F. Supp. 2d 658 (E.D. Tex. 2004) ..................................................................48

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ..................................................................44

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) ............................................................45, 46

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
245 F.R.D. 147 (S.D.N.Y. 2007),
*aff'd in part and vacated in part on other grounds*,
574 F. 3d 29 (2d Cir. 2009)....................................................................................45

*In re Fleming Cos. Sec. & Derivative Litig.*,
2004 U.S. Dist. LEXIS 26488 (E.D. Tex. Jun. 10, 2004)......................................60

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
643 F. Supp. 2d 562 (S.D.N.Y. 2009)............................................................28, 29

*In re IndyMac Mortg.-Backed Sec. Litig.*,
718 F. Supp. 2d 495 (S.D.N.Y. 2010)........................................................ *passim*

614852_1

**Page**

*In re Initial Pub. Offering Sec. Litig*,
  2004 U.S. Dist. LEXIS 26000
  (S.D.N.Y. Dec. 28, 2004)...........................................................................................59

*In re Initial Pub. Offering Sec. Litig*.,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)..................................................................27, 29

*In re JDN Realty Corp. Sec. Litig*.,
  182 F. Supp. 2d 1230 (N.D. Ga. 2002) ........................................................................43

*In re Lehman Brothers Sec. & ERISA Litig*.,
  684 F. Supp. 2d 485 (S.D.N.Y. 2010)............................................10, 11, 16, 62

*In re Lilco Sec. Litig.*,
  625 F. Supp. 1500 (E.D.N.Y. 1986) .......................................................................19, 20

*In re MobileMedia Sec. Litig.*,
  28 F. Supp. 2d 901 (D.N.J. 1998) ...............................................................................60

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
  2010 U.S. Dist. LEXIS 84146 (S.D.N.Y. Aug. 17, 2010) ........................................35

*In re Nat'l Century Fin. Enters.*,
  580 F. Supp. 2d 630 (S.D. Ohio 2008) ......................................................................22

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
  396 F. Supp. 2d 1178 (D. Colo. 2004).........................................................................5

*In re SemGroup Energy Partners, L.P.*,
  729 F. Supp. 2d 1276 (N.D. Okla. 2010) .............................................................34, 35

*In re Taxable Muni. Bond Sec. Litig.*,
  1993 U.S. Dist. LEXIS 18592 (E.D. La. Dec. 29, 1993).........................................22

*In re Thornburg Morg., Inc.*,
  683 F. Supp. 2d 1236 (D.N.M. 2010) ............................................................... *passim*

*In re Thornburg Mortg., Inc.*,
  2009 U.S. Dist. LEXIS 124549 (D.N.M. Dec. 21, 2009).....................................42, 51

*In re Thornburg Mortg. Sec. Litig.*,
  695 F. Supp. 2d 1165 (D.N.M. 2010) ......................................................5, 40, 64

- vii -

**Page**

*In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*,
  604 F. Supp. 2d 1188 (N.D. Ill. 2009) .................................................................27

*In re Wash. Mut., Inc. Sec.*,
  694 F. Supp. 2d 1192 (W.D. Wash. 2009) ...........................................................46

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
  2010 U.S. Dist. LEXIS 124498 (N.D. Cal. Oct. 19, 2010).....................................59

*In re Wells Fargo Mortg. Backed Certificates Litig.*,
  712 F. Supp. 2d 958 (N.D. Cal. 2010) ........................................................ *passim*

*In re Westinghouse Sec. Litig.*,
  90 F.3d 696 (3d Cir. 1996).......................................................................... *passim*

*In re Williams Sec. Litig.*,
  339 F. Supp. 2d 1242 (N.D. Okla. 2003) ...............................................................7

*In re WorldCom, Inc. Sec. Litig.*,
  2004 U.S. Dist. LEXIS 4240 (S.D.N.Y. Mar. 19, 2004).....................................60

*In re WorldCom, Inc. Sec. Litig.*,
  2005 U.S. Dist. LEXIS 2215 (S.D.N.Y. Feb. 18, 2005).....................................26

*In re WorldCom, Inc. Sec. Litig.*,
  219 F.R.D. 267 (S.D.N.Y. 2003) ...............................................................45, 46

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 431 (S.D.N.Y. 2003)...................................................................31

*Johnston v. Norton*,
  1993 WL 465333 (S.D.N.Y. Nov. 10, 1993)........................................................66

*Jones v. Bock*,
  549 U.S. 199 (2007)...............................................................................................47

*Joseph v. Wiles*,
  223 F.3d 1155 (10th Cir. 2000) ...................................................................38, 45

*Koch v. Shell Oil Co.*,
  52 F.3d 878 (10th Cir. 1995) ...............................................................................47

*La Pietra v. RREEF Am., L.L.C.*,
  738 F. Supp. 2d 432 (S.D.N.Y. 2010)...................................................................59

- viii -

**Page**

*Lane v. Page*,
   581 F. Supp. 2d 1094 (D.N.M. 2008) ...................................................39

*Lane v. Page*,
   649 F. Supp. 2d 1256 (D.N.M. 2009) ........................................... *passim*

*Lane v. Page*,
   727 F. Supp. 2d 1214 (D.N.M. 2010) ...................................................67

*LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*,
   951 F. Supp. 1071 (S.D.N.Y. 1996)......................................................22

*Levitt v. Bear Stearns & Co.*,
   340 F.3d 94 (2d Cir. 2003)....................................................................52

*Lone Star Fund V (US), LP v. Barclays Bank PLC*,
   594 F.3d 383 (5th Cir. 2010) ...........................................................23, 24

*Lone Star Indus., Inc. v. Horman Family Trust*,
   960 F.2d 917 (10th Cir. 1992) ..........................................4, 23, 24, 25

*Maher v. Durango Metals*,
   144 F.3d 1302 (10th Cir. 1998) ...........................................................61

*Mass. Bricklayers & Masons Funds v. Deutsche Alt -A Sec.*,
   2010 U.S. Dist. LEXIS 33976 (E.D.N.Y. Apr. 6, 2010) ......................55

*Matrixx Initiatives, Inc. v. Siracusano*,
   __U.S.__, 2011 U.S. LEXIS 2416 (Mar. 22, 2011)................................5

*McDonald v. Kinder-Morgan, Inc.*,
   287 F.3d 992 (10th Cir. 2002) ...........................................................7, 8

*McMahan & Co. v. Wherehouse Entmt., Inc.*,
   65 F.3d 1044 (2d Cir. 1995).........................................................23, 26, 32

*Merck & Co. v. Reynolds*,
   __ U.S. __, 130 S. Ct. 1784 (2010) (Breyer, J.)................................52, 53

*MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/American Express Inc.*,
   886 F.2d 1249 (10th Cir. 1989) .........................................................6, 26

*Miller v. Shell Oil Co.*,
   345 F.2d 891 (10th Cir. 1965) ..............................................................50

- ix -

**Page**

*Mobley v. McCormick*,
    40 F.3d 337 (10th Cir. 1994) ...................................................................50

*Murken v. Solv-Ex Corp.*,
    1997 WL 34605217 (D.N.M. Aug. 19, 1997) .......................................65

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
    2010 U.S. Dist. LEXIS 47512 (S.D.N.Y. Mar. 29, 2010) ............................. *passim*

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    2010 U.S. Dist. LEXIS 32058 (S.D.N.Y. Mar. 31, 2010) .........................11, 21, 63

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    2011 U.S. Dist. LEXIS 4343 (S.D.N.Y. Jan. 18, 2011)...................................39

*N.J. Carpenters HealthFund v. Residential Capital*,
    2010 U.S. Dist. LEXIS 135261 (S.D.N.Y. Dec. 22, 2010) ...........................59

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*,
    720 F. Supp. 2d 254 (S.D.N.Y. 2010) ............................................... *passim*

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*,
    743 F. Supp. 2d 288 (S.D.N.Y. 2010)....................................................32

*Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*,
    277 B.R. 20 (S.D.N.Y. 2002)................................................................58

*Olcott v. Del. Flood Co.*,
    76 F.3d 1538 (10th Cir. 1996) .............................................................52

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004)......................................................13, 14, 15

*Pinter v. Dahl*,
    486 U.S. 622 (1988)..........................................................................34, 37

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    632 F.3d 762 (1st Cir. 2011) ...............................................................36, 61

*Price v. Philpot*,
    420 F.3d 1158 (10th Cir. 2005) ...........................................................42

*Pub. Emps. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    2011 U.S. Dist. LEXIS 3267 (S.D.N.Y. Jan. 12, 2011)...........................36, 53, 62

- x -

**Page**

*Pub. Emps. Ret. Sys. v. Merrill Lynch & Co.*,
   714 F. Supp. 2d 475 (S.D.N.Y. 2010)............................................................. *passim*

*Rafton v. Rydex Series Funds*,
   2011 U.S. Dist. LEXIS 707 (N.D. Cal. Jan. 5, 2011) ..................................... *passim*

*Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*,
   No. 09 Civ. 3701 (JGK), Opinion and Order (S.D.N.Y. Mar. 30, 2011) ...................... *passim*

*Ret. Sys. v. MBIA, Inc.*,
   2011 U.S. App. LEXIS 3813 (2d Cir. Feb. 28, 2011) .....................................53, 54

*Ret. Sys. v. Merrill Lynch & Co. Inc.*,
   2010 U.S. Dist. LEXIS 127211 (S.D.N.Y. Dec. 1, 2010) ................................38, 63

*Richardson v. MacArthur*,
   451 F.2d 35 (10th Cir. 1971) ..............................................................61

*Sanders v. Robinson Humphrey/American Express, Inc.*,
   1985 U.S. Dist. LEXIS 16077 (N.D. Ga. Sept. 12, 1985) ...................................48

*Schaffer v. Evolving Sys., Inc.*,
   29 F. Supp. 2d 1213 (D. Colo. 1998)..................................................6, 26

*Schwartz v. Celestial Seasonings*,
   124 F.3d 1246 (10th Cir. 1997) ......................................................6, 7, 9

*Spiegel v. Tenfold Corp.*,
   192 F. Supp. 2d 1261 (D. Utah 2002)....................................................7

*Staehr v. Hartford Fin. Servs. Grp.*,
   547 F.3d 406 (2d Cir. 2008)..........................................................52, 54

*Sterlin v. Biomune Sys., Inc.*,
   154 F.3d 1191 (10th Cir. 1998) ......................................................51, 52

*Stratmore v. Combs*,
   723 F. Supp. 458 (N.D. Cal. 1989) .....................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).....................................................................5

*Thornburg Mortg., Inc. Sec. Litig.*,
   265 F.R.D. 571 (D.N.M. 2010)..........................................................67

- xi -

**Page**

*Trief v. Dun & Bradstreet Corp.*,
144 F.R.D. 193 (S.D.N.Y. 1992) ................................................................58, 59

*TSC Indus. v. Northway, Inc.*,
426 U.S. 438 (1976)...........................................................................................4, 8

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
692 F. Supp. 2d 387 (S.D.N.Y. 2010)..............................................10, 11, 16, 35

*United Food & Commercial Workers Union v. Chesapeake Energy Corp.*,
2010 WL 3527596 (W.D. Okla. Sept. 2, 2010) ......................................................8

*Wenneman v. Brown*,
49 F. Supp. 2d 1283 (D. Utah 1999)....................................................................50

*Yuan v. Bayard Drilling Techs., Inc.*,
96 F. Supp. 2d 1259 (W.D. Okla. 1999) ................................................................7

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
§77(e) ..................................................................................................................27
§77k ............................................................................................................ passim
§77k(a) ........................................................................................................ passim
§77k(e) ....................................................................................................26, 27, 31
§77l(a)(2) ...............................................................................................................5
§77m ...................................................................................................................46
§77n ....................................................................................................................23
§77o.....................................................................................................................61
§77z-1(a)(3)(A) ...................................................................................................56

N.M. Stat. Ann.
§58-13B-30.B.........................................................................................................1
§58-13B-40.A ........................................................................................................1
§58-13B-54.A ......................................................................................................64
§58-13B-54.C ..........................................................................................64, 65, 66

Page

Federal Rules of Civil Procedure
    Rule 8(a) ................................................................................................... *passim*
    Rule 9(b) ...................................................................................................7
    Rule 12(b) .................................................................................................50
    Rule 12(b)(6) ............................................................................................ *passim*
    Rule 12(d) ................................................................................................41
    Rule 12(e) ................................................................................................49
    Rule 15 ....................................................................................................57
    Rule 15(a) ................................................................................................67
    Rule 15(a)(2) ...........................................................................................67
    Rule 15(c)(2) ...........................................................................................57
    Rule 23 ..........................................................................................40, 56, 60
    Rule 56 ............................................................................................50, 65
    Rule 56(f)(2) ............................................................................................41

17 C.F.R.
    §210.4-01 .........................................................................................43, 44
    §230.158(a) ..............................................................................................42
    §230.436(g)(1) .........................................................................................21

46 Fed. Reg. 42024-01, 42024 (Aug. 18, 1981) ........................................21

70 Fed. Reg. 1506, 1510 (Jan. 7, 2005) .............................................42, 44

## LEGISLATIVE HISTORY

S. Rep. No. 104-98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679 ..........................................56, 57

Plaintiffs respectfully submit this memorandum of law in opposition to defendants' motions to dismiss the amended complaint.

## I.      INTRODUCTION

This action involves strict liability and negligence-based claims under §§11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act") as well as §§58-13B-30.B and 58-13B-40.A of the New Mexico Securities Act of 1986.  At the heart of the Amended Complaint ("Complaint") (Dkt. No. 103) are materially false and misleading Registration Statements and Prospectus Supplements (collectively, the "Offering Documents") which were used by defendants to target institutional investors in connection with the sale of billions of dollars worth of mortgage-backed securities (the "Certificates") issued by Thornburg Trusts 2006-3, 2006-5 and 2007-4 (the "Trusts").  Neither the Certificates nor the mortgages contained therein were as represented in the Offering Documents.  As a result of purchasing the Certificates, the plaintiffs and the Class suffered substantial economic harm.

The Complaint more than meets the liberal notice pleading requirements of Rule 8(a) by alleging that defendants (mis)represented in the Offering Documents that the originators of the loans held by the Trusts had followed specific lending guidelines.  ¶¶48-50, 52-53.[1]  The undisclosed true facts were that the lenders had completely abandoned their guidelines and made loans without regard to borrowers' ability to repay.  ¶¶5-7, 48-54.  The Offering Documents also falsely stated that appraisals would be performed based on the actual value of the properties.  ¶¶7-8, 57-61.  In fact, as plaintiffs allege, rather than following established industry appraisal standards, appraisers were systematically providing inflated appraisals.  ¶¶58-61.  The improperly inflated appraisals, in turn,

---

[1]      All "¶__" or "¶¶__" references are to the Complaint.

made the "loan to value" ("LTV") ratios reported in the Offering Documents false.  ¶¶64-67. Further, contrary to representations made in the Offering Documents, appraisers' compensation was affected by the approval or disapproval of loans.  ¶¶58-61.  The Complaint also alleges that because of this faulty data, and for other reasons, the Investment Grade triple-A credit ratings assigned to the Certificates were false.  ¶¶68-89.  The Offering Documents further falsely represented that the underlying loan documents were free from fraud and did not contain any untrue statements of material facts.  ¶¶62-63.

Defendants seek immunity, claiming that plaintiffs have not alleged any facts showing that the Offering Documents were materially false and misleading, and that defendants completely disclosed all risks associated with the Certificates.  Defendants' obfuscation and creative lawyering aside – the law is clear, they are liable under the strict liability and negligence provisions of the federal Securities Act, as well as the New Mexico Securities Act of 1986.

Plaintiffs have pled that the information omitted from the Offering Documents was material. Without question, a reasonable shareholder would consider it important to know before investing in the Certificates that, contrary to the representations in the Offering Documents, loans placed in the Trusts had been extended to borrowers who could not repay them; the underlying loan documents had been falsified; the appraisals underlying the loans had been falsely inflated; and the Investment Grade triple-A credit ratings were inaccurate.

Moreover, defendants' purported "disclosures" in the Offering Documents do not shield them from liability because the "disclosures" failed to reveal the information plaintiffs allege was omitted – namely: (i) that the loans in the Trusts were made without regard to borrowers' ability to repay; (ii) that the underlying loan documentation was routinely falsified; (iii) that appraisals were systematically inflated and the LTV ratios set forth in the Offering Documents were false; and (iv)

- 2 -

that the ratings assigned to the Certificates were also false and misleading because they were based on inaccurate information and inherently unreliable models.  None of this information was disclosed to investors.  Thus investors were not put on notice of actual risks associated with the Certificates.

Defendants' remaining challenges fail.  Plaintiffs have more than sufficiently pled economic loss by alleging that the value of the Certificates has diminished since their original offering. Moreover, plaintiffs' claims relating to the 2006-3, 2006-5 and 2007-4 Trusts were timely asserted. Defendants' motion to dismiss should be denied.

## II.    STATEMENT OF FACTS

The Offering Documents affirmatively represented that, with respect to the Certificates, each underlying mortgage loan was originated pursuant to underwriting standards which provided that each applicant's "ability to repay the loan" would be evaluated.  ¶¶49-50, 52-53.  The Offering Documents also affirmatively represented that the underlying loans would be made based on the true value of the underlying properties, and that appraisals would be performed by qualified appraisers "whose compensation is not affected by the approval or disapproval of the mortgage loan." ¶¶57-61. The Offering Documents also set forth the purported LTV ratios associated with the underlying loans, and represented that the underlying loan documentation was free from fraud and any misrepresentation. ¶¶62-67.  Finally, the Offering Documents stated that the Certificates had earned Investment Grade AAA credit ratings, which ratings purportedly incorporated the credit quality of the mortgage pool, as well as the likelihood of receipt of all distributions on the underlying loans. Each of these representations was materially false and misleading.  ¶¶68-70.

Contrary to the representations in the Offering Documents, the originators of the mortgages transferred to the Trusts were originating loans without regard to the borrowers' ability to repay in an effort to generate loan origination fees.  ¶¶35-56.  As part of this approach, required loan

- 3 -

documentation was either not submitted at all or was improperly altered. *Id*. Moreover, the appraisals of the underlying properties were not designed to ascertain the true value of properties being used as collateral. ¶¶57-68. Instead, appraisers – whose compensation was tied entirely to whether or not loans were approved – were pressured to produce falsely inflated property appraisals. *Id*. As a result, the LTV ratios disclosed in the Offering Documents – which were based on the inflated appraisals – were also false. ¶¶64-68. Furthermore, the credit ratings assigned to the Certificates were also rendered false by the fact that they were based on outdated and inherently unreliable rating models and criteria, as well as inaccurate loan information provided by defendants. ¶¶68-89.

Due to defendants' material misrepresentations, the price at which the Certificates were offered and sold to plaintiffs and the Class was artificially inflated. ¶¶13, 17. When the truth about the Certificates reached investors, and the ratings on the Certificates were reduced to reflect reality, the value of the Certificates decreased. ¶¶13, 79, 86, 107, 118, 131. As a result of the decline in the Certificates' value, plaintiffs and the members of the Class have suffered significant harm.

## III. PLAINTIFFS STATE A CLAIM UNDER §§11 AND 12(a)(2) OF THE SECURITIES ACT

Rule 12(b)(6) motions to dismiss in this Circuit are "'viewed with disfavor, and [are] rarely granted.'" *Lone Star Indus., Inc. v. Horman Family Trust*, 960 F.2d 917, 920 (10th Cir. 1992).[2] This is particularly apt here because plaintiffs' claims deal "primarily with 'fact-specific inquiries' such as materiality." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997).[3]

---

[2]     Citations are omitted and emphasis is added throughout unless otherwise indicated.

[3]     The materiality determination "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).

"The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiffs favor." *In re Thornburg Mortg. Sec. Litig.*, 695 F. Supp. 2d 1165, 1185 (D.N.M. 2010) (Browning, J.) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (Ginsburg, J.)). Here, the relevant question is whether the Complaint's "allegations suffice to 'raise a reasonable expectation that discovery will reveal evidence' satisfying the materiality requirement," and "'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matrixx Initiatives, Inc. v. Siracusano*, __U.S.__, 2011 U.S. LEXIS 2416, at *34 (Mar. 22, 2011) (Sotomayor, J.) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (Souter, J.) and *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1940 (2009) (Kennedy, J.)). Here, the answer is a resounding "yes."

## A.     Strict Liability Under §§11 and 12(a)(2) of the Securities Act

Section 11 of the Securities Act imposes liability upon every person who, among other things, (i) signed the registration statement, (ii) was a director of the issuer, (iii) was an underwriter of the offering, or (iv) prepared or certified any report or valuation used in connection with the registration statement, for any materially misleading statements and omissions made therein. *See* 15 U.S.C. §§77k, 77l(a)(2); *In re Thornburg Morg., Inc., Sec. Litig.*, 695 F. Supp. 2d 1165, 1191 (D.N.M. 2010) (Browning, J.); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 396 F. Supp. 2d 1178, 1202 (D. Colo. 2004). "When alleging a violation of §11, a plaintiff who 'purchased a security issued pursuant to a registration statement . . . need only show a material misstatement or omission to establish [a] prima facie case. Liability against the issuer of a security is virtually absolute, even

- 5 -

for innocent misstatements.'"  *Schwartz v. Celestial Seasonings*, 124 F.3d 1246, 1251 (10th Cir. 1997) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) (Marshall, J.)).

Section 12(a)(2) liability is similar to Section 11 liability in that "[t]he purchaser need not prove scienter, fraud, or negligence on the part of the seller, nor need he establish that he relied upon the misrepresentation or omission or that his or her loss was a direct or proximate result of the misrepresentation or omission."  *Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1220 (D. Colo. 1998) (citing *MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/American Express Inc.*, 886 F.2d 1249, 1256-57 (10th Cir. 1989)).  Sections 11 and 12(a)(2) of the Securities Act impose a stringent standard of liability on defendants and "place[] a relatively minimal burden on a plaintiff."  *Huddleston*, 459 U.S. at 381-82; *In re Thornburg Morg., Inc.*, 683 F. Supp. 2d 1236, 1248 (D.N.M. 2010) (Browning, J.).

### B.   Rule 8(a) Applies to Plaintiffs' Claims

Because plaintiffs' claims are based on theories of strict liability and negligence under §§11 and 12 of the Securities Act and expressly disclaim defendants' fraudulent conduct, they are governed by the notice pleading standard set forth in Fed. R. Civ. P. 8(a).  *Thornburg*, 683 F. Supp. 2d at 1248; *Schwartz*, 124 F.3d at 1251-52.  The liberal pleading standard of Rule 8(a) does not require "detailed factual allegations," but rather a short and plain statement of the claim showing that the pleader is entitled to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-55, 570 (2007) (Souter, J.); *Ashcroft v. Iqbal*, __U.S.__, 129 S. Ct. 1937, 1949 (2009) (Kennedy, J.).  A complaint need only allege "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see also Iqbal*, 129 S. Ct. at 1949 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.").  Rule 8(a) has been consistently applied in the Tenth Circuit to Securities Act claims.  *See, e.g.*,

- 6 -

*Schwartz*, 124 F.3d at 1252 (holding that Rule 9(b) did not apply to plaintiffs' claims because they were "not premised on fraud"); *Thornburg*, 683 F. Supp. 2d at 1255.[4]

## C.   The Complaint Alleges that Defendants Made Materially False and Misleading Statements Pursuant to the Strict Liability Provisions of §§11 and 12(a)(2)

Citing no Tenth Circuit authority, defendants assert that dismissal is warranted because plaintiffs have failed to specify particular bad loans within each trust, and that, as a result, the allegedly false and misleading statements are immaterial as a matter of law.  In so doing, defendants ignore well established Tenth Circuit and Supreme Court law that imposes a "minimal burden on plaintiffs" under Rule 8(a) and imposes "virtually absolute" liability on defendants so long as plaintiff shows a material misstatement or omission.  Memorandum of Law in Support of the Motion to Dismiss of Defendants Greenwich Capital Acceptance, Inc. (n/k/a RBS Acceptance Inc.), Structured Asset Mortgage Investments II, Inc., Credit Suisse Securities (USA) LLC, RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.), Robert J. McGinnis, Carol P. Mathis, Joseph N. Walsh III, John C. Anderson, James M. Esposito, Jeffrey Verschleiser, Michael B. Nierenberg, Jeffrey Mayer, and Thomas F. Marano ("Dkt. No. 126") at 1, 13-29.  Defendants are wrong.

Under Section 11, a statement is material if "'a reasonable investor would consider it important in determining whether to buy or sell stock.'"  *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 997 (10th Cir. 2002); *Thornburg*, 683 F. Supp. 2d at 1250.  The Tenth Circuit will dismiss securities claims pursuant to Rule 12(b)(6) only "'where the alleged misstatements or omissions are

---

[4]     *See also Yuan v. Bayard Drilling Techs., Inc.*, 96 F. Supp. 2d 1259, 1265-66 (W.D. Okla. 1999) (refusing to apply Rule 9(b) where plaintiff "alleged negligence-based claims, not fraud-based claims" under §§11 and 12(a)(2)); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1262-63 (N.D. Okla. 2003) ("the particularity requirements of Fed. R. Civ. P. 9(b) should not be extended to Section 11 and Section 12(a)(2) claims because those claims do not require fraud"); *Spiegel v. Tenfold Corp.*, 192 F. Supp. 2d 1261, 1267-68 (D. Utah 2002) (applying Rule 8(a) where "complaint alleges negligence in both the §11 and §12(a) claims").

plainly immaterial.'" *McDonald*, 287 F.3d at 997; *Thornburg*, 683 F. Supp. 2d at 1250; *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) ("'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance'"). "The issue of materiality 'may be characterized as a mixed question of law and fact,' and the determination 'requires delicate assessments of the inferences a "reasonable shareholder" would draw . . . and these assessments are peculiarly ones for the trier of fact.'" *United Food & Commercial Workers Union v. Chesapeake Energy Corp.*, 2010 WL 3527596, at *6 (W.D. Okla. Sept. 2, 2010) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (Marshall, J.)).

The Complaint alleges materially false and misleading statements.  It provides detailed factual information regarding the actual lending practices employed during the relevant time period by the specific loan originators who underwrote the actual loans that were ultimately conveyed to the Trusts at issue here.  ¶¶48-67.  For example, the Complaint details the actual lending practices employed during the relevant time period by Wells Fargo for Trust 2006-5.  ¶¶48-56.  With regard to the loans originated by Wells Fargo and other originators that Thornburg purchased and included in the Certificates, the Prospectuses at issue stated, among other things, that underwriting standards utilized were intended to "evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral."  ¶49.  The Complaint details how Wells Fargo and other originators abandoned these standards, and that information being submitted in connection with the loans sold to Thornburg and others was false. ¶¶51, 54.

The alleged misstatements directly relate to the most important aspects of the overall investment quality and riskiness of the Certificates, and thus were clearly material.  Without question, any reasonable investor would consider it important to know when investing in the Certificates that, contrary to the Offering Documents' representations, the loans contained within the Trusts had been extended to borrowers who could not afford to repay them, and that the originators were not following their own lending "guidelines."  Similarly, a reasonable investor would have certainly thought it important to know that the underlying loan documents had been falsified, or that the appraisals had been falsely inflated, as this information would be important in determining the likelihood of repayment or whether the losses were sufficiently collateralized in the event of default – *i.e.*, how risky the investment was.  Additionally, a reasonable investor would consider it important to his or her investment decision that the credit ratings for the Certificates, which defendants' repeatedly relied on to tout the Certificates as "investment grade," were in fact inherently inaccurate and unreliable because they had been formulated based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information.  Defendants' contention that the allegedly omitted facts could not possibly take on actual significance in the mind of a reasonable shareholder is not credible.

Plaintiffs' allegations are more than sufficient in the Tenth Circuit to survive at the pleading stage.  *See Schwarz*, 124 F.3d at 1251.  Moreover, numerous courts have upheld allegations of widespread and systematic abandonment of underwriter guidelines, and rejected defendants' precise argument here that plaintiffs must point to specific loans within each trust to plead a material misstatement or omission under §11.  Most recently, in *Emps.' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*, No. 09 Civ. 3701 (JGK), Opinion and Order (S.D.N.Y. Mar. 30, 2011) (Declaration of Darren J. Robbins in Support of Plaintiffs' Oppositions to Defendants' Motions to Dismiss ("Robbins Decl."), filed herewith, Ex. 11), the court unequivocally held that

- 9 -

"[a]llegations of widespread abandonment of underwriting and appraisal guidelines can hardly be held immaterial as a matter of law.  *See Tsereteli*, 692 F. Supp. 2d at 392-93."  *Id*. at 26.

The *J.P. Morgan Chase* court explicitly held that "A plaintiff need not allege that any particular loan or loans were issued in deviation from the underwriting standards, so long as the complaint alleges 'widespread abandonment of underwriting guidelines.'"  *Id*. at 21.  The court then found that the complaint's allegations of systematic and widespread abandonment of the underwriter guidelines stated in the offering documents were sufficient to survive dismissal:

> Allegations that loan originators "abandoned the underwriting standards that [they] professed to follow and ignored whether borrowers ever would be able to repay their loans" are actionable, notwithstanding the fact that Offering Documents may have disclosed that loans could be issued pursuant to low- or no-documentation programs or under exceptions to those guidelines.  *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 392 (S.D.N.Y. 2010); *see also In re IndyMac*, 718 F. Supp. 2d at 509; *DLJ Mortg*., 2010 WL 1473288, at *6-7; *In re Lehman Bros*., 684 F. Supp. 2d at 493-94.

> Here, the plaintiff has alleged, for example, that loan originators deviated from underwriting standards "as a matter of course" or issued loans without evaluating "the prospective borrower's repayment ability," in violation of the underwriting standards specified in the Offering Documents. (SAC ¶¶ 79, 94.)  These are factual allegations, not legal conclusions, and must be accepted as true for purposes of Rule 8(a).  *See Iqbal*, 129 S. Ct. at 1949.

*Id*. at 21-22.

In *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495 (S.D.N.Y. 2010), Judge Lewis Kaplan also upheld under Rule 8(a) the validity of allegations like those here that, contrary to the representations in the offering documents for mortgage based securities, defendants had completely abandoned their underwriting standards and ignored the borrowers' ability to meet their monthly obligations in order to produce as many loans as possible.  *Id*. at 509.

Likewise, in *Tsereteli v. Residential Asset Securitization Trust (2006-A8)*, 692 F. Supp. 2d 387 (S.D.N.Y. 2010), the court found that the complaint's allegations of widespread abandonment of

- 10 -

underwriting guidelines without identification of specific bad loans sufficiently pled false and misleading material misstatements and omissions under §11. *Id.* at 392. Similarly, in *In re Lehman Brothers Sec. & ERISA Litig.*, 684 F. Supp. 2d 485 (S.D.N.Y. 2010), the court upheld allegations similar to those in the Complaint here, reasoning:

> Finally, the Individual Defendants argue that the allegedly omitted information is not material because the complaint fails to allege the volume of loans that departed from the stated underwriting guidelines and that the Offering Documents contained an "ocean's worth" of specific data about the loan pools. These arguments are insufficient at this stage to determine that the alleged misstatements and omissions are immaterial as a matter of law.

*Id.* at 494; *see also N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2010 U.S. Dist. LEXIS 32058, at *22 (S.D.N.Y. Mar. 31, 2010) ("factual allegations about [the originator's] improper underwriting practices . . . create a fair inference that [the originator] totally disregarded the underwriting guidelines, contrary to what was stated in the Offering Documents"); *Pub. Emps. Ret. Sys. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 483 (S.D.N.Y. 2010) ("*Merrill Lynch MBS*") ("the alleged repeated deviation from established underwriting standards is enough to render misleading the assertion in the registration statements that underwriting guidelines were generally followed").

Moreover, with regard to the loans originated by Wells Fargo – like those at issue in the instant case – at least one court has previously noted the alleged dismal quality of Wells Fargo's underwriting practices and the fact that the impropriety of such practices were withheld from investors. *In re Wells Fargo Mortg. Backed Certificates Litig.*, 712 F. Supp. 2d 958 (N.D. Cal. 2010) (denying motion to dismiss).

Similar to the cases discussed above, the Complaint concisely alleges that defendants made specific and material misrepresentations and omissions in the Offering Documents. ¶¶48-61. The falsity of the misrepresentations and omissions are supported by factual allegations of pervasive, systematic practices employed by the originators of the specific loans underlying the Certificates.

- 11 -

614852_1

The totality of these allegations makes it much more than "plausible" that the Offering Documents contained material false statements and omissions and clearly raises plaintiff's right to relief "above the speculative level." *Twombly*, 550 U.S. at 555, 570.  Nothing more is required under Rule 8(a).

Finally, defendants' transparent and misleading attempt to distance themselves from the misrepresentations in the Offering Documents further demonstrates the sufficiency of the Complaint.  Defendants assert that "the vast bulk of the majority of underlying loans in the mortgage pools for the 2006-3, 2006-5 and 2007-4 offerings ***were not originated by Thornburg***." Dkt. No. 126 at 14.  But, defendants ignore the plain fact that the Complaint and the Offering Documents state directly to the contrary.   Indeed, the Prospectus Supplement for Trust 2006-3 states unequivocally that "approximately 82.64%  and 12.24% of the mortgage loans were originated by Thornburg Mortgage Home Loans, Inc., (together with its correspondent lenders other than First Republic Bank) and First Republic Bank respectively."  Robbins Decl., Ex. 6; ¶52.[5]

Citing the relevant portions of the Offering Documents, the Complaint plainly alleges that the Offering Documents represented  that mortgage loans originated by Thornburg or its correspondent lenders were originated and/or acquired in a manner which complied with Thornburg's underwriting standards.   ¶52.   The Complaint further alleges systematic and  widespread abandonment of Thornburg's underwriting standards.   ¶54.   Defendants cannot avoid liability for the false and

---

[5]      Similarly, the Prospectus Supplement for 2006-5 states that "approximately 25.70% of the mortgage loans were originated by the seller (including its correspondent lenders, other than First Republic).   The mortgage loans originated by the seller (including its correspondent lenders, other than First Republic Bank), were originated by them in accordance with the seller's underwriting guidelines."  Likewise, the Prospectus Supplement for 2007-4 states: "Of the mortgage loans in this securitization, approximately 73.90% were acquired from correspondents, approximately 2.80% were originated by the seller through it retail operations and approximately 23.29% were originated by the seller through its wholesale operations."  Robbins Decl., Exs. 13-14.  Defendants cannot dispute that Thornburg was the "seller."

misleading statements in the Offering Documents by misleadingly claiming that the loans were not originated by Thornburg.  Defendants' motion should be denied.

### D.     The Offering Documents Did *Not* Disclose the Allegedly Omitted Information

Defendants attempt to immunize themselves from liability by asserting that the Offering Documents provided extensive and detailed disclosures such that "[n]o reasonable investor could have been mistaken about the risks associated with the loans backing their investments."  Dkt. No. 126 at 2.  But, while it is true that the Offering Documents contain pages of boilerplate warnings and risk disclosures, the bottom line is that none of these purported disclosures reveal the information plaintiffs allege was omitted, and none of these purported warnings put investors on notice of the actual risks associated with the Certificates.  *See N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*, 720 F. Supp. 2d 254, 269 (S.D.N.Y. 2010) ("Plaintiffs can overcome cautionary language if the 'language did not expressly warn or did not directly relate to the risk that brought about plaintiffs' loss.'"); *Grossman*, 120 F.3d at 1120 ("not every risk disclosure will be sufficient to immunize statements relating to the disclosure; rather, 'the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions'") (quoting *In re Donald Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993)); *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) ("The cautionary language . . . must relate directly to that by which plaintiffs claim to have been misled."); *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("the cautionary language must . . . warn[] of the specific contingency that lies at the heart of the alleged misrepresentation").

**1.      The Offering Documents Did *Not* Disclose the Originators'
          *Actual* Lending Practices**

Defendants assert that the Offering Documents fully disclosed that the originators could pursue alternative or "more permissive" lending programs and grant "underwriting exceptions" that reduced or eliminated documentation and verification requirements.   Dkt. No. 126 at 15-20. Defendants then assert that these purportedly "robust disclosures" provided investors "all the material facts regarding the underwriting and loan documentation for the mortgage loans." *Id*. at 20.

What defendants ignore of course, is the fact that, despite the use of so-called "alternative or permissive" lending programs and the granting of "underwriter exceptions," the Offering Documents nonetheless represented that all underlying loans were underwritten pursuant to at least some standards, which were at least generally intended "to make sure borrowers could repay" the loans that were being made.[6]  ¶¶5, 49-50, 52-53.   By simply stating that, in some limited instances, originators may not have had to document income, debts or assets, or verify them, the Offering Documents did not, by any means, inform investors that the originators, such as Wells Fargo, had failed to make any determination at all regarding the borrowers' ability repay their loans.   In fact, the Offering Documents stated the exact opposite – that, regardless of whether the need for documentation and/or verification was reduced, or even eliminated, the lending guidelines still required each originator to, at a minimum, make a determination as to whether the borrowers could repay their loans.  *Id*.

---

[6]      *See* ¶5 ("Wells Fargo's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan."); ("prior to acquiring any mortgage loan from a correspondent, [Thornburg] conducts a review of the mortgage file to determine whether the loan meets [Thornburg's] underwriting standards"); ("[i]n connection with its bulk purchase program, [Thornburg] conducts a loan documentation review . . . to confirm adherence to the terms of the purchase agreement with the loan seller").

- 14 -

Yet, contrary to these affirmative representations regarding the underwriting guidelines supposedly employed by the originators, the Complaint alleges that the loan originators had in fact systematically abandoned any semblance of underwriting standards aimed at evaluating prospective borrowers' repayment ability.  ¶¶51, 54.  Instead, the originators were making loans without due regard to borrowers' ability to repay, attempting to generate and sell to defendants as many loans as possible.  *Id*.  As such, the underwriting guidelines set forth in the Offering Documents, even those pertaining to the most lenient underwriting guidelines, were false and misleading.

Several courts have recently rejected the very same disclosure arguments advanced by defendants here.  Most recently, in *J.P. Morgan Chase*, the court held:

> "While the Offering Documents did state that exceptions could and would be made to the underwriting standards, and that some low- or no-documentation loans would be issued, they repeatedly represented that loan originators would "generally" follow underwriting guidelines."  (Prospectus Supplement at S-42 to S-51.)  "[T]he alleged repeated deviation from established underwriting standards is enough to render misleading the assertion in the registration statements that underwriting guidelines were generally followed."  *PERS of Miss*., 714 F. Supp. 2d at 483.

*Id*. at 22.

Similarly, in *Royal Bank*, defendants attempted to avoid liability for misleading statements regarding loan originators' lending practices by arguing that their offering materials "disclosed the underlying loan pool data and indicated that underwriting guidelines included riskier types of loan programs."  720 F. Supp. 2d at 269.  The court rejected defendants' arguments, finding that the offering materials "did not indicate, as Plaintiffs allege, that mortgage originators like Countrywide would disregard even the most minimum of the stated guidelines."  *Id.*  The court concluded that plaintiffs had adequately alleged actionable misstatements because "[d]isclosures that described lenient, but nonetheless existing guidelines about risky loan collateral, would not lead a reasonable investor to conclude that the mortgage originators could entirely disregard or ignore those loan

guidelines." *Id*. at 270; *Tsereteli*, 692 F. Supp. 2d at 392 (rejecting similar arguments because "[t]he warnings [defendants] highlight[ed] did not disclose the[] alleged facts" – namely, that the originator "had abandoned the underwriting standards that it professed to follow and ignored whether borrowers ever would be able to repay their loans"); *IndyMac*, 718 F. Supp. 2d at 509 ("Disclosures regarding the risks stemming from [alternative lending] standards do not adequately warn of the risk the standards will be ignored [all together].").

Nor can defendants avoid liability for these misstatements based on their contention that the Offering Documents made clear that the underwriting policies were "guidelines" from which originators had discretion to deviate. Dkt. No. 126 at 17-18. This argument was recently rejected in *Lehman Bros.*, 684 F. Supp. 2d at 493. There, like here, the complaint "[did] not allege that the loan originators simply made loans pursuant to the disclosed exceptions . . . [but rather], that the originators ***systematically*** failed to follow the underwriting guidelines, including the procedures for using underwriting guideline exceptions." *Id*. As such, the court held that defendants' disclosure "that the loan originators had discretion to issue loans pursuant to exceptions to the guidelines" was insufficient to shield defendants from liability. *Id*. Because the Complaint similarly alleges that originators systematically failed to follow any guidelines, even those related to the procedures for supposed underwriting "exceptions," the same analysis should be applied to reject defendants' arguments here.

### 2. The Offering Documents Misrepresented the Property Appraisals of the Trusts' Underlying Loans

Defendants contend that the appraisal allegations fail because plaintiffs have failed to plead that the appraisers for the loans underlying the Trusts "'did not truly believe the appraisal[s] at the time [they were] issued.'" Dkt. No. 126 at 21. In fact, the Complaint expressly alleges that the appraisers did not subjectively believe in their appraisals, describing them as "false" and "artificially

inflated," due to the fact that appraisers were routinely forced to either provide predetermined, inflated appraisals or face being "blackballed" within the industry.  ¶¶58-61.  Plaintiffs bolster these allegations by describing the experiences of appraisers who worked for Wells Fargo (who originated 72% of the loans in Trust 2006-5) and were told to, and did in fact, provide inflated appraisals.  ¶48.

In *J. P. Morgan Chase*, Order at 23, the court upheld allegations, like those here, that loan underwriters failed to conduct appraisals that reflected the true value of the properties underlying the loans in the trusts:

> The plaintiff alleges that appraisers were ordered to [and] did produce "predetermined, preconceived, inflated and false appraisal values" and "frequently succumbed to brokers' demands to appraise at pre-determined inflated values," leading to "[a]ppraisals . . . not based upon the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis and judgment."  (SAC ¶¶ 103, 107.)  The plaintiff further bolsters these assertions by describing the experiences of appraisers who allegedly worked for AHM and were told by mortgage brokers what home values to provide and did, in fact, provide inflated appraisals.  (SAC ¶¶ 108-10.)  Thus, the Second Amended Complaint includes specific, concrete factual allegations that (a) appraisers did not believe the appraisals when they made them and (b) that appraisers accepted assignments that were contingent on predetermined results, which would be a violation of USPAP. These allegations are sufficient to survive a motion to dismiss.

*Id*. at 23-24.  The virtually identical appraisal allegations in the Complaint are sufficient to survive defendants' motion to dismiss.

Defendants further claim that the Offering Documents adequately warned investors that these appraisals could be inaccurate or vary in the future.  Dkt. No. 126 at 24-25.  But defendants' argument ignores that the Complaint alleges that the Offering Documents misrepresented how the appraisals were conducted, and that the appraisals were inflated at the time they were made – not whether the loans would hold value in the future.[7]  Defendants' purported disclosures regarding the

---

[7]    *See* ¶58 (appraiser confirming that Wells Fargo pressured him to arrive at specific pre-determined valuations, or sometimes inflate appraisals so that certain properties would satisfy loan underwriting

appraisals did not reveal the omitted information and are insufficient.  *See Grossman*, 120 F.3d at

1120; *Royal Bank*, 720 F. Supp. 2d at 269-70; *IndyMac*, 718 F. Supp. 2d at 498.  Defendants'

argument fails.

### 3. The Offering Documents Misrepresented the LTV Ratios Associated with the Loans in the Trusts

Defendants assert that the LTV ratio allegations must fail because the appraisal allegations

are insufficient.  Not so.  The understated LTV ratios listed in the Offering Documents are also

actionable as they were based on the false and artificially inflated appraisals.  As the Complaint lays

out, incorporating inflated appraisals into the LTV calculation resulted in lower LTV ratios, and

these lower LTV ratios helped bolster the illusion that the Certificates were much safer/less risky

than they actually were.  ¶115.

In *J.P. Morgan Chase*, the court upheld allegations, identical to those in the Complaint, here

that the LTV ratios provided in the offering documents were false and misleading because they were

based on artificially inflated appraisals:

> As already stated, the Second Amended Complaint sufficiently alleges that the
> appraisals supporting the underlying loans were not believed when made.
> Accordingly, the claims regarding LTV ratios are also sufficient: if the appraisals
> were not believed to be accurate, then the LTV ratios could not be believed to be
> accurate.  *See In re Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d
> 958, 972 (N.D. Cal. 2010).

Order at 24.

Similarly, in *Wells Fargo*, the court upheld allegations that the offering documents misstated

the LTV ratios "because the calculation of the home's value was frequently based on an inflated

appraisal . . . [and] the true loan-to-value ratio frequently exceeded 100% because the homes were

---

requirements); (Las Vegas appraiser conducted over 300 inflated appraisals at the demand of Wells Fargo and other lenders).

actually worth far less than their stated appraisal value." *Wells Fargo*, 712 F. Supp. 2d at 972. In the instant case, defendants similarly never disclosed anywhere in the Offering Documents that the underlying appraisals were false and artificially inflated, or that the LTV ratios were false and artificially understated.

4.    **The Offering Documents Did *Not* Disclose that the Underlying Loan Documents Were *Actually* Falsified and Full of Untrue Statements**

Notably, defendants fail to even challenge the Complaint's allegations that the Offering Documents falsely assured investors that the loan documentation underlying the loans was "true and correct" and free of fraud. Defendants themselves voluntarily chose to put these particular representations into the Offering Documents, knowing that such materials were obviously intended to be distributed to and read by investors. Indeed, the very purpose of offering materials, such as those filed by defendants here, is to convey information to investors. The Complaint alleges *inter alia* that the borrowers and loan originators were systematically and routinely falsifying the incomes of the borrowers and that property appraisals were systematically inflated by appraisers who were being pressured by loan originators. ¶¶43-61. By choosing to affirmatively make and include these fraud representations in the Offering Documents, defendants undertook responsibility for their veracity, and thus, they are strictly liable pursuant to §§11 and 12(a)(2). *In re Lilco Sec. Litig.*, 625 F. Supp. 1500, 1503 (E.D.N.Y. 1986).

5.    **The Offering Documents Did *Not* Disclose that the Credit Ratings Assigned to the Certificates Were *Actually* False and Inherently Unreliable**

Defendants' argument regarding the false and misleading credit ratings is premised on yet another mischaracterization of plaintiffs' allegations. *See* Dkt. No. 126 at 29-31. Contrary to defendants' assertions, and as articulated in detail in plaintiffs' Opposition to the Rating Agency

- 19 -

Defendants' Motion to Dismiss ("Opp. to Rating Agency MTD"), the Complaint alleges much more than a mere failure to disclose "the ratings assigned to the certificates." *Id*. at 30; *see also* Opp. to Rating Agency MTD at §II.A. (incorporated by reference herein).  Indeed, the Complaint alleges that the triple-A "investment grade" ratings assigned to the Certificates, which defendants voluntarily included in the Offering Documents, were actually false at the time of the offerings due to the ***inherently flawed*** models and ***inaccurate loan information*** relied on to derive the ratings.  *See* ¶¶4, 12, 44, 68-89.  ***This*** information was not disclosed in the Offering Documents.

The Complaint provides extensive factual support for plaintiffs' allegations that the ratings "did not represent the true risk of the Certificates, but were in fact based on insufficient information and false assumptions about the underlying mortgages."  ¶¶77, 82-84.  In particular, the Complaint alleges the Certificates' ratings could not possibly have been accurate because the "the Rating Agency Defendants had been aware that their modeling assumptions had been wrong, yet failed to timely adjust their models or cease issuing defective credit ratings."  ¶82 (citing rating agency employees and internal emails describing defects in the models and methods from 2002-2007).  Moreover, as alleged in the Complaint, the rating agencies knew that mortgage originators "had loosened – or worse, abandoned – their underwriting standards and were relying on falsified mortgage loan documentation, yet rated the Certificates investment-grade while disclaiming any responsibility for verifying the accuracy of the underlying loans."  ¶85.  As Fitch's President and CEO has acknowledged, Fitch "did not do the due diligence function of trying to recognize whether there was fraud involved in the origination of loans."  ¶86.  These failures and omissions precluded the ratings from accurately capturing and reflecting the true level of risk associated with the Certificates.  ¶¶82-86.  Indeed, it is virtually irrefutable that the Certificates' ratings were materially false and inaccurate at the time of the offerings in light of the dramatic adjustment "by ***as many as***

*18 grade levels* downward" when the true nature and lack of quality of the underlying loans came to

light. ¶79. Having voluntarily chosen to include the ratings in the Offering Documents, defendants

undertook responsibility for their veracity.   *See* 15 U.S.C. §77k; *Huddleston*, 459 U.S. at 382

("Liability against the issuer of a security is virtually absolute, even for innocent misstatements.").[8]

      Knowing this to be true, defendants attempt to evade liability for the materially false and

misleading ratings by excising them from the Offering Documents altogether.   *See* Dkt. No. 126 at

29 (arguing that the ratings "are not considered part of the registration statement") (citing *Merrill*

*Lynch MBS,* 714 F. Supp. 2d at 481; 17 C.F.R. §230.436(g)(1)).   Defendants are wrong.   Indeed, as

their own authority explained in the very next sentence, SEC Rule 436(g)(1) does not render ***ratings***

inactionable *per se*, but rather "***was intended to 'exclude any [NRSRO]*** whose security rating is

disclosed in a registration statement from civil liability under Section 11.'"   *Merrill Lynch MBS*, 714

F. Supp. 2d at 481-82 (declining to hold rating agencies liable under §11 as "statutory underwriters"

because SEC rule would be "rendered effectually nugatory"); 46 Fed. Reg. 42024-01, 42024 (Aug.

18, 1981) ("The second proposed rule would exclude any [NRSRO] whose security rating is

disclosed in a registration statement from civil liability under Section 11 of the Securities Act of

1933.").[9] Defendants' argument conflates ***who*** can be held liable pursuant to §11 with ***what*** a proper

---

[8]      The cases defendants cite in support of their argument that other courts have rejected purportedly identical ratings claims are each inapposite and fail to support defendants' argument here. *See* Dkt. No. 126 at 29.  Unlike the allegations in defendants' cases, the Complaint here ***does*** set forth detailed "factual allegation[s] that indicate[] the ratings . . . described in the documents were incorrect at the time offered," and the Complaint here ***does*** "allege[] that the opinions [expressed by the ratings] were ***not*** truly held [by the ratings agencies]" at they time they were issued.  *See Residential Capital*, 2010 U.S. Dist. LEXIS 32058, at *24-*25.

[9]      In addition, defendants neglect to note that Rule 436(g) exempting rating ***agencies*** from §11 liability was rescinded by the Dodd-Frank Wall Street Reform and Consumer Protection Act.  *See* 111 P.L. 203, 939G.

defendant can be liable for.  Dkt. No. 126 at 29.  Regardless, §11 could not be more clear: Defendants are liable for "***any*** part of the registration statement" which "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. §77k(a).

Moreover, defendants' argument is belied by numerous cases holding that materially false and misleading ratings ***can*** be the basis for claims such as those here.  *See, e.g.*, *Wells Fargo*, 712 F. Supp. 2d at 973 (finding that plaintiff's allegations, "particularly the statements from Moody's and S&P's executives, are sufficient to establish an actionable misstatement with respect to the rating process").[10]  Because the ratings were false, their inclusion in the Offering Documents in turn made those materials themselves false and misleading.  As a result, defendants are liable under §§11 and 12(a)(2).

### E. The Defendants Cannot Escape Liability Under the Securities Act by Pointing to Purported "Cure" Provisions in the Offering Documents

Defendants contend that they should be immune from liability because the Offering Documents purportedly describe a process by which defective loans could be replaced, and plaintiffs never sought to replace any loans.  Dkt. No. 126 at 17-29.  Defendants assert that this is the only

---

[10]    *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 175-76 (S.D.N.Y. 2009) (denying motion to dismiss because ratings were alleged to be misleading); *CalPERS v. Moody's Corp.*, No. CGC-09-490241, Order at 4 (San Francisco Cnty. Super. Ct. June 1, 2010) (denying demurrer because ratings were alleged to be misleading) (Robbins Decl., Ex. 2); *In re Nat'l Century Fin. Enters.*, 580 F. Supp. 2d 630, 638-40 (S.D. Ohio 2008) (denying rating agency's motion to dismiss state law claims because ratings were alleged to be misleading); *Commercial Fin. Servs. v. Arthur Andersen LLP*, 94 P.3d 106, 110-14 (Okla. Ct. App. 2004) (reversing trial court's decision dismissing contribution claims by issuer against rating agency arising out of false and misleading ratings); *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071, 1085 (S.D.N.Y. 1996) (recommending denial of rating agency's motion to dismiss because ratings were alleged to be false and misleading); *In re Taxable Muni. Bond Sec. Litig.*, 1993 U.S. Dist. LEXIS 18592, at *11-*16 (E.D. La. Dec. 29, 1993) (denying rating agency's motion to dismiss contribution claims because ratings were alleged to be false and misleading).

- 22 -

"remedy" available to plaintiffs under the Offering Documents. *Id*. But this purported "cure" procedure does not insulate defendants from the strict liability provisions of the Securities Act.

Liability for a material misstatement or omission exists under §§11 and 12(a)(2) irrespective of any available remedial relief, especially where, like here, such remedial relief is purportedly available only after plaintiffs have already purchased their securities pursuant to the false offering materials. *See* 15 U.S.C. §77k (to state a claim under §11, a plaintiff need only plead that: (1) he or she purchased a registered security; and (2) the registration statement contained a material misstatement or omission). Indeed, the Securities Act specifically provides that defendants cannot insulate themselves from liability under §§11 or 12(a)(2) by including in the relevant offering materials a provision that would essentially require investors to waive their rights under the Securities Act, stating: "Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this title or of the rules and regulations of the Commission shall be void."[11] 15 U.S.C. §77n. Here, that is exactly what defendants have attempted to do.

Although defendants rely heavily on the Fifth Circuit's opinion in *Lone Star Fund V (US), LP v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010), they fail to advise the Court that *Lone Star* has been consistently rejected. In *J.P. Morgan Chase*, the court held:

> Moreover, *Lone Star* is in significant tension with the well-established rule that "individual security holders may not be forced to forego their rights under the federal securities laws due to a contract provision." *McMahan & Co. v. Wherehouse Entmt., Inc.*, 65 F.3d 1044, 1051 (2d Cir. 1995); *see also* 15 U.S.C. § 77n ("Any

---

[11] Because of the express terms of §14 of the Securities Act, "courts have been careful in securities cases to preserve the rights of private action under the securities laws." *Stratmore v. Combs*, 723 F. Supp. 458, 461-62 (N.D. Cal. 1989) (citing, *e.g.*, *Doody v. E.F. Hutton & Co.*, 587 F. Supp. 829, 833 (D. Minn. 1984) ("Since the securities laws are a remedial measure intended to encourage the prosecution of securities fraud actions, the Court refuses to enforce this indemnity provision.")), *aff'd*, 968 F.2d 810 (9th Cir. 1992).

> condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void."). Although offering documents are "complex contractual documents that must be read in their entirety to be given effect," *Lone Star*, 594 F.3d at 388, enforcing a "sole remedy" clause would vitiate the obligations imposed by Section 11 and be contrary to the anti-waiver provision of Section 14.

Order at 28.

Similarly, the court in *City of Ann Arbor Emps. Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.* held:  "[I]n the court's view, Lone Star is at odds with the anti-waiver provision of the securities laws" and, "[i]t is likely that the Second Circuit would hold that the Trust language relied upon by Defendants violates this anti-waiver provision of the 1933 Act." 2010 U.S. Dist. LEXIS 137290, at *17-*19 (S.D.N.Y. Dec. 23, 2010).

Moreover, both the *J.P. Morgan Chase* court and the *Citigroup* court held that *Lone Star* does not apply because it is factually distinguishable.  In *Lone Star*, plaintiffs "'pointed to a limited number of loans that failed to conform to the representation regarding their default status'; here, by contrast the plaintiffs claim 'widespread misrepresentations regarding the nature of the underwriting [and appraisal] practices described in the offering documents.'" *J.P. Morgan Chase*, Order at 27-28; *see Citigroup*, 2010 U.S. Dist. LEXIS 137290, at *18.  Moreover, as the *J.P. Morgan Chase* court recognized, *Lone Star* "is also difficult to square with the strict liability nature of a Section 11 claim and the absence of any requirement that a plaintiff show reliance." *J.P. Morgan Chase*, Order at 27.

Likewise, in the instant case, plaintiffs do not claim that the Trusts contain a small number of non-conforming loans.  Instead, plaintiffs claim strict liability securities laws violations in the form of widespread misrepresentations regarding the nature of the underwriting practices described in the offering documents.  ¶¶48-57.

- 24 -

Defendants' reliance on *Lone Star* should be further rejected because, as the *J.P. Morgan Chase* court recognized the "cure" mechanism is not realistically available:

> [I]t is by no means clear at this stage that the repurchase or substitution provision included in the Offering Documents sufficiently changed the nature of the representations so as to render the alleged falsehoods immaterial. The defendants concede that the Retirement System could not ***itself*** take advantage of the provision, arguing instead that the Retirement System could have combined with other investors to exercise the option. A reasonable investor might be able to conclude that this procedure would be sufficiently difficult that it should assume repurchase or substitution would not be available to it, and that the investment therefore made sense only if the issuers' representations were truthful. The "sole remedy" provision does not undercut the plaintiff's showing that the alleged misrepresentations discussed above were material.

Order at 28-29 (emphasis in original). Here, similar deficiencies in the purported "cure" provisions in the Offering Documents further dictate rejecting *Lone Star*.[12] Accordingly, defendants' assertions that the purported "cure" provision in the Offering Documents preempts plaintiffs' ability to bring claims under the Securities Act must fail.

## IV.   THE COMPLAINT ALLEGES COGNIZABLE DAMAGES AND EQUITABLE RELIEF UNDER §§11 AND 12(a)(2)

Defendants assert that plaintiffs have failed to state a claim under §§11 and 12(a)(2) because plaintiffs "do not plead a legally cognizable economic loss." Dkt. No. 126 at 31-34. In so arguing, defendants ask the Court to disregard the straightforward damage provisions of the Securities Act, which do not require the default of a debt security to state a claim.

---

[12]   Defendants' purported "cure" remedy is not realistically available to Lead Plaintiffs and is thus irrelevant. This is so because for the Trusts at issue here, such a remedy is only available to "the holders of securities of any class evidencing not less than 25% of the aggregate percentage interests." *See* Robbins Decl., Ex. 6 at 115. Trusts 2006-3, 2006-5 and 2007-4 offered billions of dollars of Certificates for sale. It is undisputed that Lead Plaintiff's Certificates constitute much less than 25% of Trust 2006-3, 2006-5 and 2007-4. *See* Certifications (Dkt. No. 56, Ex. B). Defendants' "cure" argument is a red herring.

**A.**   **The Complaint States a Cognizable Claim for Damages Under §11 by Alleging a Decline in the Value of the Certificates**

For claims asserted under §11 of the Securities Act, "[t]he plain language of section 11(e) prescribes the method of calculating damages, and the court must apply that method in every case." *McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1048 (2d Cir. 1995).  "The damage formulae in Section 11(e) relate to three different fact patterns: a plaintiff who holds the security, one who sold the security before bringing suit, and one who disposed of it after suit was filed."  *In re WorldCom, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 2215, at *10-*11 (S.D.N.Y. Feb. 18, 2005). Specifically, the statute provides:

> "The suit . . . may be to recover such damages as shall represent the **difference** between the **amount paid for the security** (not exceeding the price at which the security was offered to the public) **and** (1) the **value thereof as of the time such suit was brought, or** (2) the price at which such security shall have been disposed of in the market before suit, **or** (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages [as calculated under subsection (1), above] . . . ."

*McMahan*, 65 F.3d at 1047-48 (quoting 15 U.S.C. §77k(e)).  Under §11, a plaintiff is not required to allege loss causation or plead their exact damages to survive a motion to dismiss.  *In re Thornburg*, 683 F. Supp. 2d at 1249 ("Section 12(a)(2) liability is similar to Section 11 liability, in that '[t]he purchaser need not . . . establish . . . that his or her loss was a direct or proximate result of the misrepresentation or omission.'") (quoting *Schaffer*, 29 F. Supp. 2d at 1220 (citing *MidAmerica Fed. Sav. & Loan Ass'n*, 886 F.2d at 1256-57)); *Citigroup*, 2010 U.S. Dist. LEXIS 137290, at *14 ("Unlike claims brought pursuant to the 1934 Act, claims under the 1933 Act need allege neither scienter, reliance or loss causation.").

Interpreting the  plain language of §11, courts have routinely held that plaintiffs who retain possession of their securities need only allege a decline in the value of those securities in order to state a cognizable claim for damages under §11.  *See, e.g.*, *McMahan*, 65 F.3d at 1048 (holding that,

under §11, a "decline in market value permits plaintiffs to recover damages under the statutory scheme"); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 347, 351 n.80 (S.D.N.Y. 2003) ("*IPO II*") ("Section 11(e) sets the measure of damages for a plaintiff still holding her securities at the 'value' of those securities at the time of suit."); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 U.S. Dist. LEXIS 47512, at *12 (S.D.N.Y. Mar. 29, 2010) ("Plaintiff's alleged injury is the loss of market value.").[13]

Here, Lead Plaintiffs Maryland National ("Maryland") and Midwest Operating Engineers ("Midwest OE") continue to retain possession of Thornburg Certificates, and allege that the Certificates have suffered a decline in value.[14] ¶¶13, 79, 107, 117. Pursuant to the plain language of §11, plaintiffs have more than adequately alleged damages. *Id.*; *see* 15 U.S.C. §77(e); *Citigroup*, 2010 U.S. Dist. LEXIS 137290, at *15 ("To survive a motion to dismiss, Plaintiffs need not plead their exact damages. They must, however, plead allegations supporting some theory, as described in the statute, pursuant to which damages may be awarded.").

Defendant Banc of America Securities LLC ("BAS") seeks to expand the pleading requirements beyond those required by §11 – asserting that plaintiffs' allegations that the Certificates have suffered a decline in value are insufficient because, as to Trust 2006-5, plaintiffs have

---

[13]    *See also Alpern v. UtiliCorp United*, 84 F.3d 1525, 1541-42 (8th Cir. 1996) ("Since [plaintiff] still possesses his stock, he can recover damages under §11(e)(1) only if his purchase price was higher than the security's value 'as of the time such suit was brought.'"); *In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1194 (N.D. Ill. 2009) ("Because the stock was selling below the IPO price at the time suit was filed [plaintiff] has alleged damages."); *In re AFC Enters. Sec. Litig.*, 348 F. Supp. 2d 1363, 1380 (N.D. Ga. 2004) (upholding §11 claims asserted by plaintiff who "has not sold his stock," on basis of finding that "the first prong of 15 U.S.C. §77k(e) suggests that the Plaintiffs properly pleaded damages" by alleging a decline in the stock's value).

[14]    Maryland continues to retain possession of Trust 2006-3 and 2007-4 Certificates and Midwest OE retains possession of Trust 2006-3 and 2007-4 Certificates. *See* Certifications (Dkt. No. 56, Ex. B).

purportedly failed to establish loss causation.  Banc of America Securities LLC's Joinder in the Motion to Dismiss of the Depositor Defendants, the Individual Defendants, Credit Suisse Securities (USA) LLC, and RBS Securities Inc. ("Dkt. No. 130") at 6.  This argument ignores the established principle recognized by this Court, and numerous others, that a plaintiff asserting claims for a violation of §11 need not allege loss causation.  *Thornburg*, 683 F. Supp. 2d at 1249 ("'[t]he purchaser [under §11] need not . . . establish that . . . his or her loss was a direct or proximate result of the misrepresentation or omission'"); *Citigroup*, 2010 U.S. Dist. LEXIS 137290, at *14 ("Unlike claims brought pursuant to the 1934 Act, claims under the 1933 Act need allege neither scienter, reliance or loss causation."); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009) ("Because it is unnecessary to plead loss causation to maintain claims under Sections 11 and 12, the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion.  *In re WRT Energy*, 2005 U.S. Dist. LEXIS 18701, 2005 WL 2088406, at *2 (S.D.N.Y. Aug. 30, 2005) (vacating earlier Rule 12(b)(6) dismissal for failure to establish loss causation and observing that '[t]o conclude otherwise places a burden of pleading loss causation on the plaintiffs, and removes the burden of establishing negative causation from the defendants, where it properly lies.').").

Plaintiffs have more than sufficiently pled that, with regard to Trust 2006-5, Lead Plaintiff Midwest OE suffered a decline in value in the Certificates.  Moreover, though not required at this stage, as explained in §IV.D. *infra*, Lead Plaintiff Midwest OE's certification shows that it suffered a cognizable loss in connection with its purchase and sale of its 2006-5 Certificates.  *See* §IV.D *infra*.

Defendants' attempts to negate plaintiff's straightforward allegations that they suffered a decline in value of the Certificates resulting from defendants' misstatements and omissions fails.  ¶¶13, 79, 107, 117.  At the appropriate stage of this litigation, defendants will be given an

- 28 -

opportunity to present evidence to dispute the Complaint's allegations, but at this stage, plaintiffs'

allegations control. *See IPO II*, 241 F. Supp. 2d at 347, 351 n.80 ("the determination of value is a

fact-intensive inquiry . . . [that is] inappropriate to resolve . . . at the motion to dismiss stage"); *Giant*

*Interactive*, 643 F. Supp. 2d at 572 (denying defendants' motion to dismiss where "it cannot be said

as a matter of law that 'it is apparent from the face of the complaint that the plaintiff cannot recover

her alleged losses'").  Accepting plaintiffs' well-pled allegations as true, as the Court must at this

stage, it is clearly more than "plausible" that the Certificates have experienced a substantial decline

in value, thus stating a claim for damages pursuant to §11.

### B.    The Continued Receipt of Payments Does Not Negate Plaintiffs' Allegations Regarding the Certificates' Decline in Value

Defendants contend that plaintiffs fail to plead economic loss because they "[d]o [n]ot

[a]llege [t]hat [t]hey [h]ave [f]ailed [t]o [r]eceive [a]ny '[p]ass-[t]hrough' [d]istribution."  Dkt. No.

126 at 32-34.  This argument, however, misconstrues Section 11's damages provision.

The value of mortgage-backed securities ("MBS") turns on various factors, including the rate

of return that debt pays the certificates, the riskiness or lack thereof that investors attach to those

certificates, and the collateral which exists in the event of default.  Defendants posit that so long as a

debt instrument is ultimately repaid, an investor has suffered no harm.  This ignores the fact that, like

here, the interest rate at which holders of the Certificates were compensated was far less than what it

should have been because the loans underlying the certificates were far riskier than the Offering

Documents represented.  That the security has not defaulted and that pass-through payments

continue to be made does not alter the fact that holders of the Certificates, like plaintiffs, have been

exposed to far more risk than they bargained for when they purchased the Certificates.  The interest

rate may have been sufficient for securities which were rated AAA by the Credit Rating Agency

Defendants, the highest possible rating and equivalent to high quality corporate debt, but was

- 29 -

insufficient for these securities once the Credit Rating Agency Defendants began to rate the securities according to their actual risk profile and lowered the assigned ratings significantly.

The exact argument defendants advance here was rejected in *J.P. Morgan Chase* and *DLJ*. Both those cases too involved Securities Act claims asserted on behalf of purchasers of MBS. *J.P. Morgan Chase*, Order at 1; *DLJ*, 2010 U.S. Dist. LEXIS 47512, at *12-*16.  In both cases, defendants argued that because the plaintiff did not allege that it failed to receive any principal or interest payments due under its certificates, plaintiff failed to allege a cognizable injury. *Id.*[15] These courts rejected defendants' assertions, finding defendants' argument to be "too cramped a reading of damages." *DLJ*, 2010 U.S. Dist. LEXIS 47512, at *14; *see J.P. Morgan Chase*, Order at 30.  Both courts reasoned that "[m]any fixed-income debt securities, such as corporate bonds do not trade on national exchanges and yet institutional investors routinely purchase corporate bonds hoping to realize a profit through resale." *Id*.

Both courts then explicitly rejected defendants' damages argument, holding that because "[t]his is a securities claim, not a breach of contract case . . . [p]laintiff's market value allegations are sufficient." *DLJ*, 2010 U.S. Dist. LEXIS 47512, at *14; *J.P. Morgan Chase*, Order at 31 ("Here, the plaintiff alleges that their investment has declined in value.  This is a cognizable loss for the purpose of Section 11.").

Here, as in *J.P. Morgan Chase* and *DLJ*, plaintiffs suffered cognizable harm and have so alleged.  ¶¶13, 79, 107, 117.  Notwithstanding their receipt of interest and principal payments, the Certificates have experienced a significant decline in value as the market came to appreciate that the

---

[15]      *See also DLJ*, 2010 U.S. Dist. LEXIS 47512, at *13 ("Defendants argue that pleading market value loss is insufficient in the context of a mortgage-backed securities claim," because, "[a]ccording to [d]efendants, investors in mortgage-backed securities . . . bargain only for the repayment of principal plus interest, from the cash flows generated by the underlying mortgage loans.").

- 30 -

Certificates are far riskier than the Offering Documents represented with respect to both the timing and absolute cash flow to be received.  ¶¶13, 79.  As in both *DLJ* and *J.P. Morgan Chase*, this case "is a securities claim, not a breach of contract case."  *DLJ*, 2010 U.S. Dist. LEXIS 47512, at *14; *J.P. Morgan Chase*, Order at 30.  Accordingly, defendants' argument that plaintiffs fail to allege a legally cognizable loss fails.

### C. Defendants' Purported "Warnings" Regarding the Potential Lack of a Secondary Market for the Certificates Are Irrelevant to Plaintiffs' Allegations Regarding the Certificates' Actual Decline in Value

In a related argument, defendants assert that plaintiffs fail to plead damages because the Offering Documents warned investors that a secondary market for the Certificates "might never" exist.  Dkt. No. 126 at 32.  Defendants' argument fails.

As set forth previously, the Complaint alleges that, in fact, a market for the purchase and sale of the Certificates does exist, and that the value of the Certificates in that market has declined.  ¶¶13, 79.  A plaintiff who continues to hold its securities at the time of suit is explicitly and statutorily entitled to recover "the difference between the amount paid for the security . . . and . . . the value thereof as of the time such suit was brought."  15 U.S.C. §77k(e).  Defendants' warnings regarding the potential illiquidity of those securities does not alter the fact that the factual allegations regarding the Certificates' decline in value are all that is required at the pleading stage and state a cognizable injury under §11.  *See* §IV *supra*.  Boilerplate liquidity warnings do not prevent a plaintiff from pleading a cognizable injury under §11 where they allege a decline in the value of the securities.  *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431 (S.D.N.Y. 2003) (denying motion to dismiss §11 claims despite presence of liquidity warnings); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1162-83 (C.D. Cal. 2008) (same).

- 31 -

Defendants rely solely on *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co*., 743 F. Supp. 2d 288 (S.D.N.Y. 2010).  Dkt. No. 126 at 33.  Simply put, *Goldman* was wrongly decided.  Ignoring the statutory provisions of §11(e) with respect to damages, the *Goldman* court purports to limit plaintiff to the same type of benefit-of-the-bargain damages that the Second Circuit explicitly found to be improper in *McMahan*.  *See* 65 F.3d at 1048 ("the district court erred in ruling that plaintiffs may recover benefit-of-the-bargain damages under section 11 and that the market value was 'irrelevant to Plaintiffs' claimed economic losses'"); *DLJ*, 2010 U.S. Dist. LEXIS 47512, at *12-*14 (same).

Indeed, this same analysis was expressly rejected in *J.P. Morgan Chase* and *DLJ*, where the court found that because "'[t]his is a securities claim, not a breach of contract case," "[p]laintiff's market value allegations are sufficient." *J.P. Morgan Chase*, Order at 30; *DLJ*, 2010 U.S. Dist. LEXIS 47512, at *14.  This Court should also reject *Goldman*.

### D.    Lead Plaintiff Midwest OE Suffered a Loss from Its Purchase and Sale of the 2006-5 Certificates

Defendants assert that all allegations regarding the 2006-5 Certificates must be dismissed because Midwest OE is the only Lead Plaintiff that purchased 2006-5 Certificates and purportedly "recouped their entire investment in the 2006-5 certificates."  Dkt. No. 126 at 34.  Not so.

Defendants' argument rests on a convenient misinterpretation of Lead Plaintiff Midwest OE's Certification.  *See* Certification of Midwest OE, Dkt. No. 56, Ex. B.  Defendants completely disregard the pricing data included in the Certificates – which, when considered, confirms that Midwest OE actually has a loss of $2,548.  While defendants correctly state that on October 17, 2008 Midwest OE purchased $159,803 "face amount," they conveniently ignore the fact that such face amount was purchased at a price of $98.69, leading to a total cost to Midwest OE of $157,704.59.  Next, defendants erroneously assert that Midwest OE received $156,494 in "proceeds"

- 32 -

when the Schedule A explicitly states that this represented the "face amount" of the Certificates sold at a price of $97.03, which equals proceeds of $151,848. Based on these two misleading conclusions, defendants contend that the $3,308.39 in pass through distributions received by Midwest OE between its October 17, 2007 purchase and January 16, 2008 sale equals the difference between the purchase cost in October 2007 and the sale "proceeds" in January 2008. The fact that pass-through distributions equal exactly the difference between the face amounts is not a coincidence. Assuming no residual holdings, the face amount purchased and sold equal each other except for the amount of pass-through distributions.

As set forth in the chart below, an accurate and non-misleading review of the Schedule A shows clearly that Midwest OE suffered a loss.

| | | | | | Midwest Operating Engineering Pension Trust Fund | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Face Amount Purchased | Price | Cost | Date | Face Amount Sales/ Distributions | Price | Proceeds | Gain/Loss |
| 10/17/2007 | 159,803 | $98.69 | $157,704.59 | 10/25/2007 (Pass-thru Distribution) | 1,141 | $100.00 | $1,141.11 | $(156,563.48) |
| | | | | 11/26/2007 (Pass-thru Distribution) | 1,469 | $100.00 | $1,469.43 | $1,469.43 |
| | | | | 12/26/2007 (Pass-thru Distribution) | 698 | $100.00 | $697.85 | $697.85 |
| | | | | 01/16/2008 | 156,494 | $97.03 | $151,848.09 | $151,848.09 |
| Totals: | 159,803 | | $157,704.59 | | 159,803 | | $155,156.48 | $(2,548.11) |

On October 17, 2007, Midwest OE purchased $159,803 face amount of 2006-5 Certificates at a price of $98.69 and thus paid $157,704.59. On January 16, 2008, Midwest OE sold $156,494 face amount of the 2006-5 Certificates at a price of $97.03 ($1.66 less than the purchase price on October 17, 2007) for a total of $151,848.09. During the October 17, 2007-January 16, 2008 time period in which Midwest OE held the Certificates, it received pass through distributions totaling $3,308.39. Thus, after Midwest OE sold its 2006-5 Certificates on January 16, 2008, it had received only $155,156.48, compared to the $157,704.59 it paid for the Certificates on October 17, 2007.

- 33 -

Accordingly, Midwest OE suffered an overall loss of $2,548.11.  *Id.*  Defendants' assertion that plaintiffs "recouped their entire investment" in 2006-5 Certificates is wrong.  Plaintiffs have sufficiently pled a cognizable economic loss.

## V.   PLAINTIFFS HAVE SUFFICIENTLY ALLEGED THAT THEY HAVE STANDING TO PURSUE CLAIMS UNDER SECTION 12(a)(2)

Section 12(a)(2) defines the class of defendants who may be subject to liability.  *Pinter v. Dahl*, 486 U.S. 622, 641 (1988) (Blackmun, J.).  To **state** a §12(a)(2) claim, plaintiffs are only required to "allege that the underwriter defendants were section 12[a](2) sellers."  *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 718 (3d Cir. 1996) (noting that plaintiffs were not, as defendants argued, "required to allege which underwriter sold securities to each plaintiff"); *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1307 (N.D. Okla. 2010) (noting that a "[p]laintiff is not at the pleading stage, required to prove it purchased specific common units from specific underwriters").

### A.   The Complaint Adequately States a §12(a)(2) Claim Against the Depositor, Individual and Underwriter Defendants

Defendants do not suggest that they are not statutory sellers of the Certificates pursuant to the Prospectuses at issue here.  *See* Dkt. No. 126 at 35-38.  Nor could they.  ¶¶22-23, 25-27, 29-37, 108-118.  Defendants do not even argue that plaintiffs and the Class did not, **in fact**, purchase Certificates directly from them pursuant to the Prospectuses at issue here.  *See* Dkt. No. 126 at 35-38.[16]  Rather, defendants submit that "[p]laintiffs do not even **allege** from whom they purchased their certificates."  Dkt. No. 126 at 36 (citing ¶¶19-20, 117).  First, plaintiffs are not "required to allege which underwriter sold securities to each plaintiff" at the pleading stage.  *Westinghouse*, 90 F.3d at 718;

---

[16]    The lone exception is defendants' argument regarding the Midwest OE's purchase of the 2006-5 Certificates (Dkt. No. 126 at 37-38), which is addressed *infra* at §V.B.

*SemGroup*, 729 F. Supp. 2d at 1307 (noting that a "[p]laintiff is not, at the pleading stage, required to prove it purchased specific common units from specific underwriters").

Second, and more importantly, defendants ignore multiple paragraphs in the Complaint which undermine their argument. For example, the Complaint clearly states that the §12(a)(2) claim "is brought . . . on behalf of the plaintiffs and all members of the Class who purchased or otherwise acquired the Certificates ***pursuant to*** the Offering Documents." ¶108. This exact allegation was upheld as sufficient in *IndyMac*, 718 F. Supp. 2d at 502 (approving allegation that plaintiffs "purchased the Certificates '***pursuant to***' the relevant Offering Documents"); *Tsereteli*, 692 F. Supp. 2d at 391 (same). Notably, in approving the "pursuant to" language, the *IndyMac* court specifically noted that "[w]hile other paragraphs allege that plaintiffs purchased the Certificates 'pursuant and/or traceable to' the Offering Documents, the 'pursuant to' language appears specifically in the Section 12(2) section of the [complaint]." 718 F. Supp. 2d at 502 n.36; *see also Tsereteli*, 692 F. Supp. 2d at 391 (same). The Complaint here is in accord. *Compare* ¶1 ("pursuant and/or traceable to") *with* ¶108 ("pursuant to").

The Complaint here also alleges that "[p]ursuant to an underwriting agreement, the ***Depositor Defendants*** issued and the ***Underwriter Defendants underwrote and promoted the sale of the Certificates to plaintiffs and the Class***" and "participated in the preparation and dissemination of the false and misleading Offering Documents" – which included the Prospectuses – "***for their own financial benefit***." ¶112. This allegation is also sufficient. *IndyMac*, 718 F. Supp. 2d at 502 (noting that complaint alleged that underwriter defendants "'***promoted and sold***' the Certificates ***for their own personal gain***"). Defendants' authority concurs. *See In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2010 U.S. Dist. LEXIS 84146, at *17-*18 (S.D.N.Y. Aug. 17, 2010)

- 35 -

(finding complaint's allegation that underwriter "'acted as a broker and seller in these transactions'" sufficient to allege §12(a)(2) claim).

In addition, the Complaint further alleges that defendants "[m]ade the decision to offer the Certificates for sale to investors"; "[d]rafted, revised and/or approved the Offering Documents"; "[f]inalized the Offering Documents, and caused them to become effective"; and "[c]onceived and planned the sale of the Certificates and orchestrated all activities necessary to effect the sale of the Certificates to the investing public, by issuing the Certificates, promoting the Certificates, and supervising their distribution and ultimate sale to investors." ¶112. Moreover, plaintiffs' Certifications "specif[y] the exact security that [they] bought, and the date of purchase." *Compare* Plaintiffs' Certifications, Dkt. No. 56, Ex. B, *with Pub. Emps. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 2011 U.S. Dist. LEXIS 3267, at *25 (S.D.N.Y. Jan. 12, 2011); *IndyMac*, 718 F. Supp. 2d at 502 (noting that it was adequate for plaintiffs to allege that they "purchased a specified number of Certificates on specified dates (some of which corresponded to the initial offering dates) at specified prices"). Viewing *all* facts alleged – not just the facts selectively chosen by defendants – in plaintiffs' favor, "'[i]t cannot be said at this juncture that plaintiffs can prove no set of facts that would entitled them to relief.'" *Westinghouse*, 90 F.3d at 717; *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 776 (1st Cir. 2011) (finding dismissal of §12(a)(2) claim to be "in error" where plaintiffs used "a more ambiguous phrase – that plaintiffs 'acquired the [c]ertificates pursuant and/or traceable to' the offering documents" because complaint also alleged that plaintiffs "'acquired . . . [c]ertificates *from* defendant'" and "'[d]efendants *promoted and sold* the [c]ertificates *to* [the p]laintiffs and other members of the [c]lass'") (emphasis in original); *Citigroup*, 2010 U.S. Dist. LEXIS 137290, at *16 ("The SAC's

- 36 -

614852_1

allegations regarding the purchase of the Trusts at issue are sufficient to allege Section 12 standing.").

Despite the Complaint's sufficient §12(a)(2) allegations, defendants attempt to raise the bar and insist that plaintiffs must allege additional "facts establishing any of the defendants' 'direct and active' solicitation in connection with the 'immediate sale' of certificates to Plaintiffs." Dkt. No. 126 at 37. Essentially, defendants think plaintiffs must *prove* standing in fact at the pleading stage. As the Third Circuit recognized, however, "[w]hile these concerns might be relevant on a motion for class certification, they do not address whether, as a threshold matter, plaintiffs properly stated a section 12[a](2) claim under Rule 12(b)(6)." *Westinghouse*, 90 F.3d at 718 n.22. Thus, while it is true that plaintiffs "must allege that the underwriter defendants were section 12[a](2) sellers," as the Complaint does here, plaintiffs are *not* "required to allege which underwriter sold securities to each plaintiff." *Id.* at 718.[17]

"Taken in the light most favorable to plaintiffs," the Complaint "alleges that each of the [Depositor, Individual and Underwriter Defendants] sold [the Certificates] directly to plaintiffs [and the Class] and that each plaintiff [and Class member] purchased [the Certificates] directly from an underwriter defendant." *Westinghouse*, 90 F.3d at 718; ¶¶111-112. No more is required at this stage

---

[17]    It is notable that in so holding, the Third Circuit explained that under *Pinter* – a Supreme Court decision defendants cite (Dkt. No. 126 at 36) – it is true that "a plaintiff will not *succeed* on a section 12[a](2) claim unless the plaintiff shows, among other things, that the plaintiff bought from or was solicited by a specified statutory seller." *Westinghouse*, 90 F.3d at 718. But "Pinter reached the Supreme Court following an affirmance by the Fifth Circuit of a judgment for investors entered *after a bench trial* in the district court." *Id.* at 718 n.23. As such, "Pinter does not address what allegations are necessary to *plead* that a defendant is a seller within the meaning of the statute." *Id.* at 718. "Absent a particularity requirement, plaintiffs must provide a short and plain statement showing that the underwriter defendants are statutory sellers and that plaintiffs [and the Class] purchased securities from them." *Id.* (footnote omitted). The Complaint here does just that. ¶¶111-112.

to allege a §12(a)(2) claim.  As such, the Court should find that the Complaint adequately states a §12(a)(2) claim against the Defendants.[18]

### B.   The Complaint Adequately States a §12(a)(2) Claim Against Defendant BAS

Defendant BAS suggests that plaintiff Midwest OE's §12(a)(2) claim must be dismissed because Midwest OE purchased the 2006-5 Certificates in the "aftermarket."  Dkt. No. 130 at 4-5.  Defendant BAS conflates what is required to ultimately *prove* a claim with what is required to initially *state* a claim.

Indeed, in making its aftermarket purchaser argument, defendant BAS rests not on what is actually required by the express statutory language, but on an "indicat[ion] in dicta that only purchasers in the initial public offering could bring suit pursuant to section 12[a](2)."  *Joseph v. Wiles*, 223 F.3d 1155, 1160-61 (10th Cir. 2000) (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 571-72 (1995).  And as the court in *Feiner v. SS&C Techs., Inc.*, 47 F. Supp. 2d 250 (D. Conn. 1999), explained, the Supreme Court in *Gustafson* was drawing a distinction between types of offerings, ***not between "offerings and aftermarket purchases*.**"  *Id.* at 252.  Indeed, *Gustafson* held that "the term 'prospectus'" is 'confined to documents related to ***public*** offerings by an issuer or its controlling shareholders.'"  *Id.* at 252-53.  Thus, *Gustafson* "cannot be read to exclude aftermarket trading" as it "did not go further and address the question presented here, namely whether, within the context of a public offering, §12(2) liability attaches to only the initial distribution of securities or to certain

---

[18]     In the alternative, if the Court finds the §12(a)(2) allegations deficient in any respect, dismissal should be "without prejudice and with leave to amend."  *Westinghouse*, 90 F.3d at 719 n.25; *Wells Fargo*, 712 F. Supp. 2d at 966 (dismissing plaintiff's §12(a)(2) claim "with leave to amend").  Indeed, in one of defendants' own cases, *Merrill Lynch MBS*, 714 F. Supp. 2d at 484, the plaintiffs were allowed to amend their §12(a)(2) claims and the court subsequently found that the allegations in the amended complaint "adequately plead standing."  *Pub. Emps.' Ret. Sys. v. Merrill Lynch & Co. Inc.*, 2010 U.S. Dist. LEXIS 127211, at *12-*13 (S.D.N.Y. Dec. 1, 2010).

- 38 -

aftermarket trading as well." *Id.* at 253.  As such, the court in *Feiner* rejected the argument defendant BAS makes here and expressly held "that *§12(2) extends to aftermarket trading of a publicly offered security*, so long as that aftermarket trading occurs 'by means of a prospectus or oral communication.'" *Id.* (noting that a §12(a)(2) claim was not dependent upon *actual* delivery of a prospectus, but that "delivery of a prospectus [was] *required* under the statutory and regulatory framework").  Thus, because defendant BAS's extra-statutory gloss is not required, plaintiffs' §12(a)(2) claim should not be dismissed.

Essentially, defendant BAS is hoping to bypass the pleading stage altogether and elicit a summary judgment-type ruling that *no* plaintiff or Class member exists who could *prove* that BAS is liable to it for selling the 2006-5 Certificates via a materially false and misleading prospectus.  Dkt. No. 130 at 4-5.  Its effort in this regard is doubly flawed.  First, defendant BAS's argument is really "about the weight of evidence that is inappropriate under rule 12(b)(6)." *Lane v. Page*, 581 F. Supp. 2d 1094, 1127 (D.N.M. 2008) (Browning, J.).  And second, defendant BAS's argument highlights what appears to be a technical defect in statutory standing, *not a pleading defect*.  And as numerous courts recognize, a standing defect – particularly one that is likely curable at the class certification stage – does not require dismissal of an otherwise properly pled complaint.  For example, defendants in *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2011 U.S. Dist. LEXIS 4343 (S.D.N.Y. Jan. 18, 2011), argued, as defendant BAS does here, that a plaintiff lacked standing "because it purchased its securities on the aftermarket, and not at the initial public offering." *Id.* at *24.  The court explained that a "single class can contain plaintiffs who have section 11 claims and section 12(a)(2) claims where the same course of conduct gives rise to liability under both sections." *Id.* "Thus, *[a plaintiff] can represent class members with section 12(a)(2) claims despite the fact that it only has section 11 claims*, and Defendants' argument to the contrary has been rejected by this

- 39 -

Circuit and this District." *Id.* at \*24-\*25 (citing *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82 (2d Cir. 2004) ("[I]t is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim."); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, 2000 U.S. Dist. LEXIS 13469, at \*9 (S.D.N.Y. Sept. 20, 2000) ("Courts have repeatedly certified classes where the class representatives had not invested in all of the subject securities.")).

Indeed, the Third Circuit in *Westinghouse* reversed a district court's dismissal of a complaint alleging §12(a)(2) claims because of flaws with the same type of argument defendant BAS makes here. 90 F.3d at 719. In *Westinghouse*, the district court "found that plaintiffs were attempting to bring a class action against a proposed class of defendants 'without alleging facts which would establish standing by a plaintiff against each defendant.'" *Id.* at 718 n.22. In rejecting this finding, the Third Circuit explained that "[w]hile these concerns might be relevant on a motion for class certification, they do not address whether, as a threshold matter, plaintiffs properly stated a section 12(2) claim under Rule 12(b)(6)." *Id.* This Court's prior opinion in *Thornburg* is in accord. *See* 683 F. Supp. 2d at 1254-55 (holding at the pleading stage that "although the Plaintiffs may lack statutory standing under Sections 11 and 12(a)(2) against certain Defendants, an issue the Court does not need to resolve to establish jurisdiction, they do not lack standing under Article III such that the Court would lack subject-matter jurisdiction over these claims" and noting that problems were more of a Rule 23 nature).[19]

---

[19]     In the event the Court is persuaded by defendant BAS's argument in this regard, plaintiffs respectfully request that dismissal be without prejudice to their ability to attempt to cure any such standing defect via amendment. *See Westinghouse*, 90 F.3d at 719 n.25 ("We alternatively hold that the district court's dismissal of plaintiffs' section 12(2) claims based on plaintiffs' failure to specify which underwriters sold to each plaintiff should have been without prejudice and with leave to amend.").

- 40 -

The Complaint adequately pleads a claim that defendant BAS is liable for its violations of §12(a)(2) here.  Which members of the Class defendant BAS is ultimately liable to is a matter for another day.  Defendant BAS's motion to dismiss should be denied.

## VI.   LEAD PLAINTIFF MIDWEST OE IS ENTITLED TO THE PRESUMPTION OF RELIANCE FOR ITS PURCHASE OF THE 2006-5 CERTIFICATES

Purchasers are not required to prove reliance under §11 unless "such person acquired the security after the issuer has made generally available to its security holders ***an earnings statement covering a period of at least twelve months*** beginning after the effective date of the registration statement."  15 U.S.C. §77k(a).[20]  Defendants submit that Midwest OE is not entitled to §11's presumption of reliance for its October 17, 2007 purchase of the 2006-5 Certificates because it acquired the Certificates "after more than 12 months of distribution reports" were made available. Dkt. No. 126 at 38-39.  Defendants' creative attempts to ignore the statutory test while grafting their own suggested language onto §11 fails and their improper attempt to shift the burden of proving reliance to plaintiffs should be rejected.

Preliminarily, defendants' reliance on monthly distribution reports "requires the Court to rely upon a document outside the pleadings and to draw inferences against the non-moving party." *Lane v. Page*, 649 F. Supp. 2d 1256, 1294 (D.N.M. 2009) (Browning, J.).  As such, it is improper and cannot serve as a basis to dismiss the Complaint without first converting the motion to a summary judgment motion and affording plaintiffs "a reasonable opportunity to present all the material that is pertinent to the motion," including permitting discovery.  *See* Fed. R. Civ. P. 12(d); Fed. R. Civ. P.

---

[20]   When such an earnings statement has been made generally available, a plaintiff must prove it "acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person."  *Id.*

56(f)(2); *Price v. Philpot*, 420 F.3d 1158, 1167 (10th Cir. 2005) ("[W]hen a district court relies on material from outside the pleadings, the court converts the motion to dismiss into a motion for summary judgment.  And when such a conversion occurs, the district court 'must provide the parties with notice so that all factual allegations may be met with countervailing evidence.'").[21]

Substantively, defendants' argument fails for at least two reasons: (1) the 2006-5 Trust has *never* filed an "earning statement covering a period of at least 12 months beginning after the effective date of the registration statement" (15 U.S.C. §77k(a)); and (2) "*monthly* distribution reports" simply are *not* the equivalent of an annual earning statement.  Dkt. No. 126 at 38-39.

To qualify as an "earning statement" under §11(a), the filing must include certain information filed on Form 10-K or Form 10-Q.  *See* 17 C.F.R. §230.158(a).  While asset-backed securities are not required to file Form 10-Qs, a "modified annual report on *Form 10-K is required*." 70 Fed. Reg. 1506, 1510 (Jan. 7, 2005).  Here, the 2006-5 Trust filed two Form 10-Ks: one on April 2, 2007, and the second on July 21, 2008.  *See* Robbins Decl., Exs. 4-5.  The April 2007 Form 10-K was for the fiscal year ended December 31, 2006.  *See* Robbins Decl., Ex. 4.  But as defendants duly noted, the 2006-5 Certificates "were publicly offered on August 29, 2006."  Dkt. No. 126 at 38.  Thus, the April 2007 Form 10-K *only covered a period of four months – eight months shy of the requisite "period of at least twelve months* beginning after the effective date of the registration statement."  15 U.S.C. §77k(a).  Indeed, to qualify under §11(a), the earning statement needed to

---

[21]     While plaintiffs disagree that it is proper for the Court to take judicial notice of defendants' extraneous SEC filings on a motion to dismiss – particularly when plaintiffs' action is predicated upon defendants' materially false and misleading SEC filings – plaintiffs are aware of this Court's inclination to do so as previously articulated in *In re Thornburg Mortg., Inc.*, 2009 U.S. Dist. LEXIS 124549 (D.N.M. Dec. 21, 2009) (Browning, J.).  Thus, to the extent the Court takes judicial notice of defendants' exhibits (in particular Exs. B, M and N), plaintiffs respectfully request that the Court take counter-judicial notice of plaintiffs' Exhibits 3, 4 and 5 attached to the Robbins Decl.

cover the twelve-month period from August 29, 2006 through August 29, 2007.  *Id.*  No such

statutory "earning statement" was filed ***prior*** to the Midwest OE's purchase on October 17, 2007,

and indeed ***has never been filed***.[22]  Thus, "because [Midwest OE] purchased [the Certificates] prior

to the issuance of [the 2006-5 Trust's] earnings statements covering the twelve-month periods after

the effective dates of the registration statements, a presumption of reliance is ***automatically***

***triggered***."  *In re JDN Realty Corp. Sec. Litig.*, 182 F. Supp. 2d 1230, 1245 (N.D. Ga. 2002)

(footnote omitted).  Consequently, defendants' argument fails.

Knowing that the statutory "earning statement" was not filed ***before*** Midwest OE's purchase

(or ever), defendants argue instead that their "monthly distribution reports" on Form 10-D somehow

suffice.  Dkt. No. 126 at 38-39.  They are wrong.  ***First***, even assuming a Form 10-D "***monthly***

***distribution report***" was encompassed by the statutory definition (it is not), §11(a)'s plain terms

required defendants to file those forms for a "***period of at least twelve months***" before the burden of

proving reliance would have shifted to plaintiff.  15 U.S.C. §77k(a).[23]  Here, defendants only filed

their Form 10-Ds for a ***period of four months***, ending in January 2007 when they notified the SEC

---

[22]     Notably, not only was the July 21, 2008 Form 10-K/A filed nine months ***after*** Midwest OE's purchase, it was an amendment to the April 2007 Form 10-K that only covered four months in 2006.  *See* Robbins Decl., Ex. 5.  Moreover, the Form 10-K/A was filed for the purpose of "identif[ying] a ***material instance of noncompliance with the servicing criteria***" by Wells Fargo because Wells Fargo "did not have . . . sufficient policies and procedures to capture the information" required by the agreements.  *Id.* at 2.  Indeed, the "1122 statements for Wells Fargo Bank . . . has disclosed material noncompliance with criterion 1122(d)(3)(i)" and "[c]ertain monthly investor or remittance reports" – *i.e.*, the Form 10-Ds – "included errors in the calculation and/or the reporting of delinquencies for the pool assets."  *Id.* at 4.  As such, the Form 10-K/A confirmed that the 2006-5 Trust's SEC filings – including the Form 10-Ds – violated 17 C.F.R. §210.4-01, requiring that SEC filings not be false or misleading.  The 2006-5 Trust has not filed another SEC filing since July 21, 2008.  *See* Robbins Decl., Ex. 3.

[23]     Each of the four Forms 10-D filed with the SEC plainly state that the monthly distribution report is only for the period of a month.  *See, e.g*., Robbins Decl., Exs. 7-10 (October 10, 2006 Forms 10-D for "monthly distribution period from: August 31, 2006 to September 25, 2006").

- 43 -

of their "suspension of duty to report."  *See* Robbins Decl., Exs. 7-10.  Thus, the plain wording of the statute forecloses defendants' argument.

*Second*, a Form 10-D simply is not the §11(a) "equivalent of earnings statements typically filed by corporate entities" as defendants suggest.  Dkt. No. 126 at 38.  As the SEC explained, it adopted Form 10-D for asset-backed issuers "to act as the report for the periodic distribution information currently provided under cover of Form 8-K."  70 Fed. Reg. 1506, 1510 (Jan. 7, 2005).  Even assuming *arguendo* that a Form 8-K was similar to a Form 10-Q (it is not), "a Form 10-Q, unlike a Form 10-K, is not 'an earning statement covering a period of at least twelve months' and thus ***does not satisfy the §77k-a***)."  *In re Enron Corp. Sec., Derivative & ERISA Litig*., 258 F. Supp. 2d 576, 641 (S.D. Tex. 2003).  Indeed, the very regulations defendants rely on in support of their argument confirm as much: "A modified annual report on Form 10-K is required with two items being most important: a servicer's statement of compliance with its servicing obligations; and a report by an independent public accountant regarding compliance with particular servicing criteria."  70 Fed. Reg. 1506, 1510 (Jan. 7, 2005).  The four Form 10-Ds do not contain ***either*** of these two items.  *See, e.g.*, Robbins Decl., Exs. 7-10.  Nor do any of the Form 10-Ds "include a certification under Section 302 of the Sarbanes-Oxley Act" as is required with Form 10-K.  *Id.*  Thus, a Form 10-D simply is not the "earning statement covering a period of at least twelve months beginning after the effective date of the registration statement" required to shift the burden of proving reliance to plaintiffs.  15 U.S.C. §77k(a).

*Third*, the Form 10-Ds defendants' argument is based on contained financial information for the very loans plaintiffs allege were misrepresented in the Offering Documents (*see supra* §III.C.-D.) ***and***, as was subsequently disclosed, "included errors in the calculation and/or the reporting of delinquencies for the pool assets" in violation of 17 C.F.R. §210.4-01, which requires

- 44 -

that SEC filings not be misleading.  *See* Robbins Decl., Exs. 7-10.  Thus, even if the Court were inclined to equate four months of "monthly distribution reports" with the annual earning statement set forth in §11(a) (it should not), it is axiomatic that "[a]n earning statement that violates the SEC filing requirements should not be considered an 'earning statement' for purposes of Section 11, and should not function in a Section 11 claim to shift to the plaintiff the burden of proving reliance."  *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 293-94 (S.D.N.Y. 2003).  Indeed, "[i]t would be illogical indeed if any filing – no matter how inaccurate or misleading, and despite its perpetuation of the very misrepresentations at stake in the Section 11 claim – were sufficient to shift the burden to the plaintiffs to establish reliance on the Registration Statement."  *Id.* at 294.  In short, "Section 11(a) and the SEC rulemaking do not allow defendants to shift the reliance burden to plaintiffs where, as in this case, both the financial statements incorporated in the registration statements and subsequent earning statements are alleged to contain material accounting-related misstatements or omissions."  *In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 7322254, at *33 (C.D. Cal. Dec. 9, 2009); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 165 (S.D.N.Y. 2007) ("Such an earnings statement that violates the SEC filing requirements is incapable of shifting to plaintiff the burden to prove reliance under §11 of the '33 Act."), *aff'd in part and vacated in part on other grounds*, 574 F. 3d 29 (2d Cir. 2009); *WorldCom*, 219 F.R.D. at 293-94; *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 529 F. Supp. 2d 644, 697 (S.D. Tex. 2006).  Because defendants' Form 10-Ds were not annual earning statements and were independently materially false and misleading, they cannot shift the burden of proving reliance to plaintiffs.

And ***finally***, even if the Form 10-Ds constituted an annual earning statement that was not materially false and misleading (they do not), it is still highly doubtful that plaintiffs would be required to prove reliance.  *See Joseph*, 223 F.3d at 1160 ("This distinction centers on where the

- 45 -

misstatement or omission takes place, in the public offering or in the secondary market. Here, [plaintiff] may have purchased in the aftermarket, but the alleged deception took place in the initial offering. It does not do violence to the scope and purpose of the 1933 Act to allow [plaintiff], under these circumstances, to bring a claim under section 11.").[24]

Tellingly, defendants failed to cite *any* authority supporting their argument. As demonstrated, their argument lacks any basis in the law or the facts. Plaintiff Midwest OE *is* entitled to the presumption of reliance and defendants' motion to dismiss should be denied.

## VII.   PLAINTIFFS' CLAIMS ARE TIMELY

Defendants contend that: (i) their affirmative defense is plaintiffs' burden to plead; (ii) a reasonable investor would have filed a claim after reading non-specific articles that do not mention a single named defendant here; and (iii) the statute of repose bars plaintiffs' claims relating to the 2006-3 and 2006-5 Trusts. *See* Dkt. No. 126 at 39-49.[25] They are wrong.

---

[24]     *See also Enron*, 529 F. Supp. 2d at 697 n.81 ("'Not only does the statute provide that even when a twelve-month earning statement triggers the burden to show reliance on the registration statement, the investor need not show that she actually read the registration requirement. Where the securities at issue are sold in an open and developed market, . . . the §11 investor/claimants relied on the market price as the reflection of all public information about the company's financial condition and should be entitled to a presumption of reliance under such circumstances.'"); *WorldCom*, 219 F.R.D. at 295 ("Even after the dissemination of an earning statement, the registration statement remains among the sources of information affecting the market price of the security and, certainly in the circumstances of this case, where there was an open and developed market in WorldCom securities and no curative disclosure in the earning statement, reliance on the 2000 Registration Statement may be presumed."). And, even if plaintiffs were required to prove actual reliance (which they are not), allegations such as plaintiffs "'acquired these securities relying upon the statements . . . shown above to be untrue and/or relying upon the Registration Statements . . . and not knowing the omitted material facts'" are sufficient to allege reliance "particularly given §11's express statement that reliance may established 'without proof of the reading of the registration statement.'" *In re Wash. Mut., Inc. Sec.*, 694 F. Supp. 2d 1192, 1221 (W.D. Wash. 2009) (quoting 15 U.S.C. §77k(a)).

[25]     Section 13 of the Securities Act governs the timeliness of claims brought pursuant to §§11 and 12(a)(2) and provides, in relevant part, that "[n]o action shall be maintained . . . under [§§11 or 12(a)(2)] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. §77m. Because the

- 46 -

### A.    As an Affirmative Defense, the Statute of Limitations Is *Defendants'* Burden to Prove, Not *Plaintiffs'* Burden to Plead

"Because statutes of limitation and repose must be raised as affirmative defenses," defendants "have the burden of proof on the issue of whether plaintiff's action was timely filed." *Koch v. Shell Oil Co.*, 52 F.3d 878, 880 (10th Cir. 1995).  Importantly, a plaintiff only has the "burden of establishing a factual basis for tolling the statute" when "the dates given in the complaint make clear that the right sued upon has been extinguished." *Aldrich v. McCulloch Props.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980).

Here, defendants fail to identify a ***single*** date in the Complaint that demonstrates plaintiffs' action is untimely.  And, in fact, the Complaint expressly pleads that the §§11 and 12(a)(2) claims were "brought within one year after discovery of the untrue statements and omissions in the Offering Documents, and within three years after the Certificates were sold to plaintiffs and the members of the Class."  ¶¶105, 116.  As such, the statute of limitations defense does not compel this Court to dismiss the action as a matter of law.  *See Jones v. Bock*, 549 U.S. 199, 215 (2007) ("Whether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground, ***not*** on the nature of the ground in the abstract.") (Roberts, C.J.).

Moreover, defendants' argument that "plaintiff must plead facts concerning the '(1) the [sic] time and circumstances of the discovery of the [alleged false] statement; (2) the reasons why it was not discovered earlier (if more than one year has lapsed); and (3) the diligent efforts which plaintiff undertook in making or seeking such discovery'" has been consistently rejected for numerous

---

first complaint in this action was filed on February 27, 2009, defendants must demonstrate inquiry notice of probable wrongdoing and legal claims prior to February 27, 2008 in order for plaintiffs' claims to be barred.

614852_1

reasons.  Dkt. No. 126 at 41.  *First*, and most importantly, "nothing in the Securities Act dictates that a plaintiff plead compliance with the statute of limitations as a substantive element of his cause of action."  *Sanders v. Robinson Humphrey/American Express, Inc.*, 1985 U.S. Dist. LEXIS 16077, at *10-*11 (N.D. Ga. Sept. 12, 1985) (noting that requiring such allegations "would elevate form over substance and require dismissal of the plaintiff's section 11 and 12(2) claims based on a mere technicality"); *In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658, 677 (E.D. Tex. 2004) (noting that there is no "clause in §§77e, 77k, 77l, or 77m which shows legislative intent to require plaintiffs to plead facts 'because compliance with Section 13 is an essential element of the rights created under Sections 11 and 12(2)'" as defendants argued).

*Second*, "none of the authorities requiring plaintiffs to affirmatively plead compliance with the statute of limitations are binding on this court, and therefore are only 'persuasive' authorities."  *Elec. Data Sys.*, 305 F. Supp. 2d at 675.  Indeed, "none of these 'persuasive' authorities give the Court a persuasive reason to ignore Rule 8(a)'s requirement of a short and plain statement in favor of a heightened, fact-pleading requirement."  *Id.* (rejecting defendants' authorities because "Rule 8(a) makes no distinction between pleading requirements for 'substantive' and 'procedural' elements").  Indeed, "Rule 8(a) only requires 'fair notice'" and "does not require plaintiffs to plead every element that they must ultimately prove simply because plaintiffs carry the burden of proof."  *Id.* at 675, 677.  Consequently, "even assuming that the statute of limitations is an essential element of Plaintiffs' claim under the Securities Act, the Court [should] reject[] the argument that Plaintiffs failed to state a claim upon which relief can be granted simply because they did not affirmatively plead compliance with the statute of limitations."  *Id.* at 677.

Defendants also raised this very argument, *i.e.*, that "compliance with §13 must be affirmatively plead with specificity," in *In re Dynegy, Inc.*, 339 F. Supp. 2d 804, 834 (S.D. Tex.

2004).  Judge Lake was not persuaded, however, because, just like here, "Lead Plaintiff's 1933 claims are 'solely strict liability and negligence claims.'"  *Id*. at 835; ¶¶100, 109.  As such, "the §11 claims asserted in this action are subject to the notice pleading standard of Rule 8(a)."  *Dynegy*, 339 F. Supp. 2d at 835.  Based on this finding, Judge Lake held that plaintiff "sufficiently alleged compliance with §13 and that the defendants' argument that such pleadings are subject to a specific and demanding standard is based on authority that is not binding on this court."  *Id.* at 834.  Plaintiffs' §11 and §12(a)(2) claims give defendants fair notice.[26]  No more is required.

Even if it was plaintiffs' burden to anticipate and disprove defendants' affirmative defense (it is not), defendants acknowledge (as they must) that the original complaint filed in this action alleged that the "truth" about Thornburg's mortgage-backed securities was first revealed on February 28, 2008 – ***within the one-year statute of limitations***.  Dkt. No. 126 at 49 (quoting Original Complaint, Dkt. No. 1, Ex. A, ¶11).  Thus, defendants' own brief demonstrates the fallacy of their statute of limitations argument.

## B. Defendants' Articles Do Not Establish, as a Matter of Law, that Plaintiffs Were on Inquiry Notice Before the Original Complaint Was Filed

Defendants also contend that publicly available media reports and articles regarding relaxed industry underwriting standards, the use of Alt-A and subprime loans, and rating agency models collectively placed plaintiffs on notice of the alleged misrepresentations in the Offering Documents well before February 27, 2008.  *See* Dkt. No. 126 at 43-47.  Irrespective of the propriety of considering such a huge volume of materials outside the Complaint on a motion to dismiss,

---

[26]    If defendants truly believed plaintiffs' §11 and §12(a)(2) claims were so vague or ambiguous that they cannot reasonably prepare a response, their remedy was to file a Rule 12(e) Motion for a More Definite Statement, not seek to dismiss the Complaint.

defendants' general articles are insufficient to "overcome the especially high hurdle in establishing inquiry notice as a matter of law." *Rafton v. Rydex Series Funds*, 2011 U.S. Dist. LEXIS 707, at *28 (N.D. Cal. Jan. 5, 2011).

### 1.   The Court Should Decline to Take Judicial Notice of Articles that Are Not Referenced in the Complaint

"The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations ***within the four corners of the complaint*** after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). Yet, in asserting their statute of limitations affirmative defense, defendants urge this Court to consider facts ***outside*** the Complaint. *See, e.g.*, Dkt. No. 125-1, Exs. O-JJ. This is inappropriate on a motion to dismiss.

Indeed, if

> the affirmative defense is based upon matters outside the complaint, and is raised by a motion under Rule 12(b), then the court must consider the motion as one for summary judgment under Rule 56 in order to consider evidentiary matters outside the complaint. And, then, only if there is no genuine issue of fact as to the affirmative defense, can the court sustain the motion to dismiss.

*Miller v. Shell Oil Co.*, 345 F.2d 891, 893 (10th Cir. 1965). The Court should decline to convert the defendants' Rule 12(b)(6) motion into one under Rule 56 because the facts upon which the defendants' rely are not undisputed. *Wenneman v. Brown*, 49 F. Supp. 2d 1283, 1293 (D. Utah 1999) ("the trier of fact should determine when, and under what circumstances, the running of the statute of limitations was triggered").

For this reason as well, defendants' motion to dismiss should be denied.  *Bowman v. Cnty. of Okla.*, 1993 U.S. App. LEXIS 25028, at *5 (10th Cir. Sept. 27, 1993) (motion could only "be granted where the ***undisputed*** facts establish that the statute of limitations has expired").[27]

> ### 2.   Even If the Court Takes Judicial Notice of the Existence of Defendants' Articles, They Still Do Not Establish that the Complaint Was Untimely as a Matter of Law

While "[t]aking judicial notice of documents outside the Complaint is somewhat of a departure . . . from standard practice on motions to dismiss," it "does not change the legal standards the Court applies."  *Lane*, 649 F. Supp. 2d at 1303.  "And that entails the Court drawing all reasonable inferences in [plaintiffs'] favor as the non-moving party."  *Id.*  Under that standard and the current record, the Court should not hold ***as a matter of law*** that, after exercising reasonable diligence, plaintiffs should have uncovered sufficient facts about their claims prior to February 27, 2008.

In the Tenth Circuit, "inquiry notice . . . triggers an investor's duty to exercise reasonable diligence and . . . the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered facts underlying the alleged [violation]." *Sterlin v. Biomune Sys., Inc.*, 154 F.3d 1191, 1201 (10th Cir. 1998).  "Delaying the accrual of the one-year limitations period until this time . . . ensure[s] that plaintiffs are given the opportunity to adequately develop the facts and determine whether those facts merit bringing suit, thus giving meaning to the term 'inquiry.'"  *Id.* at 1202; *Lane*, 649 F. Supp. 2d at 1301 (same).  Ultimately, "[i]nquiry notice may be found as a matter of law ***only when uncontroverted evidence clearly***

---

[27]      If, however, this Court is inclined to consider defendants' numerous articles as previously articulated in *In re Thornburg Mortgage, Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 124549 (D.N.M. Dec. 21, 2009) (Browning, J.), plaintiffs respectfully request that the articles "should not be considered for the truth of the matters asserted therein." *Id.* at *9.

*demonstrates* when the plaintiff should have discovered the misconduct." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 427 (2d Cir. 2008); *Olcott v. Del. Flood Co.*, 76 F.3d 1538, 1549 (10th Cir. 1996) ("We remind the district court the determination of when [plaintiff] had notice of the underlying events requires an evidentiary finding. As a result, resolving the notice issue in the procedural context of a motion to dismiss is wrong."). "[W]here there are plausible inferences to be drawn in either direction, the issue of 'whether a plaintiff had sufficient facts to place it on inquiry notice is "***often inappropriate for resolution on a motion to dismiss*** under Rule 12(b)(6)."'" *Merrill Lynch MBS*, 714 F. Supp. 2d at 480 (denying defendants' motion to dismiss on the basis of statute of limitations).

"The Supreme Court has set a high bar for establishing inquiry notice as a matter of law in securities cases." *Rafton*, 2011 U.S. Dist. LEXIS 707, at *25-*26. Indeed, in *Merck & Co. v. Reynolds*, __ U.S. __, 130 S. Ct. 1784 (2010) (Breyer, J.), the Supreme Court ruled that the limitations period does not begin to run until "a reasonably diligent plaintiff would have discovered 'the facts constituting the violation.'" *Id.* at 1798; *Sterlin*, 154 F.3d at 1199 ("when the plaintiffs could not have reasonably discovered the facts underlying the alleged fraud until some period after they were put on inquiry notice, the limitations period should not begin to run upon inquiry notice"); *Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 104 (2d Cir. 2003) ("It makes little sense from a policy perspective to require specific factual allegations – on pain of dismissal in cases of this sort – and then to punish the pleader for waiting until the appropriate factual information can be gathered by dismissing the complaint as time barred."). ***Defendants failed to even acknowledge Merck's existence***.

This omission is significant, as the Supreme Court "was critical of the use of 'inquiry notice' as a basis for determining when a reasonably diligent plaintiff should have discovered the facts

constituting a violation." *Merrill Lynch MBS*, 714 F. Supp. 2d at 480 (citing *Merck*, 130 S. Ct. 1784).  Moreover, after defendants' brief was filed, the Second Circuit articulated what the "facts constituting the violation" means: "the reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 2011 U.S. App. LEXIS 3813, at *12 (2d Cir. Feb. 28, 2011).  And although no circuit court has yet "had occasion to determine whether *Merck* requires a change in how the Circuit interprets Section 13 of the 1933 Act, ***Merck, if anything, favors the plaintiffs here***." *Merrill Lynch MBS*, 714 F. Supp. 2d at 480 (noting that "in *Merck*, the [Supreme] Court rejected arguments of the defendants quite similar to the arguments made by defendants here").

Rather than concede that the action was timely filed (as their own brief seems to acknowledge), defendants attempt to distract the Court with a dozen bullet points about generalized information from sources like Credit Suisse's website, *CNNMoney.com*, *Kiplinger.com*, the *Fresno Bee*, *National Mortgage News*, *Mortgage Banking*, *American Banker*, and one of (former) Attorney General Andrew M. Cuomo's press releases.  *See* Dkt. No. 126 at 43-47 nn.38-55.  Even ignoring whether all of these sources are "widely available" (and they certainly do not appear to be), ***not one is pled, or even alluded to, in the Complaint***.  "Although Defendants point to a number of publicly available documents generally related to the weakening and outright disregard for underwriting guidelines by subprime originators, ***this information alone does not 'relate directly' to the misrepresentations and omissions alleged in the [Complaint]***." *Goldman Sachs*, 2011 U.S. Dist. LEXIS 3267, at *26-*27; *Rafton*, 2011 U.S. Dist. LEXIS 707, at *27 (same); *Wells Fargo*, 712 F. Supp. 2d at 966-67 (same); *Royal Bank*, 720 F. Supp. 2d at 267 (same).  Moreover, "***[n]one of the articles are directly related to the [Thornburg Mortgage] issuing trusts***; rather, they related to the

- 53 -

mortgage originators whose loans comprised the pools out of which the Certificates at issue were created." *Id.*; *Rafton*, 2011 U.S. Dist. LEXIS 707, at *27 (noting that the "articles did not discuss the specific Fund at issue"); *J.P. Morgan Chase*, Order at 12 n.2 (nothing that defendants withdraw their statute of limitation argument in light of *MBIA*).

Ultimately, the "question of whether this press coverage was sufficient to put a reasonable investor on notice of his claims . . . is a factual question not appropriate for resolution on a motion to dismiss." *Wells Fargo*, 712 F. Supp. 2d at 967; *Lane*, 649 F. Supp. 2d at 1303-04.  Indeed, a securities "complaint should be dismissed on statute of limitations grounds ***only if*** notice to the plaintiff is the 'inference most naturally derived' from the allegations ***in the complaint***." *Wells Fargo*, 712 F. Supp. 2d at 967; *Thornburg*, 683 F. Supp. 2d at 1247 (court is to "draw all reasonable inferences in the plaintiff's favor" on a motion to dismiss).  "In this case, the inference urged by defendants is not necessarily the most natural one; indeed the news articles themselves give rise to competing inferences." *Wells Fargo*, 712 F. Supp. 2d at 967.  "As plaintiffs point out, several of the news articles cited by defendants contain assurances from banks and rating agencies as to the quality of mortgage-backed securities." *Compare id.* (referencing statements in May 16, 2007 *Financial Times* article) *with* Dkt. No. 125-1, Ex. JJ (same article discussed in *Wells Fargo*).  Moreover, as defendants themselves argue, plaintiffs continued to receive regular distributions at the same time defendants claim  plaintiffs were on notice of these purportedly false statements.  As such, the Court should not "conclude that this press coverage put plaintiffs on notice of their claims as a matter of law." *Wells Fargo*, 712 F. Supp. 2d at 967.[28]

---

[28]    *See also Staehr*, 547 F.3d at 426-33 ("[b]ecause nearly all of the stories in the record are ***devoid of company-specific information***, the argument that they constitute 'storm warnings' is far from compelling" and "[t]he news reports in the record were insufficient to give a reasonable investor notice of a probability that they might have been defrauded"); *Royal Bank*, 720 F. Supp. 2d at 267 (holding that defendants'

Further cutting against defendants' argument is the fact that, as previously discussed herein (*supra* §VI. n.22), the Form 10-K/A for the 2006-5 Trust filed on July 21, 2008 "identifie[d] a **material instance of noncompliance with the servicing criteria**" by Wells Fargo because Wells Fargo "did not have . . . sufficient policies and procedures to capture the information" required by the agreements. Robbins Decl., Ex. 5 at 4. Indeed, the "1122 statements for Wells Fargo Bank . . . has disclosed material noncompliance with criterion 1122(d)(3)(i)" and "[c]ertain monthly investor or remittance reports" – *i.e.*, the Form 10-Ds – "included errors in the calculation and/or the reporting of delinquencies for the pool assets." *Id.* Plaintiffs' initial complaint filed on February 27, 2009 was filed well in advance of the expiration of the one-year limitations period following the filing of this report (*i.e.*, July 21, 2009).[29]

"A plaintiff is on inquiry notice 'when the circumstances would suggest to an investor of ordinary intelligence the probability' that he or she has a claim." *Pub. Emps. Ret. Sys. of Miss.*, 2011 U.S. LEXIS 3267, at *27. Defendants' myriad non-specific articles do not demonstrate, *as a matter of law*, "that Plaintiff[s] should have been on notice as of February [27], 2008 of the alleged misstatement or omissions." *Id.* As such, the Complaint should not be dismissed as untimely.

---

argument based on "publicly available documents generally related to the weakening and outright disregard for underwriting guidelines by subprime originators" provided "insufficient information . . . to determine that Plaintiffs' claims are time-barred as a matter of law"); *Mass. Bricklayers & Masons Funds v. Deutsche Alt -A Sec.*, 2010 U.S. Dist. LEXIS 33976, at *3 (E.D.N.Y. Apr. 6, 2010) (denying motion to dismiss on statute of limitations grounds because "[q]uestions of fact regarding circumstances of discovery of allegedly false information preclude the entry of judgment at this stage of the proceedings"); *Merrill Lynch MBS*, 714 F. Supp. at 480 (rejecting similar argument based on the court's holding that "where there are plausible inferences to be drawn in either direction, the issue of 'whether a plaintiff had sufficient facts to place it on inquiry notice is "often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)"'"); *IndyMac*, 718 F. Supp. 2d at 505 (court was unable to "conclude as a matter of law that the publicly available information was sufficiently specific to put the plaintiffs on actual or inquiry notice that a cause of action was probable").

[29]     If granted leave to amend, plaintiffs can plead this fact in an amended complaint.

### C.      The Claims Relating to the 2006-3 and 2006-5 Trusts Are Also Timely

Hoping to use plaintiffs' timely pleading as both a shield and a sword, defendants argue that Lead Plaintiffs cannot assert claims on behalf of purchasers of the 2006-3 and 2006-5 Certificates because the named plaintiff on the initial complaint (Genesee County Employees' Retirement System) did not purchase those same Certificates.  *See* Dkt. No. 126 at 47-49.  Not so.

As defendants recognized, the initial complaint alleging violations of §§11, 12(a)(2) and 15 on behalf of purchasers of the 2006-2, *2006-3*, 2006-4, *2006-5*, 2006-6, 2007-1, 2007-2, 2007-3, 2007-4 and 2007-5 Certificates was timely filed.  *See* Dkt. No. 126 at 49 (acknowledging that the initial complaint pled that the "truth" was revealed on February 28, 2008); Dkt. No. 1, Ex. A. Because the initial complaint was timely, under principles of *American Pipe* tolling, it is axiomatic that the amended complaint (which contains the exact same claims) is also timely.

In *Am. Pipe and Constr. Co. v. Utah*, 414 U.S. 538 (1974) (Stewart, J.), the Supreme Court held, in no uncertain terms, that "***the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class*** who would have been parties had the suit been permitted to continue as a class action." *Id.* at 554.  A "contrary rule allowing participation only by those potential members of the class who had earlier filed motions to intervene in the suit would deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure." *Id.* at 553.[30]  Moreover, the

---

[30]      Defendants' argument overlooks the fact that the PSLRA expressly contemplates that investors may not immediately file complaints, but rather will wait until the expiration of the 60-day waiting period following publication of the mandatory "[e]arly notice to class members" to file a lead plaintiff motion. *See* 15 U.S.C. §77z-1(a)(3)(A); S. Rep. No. 104-98, at 10 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 689 (noting that PSLRA was enacted, in part, to eliminate the "race to the courthouse to be the first to file the complaint"). Here, the statutory notice was published on April 27, 2009, and Lead Plaintiffs timely filed their motion on June 26, 2009. *See* Dkt. Nos. 55-56.  And, Lead Plaintiffs' motion was not granted until February 26, 2010. *See* Dkt. No. 83.  It would be a perverse application of the statute of limitations indeed, in a case

policies of ensuring essential fairness to defendants and of barring a plaintiff who "has slept on his rights," are satisfied when, as here, a named plaintiff who is found to be representative of a class commences a suit and thereby *notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment*.

*Id.* at 554-55. This is so because "[w]ithin the period set by the statute of limitations, the defendants have the essential information necessary to determine both the subject matter and size of the prospective litigation, whether the actual trial is conducted in the form of a class action, as a joint suit, or as a principal suit with additional intervenors." *Id.*[31] Notably, *defendants' brief does not mention the U.S. Supreme Court's decision in American Pipe at all*.

This omission is not surprising because *American Pipe* tolling undermines defendants' argument. Indeed, in accordance with *American Pipe*, the statute of limitations applicable to the

---

like this that is subject to the PSLRA's requirements, to bar a properly appointed lead plaintiff from subsequently filing a more detailed and comprehensive amended complaint that directly relates to the original complaint. *See* S. Rep. No. 104-98, at 11 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 690 (noting that, under the "race to the courthouse" system, "no deference [was] given to the most thoroughly researched complaint").

[31] Defendants' suggestion (*see* Dkt. No. 126 at 47) that the December 10, 2010 filing date of the *Amended* Complaint should be used to assess their statute of limitations/repose argument instead of the February 28, 2009 filing date of the *Initial* Complaint is unpersuasive. *See In re Ambac Fin. Grp., Inc.*, 693 F. Supp. 2d 241, 276 n.41 (S.D.N.Y. 2010) (noting that the "relevant date for statute of limitations purposes is the day on which *any* plaintiff in this consolidated action *first filed a complaint* asserting claims relating to the [relevant] Offering"). Moreover, the "Federal Rules of Civil Procedure state that an amended pleading relates back when '[t]he claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrences set forth or attempted to be set forth in the original pleading.'" *Royal Bank*, 720 F. Supp. 2d at 266-67 (quoting Fed.R.Civ.P. 15(c)(2)). Indeed, an "amended pleading will relate back if 'adequate notice of the matters raised in the amended pleadings has been given to the opposing party within the statute of limitations by the general facts situation alleged in the original pleading.'" *Id.* (noting that "[w]here no new cause of action is alleged, relation back under Rule 15 is to be liberally granted"). Here, the Amended Complaint alleges the same §§11, 12(a)(2) and 15 claims against the same defendants for purchases in the same trusts identified in the original complaint. The Amended Complaint also "shares the same core factual allegations contained in the initial, state court complaint with regard to the central issues of the claim: misstatements about the underwriting guidelines, conflicts of interest with the rating agencies, and outdated credit rating models." *Id.* As such, defendants had adequate notice of the nature of this action. *Id.*

claims asserted by Lead Plaintiffs in the Amended Complaint was tolled by the filing of Genesee County's original complaint which asserted claims on behalf of all persons who purchased or acquired Thornburg Certificates from 10 public offerings of mortgage based securities, including those from Thornburg Trusts 2006-3 and 2006-5.  *See* Dkt. No. 1, Ex. A at 1, 10.  As in *American Pipe*, Lead Plaintiffs were part of the "asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  *Id.* at 554.  As such, they were not only permitted but "***encouraged*** to remain passive during the early stages of the class action and to 'rely on the named plaintiffs to press their claims.'"  *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 31 (S.D.N.Y. 2002) (citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 352-53 (1983) (Blackmun, J.); *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 203 (S.D.N.Y. 1992) ("The *American Pipe* tolling rule allows putative class members to wait on the sidelines, rather than forcing them to congest the courts with defensively filed suits designed solely to guarantee that such plaintiff's claims are not arbitrarily precluded by the running of a statute of limitations.").  Moreover, as in *American Pipe*, the purposes underlying §13 – "ensuring essential fairness to defendants and [] barring a plaintiff who 'has slept on his rights'" – were satisfied by the timely filing of Genesee County's original complaint, which provided defendants with explicit notice of "the essential information necessary to determine both the subject matter and size of the [new plaintiffs' claims]."  414 U.S. at 554-55.

The "concerns about repose, inefficiency, and wasteful litigation" are "inapposite where, as here, there never has been a definitive class certification determination" that Genesee County lacked

standing. *IndyMac*, 718 F. Supp. 2d at 504. Nor have any of the claims been dismissed.[32] This is

significant, because "[s]everal courts have held that *American Pipe* is appropriately applied to

motions to intervene or amended complaints filed to substitute a proper class representative with

standing ***prior*** to a [final] decision on class certification." *Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*,

2002 U.S. Dist. LEXIS 27189, at *89 (D.N.J. June 26, 2002), *aff'd*, 394 F.3d 126 (3d Cir. 2004); *In*

*re Initial Pub. Offering Sec. Litig*, 2004 U.S. Dist. LEXIS 26000, at *21 (S.D.N.Y. Dec. 28, 2004)

("tolling the applicable statute of limitations . . . where class counsel mistakenly believed that [lead

plaintiff] had standing to assert his claims, and no prejudice to the defendants will result from

allowing the substitution of qualified lead plaintiffs, best satisfies the goals of *American Pipe*");

*Trief*, 144 F.R.D. at 203 (finding that an intervening class representative seeking to cure potential

standing deficiencies raised by defendants "is the type of plaintiff that the *American Pipe* tolling rule

is designed to protect").[33] Thus, because there has been no judicial determination either defining the

---

[32]     Defendants' authorities are distinguishable. Unlike here, in *DLJ*, the claims sought to be added were ***not*** alleged in the initial complaint. *See* 2010 U.S. Dist. LEXIS 136142, at *6-*7. *Wells Fargo* is also inapposite because a plaintiff with standing did not attempt to intervene until ***after*** the court dismissed the complaint. *In re Wells Fargo Mortg.-Backed Certificates Litig.*, 2010 U.S. Dist. LEXIS 124498, at *12-*14 (N.D. Cal. Oct. 19, 2010). Thus, neither case is analogous to the situation here.

[33]     In addition, the relation back "doctrine is appealing in the present case because the result of the proposed intervention is easily analogized to an amendment for which relation back would be appropriate." *N.J. Carpenters HealthFund v. Residential Capital*, 2010 U.S. Dist. LEXIS 135261, at *20 (S.D.N.Y. Dec. 22, 2010). In the alternative, the Court can defer the ruling on the issue of standing to the class certification stage. *See Residential Capital*, 2010 U.S. Dist. LEXIS 135261, at *20-*21 (noting the "growing consensus among district courts in this circuit that, where the answer to standing challenges could depend upon the outcome of a class certification motion, such challenges may be deferred until after a decision on class certification") (citing *Blessing v. Sirius XM Radio Inc*., 2010 U.S. Dist. LEXIS 122076, at *12-*15 (S.D.N.Y. Nov. 17, 2010) (collecting cases); *La Pietra v. RREEF Am., L.L.C*., 738 F. Supp. 2d 432, 439 n.1 (S.D.N.Y. 2010) (same). Indeed, "[d]efendants here will retain their rights to bring standing challenges upon resolution of the class certification process, and those challenges are more properly resolved at that point when the full scope of parties can be ascertained." 2010 U.S. Dist. LEXIS 135261, at *21; *La Pietra*, 738 F. Supp. 2d at 439 n.1 (allowing claims to continue in anticipation of class certification decision despite fact that original plaintiff's allegedly had not purchased them and lacked standing to sue on them).

scope of the class or the claims, *American Pipe* tolling is available and appropriate for the Lead

Plaintiffs' claims relating to the 2006-3 and 2006-5 Trusts.[34]

     "Since the imposition of a time bar would not in this circumstance promote the purposes of

the statute of limitations, the tolling rule" established by *American Pipe* "is consistent both with the

procedures of Rule 23 and with the proper function of the limitations statute."  414 U.S. at 555.

Thus, defendants' arguments do not support dismissal of the Complaint.

## VIII.  PLAINTIFFS' COMPLAINT ADEQUATELY STATES A CONTROL PERSON CLAIM

     "'To state a prima facie case of control person liability, the plaintiff must establish (1) a

primary violation of the securities laws, and (2) "control" over the primary violator of the alleged

controlling person.'" *Adams v. Kinder-Morgan, Inc*., 340 F.3d 1083, 1107 (10th Cir. 2003) (internal

quotation marks omitted); *Lane*, 649 F. Supp. 2d at 1272.[35]  Importantly, the Tenth Circuit has

---

[34]    This is particularly true where, as here, the question of standing is a relatively novel and unresolved one. *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 4240, at *6-*7 (S.D.N.Y. Mar. 19, 2004) (finding purchasers of one type of debt security had standing to pursue claims on behalf of purchasers of a second type of debt security issued pursuant to the same registration statement); *Countrywide*, 588 F. Supp. 2d at 1165 (finding §11 standing for all offerings pursuant to an "initial shelf registration statement contain[ing] an actionable statement or omission that is common to more than one issuance"); *In re Fleming Cos. Sec. & Derivative Litig.*, 2004 U.S. Dist. LEXIS 26488, at *153 (E.D. Tex. Jun. 10, 2004) ("[C]ase law holds that purchasers of one type of security have ***standing*** to sue on behalf of purchasers of other types of security issued pursuant to a single registration statement.") (emphasis in original); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 911 (D.N.J. 1998) (finding §11 standing for stock purchasers to represent note purchasers where the different types of securities were both issued pursuant to the same registration statement).

[35]    Section 15 provides that:

    [e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12 shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable.

- 60 -

"expressly 'reject[ed] those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation.'"  *Maher*, 144 F.3d at 1305.  Instead, "once the plaintiff establishes the *prima facie* case, the burden shifts to the defendant to show lack of culpable participation or knowledge."  *Id.* at 1306.

"The first element is fairly straightforward."  *Thornburg*, 683 F. Supp. 2d at 1251.  Indeed, because plaintiffs' Complaint states actionable §11 and §12(a)(2) claims, the first element is satisfied here.  *See supra*, §III.

"The second element of the *prima facie* case" under §15 "requires that the plaintiffs plead facts from which it can be ***reasonably inferred*** . . . that the . . . defendants were control persons." *Adams*, 340 F.3d at 1108.  In this regard, the "Tenth Circuit observed that [§15] 'has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a controlling person liable.'"  *Lane*, 649 F. Supp. 2d at 1306 (quoting *Richardson v. MacArthur*, 451 F.2d 35, 41 (10th Cir. 1971)).  Notably, as defendants' own authority recognizes, "[g]iven the 'highly factual nature' of the control person inquiry, resolving that issue on a motion to dismiss is often inappropriate."  *Nomura*, 632 F.3d at 776.

As with the first element of the §15 claim, the Complaint here alleges facts from which it can "reasonably be inferred" that the Individual Defendants and RBS were control persons.  *Adams*, 340 F.3d at 1108.  Indeed, the Complaint alleges that each of the Individual Defendants signed the relevant Registration Statements and was a high-level executive and/or director of the Depositor Defendants.  ¶¶29-38.  As such, "their signatures enabled [the Depositor Defendants'] participation

---

15 U.S.C. §77o.  "Section 15 is a 'control person' provision, similar to Section 20(a) of the Exchange Act." *Thornburg*, 683 F. Supp. 2d at 1251.  Thus, "[a]lthough worded differently, the control person provision of §15 and 20(a) are interpreted the same." (quoting *Maher v. Durango Metals*, 144 F.3d 1302, 1305 n.7 (10th Cir. 1998)).

in the allegedly unlawful conduct." *J.P. Morgan Chase*, Order at 34.  These facts are sufficient to state a §15 claim at this stage.  *See, e.g.*, *Id.*; *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 495 (S.D.N.Y. 2010) (denying motion to dismiss §15 claim where complaint sufficiently alleged that Individual Defendants "were the company's officers or directors and signed the registration statements").[36]

Furthermore, the charging allegations also state that each of the Individual Defendants "had the power and authority to cause, and in fact did cause, the Depositor Defendants to engage in the wrongful conduct complained of herein."  ¶123.  These additional allegations sufficiently state a claim at this stage.  *See Wells Fargo*., 712 F. Supp. 2d 958 (finding complaint's allegations that "[e]ach of the Individual Defendants and Wells Fargo Bank  had the power and influence, and exercised that power and influence, to cause the Depositor to engage in violations of the Securities Act" sufficient to state a §15 claim at the motion to dismiss stage).  Indeed, "[i]t is certainly 'plausible' that high level officers (like the [Individual Defendants]) who signed the Registration Statements were in a position to exercise control over the [filing of the Registration Statement] and its disclosures."  *Rafton*, 2011 U.S. Dist. LEXIS 707, at *32-*33 (denying motion to dismiss §15 claims); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 550 (N.D. Cal. 2009) (same).  No more is required.  *See Adams*, 340 F.3d at 1108 (requiring facts permitting a "reasonabl[e] infer[ence]" of control); *Lane*, 649 F. Supp. 2d at 1307 (a plaintiff need only plead "the potential to control general corporate matters and not the actual exercise of that control").

---

[36]     *See also Goldman Sachs Grp.*, 2011 U.S. Dist. LEXIS 3267, at *35 (same); *In re Am. Int'l Grp.*, 2010 U.S. Dist. LEXIS 101263, at *69-*70 (S.D.N.Y. Sept. 27, 2010) (same); *Bauer v. Prudential Fin., Inc.*, 2010 U.S. Dist. LEXIS 64384, at *40-*41 (D.N.J. June 29, 2010) (same); *In re Citigroup Bond Litig.*, 723 F. Supp. 2d 568, 595 (S.D.N.Y. 2010) (same); *Royal Bank*, 720 F. Supp. 2d at 272 (same); *Ambac*, 693 F. Supp. 2d at 281 (same).

With respect to RBS, the Complaint alleges that:

- RBS created Depositor Defendant GCA as its Special Purpose Entity ("SPE") for the Certificates;

- revenue from the Depositor Defendant GCA's securitizations inured exclusively to RBS's benefit;

- statements in RBS's SEC filings show control through comprehensive involvement with the Depositor Defendant GCA's operations;

- RBS directly participated in Depositor Defendant GCA's issuance of the Certificates, including prominently featuring "Greenwich Capital Markets" on the front page of the Prospectus and Prospectus Supplement for Series 2006-3; and

- Individual Defendants from Depositor Defendant GCA at the same time served as high level executives at GCM, including Chief Financial Officer and Managing Director Mathis, Manager, Director and Head of Consumer Finance McGinnis, and Managing Director Walsh.

¶122.  Virtually identical allegations state a claim in *Merrill Lynch*, 2010 U.S. Dist. LEXIS 127211, because they detailed a "closer connection between [the underwriter bank] and [its depositor subsidiary]" and "suggest that [the underwriter bank] exercised greater control over the [depositor subsidiary] than that inherent in a typical parent-subsidiary relationship." *Id.* at *14-*15; *contra Residential Capital, LLC*, 2010 U.S. Dist. LEXIS 32058, at *28 ("The allegations here are insufficient to hold underwriters that are ***distinct***, ***non-subsidiary banks*** liable as control persons of the Residential Capital companies that securitized and issued the RALI Securities.").

Coupled with the underlying securities violations plaintiffs have sufficiently pled, and the showing of potential control, plaintiffs have sufficiently pled their §15 claim.  As such, the defendants' motion to dismiss should be denied.

## IX.   THE COMPLAINT ADEQUATELY STATES A CLAIM UNDER THE N.M. SECURITIES ACT

Defendants argue that the Complaint should be dismissed because "[p]laintiffs do not allege that they purchased their certificates, or were offered the certificates, in New Mexico." Dkt. No. 126

- 63 -

at 53. But, the New Mexico Securities Act does not require plaintiff to plead such facts. Indeed, the New Mexico Securities Act applies to securities transactions "in the state." N.M. Stat. Ann. §58-13B-54.A.(1). Importantly, "an offer to sell" is "made" in New Mexico, "*whether or not either party is present in this state if the offer . . . originates in the state*." N.M. Stat. Ann. §58-13B-54.C.(1).

Here, the Complaint unquestionably alleges that "[m]any of the acts and conduct complained of herein occurred in substantial part in this District." ¶16. Specifically, "TMST, formerly known as Thornburg Mortgage, Inc., and TMHL were headquartered in New Mexico." *Id.* "In addition, defendants conduct business in this District." *Id.* Furthermore, as this Court is well-aware, prior to declaring bankruptcy, Thornburg and TMHL "purchased and originated first lien residential mortgage loans primarily for securitization" from its headquarters in Santa Fe, New Mexico. ¶18; *Thornburg*, 695 F. Supp. 2d at 1173 ("TMI was formed under the laws of the State of Maryland, and has its principal place of business in Santa Fe, New Mexico."). And, the Offering Documents stated that Thornburg acquired the loans contained in the Trusts by originating the loans itself, through Thornburg correspondents and/or via bulk purchases. ¶¶46, 52 (noting that Thornburg and its correspondents originated 82.6%, 26.3% and 100% of the loans in the 2006-3, 2006-5 and 2007-4 Trusts, respectively). As such, there can be no real dispute that both the underlying Thornburg loans and the Thornburg Certificates (which bundled and securitized many of those loans) "originated" in and were "offered" from this State.

Notably, in making this argument, defendants ignored Judge Parker's decision holding that plaintiff's allegations that "an offer to sell was made in New Mexico because [the corporation's] principal place of business is in New Mexico and because a substantial portion of its business including the 'acts and transactions complained of' occurred in New Mexico" were "sufficient to

defeat" defendants' "Rule 12(b)(6) motion to dismiss." *Greene v. Horizon/CMS Healthcare Corp.*, 1998 U.S. Dist. LEXIS 12254, at *23-*24 (D.N.M. July 13, 1998). In so holding, Judge Parker specifically noted that "[t]hese allegations meet the requirements of Section 58-13B-54(C) *regardless* of where Plaintiffs reside." *Id.* at *24 (noting that "[d]efendants may renew this argument in a Rule 56 motion if, after discovery, undisputed evidence shows that the offer to sell was not made in New Mexico").[37] Because the Complaint here contains the requisite jurisdictional statement demonstrating that the N.M. Securities Act applies, the motion to dismiss should be denied.

Defendants' citation to cases from Wisconsin, New York and Florida to guide this Court's decision on the parameters of a New Mexico statute do not counsel otherwise. *See* Dkt. No. 126 at 53 n.57. For example, not only was *Calnin v. Hilliard*, 2008 WL 336892, at *10 (E.D. Wis. Feb. 5, 2008) a decision at summary judgment *after* discovery had been conducted – not a pre-discovery motion to dismiss – the Wisconsin statute discussed in *Calnin* contained entirely different language from the language used in the N.M. statute. *Compare* Wis. Stat. §551.66 *with* N.M. Stat. Ann. §58-13B-54.C.(1).[38] In granting summary judgment on the Wisconsin statute, the court noted that

---

[37]     The Defendants' citation to "*Murken v. Solv-Ex Corp.*, 1997 WL 34605217 (**D.N.M.** Aug. 19, 1997)" is incorrect. First, *Murken* was an agreed-to form-of-order signed by Judge Conway in the **Second Judicial District Court for Bernalillo County**, **not the District of New Mexico**. *Id.* And second, Judge Conway granted plaintiff leave to amend his complaint to add language indicating subject matter jurisdiction, *i.e.*, that the securities were prepared in and offered from New Mexico. *Id.* Thus, even if the Court finds that the Complaint does not adequately state that the Thornburg securities originated in and/or were offered from New Mexico, *Murken* indicates that the Court should grant plaintiff leave to amend to cure this minor jurisdictional defect. *Id.*; *Lane*, 649 F. Supp. 2d at 1263 (granting plaintiff "ten days to seek leave to amend" to cure a "relatively technical" deficiency).

[38]     The language from the Wisconsin statute in effect at the time *Calnin* was decided stated: "The provisions of this chapter concerning sales and offers to sell apply when a sale or offer to sell is made in this state or when an offer to purchase is made and accepted in this state. The provisions concerning purchases and offers to purchase apply when a purchase or offer to purchase is made in this state or an offer to sell is made and accepted in this state." 2008 WL 336892, at *9. The N.M. Securities Act contains altogether different language. *See* N.M. Stat. Ann. §58-13B-54.C.(1).

- 65 -

"plaintiffs failed to present *any evidence* sufficient to establish that there was *any relevant contact* between the State of Wisconsin and [plaintiffs'] transactions." *Id*.[39]  Unlike the plaintiffs in *Calnin*, *Johnston*, and *Allen*, the Complaint here *does* allege facts establishing the requisite contact required under the relevant New Mexico Statute.  *See* ¶¶16, 18, 46, 52.  *See generally Greene*, 1998 U.S. Dist. LEXIS 12254, at *31 (upholding both federal and N.M. securities claims based upon the same set of underlying facts).

Finally, as previously discussed, plaintiffs' N.M. Securities Act claims relating to the 2006-3 and 2006-5 Offerings are timely.  *See supra* §VII.C.  None of defendants' challenges to the N.M. Securities Act claims are well-grounded.  As such, defendants' motion to dismiss should be denied.

## X.    CONCLUSION

The federal securities laws and the New Mexico Securities Act do not allow defendants to make materially false and misleading statements in Offering Documents for the sale of billions of

---

[39]    *See also Johnston v. Norton*, 1993 WL 465333, at *23 (S.D.N.Y. Nov. 10, 1993) (dismissing complaint because "[p]laintiffs must demonstrate that an offer or purchase or sale occurred in New Jersey. Not only do they fail to do this, *they allege nothing refuting* the general partner defendants' assertion that the offer and acceptance of the Partnership units took place directly between the limited partner investors (none of whom reside in New Jersey) and the general partner defendants (residents of Connecticut and Long Island), outside the state of New Jersey"); *Allen v. Oakbrook Sec. Corp*., 763 So. 2d 1099, 1100 (Fla. Dist. Ct. App. 1999) (dismissing complaint because "it is *undisputed* that the sales of the securities involved were not made in Florida").

dollars of MBS and hide behind meritless arguments. The Complaint appropriately puts them on notice of their misdeeds. No more is required. Defendants' motions to dismiss should be denied.[40]

DATED: March 30, 2011                      Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
JONAH H. GOLDSTEIN
DANIELLE S. MYERS


_____
            s/ DARREN J. ROBBINS
            DARREN J. ROBBINS

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

LAW OFFICES OF NICHOLAS
  KOLUNCICH III, LLC
NICHOLAS KOLUNCICH III
6501 Americas Parkway NE
One Park Square – Suite 620
Albuquerque, NM  87107-5375
Telephone:  505/881-2228
505/881-4288 (fax)

Liaison Counsel

---

[40] In the event the Court is inclined to grant the Defendants' motions, plaintiffs respectfully request that the dismissal be without prejudice to their ability to cure any defects via amendment. *See* Fed. R. Civ. P. 15(a)(2) (leave to amend should be "freely" given); *Thornburg Mortg., Inc. Sec. Litig.*, 265 F.R.D. 571, 580 (D.N.M. 2010) (Browning, J. (allowing amendment in light of "the policy of allowing plaintiffs to have all of their claims decided on the merits, rather than on procedural barriers."; *Lane v. Page*, 727 F. Supp. 2d 1214, 1225 (D.N.M. 2010) (the "'Tenth Circuit has emphasized that "[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties"'").

- 67 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 30, 2011, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 30, 2011.

<u>s/ DARREN J. ROBBINS</u>
DARREN J. ROBBINS

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  darrenr@rgrdlaw.com

# Mailing Information for a Case 1:09-cv-00300-JB -KBM

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Floyd Abrams**
  fabrams@cahill.com

- **Jade A. Burns**
  jburns@kramerlevin.com

- **Eric R. Burris**
  eburris@bhfs.com,ecordero@bhfs.com,ywhitson@bhfs.com

- **Bradley J Butwin**
  bbutwin@omm.com

- **Candace Camarata**
  camaratac@gtlaw.com

- **William H. Carpenter**
  bill@carpenter-law.com,djstout@carpenter-law.com,RGonzales@carpenter-law.com,lsromero@carpenter-law.com

- **Michael R Comeau**
  mcomeau@cmtisantafe.com,receptionist@cmtisantafe.com

- **James J Coster**
  jcoster@ssbb.com

- **Jonathan C. Dickey**
  jdickey@gibsondunn.com

- **Jim Dines**
  jdines@dineslaw.com,gwilliams@dineslaw.com

- **Thomas A. Dubbs**
  tdubbs@labaton.com

- **Richard Edlin**
  edlinr@gtlaw.com

- **Andrew J Ehrlich**
  aehrlich@paulweiss.com

- **Martin Flumenbaum**
  mflumenbaum@paulweiss.com

- **Frederic S. Fox**
  ffox@kaplanfox.com

- **Bernard J Garbutt , III**
  bgarbutt@morganlewis.com

- **David J. Goldsmith**
  dgoldsmith@labaton.com

- **Jonah H. Goldstein**
  jonahg@rgrdlaw.com

- **Joel Haims**
  jhaims@mofo.com

- **Donald R. Hall**
  dhall@kaplanfox.com

- **Grey W. Handy**
  ghandy@cmtisantafe.com,sdevargas@cmtisantafe.com,receptionist@cmtisantafe.com

- **Dani R. James**
  djames@kramerlevin.com

- **Robert N Kaplan**
  rkaplan@kaplanfox.com

- **Jaime Rae Kennedy**
  jkennedy@montand.com,dherrera@montand.com

- **Dean J. Kitchens**
  DKitchens@GibsonDunn.com

- **Michael S Kraut**
  mkraut@morganlewis.com

- **Ronald Lefton**
  leftonr@gtlaw.com

- **Kristina Martinez**
  kemartinez@hollandhart.com,rsougstad@hollandhart.com,jgarcia@hollandhart.com,intaketeam@hollandhart.com

- **Laura Killian Mummert**
  lkillianmummert@labaton.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com

- **Victor R. Ortega**
  vortega@montand.com,dherrera@montand.com,cvaldez@montand.com,smcmillan@montand.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com,jillk@rgrdlaw.com,kathryns@rgrdlaw.com

- **Jonathan Rosenberg**
  jrosenberg@omm.com

- **Tammy Lynn Roy**
  troy@cahill.com

- **Josh M Rubins**
  jrubins@ssbb.com

- **Paul Scarlato**

pscarlato@labaton.com

- **Allison Schnieders**
  aschnieders@mofo.com

- **Robert F Serio**
  rserio@gibsondunn.com

- **Mark F. Sheridan**
  msheridan@hollandhart.com,rsougstad@hollandhart.com,intaketeam@hollandhart.com

- **Luis G. Stelzner**
  lgs@stelznerlaw.com,twerner@stelznerlaw.com,dlujan@stelznerlaw.com,aw@stelznerlaw.com

- **Stefanie J. Sundel**
  ssundel@labaton.com

- **William J Sushon**
  wsushon@omm.com

- **Robert P. Warburton**
  rpw@stelznerlaw.com,gbyrne@stelznerlaw.com

- **Gregory P Williams**
  gwilliams@dineslaw.com,smcglothlin@dineslaw.com,jdines@dineslaw.com

- **Aric H Wu**
  awu@gibsondunn.com,mknox@gibsondunn.com,jmyatt@gibsondunn.com,gwinston@gibsondunn.com

- **Adam Zurofsky**
  azurofsky@cahill.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Jason W Myatt
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
```