# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

GENESEE COUNTY EMPLOYEES' RETIREMENT
SYSTEM; MARYLAND-NATIONAL CAPITAL PARK
& PLANNING COMMISSION EMPLOYEES' RETIREMENT
SYSTEM; MIDWEST OPERATING ENGINEERS PENSION
TRUST FUND, Individually and On Behalf of All Others
Similarly Situated,

       Plaintiffs,

vs.                                      No. CIV 09-0300 JB/KBM

THORNBURG MORTGAGE SECURITIES TRUST
2006-3; THORNBURG MORTGAGE SECURITIES
TRUST 2006-5; THORNBURG MORTGAGE SECURITIES
TRUST 2007-4; GREENWICH CAPITAL ACCEPTANCE,
INC.; STRUCTURED ASSET MORTGAGE INVESTMENTS II,
INC.; CREDIT SUISSE SECURITIES LLC d/b/a CREDIT
SUISSE SECURITIES (USA) LLC; RBS SECURITIES INC.;
BANC OF AMERICA SECURITIES LLC; ROBERT J.
MCGINNIS; CAROL P. MATHIS; JOSEPH N. WALSH,
III; JOHN C. ANDERSON; JAMES M. ESPOSITO;
JEFFREY L. VERSCHLEISER; MICHAEL B. NIERENBERG;
JEFFREY MAYER; THOMAS F. MARANO; MOODY'S CORP.;
MOODY'S INVESTORS SERVICES, INC.; MCGRAW-HILL
COMPANIES, INC.; STANDARD & POOR'S RATING
SERVICES; FITCH, INC.; and FITCH RATINGS,

       Defendants.

## <u>MEMORANDUM OPINION AND AMENDED ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Opposed Motion to Dismiss of

Defendants Greenwich Capital Acceptance, Inc. (n/k/a RBS Acceptance Inc.), Structured Asset

Mortgage Investments II, Inc., Credit Suisse Securities (USA) LLC, RBS Securities Inc. (f/k/a

Greenwich Capital Markets, Inc.), Robert J. McGinnis, Carol P. Mathis, Joseph N. Walsh III, John

C. Anderson, James M. Esposito, Jeffrey L. Verschleiser, Michael B. Nierenberg, Jeffrey Mayer,

Thomas F. Marano, filed July 11, 2011 (Doc. 125)("Joint Motion"); (ii) Banc of America Securities LLC's Joinder in the Motion to Dismiss of the Depositor Defendants, the Individual Defendants, Credit Suisse Securities (USA) LLC, and RBS Securities, Inc., filed February 11, 2011 (Doc. 130)("Joinder in Motion"); and (iii) the Rating Agencies' Motion to Dismiss with Prejudice the Amended Class Action Complaint, filed February 11, 2011 (Doc. 128)("Rating Agency Defendants' Motion"). The Court held a hearing on September 19, 2011. The primary issues are: (i) whether the Plaintiffs Maryland-National Capital Park & Planning Commission Employees' Retirement System and Midwest Operating Engineers Pension Trust Fund have constitutional standing to pursue their claims; (ii) whether the Plaintiffs' claims are time-barred by the applicable statutes of limitation or repose; (iii) whether the Plaintiffs have stated sufficient materiality allegations against the Defendants other than the Rating Agency Defendants;[1] (iv) whether the Plaintiffs have alleged a section 12(a)(2) claim under the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa against the Defendants; (v) whether the Plaintiffs must plead reliance on the alleged misrepresentations in the offering documents for the 2006-5 offering; (vi) whether the Plaintiffs have stated a control-person claim against the Individual Defendants[2] or Defendant RBS Securities, Inc.; (vii) whether lack of causation undercuts the Plaintiffs' claims related to the 2006-5 offering; (viii) whether the Plaintiffs have stated claims under the New Mexico Securities Act, N.M.S.A. 1978, §§ 58-13B-1 through 58-

---

[1] The Court will refer to the following Defendants as the Rating Agency Defendants: (i) Defendant Moody's Corp.; (ii) Defendant Moody's Investors Services, Inc.; (iii) Defendant McGraw-Hill Companies, Inc.; (iv) Defendant Standard & Poor's Rating Services; (v) Defendant Fitch, Inc.; and (vi) Defendant Fitch Ratings.

[2] The Court will refer to the following Defendants as the Individual Defendants: (i) Defendant Robert J. McGinnis; (ii) Defendant Carol P. Mathis; (iii) Defendant Joseph N. Walsh, III; (iv) Defendant John C. Anderson; (v) Defendant James M. Esposito; (vi) Defendant Jeffrey L. Verschleiser; (vii) Defendant Michael B. Nierenberg; (viii) Defendant Jeffrey Mayer; and (ix) Defendant Thomas F. Marano.

13B-57, repealed by L. 2009, Ch. 82, § 703, effective Jan. 1, 2010, against any of the Defendants;[3]
(ix) whether the Plaintiffs have stated sufficient materiality allegations against the Rating Agency
Defendants; (x) whether the First Amendment of the United States Constitution bars the Plaintiffs'
claims against the Rating Agency Defendants; and (xi) whether the Credit Rating Agency Reform
Act of 2006 ("CRARA"), Pub. L. No. 109-291, 120 Stat. 1327, preempts any of the Plaintiffs' New
Mexico Securities Act claims against the Rating Agency Defendants.  The Court will grant in part
and deny in part both the Joint Motion and the Rating Agency Defendants' Motion.  The Court will
allow the Plaintiffs leave to file a motion to amend their pleadings consistent with its discussion in
the Memorandum Opinion and Amended Order.  With respect to the issue of pleading their
compliance with the applicable statute of limitations and statute of repose, the Court will grant the
Plaintiffs leave to amend to cure this defect without requiring them to file a motion seeking leave
to amend.

The Plaintiffs have constitutional standing to pursue their claims against the Defendants.
The Plaintiffs' claims are not time-barred under federal securities law or under the New Mexico
Securities Act.  The Plaintiffs have sufficiently pled allegations about material misrepresentations
or omissions against the Defendants other than the Rating Agency Defendants with respect to:
(i) their abandonment of their loan underwriting guidelines; (ii) their improper appraisal practices
regarding the 2006-5 offering; (iii) the inflated loan-to-value ("LTV") ratios regarding the 2006-5
offering; and (iv) to the credit ratings regarding the 2006-5 and 2007-4 offerings.  The Plaintiffs

---

[3]The current version of the New Mexico Securities Act appears at N.M.S.A. 1978, §§ 58-13C-101 through 58-13C-701.  The new version of the New Mexico Securities Act expressly contains a provision stating: "The predecessor act exclusively governs all actions or proceedings that are pending on the effective date of the New Mexico Uniform Securities Act or may be instituted on the basis of conduct occurring before the effective date of the New Mexico Uniform Securities Act . . . ."  N.M.S.A. 1978, § 58-13C-701.

have adequately alleged their section 12(a)(2) claims.  The Plaintiffs have no obligation to plead reliance on the alleged misrepresentations related to the 2006-5 offering.  The Plaintiffs have adequately stated a control-person claim.  Lack of causation does not undercut the Plaintiffs' claims related to the 2006-5 offering.  While the Plaintiffs have not sufficiently alleged that their claims satisfy the jurisdictional provisions of the New Mexico Securities Act, they have sufficiently alleged that the Rating Agency Defendants can be liable under the New Mexico Securities Act.  Against the Rating Agency Defendants, the Plaintiffs have sufficiently pled allegations about material misrepresentations or omissions with respect to Defendants McGraw-Hill Companies, Inc. and Standard & Poor's Rating Services, but not against Defendants Fitch, Inc., Fitch Ratings, Moody's Corp., or Moody's Investors Services, Inc.  The First Amendment does not bar the Plaintiffs' claims against the Rating Agency Defendants.  Lastly, CRARA preempts some of the theories on which the Plaintiffs base their claims under the New Mexico Securities Act against the Rating Agency Defendants.

## FACTUAL BACKGROUND

The Court recites the factual background in this case in the light most favorable to the Plaintiffs.  This dispute arises out of several investment offerings[4] of mortgage-backed securities ("MBS").  The asserted class invested in these MBS and ultimately suffered significant losses on their investments.  The Plaintiffs contend that the Defendants made a variety of misrepresentations relating to these investments that misled the asserted class as to the true risk of these investments.

---

[4]An "offering" is the "sale of an issue of securities."  Black's Law Dictionary 1189 (9th ed. 2009).  An "issue" in securities law is a "class or serious of securities that are simultaneously issued for sale."  Black's Law Dictionary, supra, at 908.

1.      **Non-Parties**

Thornburg Mortgage Securities Trust 2006-3, Thornburg Mortgage Securities Trust 2006-5, and Thornburg Mortgage Securities Trust 2007-4 are statutory trusts formed under Delaware law. See Amended Complaint for Violations of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 and §§ 58-13B-30(B) and 58-13B-40(A) of the New Mexico Securities Act of 1986 ¶ 21, at 13, filed December 10, 2010 (Doc. 103)("Amended Complaint").[5]   On March 22, 2011, the Plaintiffs voluntarily dismissed these statutory trusts from this action.   See Plaintiffs' Notice of Voluntary Dismissal Without Prejudice of Defendants Thornburg Mortgage Securities Trust 2006-3, Thornburg Mortgage Securities Trust 2006-5, and Thornburg Mortgage Securities Trust 2007-4 (Doc. 138).   These statutory trusts are referred to collectively as the "Thornburg Trusts."   The Plaintiffs did not name Thornburg Mortgage Home Loans, Inc. ("Thornburg Mortgage Home Loans") as a Defendant, but Thornburg Mortgage Home Loans originated many of the mortgage loans involved in this dispute.  See Amended Complaint ¶ 3, at 7.

2.      **The Parties**

This action is brought by Lead Plaintiffs: (i) Maryland-National Capital Park & Planning Commission Employees' Retirement System ("Maryland-National Capital"); and (ii) Midwest Operating Engineers Pension Trust Fund ("Midwest Operating").  See Amended Complaint ¶¶ 19-20, at 13. Maryland-National Capital is a single-employer, defined-benefit-pension plan established in 1972 that a board of trustees administers.  See Amended Complaint ¶ 19, at 13.  It purchased

---

[5]The number assigned to each of these statutory trusts identifies each respective trust and also relates to the specific timing of the offering from each trust, with the earlier numbers generally signifying earlier offerings. See Class Action Complaint for Violations of the Securities Act of 1933 ¶¶ 41, 65, at 14-15, 21-22 (filed February 27, 2009 with the First Judicial District, County of Santa Fe, New Mexico), filed March 27, 2009 (Doc. 1-1).

certificates in the 2006-3 and 2007-4 offerings.  See Amended Complaint ¶ 19, at 13.  Midwest Operating provides benefits to members of the Local 150 of the International Union of Operating Engineers.  See Amended Complaint ¶ 20, at 13.  Midwest Operating purchased certificates in the 2006-3, 2006-5, and 2007-4 offerings.  See Amended Complaint ¶ 20, at 13.

Defendant Greenwich Capital Acceptance, Inc. ("GC Acceptance") is a finance subsidiary of Greenwich Capital Holdings, Inc. and an affiliate of RBS Securities, Inc. ("RBS Securities"),[6] organized for the limited purpose of acquiring, owning, and transferring mortgage assets and selling interests in those assets or bonds secured by those assets.  See Amended Complaint ¶ 22, at 14. Defendant Structured Asset Mortgage Investments II, Inc. ("SAMI II") is a wholly owned subsidiary of The Bear Stearns Companies Inc. ("Bear Stearns"), which JP Morgan Chase & Co. acquired, and was organized for the sole purpose of serving as a private secondary mortgage market conduit. See Amended Complaint ¶ 23, at 14.  The Plaintiffs state in their Amended Complaint that RBS Securities served as a "depositor" for the Series 2006-3 and Series 2007-4 certificates and was the "issuer" of the certificates within the meaning of § 2(a)(4) of the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa.  Amended Complaint ¶ 22, at 14.[7]  The Plaintiffs state in their Amended Complaint that SAMI II served as a "depositor" for the Series 2006-5 certificates and was the issuer of the certificates within the meaning of §2(a)(4) of the Securities Act.  Amended Complaint ¶ 23, at 14. Defendants GC Acceptance and SAMI II are collectively referred to as the "Depositor Defendants."

Defendant Credit Suisse Securities LLC, d/b/a/ Credit Suisse Securities (USA) LLC ("Credit

---

[6]RBS Securities was formerly known as Greenwich Capital Markets, Inc.  See Amended Complaint ¶ 22, at 14.

[7]Section 2(a)(4) of the Securities Act defines an issuer as "every person who issues or proposes to issue any security" subject to various exclusions not applicable to this case.  See 15 U.S.C. § 77b.

Suisse"), is a subsidiary of Credit Suisse Group.  See Amended Complaint ¶ 25, at 14.  Defendant

RBS Securities is a subsidiary of Greenwich Capital Holdings, Inc.  See Amended Complaint ¶ 26,

at 15.  Defendant Banc of America Securities LLC ("BA Securities") is an investment banking

subsidiary of Bank of America Corp.  See Amended Complaint ¶ 27, at 15.  The Plaintiffs state in

their Amended Complaint that Credit Suisse acted as an "underwriter" for the 2006-3 and 2006-5

offerings within the meaning of § 2(a)(11) of the Securities Act.  See Amended Complaint ¶ 25, at

14.[8]  The Plaintiffs also state that RBS Securities acted as an underwriter for the 2006-3, 2006-5, and

2007-4 offerings.  See Amended Complaint ¶ 26, at 15.  The Plaintiffs state that BA Securities acted

as an underwriter for the 2006-5 offering.  See Amended Complaint ¶ 27, at 15.  These underwriters

participated in the drafting and dissemination of the offering documents involved in the Plaintiffs'

purchase of the certificates at issue in this case.  See Amended Complaint ¶¶ 25-28, at 14-15.

Defendants Credit Suisse, RBS Securities, and BA Securities are collectively referred to as the

"Underwriter Defendants."

The Plaintiffs also joined a variety of individuals as Defendants in this case.  Defendant

Robert J. McGinnis was, at all relevant times, a Director and Principal Executive Officer of RBS

Securities.  See Amended Complaint ¶ 29, at 15.  Defendant Carol P. Mathis was, at all relevant

times, the Principal Financial Officer and Principal Accounting Officer of GC Acceptance.  See

Amended Complaint ¶ 30, at 15.  Defendant Joseph N. Walsh III was, at all relevant times, a

---

[8]Section 2(a)(11) of the Securities Act defines an underwriter as:

[A]ny person who has purchased from an issuer with a view to, or offers or sells for
an issuer in connection with, the distribution of any security, or participates or has
a direct or indirect participation in any such undertaking, or participates or has a
participation in the direct or indirect underwriting of any such undertaking . . . .

15 U.S.C. § 77b(11).

Director and Managing Director of RBS Securities.  <u>See</u> Amended Complaint ¶ 31, at 16. Defendant John C. Anderson was, at all relevant times, a Director and Managing Director of RBS Securities.  <u>See</u> Amended Complaint ¶ 32, at 16.  Defendant James M. Esposito was, at all relevant times, a Director, Managing Director, General Counsel, and Secretary of RBS Securities. <u>See</u> Amended Complaint ¶ 33, at 16.  Defendants McGinnis, Mathis, Walsh, Anderson, and Esposito signed the registration statements RBS Securities filed on January 11, 2006 (No. 333-130961) and January 29, 2007 (No. 333-140279), as amended.  <u>See</u> Amended Complaint ¶¶ 29-33, at 15-16.

Defendant Jeffrey L. Verschleiser was, at all relevant times, the Principal Executive Officer of SAMI II.  <u>See</u> Amended Complaint ¶ 34, at 16.  Defendant Michael B. Nierenberg was, at all relevant times, the Principal Financial Officer and Principal Accounting Officer of SAMI II. <u>See</u> Amended Complaint ¶ 35, at 16.  Defendant Jeffrey Mayer was, at all relevant times, a Director of SAMI II.  <u>See</u> Amended Complaint ¶ 36, at 16.  Defendant Thomas F. Marano was, at all relevant times, a Director of SAMI II.  <u>See</u> Amended Complaint ¶ 37, at 16.  Defendants Verschleiser, Nierenberg, Mayer, and Marano signed the Registration Statement filed by SAMI II on March 6, 2006 (No. 333-132232), as amended.  <u>See</u> Amended Complaint ¶¶ 34-37, at 16.  These nine individuals collectively are referred to as the "Individual Defendants."

The Plaintiffs have also joined several rating agencies as Defendants.  Defendant Moody's Corp. is a Delaware corporation which, together with Defendant Moody's Investors Service, Inc. (collectively, "Moody's"), is a credit rating agency that performs credit analysis for commercial and government entities.  Amended Complaint ¶ 39, at 17.  Defendant McGraw-Hill Companies, Inc. ("McGraw-Hill") is a New York corporation.  <u>See</u> Amended Complaint ¶ 40, at 17.  Defendant Standard & Poor's Ratings Services ("S&P"), a division of McGraw-Hill, is a credit rating agency that performs credit analysis for commercial and government entities.  <u>See</u> Amended Complaint

¶ 40, at 17.  Defendants Fitch, Inc. and Fitch Ratings (collectively, "Fitch") is a credit rating agency headquartered in New York, New York and London, England.  Amended Complaint, ¶ 41, at 17. Defendants Moody's Corp., Moody's Investors Services, McGraw-Hill, Standard & Poor's, Fitch, Inc., and Fitch Ratings are collectively referred to as the "Rating Agency Defendants."

The Plaintiffs state that the Depositor Defendants retained the Rating Agency Defendants to issue certain ratings, not below investment grade, for the certificates in question.  See Amended Complaint ¶¶ 39-41, at 17-18.  This specific rating was a condition of issuance of the certificates. See Amended Complaint ¶¶ 39-41, at 17-18.  The Plaintiffs allege that the Rating Agency Defendants were substantial participants in creating each of the Thornburg Trusts and in drafting and disseminating the offering documents for the certificates.  See Amended Complaint ¶¶ 39-41, at 17-18.  Plaintiffs state that the Thornburg Trusts, Depositor Defendants, Underwriter Defendants, and Individual Defendants paid the Rating Agency Defendants substantial amounts of money during 2006 and 2007 for their participation in the issuance and sale of the certificates.  See Amended Complaint ¶ 42, at 58.

### 3. The Nature of the Statutory Trust Arrangement and Related Offerings.

The Thornburg Trusts issued mortgage-pass through certificates or MBS.  MBS represent a securitized interest in an underlying pool of mortgages, paying certificate holders the cash flows derived from the pools of securitized mortgages.  See Amended Complaint ¶ 3, at 7.[9]  The theory behind this capital structure is to have the principal and interest payments from the underlying pool of mortgages pass directly to the investors each month.  See Amended Complaint ¶ 3, at 7.  Interests

---

[9]"Asset-backed securities and ABS issuers differ from corporate securities."  Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1506, 1508 (Jan. 7, 2005).  Corporate securities are purchased for "the timing and receipt of cash flows from th[e] [underlying] assets."  Asset-Backed Securities, supra, at 1511.

in the MBS are then sold to investors in the form of certificates[10] using a cash-flow schedule -- referred to as a waterfall -- that is structured to allocate incoming cash flows to various "tranches" of the trust.  Amended Complaint ¶ 43, at 18.  Those tranches within a MBS which have the highest priority of payment represent the safest investments in the pool, and are structured by issuers, depositors, and rating agencies to receive AAA/Aaa ratings.  See Amended Complaint ¶ 43, at 18.[11] Tranches lower down the entitlement line obtain payment only after the more senior tranches are paid and therefore receive lower credit ratings.  See Amended Complaint ¶ 43, at 18.  Stated differently, the senior tranches normally receive ratings of AAA/Aaa and take their payments first. See Class Action Complaint for Violations of the Securities Act of 1933 ¶ 53, at 18 (filed February 27, 2009 with the First Judicial District, County of Santa Fe, New Mexico), filed March 27, 2009 (Doc. 1-1)("Original Complaint").  The middle tranches -- also called the mezzanine tranches -- generally receive ratings of AA/Aa2 and take payments after the senior tranches.  See Original Complaint ¶ 53, at 18.  The bottom tranches -- also called the equity tranches -- generally receive ratings below investment grade, in other words a rating at or below BBB-/Baa3, and take payments after the mezzanine tranches.  See Amended Complaint ¶ 73, at 36-37; Original Complaint ¶ 53, at 18.

---

[10]Certificates are basically another name for securities.  Black's Law Dictionary defines a "certificated security" as a "security that is a recognized investment vehicle, belongs to or is divisible into a class or series of shares, and is represented on an instrument payable to the bearer or named person."  Black's Law Dictionary, supra, at 1476.

[11]S&P and Fitch use a ratings system that relies on all capital letters, with the highest rating being AAA.  See Amended Complaint ¶ 12, at 11.  Moody's uses a similar system, but the ratings include letters and numbers, such as Aaa and Baa3 ratings.  See Amended Complaint ¶¶ 12, 73, at 12, 36-37.  For example, a BBB rating from S&P and Fitch equates to a Baa rating from Moody's. See Amended Complaint ¶ 73, at 36-37.  Likewise, a BBB- rating equates to a Baa3 rating.  See Amended Complaint ¶ 73, at 36-37.

A certificate's value and the interest rate at which it can be sold are tied directly to the objective ability of the borrowers associated with the underlying mortgages to repay the principal and interest on the underlying mortgages as well as the adequacy of the collateral in the event of default.  See Amended Complaint ¶ 3, at 7.  Pools of mortgage loans backed the certificates at issue in this case.  Amended Complaint ¶ 3, at 7.  Thornburg Mortgage Home Loans and its business affiliates, including Wells Fargo Bank, N.A. ("Wells Fargo"), originated, acquired, and/or serviced these mortgage loans.  See Amended Complaint ¶ 3, at 7.  The Defendants designed the certificates to ensure that they received the highest ratings, because the Defendants could not have sold the certificates without the AAA/Aaa ratings assigned to the certificates by the Rating Agency Defendants.  See Amended Complaint ¶ 44, at 18.

In connection with the registration and sale of each of the 2006-3, 2006-5, and 2007-4 offerings, the Defendants prepared and filed with the Securities and Exchange Commission ("SEC") registration statements for each offering.  See Original Complaint ¶ 65, at 21-22.  Each registered offering included a base prospectus and a prospectus supplement.  Some of the representations in the various prospectus supplements are highly similar or identical.  See Amended Complaint ¶¶ 52-53, 57, 62, 68-69, at 22-23, 25, 29, 33-34.  These offering documents represented that Thornburg Mortgage Home Loans acquired the loans contained in the Thornburg Trusts by: (i) originating the loans itself; (ii) acquiring loans originated through Thornburg Mortgage Home Loans correspondents; and/or (iii) via bulk purchases of loans from originators such as Wells Fargo.  See Amended Complaint ¶ 46, at 19.  The offering documents described the underwriting guidelines purportedly used in connection with the origination of those loans, identified the specific loan originators who sold the loans to Thornburg Mortgage Home Loans, and detailed the originators' specific underwriting guidelines.  See Amended Complaint ¶ 46, at 19.  The offering documents

provided detailed information about the underlying loans contained in each trust, including the number of loans purportedly originated using a full-documentation program.  See Amended Complaint ¶ 46, at 19.  The offering documents also described the appraisal practices purportedly used in connection with loan origination with respect to the loans within the Thornburg Trusts.  See Amended Complaint ¶ 46, at 19.  The offering documents represented that: (i) the loans within the Thornburg Trusts complied with specific LTV ratios; (ii) the certificates had investment-grade credit ratings that the Rating Agency Defendants issued; and (iii) none of the documents submitted in connection with the loan underwriting process contained untrue or false information.  See Amended Complaint ¶ 46, at 19.

### 4.    The Defendants' Alleged Misrepresentations.

The Defendants made a variety of misrepresentations based on statements contained in the offering documents for the 2006-3, 2006-5, and 2007-4 offering.  First, the offering documents misrepresented the loan origination and underwriting standards which the Defendants and their affiliates used.  See Amended Complaint ¶¶ 48-54, at 20-24.  Second, the offering documents misrepresented the documentation purportedly required to issue the mortgage loans ultimately placed in the Thornburg Trusts.  See Amended Complaint ¶¶ 55-56, at 24-25.  Third, the offering documents misrepresented the validity of the property appraisals conducted in connection with the issuance of the loans ultimately placed in the Thornburg Trusts.  See Amended Complaint ¶¶ 57-61, at 25-28.  Fourth, the offering documents falsely stated that the loan documents connected with the issuance of the mortgage loans were accurate and free of fraud.  See Amended Complaint ¶¶ 62-63, at 29-30.  Fifth, the offering documents misrepresented the LTV ratios of the mortgages placed in the Thornburg Trusts.  See Amended Complaint ¶¶ 64-67, at 30-33.

-12-

a.    **Loan Origination and Underwriting Standards.**

The offering documents misrepresented the loan origination and underwriting standards which the Defendants and their affiliates used. Wells Fargo originated approximately seventy-two percent of the loans in the mortgage pool underlying the 2006-5 Thornburg Trust. See Amended Complaint ¶ 48, at 20. With respect to the 2006-5 offering, the prospectus supplement represented that the loans in the 2006-5 Thornburg Trust were underwritten in accordance with one or more of the following: (i) Wells Fargo's general underwriting standards; (ii) Wells Fargo's retention program; and (iii) the underwriting standards of participants in Wells Fargo's non-agency conduit program. See Amended Complaint ¶ 49, at 20. The prospectus supplement further represented that "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral." Amended Complaint ¶ 49, at 20. The 2006-5 Prospectus Supplement also represented, with respect to all loans acquired via Thornburg Mortgage Home Loans' Bulk Purchase program, including the Wells Fargo loans, that Thornburg Mortgage Home Loans conducted adequate loan documentation reviews which "confirm adherence to the terms of the purchase agreement with the loan seller," and obtained assurances that those loans "were underwritten in accordance with the underwriting standards and guidelines of the respective loan seller or other specified underwriting standards and guidelines." Amended Complaint ¶ 50, at 20-21.

These statements are misrepresentations because of the failure to disclose a variety of facts. These omitted facts include: (i) Wells Fargo's systematic failure to follow its stated underwriting standards; (ii) Wells Fargo's requirement that underwriters generate a specified number of loans regardless of the borrower's financial circumstances; (iii) Wells Fargo's awareness that borrowers

submitted a variety of false information in connection with their loan applications; (iv) Wells Fargo's systematic disregard of its own loan underwriting standards during the period of time origination of the loans placed into the Thornburg Trusts occurred; (v) Wells Fargo's implementation in late 2006 of a "courageous underwriting program" which formalized the practice of disregarding its underwriting guidelines; (vi) that Wells Fargo as a matter of practice extended loans to person with questionable credit and income levels; and (vii) the resulting failure of the Defendants and Wells Fargo to employ the stated underwriting standards.  Amended Complaint ¶ 51, at 21.

Thornburg Mortgage Home Loans or its "correspondent lenders" originated a large percentage of the mortgages in the 2006-3 Thornburg Trust (82.6%), the 2006-5 Thornburg Trust (26.3%), and the 2007-4 Trust (100%).  Amended Complaint ¶ 52, at 22.  The prospectuses relating to each of the offerings from the Thornburg Trusts provided the general underwriting guidelines Thornburg Mortgage Home Loans and its correspondent lenders purportedly followed.  See Amended Complaint ¶ 52, at 22.  One provision of these guidelines stated: "On a case-by-case basis, the seller may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception."  Amended Complaint ¶ 52, at 22.  For loans that the correspondent lenders originated, the offering documents represented that Thornburg Mortgage Home Loans had reviewed the lenders' mortgage files before acquiring the loans contained in the Thornburg Trusts to ensure that the lenders complied with the stated underwriting guidelines.  Amended Complaint ¶ 53, at 23.  The following statement made this representation:

> Prior to acquiring any mortgage loan from a correspondent, [Thornburg Mortgage Home Loans] conducts a review of the mortgage file to determine whether the mortgage loan meets [Thornburg Mortgage Home Loans'] underwriting standards

> . . . or whether an exception is warranted on a case by case basis. For a limited
> number of loans, the review process is conducted under [Thornburg Mortgage Home
> Loans'] supervision by one of its retail fulfillment vendors.

Amended Complaint ¶ 53, at 23.

Instead of following these practices and the respective underwriting guidelines: (i) Thornburg Mortgage Home Loans' correspondent lenders and wholesale mortgage brokers and lenders were generating loans without regard to Thornburg Mortgage Home Loans' stated underwriting standards; (ii) Thornburg Mortgage Home Loans' correspondent lenders and wholesale mortgage brokers and lenders were abusing underwriter discretion allowed for under the guidelines, because as a matter of course they invoked exceptions to and/or diverged from applicable underwriting standards; (iii) Thornburg Mortgage Home Loans failed to conduct adequate quality control reviews of the mortgage loans acquired from its correspondent lenders, wholesale mortgage brokers and lenders, and sellers through its program of purchasing loans from them -- including purchases from Wells Fargo -- to ensure that the loans complied with the stated underwriting guidelines; and (iv) the mortgage loans underlying the certificates were not supported by adequate documentation, such as accurate data concerning the borrowers' income, employment, or accurate appraisals of their property.  See Amended Complaint ¶ 54, at 22-23.

### b.   Loan Documentation.

The offering documents represented that "the vast majority of the mortgage loans underlying the Certificates were originated using a full documentation program, which documented and verified the borrowers' current employment and income."  Amended Complaint ¶ 55, at 19.  The offering documents for the 2006-3, 2006-5, 2007-4 offerings listed specific percentages of the loans within the Thornburg Trusts that complied with this full-documentation program. See Amended Complaint ¶ 55, at 19.  The full-documentation program required inclusion of information regarding whether

a borrower's

> current employment is verified, a two-year history of previous employment (or for self-employed borrowers, two years of income tax returns), verification through deposit verifications of sufficient liquid assets for down payments, closing costs and reserves, and depository account statements or settlement statements documenting the funds received from the sale of the previous home are required.

Amended Complaint ¶ 55, at 19.

Rather than follow these standards, Thornburg Mortgage Home Loans and its correspondent lenders misrepresented the truth by generating loans in violation of Thornburg Mortgage Home Loans' underwriting standards, failing to include for the full-documentation loans sufficient documentation concerning the borrowers' financial circumstances, and failing to conduct adequate quality control reviews of the mortgage loans acquired from its correspondent lenders or from originators through its Bulk Purchase program. See Amended Complaint ¶ 56, at 24-25. In doing so, they did not ensure compliance with Thornburg Mortgage Home Loans' stated underwriting standards for full-documentation loans. See Amended Complaint ¶ 56, at 24-25.

### c.   **Appraisal Validity.**

The offering documents for the 2006-3, 2006-5 and 2007-4 Thornburg Trusts represented that the "appraisal of any mortgaged property reflects the individual appraiser's judgment as to value, based on the market values of comparable homes sold within the recent past in comparable nearby locations and on the estimated replacement cost." See Amended Complaint ¶ 57, at 25. The offering documents further represented that each mortgage file contained an:

> appraisal of the related mortgaged property by a qualified appraiser, duly appointed by the originator of the mortgage loan, who had no interest, direct or indirect in the mortgaged property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the mortgage loan or, in accordance with certain specified programs of the originator of the mortgage loan an approved AVM in lieu of the appraisal.

Amended Complaint ¶ 57, at 25.

These statements constitute a misrepresentation based on Thornburg Mortgage Home Loans and Wells Fargo using inflated appraisals, which resulted in a misrepresentation that the homes securing the underlying mortgage loans were worth more than the actual market value of the property.  See Amended Complaint ¶ 58, at 25.  Specifically, there was a variety of alleged misconduct by Wells Fargo, including: (i) pressuring appraisers to accept fees fifty percent below the market rate for appraisals; and (ii) systematically threatening to not do business with real estate appraisers, or even to blackball them in a particular market to prevent them from getting business with other companies, if they failed to manipulate their appraisals above market value.  See Amended Complaint ¶ 58, at 26-27.  For example, Wells Fargo lenders allegedly directed appraisers in California to appraise houses that others had described as "'crack houses' which should have been bulldozed" with values exceeding $100,000.00.  Amended Complaint ¶ 58, at 27.

Furthermore, the Defendants' representations that the appraisals underlying the loans were based on "the market values of comparable homes sold within the recent past in comparable nearby locations" is false and misleading based on manipulations of such data by the appraisers to inflate the appraisals, and based on the appraisers failure to conduct a legitimate valuation analysis of individual properties.  Amended Complaint ¶ 59, at 27.  One of Wells Fargo's appraisers faced regulatory action and sanctions in Nevada based on these practices.  See Amended Complaint ¶ 60, at 27-28.  Independent appraisers in Florida -- from where a significant number of the mortgage loans placed in the Thornburg Trusts came -- have confirmed that many relevant appraisals were not based on comparable properties.  See Amended Complaint ¶ 61, at 28.  These appraisers stated that, to stay in business, they would inflate appraisals even if they had to drive twenty miles away from the property in question to find "comparable" sales.  Amended Complaint ¶ 61, at 28.  These Florida

-17-

appraisers also stated that they intentionally used more expensive properties with larger lots, square footage, or more amenities than the appraised property to inflate the appraised property's value.  See Amended Complaint ¶ 61, at 28.

d. <strong><u>Loan Documents Being Accurate and Free of Fraud</u></strong>.

The offering documents to the 2006-3, 2006-5, and 2007-4 offerings stated that: (i) to the seller's best knowledge, no fraud occurred in the origination of the mortgage loans, and the seller is not aware of any fact that would reasonably lead the seller to believe that any mortgagor had committed fraud in connection with the origination of a mortgage loan; (ii) the information set forth in the final mortgage loan schedule is complete, true, and correct in all material respects; and (iii) the origination practices that the seller or the related originator of the mortgage loans used, with respect to each mortgage note and mortgage, have been in all respects legal, proper, prudent, and customary in the mortgage origination and servicing business.  See Amended Complaint ¶ 62, at 29.

These statements constitute misrepresentations, because the Defendants either knew or should have known of the misrepresentations and fraud in the loan documents before offering the certificates for sale, as the Defendants purportedly performed due diligence on the loans before purchasing them from originators.  See Amended Complaint ¶ 63, at 29.  The true facts about the loan portfolios for the 2006-3, 2006-5, and 2007-4 Thornburg Trusts were that: (i) borrowers and loan originators, including Wells Fargo, were systematically and routinely falsifying the incomes of the borrowers to qualify borrowers for loans for which they could not otherwise qualify or afford to pay; (ii) appraisers, who faced pressure and/or threats from loan originators, systematically inflated the property appraisals used in connection with the loans in the Thornburg Trusts; and (iii) the loan documentation contained misrepresentations overstating borrowers' assets, understating borrowers' debts, and/or misrepresenting borrowers' employment status and the occupancy of the

-18-

purchased properties.  See Amended Complaint ¶ 63, at 29-30.

      e.    **LTV Ratios.**

The prospectus supplements used in connection with the sale of the certificates detailed the LTV ratios associated with the loans in each Thornburg Trust.  See Amended Complaint ¶ 64, at 30. This information is material to investors, because lower LTV ratios indicate less risk associated with the certificates, while a higher LTV ratio indicates greater risk.  See Amended Complaint ¶ 64, at 30.  The prospectus supplement for the 2006-3 offering represented that the weighted average of the original LTV ratio of the mortgage loan was sixty-seven percent and that approximately 2.33%, 2% and 1.19% of the group 1, group 2 and group 3 mortgage loans, respectively, had original LTV ratios in excess of eighty percent.  See Amended Complaint ¶ 64, at 30.  The prospectus supplement for the 2006-5 offering represented that the weighted average of the original LTV ratio of the mortgage loans was approximately 67.59% and that less than 1% of the loans had original LTV ratios in excess of eighty percent.  See Amended Complaint ¶ 64, at 30.  The prospectus supplement for the 2007-4 offering represented that the weighted average of the original LTV ratio of the mortgage loans was 70.74% and that approximately 3.43%, 2.54% and 2.54% of the group 1, group 2 and group 3 mortgage loans respectively had original LTV ratios in excess of 80%.  See Amended Complaint ¶ 64, at 30.  The prospectus supplements each contained additional details on the LTV ratios of the mortgage loans.  See Amended Complaint ¶ 65-66, at 31-32.

These representations of the LTV ratios constitute actionable misrepresentations, because the LTV-ratio calculations relied on the false appraisals, which resulted in inflated property values, thus undermining the accuracy of the LTV ratios.  See Amended Complaint ¶ 67, at 33.  As a result, the certificates appeared to investors to be a safer investment than they were.  See Amended Complaint ¶ 67, at 33.  Additionally, the borrowers' equity position in the properties was overstated,

subjecting the Thornburg Trusts to greater risk of default and leaving them with a lower equity cushion to protect the Thornburg Trusts in the event of default or foreclosure on the underlying mortgage loan.  See Amended Complaint ¶ 67, at 33.

> **5.**    **Role of the Rating Agency Defendants.**

The Defendants made misrepresentations based on the Rating Agency Defendants' improper conduct.  This improper conduct on the part of the Defendants and the Rating Agency Defendants is as follows.  First, the credit ratings prominently displayed in the offering documents were false and misleading.  See Amended Complaint ¶¶ 68-71, at 33-36.  Second, the Rating Agency Defendants issued false and misleading ratings on the certificates in question.  See Amended Complaint ¶¶ 72-79, at 36-38.  Third, the Defendants used the defective models and methodologies created by the Rating Agency Defendants to design the certificates.  See Amended Complaint ¶¶ 80-81, at 38-39.  Fourth, the Rating Agency Defendants used outdated and defective models when assigning their ratings.  See Amended Complaint ¶¶ 82-84, at 39-41.  Fifth, the Rating Agency Defendants failed to conduct reasonable due diligence into the underwriters'/servicers' representations.  See Amended Complaint ¶¶ 85-86. at 41-42.  Sixth, the Rating Agency Defendants lacked the resources to adequately and properly rate the MBS certificates.  See Amended Complaint ¶ 87, at 42. Lastly, the Rating Agency Defendants were not sufficiently independent when assigning their ratings.  See Amended Complaint ¶¶ 88-89, at 42-43.

> **a.**    **Prominent Display of Credit Ratings.**

The offering documents acknowledged the importance of the ratings that the Rating Agency Defendants issued.  See Amended Complaint ¶ 68, at 33.  The offering documents each used the same, or substantially similar language, that it was a condition to the issuance of the offered certificates that at least one of the Rating Agency Defendants rate the certificates as AAA/Aaa.

See Amended Complaint ¶ 68, at 33.  The offering documents went on to state: "The ratings assigned by the above rating agencies address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreement pursuant to which the certificates are issued."  Amended Complaint ¶ 68, at 33-34.  The offering documents also stated:

> The ratings of each rating agency take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on that mortgage pool is adequate to make payments required by the certificates.

Amended Complaint ¶ 68, at 34.  Each of the prospectus supplements to each offering provided the ratings for each class of loans within each Thornburg Trust.  See Amended Complaint ¶ 69, at 34-35.

These statements constituted misrepresentations.  The true facts were that the ratings assigned to these certificates: (i) did not reflect the true likelihood of the receipt of payments on the underlying loans; (ii) misrepresented that the ratings were based on the actual credit quality of the loans; and (iii) misrepresented that certain certificates were investment-grade when they should have been classified as below investment-grade, in accordance with the Rating Agency Defendants' pre-established rating guidelines.  See Amended Complaint ¶ 70, at 35.  Furthermore, the original ratings provided by the Rating Agency Defendants did not represent, based on the above misrepresentations, the true risk of the certificates, because the ratings relied on insufficient information and faulty assumptions concerning how many underlying mortgages were likely to default.  See Amended Complaint ¶ 70, at 35.[12]  The fee model which the Rating Agency Defendants

_____

[12]In March 2008, the President's Working Group on Financial Markets -- which includes the Secretary of the Treasury and Chairs of the Federal Reserve Board, the SEC, and the Commodity Futures Trading Commission -- made statements confirming that there were flaws in credit rating agencies' assessments of subprime MBS and other complex structured financial products, such as mortgage pass-through certificates.  See Amended Complaint ¶ 70 n.8, at 35.  Based on a subsequent SEC investigation, the SEC found serious defects in the Rating Agency Defendants' rating methodologies, conflicts of interest, and a lack of disclosure to investors and the public.

employed resulted in conflicts of interest with issuers of securities.  See Amended Complaint ¶ 71, at 36.  This undisclosed conflict arose because the Rating Agency Defendants would only receive compensation if they provided the rating that the Depositor Defendants, the Underwriter Defendants, and the Individual Defendants demanded.  See Amended Complaint ¶ 71, at 36.

### b.    False and Misleading Ratings.

AAA/Aaa ratings have a historic yield-default rate of less than 1/20 of one percent. See Amended Complaint ¶ 73, at 36-37.  In comparison, default rates for BBB/Baa investments are twenty times higher at a one percent default rate.  See Amended Complaint ¶ 73, at 36-37.  The Defendants were aware that credit ratings are very important to institutional investors, like those in the asserted class, as they are barred from holding below investment-grade assets.  See Amended Complaint ¶ 74, at 37.  Investments with a rating of BBB-/Baa3 or below qualify as below investment grade while a higher rating qualifies as investment grade.  See Amended Complaint ¶ 73, at 36-37.  The Rating Agency Defendants received compensation for their services from the Defendants only when the certificates in question received the desired rating of investment grade. See Amended Complaint ¶ 74, at 37.

To determine whether to award a particular certificate an investment-grade rating, the Rating Agency Defendants needed to assess the potential future performance of the underlying loan pool. See Amended Complaint ¶ 75, at 37.  To make this assessment, the Rating Agency Defendants were to assess the credit characteristics of the borrowers, including the nature of the documentation that the borrowers provided to verify their income levels, and/or their assets, and other loan information. See Amended Complaint ¶ 75, at 37.  That other loan information would include information such

---

See Amended Complaint ¶ 70 n.8, at 35-36.

as the loan's principal amount, the property's geographic location, the borrower's credit history and the credit score, the LTV ratio, the type of loan, the amount of equity in the property used as collateral, and whether the borrowers intended to rent or occupy their homes.  See Amended Complaint ¶ 75, at 37.

Additionally, the Rating Agency Defendants were required to review the Thornburg Trusts' capital structure and determine if that capital structure was sufficient to meet the desired credit rating for the certificates or whether, as part of the transaction, the Depositor Defendants would need to adjust the capital structure to provide the requisite credit enhancement for the desired rating.  See Amended Complaint ¶ 76, at 37-38.

The investment-grade ratings that the Rating Agency Defendants assigned to the certificates issued by the 2006-3, 2006-5, and 2007-4 Thornburg Trusts did not represent the true risk of the certificates.  See Amended Complaint ¶ 77, at 38.  The Rating Agency Defendants based their ratings on insufficient information and false assumptions about the underlying mortgages. See Amended Complaint ¶ 77, at 38.  Following the offerings, the Rating Agency Defendants eventually had to disclose to the public that the ratings they assigned were inaccurate.  See Amended Complaint ¶ 78, at 38.  As MBS across the country began to fail in unprecedented numbers, the Rating Agency Defendants had to adjust ratings downward to the level that the certificates should have originally received if the Rating Agency Defendants had completed reasonable diligence and/or not ignored facts concerning the credit quality of the loans included in the Thornburg Trusts. See Amended Complaint ¶ 78, at 38.

Based on this downgrade, the certificates that the Plaintiffs and the rest of the class purchased declined significantly in price.  See Amended Complaint ¶ 79, at 38.  In addition to the price declines, those who invested in these MBS were harmed by receiving a rate of return that did

not reflect the true riskiness of the MBS securities.  See Amended Complaint ¶ 79, at 38.  The downgrades were dramatic.  See Amended Complaint ¶ 79, at 38. More specifically, the certificates received a downgrade of not just one or two grade levels, but as many as eighteen grade levels downward.  See Amended Complaint ¶ 79, at 38.

c.    **Defective and Outdated Models and Methodologies.**

The Underwriter Defendants used the Rating Agencies' models to create the certificates, because the Rating Agency Defendants shared their methodologies and models with the underwriters.  See Amended Complaint ¶ 80, at 38.  The purpose of sharing this information was to allow the Underwriter Defendants, Depositor Defendants and Individual Defendants to structure the Thornburg Trusts to achieve the desired investment-grade ratings.  See Amended Complaint ¶ 80, at 38.  The Defendants created the certificates based on the Rating Agency Defendants models. See Amended Complaint ¶ 81, at 39.  The Defendants handsomely compensated the Rating Agency Defendants to obtain the desired ratings of investment grade for the certificates.  See Amended Complaint ¶ 81, at 39.  Because the Underwriter Defendants and the other Defendants used the Rating Agency Defendants' methods and models to create the certificates, the certificates received AAA/Aaa ratings.  See Amended Complaint ¶ 81, at 39.

The Rating Agencies purported to employ complex mathematical models to predict foreclosure rates for mortgages.  Around April 2010, however, subsequent to the 2006-3, 2006-5, and 2007-4 offerings, the Rating Agency Defendants disclosed additional information to the public by releasing internal electronic mail transmissions and through testimony from high ranking executives of these rating agencies.  See Amended Complaint ¶ 82, at 39.  This information revealed that the Rating Agency Defendants were aware that their modeling assumptions were wrong, yet failed to timely adjust their models or cease issuing defective credit ratings on MBS.  See Amended

Complaint ¶ 82, at 39.  With respect to S&P, a variety of employees and high-level officials internally admitted that, as early as August 2006, serious problems existed with the assessment that the ratings agencies gave to these MBS.  See Amended Complaint ¶ 82, at 39-40.  With respect to Moody's, a high-level official testified before the United States Senate on April 23, 2010 that, even as late as December 2007, that Moody's had not set a high priority on improving their models and methodologies.  See Amended Complaint ¶ 82, at 40.  A Moody's managing director also commented that the rating agency's "errors make us look either incompetent at credit analysis or like we sold our soul to the devil for revenue or a little bit of both."  Amended Complaint ¶ 82, at 40 (emphasis omitted).

In May 2006, S&P announced its plans to change the model used to rate subprime mortgage bonds.  See Amended Complaint ¶ 83, at 40.  Under this new model, subprime bonds issued before July 1, 2006, would continue to be rated by the old, less rigorous model.  See Amended Complaint ¶ 83, at 40.  The prospectus supplements for the 2006-3 and 2006-5 offerings were issued under the older model, which the Defendants knew or should have known was outdated and inaccurate.  See Amended Complaint ¶ 83, at 40-41.  S&P did not make a major change to its models and methodologies until July 2007.  See Amended Complaint ¶ 84, at 41.  Even though this change was substantial, S&P decided not to retest existing MBS, because reevaluating them would have led to mass downgrades.  See Amended Complaint ¶ 84, at 41.  Subsequently, these downgrades occurred, causing massive losses to MBS investors.  See Amended Complaint ¶ 84, at 41.

### d.      Lack of Due Diligence into Underwriters'/Servicers' Representations and Lack of Resources to Properly Rate MBS.

The Rating Agency Defendants were either aware or should have known that the originators of the mortgage loans in the Thornburg Trusts had loosened -- or worse, abandoned -- their

underwriting standards and were relying on falsified mortgage loan documentation.  In spite of this knowledge or reason to know of these problems, the Rating Agency Defendants rated the certificates in this case as investment-grade quality while disclaiming any responsibility for verifying the accuracy of the underlying loans.  See Amended Complaint ¶ 85, at 41.  Testimony before a Senate Subcommittee in 2010 revealed that in the prior decade S&P, the managing directors, and analysts received internal communications telling them that any request for loan level information from banks was totally unreasonable.  See Amended Complaint ¶ 85, at 41.  In spite of these communications, S&P told the directors and analysts that they "MUST produce a credit estimate" and that it was their "responsibility to devise some method for doing so."  Amended Complaint ¶ 85, at 41.  While testifying before the Senate on April 22, 2008, the Fitch President and CEO admitted that Fitch "did not do the due diligence function of trying to recognize whether there was fraud involved in the origination of loans" and asserted that this failure to perform due diligence was "one of the biggest accelerants for why there's been problems across the board in the mortgage market itself."  Amended Complaint ¶ 86, at 40-41.

The Rating Agency Defendants lacked to a gross degree the staff and resources to adequately and properly rate the MBS.  See Amended Complaint ¶ 87, at 42.  As a result, the underwriters of the certificates argued with the credit-rating analysts, substituted lower value assets in the Thornburg Trusts at the last minute, and pressured analysts to waive their procedures and standards.  See Amended Complaint ¶ 87, at 42.  A variety of internal S&P communications corroborate these allegations of gross understaffing and lack of resources.  See Amended Complaint ¶ 87, at 42 n.9.

Because of this lack of resources, the Rating Agency Defendants failed to conduct even cursory due diligence of loan quality in connection with the issuance of the certificates.  See Amended Complaint ¶ 86, at 41.  This failure on the Rating Agency Defendants' part served as a

prime factor in the issuance of the false and misleading ratings assigned to the certificates.

            **e.**        **The Rating Agency Defendants' Independent Nature.**

        The Rating Agency Defendants held themselves out as independent arbiters of the MBS that they rated. See Amended Complaint ¶ 88, at 42. A variety of conflicts of interest, however, undercut the Rating Agency Defendants' independence. See Amended Complaint ¶ 88, at 42. More specifically: (i) the Rating Agency Defendants' desire for increased market share and revenue from the increased volume of rating MBS deals caused them to provide unsupported credit ratings by using outdated models; (ii) Moody's "underwent a revision in the compensation structure" in 2006 so that a larger percentage of its employees' compensation was deferred, making it more important to its analysts that they reach revenue numbers on a quarterly and annual basis, thus creating an improper incentive for the analysts to rate securities highly; and (iii) Moody's faced extreme pressure from Wall Street to refrain from downgrading MBS investments and succumbed to that pressure. See Amended Complaint ¶ 88, at 42-43.[13]

        The Rating Agency Defendants played a crucial role in the 2006-3, 2006-5, and 2007-4 offerings. See Amended Complaint ¶ 89, at 43. The certificates from the Thornburg Trusts could not have been issued without the investment-grade ratings from the Rating Agency Defendants. See Amended Complaint ¶ 89, at 43. Thus, in spite of the flawed, and/or non-existent underwriting standards that originators such as Wells Fargo employed, the Rating Agency Defendants continued to give the certificates AAA/Aaa ratings, the same ratings given to United States Treasury debt. See Amended Complaint ¶ 89, at 43.

---

      [13]As evidence of this pressure, the Plaintiffs point to Moody's "downgrad[ing] debt ratings" for MBS "in July 2007." Amended Complaint ¶ 88, at 42. "Wall Street's reaction was swift: Moody's market share dropped by 2/3 from a 75% market share in residential real estate-backed CDO's to 25%." Amended Complaint ¶ 88, at 42.

# PROCEDURAL BACKGROUND

This case is a federal securities class action that sets forth claims under the Securities Act and under the New Mexico Securities Act.[14]  Against the Depositor Defendants, the Individual Defendants, and the Underwriter Defendants, the Plaintiffs assert claims under section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, and section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2).  Against the Individual Defendants and the Underwriter Defendant RBS Securities, the Plaintiffs assert claims under section 15 of the Securities Act, 15 U.S.C. 77*o*.  Against all the Defendants, the Plaintiffs assert claims under the New Mexico Securities Act, N.M.S.A. 1978, §§ 58-13B-30[15] and 58-13B-40.[16]

## 1.   Procedural History.

Genesee County Employees' Retirement System ("Genesee County") filed its Original Complaint on February 27, 2009 in the First Judicial District, County of Santa Fe, State of New Mexico.  See Original Complaint.  Genesee County joined ten total Thornburg Trusts as Defendants in the Original Complaint: (i) the 2006-2 trust; (ii) the 2006-3 trust; (iii) the 2006-4 trust; (iv) the 2006-5 trust; (v) the 2006-6 trust; (vi) the 2007-1 trust; (vii) the 2007-2 trust; (viii) the 2007-3 trust; (ix) the 2007-4 trust; and (x) the 2007-5 trust.  See Original Complaint ¶ 41, at 14-15.  Genesee

---

[14]The current version of the New Mexico Securities Act appears at N.M.S.A. 1978, §§ 58-13C-101 through 58-13C-701.  The new version of the New Mexico Securities Act expressly contains a provision stating that: "The predecessor act exclusively governs all actions or proceedings that are pending on the effective date of the New Mexico Uniform Securities Act or may be instituted on the basis of conduct occurring before the effective date of the New Mexico Uniform Securities Act . . . ."  N.M.S.A. 1978, § 58-13C-701.

[15]The old version of this statute appeared at N.M.S.A. 1978, § 58-13B-30, which the legislature recently repealed and recodified at § 58-13C-501.

[16]The old version of this statute appeared at N.M.S.A. 1978, § 58-13B-40, which the legislature recently repealed and recodified at § 58-13C-509.

County, however, alleged that it made purchases only from the 2007-4 offering, not from the other ten offerings.  See Original Complaint ¶ 19, at 10.  The Original Complaint asserted the following causes of action under the Securities Act: (i) a section 11 claim; (ii) a section 12(a)(2) claim; and (iii) a section 15 claim.  See Class Action Complaint for Violations of the Securities Act of 1933 pt. 2 (dated February 27, 2009), filed March 27, 2009 (Doc. 1-2)("Original Complaint pt. 2").[17]  The Original Complaint did not assert any causes of action under the New Mexico Securities Act.

The Defendants removed this action on March 27, 2009.  See Notice of Removal (Doc. 1). On June 26, 2009, Maryland-National Capital and Midwest Operating filed The Maryland-National Capital Park & Planning Commission Employees' Retirement System's and Midwest Operating Engineers Pension Trust Fund's Motion for Appointment as Lead Plaintiff and Approval of Their Selection of Lead and Liason Counsel.  See Doc. 55.  On February 26, 2010, the Court granted the motion to appoint Maryland-National Capital and Midwest Operating as lead Plaintiff.  See Order Appointing the Maryland-National Capital Park & Planning Commission Employees' Retirement System and Midwest Operating Engineers Pension Trust Fund as Lead Plaintiff and Approving Lead Plaintiff's Selection of Lead Counsel (Doc. 83).  On December 10, 2010, the Plaintiffs filed their Amended Complaint.  See Amended Complaint.

On February 11, 2011, the Defendants, other than the Rating Agency Defendants and BA Securities, filed their Joint Motion seeking to dismiss the Plaintiffs' claims against them.  See Joint Motion at 2-3.  On February 11, 2011, BA Securities filed its Joinder in Motion in which it joined in the Joint Motion.  See  Joinder in Motion at 1-7.  On February 11, 2011, the Rating Agency Defendants filed their Rating Agency Defendants' Motion seeking dismissal of the claims against

---

[17]When the Defendants attached the Original Complaint to their notice of removal, they split the Original Complaint into two separate exhibits.

them.  <u>See</u> Rating Agency Defendants' Motion at 1.  On February 11, 2011, the Defendants who filed the Joint Motion requested that the Court take judicial notice of various SEC filings and some news articles relevant to the issue of inquiry notice.  <u>See</u> Request for Judicial Notice by Defendants Greenwich Capital Acceptance, Inc. (n/k/a RBS Acceptance Inc.), Structured Asset Mortgage Investments II, Inc., Credit Suisse Securities (USA) LLC, RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.), Robert J. McGinnis, Carol P. Mathis, Joseph N. Walsh III, John C. Anderson, James M. Esposito, Jeffrey L. Verschleiser, Michael B. Nierenberg, Jeffrey Mayer, and Thomas F. Marano in Support of Their Motion to Dismiss Plaintiffs' Amended Complaint (Doc. 127)("Request for Judicial Notice").

On March 30, 2011, the Plaintiffs filed their Lead Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss of Defendants Greenwich Capital Acceptance, Inc. (n/k/a RBS Acceptance, Inc.), Structured Asset Mortgage Investments II, Inc., Credit Suisse Securities (USA) LLC, RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.), Robert J. McGinnis, Carol P. Mathis, Joseph N. Walsh III, John C. Anderson, James M. Esposito, Jeffrey Verschleiser, Michael B. Nierenberg, Jeffrey Mayer and Thomas F. Marano and Banc of America Securities LLC's Joinder in the Motion to Dismiss of the Depositor Defendants, the Individual Defendants, Credit Suisse Securities (USA) LLC, and RBS Securities, Inc.  <u>See</u> Doc. 140 ("Response to Joint Motion").   On March 30, 2011, the Plaintiffs filed their Lead Plaintiffs' Memorandum of Law in Opposition to Rating Agency Defendants' Motion to Dismiss.  <u>See</u> Doc. 139 ("Response to Rating Agency Defendants' Motion").  At the end of both of these responses, the Plaintiffs specifically requested leave to amend to cure any defects if the Court decides to grant either motion to dismiss.  <u>See</u> Response to Joint Motion at 81 n.40; Response to Rating Agency Defendants' Motion at 32 n.25.

On May 12, 2011, the Defendants, other than the Rating Agency Defendants and BA

Securities, filed their reply to the Plaintiffs' Response to Joint Motion.  See Reply Memorandum of Law in Support of the Motion to Dismiss of Defendants Greenwich Capital Acceptance, Inc. (n/k/a RBS Acceptance, Inc.), Structured Asset Mortgage Investments II, Inc., Credit Suisse Securities (USA) LLC, RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.), Robert J. McGinnis, Carol P. Mathis, Joseph N. Walsh III, John C. Anderson, James M. Esposito, Jeffrey Verschleiser, Michael B. Nierenberg, Jeffrey Mayer, and Thomas F. Marano (Doc. 151)("Joint Reply").  On May 12, 2011, the Rating Agency Defendants filed their reply to the Plaintiffs' Response to Rating Agency Defendants' Motion.  See The Rating Agencies' Reply Memorandum of Law in Further Support of Their Motion to Dismiss with Prejudice the Amended Class Action Complaint (Doc. 149)("Rating Agency Defendants' Reply").  On May 12, 2011, Moody's filed a supplemental reply.  See The Moody's Defendants' Supplemental Reply Memorandum of Law in Further Support of the Rating Agencies' Motion to Dismiss with Prejudice the Amended Class Action Complaint (Doc. 148)("Moody's Reply").  On May 12, 2011, Fitch also filed a supplemental reply.  See Defendant Fitch, Inc's Supplemental Reply Memorandum of Law in Further Support of the Joint Motion to Dismiss the Amended Class Action Complaint (Doc. 150)("Fitch Reply").  On May 12, 2011, BA Securities filed its joinder in the Joint Reply.  See Banc of America Securities LLC's Joinder in the Reply in Further Support of the Motion to Dismiss of the Depositor Defendants, the Individual Defendants, Credit Suisse Securities (USA) LLC, and RBS Securities Inc. (Doc. 152)("BA Securities Reply").

On September 12, 2011, the Plaintiffs filed a notice of recent authority.  See Notice of Recent Authority in Further Support of Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss (Doc. 168).  On September 28, 2011, the Rating Agency Defendants filed with the Court a letter pointing out some recent authority favorable to their

position.  See Letter to the Court from Floyd Abrams (dated September 28, 2011), filed September 28, 2011 (Doc. 176)("Sept. 28, 2011 Letter").  On October 31, 2011, the Defendants filed a notice of supplemental authority to support their argument that the Plaintiffs do not have tranche-based standing to assert claims on behalf of the tranches in which they did not invest.  See Notice of Supplemental Authority for the Motion to Dismiss of Defendants Greenwich Capital Acceptance, Inc. (n/k/a RBS Acceptance Inc.), Structured Asset Mortgage Investments II, Inc., Credit Suisse Securities (USA) LLC, RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.), Robert J. McGinnis, Carol P. Mathis, Joseph N. Walsh III, John C. Anderson, James M. Esposito, Jeffrey Verschleiser, Michael B. Nierenberg, Jeffrey Mayer, and Thomas F. Marano (Doc. 180).

In the Joint Motion, the Defendants assert that the Court should dismiss the claims against them.  See Memorandum of Law in Support of the Motion to Dismiss of Defendants Greenwich Capital Acceptance, Inc. (n/k/a RBS Acceptance Inc.), Structured Asset Mortgage Investments II, Inc., Credit Suisse Securities (USA) LLC, RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.), Robert J. McGinnis, Carol P. Mathis, Joseph N. Walsh III, John C. Anderson, James M. Esposito, Jeffrey Verschleiser, Michael B. Nierenberg, Jeffrey Mayer, and Thomas F. Marano, filed February 21, 2011 (Doc. 126)("Memorandum in Support of Joint Motion").  With respect to standing, the Defendants argue that the Plaintiffs have not suffered a cognizable economic loss and thus lack standing to assert their claims.  See Memorandum in Support of Joint Motion at 40-44. The Defendants also assert that Genesee County lacked standing to assert any claims regarding any offering other than the 2007-4 offering at the time it filed the Original Complaint.  See Memorandum in Support of Joint Motion at 57.  Thus, they assert, the applicable statute of repose bars the Plaintiffs' claims relating to the 2006-3 and 2006-5 offerings. See Memorandum in Support of Joint Motion at 58.  They argue that the Amended Complaint does not relate back to the Original

Complaint.  See Memorandum in Support of Joint Motion at 57.  The Defendants contend that the Plaintiffs as a matter of law had inquiry notice of their claims one year before the filing of this action, thus barring their claims under the applicable statute of limitations.  See Memorandum in Support of Joint Motion at 52-58.

Additionally, the Defendants contend in the Joint Motion that the Plaintiffs have not pled any actionable misrepresentations or omissions.  See Memorandum in Support of Joint Motion at 22-40. The Defendants also contend that the Plaintiffs have failed to allege facts necessary to properly assert a section 12(a)(2) claim.  See Memorandum in Support of Joint Motion at 44-47. Furthermore, the Defendants assert that the Plaintiffs have not pled reliance on any alleged misrepresentations in the 2006-5 offering documents, which undercuts their section 12(a)(2) claim. See Memorandum in Support of Joint Motion at 47-48.  The Defendants argue that the Plaintiffs have failed to state a control-person claim under section 15 of the Securities Act based on: (i) the absence of a primary violation by the Depositor Defendants; and (ii) the failure to plead facts demonstrating that the Individual Defendants or RBS Securities were control persons of the Depositor Defendants.  See Memorandum in Support of Joint Motion at 59-61.  Lastly, the Defendants contend that the Court should dismiss the Plaintiffs' claims under the New Mexico Securities Act for the following reasons: (i) the Plaintiffs do not allege that they purchased certificates, or were offered certificates, in New Mexico; (ii) the Plaintiffs fail to state a claim under the New Mexico Securities Act based on the statutory limitations for whom this act authorizes liability; and (iii) the Plaintiffs' claims relating to the 2006-3 and 2006-5 offerings are time-barred under the New Mexico Securities Act.

The Rating Agency Defendants contend that the Court should dismiss all of the Plaintiffs' claims against them.  See The Rating Agencies' Memorandum of Law in Support of Their Motion

to Dismiss with Prejudice the Amended Class Action Complaint, filed February 11, 2011 (Doc. 129)("Memorandum in Support of Rating Agency Defendants' Motion").  Specifically, they argue that the Amended Complaint fails to allege that any relevant conduct occurred in New Mexico to trigger the application of the New Mexico Securities Act.  <u>See</u> Memorandum in Support of Rating Agency Defendants' Motion at 13-14.  The Rating Agency Defendants contend that the Plaintiffs' claims fail because the Rating Agency Defendants are not sellers, offerors, or otherwise liable parties under the New Mexico Securities Act.  <u>See</u> Memorandum in Support of Rating Agency Defendants' Motion at 14-18.  The Rating Agency Defendants further contend that the Amended Complaint fails to allege any actionable misrepresentation or omission.  <u>See</u> Memorandum in Support of Rating Agency Defendants' Motion at 19-25.  The Rating Agency Defendants also argue that CRARA, preempts the Plaintiffs' claims against them.  <u>See</u> Memorandum in Support of Rating Agency Defendants' Motion at 25-31.  Lastly, the Rating Agency Defendants argue that the First Amendment bars the claims against them for the following reasons: (i) ratings are protected opinions incapable of proving true or false; and (ii) the Plaintiffs have failed to plead that the Rating Agency Defendants issued their ratings with actual malice.  <u>See</u> Memorandum in Support of Rating Agency Defendants' Motion at 31-34.

     **2.**      **The Hearing.**

On September 19, 2011, the Court heard oral argument from the Plaintiffs and the Defendants in connection with the Joint Motion and the Rating Agency Defendants' Motion. Robert Serio, who spoke on behalf of the Defendants who brought the Joint Motion, noted that at least one court has found that a plaintiff has standing to assert a claim on behalf of a class with respect to only the tranche levels in which the plaintiff invested.  <u>See</u> Transcript of Hearing at 8:23-9:3 (taken

September 19, 2011)("Tr.")(Serio).[18]  Mr. Serio also pointed to a variety of risk disclosures in the respective offering documents that he argued undercut the Plaintiffs' material misrepresentation arguments.  <u>See</u> Tr. at 10:4-11:18 (Serio).  The Plaintiffs downplayed the significance of these disclosures.  <u>See</u> Tr. at 14:4-12 (Goldstein).  The Plaintiffs also argued that resolving many of the issues in this case at the pleading stage is not proper.  <u>See</u> Tr. at 16:11-15 (Goldstein).  The Plaintiffs asserted that the materiality allegations in this case, most of which revolve around the Defendants' systematic abandonment of the standards which they represented that they would follow in the offering documents, have been successful in other courts.  <u>See</u> Tr. at 16:22-17:23 (Goldstein).  The Plaintiffs stated that the Defendants have incorrectly argued that a plaintiff must plead the existence of confidential witnesses, put forward internal electronically transmitted mail messages, and have information from an insider for these materiality allegations to survive a motion to dismiss.  <u>See</u> Tr. at 17:24-20:17 (Goldstein).  The Plaintiffs noted their position that even disclosure by a defendant that they will not follow their guidelines may not be sufficient to avoid liability under securities law, depending upon the nature of the disclosure or the nature of the alleged conduct.  <u>See</u> Tr. 20:14-22:7 (Court, Goldstein).  They also noted that what federal securities law requires is that, when a company opens their mouth, they are required to speak the entire truth.  <u>See</u> Tr. 35:14-21 (Goldstein).  The Plaintiffs clarified that they are not arguing that the Defendants had a general duty to disclose, but rather an obligation to speak the entire truth when they choose to speak on an issue.  <u>See</u> Tr. 36:14-20 (Goldstein).  The Plaintiffs also argued that the Defendants have generally tried to distance themselves from unfavorable cases on these issues in their briefing.  <u>See</u> Tr. 38:7-9 (Goldstein).  The Plaintiffs emphasized that section 11 claims under the Securities Act must satisfy

---

[18]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

a lower standard than comparable rule 10b-5 cases under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78pp, which must satisfy higher pleading standards under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, and rule 9(b). See Tr. at 41:14-23 (Goldstein). The Plaintiffs noted that rule 10b-5 claims must satisfy additional elements to establish liability. See Tr. at 41:14-23 (Goldstein). The Plaintiffs conceded, however, that the allegations regarding Thornburg Mortgage Home Loans' loan-origination practices are less specific than the allegations regarding Wells Fargo's loan-origination practices. See Tr. at 54:3-6 (Goldstein).

Mr. Serio conceded that roughly a dozen securities cases alleging underwriting-standard abandonment have survived motions to dismiss. See Tr. at 28:17-18 (Serio). Mr. Serio distinguished those cases, however, based on the lack of factual allegations in this case. See Tr. at 29:11-21 (Serio). Mr. Serio also argued that property appraisals are not statements of facts, but opinions. See Tr. at 43:16-44:2 (Serio). Thus, he argued, a plaintiff must typically allege that the appraiser does not believe the appraisal at the time it was issued. See Tr. at 45:1-3 (Serio). Mr. Serio made the same basic argument about statements regarding LTV ratios. See Tr. at 48:7-11 (Serio). Mr. Serio also pointed out that the Plaintiffs have not alleged that they made any request for repurchase or substitution of noncomplying loans, which he argues undercuts their ability to proceed with a misrepresentation claim based on that process being the exclusive method of curing such a problem. See Tr. at 58:10-22 (Serio). The Plaintiffs countered that many courts have rejected this repurchase or substitution argument as inconsistent with the federal securities law scheme. See Tr. at 60:1-11 (Goldstein).

Floyd Abrams spoke on behalf of the Rating Agency Defendants. He contended that, as a threshold matter, the New Mexico Securities Act does not permit suits against rating agencies, as that act applies only to those who sell or offer to sell a security within a state. See Tr. at 74:10-24

-36-

(Abrams).  Furthermore, Mr. Abrams argued that ratings are opinions and generally not actionable.
<u>See</u> Tr. at 75:7-15 (Abrams).  The Plaintiffs argued that, although rating agencies themselves may
be exempt from liability under federal securities law, the ratings themselves can still qualify as an
actionable statement in offering documents.  <u>See</u> Tr. at 78:22-80:3 (Myers, Court).  The Plaintiffs
also contended that, while ratings may be opinions, they contain factual components that can result
in liability for a rating agency.  <u>See</u> Tr. at 83:16-84:1 (Myers).  Julia Wood, attorney for Fitch,
contended that there are no allegations in the Amended Complaint that Fitch did not honestly believe
its ratings when it issued them.  <u>See</u> Tr. at 103:4-11 (Wood).

On the issue of cognizable economic loss, Mr. Serio argued that the Plaintiffs have not
demonstrated they have suffered an injury based on their failure to allege that they have not received
any pass-through payments of interest or principal on these certificates.  <u>See</u> Tr. at 105:15-24
(Serio).  He contended that devaluation in the secondary market alone is not enough to establish
liability, particularly given the disclosures in the offering documents that there may be no secondary
market.  <u>See</u> Tr. at 106:7:17 (Serio).  The Plaintiffs countered that this argument misrepresents the
nature of the damage scheme under the Securities Act, which allows for recovery in a broader range
of contexts than the Defendants acknowledge.  <u>See</u> Tr. at 112:25-114:11 (Goldstein).  The Plaintiffs
also argued that they have no obligation to plead loss causation as this is not a rule 10b-5 action.
<u>See</u> Tr. at 116:4-117:5 (Goldstein).  Mr. Serio withdrew the Defendants' argument that the Plaintiffs
did not suffer an actual loss from their investment in the 2006-5 offering, based on the Defendants
realization that they miscalculated Midwest Operating's damages with respect to the 2006-5
offering.  <u>See</u> Tr. at 120:17-23 (Serio).

With respect to the adequacy of the Plaintiff's allegations to pursue a claim under section
12(a)(2), Aric H. Wu, speaking on behalf of the non-Rating Agency Defendants, argued that the

Plaintiffs must plead two specific things: (i) the purchase of a security at an initial public offering; and (ii) that they purchased the security directly from a particular defendant, or that a particular defendant engaged in the direct or active solicitation of the immediate sale to the particular plaintiff. See Tr. at 124:6-12 (Wu). Mr. Wu contended that the Plaintiffs have made no specific factual allegations regarding each Defendant, but have instead lumped all the Defendants together. See Tr. at 125:15-20 (Wu). Given time constraints at the all day hearing, the Plaintiffs said they were willing to rest on their briefing on this issue and also requested leave to amend if the Court concludes that the section 12(a)(2) allegations are not sufficient. See Tr. at 128:4-12 (Goldstein).

Regarding whether the one-year presumption of reliance for the Plaintiffs section 11 claims applies, Mr. Wu argued that Midwest Operating is the only Plaintiff who alleges purchases of the 2006-5 certificates, which did not occur until October 17, 2007. See Tr. at 131:18-23 (Wu). Mr. Wu argued that, because the Plaintiffs have not alleged that they relied on any misrepresentations in the 2006-5 offering documents, they have not adequately stated a section 11 claim with respect to the 2006-5 offering, as the offering initially occurred on August 29, 2006. See Tr. at 131:18-23 (Wu). Furthermore, Mr. Wu argued that the filing of monthly statements for a period of one year by the Defendants undercuts the presumption of reliance based on 15 U.S.C. § 77k(a).[19] The

---

[19]15 U.S.C. § 77k(a) provides:

If [a plaintiff] acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person.

15 U.S.C. § 77k(a).

-38-

Plaintiffs argued that the documents which the Defendants have filed do not qualify as earning statements, and thus this statute does not apply. See Tr. at 137:5-17 (Court, Goldstein).

With respect to the standing issues in the case, the Court inquired whether it should decide those issues first before addressing the alleged misrepresentations in the case. See Tr. at 119:13-15 (Court). Mr. Serio recognized the complexity and number of arguments in the case, and agreed with the Court that it would be proper to address the standing issues first. See Tr. at 119:16-21 (Serio). Mr. Serio argued that some cases have found that purchasers in some tranches of an MBS offering did not have constitutional standing to assert claims relating to the other tranches in which they did not invest. See Tr. at 141:19-142:16 (Serio). Mr. Serio pointed out that there are twenty different tranches for some of the offerings and that the Plaintiffs have purchased certificates from roughly six of them. See Tr. at 142:17-21 (Serio). Mr. Serio noted that the certificates in the different tranches received different ratings in some cases, although many of them still received investment-grade ratings. See Tr. at 143:9-15 (Serio). The Plaintiffs countered that there is one offering, regardless of the number of tranches. See Tr. at 144:24-145:6 (Goldstein). The Plaintiffs also point out that the Defendants untimely raised this argument in their reply brief. See Tr. at 145:7-16 (Goldstein). The Plaintiffs argued that the concept that the tranches initially received different ratings does not matter in this case, because the Plaintiffs allege that the ratings were false. See Tr. at 146:14-147:18 (Court, Goldstein). Furthermore, the Plaintiffs contended that the misrepresentations flow to all of the tranches as the same offering documents applied to all the tranches. See Tr. at 147:25-148:3 (Goldstein).

With respect to the statute of limitations and statute of repose issues in the case, Mr. Serio recognized that it would also be appropriate for the Court to address those issues as a threshold matter. See Tr. at 151:2-9 (Serio). Mr. Serio argued that the Plaintiffs as a matter of law had inquiry

notice of their claims more than one year before they filed their Original Complaint.  <u>See</u> Tr. at 152:13-17 (Serio).  The Court questioned whether it could properly consider the news articles the Defendants have submitted to the Court on the issue of inquiry notice.  <u>See</u> Tr. at 158:1-4 (Court). Mr. Serio argued that it would be appropriate.  <u>See</u> Tr. at 158:5-9 (Serio).  The Plaintiffs did not contest this issue at the hearing, but noted that some of the news articles in question were not from particularly prominent publications.  <u>See</u> Tr. at 175:21-176:15 (Court, Goldstein).  Mr. Serio contended that the Plaintiffs were on notice based on statements in the offering documents that the Thornburg Trusts contained riskier Alt-A mortgage loans.  <u>See</u> Tr. at 165:1-9 (Serio).  The Court questioned whether those alleged disclosures were relevant given the nature of the Plaintiffs' allegations in this case.  <u>See</u> Tr. at 165:13-166:5 (Court).  The Plaintiffs emphasized that resolving inquiry notice at the pleadings stage of a case is in almost all cases inappropriate.  <u>See</u> Tr. at 169:16-170:6 (Goldstein).  The Plaintiffs also contend that they do not have to set forth specific factual allegations regarding their compliance with the one-year statute of limitations.  <u>See</u> Tr. at 171:23-172:18 (Goldstein).  The Plaintiffs sought leave to amend if the Court concludes their current pleadings on this issue are not sufficient.  <u>See</u> Tr. at 177:3-6 (Goldstein).

Mr. Serio also contended that <u>American Pipe & Construction Co. v. Utah</u>, 414 U.S. 538, 553 (1974), tolling does not apply to the one-year statute of limitations and three-year statute of repose applicable in this case.  <u>See</u> Tr. at 169:3-11 (Serio).  Specifically, Mr. Serio contended that, because the Plaintiffs did not file a complaint that alleged purchases from the 2006-3 and 2006-5 offerings until they filed their Amended Complaint, the statute of repose bars those claims.  <u>See</u> Tr. at 179:1-11 (Serio).  Mr. Serio conceded, however, that courts have split regarding the application of this form of tolling to a situation like this one.  <u>See</u> Tr. at 179:17-21 (Serio).  He argued that courts that have applied tolling under these circumstances have lost sight of the importance of constitutional

standing.  See Tr. at 182:4-13 (Serio).  The Plaintiffs countered that the Original Complaint asserted claims relating to the 2006-3 and 2006-5 offerings.  See Tr. at 187:16-24 (Goldstein).  Regarding the alleged lack of standing for the 2006-3 and 2006-5 offerings, the Plaintiffs argued that they dropped the claims relating to seven of the ten Thornburg Trusts, because the law became more clear following the filing of the Original Complaint that the Plaintiffs would not have standing regarding these offerings.  See Tr. at 189:8-21 (Goldstein).  The Plaintiffs pointed out, however, that the law in February 2009 on this issue was not as clear.  See Tr. at 189:18-21 (Goldstein).  They argue that there was at least some authority as of the time of filing the Original Complaint that supported the argument that Genesee County had standing, thus allowing a reasonable class member to rely on Genesee County's filing of the class action on their behalf.  See Tr. at 189:22-17 (Goldstein).  The Plaintiffs also distinguished some contrary authority on the basis that, in those cases, a dismissal or denial of class certification had already taken place, unlike the current case.  See Tr. at 190:23-191:10 (Goldstein).

On the issue of control-person liability under section 15, Mr. Wu argued for the Defendants, other than the Rating Agency Defendants, that the Plaintiffs' allegations are overly conclusory.  See Tr. at 198:25-200:9, 200:21-202:15 (Wu).  The Plaintiffs argued that they have no obligation to show that the alleged control person culpably participated in the primary violation of securities law.  See Tr. at 202:18-23 (Goldstein).  The Plaintiffs also pointed to some specific factual allegations they made on the issue of control-person liability.  See Tr. at 202:25-203:5 (Goldstein).

With respect to the New Mexico Securities Act, Mr. Wu argued for the Defendants, other than the Rating Agency Defendants, that, if the Plaintiffs cannot state a federal securities law claim they also cannot assert a state securities law claim.  See Tr. at 203:10-17 (Wu).  Mr. Wu also argued that there must be a jurisdictional nexus under the New Mexico Securities Act to state a claim under

-41-

the act, specifically that the plaintiff purchased or was offered the challenged security in New Mexico. See Tr. at 203:18-23 (Wu). Mr. Abrams reiterated this same argument for the Rating Agency Defendants. See Tr. at 206:2-25 (Abrams). Furthermore, Mr. Abrams argued that the New Mexico Securities Act does not allow for suits against a rating agency, as such a claim would not fall within the applicable statutory language requiring a person to sell or offer to sell a security. See Tr. at 207:14-208:19 (Abrams). With respect to the jurisdictional issue, the Plaintiffs countered that it is only necessary for the offer to originate in the state. See Tr. at 211:21-212:9 (Myers). The Plaintiffs also argued that the New Mexico Securities Act does not require the defendant to be a seller of a security to be liable. See Tr. at 213:10-19 (Myers). The Plaintiffs contend that, by including the rating in the offering documents, the statement is made in connection with the purchase or sale of a security. See Tr. at 213:20-214:9 (Court, Myers).

After the hearing, the Defendants submitted a letter to the Court addressing an issue raised at the hearing, specifically the effect of the United States Court of Appeals for the Tenth Circuit's recent opinion in Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d 1239 (10th Cir. 2011), on the disposition of this case. See Letter to the Court from Robert F. Serio (dated September 22, 2011), filed September 22, 2011 (Doc. 174)("Sept. 22, 2011 Letter"). The letter concludes that Lucero v. Bureau of Collection Recovery, Inc. does not affect this case, as that decision dealt with mootness rather than standing. See Sept. 22, 2011 Letter at 1-2.

### STANDARD FOR A MOTION TO DISMISS UNDER RULE 12(b)(6)

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint

is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca, 952 F.2d 1183, 1187 (10th Cir. 1991).

A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's burden to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 546 (2007). See Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009)(stating that a plaintiff's complaint must set forth more than a threadbare recital "of the elements of a cause of action, supported by mere conclusory statements"). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 545 (citation omitted). To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. at 1940. "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007). The

United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 127 S Ct. at 1974)(citations omitted).

## LAW REGARDING TAKING JUDICIAL NOTICE OF DOCUMENTS WHEN RULING ON A MOTION TO DISMISS

Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (f). "Adjudicative facts are simply the facts of the particular case." United States v. Wolny, 133 F.3d 758, 764 (10th Cir. 1998)(quoting Advisory Committee Notes to rule 201). A court has discretion to take judicial notice of such facts, whether requested or not. See Fed. R. Evid. 201(c). On the other hand, if a party requests that the court take judicial notice of certain facts, and supplies the necessary information to the court, judicial notice is mandatory. See Fed. R. Evid. 201(d). Also, if the parties timely request an opportunity to be heard, the Court must grant such an opportunity "as to the propriety of taking judicial notice and the tenor of the matter noticed." Fed. R. Evid. 201(e).

Judicial notice may be taken during any stage of the judicial proceeding, including the stage of a motion to dismiss. See 21B C. Wright & K. Graham, Federal Practice & Procedure § 5110, at 294 & n.17 (2d ed. 2005). And, while ordinarily, a motion to dismiss must be converted to a motion

for summary judgment when the court considers matters outside the complaint, see Fed. R. Civ. P.

12(d), matters that are judicially noticeable do not have that effect, see Duprey v. Twelfth Judicial

Dist. Court, No. 08-0756, 2009 WL 2482171, at *7 (D.N.M. July 27, 2009)(Browning, J.)(citing

Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279 n.1 (10th Cir. 2004)).[20]  Also, when

considering a motion to dismiss, "the court is permitted to take judicial notice of its own files and

records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d

560, 568 (10th Cir. 2000) abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955

(10th Cir. 2001).  The documents judicially noticed, however, should not be considered for the truth

of the matters asserted therein:

> Exhibits attached to a complaint are properly treated as part of the pleadings for
> purposes of ruling on a motion to dismiss.  Ordinarily, consideration of material
> attached to a defendant's answer or motion to dismiss requires the court to convert
> the motion into one for summary judgment and afford the parties notice and an
> opportunity to present relevant evidence.  However, facts subject to judicial notice
> may be considered in a Rule 12(b)(6) motion without converting the motion to
> dismiss into a motion for summary judgment.  This allows the court to take judicial
> notice of its own files and records, as well as facts which are a matter of public

---

[20] An unpublished case from the Tenth Circuit, see Carter v. Daniels, 91 F.App'x 83 (10th
Cir. 2004), might seem to hold to the contrary.  See 91 F.App'x at 85-87.  It appears, however, that
the lower court in Carter v. Daniels took judicial notice, not only of the existence of the statements
in the documents referenced, but also assumed the truth of the content of those documents.  See 91
F.App'x at 85 ("The district court noted in its Order [granting a 12(b)(6) motion to dismiss] that
'[t]he record reveals Daniels received a default judgment against Plaintiff on behalf of Payne, and
attempted to execute on the judgment.'").  See also Nichols v. United States, 796 F.2d 361, 364
(10th Cir. 1986)("The district court in this case did not exclude the documents and affidavits
submitted by both parties but incorporated facts which were not alleged in the pleadings into its
order dismissing the case.").  Grynberg v. Koch Gateway Pipeline Co., a published Tenth Circuit
decision, also from 2004, cites to 27A Fed. Proc. § 62:520, and summarizes that source as setting
forth a rule that "facts subject to judicial notice may be considered without converting a motion to
dismiss into a motion for summary judgment."  Grynberg v. Koch Gateway Pipeline Co., 390 F.3d
at 1279 n.1.  Tal v. Hogan, 453 F.3d 1244 (10th Cir. 2006), is even more explicit on this point.  The
Court finds that, so long as it takes judicial notice only of the existence and content of the submitted,
publicly filed documents, but does not assume the truth of the statements therein, it does not run
afoul of the Tenth Circuit's rule on this issue.  See Tal v. Hogan, 453 F.3d at 1265 n.24.

record.  However, the documents may only be considered to show their contents, not
to prove the truth of matters asserted therein.

Tal v. Hogan, 453 F.3d at 1265 n.24 (alterations omitted)(citations omitted)(internal quotation marks

omitted).

      In addition to those documents that are judicially noticeable, a court may consider documents

to which the complaint refers, if the documents are central to the plaintiff's claim and the parties do

not dispute their authenticity.  See Jacobsen v. Deseret Book Co., 287 F.3d 936, 941-42 (10th Cir.

2002).  If a document is not incorporated by reference or attached to the complaint, but is referenced

in the complaint and is central to the plaintiff's claim, the defendant may submit an "indisputably

authentic copy to the court to be considered on a motion to dismiss."  GFF Corp. v. Assoc.

Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997).  See 5A C. Wright & A. Miller,

Federal Practice & Procedure § 1327, at 438-39 (3d ed. 2004)("[W]hen the plaintiff fails to

introduce a pertinent document as part of her pleading . . . the defendant may introduce the

document as an exhibit to a motion attacking the sufficiency of the pleading.").

## RELEVANT FEDERAL SECURITIES LAW

      Congress put the Securities Act of 1933 in place to provide greater protection to purchasers

of registered securities than the states and common law afforded.  See Herman & MacLean v.

Huddleston, 459 U.S. 375, 383 (1983).  Claims under the Securities Act are much more limited in

scope than are those under the Exchange Act.  The Securities Act is not concerned with the

"aftermarket" -- individuals and entities buying stock from one another; rather, the Securities Act

is concerned only with initial offerings, where a company sells its securities to the public.  In a

Securities Act claim, the only pertinent representations are those made within the four corners of

the issuers' offering documents or in documents expressly incorporated therein.  See Blue Chip

Stamps v. Manor Drug Stores, 421 U.S. 723, 752 (1975).

The PSLRA does not appear to affect the pleading standards under the Securities Act, because the PSLRA's heightened pleading requirements apply only in "private action[s] arising under this chapter," 15 U.S.C. § 78u-4(b)(1), and "this chapter" refers to Chapter 2B of Title 15. The Securities Act of 1933, however, is Chapter 2A, see 15 U.S.C. § 77a ("This subchapter[, subchapter I of Chapter 2A,] may be cited as the 'Securities Act of 1933'."); 15 U.S.C. § 78a ("This chapter[, chapter 2B,] may be cited as the 'Securities Exchange Act of 1934'."), and the parties have shown the Court no binding authority for applying the PSLRA's heightened pleading standard to claims under the Securities Act.  See In re Stac Elec. Sec. Litg., 89 F.3d 1399, 1404-05 (9th Cir. 1996)(en banc)("We now clarify that the particularity requirements of Rule 9(b) apply to claims brought under Section 11 when, as here, they are grounded in fraud."); In re Thornburg Mortg., Inc. Sec. Litig., 695 F.Supp.2d 1165, 1190 (D.N.M. 2010)(Browning, J.).[21]

Under certain circumstances, the heightened-pleading requirements of rule 9(b) of the Federal Rules of Civil Procedure might apply to allegations of material misstatements in a Securities Act claim.  See Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1251-52 (10th Cir. 1997). When a plaintiff's Securities Act claim is based on negligent or innocent conduct, rather than fraudulent conduct, a court applies the more lenient pleading standards of rule 8(a).  See Schwartz v. Celestial Seasonings, Inc., 124 F.3d at 1251-52.  In comparison, if a plaintiff's claim is based on fraud in a rule 10b-5 case, "the misrepresentation claims pled must satisfy the 'particularity' requirement of Rule 9(b) of the Federal Rules of Civil Procedure, the 'plausibility' requirement of Iqbal, and the scienter requirement of the PSLRA."  Reese v. BP Exploration (Alaska) Inc., 643 F.3d

---

[21]The Securities Act contains its own provisions regarding various other aspects of the PSLRA, such as the discovery stay.  See 15 U.S.C. 77z-1(b).

681, 690-91 (9th Cir. 2011).  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007)("Exacting pleading requirements are among the control measures Congress included in the PSLRA.  The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter . . . ."); Johnson v. Siemens AG, No. 09-5310, 2011 WL 1304267, at *12 (E.D.N.Y. March 31, 2011)(noting that the PSLRA's particularity requirements are more stringent than the plausibility requirements of Ashcroft v. Iqbal); In re Thornburg Mortg., Inc. Sec. Litig., 695 F.Supp.2d at 1190.

### 1.    Section 11 of the Securities Act.

Section 11 of the Securities Act imposes liability upon every person who, among other things, (i) signed the registration statement, (ii) was a director of the issuer, (iii) was an underwriter of the offering, or (iv) prepared or certified any report or valuation used in connection with the registration statement, for any materially misleading statements and omissions made therein.  See 15 U.S.C. § 77k.  "The pleading requirements of a § 11 claim are less stringent than that of a § 10(b) claim," and it "imposes strict liability against the issuer of securities where a registration statement contains material misstatements or omits material facts."  Schaffer v. Evolving Sys., Inc., 29 F.Supp.2d 1213, 1220 (D. Colo. 1998)(Brimmer, J.)(citing Herman & MacLean v. Huddleston, 459 U.S. at 381).  Even innocent misrepresentations will subject the issuer of securities to liability under section 11.  See Herman & MacLean v. Huddleston, 459 U.S. at 381 ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case.  Liability against the issuer of a security is virtually absolute, even for innocent misstatements.").

A claim under section 11 must be based on a registration statement filed with the SEC.  See Herman & MacLean v. Huddleston, 459 U.S. at 381; Schaffer v. Evolving Sys., Inc., 29 F.Supp.2d

at 1220.  A section 11 plaintiff must identify a material misrepresentation within the four corners

of the challenged registration statement, or an omission of a material fact required to be stated

therein or necessary to make the statements therein not misleading.  See Herman & MacLean v.

Huddleston, 459 U.S. at 381-82 (contrasting § 11 of the Securities Act with § 10(b) of the Exchange

Act); Grimm v. Whitney-Fidalgo Seafoods, Inc., No. 73-1304, 1973 WL 495, at *2 (S.D.N.Y. Dec.

4, 1973)(Brieant, J.).  Corporate insiders potentially face section 11 liability for material false

statements in registration statements only if they were directors at the time of the offering or if they

personally signed the registration statement at issue.  See In re Williams Sec. Litig., 339 F.Supp.2d

1242, 1269 (N.D. Okla. 2003)(Holmes, C.J.).  Under section 11, "reliance may be established

without proof of the reading of the registration statement by such person."  15 U.S.C. § 77k(a).

Courts describe this provision as creating "a conclusive presumption of reliance for any person

purchasing the security . . . ."  APA Excelsior III L.P. v. Premiere Techs., Inc., 476 F.3d 1261, 1271

(11th Cir. 2007).  The presumption of reliance applicable to section 11 claims, however, does not

apply where an investor "acquired the security after the issuer has made generally available to its

security holders an earning statement covering a period of at least 12 months beginning after the

effective date of the registration statement."  15 U.S.C. § 77k(a).

**2.      Section 12(a)(2) of the Securities Act.**

Section 12(a)(2) of the Securities Act provides that:

> Any person who . . . offers or sells a security . . . by the use of any means or
> instruments of transportation or communication in interstate commerce or of the
> mails, by means of a prospectus or oral communication, which includes an untrue
> statement of a material fact or omits to state a material fact necessary in order to
> make the statements, in the light of the circumstances under which they were made,
> not misleading . . . and who shall not sustain the burden of proof that he did not
> know, and in the exercise of reasonable care could not have known, of such untruth
> or omission, shall be liable . . . to the person purchasing such security from him . . . .

15 U.S.C. § 77*l*(a).  A claim under section 12(a)(2) must be based on a prospectus delivered to persons or an entity purchasing securities in a offering, which generally incorporates the SEC registration statement.  Even if a section 12(a)(2) claim is based on an oral statement, the oral statement must relate to a prospectus.  See Gustafson v. Alloyd Co., 513 U.S. 561, 567-68 (1995). The section 12(a)(2) claim must identify a material misrepresentation in or omission from either the prospectus or an oral representation directly concerning the prospectus.  See Gustafson v. Alloyd Co., 513 U.S. at 577-78.  Section 12(a)(2) liability is similar to section 11 liability, in that "[t]he purchaser need not prove scienter, fraud, or negligence on the part of the seller, nor need he establish that he relied upon the misrepresentation or omission or that his or her loss was a direct or proximate result of the misrepresentation or omission."  Schaffer v. Evolving Systems, Inc., 29 F.Supp.2d at 1220 (citing MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/American Express Inc., 886 F.2d 1249, 1256-57 (10th Cir. 1989)).  Unlike a section 11 claim, however, the only proper defendants in a section 12(a)(2) action are those who "offer or sell" unregistered securities.  Schaffer v. Evolving Systems, Inc., 29 F.Supp.2d at 1220 (citing Pinter v. Dahl, 486 U.S. 622, 641 (1988)).  The Tenth Circuit has recognized that liability also extends "to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  Maher v. Durango Metals, Inc., 144 F.3d 1302, 1307 (10th Cir. 1998)(quoting Pinter v. Dahl, 486 U.S. at 647).

### 3.     The Material-Statement-or-Omission Requirement.

There can be no liability under section 11 or 12(a)(2) of the Securities Act unless the plaintiff can identify, within the four corners of the offering documents, some false or misleading material statement or omission.  See 15 U.S.C. § 77k (creating a cause of action where a registration statement "contained an untrue statement of a material fact or omitted to state a material fact

required to be stated therein or necessary to make the statements therein not misleading"); 15 U.S.C. § 77*l*(a) (creating a cause of action where a prospectus "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading "). The statement or omission must not merely be false now; rather, it must have been false at the time that the document containing it was created. See Grossman v. Novell, Inc., 120 F.3d 1112, 1124 (10th Cir. 1997)("What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation . . . ."); 15 U.S.C. § 77k(a) (creating a claim when "any part of the registration statement, when such part became effective, contained an untrue statement").

A statement of fact is material if "a reasonable person would consider it important in determining whether to buy or sell" securities. Schaffer v. Evolving Systems, Inc., 29 F.Supp. at 1220-21 (citing Grossman v. Novell, Inc., 120 F.3d at 1119). In a similar context -- a claim under section 14 of the Securities Exchange Act of 1934 -- the Supreme Court of the United States has said that a statement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the public. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). Courts in the Tenth Circuit should "not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial." McDonald v. Kinder-Morgan, Inc., 287 F.3d 992, 997 (10th Cir. 2002)(quoting Grossman v. Novell, Inc., 120 F.3d at 1118). The Tenth Circuit, in the context of securities fraud claims under section 10(b) of the Exchange Act and SEC rule 10b-5, has identified two categories of statements that are, as a matter of law, not materially misleading: vague statements of corporate optimism and

"statements considered immaterial because other documents available to the investing public 'bespoke caution' about the subject matter of the alleged misstatement at issue." Grossman v. Novell, 120 F.3d at 1120. The Supreme Court, however, has recently emphasized that "[a]ny approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive." Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. 1309, 1318 (2011)(quoting Basic, Inc. v. Levinson, 485 U.S. 224, 236 (1988)). Likewise, the Supreme Court reiterated that it was "careful not to set too low a standard of materiality, for fear that management would bury the shareholders in an avalanche of trivial information." See Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. at 1318 (internal quotation marks omitted)(quoting Basic, Inc. v. Levinson, 485 U.S. at 231). In analyzing materiality in the context of a 12(b)(6) motion to dismiss, a court should consider whether the "allegations suffice to 'raise a reasonable expectation that discovery will reveal evidence' satisfying the materiality requirement, and to 'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. at 1323 (citations omitted)(quoting Ashcroft v. Iqbal, 129 S.Ct. at 1949; Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

Alleged omissions create another hurdle for the plaintiff. Unlike statements, omissions are actionable only if the plaintiff can establish that the defendant had a duty to disclose the omitted information. See McDonald v. Kinder-Morgan, Inc., 287 F.3d at 998 (stating that, in the context of the Exchange Act, "a duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement."). See also Basic v. Levinson, 485 U.S. at 239 n.17 ("To be actionable, of course, a statement must also be misleading. Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); Shaw v.

Digital Equip. Corp., 82 F.3d 1194, 1202 (1st Cir. 1996)(stating that, in the context of section 11 and 12(a)(2) claims, "[t]he proposition that silence, absent a duty to disclose, cannot be actionably misleading, is a fixture in federal securities law."). That principle is also found in the language of the two sections of the Securities Act at issue. Section 11 creates liability where a registration statement "omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. Section 12(a)(2), likewise, creates a cause of action where the documents "omit[] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l*(a). A defendant can therefore only be liable under these sections if he or she omitted material, required information from the offering documents or made incomplete disclosures that would give leave the reader with a material false impression.

Under the "bespeaks caution" doctrine, "certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002). "The 'bespeaks caution' rule is an application of the common-sense principle that the more a speaker qualifies a statement, the less people will be misled if the statement turns out to be false." United States v. Nacchio, 519 F.3d 1140, 1161 (10th Cir. 2008), vacated in part 519 F.3d 1140 (10th Cir. 2009). "At bottom, the 'bespeaks caution' doctrine stands for the 'unremarkable proposition that statements must be analyzed in context' when determining whether or not they are materially misleading." Grossman v. Novell, Inc., 120 F.3d 1112, 1120 (10th Cir. 1997)(quoting Rubinstein v. Collins, 20 F.3d 160, 167 (5th Cir. 1994). Plaintiffs can overcome cautionary language if the "language did not expressly warn or did not directly relate to the risk that brought about plaintiffs' loss." Halperin v. eBanker

USA.com, Inc., 295 F.3d at 359.  See Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538

F.Supp.2d 662, 669 (S.D.N.Y. 2008)(Crotty, J.)("[G]eneral risk disclosures in the face of specific

known risks which border on certainties do not bespeak caution.").  Furthermore, the bespeaks

caution doctrine normally applies only to forward-looking statements such as projections or

forecasts and not to representations of present fact.  See Plumbers' Union Local No. 12 Pension

Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 773 (1st Cir. 2011).  A court may properly

apply the bespeaks caution doctrine when considering a motion to dismiss.  See Grossman v. Novell,

Inc., 120 F.3d at 1120 n.7.

    **4.    Section 13 of the Securities Act.**

Section 13 of the Securities Act provides:

> No action shall be maintained to enforce any liability created under section 77k or
> 77$l$(a)(2) of this title unless brought within one year after the discovery of the untrue
> statement or the omission, or after such discovery should have been made by the
> exercise of reasonable diligence, or, if the action is to enforce a liability created
> under section 77$l$(a)(1) of this title, unless brought within one year after the violation
> upon which it is based.  In no event shall any such action be brought to enforce a
> liability created under section 77k or 77$l$(a)(1) of this title more than three years after
> the security was bona fide offered to the public, or under section 77$l$(a)(2) of this title
> more than three years after the sale.

15 U.S.C. § 77m.  Section 13 imposes a one-year statute of limitations on claims brought under

section 11 and section 12(a)(2) of the Securities Act.  See 15 U.S.C. § 77m.  Additionally, it imposes

a three-year statute of repose on claims brought under section 11 and section 12(a)(2).  Black's Law

Dictionary defines a statute of limitations as "a statute establishing a time limit for suing in a civil

case, based on the date when the claim accrued," to ensure the "diligent prosecution of known

claims, thereby providing finality and predictability in legal affairs and ensuring that claims will be

resolved while evidence is reasonably available and fresh." Black's Law Dictionary, supra, at 1549.

"Statutes of limitation, like the equitable doctrine of laches, in their conclusive effects are designed

to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." Order of R.R. Telegraphers v. Ry. Express Agency, Inc., 321 U.S. 342, 348-49 (1944).

On the other hand, "[s]tatutes of repose are intended to demarcate a period of time within which a plaintiff must bring claims or else the defendant's liability is extinguished." Joseph v. Wiles, 223 F.3d 1155, 1167-68 (10th Cir. 2000). A statute of repose "runs from a fixed date readily determinable by the defendant," thus serving the need for finality. Sterlin v. Biomune Sys., 154 F.3d 1191, 1196 n.9 (10th Cir. 1998)(quoting Caviness v. Derand Res. Corp., 983 F.2d 1295, 1300 n.7 (4th Cir.1993)). "Unlike a statute of limitations, a statute of repose may bar a claim before the injury occurs." Schneider v. Caterpillar, Inc., 301 F.App'x 755, 757 n.3 (10th Cir. 2008)(unpublished). As a general matter, the key difference between a statute of repose and a statute of limitations is that the former serves as an absolute time bar to suit whereas the latter can be tolled. See Bradley v. Val-Mejias, 379 F.3d 892, 897 (10th Cir. 2004).

### a.    Tolling of Statutes of Limitation and Repose.

When a plaintiff has filed a class action, the filing of the class action tolls the statute of limitations period under section 13 for all the putative class members until class certification is denied. See Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 353-54 (1983); Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 553; Joseph v. Wiles, 223 F.3d at 1167-68. Additionally, the Tenth Circuit has held that the filing of a class action also tolls the statute of repose for the putative class members as a form of legal tolling as opposed to equitable tolling.[22] See Joseph v. Wiles, 223 F.3d at 1168

---

[22]The Supreme Court has recognized that equitable tolling customarily applies to statutes of limitation. See Young v. United States, 535 U.S. 43, 49 (2002). "Equitable tolling is appropriate where, for example, the claimant has filed a defective pleading during the statutory period, or where the plaintiff has been induced or tricked by his adversary's misconduct into allowing the filing

(discussing the issue in the context of a section 11 claim).  In a situation where the district court has not yet decertified the class, the Tenth Circuit recognized: "Indeed, in a sense, application of the American Pipe tolling doctrine to cases such as this one does not involve 'tolling' at all.  Rather, [this putative class member] has effectively been a party to an action against these defendants since a class action covering him was requested but never denied."  Joseph v. Wiles, 223 F.3d at 1168.

Two years later in the Young v. United States opinion, the Supreme Court in a general discussion of equitable tolling included a citation to American Pipe & Construction Co. v. Utah as part of a see also string citation.  See Young v. United States, 535 U.S. at 49 (citing Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 553).  Some might argue that in doing so the Supreme Court expressly recognized that the principles in American Pipe & Construction Co. v. Utah rest on equitable tolling grounds as opposed to legal tolling grounds.  A plaintiff can normally toll a statute of repose through legal tolling, but not equitable tolling.  See Albano v. Shea Homes Ltd. P'ship, 634 F.3d 524, 535 (9th Cir. 2011).  The Supreme Court has recognized in a discussion of the 10b-5 statute of repose that the statute of repose was not subject to equitable tolling.  See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363 (1991).  The Tenth Circuit distinguished this case when concluding that American Pipe & Construction Co. v. Utah resulted in legal tolling of a statute of repose during the time period the class action is pending.  See Joseph v. Wiles, 223 F.3d at 1166-67.  In the absence of contrary Tenth Circuit authority on the issue, this Court does not read the Supreme Court's inclusion of American Pipe & Construction Co. v. Utah in a string citation with no substantive discussion of the opinion as support for the conclusion that American Pipe & Construction Co. v. Utah tolling rests only on equitable tolling grounds.

---

deadline to pass."  Joseph v. Wiles, 223 F.3d at 1166 (citations omitted).

Furthermore, the Tenth Circuit recently reaffirmed that it considers "American Pipe tolling [as] 'legal rather than equitable in nature.'"  State Farm Mut. Auto. Ins. Co. v. Boellstorff, 540 F.3d 1223, 1231-34 (10th Cir. 2008).  Likewise, the Tenth Circuit reiterated the importance of American Pipe & Construction Co. v. Utah's "pragmatic underpinnings."  State Farm Mut. Auto. Ins. Co. v. Boellstorff, 540 F.3d at 1232.  Thus, the recognition in Joseph v. Wiles that this form of tolling operates as legal tolling during the period the class action is pending applies in this Circuit.  See Joseph v. Wiles, 223 F.3d at 1168.

> **b.**     **Effect of lack of standing on tolling of statute of limitations and repose.**

In American Pipe & Construction Co. v. Utah and Crown, Cork & Seal Co. v. Parker, the Supreme Court did not directly address whether a plaintiff's lack of standing would prevent the tolling of the limitations period for putative class members.  In American Pipe & Construction Co. v. Utah, the plaintiffs sought to intervene in the lawsuit following a determination by the district court that the class was not a proper class under rule 23 of the Federal Rules of Civil Procedure for lack of numerosity.  See 414 U.S. at 542-43.  Concluding that the statute of limitations for the claim had run during the period the original plaintiff for the putative class had filed its claims, the district court denied intervention on statute of limitations grounds.   See Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 543-44.  Concluding that the statute of limitations had been tolled until the district court denied the class certification, the Supreme Court reversed the lower court's decision that the intervention was untimely.  See Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 552-55.  The Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 553 (emphasis added).  The Supreme Court based this decision to toll the statute of limitations on the

ground that a contrary rule would undermine "the efficiency and economy of litigation which is a principal purpose of the [class action] procedure," requiring other plaintiffs to intervene in the lawsuit or file separate class actions.  Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 553-54.  It further elaborated that "a rule requiring successful anticipation of the determination of the viability of the class would breed needless duplication of motions."  Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 553-54.  This rule does not conflict with the principles underlying statutes of limitation, because the filing of a class action "notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment."  Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 554.  As the Supreme Court then explained:

> Within the period set by the statute of limitations, the defendants have the essential information necessary to determine both the subject matter and size of the prospective litigation, whether the actual trial is conducted in the form of a class action, as a joint suit, or as a principal suit with additional intervenors.

Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 554.

In Crown, Cork & Seal Co. v. Parker, the Supreme Court clarified that its holding in American Pipe & Construction Co. v. Utah applied not only to intervenors, but all asserted members of the putative class.  See Crown, Cork & Seal Co. v. Parker, 462 U.S. at 352-53.  "Restricting the rule of American Pipe to intervenors might reduce the number of individual lawsuits filed against a particular defendant but, as discussed above, this decrease in litigation would be counterbalanced by an increase in protective filings in all class actions."  Crown, Cork & Seal Co. v. Parker, 462 U.S. at 353.  "[A]lthough a defendant may prefer not to defend against multiple actions in multiple forums once a class has been decertified, this is not an interest that statutes of limitations are designed to protect."  Crown, Cork & Seal Co. v. Parker, 462 U.S. at 353.  The Court emphasized

that defendants have other procedural tools at their disposal to address those concerns, such as seeking consolidation, seeking a transfer of proceedings, or instituting multi-district litigation. See Crown, Cork & Seal Co. v. Parker, 462 U.S. at 353.

Arguably, the Supreme Court has already decided the issue whether a plaintiff in a class action who a court ultimately determines lacks standing still tolls the statute of limitations for the putative class members. It stated in both of these opinions: "[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Crown, Cork & Seal Co. v. Parker, 462 U.S. at 353 (emphasis added)(quoting Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 554). However, American Pipe & Construction Co. v. Utah did note that the Court of Appeals said the class action was not decertified for "lack of standing of the representative, or for reasons of bad faith or frivolity." Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 553. Although neither case directly decided the issue, both opinions reflect a functional attitude towards class actions and tolling limitations periods for the purposes of reducing duplicative litigation. See Crown, Cork & Seal Co. v. Parker, 462 U.S. at 352-53; Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 553-54. Specifically, American Pipe & Construction Co. v. Utah stated: "[A] rule requiring successful anticipation of the determination of the viability of the class would breed needless duplication of motions." Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 553-54. Additionally, the Supreme Court, when specifically discussing the district court judge's decision on the numerosity issue in that case, pointed out:

> Not only would a district court's estimate of the expected attrition among the class of plaintiffs be difficult for any individual plaintiff to predict, but other federal courts have indicated that subsequent attrition will not be considered as a factor affecting numerosity under Rule 23(a)(1) when considered at the outset of the case. Indeed, one commentator has observed that "[t]he federal decisions under original Rule 23(a) reflect . . . contrariety of opinion as to the meaning of 'numerous.'"

-59-

Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 553 n.23 (alteration in original)(quoting 3B J. Moore,

Federal Practice ¶ 23.05, p. 23-279 (2d ed.)).  Thus, the difficulty class members face in predicting

a district court's particular determination on an issue during the class certification process, and the

existence of contrary authority on the specific issue influenced the Supreme Court's decision in that

case.  See Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 553 n.23.  The Tenth Circuit has expanded

the holding of those Supreme Court cases to claims involving statutes of repose, once again

emphasizing the practical concerns the American Pipe & Construction Co. v. Utah rule addresses.

See Joseph v. Wiles, 223 F.3d at 1167-68.

        The United States Court of Appeals for the Third Circuit has held that American Pipe &

Construction Co. v. Utah tolling applies to situations where the original named plaintiff in the

putative class action ultimately lacked standing to pursue the claims.  See McKowan Lowe & Co.,

Ltd. v. Jasmine, Ltd., 295 F.3d 380, 385 (3d Cir. 2002)("[W]e approved American Pipe tolling for

a later class representative on a claim that the original representative was without standing to

pursue.").  In the same context, the Third Circuit has also held that amendment of a pleading to add

a plaintiff as a party relates back to the original complaint if the added plaintiff was a member of the

asserted class.  See Haas v. Pittsburgh Nat'l Bank, 526 F.2d 1083, 1097-98 (3d Cir. 1975).  The

United States Court of Appeals for the Eleventh Circuit has followed the Third Circuit on the issue

of how American Pipe & Construction Co. v. Utah tolling applies in the context of standing.  See

Griffin v. Singletary, 17 F.3d 356, 360 (11th Cir. 1994)("The district court reasoned that there is an

exception to the tolling rule announced in American Pipe and Crown, Cork & Seal when the class

action relied upon was decertified on grounds that no class representative had standing to bring the

claim asserted in the individual suits.  We disagree.").  District courts in other Circuits have

followed this line of reasoning.  See, e.g., In re Morgan Stanley Mortg. Pass-Through Certificates

-60-

Litig., No. 09-2137, 2011 WL 4089580, at *17-19 (S.D.N.Y. Sept. 15, 2011)(Swain, J.); Popoola v. Md-Individual Practice Ass'n, Inc., 230 F.R.D. 424, 430 (D. Md. 2005); Rose v. Ark. Valley Envtl. & Util. Auth., 562 F.Supp. 1180, 1192-93 (W.D. Mo.1983).  As one district court noted when applying this form of tolling to situations where the named plaintiff lacked standing:

> In short, the American Pipe rule has in fact been applied in cases involving almost every conceivable basis upon which class action status might be denied or terminated.  These courts have found no reason to limit application of the rule to instances where denial or termination is based on lack of "numerosity;" and as a general matter, given the rationale expressed in American Pipe, neither do I.

Rose v. Ark. Valley Envtl. & Util. Auth., 562 F.Supp. at 1192-93.

In providing the rationale for applying American Pipe & Construction Co. v. Utah tolling in this context, courts have offered various justifications.  One district court pointed out that "American Pipe 'is predicated on the proposition that an intervenor that reasonably expected to be represented in the originally filed action' should be able to rely on the representatives to vindicate his rights." In re Morgan Stanley Mortg. Pass-Through Certificates Litig., 2011 WL 4089580, at *18 (quoting Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 202 (S.D.N.Y.1992)(Edelstein, J.)). See Griffin v. Singletary, 17 F.3d at 360 ("Insofar as the individual claims are concerned, putative class members should be entitled to rely on a class action as long as it is pending.").  That district court further stated that "American Pipe tolling does not merely allow putative class members 'to wait on the sidelines,'" but that, as part of the class action process, the putative class members "are expected and encouraged to remain passive during the early stages of the class action." In re Morgan Stanley Mortg. Pass-Through Certificates Litig., 2011 WL 4089580, at *18 (emphasis in original)(quoting In re IndyMac Mortgage-Backed Sec. Litig., No. 09-2137, 2011 WL 2508254, at *5 (S.D.N.Y. June 21, 2011)(Kaplan, J.)).  Regarding the costs to the judicial system of an alternative rule, the Eleventh Circuit noted that "[t]he distinction which is urged on us would

produce the very evil which the [Supreme] Court sought to avoid in <u>American Pipe</u> and <u>Crown, Cork</u> <u>& Seal</u>," because "class members uncertain of the district court's standing analysis . . . would have every incentive to file a separate action prior to the expiration of his own period of limitations." <u>Griffin v. Singletary</u>, 17 F.3d at 360 (internal quotation marks omitted).  The Eleventh Circuit went on to say: "The result would be a needless multiplicity of actions -- precisely the situation that Federal Rule of Civil Procedure 23 and the tolling rule of <u>American Pipe</u> were designed to avoid." <u>Griffin v. Singletary</u>, 17 F.3d at 360 (quoting  <u>Crown, Cork & Seal Co. v. Parker</u>, 462 U.S. at 351). Generally, courts are more willing to apply this form of tolling when the lead plaintiff has standing to assert at least some, as opposed to none, of his or her claims.  <u>See</u>, <u>e.g.</u>, <u>In re Enron Corp. Sec.</u> <u>Litig.</u>, 529 F.Supp.2d 644, 708-711 (S.D. Tex. 2006).

In an MBS case, a district judge in United States District Court for the Southern District of New York addressed some of the common criticisms of the approach the Third and Eleventh Circuit follow.  <u>See</u> <u>In re Morgan Stanley Mortg. Pass-Through Certificates Litig.</u>, 2011 WL 4089580, at *17-19.  That court said the two most common criticisms are: (i) the potential for abuse by using placeholder plaintiffs to file lawsuits first and locate appropriate representatives later; and (ii) the potential lack of constitutional authority for a court to toll a claim over which it has no subject-matter jurisdiction.  <u>See</u> <u>In re Morgan Stanley Mortg. Pass-Through Certificates Litig.</u>, 2011 WL 4089580, at *17.  As to the first criticism, the district court recognized the potential for abuse and noted the possibility that <u>American Pipe & Construction Co. v. Utah</u> tolling should not apply when "the representative so clearly lacks standing that no reasonable class member would have relied" on the filing of the class action.  <u>In re Morgan Stanley Mortg. Pass-Through Certificates Litig.</u>, 2011 WL 4089580, at *18.  In its analysis whether this exception applied in that case, the district court considered whether any authority existed as of the date of filing the complaint that recognized that

the named plaintiff would have standing to assert claims on the putative class's behalf.  See In re Morgan Stanley Mortg. Pass-Through Certificates Litig., 2011 WL 4089580, at *18.  As to the second criticism, the district court pointed out that the argument misunderstands the holding in American Pipe & Construction Co. v. Utah, which recognizes that "members of the asserted class are treated for limitations purposes as having instituted their own actions."  In re Morgan Stanley Mortg. Pass-Through Certificates Litig., 2011 WL 4089580, at *18 (quoting In re WorldCom Sec. Litig., 496 F.3d 245, 255 (2d Cir. 2007)).  Consequently, for purposes of statute of limitations and statutes of repose, any subsequent class representative is deemed "by virtue of the invocation of Rule 23 to have commenced this action on the date the original complaint was filed."  In re Morgan Stanley Mortg. Pass-Through Certificates Litig., 2011 WL 4089580, at *18.

Some district courts have rejected this rule followed by the Third and Eleventh Circuit, or have distinguished these cases based on the facts or procedural posture of a case.[23]  One case from the United States District Court for the Middle District of Pennsylvania distinguished the Third Circuit case that first announced that Circuit's position that American Pipe & Construction Co. v. Utah tolling applied in situations where the plaintiff lacked standing, because in that case, class certification had already occurred, and the class was later decertified for lack of standing.  See

---

[23]In a case that did not involve a statute of limitations issue but that involved a class action, the United States Court of Appeals for the Seventh Circuit articulated some standing principles that are relevant here.  In disallowing several class members to intervene into the suit to attempt to become lead plaintiff, the Seventh Circuit emphasized that a case or controversy must exist from the beginning of the suit to the end of the suit.  See Walters v. Edgar, 163 F.3d 430, 432 (7th Cir. 1998).  An intervening Supreme Court decision, issued after the trial in Walters v. Edgar had ended, convinced the district court judge that the plaintiff did not have standing to pursue his claim.  See Walters v. Edgar, 163 F.3d at 432.  Thus, based on that intervening Supreme Court case extinguishing the lead plaintiff's standing, the Seventh Circuit concluded that other members of the class could not intervene and become the lead plaintiff as a case or controversy never existed.  See Walters v. Edgar, 163 F.3d at 432-33.

Applebaum v. State Farm Mut. Auto. Ins. Co., 109 F.R.D. 661, 663 (M.D. Pa.1986).  Notably, more recent Third Circuit cases have not made such a distinction.  See McKowan Lowe & Co., Ltd. v. Jasmine, Ltd., 295 F.3d at 383, 385-89 (allowing tolling even though district court never certified the class).  The judge in Applebaum v. State Farm Mutual Automobile Insurance Co. further reasoned that no other plaintiffs could properly intervene in the case to assert claims that the original named plaintiff asserted, because the original named plaintiff had no claims against the defendant based on lack of standing.  See 109 F.R.D. at 664.  A district court in Massachusetts noted its hesitancy to adopt the Third Circuit's rule because doing so would encourage the "filing of a class action by nominal plaintiffs who are wholly inadequate to represent the asserted class."  In re Elscint, Ltd. Sec. Litig., 674 F.Supp. 374, 378 (D. Mass.1987).  That district court also distinguished the earliest Third Circuit case on the issue, because in that case, class certification had already occurred and the original named plaintiff had standing to litigate at least some of the claims against the defendant.  See In re Elscint, Ltd. Sec. Litig., 674 F.Supp. at 378-79.  Citing to this Massachusetts district court opinion, a district judge in the United States District Court for the Western District of Pennsylvania pointed out that the Supreme Court's American Pipe & Construction Co. v. Utah decision involved denial of class certification based on lack of numerosity as opposed to standing.  See Warden v. Crown Amer. Realty Trust, No. 96-25J, 1998 WL 725946, at *4-5 (W.D. Pa. Oct. 15, 1998).  The Honorable Ronald M. White, United States District Judge for the United States District Court for the Northern District of California, expressed concerns about a court's constitutional power to allow tolling when the original named plaintiff lacked standing:

> It is one thing to toll a period of limitations because of the discretionary act of one judge seeking to manage his or her docket in an efficient manner, but it would be beyond the constitutional power of a federal court to toll a period of limitations based on a claim that failed because the claimant had no power to bring it.

Palmer v. Stassinos, 236 F.R.D. 460, 465 n.6 (N.D. Cal. 2006)(Whyte, J.).

In the context of MBS cases, courts have reached contrary conclusions regarding the application of American Pipe & Construction Co. v. Utah tolling when the original plaintiff lacked standing. Some of these courts have held that neither principles of tolling nor the relation-back doctrine apply where the plaintiff in a prior complaint did not allege purchases of, and therefore lacked standing to assert claims relating to, the MBS at issue. See In re Wells Fargo Mortg.-Backed Certificates Litig., No. 09-01376, 2010 WL 4117477, at *3-5 (N.D. Cal., Oct, 19, 2010)(Koh, J.)("However, the [original] plaintiffs did not allege facts to show they had standing to bring claims regarding these Offerings."). Some of these cases depend, to some extent, on the procedural context of the case or particular defects in the plaintiff's allegations. See N.J. Carpenters Health Fund v. DLJ Mortg. Cap., Inc., 2010 U.S. Dist. LEXIS 136142, at *6-7 (S.D.N.Y. Dec. 15, 2010)(Crotty, J.)(following dismissal of original plaintiff's claims as to three of four securities offerings, district court did not permit intervenor to assert claims for those three offerings because of previous determination that original plaintiff lacked standing); Boilermakers Nat'l Annuity Trust v. WaMu Mortg. Pass Through Certificates, Series AR1, 748 F.Supp.2d 1246, 1253 (W.D. Wash. 2010)(finding lack of standing under section 11 of the Securities Act when plaintiff relied on misrepresentations in documents other than the shelf registration). Some courts have required the plaintiffs to replead to assert claims regarding the securities in the specific offerings they actually purchased. See Me. State Ret. Sys. v. Countrywide Fin. Corp., 722 F.Supp.2d 1157, 1164 (C.D. Cal. 2010)(Pfaelzer, J.)(noting that the plaintiffs' claims relied on separate disclosures or omissions from each of the MBS offerings). On the other hand, some courts have more liberally allowed plaintiffs to assert claims relating to multiple different offerings or types of securities. See, e.g., In re Countrywide Fin. Corp. Sec. Litig., 588 F.Supp.2d 1132, 1166 (C.D. Cal. 2008)(Pfaelzer, J.)("So

long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common 'parts' that (3) were false and misleading at each effective date, there is § 11 standing.").  As one district court judge stated:

> Courts have allowed those with valid securities claims to represent the interests of the purchasers of other types of securities in class action suits.  Given Plaintiffs have sufficiently alleged individual cognizable injuries pursuant to Section 11 and Section 12(a)(2), Plaintiffs have standing to bring these claims.  Concerns over whether stock purchasers should represent notes purchasers are better addressed at the time of class certification.

In re MobileMedia Sec. Litig., 28 F.Supp.2d 901, 911 (D.N.J. 1998)(citations omitted).

On the other hand, some of these courts have held that the filing of a class action based on misrepresentations contained in one shelf registration give the plaintiff standing to assert claims regarding every tranche of MBS offered based on that shelf registration.  See Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc., 2011 WL 3652477, at *9 (S.D.N.Y. Aug. 22, 2011)(Rakoff, J.)("Defendants cite no case for the proposition that standing must be determined on a tranche-by-tranche basis.  Moreover, the representations in each Offering apply equally to all tranches within that Offering.").

### c.    Standard for Actual and Inquiry Notice for Statute of Limitations Purposes.

The Tenth Circuit defines the standard for inquiry notice under section 13 of the Securities Act as follows: "This court concludes that inquiry notice . . . triggers an investor's duty to exercise reasonable diligence and that the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud."  Sterlin v. Biomune Sys., 154 F.3d 1191, 1201 (10th Cir. 1998).  The Tenth Circuit has reminded district courts that the determination of when a plaintiff has actual or inquiry notice of underlying events requires an evidentiary finding.  See Olcott v. Del. Flood Co., 76 F.3d 1538,

1549 (10th Cir. 1996).  The Tenth Circuit went on to say that "resolving the notice issue in the procedural context of a motion to dismiss is wrong."  Olcott v. Del. Flood Co., 76 F.3d at 1549. Instead, courts should "make the necessary determination on summary judgment, or, if a genuine issue of material fact remains in dispute, after an evidentiary hearing."  Olcott v. Del. Flood Co., 76 F.3d at 1549.  Interpreting the term "discovery" in the 10b-5 statute of limitations, the Supreme Court noted that "'discovery' as used in this statute encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known."  Merck & Co., Inc. v. Reynolds, 130 S.Ct. 1784, 1796 (2010).  Although the Tenth Circuit has not yet "had occasion to determine whether Merck requires a change in how [courts] interpret Section 13 of the 1933 Act," Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc., 714 F.Supp.2d 475, 480 (S.D.N.Y. 2010)(Rakoff, J.), the Tenth Circuit has already adopted the same basic definition in the context of section 13 of the 1933 Act, see Sterlin v. Biomune Sys., 154 F.3d at 1201.

### d.   Pleading Requirements.

In Anixter v. Home-Stake Production Co., 939 F.2d 1420 (10th Cir. 1991), amended on reh'g, 947 F.2d 897, vacated sub nom. Dennler v. Trippet, 503 U.S. 978 (1992), the Tenth Circuit stated: "To comply with Section 13, the plaintiff must plead and prove facts showing that his claim was timely with respect to both the one year and three year limitations periods."  939 F.2d at 1434. Following the Tenth Circuit's grant of rehearing on separate grounds, the Supreme Court vacated the decision.  Since that date, the Tenth Circuit has, however, continued to cite its first Anixter v. Home-Stake Production Co. opinion as good authority.  See Sterlin v. Biomune Sys., 154 F.3d at 1196 (citing Anixter v. Home-Stake Prod. Co., 939 F.2d at 1437).  Thus, the Tenth Circuit appears to require that the plaintiff "state affirmatively the time and circumstances of discovery of the allegedly untrue statements or omissions" and, when the action is filed one year from the sale, "the

reason why they could not have discovered the untruths or omissions earlier." Flinn Found. v. Petro-Lewis Corp., 1985 WL 358, at *3 (D. Colo. Nov. 8, 1985)(Carrigan, J.).

     **5.**     **Section 15 Control-Person Liability.**

     Section 15 is a "control person" provision, similar to section 20(a) of the Exchange Act. It states, in relevant part: "Every person who . . . controls any person liable under sections 77k or 77*l* of this title [i.e., sections 11 or 12 of the Securities Act], shall also be liable jointly and severally . . . to any person to whom such controlled person is liable, unless the controlling person had no knowledge" of the facts that form the basis of the underlying section 11 or section 12 claims. 15 U.S.C. § 77*o*. "Although worded differently, the control person provision of § 15 and § 20(a) are interpreted the same." Maher v. Durango Metals, Inc., 144 F.3d at 1305 n.7 (citing First Interstate Bank v. Pring, 969 F.2d 891, 897 (10th Cir. 1992)). Thus, the following authority on section 20(a) liability applies equally to section 12 claims.

     Section 20(a) of the Exchange Act states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To establish a defendant's liability as a controlling person, a plaintiff must prove two things: (i) a primary violation of the securities laws, and (ii) that the defendant had "control" over the primary violator. Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1107 (10th Cir. 2003). The first element is fairly straightforward. The second element, that the defendant have control over the primary violator, requires more analysis.

     "The second element of the prima facie case [under section 20(a)] requires that the plaintiffs plead facts from which it can be reasonably be inferred that the individual defendants were control

persons." Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (citing Maher v. Durango Metals, Inc., 144 F.3d at 1306). "The Tenth Circuit observed that § 20(a) 'has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a controlling person liable.'" Lane v. Page, 649 F.Supp.2d 1256, 1306 (D.N.M. 2009)(Browning, J.)(quoting Richardson v. MacArthur, 451 F.2d 35, 41 (10th Cir. 1971)). The plaintiff must specify facts that "indicate the defendants had 'possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.'" Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1306). See 17 C.F.R. § 230.405 ("The term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.").

In Adams v. Kinder-Morgan, Inc., the Tenth Circuit addressed whether certain individuals involved in Kinder-Morgan, Inc. qualified as control persons for the purposes of section 20(a) liability. First, the Tenth Circuit held that the directors were not, ipso facto, control persons.

> We . . . conclude that the plaintiffs have failed to allege sufficient facts to support the conclusion that Kinder was a control person. During the period in question, he was not an executive of the company, but simply a member of the board of directors. The assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person within the meaning of the Exchange Act.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (citing Dennis v. Gen. Imaging, Inc., 918 F.2d 496, 509-10 (5th Cir. 1990); Burgess v. Premier Corp., 727 F.2d 826, 832 (9th Cir. 1984); Cameron v. Outdoor Resorts of Am., Inc., 608 F.2d 187, 195 (5th Cir. 1979)). On the other hand, being a significant executive with ultimate management authority is sufficient:

> [W]e conclude that the plaintiffs have pled facts supporting the allegation that [Defendant] Hall was a control person. He was the Chairman, President, and CEO of Kinder-Morgan during the relevant period. As President and CEO, Hall would have possessed the ultimate management authority of the corporation on a daily basis. There were no managers higher than Hall. He thus clearly possessed "the power to direct or cause the direction of the management and policies of [Kinder-Morgan]." Hall also had direct control over McKenzie, his chief financial officer and an alleged primary violator of Rule 10b-5.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1305; citing In re Ribozyme Pharms., Inc. Sec. Litig., 119 F.Supp.2d 1156, 1167 (D. Colo. 2000)(Babcock, J.)). A high-ranking position within the corporation, however, standing alone, is unlikely to satisfy the "control" element of a control-person claim, unless the circumstance of the defendant's position and the nature of the underlying violation would lead to an inference that the person had control. See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109 (holding that the Chief Financial Officer of Kinder-Morgan, based solely on his position as CFO, was a control person where the securities-fraud violations related specifically to official reports on the company's financial performance). Importantly, it is not necessary that the control person actively participate in the alleged fraudulent activity. See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108.[24]

## LAW REGARDING THE NEW MEXICO SECURITIES ACT

The Court of Appeals of New Mexico, when discussing the New Mexico Securities Act, recognized: "The purpose of securities laws is generally held to be the protection of the public from various methods of deceit and fraud in the sales of securities, not the regulation of commercial transactions." White v. Solomon, 105 N.M. 366, 368, 732 P.2d 1389, 1391 (Ct. App. 1986). The

---

[24] If a control person acted in good faith and did not induce the acts on which the liability of the controlled person is founded, the control person is not liable, but good faith is an affirmative defense and thus an inappropriate topic for consideration in a motion to dismiss. See Adams v. Kinder Morgan, Inc., 340 F.3d at 1109 n.5.

New Mexico Securities Act was "enacted to protect investors by relaxing the proof requirements necessary to prevail in other common law or statutory actions." State v. Ross, 104 N.M. 23, 27, 715 P.2d 471, 475 (Ct. App. 1986).  "The New Mexico Securities Act, although containing some variations, is patterned after the Uniform Securities Act" approved in 1985 "by the National Conference of Commissioners on Uniform State Laws." State v. Ramos, 116 N.M. 123, 126, 860 P.2d 765, 768 (Ct. App. 1993).

New Mexico courts often look to federal securities law when interpreting the New Mexico Securities Act.  See N.M. Life Ins. Guar. Ass'n v. Quinn & Co., Inc., 111 N.M. 750, 755 n.5, 809 P.2d 1278, 1283 n.5 (1991)("For that reason, we are inclined to look to the long line of federal authority on the subject.").  Applying this principle, one district court judge in the United States District Court for the District of Connecticut held that, because the plaintiffs failed to state a claim under federal securities law, it could grant summary judgment on their New Mexico Securities Act claims which substantially paralleled the federal securities claims.  See Freedman v. Value Health, Inc. 135 F.Supp.2d 317, 339 n.8 (D. Conn. 2001).

Section 58-13B-30 recognizes the following conduct as actionable:

> In connection with the offer to sell, sale, offer to purchase or purchase of a security, a person shall not, directly or indirectly:
>
> A.    employ any device, scheme or artifice to defraud;
>
> B.    make an untrue statement of a material fact or fail to state a necessary material fact where such an omission would be misleading; or
>
> C.    engage in an act, practice or course of business which operates or would operate as a fraud or deceit upon a person.

N.M.S.A. 1978, § 58-13B-30, repealed by L. 2009, Ch. 82, § 703, effective Jan. 1, 2010.  This language is highly similar to the language contained in rule 10b-5.  Compare N.M.S.A. 1978, § 58-

13B-30, with 17 C.F.R. § 240.10b-5.  Rule 10b-5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a)     To employ any device, scheme, or artifice to defraud,
>
> (b)     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c)     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  A person who violates section 58-13B-30 is "liable to the person purchasing the security."  N.M.S.A. 1978, § 58-13B-40, repealed by L. 2009, Ch. 82, § 703, effective Jan. 1, 2010.  These provisions apply to "a person who purchases or offers to purchase a security if (1) an offer to sell is made in this state; or (2) an offer to purchase is made and accepted in this state."  N.M.S.A. 1978, § 58-13B-54(B), repealed by L. 2009, Ch. 82, § 703, effective Jan. 1, 2010.  Section 58-13B-54(C) provides:

> [A]n offer to sell or to purchase is made in this state, whether or not either party is present in this state, if the offer: (1) originates in the state; or (2) is directed by the offeror to a destination in this state and received where it is directed, or at a post office in this state if the offer is mailed.

N.M.S.A. 1978, § 58-13B-54(C).

In interpreting the language "in connection with the purchase or sale of a security" under rule 10b-5, the Supreme Court has read this provision broadly.  See SEC v. Zandford, 535 U.S. 813, 819-20 (2002)("In its role enforcing the Act, the SEC has consistently adopted a broad reading of the phrase in connection with the purchase or sale of any security. . . . This interpretation of the ambiguous text of § 10(b), in the context of formal adjudication, is entitled to deference if it is

reasonable . . . ." (internal quotation marks omitted)).  Thus, there need not "be a misrepresentation about the value of a particular security in order to run afoul of the Act." SEC v. Zandford, 535 U.S. at 820.  For example, a broker who engages "in a fraudulent scheme in which he made sales of his customer's securities for his own benefit" violates rule 10b-5. SEC v. Zandford, 535 U.S. at 820-25. Additionally, a business could establish a rule 10b-5 violation against a company that sold the business' portfolio of treasury bonds without returning the proceeds to them even though the directors of the company were not misled about the value of a security, the fraud did not involve the manipulation of a particular security, and the fraud did not take place within the context of a securities exchange. See SEC v. Zandford, 535 U.S. at 821 (citing Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 9-10 (1971)).  Furthermore, it is also not necessary to establish that the defendant misappropriated the proceeds of a sale, as long as the "scheme to defraud and the sale of securities coincide." SEC v. Zandford, 535 U.S. at 821.  Likewise, a defendant commits fraud in connection with a securities transaction when "he use[s] misappropriated confidential information for trading purposes." SEC v. Zandford, 535 U.S. at 824 (citing United States v. O'Hagan, 521 U.S. 642 (1997)).  In that situation, it is also not necessary that "the person or entity defrauded is not the other party to the trade, but is, instead, the source of the nonpublic information." SEC v. Zandford, 535 U.S. at 824 (quoting United States v. O'Hagan, 521 U.S. at 656).

In a recent decision, Janus Capital Group, Inc. v. First Derivative Traders, 131 S.Ct. 2296 (2011), the Supreme Court more clearly defined who "make[s] an untrue statement of a material fact" under rule 10b-5, 17 C.F.R. § 240.10b-5.  In Janus Capital Group, Inc. v. First Derivative Traders, the plaintiff asserted a cause of action against a parent company that created a mutual fund and the mutual fund. See 131 S.Ct. at 2299.  Those two entities maintained their legal independence

and observed the appropriate corporate formalities.  See Janus Capital Grp., Inc. v. First Derivative Traders, 131 S.Ct. at 2229, 2304.  The mutual fund made several SEC filings, as federal securities law required, that contained several alleged material misrepresentations.  See Janus Capital Grp., Inc. v. First Derivative Traders, 131 S.Ct. at 2300.  The plaintiff argued that both the parent company and the mutual fund were liable under rule 10b-5, because they both made the material representation within the meaning of rule 10b-5.  See Janus Capital Grp., Inc. v. First Derivative Traders, 131 S.Ct. at 2300-01.  Applying the plain meaning of the term "makes," the Supreme Court concluded that, "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  Janus Capital Grp., Inc. v. First Derivative Traders, 131 S.Ct. at 2302.  Consequently, the Supreme Court concluded that it was not proper to hold the parent company liable under rule 10b-5, as the mutual fund had control over the content of the allegedly misleading SEC filings.  See Janus Capital Grp., Inc. v. First Derivative Traders, 131 S.Ct. at 2302-04.  The Supreme Court held that, even when one prepares or publishes a statement on behalf of another, this conduct does not constitute making a statement under rule 10b-5.  See Janus Capital Grp., Inc. v. First Derivative Traders, 131 S.Ct. at 2302.  The Supreme Court also noted that the plaintiff's theory of liability would be similar to, but broader in application than, control-person liability under section 20 of the Exchange Act.  See Janus Capital Grp., Inc. v. First Derivative Traders, 131 S.Ct. at 2304.[25]

---

[25]Because the parties have not raised this issue at this time, the Court does not find it necessary to address how this recent Supreme Court decision would apply to the New Mexico Securities Act.  The Janus Capital Group, Inc. v. First Derivative Traders decision was a five to four decision.  Given that the New Mexico Securities Act is narrower in scope than the respective federal statutory scheme, the Court is inclined to believe that the New Mexico Supreme Court would not interpret the respective provision under the New Mexico Securities Act as restrictively as the Supreme Court has.

In addition to damage remedies that the New Mexico Securities Act specifically affords, a victim of securities fraud "who recovers under the Act may be entitled additionally to recover for any nonduplicative damages that may be awarded on a theory of common-law fraud." Naranjo v. Paull, 111 N.M. 165, 174, 803 P.2d 254, 263 (Ct. App. 1990).  Federal securities law provides analogous remedies.  See 15 U.S.C. § 78j(b) (prohibiting any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors"); 17 C.F.R. § 240.10b-5 (making it unlawful "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security"); Stonebridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)(recognizing implied private right of action for damages under § 10(b) and Rule 10b-5).

## LAW REGARDING PREEMPTION

Article VI, Clause 2, of the Constitution provides that the laws of the United States "shall be the Supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Consistent with the Supremacy Clause, the Supreme Court has "long recognized that state laws that conflict with federal law are 'without effect.'"  Altria Grp., Inc. v. Good, 555 U.S. 70, 75 (2008)(quoting Maryland v. Louisiana, 451 U.S. 725, 746 (1981)).  The Supreme Court has summarized the situations in which preemption is likely to be found:

> Pre-emption may be either expressed or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.  Absent explicit pre-emptive language, we have recognized at least two types of implied pre-emption: field pre-emption, where the scheme of federal regulation is so pervasive as to make reasonable the inference

that Congress left no room for the States to supplement it, and conflict pre-emption, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. 88, 98 (1992) (citations omitted).

Preemption may be express or implied.  See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98.  When faced with express preemption -- where a statute expressly states that it preempts certain areas of state law -- a court must determine the scope of the preemption that Congress intended.  See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)(stating that "the purpose of Congress is the ultimate touch-stone in every pre-emption case").  "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose."  Altria Grp., Inc. v. Good, 555 U.S. at 77.  When the text of a preemption clause is susceptible to more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption."  Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005).  Preemption arguments are analyzed under rule 12(b)(1).  See Cedars-Sinai Med. Center v. Nat'l League of Postmasters of U.S., 497 F.3d 972, 975 (9th Cir. 2007)(applying rule 12(b)(1) when reviewing motion to dismiss asserting preemption defense).

Addressing express preemption requires a court to determine the scope of the preemption. That task entails scrutinizing the preempting words in light of two presumptions.  First,

[i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

Medtronic, Inc. v. Lohr, 518 U.S. at 485 (citations omitted)(internal quotation marks omitted). Second, "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case." Medtronic, Inc. v. Lohr, 518 U.S. at 485 (citations omitted)(internal quotation marks omitted).  A

-76-

court determines Congress' intent primarily from the text and the statutory framework, although the

structure and statute as a whole are relevant as well.  See Medtronic, Inc. v. Lohr, 518 U.S. at 485.

In one of its most recent express preemption decisions, Bruesewitz v. Wyeth LLC, 131 S.Ct.

1068 (2011), the Supreme Court concluded that the National Childhood Vaccine Injury Act

preempted all design-defect claims that plaintiffs seeking compensation brought against vaccine

manufacturers for injury or death that certain vaccine side effects caused.  See 131 S.Ct. 1075-1080.

The Supreme Court noted that Congress passed this act to "stabilize the vaccine market and facilitate

compensation."  Bruesewitz v. Wyeth LLC, 131 S.Ct. at 1073.  The Supreme Court pointed out that

this federal statutory scheme provided for "[f]ast, informal adjudication," allowing "[c]laimants who

show that a listed injury first manifested itself at the appropriate time are prima facie entitled to

compensation."  Bruesewitz v. Wyeth LLC, 131 S.Ct. at 1073.  Additionally,

> [a] claimant may also recover for unlisted side effects, and for listed side effects that
> occur at times other than those specified in the Table, but for those the claimant must
> prove causation.  Unlike in tort suits, claimants under the Act are not required to
> show that the administered vaccine was defectively manufactured, labeled, or
> designed.

Bruesewitz v. Wyeth LLC, 131 S.Ct. at 1074 (footnote omitted).  The Supreme Court also noted that

the statutory scheme had relatively favorable remedy provisions.  See Bruesewitz v. Wyeth LLC,

131 S.Ct. at 1074.  "The quid pro quo for this, designed to stabilize the vaccine market, was the

provision of significant tort-liability protections for vaccine manufacturers," such as limiting the

availability of punitive damages and expressly eliminating liability for a vaccine's unavoidable,

adverse side effects.  Bruesewitz v. Wyeth LLC, 131 S.Ct. at 1074.  The statutory text at issue in the

case was as follows:

> No vaccine manufacturer shall be liable in a civil action for damages arising from
> a vaccine-related injury or death associated with the administration of a vaccine after
> October 1, 1988, if the injury or death resulted from side effects that were

> unavoidable even though the vaccine was properly prepared and was accompanied
> by proper directions and warnings.

Bruesewitz v. Wyeth LLC, 131 S.Ct. at 1075 (quoting 42 U.S.C. § 300aa-22(b)(1)).  The Supreme

Court emphasized that the use of the word "unavoidable" in reaching its conclusion that the statute

preempted design defect claims resulting from unavoidable side effects.  Bruesewitz v. Wyeth LLC,

131 S.Ct. at 1075-77.  The Supreme Court also found it persuasive that the statutory text directly

mentioned other aspects of product liability law.  See Bruesewitz v. Wyeth LLC, 131 S.Ct. at 1076.

   Implied conflict preemption is found when it is impossible for a private party to comply with

both state and federal requirements, see English v. General Elec. Co., 496 U.S. 72, 78-79 (1990),

or where state law "stands as an obstacle to the accomplishment and execution of the full purposes

and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67 (1941).  "Pre-emptive intent may

also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the

legislative field, or if there is an actual conflict between state and federal law."  Hines v.

Davidowitz, 312 U.S. at 67 (citing Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)).

   The Supreme Court, in the past, found that implied preemption may take the form of

"obstacle" preemption.[26]  See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000)

(holding that preemption is appropriate where the challenged state law "stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress"); Pharm. Research

and Mfrs. of Am. v. Walsh, 538 U.S. 644, 679 (2003)(Thomas, J., concurring)("Obstacle

pre-emption turns on whether the goals of the federal statute are frustrated by the effect of the state

law.").  The Supreme Court instructed that, in obstacle preemption cases, "there is no federal

---

   [26]"Obstacle" preemption has also been referred to as the "doctrine of
frustration-of-purposes."  Geier v. Am. Honda Motor Co., 529 U.S. 861, 908 n.22 (2000)(Stevens,
J., dissenting).

pre-emption in vacuo, without a constitutional text or a federal statute to assert it." P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503 (1988). See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98. A reviewing court must still "examine the explicit statutory language and the structure and purpose of the statute." Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990). In 2000, the Supreme Court decided Geier v. American Honda Motor Co., 529 U.S. 861 (2000), which held, by a five-to-four vote, that a federal regulation which permitted, but did not require, airbags to be installed in passenger vehicles preempted claims that a car was defective because it lacked an airbag. See 529 U.S. at 874. The majority found: "The rule of state tort law for which petitioners argue would stand as an 'obstacle' to the accomplishment of [the federal regulation's] objective. And the statute foresees the application of ordinary principles of pre-emption in cases of actual conflict. Hence, the tort action is pre-empted." 529 U.S. at 886. Justice Stevens, in his dissenting opinion, expressed a desire to eliminate obstacle preemption. He argued that the presumption against preemption

> serves as a limiting principle that prevents federal judges from running amok with our potentially boundless (and perhaps inadequately considered) doctrine of implied conflict pre-emption based on frustration of purposes -- i.e., that state law is pre-empted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Geier v. Am. Honda Motor Co., 529 U.S. at 907-08 (Stevens, J., dissenting).

The Supreme Court, however, has now begun to back away from finding implied preemption based on an alleged conflict with the purposes underlying federal regulations. In 2003, the Supreme Court issued a unanimous decision in Sprietsma v. Mercury Marine, 537 U.S. 51 (2003), rejecting implied conflict preemption of state law claims that a boat engine was defective because it lacked a propeller guard. In 2008, in Altria Group. Inc. v. Good, the Supreme Court rejected the plaintiffs' obstacle-preemption claim that Maine's Unfair Practices Act was implicitly pre-empted by a similar

federal act, the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331-41, because it presented an obstacle to the Federal Trade Commission's longstanding policy of encouraging consumers to rely on representations of tar and nicotine content based on an approved methodology. See 555 U.S. at 90.  In 2009, in Wyeth v. Levine, 129 S.Ct. 1187 (2009), six Justices of the Supreme Court, including Justices Breyer and Kennedy, who joined in the majority decision in Geier v. American Honda Motor Co., rejected the plaintiff's two implied preemption arguments -- impossibility preemption and obstacle preemption. See Wyeth v. Levine, 129 S.Ct. at 1203 (holding that "it is not impossible for Wyeth to comply with its state and federal law obligations and that Levine's common-law claims do not stand as an obstacle to the accomplishment of Congress' purposes in the [Federal Food, Drug, and Cosmetic Act]").  In so ruling, Justice Stevens, writing for the majority, narrowly limited Geier v. American Honda Motor Co. to its facts, finding that the decision in that case was based on the "complex and extensive" history of the substantive regulation at issue. 129 S.Ct. at 1201.  The Supreme Court rejected obstacle preemption, stating: "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history."  Wyeth v. Levine, 129 S.Ct. at 1200.  Justice Stevens quoted Justice O'Connor's explanation in Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141 (1989): "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them." Wyeth v. Levine, 129 S.Ct. at 1200 (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. at 166-67).

Of particular import for the current status of implied obstacle preemption was Justice Thomas' concurring opinion in Wyeth v. Levine, in which he wrote:

I write separately, however, because I cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines. In particular, I have become increasingly skeptical of this Court's "purposes and objectives" pre-emption jurisprudence. Under this approach, the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law. Because implied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution, I concur only in the judgment.

129 S.Ct. at 1205 (Thomas, J., concurring in the judgment). Justice Thomas stressed his concern:

Under the vague and potentially boundless doctrine of purposes and objectives pre-emption . . . the Court has pre-empted state law based on its interpretation of broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law . . . Congressional and agency musings, however, do not satisfy the Art. I, § 7 requirements for enactment of federal law and, therefore, do not pre-empt state law under the Supremacy Clause.

Wyeth v. Levine, 129 S.Ct. at 1207. Justice Thomas emphasized that, when analyzing the preemptive effect of federal statutes or regulations, "[e]vidence of pre-emptive purpose must be sought in the text and structure of the provision at issue" to comply with the Constitution. Wyeth v. Levine, 129 S.Ct. at 1207-08 (citing CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993)). Justice Thomas, writing for the five to four majority in PLIVA, Inc. v. Mensing, 131 S.Ct. 2527 (2011), recently concluded, however, that conflict preemption required the preemption of inconsistent state laws on generic drug labeling that conflicted with the respective federal law, because it was impossible to comply with both. See 131 S.Ct. at 2577-78. The Supreme Court sought to reconcile Wyeth v. Levine, however, recognizing that the respective statutory schemes in each case were distinguishable. PLIVA, Inc. v. Mensing, 131 S.Ct. at 2581-82 (quoting Wyeth v. Levine, 129 S.Ct. at 1187)("It is beyond dispute that the federal statutes and regulations that apply to brand-name drug manufacturers are meaningfully different than those that apply to generic drug manufacturers.").

Moreover, the Supreme Court has put renewed emphasis on the presumption against preemption.  See Wyeth v. Levine, 129 S.Ct. at 1195 n.3.  "In areas of traditional state regulation, [the Supreme Court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest."  Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005)(internal quotation marks omitted).  If confronted with two plausible interpretations of a statute, the court has "a duty to accept the reading that disfavors pre-emption."  Bates v. Dow Agrosciences LLC, 544 U.S. at 449.  See Wyeth v. Levine, 129 S.Ct. at 1195; Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 518 (1992)(plurality opinion).

## ANALYSIS

While the constitutional concerns with applying the tolling rule in American Pipe & Construction Co. v. Utah are troubling, they are not insurmountable.  Moreover, the language in the most recent Supreme Court and Tenth Circuit cases suggests that they would apply the tolling rule in this case.  Accordingly, the Court finds that it has jurisdiction over the case and will proceed to decide the merits of the claims.  The Plaintiffs' claims are not time-barred under federal securities law or the New Mexico Securities Act.  The Plaintiffs have sufficiently pled allegations about material misrepresentations or omissions against the Defendants other than the Rating Agency Defendants with respect to: (i) their abandonment of their loan underwriting guidelines; (ii) their improper appraisal practices with respect to the 2006-5 offering; (iii) the inflated LTV ratios regarding the 2006-5 offering; and (iv) the allegations related to the credit ratings regarding the 2006-5 and 2007-4 offering.  The Plaintiffs have adequately alleged their section 12(a)(2) claims.  The Plaintiffs have no obligation to plead reliance on the alleged misrepresentations related to the 2006-5 offering.  The Plaintiffs have adequately stated a control-person claim.  Lack of causation does not undercut the Plaintiffs' claims related to the 2006-5 offering.  The Plaintiffs have

sufficiently alleged that the Rating Agency Defendants can be liable under the New Mexico Securities Act. The Plaintiffs have not sufficiently alleged that their claims satisfy the jurisdictional provisions of the New Mexico Securities Act. Against the Rating Agency Defendants, the Plaintiffs have sufficiently pled allegations about material misrepresentations or omissions with respect to S&P, but not against Fitch and Moody's. The First Amendment does not bar the Plaintiffs' claims against the Rating Agency Defendants. Finally, CRARA preempts some of the Plaintiffs' theories under the New Mexico Securities Act against the Rating Agency Defendants.

On some of the grounds in the Joint Motion and the Rating Agency Defendants' Motion, the Court has granted those motions. The Plaintiffs have specifically requested leave to amend on some issues and have generally requested leave to amend on any issue on which the Court decides to grant these motions. With respect to the issue of pleading their compliance with the applicable statute of limitations and statute of repose, the Court will grant the Plaintiffs leave to amend without requiring them to file a motion seeking leave to amend. To seek amendment to cure the other deficiencies, the Plaintiffs must file a motion with their proposed amended complaint attached to that motion. The Plaintiffs must bold the newly added facts in the proposed amended complaint to distinguish them from facts contained in the Amended Complaint. In the motion, the Plaintiffs should set forth their new facts -- facts that the Court did not previously have before it -- which, if the Court had known the facts, would have changed the outcome of the motion. The Plaintiffs should also address precisely how these new facts would have changed the Court's conclusions. If the Plaintiffs wish to argue in this motion to amend that the Court was incorrect on any particular rule of law in its prior opinion or raise new arguments not raised in the Response to Joint Motion or the Response to Rating Agency Defendants' Motion, they must place these arguments in another section of the motion and

not mix them in with the parts of the motion that deal with amendment.[27]

## I.        THERE IS A CONSTITUTIONAL CASE OR CONTROVERSY.

Defendants argue that the Plaintiffs lack standing to pursue some of their claims. See Reply at 33-34; Memorandum in Support of Joint Motion at 40-44. If their argument is correct, the Court would lack jurisdiction over some of the claims against the Defendants. If the Court lacks subject-matter jurisdiction, it may not decide the merits of the Plaintiffs claims, even if it would otherwise dismiss them. See Rector v. City and County of Denver, 348 F.3d 935, 942 (10th Cir. 2003)("[Constitutional] [s]tanding . . . raises jurisdictional questions and we are required to consider 'the issue sua sponte to ensure that there is an Article III case or controversy' before us."). The Court, however, disagrees that Article III standing prevents the Court from proceeding to decide this motion.

If a plaintiff does not have standing to bring a suit, federal jurisdiction never attaches to the suit. See O'Shea v. Littleton, 414 U.S. 488, 494 (1974). Federal jurisdiction must be continuous from the beginning to the end of the suit. See U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 396-97 (1980). The Supreme Court has articulated the following test for standing:

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"-- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third,

---

[27]The Court is not saying that the Plaintiffs cannot invoke law that they believe the Court misapplied in its prior opinion. The Court is saying, however, that if they use that law in conjunction with the newly alleged facts or in conjunction with the facts as they exist in the Amended Complaint, they need to set out that law in a part of the motion that is designated as a motion to reconsider and not in the part addressing the motion to amend, which deals with newly added facts.

it must be "likely," as opposed to merely "speculative," that the injury will be
"redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)(footnote omitted)(citations omitted).

The Defendants do not dispute with respect to the 2007-4 offering that in the Original Complaint

Genesee County adequately alleged that it had made purchases from that offering.   See

Memorandum in Support of Joint Motion at 56-58.  The Defendants do, however, dispute whether

Plaintiffs can meet the first of the three standing requirements, an injury in fact, based on a failure

to allege that they have not received any pass-through distributions from the MBS.   See

Memorandum in Support of Joint Motion at 40-44.

### A.      THE PLAINTIFFS HAVE PLED A COGNIZABLE ECONOMIC LOSS.

The Defendants contend that the Court should dismiss the Amended Complaint because the

Plaintiffs do not plead a legally cognizable economic loss and thus lack an injury in fact.  See

Memorandum in Support of Joint Motion at 40-44.  The Plaintiffs counter that the applicable

damage provisions under the Securities Act do not require them to plead cognizable loss in the

manner the Defendants contend.  See Response to Joint Motion at 39-48.  The Plaintiffs assert that

the language of section 11 and section 12 of the Securities Act provide the method of calculating

their damages.  See Response to Joint Motion at 39-46.  The Court agrees with the Plaintiffs that

they have no obligation to plead a cognizable economic loss beyond their current pleadings.

### 1.      The Plaintiffs Are Not Required to Allege that They Have Failed to Receive Any Pass-Through Distribution.

The Defendants contend that the Plaintiffs must allege that they failed to receive monthly

pass-through payments.  See Memorandum in Support of Joint Motion  at 41.  The Defendants

contend that, based on the nature of the payments under an asset-backed security, that the Plaintiffs

are entitled only to receive the monthly pass-through payments under the security.   See

Memorandum in Support of Joint Motion  at 41.  They point to a disclaimer in the 2006-3

Prospectus Supplement stating that:

> There is currently no secondary market for the offered certificates and there can be
> no assurance that a secondary market for the offered certificates will develop.
> Consequently, you may not be able to sell your securities readily or at prices that will
> enable you to realize your desired yield. . . .
>
> The secondary markets for asset-backed securities have experienced periods of
> illiquidity and can be expected to do so in the future.  Illiquidity can have a severely
> adverse effect on the price of securities.

Prospectus Supplement to Prospectus Dated April 26, 2006, at 8 (Doc. 125-1)("2006-3 Prospectus

Supplement").  The Defendants contend that, because this language expressly warned the Plaintiffs

that there would be no secondary market for the MBS, the Plaintiffs cannot allege an injury for the

securities now being unmarketable.  See Memorandum in Support of Joint Motion  at 41-42.

The Defendants misstate the nature of recovery under section 11 and section 12(a)(2) of the

Securities Act.  Section 11(e) provides:

> The suit authorized under subsection (a) of this section may be to recover such
> damages as shall represent the difference between the amount paid for the security
> (not exceeding the price at which the security was offered to the public) and (1) the
> value thereof as of the time such suit was brought, or (2) the price at which such
> security shall have been disposed of in the market before suit, or (3) the price at
> which such security shall have been disposed of after suit but before judgment if
> such damages shall be less than the damages representing the difference between the
> amount paid for the security (not exceeding the price at which the security was
> offered to the public) and the value thereof as of the time such suit was brought . . . .

15 U.S.C. § 77k(e).  Under section 11, a plaintiff need not allege that the damages he or she suffered

were a direct and proximate cause of the misrepresentation or omission to survive a motion to

dismiss.  See Schaffer v. Evolving Sys., Inc., 29 F.Supp.2d at 1220 (citing Herman & MacLean v.

Huddleston, 459 U.S. at 381).  Likewise, the damages scheme that section 11(e) authorizes requires

a plaintiff to plead only "a decline in market value" to state an appropriate claim for damages.

McMahan & Co. v. Wherehouse Entm't, Inc., 65 F.3d 1044, 1048 (2d Cir. 1995).  See In re Initial Pub. Offering Sec. Litig., 241 F.Supp.2d 281, 347, 351 n.80 (S.D.N.Y. 2003)(Scheindlin, J.)("Section 11(e) sets the measure of damages for a plaintiff still holding her securities at the 'value' of those securities at the time of suit.").  Under section 12(a)(2), the measure of damages is "the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."  15 U.S.C. § 77*l*.

Here, the Plaintiffs have pled that their securities have suffered a decline in value.  See Amended Complaint ¶¶ 13, 79, 107, 117, at 11-12, 38, 46, 49.  Additionally, the Plaintiffs have requested rescission damages.  See Amended Complaint ¶¶ 118, at 49.  The Defendants argue that the disclaimer in the offering documents that there may be no secondary market for these securities undercuts the Plaintiffs' damages, as they have only alleged that they cannot sell their securities on the secondary market.  See Memorandum in Support of Joint Motion  at 41-42.  The Defendants point to one opinion that has accepted this argument.  See NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co., 743 F.Supp.2d 288, 291-92 (S.D.N.Y. 2010)(Cedarbaum, J.).  That opinion stated: "Because [the plaintiff] made an investment that it knew might not be liquid, it may not allege an injury based upon the hypothetical price of the Certificates on a secondary market at the time of suit."  NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co., 743 F.Supp.2d at 292.

Other courts have held that similar statements in a prospectus cannot limit the purchaser of the securities' remedies available under federal securities law.  The United States Court of Appeals for the Second Circuit rejected an argument similar to the one that the Defendants make.  See McMahan & Co. v. Wherehouse Entm't, Inc., 65 F.3d 1044, 1048 (2d Cir. 1995)("[T]he district

court erred in ruling that plaintiffs may recover benefit-of-the-bargain damages under section 11 and that the market value was 'irrelevant to Plaintiffs' claimed economic losses.'"). The Second Circuit recognized that section 11 prescribes a particular measure of damages, and that neither the plaintiff nor the defendant can take advantage of another measure of damages to increase or reduce recovery. See McMahan & Co. v. Wherehouse Entm't, Inc., 65 F.3d at 1048. Notably, the NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co. decision on which the Defendants rely never cites McMahan & Co. v. Wherehouse Entm't, Inc., which is controlling authority in that Circuit. Two other district courts have expressly rejected the argument on which the Defendants rely in the context of MBS. See Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., No. 09-3701, 2011 WL 1796426, at *12-13 (S.D.N.Y. 2011)(Koeltl, J.); N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., No. 08-5653, 2010 U.S. Dist. LEXIS 47512, at *14 (S.D.N.Y. Mar. 29, 2010)(Crotty, J.). As the Honorable Paul A. Crotty, United States District Judge for the Southern District of New York stated:

> Many fixed-income debt securities, such as corporate bonds do not trade on national exchanges and yet institutional investors routinely purchase corporate bonds hoping to realize a profit through resale. Plaintiff may have purchased the Certificates expecting to resell them, making market value the critical valuation marker for Plaintiff. This is a securities claim, not a breach of contract case. Mortgage-backed Certificates are a type of security, which is why, in fact, the SEC has adopted a regulatory scheme relating to pooled asset-backed securities . . . .

N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., 2010 U.S. Dist. LEXIS 47512, at *14.

The approach that the Second Circuit has adopted is more persuasive. When interpreting a statute, courts should first look to the statute's plain language. See Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985). Section 11(e) plainly authorizes a particular measure of damages:

> (e) Measure of damages; undertaking for payment of costs

> The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought . . . .

15 U.S.C. § 77k(e). The title of this subsection states that this section sets forth the "[m]easure of damages" for recovery under this section. 15 U.S.C. § 77k(e). The title of a statute or section can aid in resolving an ambiguity in a statute. See Whitman v. Amer. Trucking Ass'ns, 531 U.S. 457, 482-83 (2001). Absent contrary Congressional direction, courts should generally presume that a statutory term with a common-law meaning has its common-law meaning. See Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, 402 (2003). Black's Law Dictionary defines the term "measure of damages" as: "The basis for calculating damages to be awarded to someone who has suffered an injury." Black's Law Dictionary, supra, at 1070. The statute's plain language, the caption of the statute, and Congress' use of the term "measure of damages" indicate that Congress intended this provision in subsection (e) to prescribe the measure of damages for a section 11 claim. The Second Circuit provides the most persuasive interpretation of the statute's language. Under this interpretation, the Defendants cannot alter the Plaintiffs' measure of damages through their disclosure, and the Plaintiffs may not seek a greater measure of damages than that which section 11 authorizes. Thus, the Defendants' argument that this disclosure limits the Plaintiffs' damages is unpersuasive.

### 2. The Plaintiffs Adequately Alleged in Their Pleadings that They Suffered a Loss from the 2006-5 Certificates.

Originally, the Defendants argue that lead plaintiff Midwest Operating does not have a claim

against any of the Defendants with respect to the 2006-5 offering because "they have recouped their entire investment in the 2006-5 certificates." Memorandum in Support of Joint Motion at 43. At the hearing, however, the Defendants withdrew this argument, conceding that they had incorrectly calculated Midwest Operating's damages. See Tr. at 120:17-23 (Serio). Thus, it is not necessary for the Court to address this argument as the parties agree on this damage-calculation issue.

If the Court were to address this issue, however, it would not adopt the Defendants' argument. The Defendants allege that "Midwest Operating purchased $159,803 face amount of 2006-5 certificates on October 17, 2007, and sold for $156,494 in proceeds on January 16, 2008." Memorandum in Support of Joint Motion at 34 (citing Certification of Named Plaintiff Pursuant to Federal Securities Law (dated June 26, 2009), filed June 26, 2009 (Doc. 56, Ex. B)("Midwest Operating Certification")). The Defendants allege that during the three months in which it held the certificates, Midwest Operating received pass-through distributions totaling $3,308.00. See Memorandum in Support of Joint Motion at 34. Thus, the Defendants conclude that Midwest Operating recouped its investment in the 2006-5 certificates before the filing of the lawsuit and thus has no cognizable damages. See Memorandum in Support of Joint Motion at 34. Defendants cite a United States Court of Appeals for the Ninth Circuit case that states that under section 11 and section 12(a)(2) of the Securities Act that when a plaintiff gains from his investment in the securities and suffers no loss he or she has not suffered an injury. See In re Broderbund/Learning Co. Sec. Litig., 294 F.3d 1201, 1203-05 (9th Cir. 2002).

The Plaintiffs counter that the Defendants have misinterpreted Midwest Operating's certification. See Response to Joint Motion at 32. The Plaintiffs state that a proper analysis of this certification leads to the conclusion that Midwest Operating suffered a loss of $2,548.00. See Response to Joint Motion at 32. The Plaintiffs agree that the Defendants correctly stated that

on October 17, 2008 Midwest Operating purchased $159,803.00 face amount value of these MBS, but Plaintiffs point out that these securities were actually purchased at a price of $98.69 per certificate, leading to a total cost to Midwest Operating of $157,704.59.  See Response to Joint Motion at 32.  Plaintiffs argue that the Defendants also incorrectly assert that Midwest Operating received $156,494.00 in proceeds from the sale of these securities when Midwest Operating sold the certificates for a price of $97.03 a certificate, which resulted in proceeds of $151,848.00. Consequently, Plaintiffs assert that Defendants inaccurately contend that the $3,308.39 in pass through distributions that Midwest Operating received equals the difference between the purchase cost of the certificates in October 17, 2007 and the January 16, 2008 sale price.

After consulting the certification, the Court concludes that, viewing the facts in the light most favorable to the Plaintiffs, the Plaintiffs have demonstrated sufficiently for the pleading stage of this case that they have suffered a loss of roughly $2,548.11.  See Midwest Operating Certification at 4, 8.  This is a cognizable economic loss for purposes of recovery under section 11 and 12(a)(2) of the Securities Act.  See In re Broderbund/Learning Co. Sec. Litig., 294 F.3d at 1203-05.

### B.   THE CURRENT NAMED PLAINTIFFS HAVE STANDING.

Genesee County had standing only to assert claims on the class' behalf with respect to claims relating to the 2007-4 offering, as it did not allege that it made any purchases from the other nine offerings.  The two plaintiffs named as lead plaintiffs in this case under the Amended Complaint, Midwest Operating and Maryland-National Capital, have standing to assert claims on behalf of the current class, which now covers only the 2006-3, 2006-5, and 2007-4 offerings.  If a plaintiff does not have standing to bring a suit, federal jurisdiction never attaches to the suit.  See O'Shea v. Littleton, 414 U.S. at 494.  Federal jurisdiction must be continuous from the beginning to the end of the suit.  See U.S. Parole Comm'n v. Geraghty, 445 U.S. at 396-97.  Relation-back principles,

-91-

however, allow the substitution of a class member as named plaintiff who has standing for the original named plaintiff who does not have standing without depriving the court of subject-matter jurisdiction over the suit.  See Haas v. Pittsburgh Nat'l Bank, 526 F.2d at 1097-98 (holding that, "the commencement of the original class action by [the original plaintiff] tolled the statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action" and that "amendment of the complaint by the addition of [a named plaintiff with standing], therefore, relates back to the initial filing of the complaint"); Joseph v. Wiles, 223 F.3d 1155, 1168 ("Indeed, in a sense, application of the American Pipe tolling doctrine to cases such as this one does not involve 'tolling' at all.  Rather, [the new class representative] has effectively been a party to an action against these defendants since a class action covering him was requested but never denied.").   Other than the Defendants' arguments that the Court has already addressed, there is no dispute that the Plaintiffs assert they have suffered some injury in fact that is concrete and particularized.

As part of the Original Complaint, Genesee County contends that it purchased MBS at an inflated price as part of the 2007-4 offering "pursuant to and/or traceable to the Registration Statement, as amended, and Prospectus Supplement, filed by [GC Acceptance] with the SEC on January 29, 2007 and August 31, 2007."  Original Complaint ¶ 19, at 10.  Genesee County alleged that it suffered damages as a result of the false and misleading statement contained in the document when the truth became known.  See Original Complaint ¶ 20, at 10.  As to this 2007-4 offering, the Defendants have not raised any argument that Genesee County did not suffer an injury.  First, viewing the facts in the light most favorable to Genesee County and given that the Defendants have not contested an injury here, these allegations satisfy the "injury in fact" requirement for standing given that the injury is concrete and particularized and actual.  Lujan v. Defenders of Wildlife, 504

U.S. at 560-61.  Genesee County has sufficiently alleged that it has suffered a financial loss based on some of the false or misleading statements contained in the offering document.  Second, the action is fairly traceable to the actions of the Defendants -- those who made the statements which the Plaintiffs insist were false or misleading.  Third, because the injury that Genesee County alleged is financial, a judgment of the Court could redress it.  Thus, with respect to some Defendants, therefore, Genesee County has successfully demonstrated it has standing.

The Court does not find the Defendants tranche-based standing argument persuasive.  Some courts have accepted a tranche-based standing argument, treating the tranches like separate offerings.  See Mass. Bricklayers & Masons Funds & Pipefitters' Ret. Fund Local 598 v. Deutsche Alt-A Sec., No. 08-3178, 2010 WL 1370962, at *1 (E.D.N.Y. Apr. 6, 2010); Me. State Ret. Sys. v. Countrywide Fin. Corp., 722 F.Supp.2d at 1164.  Other courts have rejected this tranche-based standing argument, concluding that the uniform misrepresentations in the offering documents apply to all the tranches and that no fundamental conflict exists between the tranches.  See Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc., 2011 WL 3652477, at *9; In re Dynex Capital, Inc. Sec. Litig., No. 05-1897, 2011 WL 781215, at *2 (S.D.N.Y. Mar. 7, 2011)(Baer, J.)("While investors' repayment rights may vary slightly based on the seniority of the tranches they purchased, this does not present a 'fundamental conflict' within the class."); N.J. Carpenters Health Fund v. Residential Capital, LLC, 272 F.R.D. 160, 166 (S.D.N.Y. 2011)(Baer, J.)("The question whether the offering documents were materially misleading will be answered the same way regardless of the varying knowledge levels, risk levels, and loss levels of purchasers of different tranches.").  While the Tenth Circuit has not addressed this issue, it has allowed a plaintiff to assert a section 11 claim on behalf of all the purchasers from an offering even though the plaintiff purchased the security in the aftermarket rather than from the original offering.  See Joseph v. Wiles, 223 F.3d at 1158-61.

In <u>Joseph v. Wiles</u>, the Tenth Circuit found that the plaintiff had standing to assert claims on behalf of all purchasers of the security at issue, because the defendant "made only one debenture offering," and the "debentures [the plaintiff] purchased are directly traceable to the May offering and registration statement."  233 F.3d at 1160.

It is true that there are a variety of tranches within each of the MBS offerings in this case, which received different ratings from the Rating Agency Defendants and which have different priorities for payment.  <u>See</u> <u>In re Wash. Mut. Mortgage-Backed Sec. Litig.</u>, No. 09-37, 2011 WL 5027725, at *2-3 (W.D. Wash. Oct. 21, 2011)(recognizing that "the fact that each tranche has a separate rating, separate payment structure, and risk profile" weighed in favor of not finding tranche-based standing).  The same offering documents apply, however, and the same misrepresentations flow to all of the tranches.  The Defendants concede that, with respect to each of the 2006-3, 2006-5, and 2007-4 offerings, the same offering documents apply to each respective offering.  <u>See</u> Memorandum of Law in Support of Joint Motion at 16-20; <u>Joseph v. Wiles</u>, 223 F.3d at 1158-61 (noting that the "debentures [the plaintiff] purchased are directly traceable to the May offering and registration statement" in support of a conclusion that the lead plaintiff had standing).  Likewise, they concede that each of these offering had only one registration statement.  <u>See</u> Memorandum of Law in Support of Joint Motion at 16.  Additionally, there was only one offering from each of these Thornburg Trusts and not separate offerings from each specific tranche.  <u>See</u> <u>Joseph v. Wiles</u>, 223 F.3d at 1158-61 (noting that the defendant "made only one debenture offering" as support for a conclusion that the lead plaintiff had standing).  The Defendants themselves refer to each of the 2006-3, 2006-5, and 2007-4 offerings as one offering as opposed to separate offerings for each tranche.  <u>See</u> Memorandum of Law in Support of Joint Motion at 15-16.  Even if those facts would not justify Genesee County's assertion of claims for all the tranches, the situation in this case creates

a greater unity of interest between the various tranches than would normally exist.  Specifically, the Plaintiffs have alleged that: (i) the ratings given to the certificates in each tranche were false; and (ii) the Rating Agency Defendants gave the certificates in the highest tranches significant credit downgrades at a later date, which reflect the credit rating the Rating Agency Defendants should have originally assigned to the certificates.  The Rating Agency Defendants downgraded these ratings not just one or two grade levels, but as many as eighteen grade levels in some cases.  This situation undermines one of the primary reasons why a person would purchase certificates from a higher level tranche -- to obtain a less risky investment with a lower likelihood of default -- as indicated by the higher credit rating.  Thus, there is no fundamental conflict between the tranches under the facts of this case.  The pleadings in In re Washington Mutual Mortgage-Backed Securities Litigation, for example, do not appear to have contained comparable allegations.  Accordingly, the Court concludes that each tranche is not a separate offering in which a plaintiff needs to have bought to have standing.

One problem to which the Defendants point is that Genesee County did not make purchases from all of the offerings that Genesee County listed in the Original Complaint.  Thus, Defendants argue that Genesee County did not have standing to assert claims on behalf of the entire class.  Genesee County joined ten total statutory trusts as defendants in the Original Complaint: (i) the 2006-2 trust; (ii) the 2006-3 trust; (iii) the 2006-4 trust; (iv) the 2006-5 trust; (v) the 2006-6 trust; (vi) the 2007-1 trust; (vii) the 2007-2 trust; (viii) the 2007-3 trust; (ix) the 2007-4 trust; and (x) the 2007-5 trust.  See Original Complaint ¶ 41, at 14-15.  Genesee County alleged purchases, however, from only the 2007-4 trust.  See Original Complaint ¶ 19, at 10.

Genesee County did not have standing when it filed the Original Complaint to assert claims regarding the nine other offerings from which it did not allege purchases.  While some authority

recognizes that a lead plaintiff can assert claims regarding classes of securities which it did not actually purchase, those cases rely on the existence of registration documents or other offering documents with uniform misrepresentations that flow to all of the class members.  See In re Countrywide Financial Corp. Securities Litigation, 588 F.Supp.2d 1132, 1166 (C.D. Cal. 2008)(Pfaelzer, J.)("So long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common 'parts' that (3) were false and misleading at each effective date, there is § 11 standing.").  Some courts have used broader language to the effect that a lead plaintiff "with a valid securities claim may represent the interests of purchasers of other types of securities in a class action where the alleged harm stems from the same allegedly improper conduct." In re Juniper Networks, Inc. Sec. Litig., 542 F.Supp.2d 1037, 1052 (N.D. Cal. 2008).  In the absence of common offering documents, however, that apply to all of the securities from an offering -- as opposed to a series of offering documents that each apply to different offerings -- the majority of courts have held that a plaintiff needs to allege purchases from each offering to have standing to assert a claim with respect to that offering.  In Maine State Retirement System v. Countrywide Financial Corp., the United States District Court for the Central District of California stated:

> Every court to address the issue in a MBS class action has concluded that a plaintiff lacks standing under both Article III of the U.S. Constitution and under Sections 11 and 12(a)(2) of the 1933 Act to represent the interests of investors in MBS offerings in which the plaintiffs did not themselves buy.

722 F.Supp.2d at 1163-64 (gathering authority).  See In re Storage Tech. Corp. Sec. Litig., 630 F.Supp. 1072, 1078 (D. Colo.1986)(Matsch, J.)("Accordingly, since section 11 covers only persons acquiring securities pursuant to the allegedly false registration statement, plaintiffs have failed to allege facts sufficient to state a claim upon which relief may be granted.").  In this case, separate

offering documents apply to each offering and a separate registration statement with the SEC covers each offering.  While it is true that each offering is one offering -- rather than a series of offerings for each tranche -- that fact applies more to the issue of tranche-based standing as opposed to standing to assert claims relating to different offerings.  There are similar misrepresentations in the various prospectus supplements and a similar course of conduct relating to each offering, but they are separate offerings that contain separate pools of mortgage loans.  While the representations for the different tranches are identical, the representations for the different offerings are not all identical. Thus, Genesee County had standing only to assert claims regarding the 2007-4 offering, as that is the only offering from which it alleged purchases.[28]

The Court cannot exercise supplemental jurisdiction over the claims relating to the other offerings from which Genesee County did not allege purchases.  The supplemental jurisdiction

---

[28]This holding regarding Genesee County's constitutional standing does not conflict with the Court's holding regarding the lead plaintiffs' constitutional standing in one of its earlier opinions, In re Thornburg Mortgage, Inc. Securities Litigation.  In that case, like this one, the lead plaintiffs had not alleged that they had made purchases from each offering at issue.  See In re Thornburg Mortg., Inc. Sec. Litig., 683 F.Supp.2d at 1254.  Unlike this case, however, there was a common shelf registration filed with the SEC and a prospectus that related to all the offerings.  See In re Thornburg Mortg., Inc. Sec. Litig., 683 F.Supp.2d at 1245.  Additionally, the plaintiffs in that case alleged that the offering documents for all the offerings incorporated the same misleading financial results.  See In re Thornburg Mortg., Inc. Sec. Litig., 683 F.Supp.2d at 1246.  In this case, in comparison, it is undisputed that a separate registration with the SEC, a separate prospectus, and a separate prospectus supplement accompanied each of the Thornburg offerings at issue.  There are likewise no allegations that those documents incorporated or referenced the same external document, such as a financial statement.  While there remains no controlling Tenth Circuit or Supreme Court authority on this issue, this Court continues to agree with its prior decision in that case and recognizes no conflict.  Compare In re Juniper Networks, Inc. Sec. Litig., 542 F.Supp.2d 1037, 1052 (N.D. Cal.2008)(holding that the lead plaintiffs had standing to assert claims on behalf of noteholders, even though they did not allege to purchase those notes, when the harm that the lead plaintiffs suffered stemmed from the same allegedly false financial statements), with In re Storage Tech. Corp. Sec. Litig., 630 F.Supp. 1072, 1078 (D. Colo. 1986)(dismissing a section 11 claim for failure to state a claim under rule 12(b)(6) when none of the named plaintiffs alleged to have purchased any of the securities sold in the public offerings).

statute, 28 U.S.C. § 1367, permits the Court to exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Courts apply the "common nucleus of operative fact" standard to determine the reach of this supplemental jurisdiction statute. Edwards v. Doe, 331 F.App'x 563, 569 (10th Cir. 2009)(unpublished)(citing Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 335 (2d Cir. 2006)). The Supreme Court has recognized, however, that it has never authorized the extension of supplemental jurisdiction "over a claim that does not itself satisfy those elements of the Article III inquiry, such as constitutional standing, that 'serv[e] to identify those disputes which are appropriately resolved through the judicial process.'" DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 351-52 (2006)(alteration in original)(quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). The Supreme Court has declined to authorize such a broad exercise of subject-matter jurisdiction, "particularly since [its] standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. at 352. Thus, because Genesee County did not have standing to assert claims regarding any offering other than the 2007-4 offering, the Court cannot exercise supplemental jurisdiction over the claims relating to the other nine offerings.[29]

_____

[29]In In re Thornburg Mortgage, Inc. Securities Litigation, the Court concluded that, as an alternative ground for its conclusion on constitutional standing, it could exercise supplemental jurisdiction over claims a lead plaintiff in a securities class action had asserted even if the lead plaintiff lacked constitutional standing to assert those claims. See 683 F.Supp.2d at 1254-55. Specifically, the Court held:

> Second, even if the Court were to find that the lack of a Lead Plaintiff with a cognizable claim against the September/January Offering Defendants were a requirement to properly state a claim against those Defendants, the Court is not convinced that lack-of-standing deprives the Court of jurisdiction over those

The issue whether the current lead Plaintiffs, Midwest Operating and Maryland-National Capital, have standing to assert claims as alleged in the Amended Complaint is a less complex issue. Federal jurisdiction must be continuous from the beginning to the end of the suit.  See U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 396-97 (1980).  In the Amended Complaint, the Plaintiffs assert claims relating only to the 2006-3, 2006-5, and 2007-4 offerings.  See Amended Complaint ¶ 21, at 13.  The Plaintiffs no longer allege claims relating to the seven other offerings as alleged in the Original Complaint.  Maryland-National Capital alleges that it purchased certificates based on the 2006-3 offering and the 2007-4 offering, and suffered substantial economic losses in connection with the purchase.  See Amended Complaint ¶ 19, at 13.  Midwest Operating alleges that it

---

potential claims.  The supplemental jurisdiction statute, 28 U.S.C. § 1367, permits the Court to exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." The claims arising from the September and January offerings appear to be part of the same common nucleus of operative fact as the claims arising from the May and June 2007 offerings, as all are related to the same series of SEC filings by the same company, and so the claims all appear to be part of the same case or controversy. Thus, even if the lack of a Lead Plaintiff with a claim against the September/January Offering Defendants would otherwise deprive the Court of subject-matter jurisdiction, the supplemental jurisdiction statute appears to remedy that jurisdictional problem.

See In re Thornburg Mortg., Inc. Sec. Litig., 683 F.Supp.2d at 1254 (citations omitted).  That opinion did not fully consider the Supreme Court's decision in DaimlerChrysler Corp. v. Cuno, which recognized that the supplemental jurisdiction statute does not authorize asserting jurisdiction "over a claim that does not itself satisfy those elements of the Article III inquiry, such as constitutional standing, that 'serv[e] to identify those disputes which are appropriately resolved through the judicial process.'"  547 U.S. at 351-52.  In comparison, a lack of statutory standing does not deprive a court of subject-matter jurisdiction to hear the merits of a case.  See Roberts v. Hammer, 655 F.3d 578, 580-81 (6th Cir. 2011).  Additionally the principles of American Pipe & Construction Co. v. Utah statutory tolling still authorize substituting in a proper plaintiff before certifying the class.  In any case, the reliance on supplemental jurisdiction in In re Thornburg Mortgage, Inc. Securities Litigation was an alternative holding and does not change the Court's prior holding that the plaintiffs had constitutional standing to bring the claims; thus, reliance on supplemental jurisdiction was unnecessary.

purchased certificates based on the 2006-3, 2006-5, and 2007-4 offerings, and suffered substantial economic loss in connection with the purchase.  See Amended Complaint ¶ 20, at 13.  These allegations are consistent with the records contained in the respective certification filed with this Court.  See Certification of Named Plaintiff Pursuant to Federal Securities Law at 4-8 (dated June 26, 2009), filed June 26, 2009 (Doc. 56-3)("Midwest Operating Certification"); Certification of Named Plaintiff Pursuant to Federal Securities Law at 11-15 (dated June 26, 2009), filed June 26, 2009 (Doc. 56-3)("Maryland-National Capital Certification").  Other than the issue of failure to plead that these two Plaintiffs have not received pass-through distributions as discussed above, the Defendants do not contest that the Plaintiffs have suffered financial losses.

First, these allegations and accompanying certifications establish that the Plaintiffs have adequately demonstrated that they have suffered an actual injury in fact that is concrete and particularized.  See Lujan v. Defenders of Wildlife, 504 U.S. at 560-61.  Second, the injury is fairly traceable to the Defendants' conduct based on their allegedly misleading statements and related conduct.  Third, because the injury that the Plaintiffs allege occurred is financial, a judgment of the Court could redress it.  Thus, with respect to all the Defendants, Midwest Operating and Maryland-National Capital have successfully demonstrated that they have standing.  The Court similarly rejects the Defendants' tranche-based standing argument against Midwest Operating and Maryland-National Capital that it has already rejected regarding Genesee County's claims.

Because the addition of these new lead Plaintiffs in the Amended Complaint relates back to the filing of the Original Complaint, subject-matter jurisdiction has been continuous in this suit from its institution to the present time.  See U.S. Parole Comm'n v. Geraghty, 445 U.S. at 396-97.  Before the filing of the Amended Complaint on December 10, 2010, no court had yet determined that Genesee County lacked standing to assert claims on behalf of any of the asserted class members.

The intervening amendment to the complaint resolved any constitutional standing issues. Furthermore, Genesee County had standing to assert claims relating to at least one of the offerings on issue.  While the Tenth Circuit has not addressed the specific issue of lack of standing of a class representative and relation back of a pleading amendment, the Court believes that the Tenth Circuit's precedent indicates it would allow such relation back.  As the Tenth Circuit has recognized, a newly substituted lead plaintiff "has effectively been a party to an action against these defendants [when] a class action covering him was requested but never denied."  Joseph v. Wiles, 223 F.3d at 1168.  The Tenth Circuit has said, in the context of a district court deciding the predominance issue during the class certification process incorrectly, that "the status of class members is to be determined by relation back to the date of the initiation of this suit" for limitations purposes.  Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968).  Similarly, the Third Circuit has expressly allowed relation back on the issue of standing where a district court subsequently decertified a class after it determined that the lead plaintiff did not have standing to assert claims on behalf of the class. See Haas v. Pittsburgh Nat'l Bank, 526 F.2d at 1095-98.  Using language similar to the Tenth Circuit's language in Joseph v. Wiles, the Third Circuit noted: "These plaintiffs were in existence at the time the action was originally brought and were described as claimants in the complaint.  The only change effectuated by the district court's order was the prompt addition of a nominal plaintiff who [regarding all of the claims]."  Haas v. Pittsburgh Nat'l Bank, 526 F.2d at 1097.  Thus, the Third Circuit found "[t]he amendment of the complaint by the addition of [a new lead plaintiff] relates back to the initial filing of the complaint."  Haas v. Pittsburgh Nat'l Bank, 526 F.2d at 1098.[30]

---

[30]The Eleventh Circuit followed the rationale in this Third Circuit opinion, although that Eleventh Circuit opinion did not discuss the nuances of relation back in this context.  See Griffin v. Singletary, 17 F.3d at 360-61.

Other Circuits have shown a greater willingness to allow relation back for newly added plaintiffs when the district court has not yet denied class certification.  See Calderon v. Presidio Valley Farmers Ass'n, 864 F.2d 384, 390 (5th Cir. 1989).

While the issue of mootness is a distinct Article III concern from standing, the Tenth Circuit has addressed some analogous principles in Lucero v. Bureau of Collection Recovery, Inc., a case that discusses whether a named plaintiff can serve as a class representative even though his claims later become moot.  In discussing the Supreme Court's rationale for finding such substitution as consistent with Article III standing requirements, the Tenth Circuit stated:

> By attributing a legal status in the case or controversy to unnamed class members apart from that of the class representative, Sosna suggests that in a proposed class action the non-named class members have an unyielding interest that could precede the moment of class certification -- the premise appearing to be that any live Article III interest a class may or may not have in a case is or is not present from its inception.

Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d at 1245.  Furthermore, the Tenth Circuit recognized that the Supreme Court has "apparently acknowledge[d] that the personal stake of the indivisible class may inhere prior to a definitive ruling on class certification."  Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d at 1245.   More specifically, the Tenth Circuit held that "a nascent interest attaches to the proposed class upon the filing of a class complaint such that a rejected offer of judgment for statutory damages and costs made to a named plaintiff does not render the case moot under Article III."  Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d at 1249. In the context of mootness, the Supreme Court has recognized that some form of relation back can apply in the context of Article III:

> Although one might argue that Sosna contains at least an implication that the critical factor for Art. III purposes is the timing of class certification, other cases, applying a "relation back" approach, clearly demonstrate that timing is not crucial.  When the claim on the merits is "capable of repetition, yet evading review," the named plaintiff

-102-

> may litigate the class certification issue despite loss of his personal stake in the outcome of the litigation.  The "capable of repetition, yet evading review" doctrine to be sure, was developed outside the class-action context.  But it has been applied where the named plaintiff does have a personal stake at the outset of the lawsuit, and where the claim may arise again with respect to that plaintiff; the litigation then may continue notwithstanding the named plaintiff's current lack of a personal stake. Since the litigant faces some likelihood of becoming involved in the same controversy in the future, vigorous advocacy can be expected to continue.

U.S. Parole Comm'n v. Geraghty, 445 U.S. at 398.  Likewise, the Supreme Court has articulated: "A plaintiff who brings a class action presents two separate issues for judicial resolution.  One is the claim on the merits; the other is the claim that he is entitled to represent a class."  U.S. Parole Comm'n v. Geraghty, 445 U.S. at 402.

Furthermore, even if relation back does not apply to standing deficiencies, because the Plaintiffs have already amended their Original Complaint to cure the standing deficiencies, dismissing the Amended Complaint based on the defects in the Original Complaint and granting leave to amend would serve no purpose.  Because the Plaintiffs have already demonstrated they can cure any standing deficiencies and the dismissal in part would be without prejudice, the Defendants will suffer no harm if no dismissal occurs.  American Pipe & Construction Co. v. Utah tolling applies to the claims of the class members, which would prevent the time-barring of their claims from the applicable statute of limitations or repose.

## II.     THE APPLICABLE ONE-YEAR STATUE OF LIMITATIONS AND THREE-YEAR STATUE OF REPOSE DO NOT BAR THE PLAINTIFFS' SECURITIES CLAIMS.

The Defendants raise several arguments that the applicable statute of limitations and statute of repose bar the Plaintiffs' claims.  Specifically, the Defendants argue that: (i) the Plaintiffs have failed to plead facts to establish their compliance with the applicable statute of limitations; (ii) the one-year statute of limitations bars the Plaintiffs' claims because a reasonable investor would have discovered the facts underlying their claims more than one year before the time of filing; and (iii) the

three-year statute of repose bars Plaintiffs' claims relating to the 2006-3 and 2006-5 offerings.  See Memorandum in Support of Joint Motion at 48-58.  The Court has considered these arguments, and concludes that the applicable statute of limitations and statute of repose do not bar any of the Plaintiffs' claims.  The Plaintiffs, however, failed to plead their compliance with the one-year statute of limitations.  The Court will grant the Plaintiffs leave to amend to cure this defect without requiring them to file a motion seeking leave to amend.

### A.   THE PLAINTIFFS HAVE FAILED TO PLEAD FACTS TO ESTABLISH THEIR COMPLIANCE WITH THE ONE-YEAR STATUTE OF LIMITATIONS.

The Tenth Circuit has stated: "To comply with Section 13, the plaintiff must plead and prove facts showing that his claim was timely with respect to both the one year and three year limitations periods."  Anixter v. Home-Stake Prod. Co., 939 F.2d at 1434.  More specifically, a plaintiff must "state affirmatively the time and circumstances of discovery of the allegedly untrue statements or omissions" and, when the action is filed one year from the sale, "the reason why they could not have discovered the untruths or omissions earlier."  Flinn Found. v. Petro-Lewis Corp., 1985 WL 358, at *3.  Here, the Plaintiffs have pled their compliance with the three-year statute of repose, as they have pled facts based on the Original Complaint that indicate their claim was filed timely within the three-year statute of repose for each of the offerings.  See Amended Complaint ¶ 105, at 46 ("This Count was brought within one year after discovery of the untrue statements and omissions in the Offering Documents, and within three years after the Certificates were sold to plaintiffs and the members of the Class.").  The Plaintiffs have failed to plead, however, their compliance with the one-year discovery period contained in the statute of limitations.  See Amended Complaint ¶ 105, at 46.  More specifically, the Plaintiffs failed to plead the time and circumstances of discovery of the allegedly untrue statements, or to the extent the action was filed beyond one year from the sale,

"the reason why they could not have discovered the untruths or omissions earlier." Flinn Found. v. Petro-Lewis Corp., 1985 WL 358, at *3.[31]  The Plaintiffs counter that the Defendants have admitted that the Plaintiffs have sufficiently pled compliance with the one-year statute of limitations when they cited and quoting from the relevant portions of the Plaintiffs' Original Complaint where they pled when they discovered the alleged misconduct.  See Response to Joint Motion at 63.  While this could potentially qualify as a judicial admission by the Defendants, this language does not appear in the Amended Complaint which superseded the Original Complaint, see Amended Complaint, and the Defendants dispute that the Plaintiffs have adequately pled compliance with section 13, see Memorandum in Support of Joint Motion at 50-52.  Because the Plaintiffs can cure this defect by amendment, the Court will grant the Plaintiffs leave to amend to plead the time and circumstances of the discovery of the allegedly untrue statement or omissions, or, to the extent applicable if the claims were filed more than one year after the sale, the reason why they could not have discovered the untruths or omissions earlier.  The Court will grant the Plaintiffs leave to amend to cure this defect without requiring them to file a motion seeking leave to amend.

## B.     PLAINTIFFS DID NOT, AS A MATTER OF LAW, HAVE INQUIRY NOTICE OF THE FACTS GIVING RISE TO THEIR CLAIMS ONE YEAR BEFORE THE TIME OF FILING OF THE ACTION.

The Defendants contend that the Court should bar the Plaintiffs' claims relating to the 2007-4 offering, because a reasonable investor would have discovered the facts underlying the Plaintiffs' claims more than one year before February 27, 2009.  See Memorandum in Support of Joint Motion at 52-56.  The Defendants contend that the Court should bar the Plaintiffs' claims relating to the

---

[31]In a separate portion of this Memorandum Opinion and Amended Order, the Court concludes that Genesee County tolled the statute of limitations and statute of repose applicable to the class members' claims by filing their Original Complaint.

2006-3 and 2006-5 offerings because a reasonable investor would have discovered the facts underlying the Plaintiffs' claims more than one year before December 10, 2010.  <u>See</u> Memorandum in Support of Joint Motion at 56-58.  The Plaintiffs counter that for all their claims the correct time from which to calculate this one-year period is February 27, 2009 because the Amended Complaint relates back to the Original Complaint.  Additionally, the Plaintiffs assert that there is a disputed fact issue regarding the Plaintiffs' notice of the facts giving rise to their claims that the Court cannot resolve as a matter of law on the pleadings.

      **1.**      <u>**The Plaintiffs Do Not Need to Demonstrate Relation Back Because the Current Lead Plaintiffs Were a Party to the Original Action and Had the Statute of Limitations and Statute of Repose for Their Claims Tolled.**</u>

Under rule 15(c)(1)(B) of the Federal Rules of Civil Procedure, an "amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense and arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).  While rule 15(c) does not expressly apply to a new pleading adding or dropping plaintiffs, courts allow relation back for new plaintiffs under some circumstances.  <u>See</u> <u>Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n, AFL-CIO</u>, 814 F.2d 32, 35-36 (1st Cir. 1987).  More specifically, courts will allow relation back for new plaintiffs when: (i) the amended complaint arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; (ii) there is a sufficient identity of interest between the new plaintiff, the old plaintiff, and their respective claims so that the defendants can be said to have been given fair notice of the latecomer's claim against them; and (iii) undue prejudice is absent.  <u>See</u> <u>Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n, AFL-CIO</u>, 814 F.2d at 35-36.

Relation back is generally only necessary for a newly added plaintiff, however, if he or she cannot otherwise satisfy the applicable statute of limitations or statute of repose.  <u>See</u> <u>e.g.</u>, <u>Asher v.</u>

Unarco Material Handling, Inc., 596 F.3d 313, 317-18 (6th Cir. 2010)(newly added plaintiffs seeking relation back because claims would otherwise be untimely).  In this case, the filing of the class action by Genesee County in state court tolled both the statute of limitations and the statute of repose during the entire period the putative class action is pending.  See Joseph v. Wiles, 223 F.3d at 1168.  The Tenth Circuit has recognized that a plaintiff who filed his own separate action, but who was already covered by another class asserting the same claims, could comply with the statute of limitations and repose based on the previously filed class action that covered him.  See Joseph v. Wiles, 223 F.3d at 1168.  The filing of the original class action tolled both the statute of limitations and statute of repose for the plaintiff in that case.  See Joseph v. Wiles, 223 F.3d at 1168.  Thus, the Tenth Circuit recognized that the plaintiff "ha[d] effectively been a party to an action against these defendants since a class action covering him was requested but never denied."  Joseph v. Wiles, 223 F.3d at 1168.  That scenario mirrors the circumstances of this case.  Before the case was removed to this Court, Genesee County filed this action as a class action in state court covering the current lead plaintiffs, Midwest Operating and Maryland-National Capital.  Thus, Midwest Operating and Maryland-National Capital have "effectively been . . . part[ies] to an action against these defendants since a class action covering [them] was requested but never denied."  Joseph v. Wiles, 223 F.3d at 1168.  The filing of that class action by Genesee County tolled the statute of limitations and statute of repose on their claims, which are the same causes of action as those asserted in the Original Complaint.  Thus, it is not necessary for Maryland-National Capital or Midwest Operating to prove that their addition as named plaintiffs under the Amended Complaint relates back, because the statute of limitations and statute of repose that would potentially bar their claims has been tolled until this class action is no longer pending.  See Joseph v. Wiles, 223 F.3d at 1168.

The Defendants also argue that American Pipe & Construction Co. v. Utah tolling should

not apply under these circumstances, because Genesee County lacked standing to assert claims on behalf of the class under the Original Complaint.  The Court rejects this argument.  Even if Genesee County did not have standing to assert a claim on behalf of the class regarding the 2006-3 and 2006-5 offerings, American Pipe & Construction Co. v. Utah tolling still applies as long as this class action is pending.

"[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  Crown, Cork & Seal Co. v. Parker, 462 U.S. at 353 (emphasis added)(quoting Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 554).  The Tenth Circuit has further expanded this rule by recognizing that the commencement of a class action also tolls the applicable statute of repose with respect to the putative class members while the class action is pending.  See Joseph v. Wiles, 223 F.3d at 1168 (discussing the issue in the context of a section 11 claim).  Both the Supreme Court and the Tenth Circuit have taken a functional attitude towards tolling limitations periods in the context of class actions to reduce duplicative litigation and protective filings.  See Crown, Cork & Seal Co. v. Parker, 462 U.S. at 352-53; Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 553-54; See Joseph v. Wiles, 223 F.3d at 1166-68.  Likewise, the Supreme Court and Tenth Circuit have recognized that American Pipe & Construction Co. v. Utah tolling does not conflict with the principle purposes behind statutes of limitation -- preventing plaintiffs from sleeping on their claims and giving defendants notice of the claims against them.  See Crown, Cork & Seal Co. v. Parker, 462 U.S. at 352-53; Amer. Pipe & Constr. Co. v. Utah, 414 U.S. at 553-54; Joseph v. Wiles, 223 F.3d at 1166-68.

The majority of courts who have addressed the issue have concluded that American Pipe & Construction Co. v. Utah tolling apples to situations where the district court ultimately determines

that the plaintiff lacks standing.  See e.g., McKowan Lowe & Co., Ltd. v. Jasmine, Ltd., 295 F.3d 380, 385 (3d Cir. 2002); Griffin v. Singletary, 17 F.3d 356, 360 (11th Cir. 1994).  The Court is persuaded that this majority approach is the more well-reasoned approach.  As the Eleventh Circuit has stated, "[t]he distinction which is urged on us would produce the very evil which the [Supreme] Court sought to avoid in American Pipe and Crown, Cork & Seal," because "class members uncertain of the district court's standing analysis . . . would have every incentive to file a separate action prior to the expiration of his own period of limitations."  Griffin v. Singletary, 17 F.3d at 360 (internal quotation marks omitted).  Furthermore, adopting the minority rule would create "a needless multiplicity of actions -- precisely the situation that Federal Rule of Civil Procedure 23 and the tolling rule of American Pipe were designed to avoid."  Griffin v. Singletary, 17 F.3d at 360 (quoting  Crown, Cork & Seal Co. v. Parker, 462 U.S. at 351).

     The two most common criticisms of this approach are unpersuasive.  These criticisms include: (i) the potential for abuse by using placeholder plaintiffs to file lawsuits first and locate appropriate representatives later; and (ii) the potential lack of constitutional authority for a court to toll a claim over which it has no subject-matter jurisdiction.  See In re Morgan Stanley Mortg. Pass-Through Certificates Litig., 2011 WL 4089580, at *17.  As to the first criticism, the Court can avoid the potential for abuse by disallowing tolling when "the representative so clearly lacks standing that no reasonable class member would have relied" on the filing of the class action.  In re Morgan Stanley Mortg. Pass-Through Certificates Litig., 2011 WL 4089580, at *18.  Relevant considerations in that analysis would be: (i) the difficulty of class members predicting a district court's particular determination on an issue during the class certification process; and (ii) whether any authority existed as of the date of filing the complaint which recognized that the named plaintiff would have standing to assert claims on behalf of the putative class.  See Amer. Pipe & Constr. Co.

v. Utah, 414 U.S. at 553 n.23; In re Morgan Stanley Mortg. Pass-Through Certificates Litig., 2011

WL 4089580, at *18.  Notably, the Tenth Circuit -- in response to arguments that broadly applying

American Pipe & Construction Co. v. Utah tolling would result in placeholder class actions flooding

the court systems -- has stated that "there is no evidence that American Pipe released any such flood

of class actions."  State Farm Mut. Auto. Ins. Co. v. Boellstorff, 540 F.3d at 1234.  As to the second

criticism, the argument misunderstands the holding in American Pipe & Construction Co. v. Utah,

which recognizes that "members of the asserted class are treated for limitations purposes as having

instituted their own actions."  In re Morgan Stanley Mortg. Pass-Through Certificates Litig., 2011

WL 4089580, at *18 (quoting In re WorldCom Sec. Litig., 496 F.3d 245, 255 (2d Cir. 2007)).

Stated differently, any subsequent class representative is deemed "by virtue of the invocation of

Rule 23 to have commenced this action on the date the original complaint was filed."  In re Morgan

Stanley Mortg. Pass-Through Certificates Litig., 2011 WL 4089580, at *18.  The Tenth Circuit has

recognized this basic premise inherent in the American Pipe & Construction Co. v. Utah decision,

particularly when a district court has not yet denied the request for class certification.  In Joseph v.

Wiles, the Tenth Circuit stated:

> Here, the claim was brought within this period on behalf of a class of which [the
> plaintiff] was a member.  Indeed, in a sense, application of the American Pipe tolling
> doctrine to cases such as this one does not involve 'tolling' at all. Rather, [the
> plaintiff] has effectively been a party to an action against these defendants since a
> class action covering him was requested but never denied.

223 F.3d at 1166-68.  See Calderon v. Presidio Valley Farmers Ass'n, 864 F.2d at 390 (showing a

greater willingness to allow relation back before a district court denies class certification).  The

Tenth Circuit has also recognized in a separate context that "a nascent interest attaches to the

proposed class upon the filing of a class complaint such that a rejected offer of judgment for

statutory damages and costs made to a named plaintiff does not render the case moot under Article

III."  Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d at 1249.  Because the members of the class have essentially been a parties to the action until the district court denies class certification, substituting in a lead plaintiff who has standing to assert all of the claims involved in the class action relates back to the filing of the Original Complaint and resolves any standing issues.  See Haas v. Pittsburgh Nat'l Bank, 526 F.2d at 1098.  Furthermore, this case does not present a situation where the lead plaintiff who filed the Original Complaint lacked standing to assert any of its claims, which has persuaded some courts not to apply American Pipe & Construction Co. v. Utah tolling.  See Applebaum v. State Farm Mut. Auto. Ins. Co., 109 F.R.D. at 664.

Here, the exception to the American Pipe & Construction Co. v. Utah tolling rule in the context of standing would not apply.  While more authority, particularly those courts that have reached their decisions since the Plaintiffs filed the Original Complaint, supports the conclusion that Genesee County did not have standing, this case is not one where "the representative so clearly lacks standing that no reasonable class member would have relied" on the filing of the class action.  In re Morgan Stanley Mortg. Pass-Through Certificates Litig., 2011 WL 4089580, at *18.  Similar to a determination on numerosity, it can be difficult to predict how a particular district court judge would decide a standing issue in a case such as this one.  It has required this Court to exert significant effort to understand and properly address the standing issues contained within the case.  Given the difficulty of the standing issues in this case and the lack of controlling authority on this issue, requiring the class members to guess how this Court would decide the standing issues in this case would be inconsistent with the principles underlying American Pipe & Construction Co. v. Utah tolling.  Likewise, at least some authority arguably supports each side of the standing argument in this case, including authority that predates the filing of the Original Complaint.  Compare In re Juniper Networks, Inc. Sec. Litig., 542 F.Supp.2d at 1052 ("Plaintiffs with a valid securities claim

-111-

may represent the interests of purchasers of other types of securities in a class action where the alleged harm stems from the same allegedly improper conduct."), and Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc., 2011 WL 3652477, at *9 ("Defendants cite no case for the proposition that standing must be determined on a tranche-by-tranche basis.  Moreover, the representations in each Offering apply equally to all tranches within that Offering."), and In re Countrywide Fin. Corp. Sec. Litig., 588 F.Supp.2d at 1166 ("So long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common 'parts' that (3) were false and misleading at each effective date, there is § 11 standing."), with In re Storage Tech. Corp. Sec. Litig., 630 F.Supp. at 1078 (dismissing a section 11 claim for failure to state a claim under rule 12(b)(6) when none of the named plaintiffs alleged to have purchased any of the securities sold in the public offerings).  As the Plaintiffs argued at the hearing, the state of the law was not as clear at the time of filing the Original Complaint.  When the Plaintiffs ultimately concluded they would not have standing to assert the claims for which they had not alleged purchases based on the development of the case law, they dropped those claims.  Furthermore, this exception's purpose is to avoid abuse of class action filings.  See In re Morgan Stanley Mortg. Pass-Through Certificates Litig., 2011 WL 4089580, at *18.  The Tenth Circuit might not even apply this exception, as it has concluded that "there is no evidence that American Pipe released any such flood of class actions" that would require such an exception.  State Farm Mut. Auto. Ins. Co. v. Boellstorff, 540 F.3d at 1234.

Given that the determination whether a plaintiff lacks standing based on his allegations is a fact-intensive inquiry, particularly in the area of MBS, in which district courts have reached different results based on subtle distinctions, the putative class members should not have to predict how the Court would decide the standing issues.  The toll on the judicial system's docket would be

significant if, in every class action with a complex standing issue, other members of the class would need to file their own class action or seek to intervene to avoid forfeiting their claim.  Burdening other district courts or judges with similar or identical class actions because of protective filings would impose a significant cost on the judiciary.

2.      **The Plaintiffs' Amended Complaint Relates Back to the Original Complaint.**

Even if Genesee County lacked standing to assert claims regarding the 2006-3 and 2006-5 offerings on behalf of the class and American Pipe & Construction Co. v. Utah tolling should not apply to situations where the original plaintiff lacked standing, the Court finds that the Amended Complaint adding Midwest Operating and Maryland-National Capital as plaintiffs relates back to the Original Complaint.  Courts will allow relation back for new plaintiffs when: (i) the amended complaint arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; (ii) there is a sufficient identity of interest between the new plaintiff, the old plaintiff, and their respective claims so that the defendants can be said to have been given fair notice of the latecomer's claim against them; and (iii) undue prejudice is absent.  See Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n, AFL-CIO, 814 F.2d at 35-36.  See also Milonas v. Williams, 691 F.2d 931, 937 (10th Cir. 1982)(applying a "relation back" theory to grant class certification in an otherwise moot case); Grand Lodge of Pa. v. Peters, 560 F.Supp.2d 1270, 1273-74 (M.D. Fla. 2008)(allowing relation back when newly added plaintiff in a putative securities fraud class action asserted the same claim as the original plaintiff, and there was no evidence of prejudice).  In the context of class actions, courts also show more willingness to allow relation back when a district court has not yet denied class certification, as the newly added plaintiffs are not trying to relitigate the propriety of the class action.  See Joseph v. Wiles, 223 F.3d at 1167-68; Calderon v. Presidio

-113-

Valley Farmers Ass'n, 864 F.2d at 390.

First, Genesee County complained about the same basic conduct in its Original Complaint as that now appearing in the Amended Complaint. The fraudulent scheme Genesee County alleges the Defendants engaged in as stated in the Original Complaint is highly similar to that alleged in the Amended Complaint. This similarity justifies the conclusion that the Amended Complaint arises out of the same transaction or occurrence set forth in the original pleading. Second, there is sufficient identity of interest between Genesee County, the two newly added plaintiffs, and their respective claims to give the Defendants fair notice of the latecomer's claim against them. The same causes of action appear in the Original Complaint and the Amended Complaint. See Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n, AFL-CIO, 814 F.2d at 36 (noting that the same causes of action appearing in the amended complaint weighs in favor of relation back). Genesee County in the Original Complaint sought to bring a claim relating to all the offerings that the Amended Complaint addresses -- the 2006-3, 2006-5, and 2007-4 offerings. Midwest Operating and Maryland-National Capital were both members of the asserted class under the Original Complaint as well. Furthermore, the length of time the Defendants have known about these claims from the time of filing the Original Complaint to the filing of the Amended Complaint undercuts an argument that they did not have notice of claims from class members like Midwest Operating and Maryland-National Capital. See Grand Lodge of Pa. v. Peters, 560 F.Supp.2d at 1274 (recognizing that the longer defendants have been on notice of the class' claims weighs in favor of relation back). Third, there is no evidence of prejudice to the Defendants. If anything, the Amended Complaint asserts fewer claims relating to a fewer number of offerings than the Original Complaint, three as opposed to ten total. See Grand Lodge of Pa. v. Peters, 560 F.Supp.2d at 1274 (recognizing that increasing the size of the class could justify not allowing relation back). The Defendants point to no specific reason why

-114-

substituting in these Plaintiffs prejudices them.  Lastly, the newly added Plaintiffs are not trying to

relitigate the propriety of a class action.  See Joseph v. Wiles, 223 F.3d at 1167-68; Calderon v.

Presidio Valley Farmers Ass'n, 864 F.2d at 390.  No court has yet determined that a class action

involving the conduct complained of by these Plaintiffs would be improper, which would weigh

against relation back.

> **3.      The Plaintiffs Did Not as a Matter of Law Have Inquiry Notice of the Facts Underlying Their Claims One Year Before the Filing of the Original Complaint on February 27, 2009.**

Because the filing of the Original Complaint tolled the statute of limitations and repose for

the claims of all the putative class members, or alternatively because the Amended Complaint relates

back to the Original Complaint, the applicable date to calculate the Plaintiffs' knowledge, or a

reasonable investor's knowledge, of the facts underlying their claims is more than one year before

February 27, 2009.  The Court thus rejects the Defendants argument that it should calculate the one-

year period of limitations covering Plaintiffs' claims relating to the 2006-3 and 2006-5 offerings

from one year before December 10, 2010.  See Memorandum in Support of Joint Motion at 56-58.

The Tenth Circuit defines the standard for inquiry notice under section 13 of the Securities

Act as follows: "This court concludes that inquiry notice . . . triggers an investor's duty to exercise

reasonable diligence and that the one-year statute of limitations period begins to run once the

investor, in the exercise of reasonable diligence, should have discovered the facts underlying the

alleged fraud."  Sterlin v. Biomune Sys., 154 F.3d 1191 at 1201.  The Tenth Circuit has reminded

district courts that the determination when a plaintiff has actual or inquiry notice of underlying

events requires an evidentiary finding.  See Olcott v. Del. Flood Co., 76 F.3d at 1549.  The Tenth

Circuit went on to say that "resolving the notice issue in the procedural context of a motion to

dismiss is wrong."  Olcott v. Del. Flood Co., 76 F.3d at 1549.  Instead, courts should "make the

necessary determination on summary judgment, or, if a genuine issue of material fact remains in dispute, after an evidentiary hearing." Olcott v. Del. Flood Co., 76 F.3d at 1549.

The Plaintiffs conceded at the hearing that the Court could take judicial notice of news publications in the context of a motion to dismiss. See Tr. at 175:21-176:15 (Court, Goldstein). Judicial notice may be taken during any stage of the judicial proceeding, including at the stage of a motion to dismiss. See 21B Wright & Graham, supra, § 5110, at 294 & n.17. The documents of which a court takes judicial notice, however, should not be considered for the truth of the matters asserted therein. See Tal v. Hogan, 453 F.3d at 1265 n.24. Here, the Defendants point to a great number of publications that reference concerns about the MBS crisis, but few of those publications specifically reference any of the relevant offerings or Thornburg Mortgage companies. See Memorandum in Support of Joint Motion at 52-56. The Defendants point to several publications that specifically reference the Thornburg offerings or Thornburg Mortgage companies that went into circulation during the summer of 2007, although these sources do not specifically indicate that the Thornburg Mortgage companies engaged in any actionable misconduct or that it engaged in any fraud regarding its lending practices. See Reply at 31 n.24. They largely indicate that the Thornburg Mortgage companies have suffered from financial troubles based on overall market conditions for companies dealing in MBS. See With Markets Moving Wildly, Insight Suffers at 2-4 (dated August 17, 2007), filed February 11, 2011 (Doc. 125-27); Thornburg: Another Subprime Victim? at 2-4 (dated August 15, 2007), filed February 11, 2011 (Doc. 125-29); Thornburg Retreats at 2 (dated August 20, 2007), filed February 11, 2011 (Doc. 125-30); Trading is Halted in Shares of Mortgage Lender at 2 (dated Aug. 15, 2007), filed February 11, 2011 (Doc. 125-31). Notice of a drop in stock price for a company does not equate to notice of potential securities violations, as the Defendants contend. See With Markets Moving Wildly, Insight Suffers at 2-4; Trading is

Halted in Shares of Mortgage Lender at 2.  In fact, one of the articles to which the Defendants point tends to paint a favorable picture of the Thornburg Mortgage companies in relation to other similarly situated companies.  See Thornburg: Another Subprime Victim? at 1-3.  These publications, while indicating problems for the Thornburg Mortgage companies, do not put investors on notice of "storm warnings" of fraudulent activity with respect to the offerings in question.  See Sterlin v. Biomune Sys., 154 F.3d at 1201.  They mostly refer to general problems for companies in the MBS industry, although there is some indication that other companies have engaged in fraud with respect to this industry and related real estate industries.  A district court should not normally determine the issue whether these publications would have put a reasonable person on inquiry notice of their claims as part of a motion to dismiss as it would require evidentiary findings.  See Olcott v. Del. Flood Co., 76 F.3d at 1549.  As the Tenth Circuit has stated, "resolving the notice issue in the procedural context of a motion to dismiss is wrong."  Olcott v. Del. Flood Co., 76 F.3d at 1549.  Even if these publications put the Plaintiffs on inquiry notice, the Plaintiffs must also have been able to discover through the exercise of reasonable diligence the facts underlying the alleged fraud for the statute of limitations to begin to run.  See Sterlin v. Biomune Sys., 154 F.3d at 1201; Lane v. Page, 649 F.Supp.2d at 1303.  Besides these publications, the Defendants have not pointed to sufficient information for the Court to conclude as a matter of law that a reasonable investor would have known of the facts establishing every element of a cause of action under section 11 or 12(a)(2) more than one year before February 27, 2009.  The Defendants can raise this issue with the Court again at the summary judgment stage of this proceeding.

## III.   THE PLAINTIFFS HAVE PLED ACTIONABLE MISREPRESENTATIONS OR OMISSIONS AGAINST THE DEFENDANTS WHO FILED THE JOINT MOTION.

The Plaintiffs have sufficiently pled allegations about material misrepresentations or

omissions against the Defendants other than the Rating Agency Defendants with respect to: (i) their abandonment of their loan underwriting guidelines; (ii) their improper appraisal practices with respect to the 2006-5 offering; (iii) the inflated LTV ratios with respect to the 2006-5 offering; and (iv) the allegations related to the credit ratings with respect to the 2006-5 and 2007-4 offering.  The Plaintiffs have no obligation to plead that a material number of non-complying loans existed.  The Plaintiffs have no obligation to plead that the Defendants have failed to cure non-complying loans.

### A.   THE ALLEGED MISREPRESENTATIONS OR OMISSIONS REGARDING THE DEFENDANTS' FAILURE TO FOLLOW THEIR LOAN ORIGINATION AND UNDERWRITING STANDARDS ARE ACTIONABLE.

The Defendants who filed the Joint Motion argue that the Plaintiffs' allegations that the offering documents misrepresented the loan origination and underwriting standards which the Defendants and their affiliates used are not material misrepresentations.  See Memorandum in Support of Joint Motion at 23-29.  First, the Defendants contend that the Plaintiffs have not alleged sufficient factual allegations with respect to Thornburg Mortgage Home Loans' loan origination practices and other conduct to demonstrate that there was a material misrepresentation.  See Memorandum in Support of Joint Motion at 23-26.  Second, the Defendants argue that the Plaintiffs have made conclusory allegations regarding Wells Fargo's loan origination practices.  See Memorandum in Support of Joint Motion at 26-29.  The Defendants also contend that, based on the bespeaks caution doctrine, the offering documents contained adequate disclosures to inform the Plaintiffs of the specific risks of which they now complain.  See Memorandum in Support of Joint Motion at 23-29.

### 1.   The Plaintiffs Have Sufficiently Alleged Factual Allegations to Support Their Misrepresentation or Omission Claims Regarding the Defendants' Failure to Follow Their Underwriting Standards.

The Defendants argue that the Plaintiffs' factual allegations regarding Thornburg Mortgage

Home Loans and Wells Fargo's loan origination practices are not sufficient to survive a 12(b)(6) motion to dismiss. The Defendants contend that Thornburg Mortgage Home Loans originated only a small percentage of the loans relating to the 2006-3, 2006-5, and 2007-4 offerings. See Memorandum in Support of Joint Motion at 23-29. The Defendants argue that there are no factual allegations that Thornburg Mortgage Home Loans originated loans without following its stated underwriting standards or based on loan documentation containing misrepresentations. See Memorandum in Support of Joint Motion at 24. Likewise, they contend that there are no factual allegations in the Amended Complaint for which Thornburg did not conduct adequate quality control reviews. See Memorandum in Support of Joint Motion at 24. The Defendants argue that the Plaintiffs have asserted only in a conclusory manner that the representations in the offering documents were false, because the opposite was true. See Memorandum in Support of Joint Motion at 24. The Defendants argue there are no factual allegations regarding the conduct of Thornburg Mortgage Home Loans' correspondent lenders, such as Luxury Mortgage Corporation, Manhattan Mortgage Company, Inc., First Republic Bank, Countrywide, and IndyMac Bank, F.S.B. See Memorandum in Support of Joint Motion at 25. The Defendants also point out that the Plaintiffs do not reference any sources for their allegations, such as statements from confidential witnesses, former employees, or internal electronic mail transmissions regarding allegations specific to the loan originator. See Memorandum in Support of Joint Motion at 26. The Defendants further assert that there are no allegations regarding how Wells Fargo failed to follow its underwriting guidelines with regard to any specific loan. See Memorandum in Support of Joint Motion at 26. More specifically, they argue that the Plaintiffs point to no loan where Wells Fargo failed to determine whether the borrowers' income or ability to repay their loans was sufficient, or extended loans to borrowers who could not afford to repay the loans or lacked the demonstrable ability to comply with the terms of

the loans.  See Memorandum in Support of Joint Motion at 28.  Thus, the Defendants conclude that the Plaintiffs have made no factual allegations that would create a sufficient nexus between the alleged underwriting standard abandonment and the loans underlying the certificates.  See Memorandum in Support of Joint Motion at 28.

The Plaintiffs counter that the Amended Complaint alleges that the loan originators systematically abandoned any semblance of underwriting standards aimed at evaluating prospective borrowers' repayment ability.  See Response to Joint Motion at 29.  The Plaintiffs point out that they alleged that the originators were making loans without due regard to borrowers' ability to repay, attempting to generate and sell as many loans as possible.  See Response to Joint Motion at 29.

The Defendants contend that, for the Plaintiffs to sufficiently state a claim for these allegations, they must refer to "substantial sources, including statements from confidential witnesses, former employees and internal e-mails."  Joint Reply at 26 (quoting Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 773).  The case the Defendants cite, however, states that "[s]imilar complaints in other cases have cited to more substantial sources, including statements from confidential witnesses, former employees and internal e-mails."  Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 773.  The United States Court of Appeals for the First Circuit in that case concluded that the plaintiffs' allegations could survive a motion to dismiss even though they did not have these "substantial sources," which the Defendants contend the Plaintiffs must have.  See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 773.  The First Circuit recognized the situation which the plaintiffs in that case faced: "This is a familiar problem: plaintiffs want discovery to develop such evidence, while courts are loath to license fishing expeditions."  Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 773.

That First Circuit concluded: "While this case presents a judgment call, the sharp drop in the credit ratings after the sales and the specific allegations as to [one of the loan originators] offer enough basis to warrant some initial discovery aimed at these precise allegations."  Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 773-74 (emphasis in original). The specific allegations regarding that loan originator were as follows:

> For example, the prospectus supplements for the two trusts at issue stated that First National Bank of Nevada ("FNBN"), one of the "key" loan originators for those trusts, used "underwriting guidelines [that] are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral."
>
> In fact, plaintiffs allege, FNBN "routinely violated" its lending guidelines and instead approved as many loans as possible, even "scrub[bing]" loan applications of potentially disqualifying material.  Indeed, plaintiffs allege that this was FNBN's "business model," aimed at milling applications at high speed to generate profits from the sale of such risky loans to others.  Thus, plaintiffs say, contrary to the registration statement, borrowers did not "demonstrate[] an established ability to repay indebtedness in a timely fashion" and employment history was not "verified."

Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 772-73 (alterations in original)(footnote omitted).

Another court noted: "Allegations of widespread abandonment of underwriting and appraisal guidelines can hardly be held immaterial as a matter of law."  Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL 1796426, at *11.  That court, synthesizing the conclusions of several other courts in MBS cases, said the following:

> Allegations that loan originators "abandoned the underwriting standards that [they] professed to follow and ignored whether borrowers ever would be able to repay their loans" are actionable, notwithstanding the fact that Offering Documents may have disclosed that loans could be issued pursuant to low- or no-documentation programs or under exceptions to those guidelines.  A plaintiff need not allege that any particular loan or loans were issued in deviation from the underwriting standards, so long as the complaint alleges "widespread abandonment of underwriting guidelines."

Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL 1796426,

at *8 (alteration in original)(citations omitted).  That court found the following allegations sufficient for the plaintiff's claims to survive a motion to dismiss:

> Here, the plaintiff has alleged, for example, that loan originators deviated from underwriting standards "as a matter of course" or issued loans without evaluating "the prospective borrower's repayment ability," in violation of the underwriting standards specified in the Offering Documents.  These are factual allegations, not legal conclusions, and must be accepted as true for purposes of Rule 8(a).  While the Offering Documents did state that exceptions could and would be made to the underwriting standards, and that some low- or no-documentation loans would be issued, they repeatedly represented that loan originators would "generally" follow underwriting guidelines.  "[T]he alleged repeated deviation from established underwriting standards is enough to render misleading the assertion in the registration statements that underwriting guidelines were generally followed."  Thus, the plaintiff's allegations regarding deviations from underwriting standards are sufficient to survive dismissal at this stage.

Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL 1796426, at *9 (alteration in original)(citations omitted).

Here, the Plaintiffs have pled "allegations suffic[ient] to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to" permit "the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. at 1323 (citations omitted)(internal quotation marks omitted).  With respect to Thornburg Mortgage Home Loans and its correspondent lenders, the Plaintiffs allege that, instead of following the stated practices and the respective underwriting guidelines: (i) Thornburg Mortgage Home Loans' correspondent lenders and wholesale mortgage brokers and lenders were generating loans without regard to Thornburg Mortgage Home Loans' stated underwriting standards; (ii) Thornburg Mortgage Home Loans' correspondent lenders and wholesale mortgage brokers and lenders were abusing underwriter discretion allowed for under the guidelines, because as a matter of course they invoked exceptions to and/or diverged from applicable underwriting standards; (iii) Thornburg Mortgage Home Loans failed to conduct adequate quality

-122-

control reviews of the mortgage loans acquired from its correspondent lenders, wholesale mortgage brokers and lenders, and sellers through its program of purchasing loans from them -- including purchases from Wells Fargo -- to ensure that the loans complied with the stated underwriting guidelines; and (iv) adequate documentation, such as accurate data concerning the borrowers' income, employment, or accurate appraisals of their property, did not support the mortgage loans underlying the certificates.  See Amended Complaint ¶ 54, at 22-23.  Additionally, the Plaintiffs allege, and the offering documents represent, that the significant majority of the loans in the mortgage pools would adhere to the stated underwriting guidelines.  These are not legal conclusions; these are factual allegations that the Court must accept as true in the context of a 12(b)(6) motion to dismiss.  See Ashcroft v. Iqbal, 129 S.Ct. at 1949; Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL 1796426, at *9.  Furthermore, like the plaintiffs in Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., the Plaintiffs here allege that there was a sharp drop in the credit ratings after the sales of the certificates with respect to all of the offerings.  See Amended Complaint ¶¶ 77-79, at 38.  Also like the plaintiffs in Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., the Plaintiffs have pled specific factual allegations with regard to Wells Fargo's underwriting practices, loans which Thornburg Mortgage Home Loans represented that it would review to confirm they complied with its stated underwriting guidelines.   These specific allegations include that Wells Fargo: (i) was "aware that information being submitted to it by borrowers to qualify for loans in connection with the loans it then sold to Thornburg and others was false, including borrowers' use of falsified bank statements"; (ii) "[d]uring the time period when the loans in the Trusts were originated . . . was systematically ignoring its own loan underwriting standards, lending to persons who Wells Fargo was aware could not afford to repay the loans[;] Wells Fargo employees objecting to this practice

-123-

were fired"; (iii) "had implemented a program in late 2006 called 'courageous underwriting' which formalized the practice of ignoring underwriting guidelines where doing so was necessary to ensure that a loan was approved"; and (iv) "[a]s a matter of practice, . . . extended stated income loans to persons with questionable credit and incomes who lacked the demonstrable ability to comply with the terms of the loan." Amended Complaint ¶ 51, at 21. Wells Fargo originated seventy-two percent of the mortgage loans in the 2006-5 Thornburg Trust. See Amended Complaint ¶ 48, at 20. These allegations are not "labels and conclusions, [or] a formulaic recitation of the elements of a cause of action." Bell Atl. Corp. v. Twombly, 550 U.S. at 555.

The Defendants contend that there are no allegations regarding the conduct of Thornburg Mortgage Home Loans' correspondent lenders or that Thornburg Mortgage Home Loans generated a significant amount of the loans in the Thornburg Trusts. See Memorandum in Support of Joint Motion at 23-25. The Plaintiffs' allegations, however, state that Thornburg Mortgage Home Loans failed to institute adequate quality controls regarding the mortgage loans from these correspondent lenders and not just that Thornburg Mortgage Home Loans failed to follow its underwriting guidelines when making loans. See Amended Complaint ¶¶ 52-54, at 17-19. Likewise, the Plaintiffs have included factual allegations that give rise to an inference that Thornburg Mortgage Home Loans did institute adequate quality control measures over Wells Fargo in a systematic way. These allegations regarding Wells Fargo, along with other allegations in the Amended Complaint, support an inference that Thornburg Mortgage Home Loans did not institute adequate quality control measures at a broad level beyond Wells Fargo. The Defendants point to a authority where district courts rejected materiality allegations that are similar to the current allegations, but some of these cases involved rule 10b-5 actions subject to heightened pleading standards under the PSLRA and rule 9(b) of the Federal Rules of Civil Procedure. See Republic Bank & Trust Co. v. Bear, Stearns

& Co., Inc., 707 F.Supp.2d 702, 707, 712 (W.D. Ky. 2010)(rule 9(b) case); In re Downey Sec. Litig.,

No. 08-3261, 2009 WL 2767670, at *6-7 (C.D. Cal. Aug. 21, 2009)(Walter, J.)(rule 10b-5 case).

Because the Plaintiffs claims are based on fraud and strict liability theories, and because scienter is

not an element of their claims, they must only satisfy Ashcroft v. Iqbal's plausibility requirement

as opposed to rule 9(b)'s particularity requirement or the strong inference of scienter requirement

under the PSLRA.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 313 ("Exacting

pleading requirements are among the control measures Congress included in the PSLRA.  The

PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation,

and the facts evidencing scienter . . . ."); Reese v. BP Exploration (Alaska) Inc., 643 F.3d at 690-91

(recognizing that Ashcroft v. Iqbal's plausibility standard is different than rule 9(b)'s particularity

standard).  Furthermore, the defendants in In re Downey Securities Litigation gave some specific

disclosures regarding the credit scores of the people to whom they were lending mortgages.  See In

re Downey Sec. Litig., 2009 WL 2767670, at *6.  The plaintiffs in one of the cited cases do not

appear to have alleged systematic disregard of underwriting guidelines as well.  See In re Downey

Sec. Litig., 2009 WL 2767670, at *6.

        The Defendants argue that the Plaintiffs' allegations do not create a sufficient nexus between

the alleged underwriting standard abandonment and the loans underlying the certificates.  See

Memorandum in Support of Joint Motion at 28 (quoting In re IndyMac Mortgage-Backed Sec.

Litig., 718 F.Supp.2d 495, 510 (S.D.N.Y. 2010)(Kaplan, J.)).  The authority the Defendants cite

states that the plaintiffs in that case met this requirement by alleging that the loan originator's

"widespread abandonment of its underwriting guidelines [occurred] during the relevant time period"

and "that the percentage of defaulting loans rose after the Certificates were issued."  In re IndyMac

Mortgage-Backed Sec. Litig., 718 F.Supp.2d at 509-10.  The Plaintiffs have adequately pled the

source of the loans in the Thornburg Trusts, as they provide in the Amended Complaint specific percentages detailing the origin of the loans.  See Amended Complaint ¶¶ 48, 52, at 20, 22. Furthermore, the Plaintiffs have alleged that the credit ratings of the certificates they purchased faced sharp downgrades, which the First Circuit in <u>Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.</u> found to be sufficient without allegations of increased mortgage defaults.  <u>See</u> Amended Complaint ¶¶ 77-79, at 38.  The Plaintiffs have also alleged that they "acquired securities at inflated prices that were far riskier than represented" based on the Defendants' conduct and "have suffered substantial economic harm in connection with their purchases of the Certificates."  Amended Complaint ¶ 13, at 11.  Furthermore, the case the Defendants cite did not hold that allegations of a rise in defaulting loans were always required.  <u>See</u> <u>In re IndyMac Mortgage-Backed Sec. Litig.</u>, 718 F.Supp.2d at 509-10.  The Defendants' argument that the Plaintiffs must point to specific defective loans or allege that they reviewed specific loans is not persuasive, particularly given that no discovery has taken place in this case.  "A plaintiff need not allege that any particular loan or loans were issued in deviation from the underwriting standards, so long as the complaint alleges 'widespread abandonment of underwriting guidelines.'" <u>Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.</u>, 2011 WL 1796426, at *8.  The Plaintiffs' obligation at the pleadings stage of a case is not to prove their case, but to plead "allegations suffic[ient] to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to" permit "the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." <u>Matrixx Initiatives, Inc. v. Siracusano</u>, 131 S.Ct. at 1323 (citations omitted)(internal quotation marks omitted).  Likewise, this case is not subject to the rule 9(b)'s particularity standards, only <u>Ashcroft v. Iqbal</u>'s plausibility standard.  <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. at 313 ("Exacting pleading requirements are

among the control measures Congress included in the PSLRA.  The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter . . . ."); Reese v. BP Exploration (Alaska) Inc., 643 F.3d at 690-91 (recognizing that Ashcroft v. Iqbal's plausibility standard is different than rule 9(b)'s particularity standard). Accordingly, the Court denies the Joint Motion with respect to the argument that the materiality allegations regarding abandonment of underwriting standards are insufficient.

### 2. The Disclosures in the Offering Documents Are Not Sufficient to Undercut the Plaintiffs' Material Misrepresentation Claims.

The Defendants also argue that, under the bespeaks caution doctrine, there were adequate disclosures in the offering documents to undercut the materiality of the alleged misrepresentations. They point to disclosures in the offering documents that state the lender may on a case-by-case basis deviate from its underwriting guidelines and state that there are no factual allegations that Thornburg Mortgage Home Loans abused underwriter discretion as a matter of course.  See Memorandum in Support of Joint Motion at 24-25.  The Defendants note that there were disclosures in the offering documents regarding loans issued under a stated-income program, which required less documentation than the full-documentation program.  See Memorandum in Support of Joint Motion at 25.  The Defendants also point to various disclosures regarding Wells Fargo's lending practices that they assert undercut the Plaintiffs' material misrepresentation allegations.  See Memorandum in Support of Joint Motion at 26-28.

The Plaintiffs counter that the Defendants' disclosures that they would in some cases not follow their stated loan origination practices did not inform the investors that the originators, such as Wells Fargo, had failed to make any determination at all regarding the borrowers' ability repay their loans.  See Response to Joint Motion at 28.  Instead, the offering documents reported that,

regardless whether the need for documentation and/or verification was reduced, or even eliminated, the lending guidelines still required each originator to, at a minimum, make a determination whether the borrowers could repay their loans.  <u>See</u> Response to Joint Motion at 28.  Furthermore, the Amended Complaint alleges that the loan originators systematically abandoned any semblance of underwriting standards aimed at evaluating prospective borrowers' repayment ability.  <u>See</u> Response to Joint Motion at 29.

Some courts have rejected the argument that disclosures similar to the ones the Defendants made in the offering documents were sufficient to counter allegations that the loan originators systematically abandoned their underwriting standards:

> While defendants argue that underwriting standards are "not strict rules" and that, even if there were deviations from the underwriting standards, the registration statements only promised that underwriting "guidelines" would be "generally" followed, the alleged repeated deviation from established underwriting standards is enough to render misleading the assertion in the registration statements that underwriting guidelines were generally followed.  Without multiplying examples, the Court concludes that the Complaint's allegations of how the registration statements were false or misleading are sufficient to escape dismissal.

<u>Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.</u>, 714 F.Supp.2d at 483.  These courts have concluded that the bespeaks caution doctrine did not undercut the materiality of these misrepresentations, because "[d]isclosures that described lenient, but nonetheless existing guidelines about risky loan collateral, would not lead a reasonable investor to conclude that the mortgage originators could entirely disregard or ignore those loan guidelines." <u>N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC</u>, 720 F.Supp.2d 254, 270 (S.D.N.Y. 2010)(Baer, J.).  As the First Circuit stated:

> The district court ruled that, read together with such warnings, the complained-of assurances were not materially false or misleading, but we cannot agree.  Neither being 'less stringent' than Fannie Mae nor saying that exceptions occur when borrowers demonstrate other 'compensating factors' reveals what plaintiffs allege,

namely, a wholesale abandonment of underwriting standards.

Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 773. Other district courts have reached similar conclusions.  See In re IndyMac Mortgage-Backed Sec. Litig., 718 F.Supp.2d at 509 (recognizing that "[d]isclosures regarding the risks stemming from the allegedly abandoned standards do not adequately warn of the risk the standards will be ignored" when the plaintiffs alleged that the defendant "ignored even those watered-down underwriting standards, including the standards for granting exceptions to the guidelines, in order to originate as many loans as possible"); Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F.Supp.2d 387, 392 (S.D.N.Y. 2010)(Kaplan, J.)(holding that "[t]he warnings [the defendant] highlights did not disclose these alleged facts" regarding abandonment of underwriting standards). The Defendants have cited to one case, In re Downey Securities Litigation, where a court concluded that a disclosure that a small, specified percentage of mortgage loans would not follow a more rigorous loan documentation program would be sufficient.  2009 WL 2767670, at *6 (finding disclosure that 10% of loans would not follow underwriting guidelines was sufficient disclosure to undercut materiality).  That court's decision conflicts with many the decision of others who have addressed the issue.  Compare In re Downey Securities Litig., 2009 WL 2767670, at *6 (finding disclosure that 10% of loans would not follow underwriting guidelines was sufficient disclosure to undercut materiality), with N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC, 720 F.Supp.2d at 270 ("Disclosures that described lenient, but nonetheless existing guidelines about risky loan collateral, would not lead a reasonable investor to conclude that the mortgage originators could entirely disregard or ignore those loan guidelines."), and In re IndyMac Mortgage-Backed Sec. Litig., 718 F.Supp.2d at 509 (recognizing that "[d]isclosures regarding the risks stemming from the allegedly abandoned standards do not adequately warn of the risk the standards will be ignored"

when the plaintiffs alleged that the defendant "ignored even those watered-down underwriting standards, including the standards for granting exceptions to the guidelines, in order to originate as many loans as possible").

Under the bespeaks caution doctrine, the relevant inquiry regarding whether disclosures undercut otherwise material misrepresentations is whether the "language did not expressly warn or did not directly relate to the risk that brought about plaintiffs' loss." Halperin v. eBanker USA.com, Inc., 295 F.3d at 359. Here, the prospectus supplements for the 2006-3, 2006-5, and 2007-4 offerings each disclosed that, "[o]n a case-by-case basis, the seller may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception." 2006-3 Prospectus Supplement at 31; Prospectus Supplement to Prospectus Dated March 28, 2006 at 12, filed February 11, 2011 (Doc. 125-2)("2006-5 Prospectus Supplement"); Prospectus Supplement to Prospectus Dated July 30, 2007 at 16, filed February 11, 2011 (Doc. 125-3)("2007-4 Prospectus Supplement"). Additionally, the prospectus to the 2006-3 offering disclosed:

> There has recently been an increasing number of mortgage loans originated under "stated income" programs . . . Typically no verification of monthly income is required under stated income programs, which increases the risk that these borrowers have overstated their income and may not have sufficient income to make their monthly mortgage loan payments.

2006-3 Prospectus at 3, filed February 11, 2011 (Doc. 125-8). Each of the prospectus supplements also details that "no or limited information was obtained regarding borrowers' income or employment" for loans originated under loan programs other than the full-documentation program. 2006-3 Prospectus Supplement at 9, 16; 2006-5 Prospectus Supplement at 9, 25; 2007-4 Prospectus Supplement at 12, 26.

With respect to Wells Fargo, the Defendants contend that the 2006-5 Prospectus Supplement

-130-

already disclosed that "[v]erifications of income, assets or mortgages may be waived under certain programs offered by Wells Fargo Bank," and that Wells Fargo had implemented an initiative to encourage its mortgage loan underwriting staff to "aggressively . . . utilize the underwriting discretion already granted to them under Wells Fargo Bank's underwriting guidelines and policies" to make underwriting exceptions.  2006-5 Prospectus Supplement at 14, 17; Memorandum in Support of Joint Motion at 26-27.  The first quotation states in full: "Verification of income, assets or mortgages, may be waived under certain programs offered by Wells Fargo, but Wells Fargo Bank's underwriting guidelines require, in most instances, a verbal or written verification of employment to be obtained."  2006-5 Prospectus Supplement at 14.  The second quotation states in full: "During the second calendar quarter of 2005, Wells Fargo Bank initiated a program designed to encourage its mortgage loan underwriting staff to prudently, but more aggressively, utilize the underwriting discretion already granted to them under Wells Fargo Bank's underwriting guidelines and policies."  2006-5 Prospectus Supplement at 17.  Additionally, the 2006-5 Prospectus Supplement disclosed regarding this initiative:

> This initiative was viewed by management as necessary and desirable to make prudent loans available to customers where such loans may have been denied in the past because of underwriter hesitancy to maximize the use of their ability to consider compensating factors as permitted by the underwriting guidelines.  There can be no assurance that the successful implementation of this initiative will not result in an increase in the incidence of delinquencies and foreclosures, or the severity of losses, among mortgage loans underwritten in accordance with the updated philosophy, as compared to the mortgage loans underwritten prior to the commencement of the initiative.

2006-5 Prospectus Supplement at 17.  The 2006-5 Prospectus Supplement also explains the means through which Wells Fargo obtains verification through different sources, such as the borrower's employer, employer-sponsored web sites, or third-party services specializing in employment verification.  See 2006-5 Prospectus Supplement at 14.  This offering document relates that

"[d]ocumentation requirements vary based upon a number of factors, including the purpose of the loan, the amount of the loan, the ratio of the loan amount to the property value and the mortgage loan production source." 2006-5 Prospectus Supplement at 15.  The 2006-5 Prospectus Supplement relates that Wells Fargo in some cases accepts alternative methods of verification, such as for "salaried income," which "may be substantiated either by means of a form independently prepared and signed by the applicant's employer or by means of the applicant's most recent paystub and/or W-2." 2006-5 Prospectus Supplement at 14.  The offering document discloses that: "Loans underwritten using alternative verification methods are considered by Wells Fargo Bank to have been underwritten with 'full documentation.'" 2006-5 Prospectus Supplement at 15.  The 2006-5 Prospectus Supplement also discloses that some borrowers "with at least one mortgage loan serviced by Wells Fargo Bank may be eligible for Wells Fargo Bank's retention program," if that "borrower is current in his or her mortgage payment obligations." 2006-5 Prospectus Supplement at 17.  Under this program, "Wells Fargo Bank may permit a refinancing of one or more of the borrower's mortgage loans that are serviced by Wells Fargo Bank or another servicer to a current market interest rate without applying any significant borrower credit or property underwriting standards." 2006-5 Prospectus Supplement at 17.  Thus,

> borrowers who qualify under the retention program may not need to demonstrate that their current total monthly debt obligation in relation to their monthly income level does not exceed a certain ratio; Wells Fargo Bank may not obtain a current credit report for the borrower . . . ; and the borrower may not be required to provide any verifications of current employment, income level or extent of assets.

Prospectus Supplement at 17.

While these disclosures warned investors that the loan originators would in some instances deviate from the stated underwriting guidelines, they did not warn investors that the loan originators would systematically abandon these guidelines -- the risk that the Plaintiffs have alleged brought

about their loss.  See Halperin v. eBanker USA.com, Inc., 295 F.3d at 359.  The Court does not find the In re Downey Securities Litigation opinion persuasive, as it does not sufficiently account for the level of specificity the disclosures must reach with respect to what the plaintiffs have alleged brought about their loss.  Furthermore, that case is factually distinguishable as the plaintiffs in that case do not appear to have alleged that systematic abandonment of underwriting guidelines occurred. See In re Downey Sec. Litig., 2009 WL 2767670, at *6.  That case also applied the heightened pleading standards of rule 9(b), which do not apply to the Plaintiffs' allegations in this case.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 313 ("Exacting pleading requirements are among the control measures Congress included in the PSLRA.  The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter . . . ."); Reese v. BP Exploration (Alaska) Inc., 643 F.3d at 690-91 (recognizing that Ashcroft v. Iqbal's plausibility standard is different rule 9(b)'s particularity standard).

Although the offering documents stated that Wells Fargo would apply its underwriting discretion "aggressively," the full sentence states that they would act "prudently, but more aggressively."  2006-5 Prospectus Supplement at 17.  None of the disclosures to which the Defendants point disclose that the loan originators would abandon their underwriting guidelines systematically.  The Plaintiffs include in their allegations in the Amended Complaint some of the disclosures to which the Defendants point.  See Amended Complaint ¶¶ 48-54, at 20-24.  The alleged misconduct is a different risk than the risks which the Defendants disclosed in the offering documents, which are smaller in scale and which the Defendants qualified with language conveying an impression that the Defendants would still generally follow the stated underwriting guidelines. See Halperin v. eBanker USA.com, Inc., 295 F.3d at 359.  Thornburg Mortgage Home Loans also represented that it would adequately review Wells Fargo's and the correspondent lenders' loan

origination practices, which the Plaintiffs allege did not occur. The Plaintiffs allege, and the offering documents represent, that the significant majority of the loans in the mortgage pools would adhere to the stated underwriting guidelines. With respect to Wells Fargo, many of the disclosures to which the Defendants point contain qualifying language that undercuts the Defendants' disclosure arguments or that indicate that the disclosure applies to a narrow subset of borrowers. For example, the retention program only applies to borrowers "with at least one mortgage loan serviced by Wells Fargo Bank," and only if that "borrower is current in his or her mortgage payment obligations." 2006-5 Prospectus Supplement at 17. The bespeaks caution doctrine does not undercut the materiality of these misrepresentations, because "[d]isclosures that describe[] lenient, but nonetheless existing guidelines about risky loan collateral, would not lead a reasonable investor to conclude that the mortgage originators could entirely disregard or ignore those loan guidelines." N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC, 720 F.Supp.2d at 270.

### B. THE ALLEGED MISREPRESENTATIONS OR OMISSIONS REGARDING THE DEFENDANTS' LOAN APPRAISAL PRACTICES ARE ACTIONABLE WITH RESPECT TO THE 2006-5 OFFERING, BUT NOT WITH RESPECT TO THE 2006-3 AND 2007-4 OFFERINGS.

The Defendants contend that the Plaintiffs' allegations that the offering documents misrepresented the validity of the property appraisals conducted in connection with the issuance of the loans ultimately placed in the Thornburg Trusts are not actionable. See Memorandum in Support of Joint Motion at 29-34. The Defendants contend that, as a general matter, appraisals are not actionable, as they are opinions. See Memorandum in Support of Joint Motion at 30. With respect to the allegations concerning Thornburg Mortgage Home Loans' appraisal practices, the Defendants contend that the factual allegations in the Amended Complaint are conclusory. See Memorandum in Support of Joint Motion at 30-31. Regarding the allegations that concern Wells Fargo's appraisal

-134-

practices, the Defendants argue that there is no nexus between the allegations in the Amended Complaint and the mortgage loans in the respective Thornburg Trusts.  See Memorandum in Support of Joint Motion at 31-34.  The Defendants also contend that the offering documents disclosed the potential risks of pressure on appraisers to give inaccurate or inflate appraisals.  See Memorandum in Support of Joint Motion at 30-31, 33-34.

> **1.    The Plaintiffs Have Adequately Pled That the Loan Appraisal Practices Relating to the 2006-5 Offering Are Actionable, But Have Not with Respect to the 2006-3 and 2007-4 Offerings.**

The Defendants contend that, as a general matter, appraisals are not actionable, as they are opinions.  See Memorandum in Support of Joint Motion at 30.  With respect to the allegations concerning Thornburg Mortgage Home Loans' appraisal practices, the Defendants contend that the factual allegations in the Amended Complaint are conclusory.  See Memorandum in Support of Joint Motion at 30-31.  With respect to the allegations concerning Wells Fargo's appraisal practices, the Defendants argue that there is no nexus between the allegations in the Amended Complaint and the mortgage loans in the respective Thornburg Trusts.  See Memorandum in Support of Joint Motion at 31-34.

The Plaintiffs counter that the Amended Complaint alleges that the appraisers did not subjectively believe in their appraisals when it described the appraisals as "false" and "artificially inflated," because of routine pressure or threats from lenders.  Response to Joint Motion at 30-31.  The Plaintiffs point to a decision that upheld similar allegations regarding loan appraisal practices at the motion to dismiss stage.  See Response to Joint Motion at 31 (citing Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL 1796426, at *9)

After analyzing a variety of cases that have addressed allegations relating to failures to conduct proper appraisals, one district court stated:

-135-

> Allegations that loan underwriters failed to conduct appraisals in accordance with [the Uniform Standards of Professional Appraisal Practice ("USPAP")] or other appraisal standards set out in offering documents have met with less success in many cases.  An appraisal is "a subjective opinion based on the particular methods and assumptions the appraiser uses" and thus "is actionable under the Securities Act only if the [complaint] alleges that the speaker did not truly have the opinion at the time it was made public."  A bare assertion that appraisals were not made in accordance with USPAP is "a legal conclusion not entitled to the assumption of truth unless supported by appropriate factual allegations."  Thus, a complaint must typically allege either that appraisers did not in fact believe in the truth of their appraisals at the time they gave them, or that appraisers deviated from USPAP or other representations in concrete ways.

Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL 1796426, at *9 (citations omitted).  An opinion may in some cases be actionable under federal securities law.

See Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1094-96 (1991).  In addition to properly alleging that the holder of the opinion did not actually believe it at the time it was made, the factual allegations regarding the appraisal practices must be sufficiently specific to state a plausible claim.

See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 773.  The First Circuit found allegations regarding loan appraisal practices insufficient to survive a motion to dismiss because

> [t]he complaint alleges in a single general statement that the appraisals underlying the loans at issue here failed to comply with USPAP requirements; but there is no allegation that any specific bank that supplied mortgages to the trusts did exert undue pressure, let alone that the pressure succeeded.  The complaint fairly read is that many appraisers in the banking industry were subject to such pressure.  So, unlike the lending standard allegation, the complaint is essentially a claim that other banks engaged in such practices, some of which probably distorted loans, and therefore this may have happened in this case.

> On this basis, virtually every investor in mortgage-backed securities could subject a multiplicity of defendants "to the most unrestrained of fishing expeditions."  Accordingly, we agree with the district court that such an allegation -- amounting to the statement that others in the industry engaged in wrongful pressure -- is not enough.  Several other district courts have reached precisely this conclusion.

Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 774

(emphasis in original)(footnote omitted)(citations omitted).  Some courts have also required that the plaintiffs allege in some way that the improper appraisals are connected to the mortgage loans in the trust at issue.  See Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F.Supp.2d at 393-94 (finding that a government report of improper appraisal practices did not sufficiently relate to the MBS in the case when the report looked only at twenty-two loans and only "noted instances" where corporate officials employed by the defendant accepted appraisals not in compliance with the USPAP standards (emphasis omitted)).  One district court found the following allegations in the complaint sufficient to survive dismissal:

> Plaintiffs again support their allegations primarily with statements from confidential witnesses.  Id. ¶ 103 ("CW 2 confirmed that, at Wells Fargo Home Mortgage, representatives constantly pushed the appraisers they worked with to inflate the value of the real estate underlying the mortgage loans"); ¶ 107 ("CW 1 remarked that 'appraisals were very inflated,' and observed that the retail officers 'always managed to get the value they wanted'"); ¶ 108 (CW 7, a former Senior Underwriter with Wells Fargo Home Mortgage, "estimated that 70% of the loans CW 7 worked with had an LTV over 95").  Plaintiffs additionally cite to a 2007 survey which "found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through," and to congressional testimony in which Alan Hummel, Chair of the Appraisal Institute, stated that loan appraisers had "experience[d] systemic problems of coercion."  Id. ¶ 104-05.  Plaintiffs' allegations concerning the allegedly improper appraisal practices are sufficiently specific to state a claim with respect to the securities at issue in this case.  In particular, plaintiffs have alleged that Wells Fargo's practices permitted the pervasive and systematic use of inflated appraisals, affecting all types of mortgages.  Plaintiff [sic] need not allege anything further in order to state a claim.

In re Wells Fargo Mortgage-Backed Certificates Litig., 712 F.Supp.2d 958, 972 (N.D. Cal. 2010)(Illston, J.).  Another district court denied a motion to dismiss on claims relating to loan appraisals based on the following allegations:

> The plaintiff alleges that appraisers were ordered to did produce [sic] "predetermined, preconceived, inflated and false appraisal values" and "frequently succumbed to brokers' demands to appraise at predetermined inflated values," leading to "[a]ppraisals . . . not based upon the appraiser's professional conclusion

> based on market data of sales of comparable properties and a logical analysis and judgment." The plaintiff further bolsters these assertions by describing the experiences of appraisers who allegedly worked for AHM and were told by mortgage brokers what home values to provide and did, in fact, provide inflated appraisals. Thus, the Second Amended Complaint includes specific, concrete factual allegations that (a) appraisers did not believe the appraisals when they made them and (b) that appraisers accepted assignments that were contingent on predetermined results, which would be a violation of USPAP. These allegations are sufficient to survive a motion to dismiss.

Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL 1796426, at *9 (alteration in original)(citations omitted).

The offering documents for the 2006-3, 2006-5 and 2007-4 Thornburg Trusts represented that the "appraisal of any mortgaged property reflects the individual appraiser's judgment as to value, based on the market values of comparable homes sold within the recent past in comparable nearby locations and on the estimated replacement cost." Amended Complaint ¶ 57, at 25. The offering documents further represented that each mortgage file contained an

> appraisal of the related mortgaged property by a qualified appraiser, duly appointed by the originator of the mortgage loan, who had no interest, direct or indirect in the mortgaged property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the mortgage loan or, in accordance with certain specified programs of the originator of the mortgage loan an approved AVM in lieu of the appraisal.

Amended Complaint ¶ 57, at 25. The Plaintiffs contend that "Wells Fargo's practice of using inflated appraisals in order to ensure that loans would be approved was systemic and commonplace." Amended Complaint ¶ 58, at 26. The Plaintiffs also contend that Thornburg Mortgage Home Loans used inflated appraisals. See Amended Complaint ¶ 58, at 25. The Plaintiffs point out that, to support the huge number of loans Wells Fargo was generating, Wells Fargo insisted that Rels Valuation perform the appraisals of properties. See Amended Complaint ¶ 58, at 26. "Rels contracted with appraisers to perform the appraisals, demanding that if the appraisers wanted to

perform appraisals for Wells Fargo, they had to agree to a reduced appraisal fee as low as 50% below the market rate." Amended Complaint ¶ 58, at 26. Rels Valuation then "told the independent appraisers that if they did not agree to the reduced rate, Wells Fargo would place them on a 'do-not use' list preventing them from being hired by Wells Fargo again." Amended Complaint ¶ 58, at 26.

The Amended Complaint also provides a variety of examples where Wells Fargo pressured appraisers. The Amended Complaint states that Wells Fargo frequently threatened to take business away from an Illinois residential real estate appraisal firm if it failed to provide appraisals with a specific designated value without regard to the homes' actual value. See Amended Complaint ¶ 58, at 26. A real estate appraiser in Las Vegas -- from which numerous 2006-3, 2006-5 and 2007-4 Thornburg Trust mortgage loans came -- who conducted over 300 inflated appraisals for originators, including Wells Fargo, confirmed that Wells Fargo required appraisers to come up with appraisals which were routinely fifteen to twenty-five percent higher than the actual market values, or risk being blackballed from additional work. See Amended Complaint ¶ 58, at 26. Additionally, "Wells Fargo mortgage brokers demanded inflated appraisals as a matter of course in Southern California." Amended Complaint ¶ 58, at 26. Twenty-four percent of the loans from the 2006-3 Trust and thirty-six percent of the mortgage loans in the 2006-5 Trust came from California. See Amended Complaint ¶ 58, at 26 n.6. "Wells Fargo lenders directed appraisers" in California "to either give them the appraisal numbers Wells Fargo demanded or be precluded from doing business in California, not just with Wells Fargo but with any lender." Amended Complaint ¶ 58, at 27. "In some cases, the underlying appraised houses have been described as 'crack houses' which should have been bulldozed, but were appraised with values exceeding $100,000." Amended Complaint ¶ 58, at 27.

The Plaintiffs note that the Defendants represented in the offering documents that the

appraisals underlying the loans relied on "the market value of comparable homes sold within the recent past in comparable nearby locations." Amended Complaint ¶ 59, at 27. The Plaintiffs assert that these representations were false, because, between 2005 to 2007 -- the timeframe of the appraisals for the loans in the Thornburg Trusts at issue in this case -- Rels Valuation engaged in a variety of misconduct to find "comparable home sales" that were not comparable to satisfy Wells Fargo. Amended Complaint ¶ 59, at 27. This alleged misconduct included putting pressure on Rels Valuation employees to find property with high values to use as comparable-home-sale data even if the homes were not comparable. See Amended Complaint ¶ 59, at 27. Rels Valuation faced regulatory action in Nevada for some of its improper appraisal practices of appraising properties significantly higher than the surrounding homes in the area. See Amended Complaint ¶ 60, at 27-28. Lastly, independent appraisers in Florida -- where a significant number of the mortgage loans placed in the Thornburg Trusts originated -- confirmed that many of their relevant appraisals were not based on comparable properties. See Amended Complaint ¶ 61, at 28. These appraisers also stated that they intentionally used more expensive properties with larger lots, square footage, or more amenities than the appraised property to inflate the appraised property's value. See Amended Complaint ¶ 61, at 28.

The Defendants are correct that the Plaintiffs' allegations regarding Thornburg Mortgage Home Loans' use of inflated appraisals are conclusory. While the Plaintiffs provide a number of factual allegations regarding Wells Fargo's appraisal practices, they provide no factual allegations about Thornburg Mortgage Home Loans' appraisal practices. They include one brief statement about Thornburg Mortgage Home Loans, asserting in a conclusory manner that Thornburg Mortgage Home Loans used inflated appraisals which represented that the home securing the underlying loan was worth more than the actual market value of the property. See Amended Complaint ¶ 58, at 25.

-140-

Likewise, the Plaintiffs do not provide any detailed factual allegations about any lender other than Wells Fargo placing pressure on appraisers. While Wells Fargo originated a significant number of loans from the 2006-5 offering, seventy-two percent, the Amended Complaint contains no allegations that Wells Fargo issued a significant number of loans that were part of the 2006-3 and 2007-4 offerings. See Amended Complaint ¶¶ 48, 52, at 20, 22. Thus, there are no factual allegations that any improper appraisal practices took place with respect to the 2006-3 and 2007-4 offerings. In comparison, there were factual allegations that Thornburg Mortgage Home Loans and its correspondent lenders systematically disregarded their stated underwriting guidelines with respect to all three offerings.

As to the factual allegations concerning Wells Fargo's appraisal practices, these factual allegations are more specific than those that the First Circuit found insufficient in Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp. See 632 F.3d at 774. The Plaintiffs do not, as the plaintiffs did in that case, include in their Amended Complaint a "single general statement that the appraisals underlying the loans at issue here failed to comply with USPAP requirements." Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 774. This case is not a situation where the complaint generally alleges "that many appraisers in the banking industry were subject to such pressure" and thus Wells Fargo must have also done the same thing. Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 774. These allegations are not, however, quite as specific as the factual allegations in In re Wells Fargo Mortgage-Backed Certificates Litigation, although the allegations are similar. See 712 F.Supp.2d at 972. The Plaintiffs do not reference statements from any confidential witnesses, unlike in that case. See In re Wells Fargo Mortgage-Backed Certificates Litigation, 712 F.Supp.2d at 972. They provide statements, however, from a variety of unnamed

-141-

appraisers who worked for the appraisal companies that Wells Fargo hired.  See In re Wells Fargo Mortgage-Backed Certificates Litig., 712 F.Supp.2d at 972.  The statements from those confidential witnesses in In re Wells Fargo Mortgage-Backed Certificates Litigation appear to have been somewhat more specific as to Wells Fargo's appraisal practices.  See In re Wells Fargo Mortgage-Backed Certificates Litig., 712 F.Supp.2d at 972.  The Plaintiffs provide, however, a variety of factual allegations of improper appraisal practices relating to specific housing markets from which a significant number of the loans in the Thornburg Trusts came.  While these geographical allegations could be more specific, the Plaintiffs do not need to allege with mathematical certainty from where every improper loan came to plausibly establish a "nexus to the Certificates at issue here."  Boilermakers Nat'l Annuity Trust v. WaMu Mortg. Pass Through Certificates, Series AR1, 748 F.Supp.2d at 1256.  The Plaintiffs burden at this stage of the litigation is to plead "allegations suffic[ient] to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to" permit "the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged."  Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. at 1323 (citations omitted)(internal quotation marks omitted).  The Amended Complaint could state with more specificity the exact timing of the statements from appraisers or the timing of the improper appraisal practices, but it ties these factual allegations to the time period in which Wells Fargo sought to generate a large number of mortgage loans, some of which went into the 2006-5 Thornburg Trust.  Furthermore, the Amended Complaint states that Rels Valuation between 2005 and 2007, the relevant timeframe for appraisals in the 2006-5 Thornburg Trust, engaged in a variety of improper appraisal practices.  More importantly, the Plaintiffs allege that Wells Fargo systematically instituted these practices of pressuring and threatening appraisers unless they gave Wells Fargo appraisals in line with their demands.  See In re Wells Fargo

-142-

Mortgage-Backed Certificates Litig., 712 F.Supp.2d at 972.  They provide factual support for their allegations of systematic conduct by listing a variety of examples.  Thus, with respect to the claims relating to the 2006-5 offering, these allegations create a reasonable inference that the appraisers on a systematic basis did not believe in the appraisals they gave for these loans; in other words that they were "not based upon the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis and judgment."  Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL 1796426, at *9.

Many of the opinions that the Defendants cite are distinguishable.  Many of those cases are rule 10b-5 cases or cases where the court applied the heightened pleading standards of rule 9(b) of the Federal Rules of Civil Procedure.  See Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 148 (3d Cir. 2004)(10b-5 case); Republic Bank & Trust Co. v. Bear, Stearns & Co., Inc., 707 F.Supp.2d at 707, 712 (rule 9(b) case).  Those cases involve rule 9(b)'s heightened pleading standard, which require the plaintiffs to plead their claims with particularity.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 313 ("Exacting pleading requirements are among the control measures Congress included in the PSLRA.  The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter . . . ."); Reese v. BP Exploration (Alaska) Inc., 643 F.3d at 690-91 (recognizing that Ashcroft v. Iqbal's plausibility standard is different than rule 9(b)'s particularity standard).  Other cases they cite do not involve appraisal allegations and deal with significantly different materiality allegations.  See Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc., 638 F.Supp.2d 120, 127-28 (D. Mass. 2009)(involving confidential witnesses discussing internal company problems relating to integration of acquired companies).

Because the Plaintiffs have requested leave to amend, the Court will grant the Joint Motion

with respect to the allegations regarding appraisal practices relating to the 2006-3 and 2007-4 offerings with leave to move to amend.  See Response to Joint Motion at 81 n.40.  The Court will deny the Joint Motion with respect to the allegations regarding appraisal practices relating to the 2006-5 offering.  To seek amendment to cure these deficiencies, the Plaintiffs must file a motion with their proposed amended complaint attached to that motion.  The Plaintiffs must bold the newly added facts in the proposed amended complaint to distinguish them from facts contained in the Amended Complaint.  In the motion, the Plaintiffs should set forth their new facts -- facts that the Court did not previously have before it -- which, if the Court had known the facts, would have changed the outcome of the motion.  The Plaintiffs should also address precisely how these new facts would have changed the Court's conclusions.

### 2.     The Defendants' Disclosures Relating to Their Loan Appraisal Practices Are Not Sufficient to Undercut the Plaintiffs' Materiality Allegations.

The Defendants argue that the disclosures contained in the offering documents disclosed to the Plaintiffs the risks regarding the appraisal practices of which they now complain.  See Memorandum in Support of Joint Motion at 30-31.  The respective offering documents state:

> The quality of these appraisals may vary widely in accuracy and consistency. Because in most cases the appraiser is selected by the mortgage loan broker or lender, the appraiser may feel pressure from that broker or lender to provide an appraisal in the amount necessary to enable the originator to make the loan, whether or not the value of the property justifies such an appraised value. Inaccurate or inflated appraisals may result in an increase in the number and severity of losses on the mortgage loans.

2006-3 Prospectus at 3, 6; 2007-4 Prospectus at 4, filed February 11, 2011 (Doc. 125-10).  Notably, these statements do not appear in the 2006-5 Prospectus, see 2006-5 Prospectus, filed February 11, 2011 (Doc. 125-9), although the Defendants cite the 2006-5 Prospectus as containing this statement in their Memorandum in Support of Joint Motion, see Memorandum in Support of Joint Motion at

31 n.30.  The Court has consulted the version of the 2006-5 Prospectus the Defendants have provided to the Court and the respective SEC filing containing the full text of the 2006-5 Prospectus and has not found this language.  The 2006-5 Prospectus contains language that discusses the difficulty of making comparable appraisals and the difficulty of using LTV ratios to measure the risk of liquidation in mortgage pools, but nothing regarding appraisers feeling pressure to provide certain appraisals to an originator.  See 2006-5 Prospectus at 5.  The Plaintiffs contend that their allegations are that the Defendants misrepresented how appraisers would conduct the appraisals and that these disclosures did not provide them with sufficient information to adequately understand this specific risk.  See Response to Joint Motion at 31-32.

Under the "bespeaks caution" doctrine, "certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." Halperin v. eBanker USA.com, Inc., 295 F.3d at 357.  "The 'bespeaks caution' rule is an application of the common-sense principle that the more a speaker qualifies a statement, the less people will be misled if the statement turns out to be false."  United States v. Nacchio, 519 F.3d at 1161.  "At bottom, the 'bespeaks caution' doctrine stands for the 'unremarkable proposition that statements must be analyzed in context' when determining whether or not they are materially misleading." Grossman v. Novell, Inc., 120 F.3d at 1120.  Plaintiffs can overcome cautionary language if the "language did not expressly warn or did not directly relate to the risk that brought about plaintiffs' loss."  Halperin v. eBanker USA.com, Inc., 295 F.3d at 359.  See Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F.Supp.2d at 669 ("[G]eneral risk disclosures in the face of specific known risks which border on certainties do not bespeak caution.").  Furthermore, the bespeaks caution doctrine applies only to forward-looking statements such as projections or forecasts, and not to

representations of present fact.  See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 773.  A court may properly apply the bespeaks caution doctrine when considering a motion to dismiss.  See Grossman v. Novell, Inc., 120 F.3d at 1120 n.7.

Here, the Court has already determined that the loan appraisal allegations regarding the 2006-3 offering and the 2007-4 offering were not sufficient.  The primary disclosure to which the Defendants point does not appear in the 2006-5 offering.  That disclosure about originators pressuring appraisers arguably may expressly warn and directly relate to the risk that brought about the Plaintiffs' loss.  Halperin v. eBanker USA.com, Inc., 295 F.3d at 359.  Without specific allegations before the Court regarding the appraisal practices relating to the 2006-3 offerings and 2007-4 offerings, however, the Court cannot decide whether the material misrepresentation allegations are such that this disclosure would undermine them.  In comparison, the disclosures that appear in the 2006-5 Prospectus are more general and do not involve warnings regarding loan originators pressuring appraisers.  See 2006-5 Prospectus at 5.  Much like the disclosures relating to the deviations from loan underwriting guidelines, this cautionary "language did not expressly warn or did not directly relate to the risk that brought about plaintiffs' loss."  Halperin v. eBanker USA.com, Inc., 295 F.3d at 359.  The Plaintiffs have alleged that Wells Fargo systematically pressured and threatened appraisers to give false appraisals with respect to loans that ended up in the 2006-5 Thornburg Trust.  These disclosures do not relate to this pressure; they only comment that it may sometimes be difficult to find comparable properties to make an accurate appraisal. Therefore, the Court will deny the Joint Motion with respect to the Defendants' argument that these disclosures in the offering documents undercut the materiality of these representations or omissions regarding loan appraisal practices.

C.   **THE ALLEGED MISREPRESENTATIONS OR OMISSIONS REGARDING THE LTV RATIOS ARE ACTIONABLE WITH RESPECT TO THE 2006-5 OFFERING ONLY.**

The Defendants contend that the Plaintiffs' assertion that the offering documents misrepresented the LTV ratios of the mortgages placed in the 2006-3, 2006-5, and 2007-4 Thornburg Trusts does not state a material misrepresentation claim. The Defendants assert that this argument is "completely derivative of the improper appraisal practices claim." Memorandum in Support of Joint Motion at 34 (quoting Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F.Supp.2d at 394). The Defendants point to statements in the Amended Complaint which they assert reveal that the LTV ratio claims arise out of the improper appraisal allegations. See Memorandum in Support of Joint Motion at 34. The Defendants also assert that the Plaintiffs' LTV ratio claims rely on the erroneous premise that an inflated appraisal must cause a misstated LTV ratio that overstates borrower equity. See Memorandum in Support of Joint Motion at 34. They assert that the offering documents define LTV ratios with respect to purchase mortgage loans as the ratio between the principal balance of the mortgage loan, and the lesser of the selling price of the property or its appraised value. See Memorandum in Support of Joint Motion at 34-35 (citing 2006-3 Prospectus Supplement at 10). The Defendants conclude that, because the denominator is the lesser of the sale price or appraisal value, the LTV ratio for a purchase mortgage in each case reflects the market value of the property and, thus, would not overstate borrower equity. See Memorandum in Support of Joint Motion at 35.

The Plaintiffs counter that the understated LTV ratios listed in the offering documents are also actionable as they were based on the false and artificially inflated appraisals. See Response to Joint Motion at 32. The Plaintiffs contend that, when the Defendants incorporated the inflated appraisals into the LTV calculation, which resulted in lower LTV ratios, these lower LTV ratios

helped bolster the illusion that the certificates were much safer/less risky than they were.  See Response to Joint Motion at 32.  The Plaintiffs then point to some cases that upheld similar allegations regarding LTV ratios.  See Response to Joint Motion at 32-33 (quoting Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL 1796426, at *10; In re Wells Fargo Mortgage-Backed Certificates Litig., 712 F.Supp.2d at 972).

"Loan-to-value ratios describe the relationship between a loan's principal balance and the collateral property's value."  Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F.Supp.2d at 394.  LTV ratios are statements of opinion, because they incorporate appraisals, which are statements of opinions.  See Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL 1796426, at *10.

Courts that have addressed misleading LTV ratio claims have concluded that they are heavily linked to allegations regarding improper appraisal practices, and consequently rise and fall together.  As one district court stated: "[T]he . . . Complaint sufficiently alleges that the appraisals supporting the underlying loans were not believed when made.  Accordingly, the claims regarding LTV ratios are also sufficient: if the appraisals were not believed to be accurate, then the LTV ratios could not be believed to be accurate."  Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL 1796426, at *10 (citing In re Wells Fargo Mortgage-Backed Certificates Litig., 712 F.Supp.2d at 972).  If the appraisal allegations are not sufficient, the allegations concerning the LTV ratios will fail.  See Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F.Supp.2d at 394 ("This claim is completely derivative of the improper appraisal practices claim.  As those allegations are insufficient, the allegations concerning the loan-to-value ratios fail as well." (footnote omitted)).  See In re IndyMac Mortgage-Backed Sec. Litig., 718 F.Supp.2d at 511 ("The claim based on the LTV ratios therefore is dependent on the sufficiency of the [complaint's] allegations that the

-148-

appraisals were flawed or inflated.").

The prospectus supplements used in connection with the sale of the certificates detailed the LTV ratios associated with the loans in each Thornburg Trust. <u>See</u> Amended Complaint ¶ 64, at 30. This information is material to investors, because lower LTV ratios indicate less risk with respect to the certificates, while a higher LTV ratio indicates greater risk. <u>See</u> Amended Complaint ¶ 64, at 30. The prospectus supplement for the 2006-3 offering represented that the weighted average of the original LTV ratio of the mortgage loan was sixty-seven percent and that approximately 2.33%, 2% and 1.19% of the group 1, group 2 and group 3 mortgage loans, respectively, had original LTV ratios in excess of eighty percent. <u>See</u> Amended Complaint ¶ 64, at 30. The prospectus supplement for the 2006-5 offering represented that the weighted average of the original LTV ratio of the mortgage loans was approximately 67.59% and that less than one percent of the loans had original LTV ratios in excess of eighty percent. <u>See</u> Amended Complaint ¶ 64, at 30. The prospectus supplement for the 2007-4 offering represented that the weighted average of the original LTV ratio of the mortgage loans was 70.74%, and that approximately 3.43%, 2.54% and 2.54% of the group 1, group 2 and group 3 mortgage loans, respectively, had original LTV ratios in excess of 80%. <u>See</u> Amended Complaint ¶ 64, at 30. The prospectus supplements each contained additional details on the LTV ratios of the mortgage loans. <u>See</u> Amended Complaint ¶ 65-66, at 31-32.

The Plaintiffs contend that these representations of the LTV ratios constitute actionable misrepresentations, because the LTV-ratio calculations relied on the false appraisals, which resulted in inflated property values, thus undermining the accuracy of the LTV ratios. <u>See</u> Amended Complaint ¶ 67, at 33. Thus, the certificates appeared to investors to be a safer investment than they were. <u>See</u> Amended Complaint ¶ 67, at 33. Additionally, the borrowers' equity position in the properties was overstated, subjecting the Thornburg Trusts to greater risk of default and leaving

them with a lower equity cushion to protect the Thornburg Trusts in the event of default or foreclosure on the underlying mortgage loan.  See Amended Complaint ¶ 67, at 33.

The Plaintiffs' LTV ratio claims rely on the existence of inflated appraisals.  See Amended Complaint ¶ 67, at 33.  Here, the Court has already concluded that the appraisal allegations concerning the 2006-3 and the 2007-4 offerings were not sufficient.  Because those appraisal allegations were insufficient, the LTV ratio allegations related to those two offerings would also not be sufficient.  See Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F.Supp.2d at 394; In re IndyMac Mortgage-Backed Sec. Litig., 718 F.Supp.2d at 511.  The LTV ratio claims regarding the 2006-5 offering, however, are sufficient.  If a complaint sufficiently alleges that improper appraisal practices occurred, allegations regarding inaccurate LTV ratios will also be sufficient, assuming they are otherwise plausible.  See Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL 1796426, at *10; In re Wells Fargo Mortgage-Backed Certificates Litig., 712 F.Supp.2d at 972.  Here, the Plaintiffs include sufficient factual allegations regarding the 2006-5 Thornburg Trust LTV ratios.  They point to specific representations in the offering documents that list the LTV ratios that the Defendants calculated using the inflated appraisals.  See Amended Complaint ¶ 64, at 30.  They provide a graphical illustration of how the prospectuses for each offering set forth these LTV ratios.  See Amended Complaint ¶ 66, at 31-32. They also allege why these LTV ratios are material to investors.  See Amended Complaint ¶ 64, 67, at 30, 33.  Taken together with the improper appraisal allegations, the Plaintiffs have pled, with respect to the 2006-5 offering, "allegations suffic[ient] to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to" permit "the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. at 1323 (citations omitted)(internal quotation marks

omitted).

The Court will grant the Joint Motion with respect to the Plaintiffs' LTV ratio allegations regarding the 2006-3 and 2007-4 offering. The Court will deny the Joint Motion with respect to the LTV ratio allegations regarding the 2006-5 offering. Because the Plaintiffs have sought leave to amend their complaint, the Court will grant the Joint Motion with leave to amend regarding these LTV ratio allegations. To seek amendment to cure these deficiencies, the Plaintiffs must file a motion with their proposed amended complaint attached to that motion. The Plaintiffs must bold the newly added facts in the proposed amended complaint to distinguish them from facts contained in the Amended Complaint. In the motion, the Plaintiffs should set forth their new facts -- facts that the Court did not previously have before it -- which, if the Court had known the facts, would have changed the outcome of the motion. The Plaintiffs should also address precisely how these new facts would have changed the Court's conclusions.

### D.   THE PLAINTIFFS HAVE NO OBLIGATION TO PLEAD THAT A MATERIAL NUMBER OF NON-COMPLYING LOANS EXIST.

The Defendants contend that the Plaintiffs must allege that a material number of non-complying loans exist within each of the Thornburg Trusts. See Memorandum in Support of Joint Motion at 35. They assert that the "Plaintiffs do not identify, even roughly, the number or volume of loans in any of the 2006-3, 2006-5, or 2007-4 mortgage pools that did not comply with the characteristics of the loans disclosed in the Offering Documents." Memorandum in Support of Joint Motion at 36. The Defendants further argue:

> Even assuming that some "non-complying" loans were included in some loan pool for some offering, Plaintiffs do not allege that the purported deviations reached material levels, either relative to the huge number of loans held in the mortgage pools or to the performance of similarly situated loans during the housing meltdown.

Memorandum in Support of Joint Motion at 36.

-151-

The Plaintiffs do not specifically respond to this argument in their Response to Joint Motion. They assert, when responding to similar arguments in other portions of their Response to Joint Motion, that they have "not claim[ed] that the Trusts contain a small number of non-conforming loans." Response to Joint Motion at 38. They point out that, "[i]nstead, plaintiffs claim strict liability securities law violations in the form of widespread misrepresentations regarding the nature of the underwriting practices described in the offering documents." Response to Joint Motion at 38.

As one court noted in the context of MBS cases: "A plaintiff need not allege that any particular loan or loans were issued in deviation from the underwriting standards, so long as the complaint alleges 'widespread abandonment of underwriting guidelines.'" Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL 1796426, at *8. One judge in the Southern District of New York rejected an argument similar to the one the Defendants now make:

> Credit Suisse argues that the amended complaint fails to allege that any of the loans underlying the Certificates were issued in deviation from IndyMac Bank's underwriting standards and therefore insufficiently alleges materiality. The amended complaint, however, sufficiently alleges that there was widespread abandonment of underwriting guidelines at IndyMac Bank during the period of time at issue and that the percentage of "defaulting" loans rose dramatically shortly after the Certificates were issued. These allegations create a sufficient nexus between the alleged underwriting standard abandonment and the loans underlying the Certificates.

Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F.Supp.2d at 392 (footnote omitted). In other portions of their brief, the Defendants cite Tsereteli v. Residential Asset Securitization Trust 2006-A8 as authoritative. See Memorandum in Support of Joint Motion at 28-30, 32-34, 38.

The Plaintiffs have alleged "widespread abandonment of underwriting guidelines" in this case. Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL

1796426, at *8.  The authority to which Defendants cite is distinguishable.  In re Britannia Bulk

Holdings Inc. Securities Litigation, 665 F.Supp.2d 404 (S.D.N.Y. 2009)(Cote, J.), involved alleged

misrepresentations regarding forward freight agreements ("FFAs").  665 F.Supp.2d at 406.  The

plaintiff alleged that the offering documents for the common stock of the shipping company were

misleading, because it "misstated or failed to disclose two material facts: (1) that Britannia used

FFAs to hedge against increases, and not merely decreases, in charter rates, and (2) that the

Company had entered into FFAs for purely speculative purposes."  In re Britannia Bulk Holdings

Inc. Sec. Litig., 665 F.Supp.2d at 406.  The court dismissed the plaintiff's claims, because their

"Complaint specifies only one FFA as being inconsistent with its characterization of Britannia's

disclosures."  In re Britannia Bulk Holdings Inc. Sec. Litig., 665 F.Supp.2d at 416.  About thirty-

seven total FFAs were involved in the requisite time period.  See In re Britannia Bulk Holdings Inc.

Sec. Litig., 665 F.Supp.2d at 416.  First, this decision does not involve MBS or any comparable

arrangement where investors buy interests in the contracts or loans at issue.  Second, it deals with

much smaller numbers of contracts, none of which are pooled together.  The Defendants concede

that 2006-5 Thornburg Trust contained 2506 mortgages from Wells Fargo alone.  See Memorandum

in Support of Joint Motion at 26.  Third, these FFAs were a smaller component of the company's

business as compared to the mortgages in this case, which are the fundamental components of the

Thornburg Trusts on which the Plaintiffs relied on for a return on their investment.  Furthermore,

the Defendants' argument that the "Plaintiffs do not allege that the purported deviations reached

material levels, either relative to the huge number of loans held in the mortgage pools or to the

performance of similarly situated loans during the housing meltdown" is not persuasive.

Memorandum in Support of Joint Motion at 26.  The Plaintiffs have alleged that "widespread

misrepresentations [occurred] regarding the nature of the underwriting practices described in the

offering documents." Response to Joint Motion at 38. They have also alleged that Wells Fargo on a systematic basis pressured appraisers to inflate their appraisals. The Plaintiffs point to significant downgrades by the Rating Agency Defendants to corroborate the improper conduct in which the Defendants engaged with respect to the Thornburg Trusts. See Amended Complaint ¶¶ 77-79, at 38. In support of this argument, the Defendants cite to a case involving materiality allegations regarding dramatic increases in integration-related expenses, but ignore MBS cases that deal with these same issues. See Memorandum in Support of Joint Motion at 36 (citing Garber v. Legg Mason, Inc., 537 F.Supp.2d 597, 613 (S.D.N.Y. 2008)(Chin, J.)). Consequently, the Court will deny the Joint Motion with respect to the Defendants' argument that the Plaintiffs must plead that a material number of non-complying loans exist.

### E. THE PLAINTIFFS HAVE NO OBLIGATION TO PLEAD THAT THE DEFENDANTS HAVE FAILED TO CURE NON-COMPLYING LOANS.

The Defendants argue that the Plaintiffs have pled no actionable misrepresentations relating to the mortgage loans, because they do not allege that the Defendants failed to cure non-complying loans. See Memorandum in Support of Joint Motion at 36. The Defendants point to the following statement in the offering documents:

> Upon discovery of a breach of any representation or warranty that materially and adversely affects the interests of the certificateholders in a mortgage loan and the related documents, the seller will have a period of 90 days after discovery or notice of the breach to effect a cure. A determination of whether a breach of those representations numbered (3), (14), (17), (18), (29), (34), (35) and (36) above has occurred will be made without regard to the seller's knowledge of the factual conditions underlying the breach. With respect to the seller, if the breach cannot be cured within the 90-day period, the seller will be obligated to either:
>
> • cause the removal of the affected loan from the trust and, if within two years of the closing date, substitute for it one or more eligible substitute mortgage loans, or
>
> • purchase the affected loan from the trust.

The purchase price will be deposited in the distribution account on or prior to the next determination date after the seller's obligation to purchase the defective loan arises.  The obligation of the seller to repurchase or substitute for a defective mortgage loan is the sole remedy available to the trustee or the holders of certificates regarding any defect in that mortgage loan and the related documents.

2006-3 Prospectus Supplement at 33-34; 2006-5 Prospectus Supplement at 19; 2007-4 Prospectus Supplement at 21.  The Defendants assert that the Plaintiffs have not pled the existence of any actionable misrepresentations, because they have not alleged that they ever sought or requested this "sole remedy" provided in the offering documents, or that there was a failure to repurchase or substitute non-complying loans.  See Memorandum in Support of Joint Motion at 38.  The Defendants cite to a United States Court of Appeals for the Fifth Circuit opinion that accepted this argument.  See Memorandum in Support of Joint Motion at 37 (citing Lone Star Fund V (U.S.), LP v. Barclays Bank PLC, 594 F.3d 383, 390 (5th Cir. 2010)).  See also Joint Reply at 18 (citing Footbridge Ltd. Trust v. Countrywide Home Loans, Inc., No. 09-4050, 2010 WL 3790810, at *15-16 (S.D.N.Y. Sept. 28, 2010)(Castel, J.)).

The Plaintiffs counter that many courts have rejected this argument, because the Securities Act does not authorize such modifications of remedies and causes of action under federal securities law.  See Response to Joint Motion at 37-38.  They also note that 15 U.S.C. § 77n expressly forbids insulation from liability in the manner that the Defendants now assert.  See Response to Joint Motion at 37.

15 U.S.C. § 77n provides: "Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this title or of the rules and regulations of the Commission shall be void."  15 U.S.C. § 77n.  This statute appears in the same subchapter as the other provisions of the Securities Act.  See 15 U.S.C. ch. 2A subch. I.  The Tenth

Circuit has discussed this statute in significant detail in a comparable context in one opinion.

See Can-Am Petroleum Co. v. Beck, 331 F.2d 371, 373 (10th Cir. 1964). In that opinion, the Tenth

Circuit noted that "the remedial aspects of [the Securities Act] cannot be waived either directly or

indirectly." Can-Am Petroleum Co. v. Beck, 331 F.2d at 373. It further commented that the

Securities Act's purpose "is to protect the naive or uninformed investor and to deny recourse to the

reckless or fraudulent seller of securities." Can-Am Petroleum Co. v. Beck, 331 F.2d at 373. The

Tenth Circuit found that, in the context of what it described as an "illegal contract," that "an investor

does not waive or lose the shelter of the Act because he becomes to some extent involved in the

illegality of the security sales." Can-Am Petroleum Co. v. Beck, 331 F.2d at 373. The Supreme

Court has recognized that clauses requiring submission of a securities dispute to arbitration do not

violate this statute. See Rodriguez de Quijas v. Shearson/Amer. Express, Inc., 490 U.S. 477, 479-83

(1989).

   The Second Circuit dealt with contractual provisions analogous to these in McMahan & Co.

v. Wherehouse Entertainment, Inc. In that case, the Second Circuit concluded that a particular

clause in the offering documents placing limits on the investors' rights to sue was not enforceable.

See McMahan & Co. v. Wherehouse Entm't, Inc., 65 F.3d at 1050-51. Those provisions required

the investors to do the following before pursuing a securities claim: (i) give the respective trustee

written notice of a continuing event of default; (ii) have holders of at least twenty-five percent of

the securities make a written request to the trustee to pursue the claim on their behalf; (iii) give the

trustee indemnity sufficient to protect the trustee against losses and expenses; (iv) wait sixty days

for the trustee to comply with the request; and (v) not give the trustee directions inconsistent with

the initial request within the sixty-day period. See McMahan & Co. v. Wherehouse Entm't, Inc.,

65 F.3d at 1050. The defendants in that case argued that these provisions established only a

procedure, much like an arbitration clause, that the investors must follow before they may bring an action.  See McMahan & Co. v. Wherehouse Entm't, Inc., 65 F.3d at 1050.  The Second Circuit rejected this argument, concluding that "[t]he no-action clause in this case can operate to bar a minority plaintiff class from exercising its substantive rights under federal securities law upon the vote of a majority of the debentureholders."  McMahan & Co. v. Wherehouse Entm't, Inc., 65 F.3d at 1051.  The Second Circuit held: "The statutory framework of the 1933 and 1934 Acts compels the conclusion that individual securityholders may not be forced to forego their rights under the federal securities laws due to a contract provision."  McMahan & Co. v. Wherehouse Entm't, Inc., 65 F.3d at 1051 (citing Kusner v. First Pa. Corp., 531 F.2d 1234, 1239 (3d Cir.1976)).

In Lone Star Fund V (U.S.), LP v. Barclays Bank PLC, the Fifth Circuit dealt with a clause similar to the one contained in the offering documents in this case where the defendant had agreed in the offering documents to repurchase or substitute delinquent mortgage loans within a trust.  See 594 F.3d at 390.  The Fifth Circuit concluded that this provision did not violate 15 U.S.C. § 77n. See Lone Star Fund V (U.S.), LP v. Barclays Bank PLC, 594 F.3d at 390.  More specifically, the Fifth Circuit held that this provision did not "waive Appellants' right to pursue claims of fraud," but that "the 'repurchase or substitute' clauses" instead "change[d] the nature of [the defendant's] representation."  Lone Star Fund V (U.S.), LP v. Barclays Bank PLC, 594 F.3d at 390.  The Fifth Circuit concluded that the plaintiffs might have stated a claim if they had alleged that the defendant had falsely represented to investors that it would repurchase or substitute delinquent mortgages.  See Lone Star Fund V (U.S.), LP v. Barclays Bank PLC, 594 F.3d at 390.  One judge in the United States District Court for the Eastern District of New York has followed this Fifth Circuit decision. See Footbridge Ltd. Trust v. Countrywide Home Loans, Inc., 2010 WL 3790810, at *15-16.

Three district courts have declined to follow this Fifth Circuit decision or have distinguished

it.  See N.J. Carpenters Health Fund v. Residential Capital, LLC, Nos. 08-8781, 08-5093, 2011 WL

2020260, at *6 (S.D.N.Y. May 19, 2011)(Baer, J.)("[T]he overwhelming majority of courts in this

Circuit have rejected the Lone Star approach."); City of Ann Arbor Emps.' Ret. Sys. v. Citigroup

Mortg. Loan Trust Inc., No. 08-1418, 2010 WL 6617866, at *7 (E.D.N.Y. Dec. 23, 2010)("Perhaps

more importantly, the court further rejects reliance on Lone Star on the ground that the Second

Circuit has never accepted that court's approach."); Boilermakers Nat'l Annuity Trust v. WaMu

Mortg. Pass Through Certificates, Series AR1, 748 F.Supp.2d at 1256 ("Unlike the scenario in Lone

Star, Plaintiffs [sic] allegations are not simply based on a representation about the absence of

delinquent loans. As set forth above, Plaintiffs allege misstatements and omissions regarding

underwriting guidelines.").  One court in the Eastern District of New York recognized that this Fifth

Circuit decision "is at odds with the anti-waiver provision of the securities laws." City of Ann Arbor

Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc., 2010 WL 6617866, at *7.  That court

recognized that the Second Circuit has broadly interpreted this anti-waiver provision.  See City of

Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc., 2010 WL 6617866, at *7 (citing

McMahan & Co. v. Wherehouse Entm't, Inc., 65 F.3d at 1050-51).

        This Court concludes that the holding in Lone Star Fund V (U.S.), LP v. Barclays Bank PLC

is not consistent with 15 U.S.C. § 77n's anti-waiver provision.  "The statutory framework of the

1933 and 1934 Acts compels the conclusion that individual securityholders may not be forced to

forego their rights under the federal securities laws due to a contract provision." McMahan & Co.

v. Wherehouse Entm't, Inc., 65 F.3d at 1051 (citing Kusner v. First Pa. Corp., 531 F.2d at 1239.

This statute speaks in broad terms: "Any condition, stipulation, or provision binding any person

acquiring any security to waive compliance with any provision of this title or of the rules and

regulations of the Commission shall be void."  15 U.S.C. § 77n.  As the Supreme Court has

recognized: "Statutory construction must begin with the language employed by [the writer] and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985). In determining the meaning of a statute, courts look to the statute as a whole. See United States v. Atl. Research Corp., 551 U.S. 128, 135 (2007). Furthermore, courts should construe a remedial statute broadly, if the statute's language fairly permits the construction. See Marriott v. Nat'l Mut. Cas. Co., 195 F.2d 462, 466 (10th Cir. 1952)(citing United States v. Amer. Trucking Ass'n, 310 U.S. 534, 543 (1940)). Given the anti-waiver statute's broad language, the Fifth Circuit's brief analysis of this issue compared to the Second Circuit's analysis in McMahan & Co. v. Wherehouse Entertainment, Inc., and the number of courts that have criticized the Fifth Circuit's decision in Lone Star Fund V (U.S.), LP v. Barclays Bank PLC, the Court declines to adopt the Defendants' argument that this provision in the offering documents requires the Plaintiffs to include any additional allegations in their Amended Complaint to pursue a federal securities claim.

### F.   THE PLAINTIFFS HAVE PLED SOME ACTIONABLE MISREPRESENTATIONS OR OMISSIONS AGAINST THE NON-RATING AGENCY DEFENDANTS REGARDING THE CREDIT RATINGS IN THE OFFERING DOCUMENTS.

The Defendants contend that the Plaintiffs have not pled actionable misrepresentations against them with respect to the credit ratings that appear in the offering documents. First, based on an SEC regulation, 17 C.F.R. § 230.436(g)(1),[32] they argue that credit ratings are not part of a registration statement under federal law. See Memorandum in Support of Joint Motion at 38. Second, the Defendants argue that there is no allegation that the offering documents inaccurately

---

[32]Notably, Congress recently repealed 17 C.F.R. § 230.436(g). See The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 939G, 124 Stat. 1376, 1890 (2010)(providing that "Rule 436(g) . . . shall have no force or effect")

disclosed the ratings assigned to the certificates.  See Memorandum in Support of Joint Motion at 39.  They also note that ratings are generally opinions which the Plaintiffs must allege were not truly held for them to be actionable.  See Memorandum in Support of Joint Motion at 39.  Third, they argue that the offering documents expressly warned investors that "[a] rating is not a recommendation to buy, sell or hold securities and it may be lowered or withdrawn at any time by the assigning rating agency."  2006-3 Prospectus Supplement at 5; 2006-5 Prospectus Supplement at 5; 2007-4 Prospectus Supplement at 7.  Fourth, the Defendants argue that it was publicly known for many years that issuers pay rating agencies to rate securities and thus the offering document did not need to repeat what was common knowledge.  See Memorandum in Support of Joint Motion at 40.

The Plaintiffs counter that they have alleged much more than a mere failure to disclose the ratings assigned to the certificates.  See Response to Joint Motion at 33-34.  The Plaintiffs point to their allegations that the "ratings assigned to the Certificates, which the defendants voluntarily included in the offering documents, were actually false at the time of the offerings due to the inherently flawed models and inaccurate loan information relied on to derive the ratings."  Response to Joint Motion at 34 (emphasis omitted).  They contend that this information is what the Defendants failed to disclose in the offering documents.  See Response to Joint Motion at 34.  The Plaintiffs then point to various factual allegations in the Amended Complaint that support their contentions.  See Response to Joint Motion at 34-35.  The Plaintiffs point out that the Defendants' authority contradicts their argument that ratings are never actionable.  See Response to Joint Motion at 35.  They point out that 17 C.F.R. § 230.436(g)(1) protects rating agencies and not others who make statements in offering documents related to those ratings.  See Response to Joint Motion at 35.  The Plaintiffs cite to other cases that have found ratings in offering documents to be actionable.  See

-160-

Response to Joint Motion at 36.

As the First Circuit has noted, investment "ratings are opinions purportedly expressing the agencies' professional judgment about the value and prospects of the certificates." Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775 (emphasis omitted). "An opinion may still be misleading if it does not represent the actual belief of the person expressing the opinion, lacks any basis or knowingly omits undisclosed facts tending seriously to undermine the accuracy of the statement." Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775. "Liability may on this theory also extend to one who accurately described the opinion." Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775. When supported by sufficient factual allegations, courts have found credit ratings in offering documents to be actionable under the Securities Act. See, e.g., In re Wells Fargo Mortgage-Backed Certificates Litig., 712 F.Supp.2d at 972-73 ("In the Court's view, these allegations, particularly the statements from Moody's and S & P's executives, are sufficient to establish an actionable misstatement with respect to the rating process."). In dismissing misrepresentation allegations regarding credit ratings, the First Circuit noted:

> The complaint includes acknowledgments from S & P and Moody's executives conceding, in hindsight, that the models and data that the rating agencies were using were deficient. But the ratings were not false or misleading because rating agencies should have been using better methods and data. Defendants are not liable under the securities laws when their opinions, or those they reported, were honestly held when formed but simply turn out later to be inaccurate; nor are they liable only because they could have formed "better" opinions. A majority of district courts that have considered the issue have dismissed similar claims, and the Sixth Circuit affirmed one such dismissal.
>
> In addition to claiming that the ratings were faulty, the complaint also alleges that the ratings agencies produced high ratings aimed at keeping business, and it quotes individuals at the rating companies to support that proposition and to suggest that some inside the company thought that ratings were skewed. But, tellingly, the complaint stops short of alleging expressly that the leadership of S & P or Moody's

believed that their companies' ratings were false or were unsupported by models that generally captured the quality of the securities being rated.

The line is admittedly a fine one, but the ratings -- inherently opinions and not warranties against error -- were accurately reported by defendants and nothing more is required so long as the ratings were honestly made, had some basis, and did not omit critical information. That a high rating may be mistaken, a rater negligent in the model employed or the rating company interested in securing more business may be true, but it does not make the report of the rating false or misleading. If the purchaser wants absolute protection against errors of opinion, the answer is insurance rather than lawsuits.

Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775 (footnotes omitted)(citations omitted). The First Circuit noted that the plaintiffs strongest allegations in that case were statements from: (i) an S&P managing director admitting that S&P intentionally inflated ratings and that he "knew it was wrong at the time," but did it because "[i]t was either that or skip the business"; and (ii) from a CEO of Moody's reportedly saying to his board in 2007 that Moody's faced pressure to rate investments higher and that sometimes they "drink the kool-aid." Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775 n.16.

A district judge in the United States District Court for the Western District of Washington dismissed allegations related to credit ratings because the plaintiffs did not allege sufficient facts along with their allegations that the ratings relied on outdated models. See Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates, Series AR1, 748 F.Supp.2d at 1256. Furthermore, that court noted that "there is no duty [for an issuer] to disclose the methods used by agencies in developing a rating" and that "[t]he mere fact that the ratings would have been different under a different methodology is insufficient to state a claim." Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates, Series AR1, 748 F.Supp.2d at 1256. The Honorable Lewis A. Kaplan, United States District Judge, in the Southern District of New York

found the plaintiffs' allegations to be insufficient when the complaint lacked "factual allegations that call the accuracy of" statements in the offering documents relating to the ratings "into question." In re IndyMac Mortgage-Backed Sec. Litig., 718 F.Supp.2d at 511-512.  The court found, for example, that "[t]here are no allegations that . . . the rating agencies did not consider the enumerated factors or that the ratings did not express the agencies' judgment about the likelihood of investors receiving that which they were owed."  In re IndyMac Mortgage-Backed Sec. Litig., 718 F.Supp.2d at 511.  That court noted that "[t]he closest plaintiffs come are their allegations that the ratings were based on outdated models, unverified loan information, and that the ratings agencies 'failed to properly consider the credit quality of the mortgage loans,'" but found that the allegations did not support "a plausible inference that the ratings did not express each rating agency's judgment at the time they were issued."  In re IndyMac Mortgage-Backed Sec. Litig., 718 F.Supp.2d at 511.  Courts have also looked for specific allegations that support an inference that the rating agencies "did not actually believe that the ratings they had assigned were supported by the factors they said they had considered."  Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F.Supp.2d at 395.

One judge in the Northern District of California found the following allegations regarding credit ratings to be sufficient to state a claim under the Securities Act:

> Plaintiffs allege that contrary to the statements in the Prospectus Supplements, however, "The assigned ratings were not the result of the Ratings Agencies' independent analysis and conclusion," but rather were predetermined by Wells Fargo.  Id. ¶ 112.  Plaintiffs allege that the "AAA" ratings assigned to the Certificates were "unjustifiably high and did not represent the true risk of the Certificates" because they were "based on insufficient information and faulty assumptions concerning how many underlying mortgages were likely to default."  Id. ¶ 115.

> In support of their allegation that the Offering Documents' statements regarding the rating process constitute actionable misstatements, plaintiffs point to certain external evidence, including an SEC Summary Report stating that rating agencies had failed to disclose relevant rating criteria, implement written procedures

for rating mortgage-backed securities, document specific steps in the rating process, implement procedures for identifying errors in ratings or assessing compliance with rating standards, or document rating agency decisions. Id. ¶ 117. Plaintiffs also quote statements by executives of defendants Moody's and Standard & Poor's in which the executives admitted that they were aware at the time the subject ratings were made that the agencies' rating models were outdated. Id. ¶¶ 122-24. See id. ¶ 122-23 (S & P's Managing Director stated that S & P developed but failed to implement a more thorough ratings process as early as 2004, and that "had these models been implemented [the rating agencies] would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses"); ¶ 124 (Moody's Managing Director stated "that the rating agencies 'did not update their models or their thinking' during the period of deterioration in credit standards").

In re Wells Fargo Mortgage-Backed Certificates Litig., 712 F.Supp.2d at 973.

### 1.    The Credit Ratings Are Part of the Offering Documents.

The Court rejects the Defendants' arguments that ratings are not a part of the offering documents.  The SEC rule to which the Defendants point, 17 C.F.R. § 230.436(g)(1), exempts the rating agencies themselves from liability under federal securities law, but not the ratings themselves.  Furthermore, as many courts have noted, ratings in offerings documents can qualify as actionable misrepresentations under the Securities Act for others besides rating agencies.  See, e.g., Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775.

17 C.F.R. § 230.436 prescribes certain procedures related to the inclusion of the reports or opinions of experts or counsel in a registration or prospectus when those who have control over these documents quote or summarize the opinion or report.  See 17 C.F.R. § 230.436(a).  17 C.F.R. § 230.436(a) details that the written consent of the expert or counsel must "be filed as an exhibit to the registration statement and shall expressly state that the expert or counsel consents to such quotation or summarization."  17 C.F.R. § 230.436(a).  Furthermore, if the registration statement states that "any information contained in the registration statement has been reviewed or passed upon by any persons and that such information is set forth in the registration statement upon the

-164-

authority of or in reliance upon such persons as experts, the written consents of such persons shall

be filed as exhibits to the registration statement." 17 C.F.R. 230.436(b).  17 C.F.R. § 230.436(g)(1)

provides:

> Notwithstanding the provisions of paragraphs (a) and (b) of this section, the security
> rating assigned to a class of debt securities, a class of convertible debt securities, or
> a class of preferred stock by a nationally recognized statistical rating organization,
> or with respect to registration statements on Form F-9 (§ 239.39 of this chapter) by
> any other rating organization specified in the Instruction to paragraph (a)(2) of
> General Instruction I of Form F-9, shall not be considered a part of the registration
> statement prepared or certified by a person within the meaning of sections 7 and 11
> of the Act.

17 C.F.R. § 230.436(g)(1).  When the SEC proposed subsection (g)(1), the SEC stated: "The second

proposed rule would exclude any nationally recognized statistical rating organization whose security

rating is disclosed in a registration statement from civil liability under Section 11 of the Securities

Act of 1933."  Disclosure of Security Ratings in Registration Statements, 46 Fed. Reg. 42,024,

42,024 (Aug. 18, 1981).  The SEC found it important to exempt rating agencies from liability,

because, "unlike the case of other experts such as attorneys or accountants, there are few national

rating organizations," and "all three rating organizations that meet the proposed definition in Rule

436(g) indicated in their comments [to an earlier release] that they would not provide the requisite

consents" required under subsection (a) and (b).  Disclosure of Security Ratings in Registration

Statements, 46 Fed. Reg. at 42,027-28 & n.27.  The SEC did not mention anything about making

the ratings themselves exempt.  Furthermore, it mentioned that "a security rating presented [in a

filing] without any further explanation could mislead or confuse investors" under some

circumstances without additional information "making clear the source of the rating to which the

interested investor can turn for further details."  Disclosure of Security Ratings in Registration

Statements, 46 Fed. Reg. at 42,026.

-165-

The Defendants have cited to no authority where a court has accepted the argument that they now make before the Court. Under <u>Auer v. Robbins</u>, 519 U.S. 452 (1997), an agency's interpretation of its regulation is "controlling unless plainly erroneous or inconsistent with the regulation." 519 U.S. at 461. Nothing in the SEC's discussion of this regulation at the time it proposed that regulation suggested that the SEC intended to insulate issuers of securities from liability when they included a credit rating from a third party in offering documents. In fact, the SEC indicated that there was a risk that disclosing a credit rating could be misleading absent disclosure of sufficient information about the rating agency. Given that the provisions of 17 C.F.R. § 230.436 address the narrow issue of including the opinion of someone else in offering documents as part of a securities offering, the Court does not conclude that the SEC's interpretation of its own rule is "plainly erroneous or inconsistent with the regulation." <u>Auer v. Robbins</u>, 519 U.S. at 461. The Tenth Circuit applies the principles of statutory construction when it interprets regulations. <u>See</u> <u>Morris v. U.S. Nuclear Regulatory Comm'n</u>, 598 F.3d 677, 706 (10th Cir. 2010). In determining the meaning of a statute, courts look to the statute as a whole. <u>See</u> <u>United States v. Atl. Research Corp.</u>, 551 U.S. 128, 135 (2007). "Statutory construction must begin with the language employed by [the writer] and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." <u>Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.</u>, 469 U.S. 189, 194 (1985). Courts generally construe exemptions from remedial statutes narrowly. <u>See</u> <u>Markowitz v. Ne. Land Co.</u>, 906 F.2d 100, 105 (3d Cir. 1990). The language and structure of this regulation indicate that the SEC intended to exempt certain rating agencies from liability under the regulation rather than those who include credit ratings in offering documents. This regulation deals with procedures to protect experts and others whose opinion or report appears in offering documents. Furthermore, a court should construe this exemption from liability under federal securities law narrowly. Assuming

-166-

this regulation is susceptible to the interpretation that the Defendants put forth, the SEC's interpretation is controlling unless plainly erroneous or inconsistent with the regulation. The Court concludes that the SEC's interpretation is not plainly erroneous or inconsistent with the regulation.

2.      <u>Applicable Allegations Regarding the Rating Agency Defendants</u>.

The Plaintiffs point to several statements in the offering documents relating to the credit ratings. The offering documents stated that it was a condition to issuance of the senior certificates that they be rated AAA/Aaa by the respective rating agency. <u>See</u> Amended Complaint ¶ 68, at 33. The offering documents also stated that, "[t]he ratings assigned by the above rating agencies address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreement pursuant to which the certificates are issued." Amended Complaint ¶ 68, at 33-34 (alteration in original). For the 2006-3 offering, the Plaintiffs point out that Moody's and Fitch gave five classes of certificates AAA/Aaa ratings. <u>See</u> Amended Complaint ¶ 69, at 34. For the 2006-5 offering, they point out that Moody's and S&P gave four classes of certificates AAA/Aaa ratings. <u>See</u> Amended Complaint ¶ 69, at 34. For the 2007-4 offering, the Plaintiffs note that Moody's and S&P gave five classes of certificates AAA/Aaa ratings. <u>See</u> Amended Complaint ¶ 69, at 34.

The Plaintiffs make a variety of allegations with respect to the credit ratings, the Rating Agency Defendants, and the other Defendants' involvement with the both of them. First, the credit ratings prominently displayed in the offering documents were false and misleading. <u>See</u> Amended Complaint ¶¶ 68-71, at 33-36. Second, the Rating Agency Defendants issued false and misleading ratings on the certificates in question. <u>See</u> Amended Complaint ¶¶ 72-79, at 36-38. Third, the Defendants used the defective models and methodologies created by the Rating Agency Defendants to design the certificates. <u>See</u> Amended Complaint ¶¶ 80-81, at 38-39. Fourth, the Rating Agency

-167-

Defendants used outdated and defective models when assigning their ratings.  See Amended Complaint ¶¶ 82-84, at 39-41.  Fifth, the Rating Agency Defendants failed to conduct reasonable due diligence into the underwriters'/servicers' representations.  See Amended Complaint ¶¶ 85-86. at 41-42.  Sixth, the Rating Agency Defendants lacked the resources to adequately and properly rate the MBS certificates.  See Amended Complaint ¶ 87, at 42.  Lastly, the Rating Agency Defendants were not sufficiently independent when assigning their ratings.  See Amended Complaint ¶¶ 88-89, at 42-43.

With respect to factual allegations to support these contentions, the Plaintiffs point to some governmental investigations relating to the Rating Agency Defendants and MBS.[33]  They point to

---

[33]The following information appears in footnote 8 on page 35 of the Amended Complaint in footnote 8.  In March 2008, the President's Working Group on Financial Markets, which includes the Secretary of the Treasury and Chairs of the Federal Reserve Board, SEC and Commodity Futures Trading Commission, confirmed that there were flaws in credit rating agencies' assessments of subprime MBS and other complex structured financial products, such as mortgage pass-through certificates.  Consequently, on June 11, 2008, the SEC proposed new rules that would, inter alia: (a) prohibit rating agencies from issuing ratings on a structured product, including mortgage passthrough certificates, unless information on the assets underlying the product was made available; (b) prohibit credit rating agencies from structuring the same products they rate; and (c) require the public disclosure of the information used by credit rating agencies in determining a rating on a structured product, including information on the underlying assets.  On July 8, 2008, the SEC released findings from an extensive 10-month examination of the ratings practices of Fitch, Moody's, and S&P:

> Under new statutory authority from Congress that enabled the SEC to register and examine credit rating agencies, the agency's staff conducted examinations of Fitch Ratings, Ltd., Moody's Investor Services Inc., and Standard & Poor's Ratings Services to evaluate whether they are adhering to their published methodologies for determining ratings and managing conflicts of interest. With the recent subprime market turmoil, the SEC has been particularly interested in the rating agencies' policies and practices in rating mortgage-backed securities and the impartiality of their ratings.
>
> The SEC staff's examinations found that rating agencies struggled significantly with the increase in the number and complexity of subprime residential mortgage-backed securities (RMBS) and collateralized debt obligations (CDO) deals

the Defendants' awareness of institutional investors' desire to purchase investments with investment-grade ratings.  See Amended Complaint ¶ 74, at 37.  The Plaintiffs allege that the Defendants manipulated this situation by engaging in improper conduct with the Rating Agency Defendants.  See Amended Complaint ¶ 74, at 37.  The Plaintiffs mention that the Rating Agency Defendants were involved in the review process of the capital structure of the Thornburg Trusts. See Amended Complaint ¶ 76, at 37-38.  They also allege that the Rating Agency Defendants eventually had to downgrade their prior ratings of the MBS at issue in this case, because they did not exercise reasonable diligence and ignored facts regarding the quality of the loans in the Thornburg Trusts.  See Amended Complaint ¶ 78, at 38.

The Plaintiffs include in the Amended Complaint various facts regarding the outdated and defective models the Rating Agency Defendants employed.  With respect to S&P, the Plaintiffs note that, in August 2006, a S&P employee internally confirmed that S&P did not adjust its ratings to take into account then-known credit risks from the fraud and lax underwriting standards associated with the trust certificates it rated: "[T]here has been rampant appraisal and underwriting fraud in the industry for quite some time as pressure has to feed the origination machine."  Amended Complaint at ¶ 82, at 39.  In September 2006, S&P internally admitted: "I think it's telling us that underwriting fraud; appraisal fraud and the general appetite for new product among originators is resulting in

---

since 2002.  The examinations uncovered that none of the rating agencies examined had specific written comprehensive procedures for rating RMBS and CDOs. Furthermore, significant aspects of the rating process were not always disclosed or even documented by the firms, and conflicts of interest were not always managed appropriately.

"We've uncovered serious shortcomings at these firms, including a lack of disclosure to investors and the public, a lack of policies and procedures to manage the rating process, and insufficient attention to conflicts of interest . . . ."

loans being made that shouldn't be made." Amended Complaint at ¶ 82, at 39.   A colleague responded that the head of the S&P surveillance group "told me that broken down to loan level what she is seeing in losses is as bad as high 40's - low 50%.  I'd love to be able to publish a commentary with this data but [it] maybe [sic] too much of a powder keg."  Amended Complaint ¶ 82, at 39. Frank Raiter, former managing director and head of residential mortgage ratings at S&P from 1995-2005, testified on April 23, 2010 before the United States Senate that in late 2002, a new version of S&P's ratings model was developed using approximately 2.5 million loans with significant performance information, but was not implemented because of budgetary constraints. See Amended Complaint ¶ 82, at 39.  Mr. Raiter also revealed:

> [I]n late 2002 or early 2003, another version of the model was introduced based on approximately 650,000 loans. At the same time, a data set of approximately 2.8 million loans was collected for use in developing the next version of the model.  By early 2004, preliminary analysis of this more inclusive data set and the resulting econometric equation was completed.  That analysis suggested that the model in use was underestimating the risk of some Alt-A and subprime products.  In spite of this research, the development of this model was postponed due to a lack of staff and IT resources.  Adjustments to the model used in 2004, with the identified problems, were not made until March, 2005.  To my knowledge a version of the model based on the 2.8 million loan data set was never implemented.

Amended Complaint ¶ 82, at 39-40.  Mr. Raiter also explained that "it's clear from a lot of these e-mails, people were making very poor calls in terms of the analytics."  Amended Complaint ¶ 82, at 40.  Mr. Raiter also explained that:

> if you've developed a model in-house that shows that it's much better than anything you're running, and it shows that you have been too optimistic with the ratings you've assigned, and you do not immediately start to use it and go back and re-rate the old deals so you can warn the investors that we've been wrong, then that's not doing the right thing.

Amended Complaint ¶ 82, at 40.  He also related that he had heard constantly from others at S&P that, if they change their models, everyone would think S&P had been wrong.  See Amended

-170-

Complaint ¶ 82, at 40.  He explained that this situation prevented any new ideas from developing, because the people in the company were afraid that someone would suggest S&P had not been right in the past, and that they would have liability or lose market share.  See Amended Complaint ¶ 82, at 40.  Mr. Raiter also explained that, with respect to a new model S&P developed to rate MBS, S&P "ran out of financing and funding and our budgets in 2003 to put this version 6-0 model in place, but the preliminary analysis, as Dr. Parisi suggested, was that we were not adequately rating the transactions."  Amended Complaint ¶ 82, at 40.  In May 2006, S&P announced its plans to change the model used to rate subprime mortgage bonds.  See Amended Complaint ¶ 83, at 40.  S&P would continue to rate subprime bonds issued before July 1, 2006, however, under the old, less rigorous model.  See Amended Complaint ¶ 83, at 40.  S&P did not make major changes to its MBS rating model until July 2007.  See Amended Complaint ¶ 84, at 41.  S&P decided not to retest existing MBS securities, however, because reevaluating them using the revised model would have led to massive downgrades.  See Amended Complaint ¶ 84, at 41.

With respect to Moody's, the Plaintiffs point to April 23, 2010 testimony from Richard Michalek, Vice President/Senior Credit Officer in the Structured Derivatives Products Group at Moody's before the United States Senate where he stated that, even as late as December 2007, "[i]nstalling improvements [continued to be] left for the someday pile."  Amended Complaint ¶ 82, at 40.  They refer to a statement from a Moody's managing director commenting that the rating agency's "errors make us look either incompetent at credit analysis or like we sold our soul to the devil for revenue or a little bit of both."  Amended Complaint ¶ 82, at 40.

The Plaintiffs then conclude that, based on this information, the Defendants knew or should have known the ratings related to the 2006-3 and 2006-5 Thornburg Trusts were issued under an outdated and inaccurate model.  See Amended Complaint ¶ 83, at 40-41.

The Plaintiffs also allege that the Rating Agency Defendants were either aware or should have known that the originators of the mortgage loans in the Thornburg Trusts had loosened -- or worse, abandoned -- their underwriting standards and were relying on falsified mortgage loan documentation. See Amended Complaint ¶ 85, at 41. In spite of this knowledge or reason to know of these problems, the Rating Agency Defendants rated the certificates as investment-grade quality while disclaiming any responsibility for verifying the accuracy of the underlying loans. See Amended Complaint ¶ 85, at 41. Testimony before a Senate Subcommittee in 2010 revealed that, in the prior decade, S&P, the managing directors and analysts received internal communications telling them that any request for loan level information from banks was totally unreasonable. See Amended Complaint ¶ 85, at 41. In spite of these communications, S&P told the directors and analysts that they "MUST produce a credit estimate" and that it was their "responsibility to devise some method for doing so." Amended Complaint ¶ 85, at 41. While testifying before the Senate on April 22, 2008, the Fitch President and CEO admitted that Fitch "did not do the due diligence function of trying to recognize whether there was fraud involved in the origination of loans" and asserted that this failure to perform due diligence was "one of the biggest accelerants for why there's been problems across the board in the mortgage market itself." Amended Complaint ¶ 86, at 40-41.

The Plaintiffs also allege that the Rating Agency Defendants lacked to a gross degree the staff and resources to adequately and properly rate the MBS. See Amended Complaint ¶ 87, at 42. As a result of lacking the staff and resources, the underwriters of the certificates argued with the credit-rating analysts, substituted lower value assets in the Thornburg Trusts at the last minute, and pressured analysts to waive their procedures and standards. See Amended Complaint ¶ 87, at 42. Some internal S&P communications corroborate these allegations of gross understaffing and lack

of resources.  See Amended Complaint ¶ 87, at 42 n.9.  On June 1, 2006, an internal S&P communication from an analyst noted: "In addition to the project above that involves some 863 deals, I have a back log of deals that are out of date with regard to ratings. . . . We recognize that I am still understaffed with these two additional bodies."  Amended Complaint ¶ 87, at 42 n.9.  On January 5, 2007, another S&P staffer stated:

> Now that we are into 2007, I want to take a moment to reiterate my concerns regarding the significant deficit in terms of the # of analysts currently assigned to work on US ABS and RMBS data needs.  Additionally, the caliber of the few resources currently assigned to work on these deals, which by the way number more than 8,000, is not at all sufficient.

Amended Complaint ¶ 87, at 42 n.9.

Because of this situation, the Rating Agency Defendants failed to conduct even cursory due diligence of loan quality in connection with the issuance of the certificates.  See Amended Complaint ¶ 86, at 41.  This failure on the Rating Agency Defendants' part served as a prime factor in the issuance of the false and misleading ratings assigned to the certificates.  See Amended Complaint ¶ 86, at 41.

The Plaintiffs also allege that the Rating Agency Defendants held themselves out as independent arbiters of the MBS that they rated.  See Amended Complaint ¶ 88, at 42.  A variety of conflicts of interest that the Rating Agency Defendants had, however, undercut this independence. See Amended Complaint ¶ 88, at 42.  More specifically: (i) the Rating Agency Defendants' desire for increased market share and revenue from increased volume of rating MBS deals caused them to provide unsupported credit ratings by using outdated models; (ii) Moody's "underwent a revision in the compensation structure" in 2006, so that a larger percentage of its employees' compensation was deferred, making it more important to its analysts that they reach revenue numbers on a quarterly and annual basis, thus creating an improper incentive for the analysts to rate securities

-173-

highly; and (iii) Moody's faced extreme pressure from Wall Street to refrain from downgrading MBS investments and succumbed to that pressure.  <u>See</u> Amended Complaint ¶ 88, at 42-43.[34]

The Rating Agency Defendants played an important role in the 2006-3, 2006-5, and 2007-4 offerings.  <u>See</u> Amended Complaint ¶ 89, at 43.  The certificates from these trusts could not have been issued without investment-grade ratings from the Rating Agency Defendants.  <u>See</u> Amended Complaint ¶ 89, at 43.  Thus, in spite of the flawed and/or non-existent underwriting standards that originators such as Wells Fargo employed, the Rating Agency Defendants continued to give the certificates AAA/Aaa ratings, the same ratings given to United States Treasury debt.  <u>See</u> Amended Complaint ¶ 89, at 43.

**3.      <u>The Rating Agency Allegations Are Sufficient with Respect to the 2006-5 and 2007-4 Offering.</u>**

The Plaintiffs have not made sufficient factual allegations to state a plausible claim that Fitch and Moody's did not honestly believe their ratings when they made them, that they lacked any basis, or that they knowingly omitted undisclosed facts tending to seriously undermine the accuracy of the statement.  The Plaintiffs have made sufficient factual allegations, however, that S&P did not believe its ratings when it made them, that they lacked any basis, or that S&P knowingly omitted undisclosed facts tending to seriously undermine the accuracy of the statement.  S&P issued ratings with respect to only the 2006-5 and 2007-4 offering, so the Plaintiffs have failed to allege sufficient factual allegations regarding the materiality of the credit ratings regarding the 2006-3 offering.  "An opinion may still be misleading if it does not represent the actual belief of the person expressing the

---

[34]As evidence of this pressure, the Plaintiffs point to Moody's "downgrad[ing] debt ratings" for MBS "in July 2007."  Amended Complaint ¶ 88, at 42.  "Wall Street's reaction was swift: Moody's market share dropped by 2/3 from a 75% market share in residential real estate-backed CDO's to 25%.  Amended Complaint ¶ 88, at 42.

-174-

opinion, lacks any basis or knowingly omits undisclosed facts tending seriously to undermine the accuracy of the statement." Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775. When considering these allegations, the Court's "job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 326.

Some of the most helpful allegations for the Plaintiffs here include the government investigations into the rating agencies, which apply to all three Rating Agency Defendants. See In re Wells Fargo Mortgage-Backed Certificates Litig., 712 F.Supp.2d at 973 (ascribing importance to a thorough governmental investigation regarding rating agency misconduct). The Plaintiffs allege that, in March 2008, findings from the President's Working Group on Financial Markets, which includes the Secretary of the Treasury and Chairs of the Federal Reserve Board, SEC and Commodity Futures Trading Commission, confirmed that there were flaws in credit rating agencies' assessments of subprime MBS and other complex structured financial products, such as mortgage pass-through certificates. See Amended Complaint ¶ 70, at 35 n.8. A subsequent ten-month SEC investigation revealed a wide variety of serious shortcomings with the Rating Agency Defendants, their ratings processes, their business processes, and their lack of disclosure to investors and the public. See Amended Complaint ¶ 70, at 35 n.8. The Plaintiffs also include some allegations regarding information revealed in April 2010 at a hearing before the United States Senate Permanent Subcommittee on Investigations revealing that the "credit rating agencies allowed Wall Street to impact their analysis, their independence and their reputation for reliability." Amended Complaint at 7 n.4. There are, however, quite a few rating agencies besides the Rating Agency Defendants, and this statement does not specifically reference any of the Rating Agency Defendants. A plaintiff has an obligation to "make clear exactly who is alleged to have done what to whom, to provide each

individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against" all the bad actors. Robbins v. Oklahoma, 519 F.3d at 1249-50 (emphasis in original). The SEC investigation, on the other hand, directly relates to the Rating Agency Defendants.

The Plaintiffs provide a great number of factual allegations regarding S&P's conduct, many of which relate to the relevant timeframe for rating MBS that ultimately went into these Thornburg Trusts. Specifically, they point to statements from high level officials at S&P which call into question S&P's practices. See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775 n.16 (noting that such allegations are helpful to establish a material misrepresentation argument regarding ratings); In re Wells Fargo Mortgage-Backed Certificates Litig., 712 F.Supp.2d at 973 (same). Furthermore, the Plaintiffs point to several statements from S&P employees, which also come from the requisite time period where some of the ratings for these Thornburg Trusts would have occurred, that undermine the conclusion that S&P believed its ratings. Those allegations, along with the factual allegations regarding S&P's interactions with the Defendants, permit a plausible inference that S&P "failed to properly consider the credit quality of the mortgage loans" and that the ratings S&P issued "did not express [its] judgment at the time they were issued." In re IndyMac Mortgage-Backed Sec. Litig., 718 F.Supp.2d at 511. Likewise, those allegations support a plausible inference that the ratings did not come from S&P's "independent analysis and conclusion, but rather were predetermined by" many companies, including the other Defendants in this case, who sought the ratings from S&P. In re Wells Fargo Mortgage-Backed Certificates Litig., 712 F.Supp.2d at 973 (internal quotation marks omitted). These factual allegations meet the plausibility standard that the Plaintiffs must satisfy at this stage of the proceeding, specifically that S&P's opinions are actionable. See Plumbers' Union Local No.

12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775. The Plaintiffs' factual allegations do not lead to the conclusion that these ratings "were honestly held when formed but simply turn[ed] out later to be inaccurate" or that S&P "could have formed 'better' opinions," both of which would be inactionable in this context. See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775. The Plaintiffs have pled "allegations suffic[ient] to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to" permit "the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. at 1323 (citations omitted)(internal quotation marks omitted). There are sufficient factual allegations to support a plausible inference that S&P "did not actually believe that the ratings [it] had assigned were supported by the factors [it] said [it] had considered." Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F.Supp.2d at 395.

The factual allegations regarding Moody's and Fitch, however, are not sufficient. Besides the government investigations, the Plaintiffs provide only one factual allegation against Fitch -- the statement from their CEO about Fitch not doing its due diligence and that contributing to the MBS crisis. While this statement is helpful to the Plaintiffs, it does not satisfy the plausibility requirement that the Plaintiffs must meet. See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775. The Plaintiffs have an obligation to plead "allegations suffic[ient] to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to" permit "the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. at 1323 (citations omitted)(internal quotation marks omitted). More specifically, these allegations lead only to the conclusion that these ratings "were honestly held when formed but

simply turn[ed] out later to be inaccurate," or that Fitch "could have formed 'better' opinions," both of which are inactionable based on the requirement that a rating agency must not actually believe its opinion when it gave that opinion.  See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775.  Furthermore, a plaintiff has an obligation to "make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against" all the bad actors.  Robbins v. Oklahoma, 519 F.3d at 1249-50 (emphasis in original).  In comparison, the Plaintiffs support their generalized allegations regarding the Rating Agency Defendants' conduct with specific factual allegations that relate to S&P.  The allegations regarding Fitch's conduct do not rise to the same level of plausibility and put the Defendants on fair notice regarding this alleged misrepresentation.

While the Plaintiffs' factual allegations regarding Moody's contain more detail, they are likewise not sufficient.  The Plaintiffs point to some statements from high-level officials at Moody's. These include statements from a managing director at Moody's before the United States Senate regarding the MBS crisis that Moody's was "more concerned about losing a few points of market share than about violating the law," and that there was a "see no evil, hear no evil sort of attitude." Amended Complaint at 7-8 n.4.  The Plaintiffs also point to April 23, 2010 testimony from Richard Michalek, Vice President/Senior Credit Officer in the Structured Derivatives Products Group at Moody's before the United States Senate, where he stated that, even as late as December 2007, "[i]nstalling improvements [continued to be] left for the someday pile."  Amended Complaint ¶ 82, at 40.  They point to a statement from a Moody's managing director commenting that the rating agency's "errors make us look either incompetent at credit analysis or like we sold our soul to the devil for revenue or a little bit of both."  Amended Complaint ¶ 82, at 40.  They also note that:

-178-

(i) Moody's "underwent a revision in the compensation structure" in 2006, so that a larger percentage of its employees' compensation was deferred, making it more important to its analysts that they reach revenue numbers on a quarterly and annual basis, thus creating an improper incentive for the analysts to rate securities highly; and (ii) Moody's faced extreme pressure from Wall Street to refrain from downgrading MBS investments and succumbed to that pressure.  See Amended Complaint ¶ 88, at 42-43.[35]  While these allegations undercut Moody's ratings to some degree, these allegations permit an inference only that Moody's ratings "were honestly held when formed but simply turn[ed] out later to be inaccurate," or that it "could have formed 'better' opinions," both of which are inactionable in this context.  See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775.  Likewise, the allegations regarding Moody's conflicts of interest are significant, but they do not lead to the conclusion that Moody's did not believe its ratings when it made them.  The allegations regarding Moody's raise some doubts about Moody's conduct, but they do not rise to the level of plausibility that Moody's opinions are actionable.  See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775. The Plaintiffs have an obligation to plead "allegations suffic[ient] to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to" permit "the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. at 1323 (citations omitted)(internal quotation marks omitted).

"Liability may on this theory [regarding opinions] also extend to one who accurately

_____

[35]As evidence of this pressure, the Plaintiffs point to Moody's "downgrad[ing] debt ratings" for MBS "in July 2007."  Amended Complaint ¶ 88, at 42.  "Wall Street's reaction was swift: Moody's market share dropped by 2/3 from a 75% market share in residential real estate-backed CDO's to 25%.  Amended Complaint ¶ 88, at 42.

described the opinion," such as a credit rating or the report of an expert included in a registration statement.  Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775.  Thus, the Defendants, other than the Rating Agency Defendants, can have liability for the opinions of the rating agencies by placing them in the offering documents and making other representations regarding the ratings.  See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775.  Additionally, those who must make filings under federal securities law can incur liability based on failing to meeting their "duty to prevent misleading disclosures by failing to disclose the inadequacies of the stated credit ratings."  N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC, 720 F.Supp.2d 254, 271 (S.D.N.Y. 2010)(Baer, J.).  The Plaintiffs have alleged that the Defendants included these ratings and other statements regarding the ratings in the offering documents and failed to disclose material information regarding the ratings.  Thus, the Defendants can be liable for including those ratings in the offering documents and making other statements regarding the ratings.

Thus, the Court grants the Joint Motion, with leave to amend, with respect to credit rating allegations as they apply to the Non-Rating Agency Defendants regarding the 2006-3 offering.  The Court denies the Joint Motion with respect to the 2006-5 and 2007-4 offerings.  To seek amendment to cure these deficiencies, the Plaintiffs must file a motion with their proposed amended complaint attached to that motion.  The Plaintiffs must bold the newly added facts in the proposed amended complaint to distinguish them from facts contained in the Amended Complaint.  In the motion, the Plaintiffs should set forth their new facts -- facts that the Court did not previously have before it -- which, if the Court had known the facts, would have changed the outcome of the motion.  The Plaintiffs should also address precisely how these new facts would have changed the Court's conclusions.

4.      **The Disclosures in the Offering Documents Do Not Undercut the Plaintiffs' Materiality Allegations.**

The Defendants argue that their disclosures in the offering documents warned the investors of the risk regarding the credit ratings.  Specifically, they point to a statement that says: "A rating is not a recommendation to buy, sell or hold securities and it may be lowered or withdrawn at any time by the assigning rating agency."  2006-3 Prospectus Supplement at 5; 2006-5 Prospectus Supplement at 5; 2007-4 Prospectus Supplement at 7.

The Plaintiffs counter that they have alleged that the "ratings assigned to the Certificates, which the defendants voluntarily included in the offering documents, were actually false at the time of the offerings due to the inherently flawed models and inaccurate loan information relied on to derive the ratings."  Response to Joint Motion at 34 (emphasis omitted).  They contend that this information is what the Defendants failed to disclose in the offering documents.  See Response to Joint Motion at 34.

Under the "bespeaks caution" doctrine, "certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." Halperin v. eBanker USA.com, Inc., 295 F.3d at 357.  "The 'bespeaks caution' rule is an application of the common-sense principle that the more a speaker qualifies a statement, the less people will be misled if the statement turns out to be false."  United States v. Nacchio, 519 F.3d at 1161.  "At bottom, the 'bespeaks caution' doctrine stands for the 'unremarkable proposition that statements must be analyzed in context' when determining whether or not they are materially misleading." Grossman v. Novell, Inc., 120 F.3d at 1120.  Plaintiffs can overcome cautionary language if the "language did not expressly warn or did not directly relate to the risk that brought about plaintiffs'

loss." <u>Halperin v. eBanker USA.com, Inc.</u>, 295 F.3d at 359.  See <u>Panther Partners, Inc. v. Ikanos</u>

<u>Commc'ns, Inc.</u>, 538 F.Supp.2d at 669 ("[G]eneral risk disclosures in the face of specific known

risks which border on certainties do not bespeak caution.").  Furthermore, the bespeaks caution

doctrine normally applies only to forward-looking statements such as projections or forecasts and

not to representations of present fact.  See <u>Plumbers' Union Local No. 12 Pension Fund v. Nomura</u>

<u>Asset Acceptance Corp.</u>, 632 F.3d at 773.  A court may properly apply the bespeaks caution doctrine

when considering a motion to dismiss.  See <u>Grossman v. Novell, Inc.</u>, 120 F.3d at 1120 n.7.

 The Plaintiffs' argument is more persuasive.  This "language did not expressly warn or did

not directly relate to the risk that brought about plaintiffs' loss."  <u>Halperin v. eBanker USA.com,</u>

<u>Inc.</u>, 295 F.3d at 359.  While it warned them that the Rating Agency Defendants may subsequently

withdraw or revise their rating -- which occurred -- it did not warn the Plaintiffs that the Rating

Agency Defendants did not believe their ratings when they made them, that the ratings lacked any

basis, or that the rating agencies knowingly omitted undisclosed facts tending to seriously undermine

the accuracy of the statement.  The Honorable Gerard E. Lynch, United States District Judge, in the

Southern District of New York dealt with a similar factual situation.  He found that the bespeaks

caution doctrine did not apply when a recommendation to buy securities was knowingly false.  See

<u>In re Salomon Analyst Level 3 Litig.</u>, 350 F.Supp.2d 477, 495 (S.D.N.Y. 2004)(Lynch, J.)("Under

these circumstances, if Grubman's Buy ratings were knowingly false, those statements are not

protected by the bespeaks caution doctrine.").  The court reached that conclusion based on the

plaintiffs' allegations that they suffered losses because the person rating the securities did not state

his true opinion, but rather a false one.  See <u>In re Salomon Analyst Level 3 Litig.</u>, 350 F.Supp.2d

at 495.  This situation is not one where the Plaintiffs have in a conclusory manner alleged that S&P

did not believe its own ratings -- although the Plaintiffs have not set forth sufficient allegations that

Moody's and Fitch did not believe their ratings.  See In re Merrill Lynch & Co., Inc., 273 F.Supp.2d 351, 356 n.56 (S.D.N.Y. 2003)(Pollack, J.).  The allegations regarding Moody's and Fitch, while not sufficient to allege that these credit ratings constituted a material misrepresentation, rely on the same basic theory.  Furthermore, the disclosures in the offering documents regarding all of these ratings are identical.  Thus, the Court concludes that the disclosures with respect to the Rating Agency Defendants' ratings are not sufficient to undercut the materiality of these alleged misrepresentations concerning credit ratings.

### 5.    The Court Cannot Conclude as a Matter of Law that the Rating Agency Defendants' Conflicts of Interest Are Not Material.

The Defendants argue that the Rating Agency Defendants' conflicts of interest are not material as a matter of law because those conflicts of interest were publicly known.  The Defendants cite to district court opinions that have reached this conclusion.  The Defendants have not directed the Court, however, to any government reports, news publications, or other sources that indicate these facts were publicly known.  Some of these courts, whose opinions the Defendants have cited, have considered such materials, see In re Lehman Bros. Sec. & ERISA Litig., 684 F.Supp.2d 485, 492 (S.D.N.Y. 2010)(Kaplan, J.), but the Defendants have not cited to any of those materials or told the Court what specific materials it should consider to determine whether these facts were publicly known at the respective times.  Assuming judicial notice is appropriate, if a party requests that the court take judicial notice of certain facts, and supplies the necessary information to the court, judicial notice is mandatory.  See Fed. R. Evid. 201(d).  The Defendants have not supplied the necessary information to the Court for it to consider.  While the Court does not expressly disagree with the other district courts who have reached this conclusion, those district court opinions are only persuasive sources of authority and do not bind the Court.  When considering and addressing a rule

12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; Moore v. Guthrie, 438 F.3d at 1039; Hous. Auth. of Kaw Tribe v. City of Ponca, 952 F.2d at 1187. Without any judicially noticed evidence, the Court is left with the allegations in the Amended Complaint.

The Defendants also argue that, because the SEC proposed rules requiring disclosure of certain information regarding the relationship between issuers, depositors, underwriters, and rating agencies, but never adopted those rules, such conflicts of interest are immaterial as a matter of law. See Disclosure of Security Ratings, Securities Act Release No. 33-7086, 1994 WL 469347, at *9-10 (Aug. 31, 1994). This argument misunderstands the nature of liability under federal securities law. Section 11 creates liability where a registration statement "omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. Because the SEC does not require disclosure of a certain topic does not mean that, if a person voluntarily chooses to speak about that topic in a registration statement or other offering document, the statement could never be misleading. See 15 U.S.C. § 77k. The Honorable Lewis A. Kaplan, United States District Judge, in the Southern District of New York has held in two opinions that "the rating agencies' role in structuring the Certificates is immaterial as a matter of law." In re IndyMac Mortgage-Backed Sec. Litig., 718 F.Supp.2d at 512. See In re Lehman Bros. Sec. & ERISA Litig., 684 F.Supp.2d at 492-93. His decisions, however, predate the Supreme Court's recent decision in Matrixx Initiatives, Inc. v. Siracusano. In that unanimous decision, the Supreme Court strenuously cautioned against adopting bright-line rules that would classify certain information as material or immaterial as a matter of law. See Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. at 1318-20 ("As

-184-

in <u>Basic</u>, Matrixx's categorical rule would 'artificially exclud[e]' information that 'would otherwise be considered significant to the trading decision of a reasonable investor.').  "[A]ny approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive."  <u>Matrixx Initiatives, Inc. v. Siracusano</u>, 131 S.Ct. at 1318 (quoting <u>Basic, Inc. v. Levinson</u>, 485 U.S. at 236).  While <u>Matrixx Initiatives, Inc. v. Siracusano</u> addressed materiality in the context of rule 10b-5, its discussion of materiality would be applicable and informative in any context dealing with materiality under federal securities law.  <u>See</u> <u>Krim v. BancTexas Grp., Inc.</u>, 989 F.2d 1435, 1448 n.16 (5th Cir. 1993)("The definition of materiality developed under the Securities Act of 1933 applies equally to claims under the Securities Exchange Act of 1934."). Given this warning from the Supreme Court against bright-line rules in the context of materiality, the Court declines to adopt the bright-line rule that the Defendants suggest.  As discussed above, the Plaintiffs have plausibly alleged that the statements in the offering documents relating to the 2006-5 and 2007-4 offerings were misleading with respect to the Rating Agency Defendants' credit ratings and other statements regarding those credit ratings included in the offering documents.

## IV.    **THE PLAINTIFFS HAVE ADEQUATELY PLED A SECTION 12(a)(2) CLAIM.**

The Defendants argue that the Plaintiffs have not adequately pled their standing to assert a section 12(a)(2) claim under the Securities Act.  <u>See</u> Memorandum in Support of Joint Motion at 44-47.  The Defendants argue that, "[t]o state a Section 12(a)(2) claim, a plaintiff must allege that it purchased its certificates in an initial public offering directly from, or at the 'direct and active' solicitation of, a defendant."  Memorandum in Support of Joint Motion at 45.  They assert that the Plaintiffs have not alleged from whom they purchased their certificates.  <u>See</u> Memorandum in Support of Joint Motion at 45.  Instead, the Defendants argue that the Plaintiffs have asserted only

that they purchased their certificates pursuant and/or traceable to the offering documents.  See Memorandum in Support of Joint Motion at 45.  Furthermore, the Defendants assert the Plaintiffs have not alleged facts supporting the Defendants' direct and active solicitation in connection with the immediate sale of certificates to the Plaintiffs.  See Memorandum in Support of Joint Motion at 46.  The Defendants argue that the Plaintiffs lump eighteen defendants together and in a conclusory manner assert that the Defendants are liable under section 12(a)(2), because they "'[m]ade the decision to offer the Certificates,' '[d]rafted, revised and/or approved the Offering Documents,' and 'orchestrated all activities necessary to effect the sale of the Certificates.'"  Memorandum in Support of Joint Motion at 46 (quoting Amended Complaint ¶ 112, at 47-48).  The Defendants also argue that the Plaintiffs have not alleged that they purchased all their certificates in the initial public offerings.  See Memorandum in Support of Joint Motion at 46.

The Plaintiffs counter that the Defendants have made no allegations that the Defendants are not statutory sellers or that the Plaintiffs did not purchase from them; rather, the Plaintiffs contend that the Defendants' argument is that the Plaintiffs have not alleged purchases from them.  See Response to Joint Motion at 48.  The Plaintiffs cite to authority which states that a plaintiff is not "required to allege which underwriter sold securities to each plaintiff" at the pleading stage.  Response to Joint Motion at 48-49 (quoting In re Westinghouse Sec. Litig., 90 F.3d 696, 718 (3d Cir. 1996)).  The Plaintiffs point to a variety of sections in the Amended Complaint where they make allegations regarding their purchases pursuant to the offering documents.  See Response to Joint Motion at 49.  They also point to language in the Amended Complaint where they allege purchases directly from the Defendants in the case.  See Response to Joint Motion at 49-50.  The Plaintiffs argue that the Defendants have improperly tried to raise the necessary pleading standard by requiring the Plaintiffs to allege facts showing each Defendant's direct and active solicitation in

connection with the immediate sale of certificates to the Plaintiffs.  See Response to Joint Motion at 51.

The only proper defendants in a section 12(a)(2) action are those who "'offer or sell' unregistered securities." Pinter v. Dahl, 486 U.S. 622, 641 (1988).  The definition of one who "offers or sells" includes "[a] person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." Maher v. Durango Metals, Inc., 144 F.3d at 1307 (quoting Pinter v. Dahl, 486 U.S. at 647).  Section 12(a) demands a buyer-seller relationship: "Any person who . . . offers or sells a security . . . shall be liable . . . to the person purchasing such security from him . . . ." 15 U.S.C. § 77*l*(a) (emphasis added). See Pinter v. Dahl, 486 U.S. at 642 ("At the very least . . . the language of § 12(1) contemplates a buyer-seller relationship not unlike traditional contractual privity.  Thus, it is settled that § 12(1) imposes liability on the owner who passed title, or other interest in the security, to the buyer for value.").  If a plaintiff does not allege that a defendant sold or offered to sell the security to him directly, the plaintiff must then adequately allege the defendant solicited the sale.  These allegations, as the Tenth Circuit stated in Maher v. Durango Metals, Inc., require the plaintiff to "at a minimum allege facts indicating that [the defendant] solicited [their] purchase." Maher v. Durango Metals, Inc., 144 F.3d at 1307.[36]  See Pinter v. Dahl, 486 U.S. at 645-47.

A.    THE PLAINTIFFS' FACTUAL ALLEGATIONS ARE SUFFICIENT TO STATE A SECTION 12(a)(2) CLAIM.

In addressing the required pleading standards when the plaintiff alleges that the defendant

_____

[36] The Tenth Circuit also quoted approvingly, in a parenthetical, the stricter language of the Third Circuit: "An allegation of direct and active participation in the solicitation of the immediate sale is necessary for solicitation liability, i.e., where the section 12[(a)](2) defendant is not a direct seller." Maher v. Durango Metals, Inc., 144 F.3d at 1307 (emphasis added)(quoting In re Westinghouse Sec. Litig., 90 F.3d at 717 n.19).

was a direct seller under section 12(a), the Third Circuit has stated: "We agree with the district court that plaintiffs must allege that the underwriter defendants were section 12(2) sellers, but we do not find support in <u>Pinter</u> for the district court's statement that, in order to achieve this, plaintiffs are required to allege which underwriter sold securities to each plaintiff."   <u>In re Westinghouse Sec. Litig.</u>, 90 F.3d at 718.  The First Circuit, in a more recent case that followed <u>Bell Atlantic Corp. v. Twombly</u> and <u>Ashcroft v. Iqbal</u>, set out a pleading standard similar to the Third Circuit.  <u>See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.</u>, 632 F.3d at 776. The First Circuit found section 12(a) allegations sufficient when the plaintiffs alleged that they acquired the certificates pursuant and/or traceable to the offering documents, acquired the certificates from specific defendants, and that those defendants promoted and sold the certificates to the plaintiffs and other members of the class.  <u>See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.</u>, 632 F.3d at 773.  Courts have found that alleging only that the purchases were "pursuant to" the respective offering documents is insufficient.  <u>E.g.</u>, <u>Boilermakers Nat'l Annuity Trust v. WaMu Mortg. Pass Through Certificates, Series AR1</u>, 748 F.Supp.2d at 1253-54.

Here, the Plaintiffs have met the requirements to plead their standing under section 12(a)(2).  First, they have alleged that they and the class purchased the certificates pursuant to the offering documents in question.  <u>See</u> Amended Complaint ¶¶ 1, 94, at 6, 44.  Second, the Plaintiffs allege that the Depositor Defendants, the Individual Defendants, and the Underwriter Defendants "each . . . offered and sold Certificates to Class members by the use of communication in interstate commerce and/or the United States mails, by means of the Offering Documents."  Amended Complaint ¶ 110, at 47.  Third, the Plaintiffs allege that the Depositor Defendants, the Individual Defendants, and the Underwriter Defendants "[c]onceived and planned the sale of the Certificates

and orchestrated all activities necessary to effect the sale of the Certificates to the investing public,

by issuing the Certificates, promoting the Certificates and supervising their distribution and ultimate

sale to investors."  Amended Complaint ¶ 112, at 48.  This second allegation is the most critical, as

it contains factual allegations that the Defendants offered and sold the certificates to the Plaintiffs.

Taken together, these allegations the Plaintiffs have set forth are consistent with what courts have

required to state a section 12(a)(2) claim.  See Plumbers' Union Local No. 12 Pension Fund v.

Nomura Asset Acceptance Corp., 632 F.3d at 773.  The Court does not believe more pleading on

this issue is necessary.  As the Tenth Circuit has stated:

> [T]he degree of specificity necessary to establish plausibility and fair notice, and
> therefore the need to include sufficient factual allegations, depends on context:
> "Context matters in notice pleading.  Fair notice under Rule 8(a)(2) depends on the
> type of case . . . ."  A simple negligence action based on an automobile accident may
> require little more than the allegation that the defendant negligently struck the
> plaintiff with his car while crossing a particular highway on a specified date and
> time.  The complaint in Twombly was inadequate because the plaintiff failed to plead
> any facts to show "contract, combination . . . or conspiracy, in restraint of trade"
> beyond a bare allegation of parallel conduct that could be explained as identical but
> independent action. Given that the complaint encompassed scenarios under which
> the defendants conspired to engage in parallel conduct and those in which they did
> not, the Court found that the likelihood that the plaintiff would be entitled to relief,
> even if all of the allegations were true, fell short.

Robbins v. Oklahoma, 519 F.3d at 1248 (citations omitted).  Here, the Court has already concluded

that there were sufficient factual allegations that the non-Rating Agency Defendants have made

material misrepresentations.  This specific issue, whether or not the Defendants sold or offered to

sell the Plaintiffs securities, is more akin to a negligence claim than the complex conspiracy to

restrain trade claim that appeared in Bell Atlantic Corp. v. Twombly.  See Robbins v. Oklahoma,

519 F.3d at 1248.  The level of allegations necessary to put the Defendants on fair notice that they

sold or offered to sell these securities to the Plaintiffs is minimal to prepare them to properly defend

against these allegations, more like a negligence claim.  See Robbins v. Oklahoma, 519 F.3d at

1248.  In comparison, the allegations related to the Defendants underlying improper conduct, making material misrepresentations in violation of federal securities law, would require more specificity, like the Sherman Act claims in Bell Atlantic Corp. v. Twombly.  See Robbins v. Oklahoma, 519 F.3d at 1248.  Furthermore, the Defendants have cited no authority where a court has granted a motion to dismiss on a section 12(a)(2) claim based on allegations comparable to those the Plaintiffs have included in their Amended Complaint.  Applying the rationale of each authority the Defendants have cited, those courts would have upheld these allegations.  Under the plausibility standard Ashcroft v. Iqbal imposes, a plaintiff must only "nudge[]" his or her claims "across the line from conceivable to plausible" -- not prove his or her case.  129 S.Ct. at 1950-51.  These allegations are more than a "formulaic recitation of the elements" of a section 12(a)(2) claim.  Ashcroft v. Iqbal, 129 S.Ct. at 1951.

The Defendants argue that the Plaintiffs must allege that they purchased their certificates at an initial public offering directly from, or at the direct and active solicitation of a defendant.  Because the Plaintiffs have alleged the direct offer or sale of these certificates to them, they do not need to additionally "allege facts indicating that [the defendant] solicited [their] purchase."  Maher v. Durango Metals, Inc., 144 F.3d at 1307.  Contrary to the Defendants' argument, the Plaintiffs have alleged that the Defendants offered and sold the certificates to them.  While the Plaintiffs may not be able to ultimately prove a section 12(a)(2) claim against each Defendant, they have sufficiently pled a section 12(a)(2) for purposes of a motion to dismiss.  Thus, the Court denies this argument in the Joint Motion that the Plaintiffs have not adequately alleged a section 12(a)(2) claim.

### B.  THE COURT DECLINES TO DISMISS MIDWEST OPERATING'S 12(a)(2) CLAIM REGARDING THE 2006-5 OFFERING FOR LACK OF STATUTORY STANDING.

The Defendants also contend that Midwest Operating does not have statutory standing to

pursue a section 12(a)(2) claim regarding the 2006-5 offering as revealed by the certification it filed with the Court.  See Memorandum in Support of Joint Motion at 46-47; Joint Reply at 25.  The Defendants argue that Midwest Operating did not purchase its certificates in the initial offering as required to assert a section 12(a)(2) claim.  See Memorandum in Support of Joint Motion at 46-47.  More specifically, they argue that, because Midwest Operating did not purchase its certificates within one year of the offering, it cannot maintain a section 12(a)(2) claim.  See Reply at 25.  The Plaintiffs cite to authority to support their position that they still can maintain this claim and adequately represent the class even though Midwest Operating's purchase occurred one year after the initial offering.  See Response to Joint Motion at 52-53.  The Plaintiffs also note that this is a technical defect in statutory standing that the Court should resolve at the class-certification stage as opposed to the motion to dismiss stage of this case.  See Response to Joint Motion at 53-54.

As the Court has already determined, Midwest Operating has constitutional standing. "Unlike a dismissal for lack of constitutional standing, which should be granted under Rule 12(b)(1), a dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6)." Harold H. Huggins Realty, Inc. v. FNC, Inc., 634 F.3d 787, 795 n.2 (5th Cir. 2011).[37]  When making a rule 12(b)(1) motion, a party may go beyond the allegations in the complaint to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or other evidence properly

_____

[37]As the United States Court of Appeals for the Sixth Circuit explained when articulating the difference between constitutional standing, prudential standing, and statutory standing:

> The parties have confused the questions of constitutional and prudential standing with statutory standing, which asks "whether this plaintiff has a cause of action under the statute."  The question is closely related to the merits inquiry (oftentimes overlapping it) and is analytically distinct from the question whether a federal court has subject-matter jurisdiction to decide the merits of a case.

Roberts v. Hammer, 655 F.3d at 580-81 (emphasis in original)(citation omitted).

before the court.  See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir.

1995).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four

corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d at

340.  The sufficiency of a complaint is a question of law, and when considering and addressing a

rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the

complaint, view those allegations in the light most favorable to the non-moving party, and draw all

reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551

U.S. at 322; Moore v. Guthrie, 438 F.3d at 1039; Hous. Auth. of Kaw Tribe v. City of Ponca, 952

F.2d at 1187.  A court may consider as part of a 12(b)(6) motion, however, "documents referenced

in [a] complaint because no question has been raised as to their authenticity."  Granite Southlands

Town Ctr., LLC v. Provost, No. 10-1453, 2011 WL 4952989, at *1 (10th Cir. Oct. 19,

2011)(unpublished)(citing Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002)).  See

GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir.

1997)("Notwithstanding these general principles, if a plaintiff does not incorporate by reference or

attach a document to its complaint, but the document is referred to in the complaint and is central

to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be

considered on a motion to dismiss.").

     Here, the Plaintiffs have referenced their certifications in the Amended Complaint.  See

Amended Complaint ¶¶ 19-20, at 13.  Thus, the Court can consider the Midwest Operating

Certification when it decides this 12(b)(6) motion.  The Court has already determined that Midwest

Operating has constitutional standing to pursue its claims.  In the context of a section 12(a)(2) claim,

the Third Circuit has cautioned against dismissing a section 12(a)(2) claim as part of a 12(b)(6)

motion when the plaintiff has adequately alleged the claim but may lack statutory standing to pursue

that claim:

> The district court also found that plaintiffs were attempting to bring a class action against a proposed class of defendants "without alleging facts which would establish standing by a plaintiff against each defendant."  The court stressed that "there must be a representative plaintiff who alleges sale or solicitation by each proposed defendant."   While these concerns might be relevant on a motion for class certification, they do not address whether, as a threshold matter, plaintiffs properly stated a section 12(2) claim under Rule 12(b)(6).

In re Westinghouse Sec. Litig., 90 F.3d at 718 n.22.  Because the Court has already concluded that Midwest Operating has constitutional standing, a lack of statutory standing does not deprive the Court of subject-matter jurisdiction over Midwest Operating's claims.  The Court has concluded that Midwest Operating has adequately alleged a section 12(a)(2) claim.  In a similar situation, the Second Circuit declined to "adopt a per se rule that a class may not be certified where a lead plaintiff does not have standing to bring every available claim and none of the named plaintiffs who have standing to bring the additional claims has [sic] been vetted under the PSLRA." Hevesi v. Citigroup Inc., 366 F.3d 70, 82-85 (2d Cir. 2004).  The Second Circuit recognized that "it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim" and that the PSLRA imposes some requirements that conflict with locating a plaintiff who has standing to sue on every claim. Hevesi v. Citigroup Inc., 366 F.3d at 82-83.  This Court has also in the past recognized that, "although the Plaintiffs may lack statutory standing under Sections 11 and 12(a)(2) against certain Defendants, an issue the Court does not need to resolve to establish jurisdiction, they do not lack standing under Article III such that the Court would lack subject-matter jurisdiction over these claims," and that such an issue was better addressed in the context of rule 23 of the Federal Rules of Civil Procedure.  In re Thornburg Mortg., Inc. Sec. Litig., 683 F.Supp.2d at 1254-55.

Because Midwest Operating has adequately alleged a section 12(a)(2) claim and has constitutional standing to bring such a claim, it is not necessary for the Court to decide the issue of

statutory standing at this time.  The Court reaches this conclusion because the PSLRA imposes

requirements which can conflict with finding a lead plaintiff with statutory standing to pursue claims

on behalf of the class.  The Second Circuit recognized this dilemma in <u>Hevesi v. Citigroup Inc.</u>

<u>See</u> 366 F.3d at 82 ("Rather, because the PSLRA mandates that courts must choose a party who has,

among other things, the largest financial stake in the outcome of the case, it is inevitable that, in

some cases, the lead plaintiff will not have standing to sue on every claim.").[38]  Likewise, the

Second Circuit noted that "the role of the lead plaintiff is 'to empower investors so that they-not

their lawyers-exercise primary control over private securities litigation,'" such that "any requirement

that a different lead plaintiff be appointed to bring every single available claim would contravene

the main purpose of having a lead plaintiff -- namely, to empower one or several investors with a

major stake in the litigation to exercise control over the litigation as a whole."  <u>See</u> <u>Hevesi v.</u>

<u>Citigroup Inc.</u> 366 F.3d at 82.  In a situation where there is less control over selecting a plaintiff to

represent the class, dismissing the lead plaintiff's claims, when they have adequately alleged those

claims for purposes of rule 12(b)(6), is unwise.  Doing so would create too much of an overlap with

the merits inquiry, and this problem may be remedied at the class-certification stage.  If an

individual plaintiff does not have statutory standing to assert a claim against a defendant, the

individual plaintiff cannot normally cure that defect.  In a class action, however, adding in another

---

[38]The PSLRA also creates, for example, rebuttal presumptions that a plaintiff is a proper lead plaintiff under the PSLRA if the plaintiff: (i) has filed the complaint or made a motion in response to the notice sent to the class seeking a lead plaintiff; (ii) has the largest financial interest of the class members, in the determination of the court; or (iii) otherwise satisfies the requirements of rule 23 of the Federal Rules of Civil Procedure.  <u>See</u> 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I).  A member of the class may rebut this presumption "only upon proof" that the proposed lead plaintiff "will not fairly and adequately protect the interests of the class," or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C. § 77z-1.  On the other hand, there is no requirement that the proposed lead plaintiff be able to assert the largest number of claims on behalf of the proposed class.  <u>See</u> 15 U.S.C. § 77z-1(a)(3)(B).

member of the class as a named plaintiff, who can satisfy statutory standing for a particular claim, may cure that defect.

The primary purpose of a motion to dismiss under rule 12(b)(6) is to ensure that the claims are plausible and that a defendant is on fair notice of the claims asserted against him or her.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 555 n.3 ("Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests."); Robbins v. Oklahoma, 519 F.3d at 1248 (recognizing that a motion to dismiss tests the "plausibility" of the plaintiff's claims and whether the defendant has "fair notice" of the claims against him).  Issues of statutory standing more directly address the merits of a plaintiff's claim.  See Roberts v. Hammer, 655 F.3d at 580-81 ("The question [of statutory standing] is closely related to the merits inquiry (oftentimes overlapping it) and is analytically distinct from the question whether a federal court has subject-matter jurisdiction to decide the merits of a case.").  In the context of a securities class action dealing with section 11 and 12(a)(2) claims, the Second Circuit has cautioned against dismissing a claim for lack of statutory standing: "While these concerns might be relevant on a motion for class certification, they do not address whether, as a threshold matter, plaintiffs properly stated a section 12(2) claim under Rule 12(b)(6)."  In re Westinghouse Sec. Litig., 90 F.3d at 718 n.22.  The Court agrees that, in the context of a securities class action, this issue of statutory standing is better addressed at the class-certification or summary-judgment stage.  See In re Thornburg Mortg., Inc. Sec. Litig., 683 F.Supp.2d at 1254-55 (holding that defects in statutory standing related to the lead plaintiffs' section 11 and 12(a)(2) claims did not deprive the Court of subject-matter jurisdiction and recognizing that the Court should address the statutory standing issues in the context of a motion for class certification).  The Plaintiffs have alleged sufficient facts to state plausible claims and put the

Defendants on notice of the claims against them.  Additionally, the PSLRA imposes various requirements that can conflict with locating a lead plaintiff who has statutory standing to assert each claim on behalf of the class.  For example, the class member with the largest financial stake in the dispute and who files a motion seeking the Court to name it lead plaintiff will often become the lead plaintiff.  See 15 U.S.C. § 77z-1(a)(3)(B)(iii).  Another class member can rebut this presumption that the proposed lead plaintiff is appropriate with evidence that the proposed lead plaintiff cannot adequately protect the interests of the class or is subject to unique defenses.  See 15 U.S.C. § 77z-1(a)(3)(B)(iii).  There is no requirement that the lead plaintiff be able to assert the largest number of claims on behalf of the class.  Furthermore, a class action is distinct from suits involving individual plaintiffs.  If an individual plaintiff does not have statutory standing to assert a claim against a defendant, the individual plaintiff cannot normally cure that defect.  In a class action, however, adding in another member of the class as a named plaintiff, who can satisfy statutory standing for a particular claim, may cure that defect.  This defect is often a technical one that is readily curable, as it relates to the timing of the plaintiff's purchase of the securities.  Adding an additional named plaintiff for the purposes only of curing this defect would not result in any significant delay in moving this case forward.  The Defendants may reurge this argument at the summary judgment stage or in the context of a motion for class certification.  Consequently, the Court declines to adopt this argument regarding Midwest Operating's lack of statutory standing.

## V.   THE PLAINTIFFS HAVE NO OBLIGATION TO PLEAD RELIANCE WITH RESPECT TO THE 2006-5 OFFERING.

The Defendants argue that the Court should dismiss the Plaintiffs' section 11 claims regarding the 2006-5 offering, because the Plaintiffs have failed to plead facts establishing their reliance on any alleged misrepresentations in the 2006-5 offering documents.  See Memorandum

in Support of Joint Motion at 47.  They argue that the presumption of reliance otherwise applicable to section 11 claims does not apply where an investor "acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least 12 months beginning after the effective date of the registration statement."  Memorandum in Support of Joint Motion at 47 (quoting 15 U.S.C. § 77k(a)).  They point out that, for asset-backed securities, monthly distribution reports are the equivalent of earning statements that corporate entities file.  See Memorandum in Support of Joint Motion at 47.  They note that twelve months of distribution reports for this 2006-5 Thornburg Trust were publicly available before Midwest Operating purchased the certificates.  See Memorandum in Support of Joint Motion at 47-48.

    The Plaintiffs counter that the Court cannot consider these earnings reports under a 12(b)(6) motion to dismiss.  See Response to Joint Motion at 55.  They contend that these monthly distribution reports and any other reports the Defendants have filed do not fall within this statute's definition of a yearly earning statement, and that some of these filings were not filed at the appropriate time for purposes of this statute.  See Response to Joint Motion at 56-58.  They also argue that these SEC filings violate the applicable SEC rules and thus they do not rebut the presumption of reliance.  See Response to Joint Motion at 58-59.  Lastly, they argue that, even if the filings do meet the requirements of the statute, the Plaintiffs still have no obligation to prove reliance.  See Response to Joint Motion at 59-60.

    Under section 11, "reliance may be established without proof of the reading of the registration statement by such person."  15 U.S.C. § 77k(a).  Courts describe this provision as creating "a conclusive presumption of reliance for any person purchasing the security . . . ."  APA Excelsior III L.P. v. Premiere Techs., Inc., 476 F.3d at 1271.  The presumption of reliance applicable to section 11 claims, however, does not apply where an investor "acquired the security after the

-197-

issuer has made generally available to its security holders an earning statement covering a period of at least 12 months beginning after the effective date of the registration statement."  15 U.S.C. § 77k(a).

These monthly distribution reports are not an "earning statement covering a period of at least 12 months beginning after the effective date of the registration statement" as the Defendants contend.  15 U.S.C. § 77k(a).  Two courts have rejected this same argument.  See Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc., 2011 WL 3652477, at *16 ("But the factual premise of Defendants' argument is flawed.  '[D]istribution reports' issued on Form 10-D are not equivalent to 'earnings statement[s]' for the purposes of 15 U.S.C. § 77k(a)." (alterations in original)); N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., No. 08-5653, 2011 WL 3874821, at *7 (S.D.N.Y. Aug. 16, 2011)(Crotty, J.)("This is not a general exception and, in fact, suggests that if Congress wanted to make a generalized exception, it knows how to do so.").  Those courts' conclusions are consistent with the statute's language.  Courts generally construe exemptions from remedial statutes narrowly.  See Markowitz v. Ne. Land Co., 906 F.2d at 105.  "When Congress provides exceptions in a statute, it does not follow that courts have authority to create others.  The proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth."  United States v. Johnson, 529 U.S. 53, 58 (2000).  The Defendants are correct that issuers of asset-backed securities generally file distribution reports in lieu of quarterly reports.  See Asset-Backed Securities, supra, 70 Fed. Reg. at 1508.

Although these reports may, as the Defendants argue, be the functional equivalents for asset-backed securities issuers, that does not mean that they fall within this statutory exception.  An "earning statement" must consist of one, or any combination of, the following corporate reports: Forms 10-K, 10-Q, 8-K, 20-F, 40-F, 6-K, or in the annual report pursuant to Rule 14a-3 of the

-198-

Exchange Act. See 17 C.F.R. § 230.158(a)(2)(i)-(ii). These "corporate reports differ fundamentally from" these monthly filings that the Defendants have issued "because the disclosure required of operating companies is more rigorous than that required of mortgage-backed securities." Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc., 2011 WL 3652477, at *16. For example, there are a variety of reportable events on a Form 8-K that an issuer of asset-backed securities may omit that a corporation may not. See SEC, Form 8-K (2011), available at http://www.sec.gov/about/forms/form8-k.pdf. Likewise, when an asset-backed securities issuer chooses to file a Form 10-K, one of the forms that a corporation must file, they do not need to include information about: (i) Item 1 - their Business; (ii) Item 1A - Risk Factors related to the company and the investment; (iii) Item 2 - information regarding their Properties; (iv) Item 3 - Legal Proceedings; (v) Item 4 - Submission of Matters to a Vote of Security Holders; (vi) Item 5 - the Market for the Registrant's Common Equity and Related Stockholder Matters; (vii) Item 6 - Selected Financial Data regarding the company; (vii) Item 7 - the Management's Discussion and Analysis of Financial Condition and Results of Operations; (viii) Item 7A - Quantitative and Qualitative Disclosures About Market Risk; (ix) Item 8 - Financial Statements and Supplementary Data; and (x) various other items. See SEC, Form 10-K at 4 (2011), available at http://www.sec.gov/about/forms/form10-k.pdf. While some of this information appears on a Form 10-D, the form that an asset-backed securities issuer must file, many of those items that a 10-K requires are not required in a Form 10-D, such as 10-K Item 1, Item 1A, Item 6, Item 7, Item 7A, and Item 8. See SEC, Form 10-D, available at www.sec.gov/about/forms/form10-d.pdf.

Thus, there are significant differences between the information that a corporation must provide in comparison to an asset-backed securities issuer. Furthermore, it is not a courts' job, but Congress', to create new statutory exceptions. See United States v. Johnson, 529 U.S. at 58.

Likewise, courts should construe existing statutory exceptions within a remedial statute narrowly. Markowitz v. Ne. Land Co., 906 F.2d at 105.  The Court declines to adopt the argument that the forms which an asset-backed securities issuer files or makes public to investors are equivalent to the forms a corporation must file for purposes of rebutting the presumption of reliance under 15 U.S.C. § 77k(a).

## VI.    THE PLAINTIFFS HAVE STATED A CONTROL-PERSON CLAIM.

The Defendants raise several arguments regarding the Plaintiffs' control-person claims. First, they argue that a control-person claim is not appropriate without a primary violation by the Depositor Defendants under section 11 or 12(a)(2).  See Memorandum in Support of Joint Motion at 59.  This argument is now not persuasive, as the Court has already concluded that the Plaintiffs have stated a claim under section 11 and 12(a)(2) against the Depositor Defendants.  Second, the Defendants argue that the Plaintiffs' allegations regarding the Individual Defendants control are conclusory.  See Memorandum in Support of Joint Motion at 59-60.  Third, the Defendants argue that the Plaintiffs' allegations regarding RBS Securities control are also conclusory.  See Memorandum in Support of Joint Motion at 61.

To establish a defendant's liability as a control person, a plaintiff must prove two things: (i) a primary violation of the securities laws, and (ii) that the defendant had "control" over the primary violator.  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1107.  "The second element of the prima facie case [under section 20(a)] requires that the plaintiffs plead facts from which it can be reasonably be inferred that the individual defendants were control persons."  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (citing Maher v. Durango Metals, Inc., 144 F.3d at 1306).  "The Tenth Circuit observed that § 20(a) 'has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a controlling person liable.'"  Lane v. Page, 649 F.Supp.2d at 1306

-200-

(quoting Richardson v. MacArthur, 451 F.2d at 41).  The plaintiff must specify facts that "indicate the defendants had 'possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.'"  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1306).  See 17 C.F.R. § 230.405 ("The term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.").

In Adams v. Kinder-Morgan, Inc., the Tenth Circuit addressed whether certain individuals involved in Kinder-Morgan, Inc. qualified as control persons for the purposes of section 20(a) liability.  First, the Tenth Circuit held that the directors were not, ipso facto, control persons.

> We . . . conclude that the plaintiffs have failed to allege sufficient facts to support the conclusion that Kinder was a control person.  During the period in question, he was not an executive of the company, but simply a member of the board of directors.  The assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person within the meaning of the Exchange Act.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108.  On the other hand, being a significant executive with ultimate management authority is sufficient:

> [W]e conclude that the plaintiffs have pled facts supporting the allegation that [Defendant] Hall was a control person.  He was the Chairman, President, and CEO of Kinder-Morgan during the relevant period.  As President and CEO, Hall would have possessed the ultimate management authority of the corporation on a daily basis.  There were no managers higher than Hall.  He thus clearly possessed "the power to direct or cause the direction of the management and policies of [Kinder-Morgan]."  Hall also had direct control over McKenzie, his chief financial officer and an alleged primary violator of Rule 10b-5.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108.  A high-ranking position within the corporation,

however, standing alone, is unlikely to satisfy the "control" element of a control-person claim, unless the circumstance of the defendant's position and the nature of the underlying violation would lead to an inference that the person had control.  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109 (holding that the Chief Financial Officer of Kinder-Morgan, based solely on his position as CFO, was a control person where the securities-fraud violations related specifically to official reports on the company's financial performance).  Importantly, it is not necessary that the control person actively participate in the alleged fraudulent activity.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108.

## A.   THE PLAINTIFFS HAVE STATED A CONTROL-PERSON CLAIM AGAINST THE INDIVIDUAL DEFENDANTS.

With respect to the Individual Defendants, the Plaintiffs allege that they all: (i) made the decision to offer the certificates for sale to investors; (ii) drafted, revised and/or approved the offering documents; (iii) finalized the offering documents and caused them to become effective; (iv) conceived and planned the sale of the certificates and orchestrated all activities necessary to effect the sale of the certificates to the investing public, by issuing the certificates, promoting the certificates, and supervising their distribution and ultimate sale to investors; (v) participated in the preparation and dissemination of the false and misleading offering documents for their own benefit; (vi) by virtue of their positions were privy to and were provided with actual knowledge of the material facts concealed from the Plaintiffs and members of the class; and (vii) had the power and authority to cause, and did in fact cause, the Depositor Defendants to engage in the alleged wrongful conduct.  See Amended Complaint ¶¶ 112, 124, at 47-48, 51.  The Plaintiffs contend that the Individual Defendants are control persons by virtue of their control, ownership, offices, directorship, and specific acts.

With respect to each of the Individual Defendants, the Plaintiffs made the following allegations.  McGinnis was, at all relevant times, a Director and Principal Executive Officer of RBS Securities.  See Amended Complaint ¶ 29, at 15.  Mathis was, at all relevant times, the Principal Financial Officer and Principal Accounting Officer of GC Acceptance.  See Amended Complaint ¶ 30, at 15.  Walsh was, at all relevant times, a Director and Managing Director of RBS Securities.  See Amended Complaint ¶ 31, at 16.  Anderson was, at all relevant times, a Director and Managing Director of RBS Securities.  See Amended Complaint ¶ 32, at 16.  Esposito was, at all relevant times, a Director, Managing Director, General Counsel, and Secretary of RBS Securities.  See Amended Complaint ¶ 33, at 16.  Defendants McGinnis, Mathis, Walsh, Anderson, and Esposito signed the registration statements RBS Securities filed on January 11, 2006 (No. 333-130961) and January 29, 2007 (No. 333-140279), as amended.  See Amended Complaint ¶¶ 29-33, at 15-16.

Verschleiser was, at all relevant times, the Principal Executive Officer of SAMI II.  See Amended Complaint ¶ 34, at 16.  Nierenberg was, at all relevant times, the Principal Financial Officer and Principal Accounting Officer of SAMI II.  See Amended Complaint ¶ 35, at 16.  Mayer was, at all relevant times, a Director of SAMI II.  See Amended Complaint ¶ 36, at 16.  Marano was, at all relevant times, a Director of SAMI II.  See Amended Complaint ¶ 37, at 16.  Defendants Verschleiser, Nierenberg, Mayer, and Marano signed the Registration Statement filed by SAMI II on March 6, 2006 (No. 333-132232), as amended.  See Amended Complaint ¶¶ 34-37, at 16.

The Honorable John G. Koeltl, United States District Court Judge, in the Southern District of New York found the following allegations sufficient to state a claim against individual defendants:

> As discussed above, the plaintiff has successfully pleaded a primary violation by JPM Acceptance, consisting of the Offering Documents that went out over the Individual Defendants' signatures.  The plaintiff has alleged not only that the

> Individual Directors were officers or directors of JPM Acceptance, but also that they directly participated in the alleged primary violation: their signatures enabled JPM Acceptance's participation in the allegedly unlawful conduct. This is sufficient to sustain a control person claim at the motion to dismiss stage.

Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL 1796426, at *14. The Honorable Lewis A. Kaplan, United States District Court Judge, in the Southern District of New York found allegations regarding control-person liability against individual defendants sufficient when the complaint alleged that the individuals were "the company's officers or directors and signed the registration statements." In re Lehman Bros. Sec. & ERISA Litig., 684 F.Supp.2d at 492. A court in the Northern District of California found the following allegations sufficient to state a control-person claim against individual defendants: "Each of the Individual Defendants and Wells Fargo Bank had the power and influence, and exercised that power and influence, to cause the Depositor to engage in violations of the Securities Act." In re Wells Fargo Mortgage-Backed Certificates Litig., 712 F.Supp.2d at 972. At least one court, however, has taken a stricter view of the allegations required to sufficiently allege control-person liability:

> Plaintiffs simply allege the Individual Defendants were either officers or directors of WMAAC and that they signed the Registration Statements. Based on nothing more, Plaintiffs claim each of the Individual Defendants are control persons "by virtue of his or her control, ownership, offices, [or] directorship." Such allegations, alone, are insufficient to state a claim. First, making blanket allegations about the Individual Defendants makes no sense when the Defendants apparently held different positions. In other words, Plaintiffs should have substantiated their allegations about the Individual Defendants with individualized facts. Second, the allegations are entirely circular and couched as conclusions of law. Plaintiffs allege the Individual Defendants are control persons "by virtue of his or her control." This offers no factual content that would establish a plausible claim.

Boilermakers Nat'l Annuity Trust v. WaMu Mortg. Pass Through Certificates, Series AR1, 748 F.Supp.2d at 1257-58. The Defendants cite to no other cases that have required as detailed of allegations to state a control-person claim against individuals.

After assessing what various courts have required to state a control-person claim against individual defendants, the Court concludes that the allegations against the Individual Defendants are sufficient.   With respect to some of the Individual Defendants, the Plaintiffs have alleged that they were high-level corporate officials and not just directors.   The Plaintiffs have alleged that: (i) McGinnis was, at all relevant times, a Director and Principal Executive Officer of RBS Securities; (ii) Mathis was, at all relevant times, the Principal Financial Officer and Principal Accounting Officer of GC Acceptance; (iii)  Verschleiser was, at all relevant times, the Principal Executive Officer of SAMI II; and (iv) Nierenberg was, at all relevant times, the Principal Financial Officer and Principal Accounting Officer of SAMI II.   The nature of these individuals offices, particularly principal executive officers, may be sufficient to give these individuals the requisite control over the company.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108.  The Court will, however, not rely solely on that assumption and will look at the rest of the allegations against the Individual Defendants.  With respect to all the Individual Defendants, the Plaintiffs have pled that they: (i) were officers or directors; (ii) signed the respective registration statements; (iii) participated heavily in the drafting, dissemination, and approval of the false and misleading offering documents; (iv) made the decision to sell the certificates at issue; (v) were privy to the information not disclosed to the class; and (vi) had the power and authority to cause, and did in fact cause, the Depositor Defendants to engage in the alleged wrongful conduct.   Various courts have upheld similar allegations as stating a section 15 control-person claim against individual defendants.   Thus, the Court concludes that the Plaintiffs have adequately stated a section 15 claim against the Individual Defendants.

The Court does not find persuasive the Boilermakers National Annuity Trust v. WaMu Mortgage Pass Through Certificates, Series AR1 opinion on this issue.  Although section 15 claims

must satisfy the plausibility standard under <u>Ashcroft v. Iqbal</u>, they do not need to satisfy the particularity standard under rule 9(b) based on the Plaintiffs' strict liability and negligence allegations. See <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. at 313 ("Exacting pleading requirements are among the control measures Congress included in the PSLRA. The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter . . . ."); <u>Reese v. BP Exploration (Alaska) Inc.</u>, 643 F.3d at 690-91 (recognizing that <u>Ashcroft v. Iqbal</u>'s plausibility standard is different than rule 9(b)'s particularity standard). Furthermore, as the Tenth Circuit has stated:

> [T]he degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context: "Context matters in notice pleading. Fair notice under Rule 8(a)(2) depends on the type of case . . . ." A simple negligence action based on an automobile accident may require little more than the allegation that the defendant negligently struck the plaintiff with his car while crossing a particular highway on a specified date and time. The complaint in <u>Twombly</u> was inadequate because the plaintiff failed to plead any facts to show "contract, combination . . . or conspiracy, in restraint of trade" beyond a bare allegation of parallel conduct that could be explained as identical but independent action. Given that the complaint encompassed scenarios under which the defendants conspired to engage in parallel conduct and those in which they did not, the Court found that the likelihood that the plaintiff would be entitled to relief, even if all of the allegations were true, fell short.

<u>Robbins v. Oklahoma</u>, 519 F.3d at 1248 (citations omitted). The Court has already concluded that there are sufficient allegations that the Defendants engaged in securities violations by making material misrepresentations. Alleging a control-person claim, which is derivative of a primary violation, does not require the same level of specificity to put a defendant on notice to defend against the claim. See <u>Robbins v. Oklahoma</u>, 519 F.3d at 1248. Consequently, particularized allegations regarding each individual defendant are not required, although some factual allegations regarding each individual defendant are necessary. Pleading that each respective individual defendant has signed the respective registration is a specific factual allegation and not a legal conclusion.

Allegations regarding their involvement in a particular offering, even if alleged in general terms regarding all the officers and directors, are still factual allegations.  Furthermore, the pleadings in Boilermakers National Annuity Trust v. WaMu Mortgage Pass Through Certificates, Series AR1 were more circular than those in the present case, with the plaintiffs in that case alleging that the defendants were "control persons 'by virtue of his or her control.'"  Boilermakers National Annuity Trust v. WaMu Mortgage Pass Through Certificates, Series AR1, 748 F.Supp.2d at 1257-58.

Additionally, the Plaintiffs have alleged that the Individual Defendants had not only the power to exert control, but that they have done so.  See Lane v. Page, 649 F.Supp.2d at 1305-08 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1305; Richardson v. MacArthur, 451 F.2d at 41)(recognizing that control-person allegations can be sufficient under Tenth Circuit case law when the allegations support an inference that a person had the potential to exercise control, even if there are no allegations that they did in fact do so).  It would be difficult for the Plaintiffs to make a large number of individualized factual allegations regarding each officer or director's control over specific transactions without some discovery, as this information will not normally be available in public filings with the SEC.

### B.    THE PLAINTIFFS HAVE STATED A CONTROL-PERSON CLAIM AGAINST RBS SECURITIES.

With respect to RBS Securities, the Plaintiffs have made the following allegations.  RBS Securities controlled all aspects of the management and policies of Depositor Defendant GC Acceptance by virtue of the following: (i) RBS Securities created GC Acceptance as its special purpose entity ("SPE") for the certificates; (ii) revenue from the GC Acceptance's securitizations inured exclusively to RBS Securities' benefit; (iii) statements in RBS Securities' SEC filings show control through comprehensive involvement with GC Acceptance's operations; (iv) RBS Securities

directly participated in GC Acceptance's issuance of the certificates, including prominently featuring "Greenwich Capital Markets" on the front page of the offering documents for the 2006-3 offering; and (v) Individual Defendants from GC Acceptance at the same time served as high level executives at RBS Securities (then called GC Markets), including Chief Financial Officer and Managing Director Mathis, Manager, Director and Head of Consumer Finance McGinnis, and Managing Director Walsh.  See Amended Complaint ¶ 122, at 50.

Allegations that an entity was the parent corporation of a primary violator, standing alone, do not make out a claim of control.  See Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 93, 102 (2d Cir. 2001).  A corporate affiliation or a corporate-subsidiary relationship, without additional facts demonstrating a practical ability to direct the actions of the primary violator, do not make out a claim of control.  See N.J. Carpenters Health Fund v. Residential Capital, LLC, No. 08-8781, 2010 WL 1257528, at *7 (S.D.N.Y. Mar. 31 2010)(Baer, J.).  That an entity's name appears prominently on offering documents, "lending the investment the imprimatur of the larger corporation" is not alone "enough to establish control person liability."  Emps' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 2011 WL 1796426, at *14.  Some courts have looked for a "closer connection between" the two entities for the allegations "to survive a motion to dismiss."  Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc., No. 08-10841, 2010 U.S. Dist. LEXIS 127211, at *14-15 (S.D.N.Y. Dec. 1, 2010)(Rakoff, J.).

The Court notes that the Plaintiffs' allegations are similar to the allegations upheld in Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co., Inc.  See 2010 U.S. Dist. LEXIS 127211, at *14-15.  While the Defendants assert that the Plaintiffs only characterize RBS Securities as an affiliate of GC Acceptance, see Memorandum in Support of Joint Motion at 61, the allegations are more specific than the Defendants contend.  These allegations demonstrate that RBS

Securities had the practical ability to direct the actions of the primary violator, GC Acceptance.  See N.J. Carpenters Health Fund v. Residential Capital, LLC, 2010 WL 1257528, at *7.  The Plaintiffs point to significant overlap in the controlling executives and directors of each entity.  The Plaintiffs allege that RBS Securities created GC Acceptance and receives basically all of its revenue from securitizations.  They also point out that various SEC filings demonstrate that RBS Securities exercises significant control over GC Acceptance.  These allegations are sufficient to state a control-person claim against RBS Securities under section 15.

## VII.   THE PLAINTIFFS HAVE STATED A CLAIM AGAINST THE NON-RATING AGENCY DEFENDANTS UNDER THE NEW MEXICO SECURITIES ACT, BUT HAVE FAILED TO INCLUDE SUFFICIENT ALLEGATIONS TO TRIGGER THE JURISDICTIONAL PROVISIONS OF THAT ACT.

The Defendants argue that the Plaintiffs have not stated a claim under the New Mexico Securities Act.  First, they argue that the Plaintiffs have not alleged that they purchased certificates or were offered certificates in New Mexico.  See Memorandum in Support of Joint Motion at 62.  Second, they argue that, because the Plaintiffs have failed to successfully plead any actionable misrepresentations or omissions under federal securities law, they have failed to successfully plead any actionable misrepresentations or omissions under the New Mexico Securities Act.  See Memorandum in Support of Joint Motion at 63.  Third, they argue that the New Mexico Securities Act's two-year statute of limitations bars the Plaintiffs' claims.  See Memorandum in Support of Joint Motion at 63-64.

### A.   THE PLAINTIFFS HAVE NOT SUFFICIENTLY PLED THAT THEY PURCHASED CERTIFICATES OR WERE OFFERED CERTIFICATES IN NEW MEXICO.

The Defendants argue that, under comparable blue sky laws, courts "have repeatedly held that there must be some nexus between the sale or purchase and the state and not merely the security

and the state." Memorandum in Support of Joint Motion at 62 n.57.  The Defendants note that the New Mexico Securities Act's liability provisions apply only if: (i) an offer to sell is made in New Mexico; or (ii) an offer to purchase is made and accepted in New Mexico.  <u>See</u> Memorandum in Support of Joint Motion at 62.  They argue that the Court must dismiss the Plaintiffs' claims, because they contain no allegations to establish the required nexus to New Mexico.  <u>See</u> Memorandum in Support of Joint Motion at 62.  The Rating Agency Defendants also raise this same argument.  <u>See</u> Memorandum in Support of Rating Agency Defendants' Motion at 13-14.  Because both the Rating Agency Defendants and the other Defendants make the same arguments and cite to the same authority, the Court will address both of their arguments in this section.

The Plaintiffs counter that the New Mexico Securities Act does not require a plaintiff to plead these facts.  <u>See</u> Response to Joint Motion at 78.  They note that the New Mexico Securities Act applies to securities transactions "in the state."  Response to Joint Motion at 78.  They point out that the New Mexico Securities Act recognizes that "an offer to sell" is "made" in New Mexico, "whether or not either party is present in this state if the offer . . . originates in the state."  Response to Joint Motion at 78.  The Defendants respond in their Joint Reply that many of the Plaintiffs' allegations relate to these Thornburg Mortgage companies making loans as opposed to issuing securities.  <u>See</u> Joint Reply at 38.  The Rating Agency Defendants also contend that the Plaintiffs make no allegations that any companies from New Mexico sold or offered to sell the securities.  <u>See</u> Rating Agency Defendants' Reply at 9-10.  The Rating Agency Defendants raised an argument in their reply that the "radical expansion of the State Act that Plaintiffs seek runs afoul of the extraterritoriality principles of the Commerce Clause."  Rating Agency Defendants' Reply at 10.

The Honorable James A. Parker, United States District Judge for the United States District Court for the District of New Mexico, addressed the required pleading standards to establish that

a claim falls within the terms of the New Mexico Securities Act.  See Greene v. Horizon/CMS Healthcare Corp., No. 97-114, 1998 U.S. Dist. LEXIS 12254, at *23-24 (D.N.M. July 13, 1998)(Parker, J.).  Judge Parker found allegations that the defendant's "principal place of business is in New Mexico" and that "a substantial portion of its business including the 'acts and transactions complained of'" occurred in New Mexico sufficient to trigger the terms of the New Mexico Securities Act.  See Greene v. Horizon/CMS Healthcare Corp., 1998 U.S. Dist. LEXIS 12254, at *23-24.  The court concluded: "These allegations meet the requirements of Section 58-13B-54(C) regardless of where Plaintiffs reside.  The facts alleged by Plaintiffs indicate that the offer to sell likely originated in New Mexico and this is sufficient to defeat [the defendant's] Rule 12(b)(6) motion to dismiss."  Greene v. Horizon/CMS Healthcare Corp., 1998 U.S. Dist. LEXIS 12254, at *24.

In the Amended Complaint, the Plaintiffs allege that "[m]any of the acts and conduct complained of herein occurred in substantial part in this District."  Amended Complaint ¶ 16, at 12.  The Plaintiffs also allege that "TMST, formerly known as Thornburg Mortgage, Inc., and [Thornburg Mortgage Home Loans] were headquartered in New Mexico."  Amended Complaint ¶ 16, at 12.  The Plaintiffs allege that Thornburg Mortgage Home Loans "purchased and originated first lien residential mortgage loans primarily for securitization."  Amended Complaint ¶ 18, at 12.  The Amended Complaint also alleges that the Defendants "conduct business in this District."  Amended Complaint ¶ 16, at 12.  The Amended Complaint states that Thornburg Mortgage Home Loans acquired the loans contained in the Thornburg Trusts by originating the loans itself, through its correspondent lenders or through bulk purchases.  See Amended Complaint ¶¶ 46, 52, at 19, 22.  The Amended Complaint identifies five alleged issuers of the certificates at issue, the 2006-3 Thornburg Trust, the 2006-5 Thornburg Trust, the 2007-4 Thornburg Trust, GC Acceptance, and

-211-

RBS Securities.  See Amended Complaint ¶¶ 21-23, at 13-14.  The Amended Complaint notes that the Thornburg Trusts are statutory trusts formed under Delaware law.  See Amended Complaint ¶ 21, at 13.

The Court concludes that these allegations are not sufficient to create a plausible inference that an offer to sell securities originated in New Mexico.  While the Plaintiffs contend that Thornburg Mortgage Home Loans "purchased and originated first lien residential mortgage loans primarily for securitization," there are no allegations regarding the purchase or sale of securities by any party in New Mexico.  Amended Complaint ¶ 18, at 12.  There are several allegations relating that all of the Defendants conducted business in New Mexico, and that Thornburg Mortgage, Inc. and Thornburg Mortgage Home Loans had their headquarters in New Mexico.  See Amended Complaint ¶ 16, at 12.  These two entities are not Defendants in the case, however, because of their bankruptcy filings.  See Amended Complaint ¶ 18, at 12.  Unlike the situation in Greene v. Horizon/CMS Healthcare Corp., where the plaintiffs alleged that the issuer of securities was headquartered in New Mexico, there are no comparable allegations regarding the issuer of the securities in this case.  Thus, the Court cannot conclude that the allegations in the Amended Complaint create a plausible inference that an offer to sell securities originated in New Mexico.

The Rating Agency Defendants did not raise their Commerce Clause argument until they filed their reply brief.  See Rating Agency Defendants' Reply at 10.[39]  The Rating Agency Defendants argue in their reply that the "radical expansion of the State Act that Plaintiffs seek runs afoul of the extraterritoriality principles of the Commerce Clause."  Rating Agency Defendants' Reply at 10.  While this argument would likely be waived, a court should also avoid deciding

---

[39]"[A]rguments raised for the first time in a reply brief are generally deemed waived." United States v. Harrell, 642 F.3d 907, 918 (10th Cir. 2011).

constitutional issues if it can reach a decision on alternate grounds.  See ANR Pipeline Co. v. Lafaver, 150 F.3d 1178, 1186 n.8 (10th Cir.1998).  Because the Court concludes that the allegations regarding whether an offer to sell occurred in New Mexico are deficient, the Court does not reach this Commerce Clause argument.

Consequently, the Court will grant the Joint Motion and the Rating Agency Defendants' Motion on the issue whether the Plaintiffs adequately alleged that their claims satisfy the jurisdictional terms of the New Mexico Securities Act.  To properly state a claim, the Plaintiffs are required to: (i) allege sufficient factual allegations to support a plausible inference that an offer to sell likely originated in New Mexico; or (ii) plead that the offer to sell originated in New Mexico along with sufficient factual allegations that in this context would put the Defendants on fair notice of the New Mexico Securities Act claims against them as discussed in Robbins v. Oklahoma. See 519 F.3d at 1248.  To seek amendment to cure these deficiencies, the Plaintiffs must file a motion with their proposed amended complaint attached to that motion.  The Plaintiffs must bold the newly added facts in the proposed amended complaint to distinguish them from facts contained in the Amended Complaint.  In the motion, the Plaintiffs should set forth their new facts -- facts that the Court did not previously have before it -- which, if the Court had known the facts, would have changed the outcome of the motion.  The Plaintiffs should also address precisely how these new facts would have changed the Court's conclusions.

**B.     THE PLAINTIFFS HAVE SUFFICIENTLY ALLEGED SOME MATERIAL MISREPRESENTATIONS OR OMISSIONS AS WELL AS COGNIZABLE ECONOMIC LOSS UNDER THE NEW MEXICO SECURITIES ACT.**

The Defendants argue that, because the Plaintiffs have failed to successfully plead any actionable misrepresentations or omissions under federal securities law, they have failed to successfully plead any actionable misrepresentations or omissions under the New Mexico Securities

Act. See Memorandum in Support of Joint Motion at 63. They point to authority where courts have found that insufficient material misrepresentation allegations under federal securities law also constituted insufficient materiality allegations under the New Mexico Securities Act. The Defendants do not argue that the New Mexico Securities Act requires higher pleading standards than federal securities law. The Plaintiffs have not argued that the pleading standards under the New Mexico Securities Act are different than under federal securities law. The Defendants also assert, based on their previous arguments regarding cognizable economic loss, that the Plaintiffs have not suffered an injury giving them standing to assert a claim under the New Mexico Securities Act. Because the Court has already concluded that the Plaintiffs have suffered a cognizable economic loss and because Article III standing requirements apply to all claims asserted in federal court, the Court rejects this cognizable economic loss argument.

New Mexico courts often look to federal securities law when interpreting the New Mexico Securities Act. See N.M. Life Ins. Guar. Ass'n v. Quinn & Co., Inc., 111 N.M. at 755 n.5, 809 P.2d at 1283 n.5 ("For that reason, we are inclined to look to the long line of federal authority on the subject."). Applying this principle, one judge in the United States District Court for the District of Connecticut held that, because the plaintiffs failed to state a claim under federal securities law, it could grant summary judgment on their New Mexico Securities Act claims which substantially paralleled the federal securities claims. See Freedman v. Value Health, Inc. 135 F.Supp.2d at 339 n.8.

Likewise, the Court has already concluded that the Plaintiffs have adequately alleged some material misrepresentation claims under federal securities law, although the Court has also found some of those material misrepresentation allegations to be insufficient. Consequently, the Court will grant and deny the Joint Motion with respect to the New Mexico Securities Act claims in the same

manner it granted and denied the Joint Motion with respect to the material misrepresentation arguments the Defendants have raised under federal securities law.  Because the Plaintiffs have requested leave to amend, the Court will grant the Plaintiffs leave to amend their Amended Complaint.  See Response to Joint Motion at 81 n.40.  To seek amendment to cure these deficiencies, the Plaintiffs must file a motion with their proposed amended complaint attached to that motion.  The Plaintiffs must bold the newly added facts in the proposed amended complaint to distinguish them from facts contained in the Amended Complaint.  In the motion, the Plaintiffs should set forth their new facts -- facts that the Court did not previously have before it -- which, if the Court had known the facts, would have changed the outcome of the motion.  The Plaintiffs should also address precisely how these new facts would have changed the Court's conclusions.

C.    **THE PLAINTIFFS' CLAIMS RELATING TO THE 2006-3 AND 2006-5 OFFERINGS ARE NOT TIME-BARRED UNDER THE NEW MEXICO SECURITIES ACT.**

The Defendants argue that the Plaintiffs' claims relating to the 2006-3 and 2006-5 offerings are time-barred under the New Mexico Securities Act's two-year statute of limitations.  See Memorandum in Support of Joint Motion at 63.  The Defendants rely on their same arguments regarding the Plaintiffs' having inquiry notice under federal securities law within one year of the filing of the respective complaints.  See Memorandum in Support of Joint Motion at 63. Specifically, they contend that these claims are time-barred "if they discovered or should have discovered through reasonable diligence the alleged misstatements or omissions at issue before December 10, 2008."  Memorandum in Support of Joint Motion at 64.

Section 58-13B-41 provides:

No person may sue under [section 58-13B-40] of the New Mexico Securities Act of 1986 unless suit is brought:

-215-

A.    within two years after the discovery of the violation or after discovery should have been made by the exercise of reasonable diligence; and

B.    within five years after the act or transaction constituting the violation.

N.M.S.A. 1978, § 58-13B-41.  In comparison, section 13 of the Securities Act provides:

No action shall be maintained to enforce any liability created under section 77k or 77*l*(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77*l*(a)(1) of this title, unless brought within one year after the violation upon which it is based.  In no event shall any such action be brought to enforce a liability created under section 77k or 77*l*(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77*l*(a)(2) of this title more than three years after the sale.

15 U.S.C. § 77m.  As the Supreme Court of New Mexico has noted: "In applying the inquiry notice rule, 'each case must be governed by its own peculiar circumstances.'"  City of Rio Rancho v. Amrep Sw. Inc., Nos. 32,846, 32,489, 2011 WL 4375312, at *6 (Aug. 22, 2011).  When discussing inquiry notice, the Court of Appeals of New Mexico stated: "Under this standard, Plaintiffs had an obligation to inquire as to facts that would indicate they had a claim if the publicity reached a level that would objectively make a reasonable person inquire as to the presence of a claim."  Williams v. Stewart, 137 N.M. 420, 425, 112 P.3d 281, 286 (Ct. App. 2005).  "Historically, the courts of [New Mexico] have characterized the application of the discovery rule as a jury question, particularly when conflicting inferences may be drawn."  Williams v. Stewart, 137 N.M. at 425, 112 P.3d at 286 (gathering authority).  Much like federal law, New Mexico courts have demonstrated an unwillingness to resolve inquiry notice issues at the stage of a motion to dismiss, as New Mexico courts "have characterized the application of the discovery rule as a jury question, particularly when conflicting inferences may be drawn."  Williams v. Stewart, 137 N.M. at 425, 112 P.3d at 286.

As the Court held earlier in this opinion, the applicable date from which to calculate the

Plaintiffs' knowledge, or a reasonable investor's knowledge, of the facts underlying their claims as measured by the applicable statute of limitations is from the date of filing the Original Complaint, February 27, 2009.  Furthermore, the applicable two-year statute of limitations under the New Mexico Securities Act is more lenient than the Securities Act's section 13 statute of limitations, which is only one year.  Both statutes of limitations rely on an inquiry notice standard, and impose an absolute statute of repose, five years under the New Mexico Securities Act and three years under the Securities Act.  Federal law controls under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), on procedural matters when a court decides state-law issues on a 12(b)(6) motion to dismiss.  Given that the Court earlier concluded that the Defendants' evidence did not as a matter of law put the Plaintiffs on inquiry notice of their claims under federal securities law, and that the New Mexico Securities Act's statute of limitations is more lenient than its federal counterpart, the Court also concludes that the Plaintiffs' claims are not time-barred under the New Mexico Securities Act.

## VIII.   THE COURT WILL NOT DISMISS MIDWEST OPERATING'S CLAIMS REGARDING THE 2006-5 OFFERING FOR LACK OF CAUSATION.

In its Joinder in Motion, BA Securities argues that Midwest Operating's losses related to the 2006-5 offering could not have stemmed from any alleged misrepresentation or omission.  See Joinder in Motion at 6.  BA Securities argues that the "Amended Complaint pins Plaintiffs' losses solely on ratings downgrades causing the Certificates' secondary market value to decline."  Joinder in Motion at 6.  BA Securities contends that "Midwest Operating bought and sold its 2006-5 certificates months before any rating downgrade, and the Amended Complaint contains no other non-conclusory allegation of a corrective disclosure that caused Midwest Operating's alleged loss on the 2006-5 Certificates."  Joinder in Motion at 6.  BA Securities argues that, as a result, loss causation is apparent on the face of the Amended Complaint, and that the Court must dismiss

Midwest Operating's claims related to the 2006-5 offering.  See Joinder in Motion at 6.  BA

Securities cites to the certification Midwest Operating filed with the Court.  See Joinder in Motion

to Dismiss at 6 (citing Midwest Operating Certification).

BA Securities asks the Court to consider the certification Midwest Operating filed with the

Court to assess its affirmative defense.  As one court has stated:

> Sections 11(e) and 12(b) of the Securities Act provide that it is an affirmative
> defense to a Section 11 or 12(a)(2) claim, respectively, if the defendant "proves that
> any portion or all of the amount" of damages otherwise recoverable by the plaintiff
> "represents other than the depreciation in value of the subject security resulting
> from" the material misstatement or omission in the registration statement or
> prospectus.

In re Britannia Bulk Holdings Inc. Sec. Litig., 665 F.Supp.2d at 418 (citing 15 U.S.C. § 77*l*(b); 15

U.S.C. § 77k(e)).  When a defendant's motion to dismiss raises an affirmative defense that is not

apparent on the face of the pleadings and outside evidence is presented and accepted by the court,

federal courts will generally treat the motion as if it were one for summary judgment.  See Weise

v. Casper, 507 F.3d 1260, 1267 (10th Cir. 2007).  "The nature of a Rule 12(b)(6) motion tests the

sufficiency of the allegations within the four corners of the complaint after taking those allegations

as true."  Mobley v. McCormick, 40 F.3d at 340.  The sufficiency of a complaint is a question of

law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all

well-pleaded factual allegations in the complaint, view those allegations in the light most favorable

to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs,

Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; Moore v. Guthrie, 438 F.3d at 1039; Hous.

Auth. of Kaw Tribe v. City of Ponca, 952 F.2d at 1187.

While the Court could properly consider Midwest Operating's certification as the Plaintiffs

reference it in their Amended Complaint, BA Securities asks the Court to consider when the ratings

downgrades occurred in deciding this issue.  <u>See</u> Joinder in Motion at 6 ("But Midwest Operating

bought and sold its 2006-5 Certificates <u>months before</u> any rating downgrade . . . ." (emphasis in

original)).  The Amended Complaint does not reference when these rating downgrades occurred or

reference any specific document that contains the Rating Agency Defendants' downgrades.  BA

Securities argues that it can prevail on an affirmative defense of absence of loss causation, because

the Plaintiffs only allege that they suffered losses based on the rating downgrades causing a drop

in the secondary market value of the certificates.  <u>See</u> Joinder in Motion at 6.  Midwest Operating

Certification's does not anywhere mention any ratings downgrades, although it indicates when

Midwest Operating bought and sold the respective certificates.  <u>See</u> Midwest Operating Certification

at 4-8.  The 2006-5 Prospectus Supplement likewise only lists the initial credit rating for the

securities Midwest Operating purchased -- not any information about a subsequent rating

downgrade.  <u>See</u> 2006-5 Prospectus Supplement at 3.  The Amended Complaint does not itself refer

to when these downgrades occurred or reference any documents that would indicate when these

downgrades occurred.  BA Securities has directed the Court to no other documents that contain this

information.  Consequently, the Court cannot address BA Securities argument without knowing

when the rating downgrades occurred.  The Court would have to consider other evidence outside the

pleadings to assess the viability of BA Securities causation defense.  While BA Securities has not

presented to the Court sufficient information to make this determination when the rating downgrades

occurred, the Court could not take judicial notice of evidence outside the Amended Complaint, other

than documents referenced in the Amended Complaint, regarding these credit downgrades for the

truth of the matters asserted therein.  <u>See</u> <u>Tal v. Hogan</u>, 453 F.3d at 1265 n.24.  Otherwise, the Court

would improperly convert the motion to dismiss into a motion for summary judgment.  <u>See</u> <u>Weise</u>

<u>v. Casper</u>, 507 F.3d at 1267.  Thus, the Court denies this aspect of the Joint Motion and rejects this

argument in the Joinder in Motion regarding this affirmative defense of lack of loss causation.

IX.    **THE APPLICABLE CIVIL LIABILITY PROVISIONS OF THE NEW MEXICO SECURITIES ACT DO NOT BY THEIR TERMS PRECLUDE A SUIT AGAINST THE RATING AGENCY DEFENDANTS.**

The Rating Agency Defendants argue that the terms of the New Mexico Securities Act expressly limit its application to "'person[s] who sell[] or offer[] to sell a security' (or, under certain circumstances, purchasers of securities)" as specified in the New Mexico Securities Act's section 58-13B-54.  Memorandum in Support of Rating Agency Defendants' Motion to Dismiss at 14.  The Rating Agency Defendants conclude that, because they "neither sold (or offered to sell) the Certificates at issue in this case," they cannot incur liability under the New Mexico Securities Act. See Memorandum in Support of Rating Agency Defendants' Motion to Dismiss at 14.  The Rating Agency Defendants assert that there are no allegations in the Amended Complaint that they sold or offered to sell securities within the definition of the act.  See Memorandum in Support of Rating Agency Defendants' Motion to Dismiss at 15-16.  The Rating Agency Defendants also note that no New Mexico court has ever extended liability under the New Mexico Securities Act to this degree. Memorandum in Support of Rating Agency Defendants' Motion to Dismiss at 16-17.  In support of their argument, the Rating Agency Defendants point to authority interpreting sections 11 and 12(a)(2) under federal law that have found that rating agencies were not sellers or underwriters. See Memorandum in Support of Rating Agency Defendants' Motion to Dismiss at 17-18 & n.7.

The Plaintiffs counter that the terms of the New Mexico Securities Act undermine the Rating Agency Defendants' argument.  They point out that the provisions which the Rating Agency Defendants argue preclude them from liability under the New Mexico Securities Act address a different issue.  Specifically, they argue that these provisions address where the unlawful conduct must occur to trigger the terms of the act while separate provisions address who may be liable under

-220-

the act.  See Response to Rating Agency Defendants' Motion at 12-13.  Analyzing the text of section 58-13B-30, the Plaintiffs argue that the language regarding liability under the New Mexico Securities Act does not contain the qualifiers that the Defendants contend exist.  See Response to Rating Agency Defendants' Motion at 13.  The Plaintiffs also point to some applicable comments from the Uniform Securities Act that address who may be liable under the parallel provision of the Uniform Securities Act, which the New Mexico Legislature largely adopted.  See Response to Rating Agency Defendants' Motion at 13.  The Plaintiffs also note that section 12(a)(2) cases are not persuasive on this issue, because the federal statute's language differs significantly from the applicable provision in the New Mexico Securities Act.  See Response to Rating Agency Defendants' Motion at 14 n.7.

A court's central concern in construing a particular statute "is to determine and give effect to the intent of the legislature," State ex rel. Klineline v. Blackhurst, 106 N.M. 732, 735, 749 P.2d 1111, 1114 (1988)(citation omitted), "using the plain language of the statute as the primary indicator of its intent," City of Santa Fe v. Travelers Cas. & Sur. Co., 147 N.M. 699, 702, 228 P.3d 483, 486 (2010).[40]  Courts give "the words used in the statute their ordinary meaning unless the legislature indicates a different intent." State ex rel. Klineline v. Blackhurst, 106 N.M. at 735, 749 P.2d at 1114 (citation omitted).  Courts "construe the entire statute as a whole so that all the provisions will be considered in relation to one another." Regents of Univ. of N.M. v. N.M. Fed'n of Teachers, 125

---

[40] Because the federal court is applying New Mexico law, it must apply state law as faithfully as a lower state court in New Mexico would.  Accordingly, the Court should apply the rules of statutory construction that New Mexico state courts apply, to the extent that federal and state rules of construction differ.  See United States v. Ruiz, 589 F.3d 1310, 1313 (10th Cir. 2009)("When the highest [state] court . . . has not interpreted a particular state statutory provision, . . . a federal court must examine state appellate court opinions and other authorities to predict how the [highest] court would interpret [that particular provision].  In doing so, a federal court must follow state rules of statutory construction." (citations omitted)(internal quotation marks omitted)).

N.M. 401, 411, 962 P.2d 1236, 1246 (1998)(citing N.M. Pharm. Ass'n v. State, 106 N.M. 73, 738 P.2d 1318 (1987)).   A court must construe a statute "so that no part of the statute is rendered surplusage or superfluous."   In re Rehabilitation of W. Investors Life Ins. Co., 100 N.M. 370, 373, 671 P.2d 31, 34 (1983)(citations omitted).   New Mexico courts will not, however, "read into a statute or ordinance language which is not there, particularly if it makes sense as written."   Regents of Univ. of N.M. v. N.M. Fed'n of Teachers, 125 N.M. at 411, 962 P.2d at 1246 (quoting Burroughs v. Bd. of Cnty. Comm'rs of Bernalillo Cnty., 88 N.M. 303, 306, 540 P.2d 233, 236 (1975))(internal quotation marks omitted).   New Mexico courts also will "not depart from the plain wording of a statute, unless it is necessary to resolve an ambiguity, correct a mistake or an absurdity that the Legislature could not have intended, or to deal with an irreconcilable conflict among statutory provisions."   Regents of Univ. of N.M. v. N.M. Fed'n of Teachers, 125 N.M. at  411, 962 P.2d at 1246 (citation omitted).   When interpreting a statute, a court may consider "a settled judicial construction in another jurisdiction as of the time a statute or rule is borrowed from the other jurisdiction," or "a judicial construction of the same or similar statute or rule of this or another state." N.M.S.A. 1978, § 12-2A-20(B)(1)-(2).   Accord Corum v. Roswell Senior Living, LLC, 149 N.M. 287, 248 P.3d 329, 331-32 (Ct. App. 2010).

"The New Mexico Securities Act, although containing some variations, is patterned after the Uniform Securities Act" approved in 1985 "by the National Conference of Commissioners on Uniform State Laws."   State v. Ramos, 116 N.M. at 126, 860 P.2d at 768.   Thus, a New Mexico court would find interpretations of the Uniform Securities Act persuasive.   See N.M.S.A. 1978, § 12-2A-20(B)(1)-(2); Corum v. Roswell Senior Living, LLC, 149 N.M. 287, 248 P.3d at 331-32. The analogous provision to the New Mexico Securities Act's section 58-13B-30, the provision that sets out the general prohibition on securities fraud, is section 501 of the Uniform Securities Act.

Compare N.M.S.A. 1978, § 58-13B-30, with Unif. Sec. Act § 501 (amended 1988).[41] The applicable comment to this section recognizes: "Section 501 is substantially the same as Rule 10b-5 under the Securities Exchange Act of 1934. It broadly applies to the activities of any person 'in connection with the offer to sell, sale, offer to purchase, or purchase of a security.' There are no exceptions or exclusions." Unif. Sec. Act § 501 cmt. 1. The analogous provision to the New Mexico Securities Act's section 58-13B-54, the provision that defines the scope of the act, is section 801 of the Uniform Securities Act. Compare N.M.S.A. 1978, § 58-13B-54, with Unif. Sec. Act § 801 (amended 1988). The applicable comment to this provision states:

> This section defines the application of the Act in multistate or international transactions where only some of the elements occur in this State. It is not limited in its impact to the civil liability provisions of Section 605. It does determine the scope of the Act for all types of proceedings -- administrative, civil, and criminal. The law is well settled that a person may violate the law of a particular state without ever being within the state or performing within the state every act necessary to complete the violations of law.

Unif. Sec. Act § 801 cmt. 1. No other comment expressly addresses how this provision affects the other provisions regarding civil liability.[42]

After considering the applicable comments from the Uniform Securities Act and looking at the New Mexico Securities Act as a whole, the Court finds that the Plaintiffs' interpretation of the New Mexico Securities Act is more persuasive. No provision in the New Mexico Securities Act

---

[41]The American Law Institute most recently amended the Uniform Securities Act in 2002. See Unif. Sec. Act. § 501 (amended 2002). There are no substantive changes to the amended version of section 501 that would affect its interpretation.

[42]The second comment provides some factual illustrations of when certain conduct and transactions would trigger the jurisdictional provisions of the Uniform Securities Act. See Unif. Sec. Act § 801 cmt. 2. The third comment addresses how the provisions of this section apply differently to defendants who are buyers as opposed to sellers, but that comment does not impact the issues in this case. See Unif. Sec. Act § 801 cmt. 3.

comprehensively deals with multistate, international, and extraterritorial issues as they relate to the elements of civil liability under the act besides section 58-13B-54.  The applicable comment from the Uniform Securities Act indicates that the Uniform Act's drafters intended this provision, section 801, to have the effect of defining multistate, international, and extraterritorial jurisdiction, and not to otherwise define who is liable under the New Mexico Securities.  See Unif. Sec. Act § 801 cmt. 1.  Likewise, section 58-13B-2 defines many of the terms in section 58-13B-54, such as offer to sell and offer to purchase, which indicates that section 58-13B-54 does not provide a general definition of these terms that would alter or limit those terms throughout the statute.  See N.M.S.A. 1978, §§ 58-13B-2(T), 58-13B-54.  Section 58-13B-54 impacts only those terms as they relate to the multistate, international, and extraterritorial issues raised in civil liability actions.  See N.M.S.A. 1978, §§ 58-13B-2(T), 58-13B-54.  Furthermore, the use of broad language from the federal rule 10b-5 in section 58-13B-30, one of the provisions that sets out the elements for a civil cause of action under the New Mexico Securities Act, indicates that the New Mexico Legislature intended that the provision apply "broadly . . . to the activities of any person 'in connection with the offer to sell, sale, offer to purchase, or purchase of a security'" with "no exceptions or exclusions."  Unif. Sec. Act § 501 cmt. 1.  Along the same lines, section 58-13B-40, the provision expressly governing the imposition of civil liability under section 58-13B-30, contains no other language indicating limits on who may be liable under the New Mexico Securities Act that would support the Rating Agency Defendants' argument.  See N.M.S.A. 1978, §§ 58-13B-40(A).  Accordingly, the Court declines to adopt the Rating Agency Defendants' argument that the New Mexico Securities Act does not authorize the imposition of liability against them.

The Rating Agency Defendants' citations to federal authority regarding Securities Act section 11 and 12(a) are not persuasive.  Those statutes contain significantly different language than

the applicable provision of the New Mexico Securities Act.  As the Court has already discussed, rule 10b-5 contains almost identical language to New Mexico Securities Act section 58-13B-30. Accordingly, the Court concludes that this authority concerning section 11 and 12(a) is distinguishable.

## X.    THE PLAINTIFFS HAVE PLED ACTIONABLE MISREPRESENTATIONS OR OMISSIONS AGAINST S&P, BUT NOT AGAINST FITCH OR MOODY'S.

The credit ratings are opinions and not statements of fact.  The First Amendment does not protect the Rating Agency Defendants from liability for their credit ratings.  The Plaintiffs have pled sufficient factual allegations with respect to their material misrepresentation claims against S&P, but not against Fitch or Moody's.

### A.    THE RATING AGENCY DEFENDANTS' CREDIT RATINGS ARE OPINIONS, AND NOT STATEMENTS OF FACT.

The Rating Agency Defendants contend that their credit ratings are opinions that are only actionable if they did not believe the ratings when they gave them.  See Memorandum in Support of Rating Agency Defendants' Motion at 19-21.  They point to various cases that have recognized that credit ratings are opinions.

The Plaintiffs argue that the Rating Agency Defendants' credit ratings are not opinions but are instead facts.  See Response to Rating Agency Defendants' Motion at 15-21.  The Plaintiffs contend that the Court should consider their allegations in their entirety.   See Response to Rating Agency Defendants' Motion at 16-17.  The Plaintiffs contend that their allegations relate to various facts the Rating Agency Defendants did not disclose regarding their lack of belief in their own ratings, as opposed to the Rating Agency Defendants reaching inaccurate conclusions regarding their ratings.  See Response to Rating Agency Defendants' Motion at 18.

As the First Circuit has noted, investment "ratings are opinions purportedly expressing the

agencies' professional judgment about the value and prospects of the certificates." <u>Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.</u>, 632 F.3d at 775 (emphasis omitted). "An opinion may still be misleading if it does not represent the actual belief of the person expressing the opinion, lacks any basis or knowingly omits undisclosed facts tending seriously to undermine the accuracy of the statement." <u>Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.</u>, 632 F.3d at 775.  While the Plaintiffs are correct that opinions can contain implied assertions of fact, it does not follow that the statements are not still opinions. <u>See</u> <u>Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.</u>, 175 F.3d 848, 850-856 (10th Cir. 1999)(analyzing a credit rating from a rating agency as an opinion that may contain implied assertions of fact rather than as a statement of fact).

The Plaintiffs have alleged that the Rating Agency Defendants have "made untrue statements of material fact or failed to state material facts necessary to make their statements not misleading in connection with the offer and sale of the Certificates."  Amended Complaint ¶ 130, at 51.  They then allege that the "Rating Agency Defendants . . . issued investment grade (including Triple-A) ratings on Certificates, which ratings were untrue and misleading in that the Certificates were not nearly as safe as represented by such ratings."  Amended Complaint ¶ 130, at 51.  They do not allege that the Rating Agency Defendants made any other statements in the offering documents, but do contend that these ratings were misleading based on the failure to disclose a variety of other facts. Thus, the Plaintiffs only point to the opinions that the rating agencies gave, their credit ratings, not any statements of facts that the Rating Agency Defendants made.

Many of the authorities the Plaintiffs cite are distinguishable.  In one of those opinions, Moody's was the actual issuer of securities and had given a variety of reports relating to the securities at issue. <u>See</u> <u>In re Moody's Corp. Sec. Litig.</u>, 599 F.Supp.2d 493, 499, 507-09 (S.D.N.Y.

2009)(Kram, J.)(recognizing that the class in the case included those "who acquired securities issued by Moody's from February 3, 2006 to October 24, 2007").  Furthermore, some of these decisions determine that a rating agency's credit ratings are opinions.  See In re Nat'l Century Fin. Enters., Inc., Inv. Litig., 580 F.Supp.2d 630, 639 (S.D. Ohio 2008).  Some courts, however, have held that credit ratings are not opinions.  See, e.g., In re Taxable Mun. Bond Sec. Litig., MDL No. 863, 1993 WL 591418, at *5 (E.D. La. Dec. 29, 1993); First Fin. Sav. Bank, Inc. v. Amer. Bankers Ins. Co. of Fla., Inc., Nos. 88-33, 88-148, 88-149, 88-151, 88-153, 88-534, 88-536, 1989 WL 168015, at *5 (E.D.N.C. Aug. 4, 1989), vacated in part 1991 WL 173055 (E.D.N.C. June 14, 1991).

The Tenth Circuit's authority is clear enough on this issue that the Court concludes that the Tenth Circuit would find that these credit ratings are opinions.  See Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc., 175 F.3d at 850-856.  In Jefferson County School District No. R-1 v. Moody's Investor's Services, Inc., the Tenth Circuit concluded that a credit rating giving a negative outlook on a school's bonds was an opinion.  See 175 F.3d at 850-56.  The Court finds no material distinction between the credit rating at issue in that case and the ones at issue in this case, as both involve a recommendation whether to buy a particular investment.  Furthermore, many courts that have thoughtfully considered the issue, including the First Circuit, have concluded that credit ratings are opinions.  See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d at 775.  As the First Circuit explained:

> Although these ratings are based to some degree on objective facts, they ultimately convey an opinion about a stock's prospects and, perhaps, about the likely proclivities of the stock market over a given period.  Armed with the same background facts, two knowledgeable analysts, each acting in the utmost good faith, could well assign different ratings to the same stock.  Moreover, ratings are unlike the statements sued upon in an archetypical section 10(b) action because they rest upon outsiders' views about a corporation rather than upon a corporate insider's factual assertions regarding his or her own company.  Most ratings are, therefore, best understood as statements of opinion, not as unadulterated statements of

-227-

objective fact.

Credit Suisse First Boston Corp., 431 F.3d 36, 47 (1st Cir. 2005), overruled on other grounds by

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007).  In comparison, the district court

in  First Financial Savings Bank, Inc. v. American Bankers Insurance Co. of Florida., Inc provided

no explanation why it concluded that credit ratings are statements of fact rather than opinions.  See

1989 WL 168015, at *5.  The Court finds that the First Circuit's approach more persuasive.  Credit

ratings are such that different analysts could reach different conclusions based on the same set of

facts, thus making the ratings subjective.  Furthermore, credit ratings are predictive in nature

regarding the future performance of an investment.  While a credit rating is based -- at least in part --

on objective facts, most opinions are based at least in part on objective facts, such as the statement

of a corporate official regarding the future performance of a company.  See Va. Bankshares, Inc. v.

Sandberg, 501 U.S. at 1092-93.  Consequently, the Court concludes that these credit ratings are

opinions.[43]

### B.   THE FIRST AMENDMENT DOES NOT PROTECT THE RATING AGENCY DEFENDANTS' OPINIONS.

The Court addresses this issue regarding the First Amendment in a different order than the

Rating Agency Defendants have presented their arguments.  While a court should avoid deciding

constitutional issues whenever possible, see ANR Pipeline Co. v. Lafaver, 150 F.3d at 1186 n.8, the

constitutional issues in this case potentially affect the pleading requirements that the Plaintiffs must

satisfy to state a claim against the Rating Agency Defendants.  Thus, the Court will consider the

First Amendment argument before addressing the required pleading standards and the Plaintiffs'

---

[43]The non-Rating Agency Defendants' statement of the Rating Agency Defendants' credit ratings in the offering documents is a statement of fact by the non-Rating Agency Defendants, but the Plaintiffs do not contend that the non-Rating Agency Defendants misstated the ratings.

material misrepresentation allegations.

The Rating Agency Defendants argue that their credit ratings are protected opinions under the First Amendment.  First, they argue that their credit ratings are not provably false, and thus not actionable because of First Amendment protections.  <u>See</u> Memorandum in Support of Rating Agency Defendants' Motion at 32.  Alternatively, the Rating Agency Defendants argue that the Plaintiffs have failed to allege that they issued their ratings with actual malice as required by the First Amendment.  <u>See</u> Memorandum in Support of Rating Agency Defendants' Motion at 32-34. The Rating Agency Defendants contend that credit ratings are opinions about the future that, by their nature, are not capable of being proven true or false.  <u>See</u> Memorandum in Support of Rating Agency Defendants' Motion at 32.  Thus, the Defendants conclude that the credit ratings are entitled to full First Amendment protection and are not actionable.

The Supreme Court has recognized that there is no "separate constitutional privilege for 'opinion[s].'"  <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 21 (1990).  Opinions can contain implied assertions of fact which can make those opinions actionable.  <u>See</u> <u>Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.</u>, 175 F.3d at 852-53.  Even though opinions can contain implied assertions of fact, courts still treat the opinion as an opinion for the purposes of determining whether the statement is actionable or entitled to First Amendment protection.  <u>See</u> <u>Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.</u>, 175 F.3d at 852-53.  When First Amendment protections apply because the opinion relates to a matter of public concern, an opinion can only be actionable when it is "sufficiently factual to be susceptible of being proved true or false."  <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. at 19-21.  For instance, an opinion may be "too indefinite to be proven true or false."  <u>Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.</u>, 175 F.3d at 853.

In assessing whether an article issued by a credit rating agency was actionable under the above standards in the context of a defamation claim, the Tenth Circuit asked "whether a reasonable factfinder could conclude that [the rating agency's] article implied a false assertion of fact about the [plaintiff's] financial condition." Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc., 175 F.3d at 855. To make that determination, the Tenth Circuit examined "the allegedly false statements that the [plaintiff] maintains were implied by the [rating agency's] article." Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc., 175 F.3d at 855. In that case, the credit rating agency had stated in an article that the plaintiff was not creditworthy and had given the plaintiff's bonds a negative outlook. See Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc., 175 F.3d at 855. The Tenth Circuit stated that those opinions were "not necessarily too indefinite to imply a false statement of fact" if "coupled with specific factual assertions." Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc., 175 F.3d at 855. The Tenth Circuit noted that, "[i]f such an opinion were shown to have materially false components, the issuer should not be shielded from liability by raising the word 'opinion' as a shibboleth." Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc., 175 F.3d at 855. Specifically, the Tenth Circuit held "the [plaintiff's] failure to identify a specific false statement reasonably implied from [the defendant's] article, combined with the vagueness of the phrases 'negative outlook' and 'ongoing financial pressures' indicates that [the defendant's] article constitutes a protected expression of opinion." Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc., 175 F.3d at 856.

This Tenth Circuit case, however, dealt with a situation where the rating agency issued the ratings in a nationally published article. See Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc., 175 F.3d at 856. As one court in the Southern District of New York noted, the First Amendment does not apply when a rating agency disseminates ratings to a select group of

investors and not the public at large:

> It is well-established that under typical circumstances, the First Amendment protects rating agencies, subject to an "actual malice" exception, from liability arising out of their issuance of ratings and reports because their ratings are considered matters of public concern. However, where a rating agency has disseminated their ratings to a select group of investors rather than to the public at large, the rating agency is not afforded the same protection. Here, plaintiffs have plainly alleged that the Cheyne SIV's ratings were never widely disseminated, but were provided instead in connection with a private placement to a select group of investors. Thus, the Rating Agencies' First Amendment argument is rejected.

Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 651 F.Supp.2d 155, 175-76 (S.D.N.Y. 2009)(Scheindlin, J.)(footnotes omitted)(citing Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 761-62 (1985)). As the Supreme Court noted, when a "credit report was made available to only five subscribers, who, under the terms of the subscription agreement, could not disseminate it further, it cannot be said that the report involves any 'strong interest in the free flow of commercial information'" subject to First Amendment protection. Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. at 761. In comparison, the Sixth Circuit recognized that the First Amendment's actual-malice standard applied when a rating agency for compensation issued a credit rating regarding a publicly held corporation who asserted a defamation claim against the rating agency, because the publicly held corporation was "a public figure for purposes of First Amendment defamation analysis." Compuware Corp. v. Moody's Investors Services, Inc., 499 F.3d 520, 523-24, 526 (6th Cir. 2007). A district court in the Southern District of Ohio denied a motion to dismiss raising First-Amendment arguments that a rating was a matter of public concern, because "the only place that the ratings are alleged to have appeared were in the offering materials given to a select class of investors," the company at issue was a privately held company, and the "complaint deliberately steer[ed] clear of characterizing" the ratings "as a matter of public concern." In re Nat'l Century Fin. Enters., Inc., Inv. Litig., 580 F.Supp.2d at 640 (citing Dun & Bradstreet, Inc. v.

Greenmoss Builders, Inc., 472 U.S. at 762).  Similarly, the Honorable Whitman Knapp, United States District Judge, in the Southern District of New York concluded that actual malice protection did not apply when a credit rating was "privately contracted for and intended for use in the private placement Offering Memoranda, rather than for publication in a general publication." LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co., 951 F.Supp. 1071, 1096-97 (S.D.N.Y. 1996)(Knapp, J.). The defendant in that case had argued that it was "a member of the free press entitled to the privileges and immunities accorded the press," and that the actual malice standard applied to the case; the court rejected these arguments.  LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co., 951 F.Supp. at 1095-97.

The credit ratings at issue in this case are not entitled to First Amendment protection.  When determining whether speech addresses a matter of public concern, courts should consider the expression's content, form, and context as revealed by the whole record.  See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. at 761.  Additionally, the sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; Moore v. Guthrie, 438 F.3d at 1039; Hous. Auth. of Kaw Tribe v. City of Ponca, 952 F.2d at 1187.  The Plaintiffs do not allege that the Rating Agency Defendants ever published their ratings to the public at large.  See In re Nat'l Century Fin. Enters., Inc., Inv. Litig., 580 F.Supp.2d at 640.  They allege: "The ratings on the Certificates issued by the Rating Agency Defendants were prominently displayed in the Offering Documents, as each of the defendants was aware that most institutional investors were prohibited from purchasing investments with any rating other than investment grade."  Amended Complaint

-232-

¶ 4, at 8.  In other areas in the Amended Complaint, the Plaintiffs allege only that the ratings appeared in the offering documents.  See Amended Complaint ¶¶ 12, 39-42, 46, 68-70, 77, 81, 130 at 11, 17-19, 33-35, 38-39, 51.  The Amended Complaint also asserts that the Defendants specifically targeted institutional investors for the investments.  See Amended Complaint ¶ 74, at 37.  Furthermore, the ratings related to statutory trusts, and not publicly traded companies, which would qualify as public figures.  See Amended Complaint ¶ 21, at 13.  As the Honorable Susan Illston, United States District Judge, in the Northern District of California concluded in an analogous situation: "There has been no showing here that the Trusts -- who were the ones rated and who are not bringing defamation claims against the Rating Agencies -- are 'public figures.'"  Anschutz Corp. v. Merrill Lynch & Co. Inc., 785 F.Supp.2d 799, 828-29 (N.D. Cal. 2011)(Illston, J.).  These credit ratings impacted only the limited group of investors who received the offering documents, the Thornburg Trusts, and the companies involved with those Thornburg Trusts as opposed to the public at large.  See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. at 761.

The Supreme Court's Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc. decision arguably does not extend so far as to cover this case as that case involved only a very small group of investors.  See 472 U.S. at 762.  It is worth noting that the Supreme Court highlighted those facts to illustrate the point that, besides the reasons it had already given, there "[was] simply no credible argument that this type of credit reporting requires special protection to ensure that 'debate on public issues [will] be uninhibited, robust, and wide-open,'" as they did not affect any "strong interest in the free flow of commercial information." Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. at 762.  The case which the Supreme Court cited regarding the interest in the free flow of commercial information discussed the general public's interest in access to advertising, which is a distinguishable situation from providing credit ratings in offering documents given to a select group

-233-

rather than the public at large.  See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 764-65 (1976).  As the Supreme Court noted in Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., a credit rating not addressing a matter of public concern receives no special protection when "the speech is wholly false and clearly damaging to the victim's business reputation."    Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. at 762.  The basic allegations in this case are that the credit ratings were false or misleading, which creates a sufficient analogy to the allegations in the Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc. decision, as that case involved only defamation claims.  See 472 U.S. at 761-62.  As the Supreme Court has previously stated: "Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities . . . ." Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 456 (1978).  Credit ratings are commercial speech, and thus they receive "reduced protection" and "occup[y] a 'subordinate position in the scale of First Amendment values,'" which means they "may be regulated in ways that might be impermissible in the realm of noncommercial expression." Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. at 758 n.5, 761-62.  The First Amendment does not forbid regulation of false, deceptive, or misleading commercial speech.  See Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation, Bd. of Accountancy, 512 U.S. 136, 142-43 (1994)("[F]alse, deceptive, or misleading commercial speech may be banned."); Friedman v. Rogers, 440 U.S. 1, 9 (1979)("Equally permissible are restrictions on false, deceptive, and misleading commercial speech.").  Accordingly, the Court rejects the Rating Agency Defendants' arguments that the First Amendment provides any protection to them under the facts of this case.  Thus, the Court rejects the Rating Agency Defendants' argument that the First Amendment protections regarding provably false opinions apply to their credit ratings.

Additionally, the Court rejects the Rating Agency Defendants' arguments that the Plaintiffs

must plead that they issued their credit ratings with actual malice.  The Court has concluded that First Amendment protections do not apply to these credit ratings.  Actual malice protections apply only when the complained of speech at issue implicates the First Amendment.  See, e.g., Milkovich v. Lorain Journal Co., 497 U.S. at 14 (recognizing that the First Amendment imposes actual malice restrictions).

### C.   RULE 9(b)'S HEIGHTENED PLEADING STANDARDS DO NOT APPLY TO THE ALLEGATIONS AGAINST THE RATING AGENCY DEFENDANTS.

The Rating Agency Defendants argue that the Plaintiffs must plead their allegations against them according to rule 9(b) of the Federal Rules of Civil Procedures' heightened pleadings standards.  See Memorandum in Support of Rating Agency's Motion at 21.  The Rating Agency Defendants argue that: "[I]n an apparent attempt to avoid the consequences of asserting a claim of fraud -- namely the burdens, among others, of pleading with particularity and sufficiently pleading scienter -- Plaintiffs have disclaimed any possible claim based upon credit rating opinions." Memorandum in Support of Rating Agency's Motion at 21.  The Rating Agency Defendants argue that, because the credit ratings are opinions and the Plaintiffs must allege that the Rating Agency Defendants did not believe their credit rating opinions at the time that they were issued, the Plaintiffs must satisfy rule 9(b)'s heightened pleading standards.  See Memorandum in Support of Rating Agency's Motion at 21.  The Defendants cite no authority for this argument that rule 9(b) applies to these allegations.  The Plaintiffs do not specifically respond to this argument.

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  By the terms of this rule, rule 9(b)'s heightened pleading standards do not apply to this situation.  See Fed. R. Civ. P. 9(b).  The rule

states that heightened pleading standards apply only when the Plaintiff is "alleging fraud or mistake." Fed. R. Civ. P. 9(b). "Malice, intent, <u>knowledge</u>, and <u>other conditions of a person's mind may be alleged generally</u>." Fed. R. Civ. P. 9(b) (emphasis added). Likewise, the Tenth Circuit has recognized "that Rule 9(b) requires only the identification of the circumstances constituting fraud, and . . . does not require any particularity in connection with an averment of intent, knowledge or condition of mind." <u>Schwartz v. Celestial Seasonings, Inc.</u>, 124 F.3d 1246, 1252 (10th Cir. 1997). The issue here is the Rating Agency Defendants' beliefs or knowledge, which falls within the second provision of rule 9(b).

Furthermore, the Rating Agency Defendants have pointed to no authority that the PSLRA applies to New Mexico Securities Act claims. The PSLRA does not appear to affect the pleading standards for claims under the Securities Act or any other claims outside of the Exchange Act chapter, because the PSLRA's heightened pleading requirements apply only in "private action[s] arising under this chapter," 15 U.S.C. § 78u-4(b)(1), and "this chapter" refers to Chapter 2B of Title 15. The Securities Act of 1933, however, is Chapter 2A, <u>see</u> 15 U.S.C. § 77a ("This subchapter[, subchapter I of Chapter 2A,] may be cited as the 'Securities Act of 1933'."); 15 U.S.C. § 78a ("This chapter[, chapter 2B,] may be cited as the 'Securities Exchange Act of 1934'."), and the parties have shown the Court no binding authority for applying the PSLRA' and rule 9(b)'s heightened standard to claims under the Securities Act. The New Mexico Securities Act is a New Mexico statute, and nothing in the PSLRA suggests it would apply to this act.

Furthermore, the Amended Complaint expressly states the following, which reveals that the Plaintiffs have not asserted a cause of action related to fraud: "Plaintiffs are not alleging that defendants committed fraud or acted with deceitful intent. Rather, plaintiffs allege negligence and strict liability claims." Amended Complaint ¶ 2, at 6. Interpreting the language of 15 U.S.C. § 78j,

the statutory section under which the SEC promulgated rule 10b-5, the Supreme Court held that the language of this statute requires the plaintiff to prove that the defendant engaged in fraud -- manipulative or deceptive conduct -- to establish a cause of action, even though rule 10b-5 does not itself impose such a requirement.  See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 471-74 (1977)("It is our judgment that the transaction, if carried out as alleged in the complaint, was neither deceptive nor manipulative and therefore did not violate either § 10(b) of the Act or Rule 10b-5."). The Uniform Securities Act's drafters did not include such a requirement in section 501 of the Uniform Securities Act, which the New Mexico Legislature codified and which parallels the language of rule 10b-5:

> The federal courts have promulgated a variety of requirements which must be satisfied by persons seeking to recover damages under the federal Rule 10b-5 counterpart. These include showings: of scienter; that the violative conduct involved misrepresentation or deception; and that the party seeking damages be either a purchaser or seller of the securities involved.  While the latter requirement also appears appropriate with respect to this section, the Committee did not intend that state courts be bound to follow the other federal court doctrines referenced.  The Committee has noted that various state courts have split, for example, on the necessity of showing scienter in order to state a cause of action under the 1956 Act version of this section.

Unif. Sec. Act § 501 n.3 (citations omitted)(emphasis added).  In interpreting the relevant criminal provisions of the New Mexico Securities Act, the Court of Appeals of New Mexico has stated that, a person who violates section 58-13B-30, the civil liability provision, in a willful manner "may be subject to criminal penalties" under section § 58-13B-39(A).  See State v. Collins, 142 N.M. 419, 424, 166 P.3d 480, 485 (Ct. App. 2007).  No other reported New Mexico case directly addresses the required elements to state a claim under this provision, section 58-13B-30, in the context of civil liability.  "The New Mexico Securities Act, although containing some variations, is patterned after the Uniform Securities Act" approved in 1985 "by the National Conference of Commissioners on

-237-

Uniform State Laws." State v. Ramos, 116 N.M. at 126, 860 P.2d at 768.  Thus, a New Mexico court would find interpretations of the Uniform Securities Act persuasive.  See N.M.S.A. 1978, § 12-2A-20(B)(1)-(2); Corum v. Roswell Senior Living, LLC, 149 N.M. 287, 248 P.3d at 331-32.

A court's central concern in construing a particular statute "is to determine and give effect to the intent of the legislature," State ex rel. Klineline v. Blackhurst, 106 N.M. at 735, 749 P.2d at 1114 (citation omitted), "using the plain language of the statute as the primary indicator of its intent," City of Santa Fe v. Travelers Cas. & Sur. Co., 147 N.M. at 702, 228 P.3d at 486.  Courts give "the words used in the statute their ordinary meaning unless the legislature indicates a different intent." State ex rel. Klineline v. Blackhurst, 106 N.M. at 735, 749 P.2d at 1114 (citation omitted). Courts "construe the entire statute as a whole so that all the provisions will be considered in relation to one another." Regents of Univ. of N.M. v. N.M. Fed'n of Teachers, 125 N.M. at 411, 962 P.2d at 1246.  A court must construe a statute "so that no part of the statute is rendered surplusage or superfluous." In re Rehabilitation of W. Investors Life Ins. Co., 100 N.M. at 373, 671 P.2d at 34 (citations omitted).  New Mexico courts will not, however, "read into a statute or ordinance language which is not there, particularly if it makes sense as written." Regents of Univ. of N.M. v. N.M. Fed'n of Teachers, 125 N.M. at 411, 962 P.2d at 1246 (quoting Burroughs v. Bd. of Cnty. Comm'rs of Bernalillo Cnty., 88 N.M. at 306, 540 P.2d at 236)(internal quotation marks omitted).  New Mexico courts also will "not depart from the plain wording of a statute, unless it is necessary to resolve an ambiguity, correct a mistake or an absurdity that the Legislature could not have intended, or to deal with an irreconcilable conflict among statutory provisions." Regents of Univ. of N.M. v. N.M. Fed'n of Teachers, 125 N.M. at  411, 962 P.2d at 1246 (citation omitted).  When interpreting a statute, a court may consider "a settled judicial construction in another jurisdiction as of the time a statute or rule is borrowed from the other jurisdiction," or "a judicial construction of the same or

similar statute or rule of this or another state." N.M.S.A. 1978, § 12-2A-20(B)(1)-(2). <u>Accord</u> <u>Corum v. Roswell Senior Living, LLC</u>, 149 N.M. 287, 248 P.3d at 331-32. New Mexico courts will construe civil remedial statutes in a liberal manner, but not more broadly than the statute's plain language allows. <u>See</u> <u>Krahling v. First Trust Nat'l Ass'n</u>, 123 N.M. 685, 689-90, 944 P.2d 914, 918-19 (Ct. App. 1997).

Section 58-13B-30 does not contain the language that the respective section 10 of the Exchange Act contains. Specifically, section 58-13B-30 does not contain the language "manipulative or deceptive device" like the counterpart federal statute. <u>Compare</u> N.M.S.A. 1978, § 58-13B-30, <u>with</u> 15 U.S.C. § 78j. The Supreme Court has interpreted this "manipulative or deceptive device" language in section 10(b), rather than any language in rule 10b-5 itself, as imposing the requirement that a rule 10b-5 action assert that the defendant acted fraudulently. <u>See</u> <u>Santa Fe Indus., Inc. v. Green</u>, 430 U.S. at 471-74 ("It is our judgment that the transaction, if carried out as alleged in the complaint, was neither deceptive nor manipulative and therefore did not violate either § 10(b) of the Act or Rule 10b-5."). The drafters of the Uniform Securities Act recognized that the States may not want to impose such a requirement on plaintiffs seeking to establish a securities violation. <u>See</u> Unif. Sec. Act § 501 n.3. The New Mexico Legislature did not choose to add any additional language to the statute expressly imposing such a requirement to establish a securities violation. Notably, a separate statute makes a willful violation of section 58-13B-30 a criminal violation. <u>See</u> <u>State v. Collins</u>, 142 N.M. at 424, 166 P.3d at 485. In interpreting the New Mexico Securities Act, a New Mexico court would consider the respective federal rule 10b-5 and 15 U.S.C. § 78j, the statute under which the SEC enacted rule 10b-5, as well as the respective provision of the Uniform Securities Act. <u>See</u> N.M.S.A. 1978, § 12-2A-20(B)(1)-(2). <u>Accord</u> <u>Corum</u> <u>v. Roswell Senior Living, LLC</u>, 149 N.M. 287, 248 P.3d 329, 331-32 (Ct. App. 2010). New Mexico

courts would also construe a civil remedial statute broadly in favor of those who it was intended

protect, assuming the statute's language permitted that construction.  See Krahling v. First Trust

Nat'l Ass'n, 123 N.M. at 689-90, 944 P.2d at 918-19.  New Mexico courts "construe the entire

statute as a whole so that all the provisions will be considered in relation to one another."  Regents

of Univ. of N.M. v. N.M. Fed'n of Teachers, 125 N.M. at 411, 962 P.2d at 1246.  Given that the

drafters of the Uniform Securities Act stated in the applicable comments that they did not intend to

include this additional element in section 501 of the Uniform Securities Act -- leaving that decision

to each State -- and that the New Mexico legislature did not see fit to add any additional language

to the statute, the Court concludes that the New Mexico Legislature did not intend that a securities

act violation must establish that fraud occurred under section 58-13B-30.  The Supreme Court of

the United States case which recognized that 15 U.S.C. § 78j imposes this additional requirement

was decided in 1977, nine years before the adoption of the New Mexico Securities Act.  Given that

the statute's plain language, like rule 10b-5's plain language, does not impose such a requirement,

the Court concludes that the New Mexico Legislature did not include this element under this statute.

The Court interprets this statute broadly in favor of those who it was intended to protect as its

language permits the construction.

   Because the Plaintiffs have alleged their claims in terms of strict liability and negligence, the

Court rejects the argument that rule 9(b) or the PSLRA's heightened pleading standards apply to

these allegations against the Rating Agency Defendants.  Rule 9(b) requires pleading claims with

particularity only when those claims involve fraud.  See Fed. R. Civ. P. 9(b).  Rule 9(b) does not

require alleging a person's knowledge or other states of mind with particularity, such as that a

person did not believe their opinion when they gave that opinion.  See Fed. R. Civ. P. 9(b).

**D.      THE PLAINTIFFS HAVE PLED ACTIONABLE MISREPRESENTATIONS OR OMISSIONS AGAINST S&P, BUT NOT FITCH OR MOODY'S.**

The Rating Agency Defendants contend that the Court should dismiss the Plaintiffs' claims against them as the Plaintiffs have alleged no actionable misrepresentations.  See Memorandum in Support of Rating Agency Defendants' Motion at 21-25.  The Court notes that this issue is almost identical to the issue it addressed earlier in this opinion regarding the credit rating allegations against the non-Rating Agency Defendants.  Thus, that same body of law and the same factual allegations will apply in the context of this argument by the Rating Agency Defendants.

First, the Rating Agency Defendants argue that many courts have recognized that allegations regarding supposedly defective rating models are not sufficient to allege an actionable misstatement. See Memorandum in Support of Rating Agency Defendants' Motion at 22.  They argue that the Plaintiffs' allegations are conclusory.  See Memorandum in Support of Rating Agency Defendants' Motion at 22-23.  The Rating Agency Defendants also contend that the Plaintiffs cannot allege fraud by hindsight.  See Memorandum in Support of Rating Agency Defendants' Motion at 23.  Second, the Rating Agency Defendants argue that the alleged failure to conduct adequate due diligence regarding the issuance of credit ratings is not an actionable misstatement of fact, as the Plaintiffs have not alleged that the Rating Agency Defendants had any duty to conduct such a due-diligence investigation.  See Memorandum in Support of Rating Agency Defendants' Motion at 23.  They also contend that a failure to investigate alone is not sufficient to state an actionable claim about a statement of opinion.  See Memorandum in Support of Rating Agency Defendants' Motion at 23. Third, the Rating Agency Defendants argue that they had no obligation to disclose conflicts of interest, as various courts have held these matters are immaterial as a matter of law.  See Memorandum in Support of Rating Agency Defendants' Motion at 24.

The Plaintiffs emphasize that the Court must look at all of the allegations in the Amended Complaint holistically rather than in isolation.  See Response to Rating Agency Defendants' Motion at 16 n.9.  The Plaintiffs contend:

> Where, as alleged here, the Rating Agency Defendants (as well as the other defendants) were aware "that the ratings process was flawed, knew that the portfolio was not a safe, stable investment," and that "the Rating Agencies could not issue an objective rating because of the effect it would have on their compensation, it may be plausibly inferred that" the "Rating Agencies knew they were disseminating false and misleading ratings."

Response to Rating Agency Defendants' Motion at 17 (quoting Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 651 F.Supp.2d at 179).  The Plaintiffs further emphasize that assessing materiality is a fact-specific inquiry.  See  Response to Rating Agency Defendants' Motion at 17 (quoting See Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. at 1322).  The Plaintiffs point to a variety of factual allegations in their Amended Complaint that support their contentions.  In a separate reply, Moody's argues that the factual allegations against it are insufficient, as it contends there are only a handful of allegations that relate to it.  See Moody's Reply at 3-5.  Fitch makes the same arguments regarding the sufficiency of the factual allegations against it and also notes that the Plaintiffs should sufficiently differentiate between the Defendants to adequately state a claim against them.  See Fitch Reply at 2-4.

### 1.    Sufficiency of the Materiality Allegations.

When considering these allegations, the Court's "job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 326.  The Court has addressed the almost identical issue earlier in this opinion when it evaluated the sufficiency of the credit rating allegations against the other Defendants.  The Court has considered the additional arguments that the Rating Agency Defendants have raised and that the

Plaintiffs have raised in the briefing related to the claims against the Rating Agency Defendants. The Court has also considered the additional authority to which the Plaintiffs and the Rating Agency Defendants have cited.  The Court does not conclude, however, that its conclusion regarding the sufficiency of the credit rating allegations against the other Defendants will differ from its conclusion regarding the sufficiency of the materiality allegations against the Rating Agency Defendants.  Many of these arguments that the Plaintiffs and Rating Agency Defendants have raised and their cited authority are the same or cumulative.  Consequently, the Court adopts the same conclusions it made earlier in this opinion as it relates to the sufficiency of the materiality allegations against the Rating Agency Defendants.

The Court will grant the Rating Agency Defendants' Motion with respect to the sufficiency of the materiality allegations against Fitch and Moody's.  Because the Plaintiffs have asked for leave to amend their Amended Complaint, the Court will grant the Plaintiffs' leave to amend.  See Response to Rating Agency Defendants' Motion at 32 n.25.  The Court will deny the Rating Agency Defendants' Motion with respect to the sufficiency of the materiality allegations against S&P.  To seek amendment to cure these deficiencies, the Plaintiffs must file a motion with their proposed amended complaint attached to that motion.  The Plaintiffs must bold the newly added facts in the proposed amended complaint to distinguish them from facts contained in the Amended Complaint. In the motion, the Plaintiffs should set forth their new facts -- facts that the Court did not previously have before it -- which, if the Court had known the facts, would have changed the outcome of the motion.  The Plaintiffs should also address precisely how these new facts would have changed the Court's conclusions.

**2.    The Court Cannot Conclude as a Matter of Law that the Rating Agency Defendants' Conflicts of Interest Are Not Material.**

The Rating Agency Defendants argue that their alleged conflicts of interest are not material as a matter of law, because those conflicts of interest were publicly known.  See Memorandum in Support of Rating Agency Defendants' Motion at 24.  The Rating Agency Defendants cite to district court opinions that have reached this conclusion.  Much like the other Defendants, the Rating Agency Defendants have not directed the Court to any government reports, news publications, or other sources that indicate these facts were publicly known.  Some of these courts, whose opinions the Defendants have cited, have considered such materials, see In re Lehman Bros. Sec. & ERISA Litig., 684 F.Supp.2d at 492, but the Rating Agency Defendants have not cited to any of those materials or told the Court what specific materials it should consider to determine whether these facts were publicly known at the respective times.  Assuming judicial notice is appropriate, if a party requests that the court take judicial notice of certain facts, and supplies the necessary information to the court, judicial notice is mandatory.  See Fed. R. Evid. 201(d).  The Defendants have not supplied the necessary information to the Court for it to consider.  While the Court does not expressly disagree with the other district courts who have reached this conclusion, that authority limits the Court only to the extent that authority persuades the Court.  When considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; Moore v. Guthrie, 438 F.3d at 1039; Hous. Auth. of Kaw Tribe v. City of Ponca, 952 F.2d at 1187.  Consequently, the Court declines to adopt this argument that the conflicts of interest were publicly known.

## XI.   CRARA PREEMPTS SOME OF THE PLAINTIFFS' THEORIES ON WHICH THEY BASE THEIR NEW MEXICO SECURITIES ACT CLAIMS.

The Rating Agency Defendants argue that CRARA preempts the Plaintiffs' claims against them.  <u>See</u> Memorandum in Support of Rating Agency Defendants' Motion at 25.[44]  They contend that Congress has "explicitly declared off limits" the "methodologies used by the Rating Agencies and the substance of their resulting ratings opinions."  Memorandum in Support of Rating Agency Defendants' Motion at 25.  The Rating Agency Defendants point to two express preemption provisions that appear in CRARA.  <u>See</u> Memorandum in Support of Rating Agency Defendants' Motion at 26.  The Rating Agency Defendants contend that the first preemption provision gives the SEC exclusive authority over a Nationally Recognized Statistical Ratings Organization ("NRSRO") when an NRSRO is alleged to have issued ratings in material contravention of its procedures, including those related to conflicts of interest.  Memorandum in Support of Rating Agency Defendants' Motion at 27.  The Rating Agency Defendants point out that Congress has designated each of them as an NRSRO.  <u>See</u> Memorandum in Support of Rating Agency Defendants' Motion at 26 n.10.  The Rating Agency Defendants contend that the second provision makes the SEC alone responsible for regulating the substance of ratings and methodologies used to generate them.  <u>See</u> Memorandum in Support of Rating Agency Defendants' Motion at 27.  The Rating Agency Defendants contend that these provisions preempt both state agencies and state private causes of action relating to credit ratings.  <u>See</u> Memorandum in Support of Rating Agency Defendants' Motion at 27-30.

The Plaintiffs note that this preemption argument is an affirmative defense, which generally

---

[44]The Rating Agency Defendants have not argued that any federal statute impliedly preempts the Plaintiffs' claims.

will not support a motion to dismiss.  See Response to Rating Agency Defendants' Motion at 25.

The Plaintiffs also argue that there is a presumption against preemption.  See Response to Rating

Agency Defendants' Motion at 25-26.  The Plaintiffs contend that the actual effect of these

preemption provisions is the limited purpose of allowing the SEC to regulate the registration of

NRSROs.  See Response to Rating Agency Defendants' Motion at 25-26.  The Plaintiffs argue that

the applicable provisions of the New Mexico Securities Act regulate only the purchase and sale of

securities.  See Response to Rating Agency Defendants' Motion at 26.  The Plaintiffs also point to

several decisions that have rejected this preemption argument.  See Response to Rating Agency

Defendants' Motion at 27.

        Preemption may be express or implied.  See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505

U.S. at 98.  When faced with express preemption -- where a statute expressly states that it preempts

certain areas of state law -- a court must determine the scope of the preemption that Congress

intended.  See Medtronic, Inc. v. Lohr, 518 U.S. at 485 (stating that "the purpose of Congress is the

ultimate touch-stone in every pre-emption case").  "Congress may indicate pre-emptive intent

through a statute's express language or through its structure and purpose."  Altria Group, Inc. v.

Good, 555 U.S. at 77.  When a preemption clause's text is susceptible to more than one plausible

reading, courts ordinarily "accept the reading that disfavors pre-emption."  Bates v. Dow

Agrosciences, LLC, 544 U.S. at 449.  Preemption arguments are analyzed under rule 12(b)(1).  See

Cedars-Sinai Med. Center v. Nat'l League of Postmasters of U.S., 497 F.3d at 975.

        When faced with express preemption -- where, in other words, a statute expressly states that

it preempts certain areas of state law -- a court must determine the preemption's scope.  That task

entails scrutinizing the preempting words in light of two presumptions.  First,

        [i]n all pre-emption cases, and particularly in those in which Congress has legislated

-246-

> . . . in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

Medtronic, Inc. v. Lohr, 518 U.S. at 485 (citations omitted)(internal quotation marks omitted). Second, "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case." Medtronic, Inc. v. Lohr, 518 U.S. at 485 (citations omitted)(internal quotation marks omitted). A court determines Congress' intent primarily from the text and the statutory framework, although the structure and statute as a whole are relevant as well. See Medtronic, Inc. v. Lohr, 518 U.S. at 485.

Congress enacted CRARA in 2006 "[t]o improve ratings quality for the protection of investors and in the public interest by fostering accountability, transparency, and competition in the credit rating agency industry." Pub. L. No. 109-291, 120 Stat. 1327, 1327 (2006). CRARA establishes guidelines that a rating agency must follow to register with the SEC as an NRSRO. See 15 U.S.C. § 78o-7. The parties do not dispute that the SEC has designated the Rating Agency Defendants as NRSROs. CRARA specifies the information a rating agency must furnish to the SEC and the public regarding certain procedures and policies that the agency must use with respect to issuing credit ratings, to assist the SEC in the oversight role crafted for it by Congress. See 15 U.S.C. § 78o-7(a)(1)(B). CRARA also prohibits NRSROs from engaging in a variety of conduct. See 15 U.S.C. § 78o-7(f)-(i). CRARA further grants the SEC authority to promulgate rules regarding certain matters relating to NRSROs, including potential conflicts of interest and the potential misuse of non-public information. See 15 U.S.C. § 78o-7(c), (d), (g)-(i). Nothing in these provisions expressly authorizes a private right of action. CRARA's applicable express preemption provisions are as follows:

> (c) Accountability for ratings procedures

> (1) Authority

The Commission shall have exclusive authority to enforce the provisions of this section in accordance with this chapter with respect to any nationally recognized statistical rating organization, if such nationally recognized statistical rating organization issues credit ratings in material contravention of those procedures relating to such nationally recognized statistical rating organization, including procedures relating to the prevention of misuse of nonpublic information and conflicts of interest, that such nationally recognized statistical rating organization --

    (A) includes in its application for registration under subsection (a)(1)(B)(ii) of this section; or

    (B) makes and disseminates in reports pursuant to section 78q(a) of this title or the rules and regulations thereunder.

(2) Limitation

The rules and regulations that the Commission may prescribe pursuant to this chapter, as they apply to nationally recognized statistical rating organizations, shall be narrowly tailored to meet the requirements of this chapter applicable to nationally recognized statistical rating organizations. Notwithstanding any other provision of this section, or any other provision of law, neither the Commission nor any State (or political subdivision thereof) may regulate the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings. Nothing in this paragraph may be construed to afford a defense against any action or proceeding brought by the Commission to enforce the antifraud provisions of the securities laws.

15 U.S.C. § 78*o*-7(c).  Subsection (o) of CRARA states:

(1)    In general.

No provision of the laws of any State or political subdivision thereof requiring the registration, licensing, or qualification as a credit rating agency or a nationally recognized statistical rating organization shall apply to any nationally recognized statistical rating organization or person employed by or working under the control of a nationally recognized statistical rating organization.

(2)    Limitation.

Nothing in this subsection prohibits the securities commission (or any agency or office performing like functions) of any State from investigating and bringing an enforcement action with respect to fraud or deceit against any nationally recognized statistical rating organization or person associated with a nationally recognized statistical rating organization.

15 U.S.C. § 78*o*-7(o).  One law review student note concludes that, with respect to the preemptive

effect of the act, this second provision in subsection (o) "create[s] a strong inference that Congress

meant to limit litigation involving rating agencies to suits brought by public agencies to prosecute

fraud," because "Congress easily could have included language permitting a wider variety of claims

against rating agencies, making the interpretive canon of expressio unius est exclusio alterius

appropriate here."   Note, Federal Preemption and the Rating Agencies: Eliminating State Law

Liability to Promote Quality Ratings, 94 Minn. L. Rev. 2136, 2155-56 (2010).  Judge Illston in the

Northern District of California concluded that these provisions in subsection (o) had no impact on

the preemptive effect of CRARA, and in fact weighed against preemption, because the

> savings clause . . . is a limited carve-out to the claims prohibited in subsection (o)(1).
> It has no relevance to claims not described in subsection (o)(1), except to the extent
> that it shows that Congress knows how to explicitly bar a class of claims, and save
> a subset of them with a savings clause, and, therefore Congress' failure to expressly
> prohibit general claims of fraud and deceit against NRSROs like the one at issue
> here, further weighs against a finding of preemption.

See Anschutz Corp. v. Merrill Lynch & Co. Inc., 785 F.Supp.2d 799, 828-29 (N.D. Cal.

2011)(Illston, J.).

A few courts have addressed the preemptive effect of CRARA's provisions.  One judge in

the Southern District of Ohio declined to grant a motion to dismiss on preemption grounds in a suit

against a rating agency.  See In re Nat'l Century Fin. Enters., Inc., Inv. Litig., 580 F.Supp.2d at 650-

51.  Addressing the second preemption provision, that court noted:

> At this stage, and with as little briefing as this issue has received, the Court is not
> prepared to hold that the Credit Rating Agency Reform Act preempts the application
> of state blue sky laws to credit rating agencies who have registered as NRSROs.  The
> presumption is that Congress does not intend to preempt state law.  The language of
> the Act that Moody's cites does not appear, at first impression, to stand for the broad
> proposition that Moody's argues it does.  It says that states may not regulate the
> substance of credit ratings or the procedures or methodologies used to determine
> credit ratings.  This provision seems to mean that states may not tell NRSROs what

> ratings they should give or dictate how they arrive at their ratings.  The Act says that
> even the SEC cannot so regulate.  But the Court is not prepared to hold that
> § 78*o*-7(c)(2) broadly preempts state regulation, without the benefit of fuller briefing
> of the issue and of what the phrase "regulate the substance of credit ratings" means.

In re Nat'l Century Fin. Enters., Inc., Inv. Litig., 580 F.Supp.2d at 651 (citations omitted).  This

court also stated that "Congress was more clear about preemption when it came to giving the SEC

exclusive authority to regulate the registration of NRSROs" based on the text of the first preemption

provision.  In re Nat'l Century Fin. Enters., Inc., Inv. Litig., 580 F.Supp.2d at 651 n.4.  Judge Illston

concluded that CRARA did not preempt the plaintiff's common law misrepresentation claims.

Anschutz Corp. v. Merrill Lynch & Co. Inc., 785 F.Supp.2d at 828-29.  The court recognized:

> As an initial matter, there is no indication in the text of the statute or its legislative
> history that Congress intended to wipe out all state law causes of action against
> rating agencies.  The Authorization Provision gives the SEC exclusive authority to
> enforce the provisions of the CRARA and rules issued by the SEC, but there is no
> language to indicate that the SEC's exclusive authority extends to enforcement of
> claims that arise from sources other than the CRARA.  The Limitations Provision is
> likewise limited, and prohibits only laws that seek to regulate the "substance of
> credit ratings" or the "procedures or methodologies" by which NRSROs determine
> credit ratings.  There is nothing in the legislative record cited by the Agencies to
> support their expansive preemption argument.

Anschutz Corp. v. Merrill Lynch & Co. Inc., 785 F.Supp.2d at 829 (emphasis in original)(footnote

omitted).  Judge Illston noted that the rating agencies in that case did not cite to any Congressional

testimony or other sources discussing the burden that state law claims place on NRSROs or how

those claims impair the effective operation of those organizations as well as the financial markets.

See Anschutz Corp. v. Merrill Lynch & Co. Inc., 785 F.Supp.2d at 829 n.28.  Furthermore, Judge

Illston found that, "even if the CRARA could be read to preempt common law causes of action

based on allegations that NRSRO's apply deficient standards or inadequate procedures and

methodologies in their credit ratings," the express preemption would not apply when a "plaintiff

seeks to hold the Rating Agencies liable for purported misrepresentations that allegedly would not

have occurred if the Agencies had followed their own published procedures and methodologies."
<u>Anschutz Corp. v. Merrill Lynch & Co. Inc.</u>, 785 F.Supp.2d at 830.  Judge Illston found "nothing
in either the text of the statute or the legislative history to establish that Congress intended to
preempt a common law negligent misrepresentation claim based in part or in whole on allegations
that credit agencies failed to follow their own practices."  <u>Anschutz Corp. v. Merrill Lynch & Co.
Inc.</u>, 785 F.Supp.2d at 830.  Judge Illston noted that, if discovery revealed that the rating agencies
had applied "accepted industry statistical" standards in contradiction of the plaintiff's argument that
they had not followed these practices, preemption may apply and that the rating agencies could
reurge the argument.  <u>Anschutz Corp. v. Merrill Lynch & Co. Inc.</u>, 785 F.Supp.2d at 830.

Language in a statute that grants a federal agency "exclusive authority" to regulate a
particular practice indicates Congress' intent to expressly preempt state regulation of that matter.
<u>See</u> <u>Train v. Colo. Pub. Interest Research Grp., Inc.</u>, 426 U.S. 1, 15-17 (addressing preemption of
state regulation regarding nuclear discharges).  The Rating Agency Defendants point to a case
involving statutory construction that interprets a statutory clause that includes the words
"notwithstanding."  Memorandum in Support of Rating Agency Defendants' Motion at 28.  The
Supreme Court, in the context of statutory construction, has said that "the use of such a
'notwithstanding' clause clearly signals the drafter's intention that the provisions of the
'notwithstanding' section override conflicting provisions of any other section."  <u>Cisneros v. Alpine
Ridge Grp.</u>, 508 U.S. 10, 18 (1993).  When discussing the effect of private causes of action as
opposed to public enforcement of regulation in the context of preemption, the Tenth Circuit has
recognized that, when a statute contains the appropriate language, it bans "any form of state
regulation" including "state common law dut[ies]."  <u>Arkansas-Platte & Gulf P'ship v. Van Waters
& Rogers, Inc.</u>, 981 F.2d 1177, 1179 (10th Cir. 1993).  In that case, the Tenth Circuit dealt with the

following language regarding cigarette labeling:

> Section 136v(b) prohibits a state from imposing "<u>any</u> requirement for labeling or packaging in addition to or different from those required under this subchapter." (emphasis added). In comparison, section 5(b) of the Cigarette Smoking Act states:
>
>> <u>No</u> requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.
>
> (emphasis added). Although the words employed in § 136v(b) of FIFRA are different from those in § 5(b) of the Cigarette Smoking Act, their effect is the same. Section 136v(b) exists in the context of what federal law permits the state to regulate, and it simply deprives the state of power to adopt any regulation. This is as broad as the § 5(b) proscription.
>
> We believe also the prohibition of "any" requirement is the functional equivalent of "no" requirement. We see no difference between the operative effect of the two acts.
>
> Moreover, when Congress, in § 136v(b) stated, "Such state shall not impose or continue in effect any requirements for labeling or packaging <u>in addition to or different from</u> those required under this subchapter," it gave a "reliable indicium of congressional intent with respect to state authority." We believe Congress circumscribed the area of labeling and packaging and preserved it only for federal law. With the same stroke, Congress banned any form of state regulation, and the interdiction law is clear and irrefutable.

<u>Arkansas-Platte & Gulf P'ship v. Van Waters & Rogers, Inc.</u>, 981 F.2d at 1179 (emphasis in original)(citations omitted).

The Court begins its preemption analysis with the presumption that Congress does not "cavalierly pre-empt state-law causes of action." <u>Medtronic, Inc. v. Lohr</u>, 518 U.S. at 485. Furthermore, when the text of a preemption clause is susceptible to more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption." <u>Bates v. Dow Agrosciences, LLC</u>, 544 U.S. at 449. The Court agrees with Judge Illston that 15 U.S.C. § 78<i>o</i>-7(o) has no direct impact on CRARA's preemptive effect because the savings clause in that subsection expressly limits its

application to that specific subsection.  See 15 U.S.C. § 78*o*-7(o) ("Nothing in this subsection prohibits the securities commission . . . of any State from investigating and bringing an enforcement action with respect to fraud or deceit against any [NRSRO] or person associated with a nationally recognized statistical rating organization.").  Furthermore, as Judge Illston concludes, this language in subsection (o) demonstrates -- if anything -- Congress' intent not to preempt causes of action related to fraud or deceit under state law as Congress did not include language to that effect in the respective preemption provisions.  See Anschutz Corp. v. Merrill Lynch & Co. Inc., 785 F.Supp.2d at 828-29.

It is necessary to put in perspective the history of SEC regulation of NRSROs and the changes CRARA made to this practice.  Status as an NRSRO confers certain regulatory benefits and imposes certain requirements.  See Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating Organizations, Exchange Act Release No. 55,857, 90 S.E.C. Docket 2032, 2007 WL 1624609, at *1.  The SEC historically undertook the process of identifying NRSROs through the issuance of no-action letters "where the staff has determined, among other things, that the credit rating agency is recognized nationally by the predominant users of credit ratings as issuing credible and reliable ratings."  Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating Organizations, supra, 2007 WL 1624609, at *1.  CRARA "replaces the no-action letter process -- which has been criticized as lacking transparency -- with a registration program and Commission oversight of credit rating agencies that choose to be treated as NRSROs."  Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating Organizations, supra, 2007 WL 1624609, at *1.  Under CRARA's newly enacted provisions, "a credit rating agency seeking to be treated as an NRSRO must apply for, and be granted, registration with the Commission, make public in its application certain information to help persons assess its

credibility, and implement procedures to manage the handling of material nonpublic information and conflicts of interest." Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating Organizations, supra, 2007 WL 1624609, at *1. These newly enacted provisions also provide the SEC

> with rulemaking authority to prescribe: the form of the application (including requiring the furnishing of additional information); the records an NRSRO must make and retain; the financial reports an NRSRO must furnish to the Commission on a periodic basis; the specific procedures an NRSRO must implement to manage the handling of material nonpublic information; the conflicts of interest an NRSRO must manage or avoid altogether; and the practices that an NRSRO must not engage in if the Commission determines they are unfair, coercive, or abusive.

Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating Organizations, supra, 2007 WL 1624609, at *1.

Securities law is an area where state and federal law coexist. See Bates v. Dow Agrosciences LLC, 544 U.S. at 449. Furthermore, some causes of action that relate to conduct by rating agencies would fall under traditional state-law causes of action, such as breach of contract, fraud, misrepresentation claims, defamation, and tortious interference with contracts. See Bates v. Dow Agrosciences LLC, 544 U.S. at 449-50 (" If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly."). As the provisions of 15 U.S.C. § 78o-7 illustrate, one of CRARA's primary purposes is to require NRSROs to register with the SEC if they elect to be treated as an NRSRO. See 15 U.S.C. § 78o-7(a)-(b). The applications for registration must include a variety of information regarding: (i) statistics regarding the performance of credit ratings; (ii) procedures and methodologies to determine credit ratings; (iii) policies and procedures in place to prevent misuse of material, nonpublic information; (iv) the NRSRO's organizational structure; (v) whether the NRSRO has a code of ethics in place, and if not, the reasons for this choice; (vi) conflicts of interest relating to the

issuance of credit ratings; (vii) what securities the NRSRO rates; (viii) certain information about the companies that use their credit ratings, including the amount of net revenues received from them; and (ix) other information that regulations may prescribe.  See 15 U.S.C. § 78*o*-7(a)(1)(B).  Notably, the preemption provisions in CRARA, which appear in subsection (c), immediately follow these procedures for registration set out in subsection (a) through (b).

If the SEC concludes, after notice and opportunity for hearing, that there is a need to protect investors and the public interest because of some NRSRO misconduct as set forth in the statute, the SEC may censure an NRSRO, place limits on it, or suspend or revoke its registration.  See 15 U.S.C. § 78*o*-7(d)(1).  If the SEC concludes, after notice and opportunity for hearing, that the NRSRO "does not have adequate financial and managerial resources to consistently produce credit ratings with integrity," the SEC "may temporarily suspend or permanently revoke the registration of a nationally recognized statistical rating organization with respect to a particular class or subclass of securities."  15 U.S.C. § 78*o*-7(d)(2).  15 U.S.C. § 78*o*-7(e) authorizes the SEC to terminate the NRSRO's registration under some circumstances.  See 15 U.S.C. § 78*o*-7(e).  15 U.S.C. § 78*o*-7(f) forbids an NRSRO from making certain representations regarding: (i) their sponsorship by the United States or one of its agencies; and (ii) their existence as an unregistered credit rating agency. See 15 U.S.C. § 78*o*-7(f).  15 U.S.C. § 78*o*-7(g) forbids NRSROs from misusing nonpublic information in certain ways.  See 15 U.S.C. § 78*o*-7(g).  15 U.S.C. § 78*o*-7(h) requires NRSROs to establish, maintain, and enforce written policies on managing conflicts of interest, and authorizes the SEC to make rules regarding prohibition and disclosure of conflicts of interest.  See 15 U.S.C. § 78*o*-7(h).  15 U.S.C. § 78*o*-7(i) authorizes the SEC to issue rules relating to NRSROs engaging in conduct such as improperly lowering or threatening to lower a credit rating, or modifying a credit rating when receiving compensation to do so.  See 15 U.S.C. § 78*o*-7(i).  15 U.S.C. § 78*o*-7(j)

requires NRSROs to designate a compliance officer to make sure the NRSRO complies with the procedures set forth in subsection (g) and (h).  See 15 U.S.C. § 78*o*-7(j).  15 U.S.C. § 78*o*-7(k) requires NRSROs at intervals to file certain financial statements with the SEC.  See 15 U.S.C. § 78*o*-7(k).  15 U.S.C. § 78*o*-7(l) provides that the procedures set forth in this statute are the sole means of becoming an NRSRO.  See 15 U.S.C. § 78*o*-7(l).  15 U.S.C. § 78*o*-7(m) states that, under securities law, the enforcement and penalty provisions of this chapter, the Exchange Act, apply to statements a credit rating agency makes in the same manner and to the same extent as the provisions apply to statements that a registered public accounting firm or a securities analyst makes.  See 15 U.S.C. § 78*o*-7(m).  The subsection also states that these statements will not qualify as forward-looking statements.  See 15 U.S.C. § 78*o*-7(m).  15 U.S.C. § 78*o*-7(n) authorizes the SEC to make certain regulations to carry out the statute.  See 15 U.S.C. § 78*o*-7(n).  The Court has already discussed the impact of subsection (o).  15 U.S.C. § 78*o*-7(p) authorizes the creation of a government agency to administer some of these rules.  See 15 U.S.C. § 78*o*-7(p).  15 U.S.C. § 78*o*-7(q) authorizes the SEC to create rules regarding public disclosure of credit ratings' performance over time.  See 15 U.S.C. § 78*o*-7(q).  15 U.S.C. § 78*o*-7(r) authorizes the SEC to prescribe rules, for the protection of investors and in the public interest, relating to NRSRO rating methodologies.  See 15 U.S.C. § 78*o*-7(r).  15 U.S.C. § 78*o*-7(s) authorizes the SEC to create rules that standardize the form of credit ratings to make those ratings more understandable and usable, as well as revealing more information about what went into making the particular credit rating, such as the information on which the NRSRO relied and about due diligence it performed.  See 15 U.S.C. § 78*o*-7(s).  15 U.S.C. § 78*o*-7(t) prescribes some rules regarding an NRSRO's internal makeup. See 15 U.S.C. § 78*o*-7(t).  15 U.S.C. § 78*o*-7(u) creates a duty for NRSROs to report tips regarding certain material violations of law.  See 15 U.S.C. § 78*o*-7(t).  15 U.S.C. § 78*o*-7(v) requires

NRSROs to consider certain information regarding issuers that an NRSRO has or acquires.  See 15

U.S.C. § 78*o*-7(v).

The relevant preemption provisions in the statute are as follows:

(c) Accountability for ratings procedures

(1) Authority

The Commission shall have exclusive authority to enforce the provisions of this section in accordance with this chapter with respect to any nationally recognized statistical rating organization, if such nationally recognized statistical rating organization issues credit ratings in material contravention of those procedures relating to such nationally recognized statistical rating organization, including procedures relating to the prevention of misuse of nonpublic information and conflicts of interest, that such nationally recognized statistical rating organization --

(A) includes in its application for registration under subsection (a)(1)(B)(ii) of this section; or

(B) makes and disseminates in reports pursuant to section 78q(a) of this title or the rules and regulations thereunder.

(2) Limitation

The rules and regulations that the Commission may prescribe pursuant to this chapter, as they apply to nationally recognized statistical rating organizations, shall be narrowly tailored to meet the requirements of this chapter applicable to nationally recognized statistical rating organizations.  Notwithstanding any other provision of this section, or any other provision of law, neither the Commission nor any State (or political subdivision thereof) may regulate the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings.  Nothing in this paragraph may be construed to afford a defense against any action or proceeding brought by the Commission to enforce the antifraud provisions of the securities laws.

15 U.S.C. § 78*o*-7(c).  Given that there is a presumption against preemption of state law causes of

action and that a court must construe a statute subject to more than one plausible reading in the

manner that avoid preemption, the Court concludes that these provisions do not preempt some of

theories on which the Plaintiffs' claims under the New Mexico Securities Act rely.  See Bates v.

Dow Agrosciences, LLC, 544 U.S. at 449; Medtronic, Inc. v. Lohr, 518 U.S. at 485.  The Court has considered the scope and structure of 15 U.S.C. § 78$o$-7.  The first preemption provision is more specifically restricted to "the provisions of this section."  15 U.S.C. § 78$o$-7(c)(1).  The second provision does not contain the same qualifier, but the Court must assess the provision within the context of the statute.  A court determines Congress' intent primarily from the text and the statutory framework, although the structure and statute as a whole are relevant as well.  Medtronic, Inc. v. Lohr, 518 U.S. at 485.  Notably, the second provision states that "neither the Commission nor any State . . . may regulate the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings." 15 U.S.C. § 78$o$-7(c) (emphasis added).  That the SEC may also not engage in this activity persuades the Court to interpret this provision more narrowly than the Rating Agency Defendants contend, as the SEC has significant authority under CRARA.  See In re Nat'l Century Fin. Enters., Inc., Inv. Litig., 580 F.Supp.2d at 651.  Thus, the Court concludes that the statute's preemption provisions relate to States: (i) creating and enforcing comparable regulatory schemes requiring the registration of NRSROs; (ii) prescribing rules regarding the form and content of credit ratings that the SEC may issue as prescribed in analogous provisions 15 U.S.C. § 78$o$-7 and the relevant portions of the chapter; (iii) specifying procedures or issuing substantive rules that NRSROs must follow regarding conflicts of interest, the exercise of due diligence, and other specified matters addressed in 15 U.S.C. § 78$o$-7 and the relevant portions of the chapter; and (iv) regulating the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings -- which the SEC also may not do.

This statute would also likely preclude private causes of action that sought to accomplish those same things the States may not do, although it is difficult to speak in specific terms without

factual context.  See Arkansas-Platte & Gulf P'ship v. Van Waters & Rogers, Inc., 981 F.2d at 1179.

CRARA is susceptible, however, to a construction that avoids the preemption of traditional state law

causes of action against credit rating agencies, such as breach of contract claims, defamation claims,

and securities fraud claims, assuming those claims do not rely on theories that would run afoul of

CRARA's preemptive provisions.  See Bates v. Dow Agrosciences, LLC, 544 U.S. at 449;

Medtronic, Inc. v. Lohr, 518 U.S. at 485.  Comparing CRARA to other preemptive language the

Tenth Circuit has considered is helpful:

> Section 136v(b) prohibits a state from imposing "any requirement for labeling or packaging in addition to or different from those required under this subchapter." (emphasis added).  In comparison, section 5(b) of the Cigarette Smoking Act states:
>
>> No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.

Arkansas-Platte & Gulf P'ship v. Van Waters & Rogers, Inc., 981 F.2d at 1179 (emphasis in

original).  The Supreme Court also addressed this second preemption provision, discussed in this

Tenth Circuit case, in Cipollone v. Ligget Group, Inc.  CRARA's language is similar to these

provisions in that, "[n]otwithstanding any other provision of [CRARA], or any other provision of

law, neither the Commission nor any State . . . may regulate the substance of credit ratings or the

procedures and methodologies."  15 U.S.C. § 78o-7(c)(2).  Much like Judge Illston concluded,

however, these provisions would not preempt all state law causes of action against rating agencies:

> As an initial matter, there is no indication in the text of the statute or its legislative history that Congress intended to wipe out all state law causes of action against rating agencies.  The Authorization Provision gives the SEC exclusive authority to enforce the provisions of the CRARA and rules issued by the SEC, but there is no language to indicate that the SEC's exclusive authority extends to enforcement of claims that arise from sources other than the CRARA.  The Limitations Provision is likewise limited, and prohibits only laws that seek to regulate the "substance of

credit ratings" or the "procedures or methodologies" by which NRSROs determine credit ratings.  There is nothing in the legislative record cited by the Agencies to support their expansive preemption argument.

Anschutz Corp. v. Merrill Lynch & Co. Inc., 785 F.Supp.2d at 829 (emphasis in original)(footnote omitted).  CRARA would preempt state causes of action to the extent that they sought to rely on CRARA or the rules issued pursuant to CRARA to establish a cause of action, based on the SEC's exclusive authority to enforce the provisions of the section.  Furthermore, if state causes of action effectively regulated the "substance of credit ratings" or the "procedures or methodologies" by which NRSROs determine their credit ratings, CRARA would also preempt those state causes of action.

The Court notes that the preemption provision in 15 U.S.C. § 78*o*-7(c)(1) would require the Court to consider matters outside the Amended Complaint, specifically filings the NRSRO has made with the SEC.  15 U.S.C. § 78*o*-7(c)(1) (requiring consideration of matters the NRSRO "includes in its application for registration under [a] subsection" within CRARA).  The Rating Agency Defendants have provided no such filings or information for the Court to consider in deciding the Rating Agency Defendants' Motion to Dismiss, which it would be able to consider under rule 12(b)(1).

With respect to the Plaintiffs' allegations in this case, the cause of action on which the Plaintiffs rely under the New Mexico Securities Act is as follows:

> In connection with the offer to sell, sale, offer to purchase or purchase of a security, a person shall not, directly or indirectly:
>
> A.      employ any device, scheme or artifice to defraud;
>
> B.      make an untrue statement of a material fact or fail to state a necessary material fact where such an omission would be misleading; or
>
> C.      engage in an act, practice or course of business which operates or would

operate as a fraud or deceit upon a person.

N.M.S.A. 1978, § 58-13B-30.  The Plaintiffs have based their cause of action on subsection (B), which, akin to rule 10b-5, imposes a duty to not make material misrepresentations.  See Amended Complaint ¶ 128, at 51.  This statute is a generally applicable cause of action that does not specifically regulate NRSROs in a manner that would conflict with CRARA.  Because it is a general cause of action, however, does not mean CRARA would never preempt certain theories on which a plaintiff based such a cause of action.  The Supreme Court's discussion in Cipollone v. Ligget Group, Inc. on the effect the preemption provision in that case had on common-law misrepresentation causes of action based on several different theories is instructive.  The preemption statute in that case is as follows: "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act."  Cipollone v. Liggett Grp., Inc., 505 U.S. at 515.  The plaintiff asserted two theories for his fraudulent misrepresentation claim: (i) that the defendants neutralized the effect of federally mandated warning labels through their advertising; and (ii) intentional fraud and misrepresentation both by false representation of a material fact and by concealment of a material fact.  See Cipollone v. Liggett Grp., Inc., 505 U.S. at 527-28.  The Supreme Court concluded that the first theory relied on the "state-law prohibition against statements in advertising and promotional materials that tend to minimize the health hazards associated with smoking."  Cipollone v. Liggett Grp., Inc., 505 U.S. at 527.  The Supreme Court found that the second theory relied on the "state-law duty not to make false statements of material fact or to conceal such facts."  Cipollone v. Liggett Grp., Inc., 505 U.S. at 528.  The Supreme Court found that federal law preempted the first theory, because "[s]uch a prohibition [on advertising], however, is merely the converse of a state-law requirement that warnings be included in advertising

-261-

and promotional materials." Cipollone v. Liggett Grp., Inc., 505 U.S. at 527 (emphasis in original). In comparison, the Supreme Court did not find that federal law preempted the plaintiff's second theory regarding concealment of material facts "insofar as those claims rely on a state-law duty to disclose such facts through channels of communication other than advertising or promotion." Cipollone v. Liggett Grp., Inc., 505 U.S. at 528. For instance, the Supreme Court noted that, if state law required disclosure of those health risks to a state agency, those claims would not violate the preemption provision, as it only concerned "advertising or promotion." Cipollone v. Liggett Grp., Inc., 505 U.S. at 528. Furthermore, the Supreme Court noted that federal law did not preempt the plaintiff's claims that related to material misstatements of fact made in advertisements, as they were not predicated on a duty "'based on smoking and health' but rather on a more general obligation -- the duty not to deceive." Cipollone v. Liggett Grp., Inc., 505 U.S. at 528-29. The Supreme Court noted that there was no indication in the statute at issue that Congress intended to "insulate cigarette manufacturers from the longstanding rules governing fraud." Cipollone v. Liggett Grp., Inc., 505 U.S. at 529. The Supreme Court found that the explicit reservation of authority to the Federal Trade Commission "to identify and punish deceptive advertising practices" undercut any such argument. Cipollone v. Liggett Grp., Inc., 505 U.S. at 529. Thus, the Supreme Court construed the phrase "based on smoking and health" in a way "so as not to proscribe the regulation of deceptive advertising." Cipollone v. Liggett Grp., Inc., 505 U.S. at 529. While Cipollone v. Liggett Grp., Inc. was a plurality opinion, the Supreme Court has recognized in later opinions that the opinion's analysis is sound and has rejected arguments that would have undercut the reasoning in Cipollone v. Liggett Grp., Inc. See Altria Grp., Inc. v. Good, 555 U.S. 70, 80-84 (2008)("Once that erroneous distinction is set aside, it is clear that our holding in Cipollone that the common-law fraud claim was not pre-empted is directly applicable to the statutory claim at issue in this case.").

In Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355 (2002), the Supreme Court interpreted the word "regulate" in the context of a savings clause in the Employee Retirement Income Security Act. That clause related to the regulation of insurance. See Rush Prudential HMO, Inc. v. Moran, 536 U.S. at 365-66. The Supreme Court stated that, "in deciding whether a law 'regulates insurance' under ERISA's saving clause, we start with a 'common-sense view of the matter,' under which 'a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry.'" Rush Prudential HMO, Inc. v. Moran, 536 U.S. at 365-66. CRARA contains a similar provision stating that the SEC and the States may not "regulate the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings." 15 U.S.C. § 78o-7(c)(2). Given that Congress enacts legislation with knowledge of existing law, the Court will presume that Congress intended this term regulate to operate in the same manner under CRARA. See South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 351 (1998); Altria Grp., Inc. v. Good, 55 U.S. at 85-86 (recognizing that previous precedents construing the phrase "relating to" under ERISA were persuasive when interpreting a preemption clause in a separate statute).

The Plaintiffs cause of action against the Rating Agency Defendants relies on this provision of the New Mexico Securities Act that forbids a person from "mak[ing] an untrue statement of a material fact or fail[ing] to state a necessary material fact where such an omission would be misleading" in connection with certain securities transactions. N.M.S.A. 1978, § 58-13B-30. The Plaintiffs' theories under that cause of action against the Rating Agency Defendants are as follows. First, the Rating Agency Defendants issued false and misleading ratings on the certificates in question. See Amended Complaint ¶¶ 72-79, at 36-38. Second, the Rating Agency Defendants used outdated and defective models when assigning their ratings. See Amended Complaint ¶¶ 82-84, at

-263-

39-41.  Third, the Rating Agency Defendants failed to conduct reasonable due diligence into the underwriters'/servicers' representations.  See Amended Complaint ¶¶ 85-86. at 41-42.  Fourth, the Rating Agency Defendants lacked the resources to adequately and properly rate the MBS certificates.  See Amended Complaint ¶ 87, at 42.  Fifth, the Rating Agency Defendants were not sufficiently independent when assigning their ratings.  See Amended Complaint ¶¶ 88-89, at 42-43.  The first theory is the same theory that the Supreme Court found permissible in Cipollone v. Liggett Group, Inc.  Much like the situation in Cipollone v. Liggett Group, Inc., where Congress reserved to the FTC the right to prosecute claims regarding deceptive advertising practices, Congress also reserved to the SEC the right to prosecute securities fraud claims.  15 U.S.C. § 78$o$-7(c)(2) ("Nothing in this paragraph may be construed to afford a defense against any action or proceeding brought by the Commission to enforce the antifraud provisions of the securities law.").  That language indicates Congress's intent not to insulate credit rating agencies "from the longstanding rules governing fraud," in this case securities fraud.  Cipollone v. Liggett Grp., Inc., 505 U.S. at 529.  Thus, Congress did not preempt state law claims requiring credit rating agencies to comply with the "more general obligation" regarding their "duty not to deceive" under securities law.  Cipollone v. Liggett Grp., Inc., 505 U.S. at 528-29.  Because the SEC as well as the States may not regulate the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings, the Court does not find that this language preempts general causes of action for securities violations under state law, particularly those based on a misrepresentation theory.  Furthermore, applying a commonsense test that the Supreme Court used in Rush Prudential HMO, Inc. v. Moran when a statute used the term "regulate," the phrase "regulate the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings" does not suggest the

Congress intended to preempt claims regarding fraud or misrepresentation, particularly given the clause reserving such enforcement authority to the SEC.  15 U.S.C. § 78*o*-7(c)(2).  See Rush Prudential HMO, Inc. v. Moran, 536 U.S. at 365-66.  While such a theory under a securities cause of action may have an "impact on the [NRSRO] industry," it is not "specifically directed toward that industry.'"  Rush Prudential HMO, Inc. v. Moran, 536 U.S. at 365-66.  As the Court has previously concluded, the Plaintiffs have set forth sufficient factual allegations that S&P did not believe their ratings when they issued them.  This theory that the Plaintiffs have asserted does not purport to require the Rating Agency Defendants to follow specific practices in issuing ratings, but only to issue ratings in a non-misleading manner.

The second, third, and fourth theories, however, would constitute regulation of the "substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings."  15 U.S.C. § 78*o*-7(c)(2).  Those theories rely on the premise that the credit rating agencies used faulty practices and procedures to reach their ratings.  Specifically, those theories would require the Rating Agency Defendants: (i) to change or update their specific models; (ii) to conduct additional due diligence as part of their procedure when arriving at their credit rating; and (iii) to employ additional staff or to acquire additional resources to properly arrive at a credit rating under their methodologies.  The Court notes that the third theory regarding due diligence could potentially fall under the first preemption provision rather than the second, as 15 U.S.C. § 78*o*-7 authorizes the SEC to require NRSROs to provide certain information regarding whether "third party due diligence services have been used by the" NRSRO.  15 U.S.C. § 78*o*-7.  The allegations in the Amended Complaint, however, more directly relate to the Rating Agency Defendants' failure to conduct their own due diligence rather than anything related to third-party due-diligence services or providing information related to those

services.  Thus, the Court reads the allegations as asserting a theory based on the Rating Agency Defendants' failure to conduct adequate due-diligence investigations into the other Defendants' representations to the Rating Agency Defendants, which would fall within the "procedures and methodologies by which" an NRSRO "determines credit ratings."  15 U.S.C. § 78o-7(c)(2).  See Amended Complaint ¶¶ 85-86, at 36-37.

Determining whether federal law preempts the fifth theory would require the Court to consider matters outside the Amended Complaint, specifically filings an NRSRO has made with the SEC.  See 15 U.S.C. § 78o-7(c)(1) (requiring consideration of matters an NRSRO "includes in its application for registration under [a prior] subsection," or that it "makes and disseminates in reports pursuant to" a separate federal statute).  CRARA's first preemption provision, which does not deal with regulating the substance of credit ratings, applies to "procedures relating to . . . conflicts of interest."  15 U.S.C. § 78o-7(c)(1).  When one section in a statute contains language and another section does not contain that language, courts presume that "Congress acts intentionally and purposely in the disparate inclusion or exclusion."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62 (2006).  This language regarding conflicts of interest does not appear in the second preemption provision in CRARA.  See 15 U.S.C. § 78o-7(c)(1).  A court should presume that Congress acted "intentionally and purposely in the disparate inclusion or exclusion."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 62.  The Court concludes that the second provision does not relate to conflicts of interest based on the express inclusion of language regulating conflicts of interest in the first preemption provision.  The Rating Agency Defendants have provided no such filings or information for the Court to consider in deciding the Rating Agency Defendants' Motion to Dismiss.  While the Court would have great flexibility to consider this evidence under rule 12(b)(1), the Rating Agency Defendants have not directed the Court to the evidence it would need

to decide this issue. Thus, the Rating Agency Defendants can reurge that argument regarding the fifth theory as part of a motion for summary judgment.

Consequently, the Court declines to adopt the Rating Agency Defendants' preemption argument with respect to the first and fifth theories of recovery that the Plaintiffs have asserted, but will adopt this argument with respect to the second, third, and fourth theories. While the Plaintiffs have requested leave to amend on this issue, a Court does not need to provide leave to amend when amendment would be futile. See Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d at 859. The Plaintiffs could not replead these second, third, and fourth theories in a way that would avoid preemption, as those theories fundamentally rely on a basis that would fall within the second preemption provision in CRARA. See Cipollone v. Liggett Grp., Inc., 505 U.S. at 528-29. Furthermore, the Court has allowed the Plaintiffs' claims under the New Mexico Securities Act to proceed against the Rating Agency Defendants under some theories.

**IT IS ORDERED** that the Court will grant in part and deny in part: (i) the Opposed Motion to Dismiss of Defendants Greenwich Capital Acceptance, Inc. (n/k/a RBS Acceptance Inc.), Structured Asset Mortgage Investments II, Inc., Credit Suisse Securities (USA) LLC, RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.), Robert J. McGinnis, Carol P. Mathis, Joseph N. Walsh III, John C. Anderson, James M. Esposito, Jeffrey L. Verschleiser, Michael B. Nierenberg, Jeffrey Mayer, Thomas F. Marano, filed July 11, 2011 (Doc. 125); and (ii) the Rating Agencies' Motion to Dismiss with Prejudice the Amended Class Action Complaint, filed February 11, 2011 (Doc. 128)("Rating Agency Defendants' Motion"). The Court will grant the Plaintiffs leave to amend consistent with its discussion in the Memorandum Opinion and Amended Order. The Plaintiffs have constitutional standing to pursue their claims against the Defendants. The Plaintiffs' claims are not time-barred under federal securities law or the New Mexico Securities Act. The Plaintiffs have

sufficiently pled allegations about material misrepresentations or omissions against the Defendants other than the Rating Agency Defendants with respect to: (i) their abandonment of their loan underwriting guidelines; (ii) their improper appraisal practices regarding the 2006-5 offering; (iii) the inflated LTV ratios regarding the 2006-5 offering; and (iv) the allegations regarding the credit ratings with respect to the 2006-5 and 2007-4 offerings.  The Plaintiffs have adequately alleged their section 12(a)(2) claims.  The Plaintiffs have no obligation to plead reliance on the alleged misrepresentations related to the 2006-5 offering.  The Plaintiffs have adequately stated a control-person claim.  Lack of causation does not undercut the Plaintiffs' claims related to the 2006-5 offering.   While the Plaintiffs have not sufficiently alleged that their claims satisfy the jurisdictional provisions of the New Mexico Securities Act, they have sufficiently alleged that the Rating Agency Defendants can be liable under the New Mexico Securities Act.  Against the Rating Agency Defendants, the Plaintiffs have sufficiently pled allegations about material misrepresentations or omissions with respect to Defendants McGraw-Hill Companies, Inc. and Standard & Poor's Rating Services, but not against Defendants Fitch, Inc., Fitch Ratings, Moody's Corp., or Moody's Investors Services, Inc.  The First Amendment of the United States Constitution does not bar the Plaintiffs' claims against the Rating Agency Defendants.  Lastly, CRARA preempts some of the theories on which the Plaintiffs base their claims under the New Mexico Securities Act against the Rating Agency Defendants.

UNITED STATES DISTRICT JUDGE

-268-

*Counsel:*

David J. Goldsmith
Laura Killian Mummert
Paul Scarlato
Stefanie J. Sundel
Thomas A. Dubbs
Labaton Sucharow, LLP
New York, New York

*-- and --*

William H. Carpenter
Carpenter Stout & Ransom, Ltd.
Albuquerque, New Mexico

*-- and --*

David F. Cunningham
Thompson, Hickey, Cunningham, Clow & April, P.A.
Santa Fe, New Mexico

     *Attorneys for Plaintiff Genesee County Employees' Retirement System*

Darren J. Robbins
Jonah H. Goldstein
Danielle S. Myers
Robbins Geller Rudman & Dowd, LLP
San Diego, California

     *Attorneys for Plaintiffs Maryland-National Capital Park &*
       *Planning Commission Employees' Retirement System and*
       *Midwest Operating Engineers Pension Trust Fund*

Victor R. Ortega
Jaime Rae Kennedy
Montgomery & Andrews, P.A.
Santa Fe, New Mexico

*-- and --*

Robert F. Serio
Aric H. Wu
Jason W. Myatt
Jonathan C. Dickey
Dean J. Kitchens
Gibson, Dunn & Crutcher, LLP
New York, New York

> *Attorneys for Defendants Greenwich Capital Acceptance, Inc.,*
> *Structured Asset Mortgage Investments II, Inc.,*

Victor R. Ortega
Jaime Rae Kennedy
Montgomery & Andrews, P.A.
Santa Fe, New Mexico

*-- and --*

Robert F. Serio
Aric H. Wu
Gibson, Dunn & Crutcher, LLP
New York, New York

> *Attorneys for Defendants Robert J. McGinnis, Carol P. Mathis,*
> *Joseph N. Walsh III, John C. Anderson, and James M. Esposito,*
> *Credit Suisse Securities LLC*

Dani R. James
Jade A. Burns
Kramer Levin Naftalis & Frankel, LLP
New York, New York

*-- and --*

Eric R. Burris
Brownstein Hyatt Farber Schreck
Albuquerque, New Mexico

> *Attorneys for Defendant Jeffrey L. Verschleiser*

Jaime Rae Kennedy
Montgomery & Andrews, P.A.
Santa Fe, New Mexico

*-- and --*

Joel Haims
Allison Schnieders
Morrison & Foerster LLP
New York, New York

 *Attorneys for Defendant Michael B. Nierenberg*

Eric R. Burris
Brownstein Hyatt Farber Schreck
Albuquerque, New Mexico

*-- and --*

Candace Camarata
Richard Edlin
Ronald Lefton
Greenberg Traurig, LLP
New York, New York

 *Attorneys for Defendant Jeffrey Mayer*

Joel Haims
Allison Schnieders
Morrison & Foerster LLP
New York, New York

*-- and --*

Victor R. Ortega
Jaime Rae Kennedy
Montgomery & Andrews, P.A.
Santa Fe, New Mexico

 *Attorneys for Defendant Thomas F. Marano*

Victor R. Ortega
Jaime Rae Kennedy
Montgomery & Andrews, P.A.
Santa Fe, New Mexico

*-- and --*

Bradley J. Butwin
Jonathan Rosenberg
William J. Sushon
O'Melveny & Myers, LLP
New York, New York

    *Attorneys for Banc of America Securities LLC*

Luis G. Stelzner
Robert P. Warburton
Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A.
Albuquerque, New Mexico

*-- and --*

James J. Coster
Josh M. Rubins
Saterlee Stephens Burke & Burke, LLP
New York, New York

    *Attorneys for Defendants Moody's Corp.*

Floyd Abrams
Adam Zurofsky
Christopher A. Gorman
Tammy Lynn Roy
Cahill Gordon & Reindel, LLP
New York, New York

*-- and --*

Mark F. Sheridan
Kristina Martinez
Holland & Hart, LLP
Santa Fe, New Mexico

    *Attorneys for McGraw-Hill Companies, Inc.*

Michael R. Comeau
Marshall G. Martin
Comeau, Maldegen, Templeman & Indall, LLP
Santa Fe, New Mexico

*-- and --*

-272-

Andrew J. Ehrlich
Jason D. Williamson
Martin Flumenbaum
Julian Wood
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
New York, New York

*Attorneys for Fitch Ratings*